UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | | |
|---|---|---|
| CHARLES L. WALDEN | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO. 5:22-CV-00238-KKC** |
| | ) | |
| VS. | ) | |
| | ) | **EMERGENCY MOTION TO COMPEL** |
| | ) | **CR 35 EXAMINATION and MOTION** |
| ENTERPRISE SERVICES GROUP, LLC, | ) | **FOR EXPEDITED BRIEFING** |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The Defendants, Enterprise Services Group, LLC, and Clarence M. Howard, by counsel, respectfully move for an Order compelling Plaintiff, Charles L. Walden, to attend the Fed. R. Civ. P. 35 Examination scheduled with Dr. Tomothy Kriss on Friday, April 12, 2024. Defendants have expended exhaustive efforts to resolve this issue extra-judicially. Unfortunately, the combination of delayed responses, unreasonable requests, and seemingly tactical 11th-hour demands necessitated the filing of the instant motion. With the exam scheduled to take place in less than one month's time, Defendants respectfully request an expedited briefing schedule.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Motor Vehicle Accident

This action arises from a motor vehicle accident in Madison County, Kentucky. (D.E. 1-1 at ¶ 2). On or about August 10, 2020, Plaintiff, while traveling on the Northbound exit ramp of Exit 87 on I-75, smashed into the rear of Defendant Howard's disabled box-truck parked on the right edge of the ramp, a portion of which was situated partially across the fog line and in the traveled portion of the roadway. Plaintiff stating he was "tired and did not see Unit 2 [Walden] parked on the edge of the ramp," *See* **Exhibit 1**, Collision Report at p. 2, or the reflective warning

triangles placed behind the disabled truck by Walden, "Unit 1 [Plaintiff] struck the rear of Unit 2 [Walden]." *Id.*

    2.  <u>Medical Treatment and Recovery</u>

EMS records documenting Plaintiff's condition at the scene of the accident reflect an initial Glasgow Coma Score of 15 (normal), no loss of consciousness, and no alteration in consciousness noted. Mental status examination was explicitly "normal." Plaintiff's only complaint was **left** hip pain with movement. Plaintiff reported his left hip had "given out" after walking 100 yards from the accident scene. EMS technicians noted a laceration to the right hand and small head abrasion. Plaintiff explicitly denied any spinal column pain. There were no changes in condition *en route* to the University of Kentucky emergency room. Indeed, Plaintiff was texting on his phone "the entire trip."

Upon admission to the University of Kentucky emergency room, Plaintiff reported, for the first time, that he hit his head and had a brief loss of consciousness. Again, he had a GCS of 15. Now, Plaintiff's only complaint was **right** hip pain. Physical examination of the cervical, thoracic, and lumbar spine was "normal." CT scans of the chest, abdomen and head were also all normal. The **only diagnosis** was a right acetabulum pelvis fracture.

An orthopedic consultation was scheduled the following day, August 11, 2020. As the prior day, Plaintiff's only complaint was right hip pain. He denied any numbness, tingling, nausea, or vomiting. He further denied any history of alcohol, tobacco, or recreational drug use. Both neurological examination and mental status examination were normal. Plaintiff provided written and oral consent for surgical repair of the fracture.

On August 12, 2020, Plaintiff underwent open reduction internal fixation of posterior pelvic wall of the right acetabulum with two plates. Plaintiff's records reflect a successful surgery

with remarkable results. To be sure, Plaintiff's deposition testimony confirms that his accident-related treatment was essentially limited to emergency room encounter on date of accident, surgical repair of **right** pelvic fracture and corresponding hospital stay, physical therapy regiment, and one nonspecific emergency room visit. He further testified that he was not taking any medication for the injuries he sustained as a result of the accident. With the exception of the one emergency room visit which appears to be wholly unrelated to the accident, Plaintiff's summary of treatment is consistent with the medical records documenting same. In stark contrast to the opinions of Plaintiffs' retained experts, the medical records depicting Plaintiff's recovery demonstrate a remarkable and virtually complete recovery of injuries sustained in this accident.

