UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | | |
|---|---|---|
| CHARLES L. WALDEN | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:22-CV-00238-KKC |
| | ) | |
| ENTERPRISE SERVICES GROUP, LLC | ) | |
| CLARENCE M. HOWARD, AND | ) | |
| NATIONAL INDEMNITY GROUP OF | ) | |
| INSURANCE COMPANIES OR | ) | |
| NATIONAL INDEMNITY COMPANY, | ) | |
| VINCE KLINE, AND PROGRESSIVE | ) | |
| CASUALTY INSURANCE COMPANY | ) | |
| | | |
| Defendants | | |

\*\*\*\*\*\*\*\*\*\*

**RESPONSE TO DEFENDANTS' MOTION TO COMPEL CR 35 EXAMINATION,
OBJECTION TO USE OF DR. KRISS FOR RULE 35 EXAMINATION, & REQUEST
FOR REASONABLE CONDITIONS**
\*\*\*\*\*\*\*\*\*\*

Comes the Plaintiff, CHARLES L. WALDEN, and for his Response to Defendants',

Enterprise Services Group and Clarence M. Howard, Motion to Compel CR 35 Examination,

hereby states as follows:

As an initial matter, Plaintiff objects to the Court's Order [DE 117] and Amended Order

[DE 118] allowing effectively one and a half (1.5) business days to respond to Defendant's

twenty-one (21) page Motion. Plaintiff finds such a turnaround time highly unreasonable, and

considering that Defendants have had sufficient time to reschedule an exam they scheduled

unilaterally, without the agreement of the Plaintiff, good cause has not been established for the

"emergency" nature of this Motion, nor has irreparable harm been demonstrated by the

Defendants. Nonetheless, Plaintiff's counsel has worked diligently to review the Defendants' lengthy Motion and was surprised to discover the Defendants have mislead the Court by consistently repeating false statements and summaries regarding the Plaintiff and his medical care.

## I.    TWO-PRONG STANDARD FOR GRANTING RULE 35 MOTIONS

Rule 35 examinations, even when warranted, are invasive to the privacy of Plaintiffs and, prior to the adoption of the Federal Rules of Civil Procedure, were considered to be as offensive as an additional injury rarely sanctioned by the common law courts. *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). Our highest Court having held, "[t]he inviolability of the person is as much invaded by a compulsory stripping and exposure [by the examining doctor], as by a blow." Id. at 251-52; 11 S.Ct. at 1001.

Rule 35 examinations are considered to be a special tool of discovery but because of their invasive and humiliating nature these examinations have a heightened standard for when a Court should compel the adversarial examinations. Unlike other less-invasive discovery tools a movant requesting the Court to compel a plaintiff to be examined by a doctor, hand-picked and hired by the Defendants, and who owes no hippocratic duty to the examinee (as a treating doctor owes to his/her patients), must prove that the condition of the examinee is a) "in controversy" AND b) must demonstrate "good cause" for the examination. See *Schlagenhauf v. Holder*, 379 U.S. 104, 117-18, 85 S.Ct. 234, 242, 13 L.Ed.2d 152 (1964) (noting this distinction between FRCP 35(a) and other federal rules); *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962) ("there must be greater showing of need under Rules 34 and 35 than under the other discovery rules.")

2

The "in controversy" and "good cause" requirements of Rule 35 are not met by conclusory allegations nor mere relevance to the case – but require an affirmative showing that each condition as to which the defense medical examination is sought is really and genuinely in controversy and that good cause actually exists for ordering each examination. *Ford v. Am. River Transp. Co*., No. 5:11CV-00094-R (W.D. Ky. Sep. 12, 2012), *Taylor v. Morris,* 62 S.W.3d 377 (Ky. 2001), and *Daniels v. Jevic Transportation, Inc.*, 2008 WL 489255 (E.D. Ky.). "'The decision on whether to issue a Rule 35 order for a mental examination 'lies soundly within the court's discretion.'" *Beightler v. Suntrust Banks, Inc.*, 2008 WL 1984508 at *2 (W.D.Tenn.) (quoting Hodges v. Keane, 145 F.R.D. 332, 334 (S.D.N.Y.1993))." *Ford v. Am. River Transp. Co*., No. 5:11CV-00094-R, at *3 (W.D. Ky. Sep. 12, 2012).

