RENDERED:  JULY 27, 2018; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

### NO. 2017-CA-000137-WC

GLADE TAYLOR                                                      APPELLANT


PETITION FOR REVIEW OF A DECISION
v.              OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-13-56897


MCCOY ELKHORN COAL                                        APPELLEES
CORPORATION;
HON. CHRIS DAVIS, ADMINISTRATIVE
LAW JUDGE; AND
KENTUCKY WORKERS' COMPENSATION
BOARD


OPINION
REVERSING AND REMANDING

** ** ** ** **


BEFORE:  COMBS, D. LAMBERT, AND NICKELL, JUDGES.

LAMBERT, D., JUDGE:  Glade Taylor appeals an order of the Kentucky Workers'

Compensation Board ("WCB"), which affirmed the denial of the benefits Taylor

had sought based on an allegedly work-related neck injury.   Taylor asserts that the evidence relied upon by the Administrative Law Judge ("ALJ") contained sufficient inaccuracies to preclude the ALJ from such reliance.  After careful review, we hold that the ALJ improperly relied on unsubstantial evidence and reverse the WCB.

## I.  FACTUAL AND PROCEDURAL HISTORY

McCoy Elkhorn Coal Corporation ("MECC") operated a sub-surface mine at which Taylor worked.  MECC initially hired Taylor in 2000 as a dead work boss[1] for the mine's third shift, though Taylor eventually worked his way up to a position as mine foreman.  Taylor worked in that capacity on the dates of his injuries until physical disability ended his working days on December 10, 2013.  Taylor had been a 37-year veteran of the coal mining industry at that point.  Taylor alleges that two separate work-related injuries caused his disability.

The first of such injuries occurred on March 5, 2013, when, while carrying a heavy bucket of plaster in each hand, Taylor struck his head on a beam and fell, twisting his back and neck.  He had appointments with his primary care provider, nurse practitioner Crystal Blair[2] in April, May, and August of 2013, but did not complain of any back or neck ailments.  According to his hearing

---

[1] In coal mining parlance, "dead work" refers to any work for which the mining company derives no immediate profit, such as locating a coal seam or preparing a work area to be mined later. William Stukeley Gresely, *A Glossary of Terms Used in Coal Mining*, 75 (1883).

[2] Also identified in later records as Crystal Branham.

testimony, he did not miss work solely as a result of this injury, though he amended this testimony to reflect that he later missed work due to an accumulation of factors including this injury.  Taylor first sought treatment specifically for persistent lower back pain on November 1, 2013, with Dr. Michael Trivette.

Taylor's second injury occurred on December 10, 2013.  Taylor was performing an inspection approximately three miles into the mine when the battery powering the carrier he was riding died.  The mine tunnel had an extremely low ceiling, which necessitated that Taylor walk in a hunched position on his way back to the surface.  While attempting to traverse a steep incline, Taylor fell, twisting around as he went.  Ultimately, Taylor came to a stop when he hit a wall.  Because the fall occurred so late in his shift, Taylor reported the injury to his supervisor and went home.  The next day Taylor went to the emergency room at the Pikeville Medical Center, where MRIs of both his lumbar and cervical spine were performed.

Dr. Trivette ordered that x-rays be performed while Taylor was at Pikeville Medical Center.  The lumbar x-rays revealed mild degenerative disc disorder, which the MRI also showed.  However, the MRI further revealed a herniation at the L5-S1 disc space and stenosis.  A referral to a neurosurgeon is noted on the MRI report.  Taylor also saw Dr. Trivette again the next day for back pain.

Taylor sought treatment at Hometown Family Care on December 19, 2013, because the medications prescribed to him by Dr. Trivette offered "minimal relief," according to his medical records.  He complained of pain in his back, which radiated into his right thigh.

Taylor saw a neurosurgeon, Dr. Duane Densler, on December 24, 2013.  Dr. Densler's report indicated complaints of both back and neck pain.  Dr. Densler continued treating Taylor, though an eventual surgery was performed by another neurosurgeon.

Taylor visited Hometown Family Care on February 18, 2014, for a follow-up for unrelated chest pain and nausea, but "back pain" and "disc herniation" were also included in his diagnoses for this visit.  There was no mention of neck pain at this time.