| **Date** | **Provider** | **Treatment/Notes** |
| --- | --- | --- |
| 8/13/2020 | Univ. of KY Healthcare Dr. Fryer (Orthopedics) | "Doing well" |
| 8/14/2020 | Univ. of KY Healthcare Dr. Garrett (Orthopedics) | "Doing well" |
| 8/15/2020 | Univ. of KY Healthcare Dr. Hare (Orthopedics) | "Doing well." Pain is well controlled. |
| 8/17/2020 | Results Physiotherapy (Physical Therapy) | "No complaints of pain this morning." Patient tolerated 15 minutes of therapy. |
| 8/17/2020 | Univ. of KY Healthcare Dr. Kalbac (Orthopedics) | "Doing well." Pain is well controlled. |
| 8/31/2020 | Univ. of KY Healthcare Dr. Raisley (Orthopedics) | Outpatient office visit 3-Weeks Post MVA 4/10 pain Diagnosis: pelvic fracture Not taking any prescription opioids / pain medication. |
| 9/14/2020 | Baptist Health APRN Campbell | <u>Chief complaint</u>: **multiple socially transmitted diseases requiring multiple antibiotics**.<br>• Recent MVA causing hip fracture and requiring surgery is noted. |

3

| | | |
|---|---|---|
| | | • Plaintiff is not taking any prescription pain medications.<br>• Plaintiff states he is engaged in physical therapy.<br>• Systematic proactive review systems questioning is "negative."<br>• Physical exam confirms<br>  ○ Full cervical motion<br>  ○ Alert and oriented<br>  ○ Normal mental status<br>  ○ Normal thought<br>• Diagnoses:<br>  ○ Socially Transmitted Disease<br>  ○ Recent surgery for hip fracture |
| 9/21/2020 | Univ. of KY Healthcare<br>Dr. Aneja | • Plaintiff notes the right hip pain has significantly decreased.<br>• 14-point proactive review of systems questioning is negative.<br>• Only requires over-the-counter pain medicine.<br>• Normal neurological exam.<br>• Full right hip flexion extension on exam.<br>• Right hip x-rays are fine.<br>• Plaintiff has some weakness, and physical therapy is started |
| 9/25/2020 | Physical Therapy | Initial Evaluation<br>• Right Hip Pain: 4/10 |
| 10/28/2020 | Physical Therapy | 10-Weeks Post-Surgery<br>• Pain 2/10<br>• 85% improvement in pain after 10 Physical Therapy sessions<br>• "Above average improvement noted at this time"<br>• "potential for continued improvement is good"<br>• Goals Achieved:<br>  ○ Ambulating 50 feet x 30 repetitions without assistance or cane<br>  ○ Full weight-bearing |

| 11/2/2020 | Physical Therapy | <ul><li>2/10 Pain Rating</li><li>"Patient progressing well"</li><li>Only complaint is bilateral hip soreness</li></ul> |
|---|---|---|
| 11/3/2020 | Physical Therapy | <ul><li>2/10 Pain</li></ul> |
| 11/5/2020 | Physical Therapy | <ul><li>2/10 Pain</li><li>Above average improvement</li></ul> |
| 11/24/2020 | Physical Therapy | <ul><li>2/10 Pain</li><li>Able to achieve full active and passive range of motion in the hip in all directions</li></ul> |
| 12/2/2020 | Physical Therapy | <ul><li>2/10 Pain Rating</li><li>Tolerated all physical therapy without pain</li><li>But reports fatigue and soreness</li><li>Patient reports 100% improvement since starting physical therapy but 75% of normal</li></ul> |
| 12/11/2020 | Physical Therapy | 4-Months Post MVA<ul><li>**"No Pain"**</li><li>Full symmetric range of motion in all planes of both hips</li></ul> |
| 12/15/2020 | Physical Therapy | No Show. Failed to Attend |
| 12/16/20 | Physical Therapy | No Show. Failed to Attend |
| 12/17/20 | Physical Therapy | No Show. Failed to Attend |
| 12/29/2020 | Physical Therapy | No Show. Failed to Attend |
| 1/5/2021 | Physical Therapy | <ul><li>Summary of Treatment to Date<ul><li>17 Total Physical Therapy Sessions</li><li>10 Total "No Shows"</li></ul></li><li>"Tolerated physical therapy today with minimal pain and minimal difficulty"</li><li>Above average improvement noted</li></ul> |
| 1/8/2021 | Physical Therapy | Pain: 2/10 |
| 1/12/21 | Physical Therapy | Pain: 2/10 |
| 1/25/21 | Physical Therapy | <ul><li>Pain: 2/10</li><li>Patient: "Strength is all I am lacking."</li><li>Patient reports increased exercises and activities over the past two weeks.</li></ul> |
| 1/27/2021 | Baptist Health Nuse Practitioner Campbell | <ul><li>Chief complaint is headache, status post recent MVA</li><li>Proactive review systems questioning is explicitly negative for musculoskeletal symptoms or muscle pain.</li></ul> |