**Defendants Have Not Even Met the "In Controversy" Requirement for a Rule 35 Exam**

Defendants have claimed, contrary to the aforementioned caselaw, that Plaintiff "seeking millions" (yet another misrepresentation of Plaintiff's position) for his injuries somehow undeniably placed "these conditions squarely at issue." First, "at issue" is not the standard but Plaintiff's conditions for which the examinations are requested must be "in controversy." While some courts have held mere pleadings to be enough to establish controversy, the plain meaning of the word doesn't allow for such an interpretation, and interpreting the rule in such a way would cause the heightened standard to be arbitrary; reducing the heightened standard of Rule 35 examinations to the basic rule of discovery found in FRCP 26(b)(1) which is the "parties may obtain discovery regarding any matter, not privileged, which is relevant."

There must be a disagreement about the Plaintiff's condition; an actual controversy. If the Defendants are seriously contesting every injury reported at the emergency department

immediately following this collision then they should be required to state as much in their motion. The Court is not able to make a reasonable determination as to which of Plaintiff's conditions are in controversy since the Defendant has not affirmatively stated which conditions and symptoms it is contesting. If the Court finds the Defendants have stated every condition for which is in controversy then the Court should include in its Order that the Defendants may not later claim any other condition not specifically mentioned in their Motion to Compel a Rule 35 Examination. The Defendants' blanket statement that Plaintiff has placed all of his injuries in controversy by stating they exist after the collision fails to affirmatively place every single condition in controversy. The Defendants must make an affirmative showing as to each condition for which the examination is sought and the blanket statement provided is entirely inadequate. Defendants' motion should be denied at least until a more specific statement on which conditions are in controversy is filed. Only then can the Plaintiff properly apprise his rights in relation to the motion, including whether or not the specific examinations requested are inappropriate, duplicative discovery, or if there is some other lawful justification to protect the Plaintiff from such adversarial prodding by a defense doctor.

**Defendants Have Not Established "Good Cause" for a Rule 35 Exam**

When Defendants requested an exam under Rule 35 without a Court order, Plaintiff has every right to perform his due diligence in understanding the course and scope of the examination prior to agreeing to submit to it. Plaintiff specifically requested the scope of the examination and the basis on which Defendants claimed good cause for the exam. It is well-established that these are the two items which a party seeking an order for a Rule 35 Exam must show. *Schlagenhauf v. Holder*, 379 U.S. 104, 117-118 (1964). It is baffling to the Plaintiff that

4

Defendants could object to Plaintiff's counsel requesting the legal basis for a request, using the specific terminology found in case law and with which the Defendants should be familiar.

To be successful on a Motion to Compel a Rule 35 Exam, the movant must show that "the condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Id*. at 118. A mere showing of relevancy is insufficient to establish "good cause." *Id*. In addition, the court should consider whether the desired information can be obtained by means other than an IME. *Id*; see also *Page v. Hertz Corp*., 2011 U.S. Dist. LEXIS 131808 (D.S.D. Nov. 15, 2011).

Despite the Defendants' lengthy Motion, containing a number of serious false statements, Defendants have not established the good cause necessary to be successful on their Motion. Our Federal Rules of Civil Procedure specifically protect Plaintiffs from abusive, duplicative discovery. FRCP Rule 26 (b)(2)(C)(i). Our federal court system has held that when the defendant has access to medical records and reports that conduct the same testing an "independent physician" proposes, good cause for the exam may not exist. *Hughes v Groves*, 47 F.R.D. 52, 57 (E.D. Mo. 1969); see also *Martin v Tindell*, 98 So.2d 473, 475 (Fla. 1957).

The Defendants argue the damages claimed by the Plaintiff independently establish "good cause," yet this is an impossibility since an affirmative showing is required. Interpreting Rule 35 without requiring specific affirmation by the movant renders the heightened two-prong requirement of compelling Rule 35 examinations arbitrary. The Defendants would have this Court ignore its duty to give meaning to the heightened standard of "in controversy" and "good cause."

The Defendants mention a previous collision with similar injuries in their motion. While not binding on this Court, the Kentucky Court of Appeals has helpfully opined "good cause" is

not found when the defendant's only stated reason for a Rule 35 examination was because the plaintiff had been in similar accidents and claimed similar injuries. *Peeples v. Allstate Prop. & Cas. Ins. Co.*, No. 2019-CA-1432-MR, 2020 Ky. App. Unpub. LEXIS 697 (Ct. App. Oct. 16, 2020).