During the prosecution of Taylor's claim for benefits, he underwent no less than five independent medical evaluations ("IME").

Taylor first saw an orthopedic surgeon, Dr. David Muffly, on June 27, 2014.  Dr. Muffly noted that Taylor admitted to delaying treatment for his injuries sustained in his March 5 fall out of fear that he would miss a bonus at work, and that he eventually sought treatment from Dr. Trivette when the pain grew unbearable.  Dr. Muffly reported cervical disc degeneration as well as protrusion at the C4-C5 disc space, causing cervical strain.  Dr. Muffly concluded that the

-4-

lumbar disc herniation and the cervical strain were related to the incidents of March 5 and December 10, 2013.  Dr. Muffly assigned Taylor a whole person impairment ("WPI") rating of 11% for the two injuries: 5% for his neck impairment and 6% for his lower back impairment.

Dr. Joseph Zerga, a neurologist, performed an independent medical evaluation on Taylor on October 7, 2014.  Dr. Zerga reported that Taylor told him the pain was most intense in the sacral coccygeal area.  Dr. Zerga also reported normal range of neck movement during conversation, and further noted that Taylor "does not have any evidence of significant cervical or lumbar spine disease."  He diagnosed Taylor with coccyx pain and assigned a 3% WPI rating.

MECC also sent Taylor to see Dr. G. Chris Stephens on October 31, 2014.  Dr. Stephens noted that Taylor reported neck pain, which radiated into his right shoulder, and back pain which extended into his legs.  Dr. Stephens noted Taylor's "chronic neck pain secondary to moderately severe cervical spondylosis" and noted his complete disagreement with Dr. Zerga's assessment, going as far as to say that he was uncertain as to how Dr. Zerga reached his conclusions, given that they reviewed the same records.  Dr. Stephens noted Taylor's multiple appointments with Blair during the period between March and November of 2013, and that Taylor had either failed to mention or explicitly denied back and neck symptoms.  Ultimately, Dr. Stephens concurred with Dr. Muffly that Taylor's

condition was work-related and assigned a 5% WPI to both the cervical and lumbar injuries.  Dr. Stephens, however, included a *caveat* that Taylor's failure to seek medical attention for the eight months following the March injury reflected poorly on his chances for full benefits.

Taylor's claim for benefits was abated at one point while he had surgery on his neck.  The surgery was approved by MECC's workers' compensation insurance carrier, as were temporary total disability benefits.  Dr. Norman Mayer performed this surgery, which involved fusion of several of Taylor's cervical vertebrae, on July 24, 2015.

MECC then sent Taylor to Dr. Timothy Kriss for an IME on December 23, 2015.  Dr. Kriss listed the evidence he had reviewed in preparing the report, which included the MRI studies taken just after Taylor's December fall, x-ray images taken after his December fall and after his surgery, the treatment records from Taylor's visits with Blair, Drs. Trivette, Densler, Mayer, and other treating physicians, and the IME reports prepared by Drs. Zerga and Stephens.  Dr. Kriss did not mention reviewing Dr. Muffly's IME report.

Dr. Kriss reported that Taylor exhibited signs of symptom exaggeration, which seemingly prompted him to disregard Taylor's account of his March fall and the symptoms following that event.  Dr. Kriss also noted in his report that Taylor had failed to timely notify MECC of the March fall, though

MECC had stipulated on the record more than one year prior to Dr. Kriss' IME that it had received timely notice of the fall.  Relying entirely on the medical records, Dr. Kriss concluded that Taylor's neck injuries were not work-related, but dormant pre-existing conditions which became symptomatic following his injuries. Dr. Kriss opined that it made no medical sense whatsoever for an individual who suffered a significant back injury to not suffer symptoms for eight months.  Dr. Kriss assigned Taylor a whole person impairment rating of 25% but noted that the rating was based entirely on the outcome of Taylor's surgery, which Dr. Kriss concluded was to repair damage in his cervical spine resulting not from work-related injuries, but from the natural process of aging.  Dr. Kriss assigned a 5% whole person impairment rating for Taylor's lumbar injury.  Dr. Kriss also concluded that Taylor was medically capable of returning to work, and that he had no objective medical basis for imposing restrictions.