| | | |
|---|---|---|
| | | • Proactive review systems questioning is negative for "all other symptoms." <br> • Physical examination of the back shows full range of motion but tenderness in the thoracic spine <br> • Thoracic MRI ordered <br>   ○ Note: Plaintiff failed to schedule MRI. <br> • Diagnosis: <br>   ○ "Thoracic spine" <br>   ○ THC Abuse |
| 2/5/2021 | Physical Therapy | 6-Months Post-MVA <br> • Pain: 2/10 <br> • Complaint of low back pain today, with no specific cause identified <br>   ○ First post-MVA complaint or suggestion of back pain. |
| 2/9/2021 | Physical Therapy | Final Physical Therapy Visit Attended <br> 5 Months, 4 Weeks Post MVA <br> • Pain: 2/10 <br> • FOTO functional outcome survey has improved from 39 to 72, which is "better than predicted compared to other similar patients" |
| 3/3/2021 | Physical Therapy | **Discharge Summary Only (No Treatment)** <br> • 22 Total Visits (13 Cancelled or No show) <br> • Last visit was 2/9/21 <br> • Intake Function Score was 39 (Stage 2 - Household Ambulation). Current Score is 72 (Stage 4 - Advanced Ambulation). <br>   ○ For context, Stage 5 represents Athletic Ability. <br> • Average satisfaction score 100%. |

3.  Unrelated Post-MVA Medical Treatment

Plaintiff's accident-related treatment presumably ended with his final physical therapy visit on February 9, 2021. Thereafter, nearly 11-months elapsed before Plaintiff's next medical

encounter – an encounter which was wholly unrelated to the underlying accident, but also served to confirm Plaintiff's recovery from injuries sustained in the accident. In fact, the same is true with respect to all medical treatment Plaintiff received over the course of the entire 2022 calendar year.

| **Date** | **Provider** | **Treatment/Notes** |
|---|---|---|
| 1/5/2022 | St Joseph Berea, Emergency Room | Unrelated to MVA <br>• Worried about possible spider bite to R forearm. Thought it could be from working w trowel and concrete mixer. Patient most likely with overuse syndrome from working and constant wrist movement. <br>• Diagnosis: Acute R distal forearm pain. |
| 9/24/2022 | St Joseph Berea, Emergency Room | Unrelated to MVA <br>• Three fingers caught in an angle grinder. <br>• As part of systematic proactive review systems questioning, <br>    ○ Explicitly denies any and all neck pain. <br>    ○ Explicitly denies any and all back pain. <br>    ○ Explicitly denies any and all headache. <br>    ○ Explicitly denies any difficulty walking. <br>    ○ Explicitly denies any decreased memory. <br>    ○ Explicitly denies any eye or vision problems. <br>• Physical examination of the head is explicitly "normal." <br>• Physical examination of the neck is explicitly "normal." <br>• Physical examination of the back is explicitly "normal." <br>• Plaintiff expressly denies any history of alcohol, tobacco, or recreational drug use. |

| | | |
|---|---|---|
| | | • The ER physician "soak[s] the fingers in saline and chlorhexidine as the hands are filthy."<br>• **Patient leaves the emergency room before the completion of treatment.** |
| 9/27/2022 | Univ. Of Kentucky Emergency Room | Unrelated to MVA<br>• Laceration of three fingers from "working with an angle grinder" three days previous<br>• "Denies any other medical complaints."<br>• "Denies pain but says he is uncomfortable."<br>• Proactive review of systems questioning negative for back pain, joint pain.<br>• Proactive review of systems questioning is negative for all systems. |
| 10/21/2022 | Baptist Health Nurse Practitioner Campbell | Unrelated to MVA<br>• "**LEFT** hip pain for 2 to 3 months"<br>• "**LEFT** low back pain associated with the left hip pain"<br>• **"No prior left hip pain"**<br>• **"No recent left hip injury"**<br>• "MVA one year ago, status post RIGHT hip surgery"<br>• Tylenol works well for pain when needed, at least once a day<br>• Reports needing to stand and stretch every 20 to 30 minutes while sitting<br>• Detailed neurological examination is normal:<br>    ○ normal gait<br>    ○ normal coordination<br>    ○ alert and oriented times three<br>    ○ normal mental status exam<br>    ○ normal attention<br>    ○ normal mood<br>    ○ normal speech<br>    ○ normal behavior<br>• Diagnosis: chronic **left hip pain**, **left low back pain**<br>• Refer to Physical Therapy |