**Defendants' Motion Would Have Dr. Kriss to Determine Scope; Lacks Detail**

The Defendants have failed to affirmatively and specifically enumerate the conditions "in controversy," the "good cause" establishing why the specific examinations requested are necessary to obtain relevant information, nor did they even include the actual specifics of the examinations requested; instead calling them "standard." Plaintiff should not be required to submit to a scopeless and amorphous examination, subject to the whims of a defense-hired doctor. Instead of identifying specific tests, the Defendants call the examinations they are requesting "standard examinations." This is not specific enough to meet the requirement. The Defendants also failed to include in their motion a definite scope of the examination, stating instead, "Dr. Kriss should attempt to stay within the confines of the testing described in the [Proposed] Order, unless, in his professional opinion, Dr. Kris determines that additional testing is required." This proposal doesn't even allow the Plaintiff the right to contest these hypothetical, mystery tests as duplicative discovery, abuse, or to otherwise protect his privacy and legal rights in the context of a Rule 35 examination.

Defendants' email itemizing the testing to be conducted by Dr. Kriss contains numerous repeat exams that have been conducted on the Plaintiff at length by his treating providers, yet notably not conducted by Dr. Changaris.

| Long tract signs (Babinski, Hoffman's, clonus, etc.) (para. ii) | Kentucky Orthopedics and Spine 04/17/2023 |
| --- | --- |

| Reflexes (para. iii) | Kentucky Orthopedics and Spine 04/17/2023; BHMG Primary Care 01/09/2023; BHMG Primary Care 01/27/2021 |
|---|---|
| Gait (para. iv) | Kentucky Orthopedics and Spine 04/17/2023; BHMG Primary Care 10/21/2022 |
| Straight leg raise (para. xi) | Kentucky Orthopedics and Spine 04/17/2023 |
| Patrick sign (para. xiii) | Kentucky Orthopedics and Spine 04/17/2023 |
| Greater trochanter examination (para. xiv) | UK HealthCare Radiographic Imaging 08/10/2020; UK HealthCare Radiographic Imaging 09/21/2020; |

In addition, the following tests from Defendants' list have never been conducted on the Plaintiff, and Defendants have refused to give any explanation for their necessity, other than that they are "routine" examinations:

Electronic inclinometer with automatic sensing (para. v)

Lehrmitte's sign (para. vi)

Spurling sign (para. vii)

Romberg sign (para. viii)

Phalen's sign (para. ix)

Tinel's sign (para. x)

Neer sign (para. xvi)

Hawkins sign (para.xvii)

Of the tests provided for Dr. Kriss to conduct (paragraph b of Defendants' email), only the following were conducted by Dr. Changaris: hip examination (para. xii), shoulder examination (para. xv), Nystagmus (para. xviii), facial sensation (para. xix), and air conduction (para. xx). Dr. Changaris conducted range of motion testing on the Plaintiff's cervical spine (as part of a cervical neurological exam), shoulder range of motion, and lumbar range of motion; nonetheless, "complete range of motion" testing is far too broad.

7

In paragraph d of Defendants' email, they indicated that Dr. Kriss would conduct:

Verbal inquiries relating to Plaintiff's current physical condition, pre-MVA physical condition, nature of improvements or declines in physical condition since subject MVA, mechanism of injuries regarding subject MVA and prior injury-related incidents/events, current medical treatment, medical treatment between subject MVA and date of IME, pre-MVA medical treatment, medication regiment (current, pre-MVA, period between MVA and IME), Occupational status (current and pre-MVA), pre-MVA medical history.

All of these items are **well** documented in Plaintiff's medical records. Defendants have absolutely not established good cause to continue to ask Plaintiff questions about his medical history, when he has provided it via written discovery, deposition testimony, extensive medical records provided by the Plaintiff, and medical records obtained by the Defendants themselves.