Taylor saw Dr. Muffly again after the surgery, on February 4, 2016. At that time, Dr. Muffly noted that Dr. Mayer said the fusion was not yet solid and needed more time to improve.  Dr. Muffly noted the records that he had reviewed, which included Dr. Stephens' IME (which discussed the eight-month delay in treatment after the March fall).  Dr. Muffly opined that Taylor's cervical symptoms, which were directly caused by his work-related injuries from March 5 and December 10 of 2013, progressively worsened to the point that surgical

-7-

correction became necessary.  In assessing Taylor's post-surgery condition, Dr. Muffly assigned Taylor a whole person impairment rating of 27% and opined that he could not return to his previous employment even with stringent restrictions on lifting, bending, and working overhead.

The ALJ agreed with Dr. Kriss' findings and denied Taylor's claims relating to his cervical impairment entirely.  Instead, the ALJ awarded temporary total disability benefits to Taylor based on Dr. Muffly's 6% impairment rating to his lumbar spine, and permanent partial disability benefits based on the same impairment.  The ALJ specifically noted in the Opinion, Award, and Order that he disbelieved the portion of Dr. Muffly's report relating to the cervical impairment being work-related because Dr. Muffly was not aware of all the circumstances at play.  The ALJ noted a "complete lack of supporting evidence that a work incident took place [on March 5, 2013], and more significantly that the Plaintiff not only failed to seek treatment for his injuries until 8 months post-accident, but actively denied having suffered a musculoskeletal injury to medical providers during that time[.]"

Taylor moved for reconsideration, which a different ALJ reviewed and denied.  Taylor then appealed the second ALJ's ruling to WCB, which affirmed.  This appeal followed.

## II.  ANALYSIS

## A.  STANDARD OF REVIEW

The standard of appellate review of a decision by an administrative agency affords great deference to the agency, particularly the WCB.  "On appeal, our standard of review of a decision of the Workers' Compensation Board 'is to correct the Board only where the … Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice.'"  *Pike County Bd. of Educ. v. Mills*, 260 S.W.3d 366, 368 (Ky. App. 2008) (quoting *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-688 (Ky. 1992)).  The party claiming benefits bears the burden of proving entitlement to benefits as well as the appurtenant risk of non-persuasion.  *Id.* (*citing Wolf Creek Collieries v. Crum*, 673 S.W.2d 735 (Ky. App 1984).

KRS 342.285 designates the ALJ as the sole fact-finder in workers' compensation claims.  KRS 342.285(1).  This Court has interpreted the provision to grant "…the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence, and to draw reasonable inferences from the evidence[,]" to the ALJ.  *Bowerman v. Black Equipment Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009).  An ALJ is entitled to believe or disbelieve all or parts of the evidence presented for review.  *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15 (Ky. 1977).  "In short, appellate courts may not second-guess or disturb

discretionary decisions of an ALJ unless those decisions amount to an abuse of discretion." *Bowerman*, at 866 (citing *Medley v. Bd. of Educ., Shelby County*, 168 S.W.3d 398, 406 (Ky. App. 2004)).

## B. THE WORKERS' COMPENSATION BOARD ERRED IN AFFIRMING THE ALJ'S RULING

Taylor details the discrepancies between the medical reports in his brief to this Court. Taylor rests his entire case on the assertion that Dr. Kriss incorrectly concluded that Taylor had neither complained of, nor sought treatment for, an injury to his cervical spine between March 5, 2013, and December 10, 2013. Taylor attacks the report by highlighting the portion noting that Taylor failed to notify MECC of the work-related injuries, and conversely noting that MECC stipulated that it had been timely notified. Taylor points out that Dr. Kriss' report fails to mention either temporary total disability benefits Taylor was receiving at the time Dr. Kriss evaluated him (in late 2014), or the notation regarding the neurosurgeon referral on the MRI report from December of 2013. Finally, Taylor casts aspersions on Dr. Kriss' failure to "explain away" the report from the cervical MRI (from December 12, 2013) that Dr. Kriss stated in his report that he had reviewed.