|  |  | ○ **Declined by Patient** |
|  |  | • Prescriptions: Robaxin muscle relaxer, topical Voltaren anti-inflammatory gel |
| 12/29/22 | St Joseph Berea, Emergency Room | 1 Year, 4 ½ Months Post-MVA<br>• RIGHT-SIDED low back pain **after patient "fell yesterday."**<br>• Hydrocodone not helping<br>• No other injuries<br>• Gait is steady<br>• Proactive review of systems questioning is positive for low back pain,<br>• **All other proactive review of systems questioning is "negative."**<br>• Past medical history includes osteoarthritis<br>• Physical exam: full range of motion with the right hip, lumbar spine nontender, right hip nontender<br>• "Neurologically intact"<br>• Mental status examination "at baseline"<br>• CT scans of the pelvis and hip are unremarkable for new trauma or new findings<br>• Diagnosis: **ACUTE right** low back pain without sciatica |

4. "New Injuries" More Than 2-Years After Collision

Then, out of the blue, Plaintiff's attorney requests a "memory workup" with Dr. Geile. *See* **Exhibit 2**, 1/9/2023 Medical Record, Dr. Geile ("Attorney wants memory work up"). It is during this encounter that Plaintiff first begins complaining of decreased memory and increased headaches which Plaintiff is now attributing to the subject collision. Around this same time, Plaintiff also begins complaining of new onsets of pain in his right hip and low back pain which Plaintiff attributes exclusively to the subject accident. *See* **Exhibit 3**, 2/10/23 Medical Record, Nurse Practitioner Campbell. When reporting these new symptoms Plaintiff conveniently neglects

to address the unrelated and far more recent December 2022 fall incident in which Plaintiff first complained of right-sided low-back pain. *Compare* **Exhibit 3** with **Exhibit 4**, 12/29/22 Medical Record, St. Jospeh Berea ("R[ight] hip pain after mechanical fall yesterday evening."). Two-months later, Plaintiff presented to Dr. Greg Grau (orthopedics) with complaints of right hip pain. Here, Plaintiff provided a history of a severe motor vehicle accident in 2011 and a subsequent accident "within the past year." In addition to neglecting to mention the fall-injury occurring only 3 ½ months earlier, Plaintiff continued to provide a misleading timeline with respect to the underlying accident.[1] Plaintiff treated with Dr. Grau on three additional occasions over the next four months. Plaintiff's visit with Dr. Grau on August 9, 2023, represents the last occasion Plaintiff received medical treatment in connection with the underlying accident. ("without any other complaints. Is not having radicular symptoms. Significantly improved. . . States has improved enough that I will see back prn.").

  5. <u>New Injuries Alleged by Plaintiff's Experts</u>

    i. **<u>Timothy Wilson, M.D. (Orthopedic Surgeon)</u>**

  Dr. Wilson was retained by Plaintiff for the limited purpose of offering expert testimony in this action. Dr. Wilson is not a treating physician, but rather, examined Plaintiff on November 30, 2023, conducted an extremely limited review of select medical records post-dating the 2020 collision, and authored a CR 26 Report thereafter. Dr. Wilson did **<u>not</u>** review a single medical record documenting Plaintiff's injuries and conditions prior to the subject accident. *See* DE 97-1 at pp 1-2.