**Defendants' Misrepresentations of Plaintiff's Medical Records**

The Defendants have treated the Plaintiff's complex and largely undisputed medical history like a buffet, where they can grab items as they please, leave those they don't care for, a present a plate of their own crafting to the Court. While they make clear misrepresentations of certain facts – misrepresentations which become clear as soon as one consults the medical record they purported to have originated from – other "facts" are clearly false and nothing more than a thinly veiled attempt to minimize the severity of the subject wreck, the Plaintiff's injuries, and by extension, their own negligence. In an era of "alternative facts," let the judicial system be the refuge of truth.

To begin to address the multiple factual inaccuracies, Defendants claim that in the EMS record from 08/10/2020, the date of the subject collision, "Plaintiff's only complaint was **left** hip pain with movement" (emphasis in original) [Defendants' Motion, DE 115, page 2]. The EMS medical record, attached hereto as Exhibit "A," can speak for itself that Plaintiff never complains of "left" hip pain, only hip pain. The medical record further documents that the EMTs

intentionally and with an effort to make their patient as comfortable as possible placed the Plaintiff on his left side: "On board patient rested in a left lateral position." The collision report, attached to Defendants' Motion as Exhibit 1, also makes no mention of "left" hip pain.

Defendants move on to claim that at the University of Kentucky Emergency Department, Plaintiff's "**only diagnosis** was a right acetabulum pelvis fracture." Once again, the medical record speaks for itself in the falsity of this statement. Plaintiff's "Active Problems" listed his fracture of right acetabulum, but also posterior dislocation of hip and a concussion. See Exhibit "B." The "Hospital course" summarizing his 7-day stay at the University of Kentucky Hospital noted he was found to have a "periprosthetic acetabulum fracture, right hip dislocation, and a concussion." See Exhibit "C." Defendants have grossly misrepresented Plaintiff's initial complaints, but further tried to minimize his severe hip and head injuries. Despite Defendants' assertion that Plaintiff "only" suffered a right pelvis fracture, in reality, his injuries were so severe that he spent 7 days in the hospital, had surgery that was described by his surgeon as "complex" due to the Plaintiff's "significant marginal impaction greater than 30% surgical effort." See Exhibit "D." In layman's terms, the Plaintiff's pelvis was crushed by the Defendants' vehicle. Plaintiff required the use of a wheelchair or walker for months following this collision (see Baptist Health Medical Group Primary Care medical record from 09/14/2020, where Plaintiff reported to his primary care physician for the first time after his collision and is noted to ambulate with a walker); required assistive equipment at home, including a shower chair (see Baptist Health Medical Group Primary Care medical record from 09/14/2020); required extensive physical therapy and occupational therapy, both while at UK Hospital and after discharge; and was discharged under the conditions of staying with his father and having his mother available to provide assistance (see Exhibit "E").

9

Next, the Defendants move on to cherry-picking words from the Plaintiff's medical record, pulling it completely out of the context in which it was made, and indicating that it is clearly demonstrated that the Plaintiff wasn't seriously injured, despite the remainder of his medical records. Specifically, Defendants have classified the notes "Doing well" from the University of Kentucky Orthopedics to mean that he had a "virtually complete recovery of injuries sustained in this accident." Considering the Plaintiff had just underwent major and complex surgery to repair a dislocated and fractured hip, considering he was discharged from the hospital under the specific conditions of having assistance, considering that Plaintiff was receiving IVs of morphine and dilaudid to control his pain, and considering that Plaintiff continued with physical therapy treatment upon his discharge from University of Kentucky Hospital, the doctor's note of "doing well" is plainly not an indication that the Plaintiff was ready to return to his activities as normal.

Consistent with their misclassifications and complete fabrications of the Plaintiff's medical records thus far, the Defendants allege that Mr. Walden was released from physical therapy because he had improved so miraculously and beyond what his therapists had expected, that of course he should be discharged from treatment. Plaintiff respectfully directs the Court to the third page of his Discharge Summary from Results Physiotherapy, attached hereto as Exhibit "F," which states "The patient is discontinuing therapy due to insurance visit limitations." Furthermore, Mr. Walden is noted to have met 80% of his therapy goals, is discharged with a Home Exercise Program, and is noted to only be able to walk for 41-50 minutes, struggles with endurance and fatigue, and requires more time in therapy to achieve his goals related to using the stairs. See Exhibit "F." Considering that Mr. Walden was discharged from physical therapy at UK Hospital because he was released home with assistance he could not even "ambulate greater

than or equal to 200 ft with appropriate assistive device," his ability to walk for 40 minutes is certainly an improvement and worth celebrating. However, the Plaintiff was far from a "virtually complete recovery" from his injuries, as Defendants claim. Once again, the Defendants have ignored evidence in the medical record in order to fit the narrative they hope to pursue, regardless of the facts of Mr. Walden's health.