Taylor urges this Court to hold that the ALJ should have instead relied on Dr. Muffly's evidence, which included an opinion that the cervical issues were

related to his work injuries.  Both parties, as well as both ALJs and the WCB, cite *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839 (Ky. 2004), to stand for the proposition that a substantially inaccurate physician's report cannot be considered substantial evidence.  Obviously, the parties cite this case to reach opposite conclusions.

Taylor asserts that the inaccuracies in Dr. Kriss' medical report, particularly the omissions of the neurosurgeon referral notation on the lumbar MRI report and the cervical MRI report, are too big to ignore.  These omissions, according to Taylor, render the Dr. Kriss' report incapable of being substantial evidence to support the ALJ's ruling.

MECC, on the other hand, contends that Dr. Muffly's lack of the complete factual picture, notably the fact that Taylor never complained on the record about any neck pain or injury prior to November of 2013, makes the evidence generated by Dr. Muffly less than substantial, and likewise incapable of supporting the ruling.

In *Cepero*, the claimant fell at work and injured his knee when his feet became entangled in a wire.  His employer referred him to a doctor on the day of the accident who diagnosed him with a contusion and strain of the left knee. Cepero returned to work with over-the-counter pain medication.  Seven days later, his knee still swollen, he saw another physician, Dr. Louise Box, and disclosed to

-11-

her that he had broken his left knee three years prior and spent three months in a wheelchair.  He did not disclose the work injury from the previous week to Dr. Box, who referred the claimant to Drs. Leonard Goddy and Thomas Loeb, orthopedic surgeons.

When Dr. Goddy saw the claimant, he described a "twisting valgus injury that occurred while practicing martial arts in Cuba two and one-half years earlier." *Cepero* at 840.  Dr. Goddy diagnosed the claimant with "'disruption of the anterior cruciate ligament [ACL] and disruption of the lateral collateral ligament knee left.'" *Id.*  Dr. Loeb performed the surgical reconstruction of the claimant's knee, which entailed removing part of the claimant's medial meniscus. Dr. Loeb offered testimony that injuries to the ACL and medial meniscus are typically the result of "valgus-type injuries in which the ankle is forced away from the midline of the body, thus pushing the lower leg outward and the knee inward" which Dr. Loeb attributed to the martial arts injury.  *Id.*

Cepero then had two IMEs.  Dr. David Changaris performed the first, and his report indicated the claimant only mentioned his fall at work, and not the martial arts injury.  Dr. Ellen Ballard performed the second, and the claimant specifically denied having injured his left knee at any point in the past other than his fall at work.  Dr. Ballard prepared a report concluding the disability to be the result of work-related injury.  However, during deposition, Dr. Ballard changed her

opinion after learning of the treatment by Drs. Box and Goddy and the martial arts injury.

During his deposition testimony, Cepero insisted that he had never injured his left knee before his work fall.  When confronted with Dr. Goddy's treatment records, he testified that the martial arts injury occurred fifteen years ago and denied ever spending time in a wheelchair.  Cepero, a native of Cuba, suggested that the "language barrier" caused the confusion surrounding his account of his medical history.

The ALJ, despite the contradictory and inconsistent nature of the claimant's testimony, found him credible.  The ALJ also relied on Dr. Changaris' report, and Dr. Ballard's original findings, in awarding the claimant benefits.  The WCB reversed, holding that the opinions expressed in Dr. Changaris' report and Dr. Ballard's original report did not amount to substantial evidence as they pertained to the causation of Cepero's present condition.

The Supreme Court held that Dr. Changaris' report (which was based only on the reported work injury) and his conclusion regarding causation was "corrupt due to it being substantially inaccurate or largely incomplete" and consequently did not "measure up as substantial evidence[.]"  *Id.* at 842-43.  "Medical opinion predicated upon such erroneous or deficient information that is

completely unsupported by any other credible evidence can never, in our view, be reasonably probable." *Id.* at 842.