  Dr. Wilson offers the opinion that Plaintiff currently suffers a 10% whole person consisting of the following: acetabular fracture (3%), decreased hip range of motion (4%), and substance

---

[1] In stark contrast to the one-year time frame represented by Plaintiff, over 2 years and 8 months had elapsed between the date of the accident and Plaintiff's encounter with Dr. Grau.

abuse (3%). Despite having failed to review the first medical record pre-dating the subject accident, Dr. Wilson attributed a full 50% of Plaintiff's impairment rating to the subject accident. Dr. Wilson further opined that Plaintiff will likely need a right total hip arthroplasty at an unknown future date. While admitting that Plaintiff's 2011 injury, standing alone, would have necessitated an identical procedure, Dr. Wilson nevertheless attributes Plaintiff's need for the hip replacement as being 50% related to the 2020 motor vehicle collision and 50% to the 2011 motor vehicle collision.

### ii.  **David Changaris, M.D. (Neurosurgeon)**

Dr. Changaris was also retained as a non-treating expert witness. Dr. Changaris' likewise failed to review any medical records pre-dating the subject accident. *See* DE 97-2 at p. 1. The records that were reviewed relating to the underlying collision were limited to those selected by Plaintiff's counsel. Dr. Changaris apparently conducted an examination of Plaintiff, but his report neglects to identify the date of same.

Many, if not most, of Dr. Changaris' opinions are seemingly based to a large degree on the subjective complaints relayed by Plaintiff on the date of the examination. That is, the majority of Plaintiff's subjective complaints documented by Dr. Changaris are contradictory to and/or inconsistent with the medical records created by the physicians actually providing treatment to Plaintiff. For example, Dr. Changaris CR 26 Report represents the first and only instance of Plaintiff ever complaining of any of the following injuries in relation to the 2020 collision: 1) Neck Pain, 2) Left Leg Pain, 3) Right Knee Pain, 4) Left Ankle Pain, 5) Left Foot Pain, 6) Appetite Changes, 7)Sleep Difficulties, 8) Vision Changes, 9) Relationship Difficulties, 10) Hearing Difficulties, 11) Emotional Changes, and 12) Decreased Activity. Of course, Plaintiff's purported complaints of headaches and concentration are consistent with only a single alternative encounter: Dr. Gile's January 9, 2023 "memory workup" undertaken at the request of Plaintiff's attorney.

That leaves only two other complaints highlighted by Dr. Changaris: right hip pain and low back pain. Regarding the former, right hip pain, Dr. Changaris does not even mention, let alone address, the records from Plaintiff's treating providers demonstrating the near resolution of said pain by February 9, 2021, at the latest.

Notwithstanding these extreme contradictions in Plaintiff's well-documented recovery, and seemingly based on nothing more than his physical and mental examination of Plaintiff and analysis of a "FallTrak Balance Video Posturography Test," Dr. Changaris proceeds to offer the following opinions, all of which he attributes exclusively to the 2020 motor vehicle accident:

1. Upper Extremity Impairment resulting in 7% whole person impairment.
2. Traumatic Brain Injury.
3. Early signs of Parkinson's disease caused by Traumatic Brain Injury.
4. Severe risk of future falls.
5. Require "total nursing support within 10 years."
6. Require long-term day-care in 20 years ($1,603/month).
7. Require nursing home care in private room within 25 years ($8,821/month).
8. Inability to ever return to gainful employment.

6. *Brief* Clinical Summary Prior To August 10, 2020

Plaintiff's medical records prior to the 2020 collision, which were not reviewed by Plaintiff's non-treating experts document a lengthy history of injuries and medical conditions. To be sure, in 2012, Plaintiff was involved in a collision resulting in many of the same injuries he alleges were sustained in the 2020 collision. One significant difference, however, is that the 2012 injuries were far more significant than those he is claiming in relation to this collision.

On July 6, 2012, at age 20, Plaintiff Mr. Walden was a pedestrian struck head-on by a motor vehicle traveling 45 mph. His Glasgow coma scale at the scene was three, the lowest possible. Toxicology testing was positive for marijuana and benzodiazepines.

Plaintiff was intubated at the scene, and also had left tension pneumothorax relieved with needle thoracotomy. His coma score was 1-4-1 on arrival at UK hospital. Intracranial pressure

monitoring showed completely normal pressure for the next six days, with the exception of a spike during orthopedic surgery.