Defendants move on to misclassify and misrepresent Plaintiff's treatment following his release from physical therapy. Alleging that Plaintiff's attorney requested an "out of the blue" memory workup and that Plaintiff didn't begin complaining of decreased memory and increased headaches until January of 2023, Defendants conveniently ignore the documented history of headaches, "mental status changes," and the abrasion to his head noted by EMS from the collision itself. Plaintiff's poor memory is well-documented, and is the reason he missed his primary care physician appointments on 04/02/2021, 06/17/2022, and 11/21/2022. In fact, Plaintiff's medical record reflects diagnoses of traumatic brain injuries as well as commonly associated symptoms, both prior and subsequent to the 08/10/2020 collision, including "right frontal lobe encephalomalacia" (diagnosed by UK HealthCare on February 28, 2013), "mild to moderate neurocognitive disorder" (diagnosed by UK Healthcare on May 7, 2014), "mental status change" and "post-traumatic epilepsy" (diagnosed by UK HealthCare on August 26, 2020), and "headaches" (noted by Baptist Health Medical Group Primary Care on January 9, 2021).

**Defendants' Misrepresentations of Plaintiff's Expert Witnesses**

Defendants did not stop with misrepresenting Plaintiff's medical records, but moved on to misrepresent and disparage Plaintiff's retained experts, Dr. Timothy Wilson and Dr. David Changaris.

11

It isn't clear why the Defendants use this motion as an opportunity to attack Dr. Wilson and his report, as Dr. Wilson is an orthopedic surgeon who evaluated the Plaintiff and provided an opinion regarding Plaintiff's orthopedic injuries. Defendants are seeking an examination of the Plaintiff by a neurosurgeon, Dr. Timothy Kriss. Thus, Plaintiff will address Defendants' criticisms of Dr. Changaris. As an initial matter, Defendants state "Dr. Changaris apparently conducted an examination of Plaintiff, but his report neglects to identify the date of same." Since the Defendants are having difficulty reading Dr. Changaris' typewritten report, Plaintiff directs them to page 1, which begins with "Office record from D. Changaris, MD [Neurosurgeon]; left-justified and immediately above "Consultation," Dr. Changaris notes "November 17, 2023" as the date of his examination.

Next, Defendants indicate that Dr. Changaris' report is inconsistent with the Plaintiff's medical records because of Plaintiff's complaints of neck pain, left leg pain, right knee pain, left ankle pain, left foot pain, appetite changes, sleep difficulties, vision changes, relationship difficulties, hearing difficulties, emotional changes, and decreased activity. Plaintiff notes that most of these symptoms are in fact indicators of traumatic brain injuries, from which it is undisputed that Plaintiff suffers (Defendants may dispute that Plaintiff has suffered a traumatic brain injury from this MVA, but his medical record clearly establishes a history of TBI as well as at the very least a concussion from this MVA, which is a form of TBI).

**Defendants Attempt to Harass Plaintiff to Deflect From Their Own Negligence**

Defendants proceed to attack the Plaintiff for his medical history, specifically his Substance Use Disorder, under the guise of providing a "brief clinic summary." The Plaintiff has been transparent that he suffers from Substance Use Disorder; he is currently attending a

rehabilitation program, requiring him to put other necessary medical treatment on hold. Furthermore, Dr. Wilson clearly addressed Plaintiff's SUD in his report, attributing 3% of Plaintiff's impairment to it.

Yet, Defendants once again use a false narrative regarding his medical history to attempt to harass the Plaintiff. How his Substance Use Disorder is relevant to their requested Rule 35 Exam is not clear in their Motion. Twice Defendants indicate that Plaintiff's "toxicology reports" indicate the presence of certain substances. The first instance is regarding Plaintiff's MVA from July 6, 2012 whereby he was a pedestrian struck head-on by a motor vehicle. Defendants indicate "toxicology testing was positive for marijuana and benzodiazepines," yet Upon Plaintiff's review of his medical records, he cannot find such a report, and considering that Defendants neither attached it, nor specified where it could be referenced, and considering the other instances Plaintiff has already identified, above, where Defendants have misrepresented Plaintiff's medical records, Plaintiff must object to such classification.