The facts here more closely mirror Taylor's interpretation of *Cepero*. Though no medical evidence of record mentions a neck injury until he sought treatment for the second injury on December 10, 2013, Dr. Kriss' report flatly ignores Taylor's statements reflected in both Drs. Muffly's and Stephens' reports regarding that gap. The ALJ found that Dr. Muffly's review of Taylor's medical history was less credible because it was fettered by the lack of a complete picture; *i.e.,* lack of knowledge of Taylor's eight-month silence regarding any possible neck injury. Yet Dr. Muffly's first IME report clearly indicates his awareness of that fact, as does Dr. Stephens' report, which both Dr. Kriss and Dr. Muffly reviewed.

Moreover, it is Dr. Kriss' report that reflects a lack of knowledge of the complete factual picture. Dr. Kriss noted that Taylor never notified his employer of his March injury, a statement which was demonstrably inaccurate even at the time Dr. Kriss made it. Dr. Kriss' failure to include Dr. Muffly's original IME report in the list of records he had reviewed indicates that he had not examined evidence pertinent to his review.

In our reading of the IME report Dr. Kriss generated, it is plainly evident that he began with an assumption that Taylor may have been exaggerating

his symptoms, and then that Taylor must have lied regarding both of his work accidents.  Dr. Kriss spends significant effort justifying this assumption and in actively ignoring any evidence contradicting this opinion.

Dr. Kriss' report does not reflect a measured examination of all evidence available.  Its conclusion is based on assumption and a willfully incomplete examination of the facts.  Much like the evidence relied upon by the ALJ in *Cepero*, the report is too corrupt to constitute substantial evidence.

While it is not the place of the WCB or this Court to disrupt those findings where substantial evidence supports them, we cannot conclude the ALJ properly relied on Dr. Kriss' faulty IME report in reaching its ruling.

### III.  CONCLUSION

Having reviewed the record and finding no support for Taylor's position, we must reverse and remand.

COMBS, JUDGE, CONCURS.

NICKELL, JUDGE, CONCURS IN THE MAJORITY OPINION BUT WRITES SEPARATELY.

NICKELL, JUDGE:  In its Opinion Affirming, the WCB determined ALJ Steven G. Bolton, as trier, appropriately weighed conflicting medical evidence and reasonably exercised authorized discretion in concluding Taylor's cervical condition was non-work-related and, therefore, non-compensable.  *Bowerman*, 297

S.W.3d at 866.  Because it concluded the medical opinion of Dr. Timothy C. Kriss, a central Kentucky neurosurgeon who performed an IME and medical records review, represented substantial evidence of probative value supporting ALJ Bolton's factual finding, the WCB held the decision was not clearly erroneous and should not be disturbed on appeal.  *Special Fund v. Francis*, 708 S.W.2d 641, 643-44 (Ky. 1986).  Taylor bore the requisite burden of proof and risk of non-persuasion before ALJ Bolton, and because Taylor was unsuccessful, the question on appeal is "whether the evidence was so overwhelming, upon consideration of the entire record, as to have compelled a finding in his favor."  *Wolf Creek Collieries*, 673 S.W.2d at 736.

In the Opinion, Award and Order, ALJ Bolton denied and dismissed Taylor's cervical injury claim.  In doing so, he adopted the medical opinions of Dr. Kriss.  In reviewing Taylor's medical records, Dr. Kriss concluded Taylor had failed to report or seek treatment for cervical complaints immediately following either of the work-related incidents occurring on March 5, 2013, and December 10, 2013.  Based on this factual understanding, Dr. Kriss deduced Taylor's significant cervical degenerative changes were age-appropriate and asymptomatic prior to a subsequent spontaneous manifestation, wholly absent any work-related traumatic cause or arousal.

In the Order on Reconsideration overruling Taylor's petition, ALJ

Chris Davis echoed ALJ Bolton's decision, finding "[a]s a factual matter" Taylor "failed to seek any medical treatment" and "denied the existence of injuries to the cervical spine" immediately following either work-related traumatic events.  ALJ Davis concluded these factors "form a sufficient basis to reject the cervical claims."

The WCB began its analysis "by noting the only issue on appeal was the ALJ's dismissal of Taylor's cervical claim."  It acknowledged ALJ Bolton had "relied entirely on the opinions of Dr. Kriss in finding neither work-related event resulted in a cervical injury warranting an impairment rating."