After waiting several days to make sure the brain pressure was okay, Mr. Walden underwent left femur intermedullary nail placement followed by open reduction internal fixation of a right acetabulum pelvic fracture on July 6, 2012. Mr. Walden required tracheostomy and percutaneous gastrostomy. Plaintiff was diagnosed with a severe traumatic brain injury. Luckily, brain surgery was not required, but did require sedation the entire time he was on a ventilator. Additionally, Plaintiff sustained fractures of the C-7 spinous process, right collarbone, and right shoulder blade. Following a 7-month inpatient hospital stay, Plaintiff was transferred to inpatient rehabilitation at Cardinal Hill.

In May 2014, Plaintiff was diagnosed with long-term multiyear poly-substance abuse, including cocaine utilized 2 to 3 times a week for at least the last three years. Long-term history of methamphetamine abuse was also confirmed.

Plaintiff overdosed on heroin on August 5, 2016. Responding EMS documented a GCS of 3 (lowest possible), which was completely reversed following the administration of Narcan opioid blocker. Although overdosing on heroin, Plaintiff confirmed that his drug of choice was actually methamphetamine. Plaintiff further confirmed intravenous drug abuse, but the drug was not specified.

Plaintiff overdosed on heroin again on June 25, 2017, but survived following the administration of Narcan.

On July 13, 2017, Plaintiff was a restrained passenger in another motor vehicle collision, suffering a left mid shaft collarbone fracture displaced 9 mm and another concussion.

13

On August 3, 2020, exactly one week prior to the August 10, 2020 collision, Plaintiff presented to Dr. Gile to establish a new family doctor. There Plaintiff complained of fatigue, somnolence, sleep apnea, memory loss, joint pain, back pain, gait problems, decreased concentration, rectal bleeding, and hepatitis C. Urinary testing was positive for two different socially transmitted bacterial infections requiring two different antibiotics. Toxicology testing was positive for alcohol and marijuana, both inconsistent with the medical history Plaintiff provided to Dr. Gile.

       7.   <u>Repeated Requests for Voluntary Attendance at IME</u>

By correspondence dated January 11, 2024, Defendants advised Plaintiff that an IME had been scheduled with Dr. Kriss on April 12, 2024; payment for travel expenses was included at this time. Plaintiff did not respond. Thereafter, Defendants followed up by email on 2/14/24 to "remind you of the IME of Mr. Walden with Dr. Kriss on April 12, 2024." *See* **Exhibit 5**, 2/14/24 Email. It was not until two weeks later, in the late afternoon of February 26, that Plaintiff finally responded by inquiring "what the scope of the examination will be and also the 'good cause' required to be demonstrated for the examination." *See* **Exhibit 6**, 2/26/24 Email. Defendants responded in detail to both inquiries the following evening, February 27. In that same email, Defendants requested at the outset, "please **advise at your earliest convenience if Plaintiff will voluntarily submit for the IME**." (emphasis in original). *See* **Exhibit 7** at pp. 16-19, Email Chain. Plaintiff did not respond.

Defendants followed up one week later. *Id.* at p. 16 (3/5 email). Plaintiff did not respond. Defendants followed up again two days later. *Id.* at p. 15 (3/7 email). Plaintiff finally responded later that day, alleging "I missed your previous emails somehow." *Id.* at p. 14. At the same time Plaintiff inquired if Defendants had confirmed with their expert whether the scope of the

examination would be broader than previously outlined. ("I would like to get a complete scope of the proposed IME as my client will not be able to agree to an IME without a full understanding of what is being asked of him by the defense….I appreciate you attempting to cover the entire scope but if we can nail the entire scope down then I will be able to advise my client as to the same.")

Defendants responded seven minutes later confirming that their expert did not intend to conduct an examination beyond that previously described by Defendants. *Id.* at p. 14 (3/7 email). In light of Plaintiff's failure to respond to a different, albeit related email requesting production of the full and complete posturography data and report utilized and interpreted by Dr. Changaris, Defendants sought confirmation of Plaintiff's receipt of same. Plaintiff responded the following day, advising "We have produced everything available. There's no recorded video or set of recorded data that has not been produced." *Id.* at p. 13 (3/8 email)

On March 11, Plaintiff raised yet another round of inquiries effectively seeking the same information Defendants provided weeks earlier in describing the scope of the CR 35 exam. Ignoring the exhaustive identification of the specific tests that would likely be conducted, Plaintiff was now demanding an even more detailed explanation for three terms originally used in a generic sense, immediately followed by identification of the well-known tests utilized by neurology and orthopedic experts, including those retained by Plaintiffs. Specifically, Plaintiff demanded that Defendants explain "What does Dr. Kriss consider a Complete Physical examination, Complete Range of Motion testing, and Complete Mental Status examination?" *Id.* at p. 12 (3/11 email). Not to be outdone, Plaintiff added an additional demand imposing an unspecified time limitation on the exam. Lastly, Plaintiff insisted on limiting the questioning that could be presented by Dr. Kriss, despite the absence of any such limitations imposed on the retained, non-treating experts retained by Plaintiff.