Defendants again reference "Toxicology testing was positive for alcohol and marijuana" regarding Plaintiff's Primary Care visit on August 3, 2020. Again, upon review of this specific medical record, the toxicology report itself indicates that there are "inconsistent results" regarding ethyl glucuronide and THC, but that "the possibility of the POSITIVE EIA screen being due to cross-reactivity cannot be excluded without performing confirmatory LC-MS/MS testing," which was not pursued as indicated by the report. Furthermore, the testing also indicates a number of medications and drugs for which Plaintiff tested negative, including but not limited to cocaine, opiates, amphetamines, methamphetamines, and benzodiazepines.

Furthermore, pursuant to the National Library of Medicine[1], there are a variety of legal, common products on the market that have been proven to cause false positives on initial ethyl glucuronide (EtG) tests, including but not limited to: hand-sanitizers, hair products containing alcohol, mouthwash, non-alcoholic beer or wine, cough syrup such as Nyquil, perfumes, aftershave, and bug spray.

## II.      OBJECTION TO DR. KRISS AS RULE 35 EXAMINER

Even if a physical examination is warranted under Rule 35, the moving party has no absolute right to compel that examination by a particular physician of its own choosing. *McKitis v. DeFazio*, 187 F.R.D. 225, 227 (D. Md. 1999); *Stinchcomb v. United States*, 132 F.R.D. 29, 30 (E.D. Pa. 1990); 8A Charles A. Wright, Arthur R. Miller, Richard L. Marcus, Fed. Practice Procedure § 2234.2 at 485 (2d ed. 1994) (hereinafter "Wright Miller"). *Page v. Hertz Corp.*, CIV. 09-5098, at *11 (D.S.D. Nov. 15, 2011). "The court should appoint a physician different from the one proposed by a defendant only when the plaintiff raises a valid objection. *Powell v. United States*, 149 F.R.D. 122 (E.D.Va.1993)" *Holland v. United States*, 182 F.R.D. 493, 494 (D.S.C. 1998).

**Defendants' Chosen Expert Has Been Found to Demonstrate Bias**

Courts have repeatedly held that even if a physical examination is warranted under Rule 35, the moving party has no absolute right to compel that examination by a particular physician of its own choosing. *McKitis v. DeFazio*, 187 F.R.D. 225, 227 (D. Md. 1999); *Stinchcomb v. United States*, 132 F.R.D. 29, 30 (E.D. Pa. 1990); 8A Charles A. Wright, Arthur R. Miller,

---

[1] Arndt, Torsten, Joachim Grüner, Stefanie Schröfel, and Karsten Stemmerich. 2012. "False-Positive Ethyl Glucuronide Immunoassay Screening Caused by a Propyl Alcohol-Based Hand Sanitizer." Forensic Science International 223 (1-3): 359–63. https://doi.org/10.1016/j.forsciint.2012.10.024.

Richard L. Marcus, *Fed. Practice Procedure* § 2234.2 at 485 (2d ed. 1994). "[In requesting a Rule 35 IME] … the moving party does not have an absolute right to select a physician, for the matter rests within the discretion of the trial court." *Page v. Hertz Corp*., 2011 U.S. Dist. LEXIS 131808 (D.S.D. Nov. 15, 2011).

In *Taylor v. McCoy Elkhorn Coal Corporation, et al*, 2017-CA-000137-WC (Ky Ct. App. 2018), attached hereto as Exhibit "G", the Court of Appeals reviewed a decision by the Worker's Compensation Board. "The standard of appellate review of a decision by an administrative agency affords great deference to the agency, particularly the WCB." *Taylor v. MECC*, 2017-CA-000137-WC (Ky Ct. App. 2018). However, the Court of Appeals overturned the Worker's Compensation Board's decision upholding the ALJ specifically because of the gross inaccuracies in Dr. Timothy Kriss' report which favored the party which hired him.