Based on perceived delays, denials, and discrepancies in reporting low back and cervical complaints, Dr. Kriss concluded Taylor had "*shown quite emphatically that he is not an accurate medical historian,*" and "*therefore we must rely on the contemporaneous medical records, not markedly delayed, contradictory, retrospective reconstructions from Mr. Taylor.*"  (emphasis in original).  ALJ Bolton obviously agreed, acknowledging he had "some problems with Mr. Taylor's testimony."  Even Dr. George Christopher Stephens, an orthopedic surgeon at Baptist Health Lexington who also performed and IME and medical records review, conceded the varying medical histories contained in Taylor's medical records were "quite atypical" and admitted "I am giving this

-17-

gentleman the benefit of the doubt and trusting the history that I obtained from him to be accurate" in opining the cervical condition was work-related.

In proceeding to review Taylor's medical records, Dr. Kriss gleaned two significant impressions related to Taylor's March 5, 2013, work-related event. First, Taylor had explicitly denied low back or neck pain to Crystal Blair, an APRN at Hometown Family Care, on multiple occasions in April, May, and August of 2013. And second, Taylor failed to report or seek diagnostic testing or medical attention for any low back or cervical or upper extremity symptoms for eight months immediately following the alleged traumatic event. As a result, Dr. Kriss concluded Taylor's November 1, 2013, complaint of low back pain to Dr. Maurice M. Trivette, a family practitioner at Pikeville Medical Center (PMC), represented a spontaneous, atraumatic manifestation, resulting from the natural progression of longstanding lumbar osteoarthritis, degenerative disc disease, and spondylosis.

Most importantly for purposes of this appeal, Dr. Kriss discerned the medical records:

> are definitive that Mr. Taylor had no neck, cervical or upper extremity complaints whatsoever for more than nine days after the December 10th, 2013 slip and fall.

This understanding led Dr. Kriss to conclude the December 10, 2013, work-related event had not caused or aroused Taylor's neck and upper extremity complaints.

-18-

Instead, he again opined Taylor's cervical symptoms arose "spontaneously and atraumatically" due to "a totally age-appropriate, totally natural manifestation of unavoidable degeneration."

On appeal, Taylor argues Dr. Kriss's medical opinion relative to the December 10, 2013, work-related event was founded on a misapprehension of contemporaneous medical records. Citing the Supreme Court of Kentucky's holding in *Cepero, supra,* Taylor asserts Dr. Kriss's factually unfounded medical opinion cannot provide the requisite substantial evidence necessary to support ALJ Bolton's denial and dismissal of his cervical injury claim.

In *Cepero*, the Supreme Court quoted the WCB's reasoned analysis in holding:

> where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable. Furthermore, to permit a ruling of law to stand based upon such evidence that is not reliable, probative and material would be fundamentally unjust. We therefore conclude the opinions of [the physician] . . . . do not measure up as substantial evidence, and it was error for the ALJ to blindly elect to adopt [the] flawed conclusions to support any ruling of law.

*Cepero*, 132 S.W.3d at 842-43.

-19-

Here, in finding "no merit" to Taylor's argument, the WCB sought to distinguished *Cepero*, stating:

> Cepero, supra, was an unusual case involving not only a complete failure to disclose, affirmative efforts by the employee to cover up a significant injury to the left knee only two and a half years prior to the alleged work-related injury to the same knee. The previous, non-work-related injury had left Cepero confined to a wheelchair for more than a month. The physician upon whom the ALJ relied in awarding benefits was not informed of this prior history by the employee and had no other apparent means of becoming so informed. Every physician who was adequately informed of this prior history opined Cepero's left knee impairment was not work-related but, instead, was attributable to the non-work-related injury two and a half years previous. We find nothing akin to Cepero in the case *sub judice*. The ALJ could reasonably infer the opinions expressed by Dr. Kriss on December 23, 2015, were based on a complete understanding of Taylor's medical history since he indicated he reviewed in detail the medical records pertaining to the cervical condition, including the MRIs.