Defendants responded within two hours, this time providing an even more detailed response than their original response addressing virtually the same questions relating to scope. *Id.* at pp. 9 - 11 (3/17 email). After addressing the progressive nature that is necessarily associated with all medical examinations, Defendants proffered that "Dr. Kriss will be performing standard physical examination, range of motion testing, and mental status examination you have undoubtedly observed in virtually every other case involving allegations of neuro-related injuries. I imagine they will be similar to the examinations utilized by Dr. Changaris (DE 97-2) and Dr. Wilson (DE 97-1)." Defendants then addressed Plaintiff's remaining questions before finally "respectfully request[ing] a response by the close of business today." *Id.*

In his response, three days later, Plaintiff continued to insist on Defendants providing even more, albeit unexplained, details as to the scope of the exam. At the same time, Plaintiff neglected to address Defendants' inquiry regarding the length of the examinations conducted by either of Plaintiff's experts. Plaintiff then asserted that the non-treating experts he retained to conduct "independent medical examinations," were somehow different than the non-treating expert defendant retained to conduct its own "independent medical examination." Plaintiff then insisted on an additional requirement: that Dr. Kriss' exam be videotaped – despite Plaintiff's failure to videotape the examinations conducted by his own experts.[2] *Id.* at pp. 7-9. Plaintiff concluded by refusing to voluntarily submit to the CR 35 examination based on Defendants' alleged failure to sufficiently describe the scope of the examination to be conducted by Dr. Kriss.

Of the firm opinion that their prior emails had thoroughly and exhaustively addressed each and every purported concern raised by Plaintiff, Defendants elected to proceed with drafting the instant motion.

---

[2] Curiously, not even the "FallTrak Balance Video Posturography Test" conducted by Dr. Charis was videotaped.

On March 19, Plaintiff emailed Defendants under the guise of attempting to resolve his purported concerns. *Id.* at p. 6. Defendants responded immediately reiterating their request for nothing more than for their expert to have the same opportunity as Plaintiff's experts. *Id.* Plaintiff replied by continuing to claim an alleged lack of understanding of the scope of Dr. Kriss examination. Plaintiff insisted, again without explanation, that Defendants address the same requests to which Defendants had already responded. *Id.* at pp. 4-5. Despite Plaintiff's lack of cooperation, Defendants made one final effort to define, in detail, the scope of the examination. Defendants then documented with specific citations each instance of Plaintiff's retained experts finding it necessary to question Plaintiff on the very same topics Defendants indicated would need to be addressed by their expert. *Id.* at pp. 1-4. As of the instant filing, Plaintiff has not responded to Defendants' most recent email sent at 2:50 PM.

## II.   APPLICABLE LAW

Fed. R. Civ. P. 35(a) provides:

> **(a) Order for an Examination.**
> **(1) *In General.*** The court where the action is pending may order a party whose mental or physical condition--including blood group-- is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody or under its legal control.
> **(2) *Motion and Notice; Contents of the Order.*** The order:
> **(A)** may be made only on motion for good cause and on notice to all parties and the person to be examined; and
> **(B)** must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it.

## III.   ARGUMENT

1. Plaintiff's mental and physical conditions directly at issue

Seeking millions in damages for alleged mental and physical injuries, Plaintiff has undeniably placed these conditions squarely at issue. This Court need look no further than the alleged injuries and damages addressed in the CR 26 Reports of Plaintiff's own experts. *See* DE 97.

2. <u>Plaintiff's alleged damages, retention of three experts, and speculative damages independently establish "good cause."</u>

Plaintiff's efforts to recover millions in damages for alleged mental and physical damages, standing alone, establishes "good cause" for the entry of an Order compelling Plaintiff's attendance at an independent physical and mental examination performed by Board Certified Neurosurgeon, Dr. Timothy Kriss. FRCP 35(a)(2)(A); Schlagenhauf v. Holder, 379 U.S. 104, 119 (1964) (when a plaintiff in a negligence action "places that mental or physical injury clearly in controversy . . . [he] provides the defendant with good cause for an examination.")