Kentucky law is established that "a substantially inaccurate physician's report cannot be considered substantial evidence." *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839 (Ky. 2004). The Court of Appeals in *Taylor* specifically found: "Dr. Kriss' report flatly ignores [the plaintiff's] statements reflected in both Drs. Muffly's and Stephens' reports regarding that gap" [pg 14] and "Moreover, it is Dr. Kriss' report that reflects a lack of knowledge of the complete factual picture. Dr. Kriss noted that [plaintiff] never notified his employer of his March injury, ***a statement which was demonstrably inaccurate even at the time Dr. Kriss made it***" (emphasis added) [pg 14]. The Court of Appeals went further, saying:

> In our reading of the IME report Dr. Kriss generated, it is plainly evident that he began with an assumption that Taylor may have been exaggerating his symptoms, and then that Taylor must have lied regarding both of his work accidents. Dr. Kriss spends significant effort justifying this assumption and in actively ignoring any evidence contradicting this opinion. Dr. Kriss' report does not reflect a measured examination of all evidence available. Its conclusion is based on assumption and a willfully incomplete examination of the facts. [pg 14-15]

For the Court of Appeals to overturn both an ALJ and the Worker's Compensation Board is no small matter, yet they did so specifically because of Dr. Kriss and his refusal to objectively consider the facts and evidence before him in those matter. The Court of Appeals found Dr. Kriss so grossly "corrupt" [pg 15] that it had no choice but to overturn a decision that relied on his opinion. "While it is not the place of the WCB or this Court to disrupt those findings where substantial evidence supports them, we cannot conclude the ALJ properly relied on Dr. Kriss' faulty IME report in reaching its ruling."

But this is not the only matter in which our Courts have found Dr. Kriss to present biased information in favor of those who pay his bills rather than in favor of objective standards of truth. In *Burns v. Astrue*, 2009 WL 223866, attached hereto as Exhibit "H," Dr. Kriss opined that a plaintiff was malingering and needed no restrictions, which the ALJ then used to deny her benefits. However, this Court (albeit in the southern division at London) overturned that decision in the face of clear objective evidence to the contrary, namely an MRI, a CT scan, and the subsequent opinions of two neurosurgeons.  In *Leaseway Motor Co Transport v. Cline et al.*, 2007 WL 858834, attached hereto as Exhibit "I", our Kentucky Supreme Court heard an appeal that went back and forth between the WCB and the Court of Appeals repeatedly. It is noted in this opinion that Dr. Kriss himself had acknowledged to the WCB that "his method for apportioning impairment might well be viewed as arbitrary."  Dr. Kriss has specifically demonstrated biases against claimants and plaintiffs with traumatic brain injuries. In *Uninsured Employers v. Poplar Brook Development LLC et al.*, 2016 WL 5247928, attached hereto as Exhibit "J," our Supreme Court was again evaluating an appeal from the WCB where the "independent medical examination" of Dr. Kriss was submitted into evidence. In this instance, Dr. Kriss completely discounted the claimant's compression fracture, insisting it was actually

just an "indention," and further claiming that the pain, numbness, and tingling the claimant was experiencing was due solely to his weight. Furthermore, Dr. Kriss stated that the claimant did not actually suffer from a traumatic brain injury and should be weaned off any narcotic medications.

If this Court finds that the Defendants have established good cause for an examination of the Plaintiff, and are sufficiently convinced that the scope is within those reasonably established by his actual medical history – as opposed to the false narrative of his medical history that the Defendants put forth – then the Plaintiff respectfully requests that he be ordered to an examination with an impartial, truly independent neurosurgeon who will evaluate the Plaintiff fairly and without the clearly pre-conceived bias that Dr. Kriss has already displayed.

## III.   CONDITIONS

**Plaintiff Proposed an Agreed Order with Conditions for the Examination**

Defendants objected to Plaintiff's counsel professionally advocating for his client while attempting to hammer out the specific scope of the proposed examination, even implying dishonesty via "stall tactics" on the part of Plaintiff's counsel. However, courts have held that if a plaintiff voluntarily submits to an examination by a physician selected by the defendant, that plaintiff waives their rights to insist upon a Rule 35 motion for an order of examination. *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 689 (10th Cir. 2007).

Furthermore, despite Defendants' attempts to cast doubt on Plaintiff's counsel's advocacy, Plaintiff did provide a proposed Agreed Order with terms, attached hereto as Exhibit "K," to which he received no response. When Plaintiff's counsel followed up with Defense counsel, he was told the suggested terms and attending questions about the would-be

examination were both interpreted as a rejection of the examination in spite of the plain language of such inquiries.