Clearly, a physician's detailed review of medical records does not necessarily establish "a complete understanding" of their substance, and significant factual misconceptions result in unfounded, unreliable medical conclusions.

At the outset, Dr. Kriss asserts Taylor failed to provide MECC due and timely notice of the two work-related traumatic incidents. This misconception is wholly debunked by the parties' contrary stipulation.

Foremost, however, Dr. Kriss's medical opinion incorrectly surmises

-20-

the absence of contemporaneous and ongoing cervical symptoms, evaluations and treatments. To the contrary, Taylor's cervical complaints, assessments, and care following the December 10, 2013, work-related traumatic event were immediate, ongoing, and ubiquitous.

Specifically, on December 12, 2013—just two days after the traumatic work event—Dr. Trivette examined Taylor. Based on his medical assessment of Taylor's presentation, records establish Dr. Trivette found it medically necessary to order both lumbar and cervical MRI films. Though the "History of Present Illness" broadly listed only "back pain," the cervical MRI films revealed cervical degenerative disc and joint disease, with stenosis. Dr. Kriss also apparently failed to weigh MECC's provision of medical benefits covering these early cervical MRI studies, or to consider temporary total disability benefits were immediately initiated on December 13, 2013. When the "contemporaneous" cervical MRI studies ordered by Dr. Trivette are properly considered, nurse practitioner Blair's December 19, 2013, notations of a work injury and a neck disorder cannot be mischaracterized as a delayed report, but are entirely consistent with a work-related trauma causing or arousing an injury.

Further, upon referral from Dr. Trivette, Dr. Duane W. Densler, a PMC neurosurgeon, examined Taylor on December 24, 2013—just two weeks after the work event—noting:

-21-

> History of present illness:  This 58 year old male presents
> with:  2.  Neck Pain:  The Problem is severe.  Duration:
> 3 weeks.  The problem has worsened.  The frequency of
> the pain is constant.  Location of pain is bilateral
> shoulder and bilateral arm.  The patient describes the
> pain as aching and sharp.  Aggravating factors include
> driving, flexion, hyperextension, prolonged sitting and
> turning head.  Relieving factors tried included heating
> pad and OTC medications.  Pertinent negatives include
> bladder incontinence, incoordination and weight loss.
> MRI at PMC, numbness and tingling in arms and hands
> bilateral, arm and hands weakness, no PT, no chrio [sic],
> no epi injection, patient walked and fell on rocks and
> twisted his back 12-10-13.

Dr. Densler's clinical diagnosis included neck pain secondary to cervical disc degeneration and displacement, and he recommended a course of treatment to include physical therapy, epidural steroid injection, or surgery.  As a result, Taylor received physical therapy, injections, and other treatment modalities from Dr. David A. Weber, a PMC pain management specialist, from December 24, 2013, through November 5, 2014.

Lastly, when conservative measures proved unsuccessful, Dr. Norman W. Mayer, another PMC neurosurgeon, ultimately performed an anterior cervical discectomy at the C4-5 and C5-6 levels, with immobilization by fusion, on July 24, 2015.  Dr. Mayer's pre-operative and post-operative diagnoses were herniated nucleus pulposus at the C4-5 and C5-6 levels, with cervical radiculopathy.  He also subsequently noted the formation of large spurs anteriorly at the C6-7 level.

In the present appeal, because Taylor was a poor medical historian,

Dr. Kriss was justified in basing conclusions on the strength of Taylor's medical records. However, Taylor is entitled to an Opinion, Award and Order based on medical opinions founded upon an accurate understanding of his medical records. Because Dr. Kriss inexplicably misapprehended—and, therefore, unavoidably misinterpreted and misapplied—Taylor's medical records, his medical opinion of a non-work-related, atraumatic, spontaneous cervical condition cannot "measure up as substantial evidence," and ALJ Bolton erred in adopting his "flawed conclusions to support" the denial and dismissal of Taylor's cervical claim. *Cepero*, at 842.

As a result, I concur.

BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Randy G. Clark                          Terri S. Walters
Pikeville, Kentucky                     Pikeville, Kentucky

Michael F. Johnson                      Racheal Wagner Kennedy
Pikeville, Kentucky                     Pikeville, Kentucky