Plaintiff's retention of his own expert in literally the same field as Dr. Kriss seemingly reflects a concurrence that "good cause" has been demonstrated. But that is apparently not the case as Plaintiff has refused Defendants' exhaustive efforts seeking Plaintiff's voluntary attendance at an examination under conditions identical or similar to those applicable to the examinations conducted by both of Plaintiff's experts. Fortunately, CR 35 precludes Plaintiff's unilateral and unsubstantiated efforts to apply unequal standards that unfairly prejudice Defendants.

Finally, the highly speculative nature of damages asserted for the first and only time by Plaintiff's experts – and not even Plaintiff – must assuredly demonstrate "good cause" for the independent examination being sought by Defendants. This is especially true in light of the stark contradictions in Plaintiff's medical records, on the one hand, and the opinions of Plaintiff's experts, on the other. Plaintiff's prior injuries and pre-existing conditions that were not even

considered by Plaintiff's experts, despite documenting the very same injuries Dr. Changaris now claims are attributable exclusively to this collision, further establishes good cause.

    3.  <u>Conditions of Examination</u>

Defendants are merely seeking a single mental and physical examination believed to be effectively identical to the two distinct examinations conducted by Plaintiff's experts, Dr. Wilson and Dr. Changaris. As previously addressed ad nauseum with Plaintiff, the proposed examination will consist of nothing more than a standard neurological and mental examination fully described in Defendants' multiple emails to Plaintiff. *See generally*, **Exhibit 7**.

As in all medical encounters, every painstaking detail that might be required is impossible to predict. That is, the nature of the examination may or may not be progressive in that the standard tests that will need to be performed are often dependent on the results of a prior test. By way of just one example, if two tests designed to evaluate the same area are negative, the physician would be unlikely to perform a third test. If, on the other hand, one test is positive and one is negative, the physician would likely need to perform a third or fourth test. Nevertheless, Defendants exhausted every last effort to provide Plaintiff with detailed explanation of the anticipated scope of the examination. Ultimately, the scope of Dr. Kris' examination will be limited strictly to what is necessary to form an informed and independent opinion regarding the physical and mental condition of Plaintiff. While Defendants reasonably believe that the scope of the examination will be consistent with the scope outlined in their email communications with Plaintiff, Defendants cannot predict with absolute certainty whether additional (or fewer) tests will be required. Against that backdrop, Defendants respectfully propose the following limitation:

> The scope of the examination shall consist of a standard neurological examination, standard physical examination, and standard mental examination. Dr. Kris should attempt to stay within the confines of the testing described in the [Proposed] Order, unless,

in his professional opinion, Dr. Kris determines that additional testing is required.

Dr. Kris shall limit his questioning to the topics set forth in the [Proposed] Order.

The length of the examination should be no longer than is reasonably necessary for Dr. Kriss to form an informed and independent assessment of Plaintiff's condition and prognosis.

WHEREFORE, Defendants respectfully request that the Court enter the attached, or similar Order, directing Plaintiff's participating in the CR 35 Exam with Dr. Tomothy Kriss scheduled for Friday, April 12, 2024. Because of Plaintiff's repeated delays and stall tactics associated with Defendants' efforts to resolve this issue extra-judicially, Defendants additionally request an expedited briefing schedule in order to allow the Court to issue its ruling prior to the April 12 examination.

Respectfully submitted,

HAMM, MILBY & RIDINGS, PLLC
120 NORTH MAIN STREET
LONDON, KY 40741
PHONE: 606-864-4126
FAX: 606-878-8144
EMAIL:  marcia@hmrkylaw.com
EMAIL:  jridings@hmrkylaw.com
ATTORNEYS FOR DEFENDANTS,
ENTERPRISE SERVICES GROUP, LLC AND
CLARENCE M. HOWARD


By:  /s/ Jay Ridings
        JAY MILBY RIDINGS

CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of March, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

_/s/ Jay Ridings_____
COUNSEL FOR DEFENDANTS, ENTERPRISE
SERVICES GROUP, LLC and CLARENCE M.
HOWARD