Should Defendants be ultimately successful in their motion, after having amended it to include the requisite specificity required by Rule 35, then the following conditions should be placed on the examination:

1.   A date for the selected examiner's deposition shall be provided to Plaintiff at least ten (10) days before the date of the physician's trial testimony deposition;

2.  That Plaintiff, Charles L. Walden, may be accompanied to the proposed examination by a friend, family member, or other person of his choice (not including his lawyer or employees of his lawyer);

3.  That the examination shall be video recorded by the person chosen by Plaintiff, Charles L. Walden, who accompanies him to the proposed examination, or in the alternative by a court-approved videographer;

4.  That in the event the examiner desires for Plaintiff, Charles L. Walden, to fill out any questionnaires or other written data request, any such questionnaire of written data request shall be submitted to his counsel no less than ten (10) days in advance of the scheduled examination, and he shall bring the documents with him to the examination;

5.  That the examination shall be limited to a physical examination, and any questions to be asked by the physician must specifically pertain to the particulars of the physical examination and the assessment of related injuries, to include the dynamics of any motion that occurred within the vehicle and whether he struck anything within the vehicle compartment, in the collision, but otherwise may not include questions about witnesses, or any other matters not directly related to the physical examination itself;

6.  That mileage be paid to Plaintiff, Charles L. Walden, for travel to and from his home to the physician's office;

7.  That there is no reference in the report, the physician's testimony, or any of the subsequent proceedings in this matter that such examination is an "independent medical examination" or any other indication than it is anything other than an examination by an adverse party in this matter;

8.  That the examining physician owes no Hippocratic duties to Mr. Walden since Mr. Walden is not his patient; and

9.  A copy of the report generated as a result of the examination shall be forwarded to counsel for Plaintiff, Charles L. Walden, immediately on receipt of same by defense counsel and without any edits.

10.  Reasonable time constraints on the examination.

**Videotaped Rule 35 Examination**

"Federal trial courts have produced mixed results when deciding whether particular circumstances warrant the presence of a video camera or other recording device in the examination room. See 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus Federal Practice Procedure: § 2236, at 496 (2d ed. 1994) (noting that federal courts have responded to issues of a third party or recording presence at Rule 35 examinations in "diverse ways that may, in large measure, be explained by the particular circumstances presented."); compare, e.g., *Zabkowicz v. West Bend Co.,* 585 F. Supp. 635, 636 (E.D. Wis. 1984) (allowing examination to be videotaped), with *Abdulwali v. Washington Metro. Area Transit Auth*., 193 F.R.D. 10, 14 (D.D.C. 2000) (denying request to videotape). Nevertheless, we are not left completely without

19

direction. Courts have unanimously accepted the tenet that the conditions of a Rule 35 examination are left to the sound discretion of the trial court." *Metropolitan Pro. Cas. Ins. v. Overstreet*, 103 S.W.3d 31, 35-36 (Ky. 2003).

For the reasons aforementioned in Plaintiff's objection to Dr. Kriss being allowed to conduct a Rule 35 Examination on him, Plaintiff requests the objectivity of a video record of the examination. Plaintiff would still be subject to the unfair examination by a demonstrably biased neurological surgeon, as recognized by other courts, however there would at least be a video record which can be used to impeach Dr. Kriss.

WHEREFORE, Plaintiff respectfully requests that Defendants' Motion to Compel a Rule 35 Exam with Dr. Timothy Kriss be DENIED. In the alternative, Plaintiff respectfully requests that Plaintiff be ordered to attend a Rule 35 Exam under the conditions proposed in his Proposed Agreed Order and with an independent neurosurgeon other than Dr. Timothy Kriss.

Respectfully Submitted,

MORRIN LAW OFFICE

  /s/*Robert A. Morrin*
Hon. Robert A. Morrin (KBA # 94368)
214 West Main Street
Richmond, KY 40475
(859) 358-0300
*Counsel for Plaintiff*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of March, 2024, a true and correct copy of the foregoing was filed through the Court's eFiling system, which serves a copy on all counsel of record.

  /s/*Robert A. Morrin*
Hon. Robert A. Morrin (KBA # 94368)
MORRIN LAW OFFICE
*Counsel for Plaintiff*