UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

CHARLES L. WALDEN                           )
                                            )
        Plaintiff                           )
                                            )
                                            )
v.                                          )        CIVIL ACTION NO. 5:22-CV-00238-KKC
                                            )
ENTERPRISE SERVICES GROUP, LLC              )
CLARENCE M. HOWARD, AND                     )
NATIONAL INDEMNITY GROUP OF                 )
INSURANCE COMPANIES OR                      )
NATIONAL INDEMNITY COMPANY,                 )
VINCE KLINE, AND PROGRESSIVE                )
CASUALTY INSURANCE COMPANY                  )

        Defendants amended

**********

**AMENDED RESPONSE TO DEFENDANTS' MOTION TO COMPEL CR 35
EXAMINATION, OBJECTION TO USE OF DR. KRISS FOR RULE 35
EXAMINATION, & REQUEST FOR REASONABLE CONDITIONS**
**********

Comes the Plaintiff, CHARLES L. WALDEN, and for his Amended Response to

Defendants', Enterprise Services Group and Clarence M. Howard, Motion to Compel CR 35

Examination, as permitted by the Court's April 12, 2024 Order [DE 125], hereby states as

follows:

Defendants have repeatedly asserted that they have suffered prejudice as a result of

Plaintiff's refusal to participate in an exam without fully defined conditions – namely the time,

place, manner, and scope of the examination – as required by the rules of civil procedure.

However, if Defendants had petitioned the Court for a Rule 35 Exam prior to unilaterally

scheduling it, then these scheduling issues would have never occurred. Mr. Walden has been

seriously injured by these Defendants ignoring safety rules. He should not be made to suffer

1

victim-blaming, undue prejudice, and further injury caused by their failure to adhere to the Federal Rules of Civil Procedure.

The Defendants have mislead this Court by consistently repeating false statements and partial summaries regarding the Plaintiff and his medical care. They have failed to establish the necessary qualifications for a Rule 35 Exam, and have intentionally chosen a physician who is especially not "Independent," and who has also demonstrated repeated bias toward plaintiffs.

## I.      TWO-PRONG STANDARD FOR GRANTING RULE 35 MOTIONS

Rule 35 examinations, even when warranted, are invasive to the privacy of Plaintiffs and, prior to the adoption of the Federal Rules of Civil Procedure, were considered to be as offensive as an additional injury rarely sanctioned by the common law courts. *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). Our highest Court having held, "[t]he inviolability of the person is as much invaded by a compulsory stripping and exposure [by the examining doctor], as by a blow." Id. at 251-52; 11 S.Ct. at 1001.

The Court has complete discretion as to whether or not to actually grant the motion, even if it deems the "in controversy" and "good cause" requirements are met. The Order for such an examination has two requirements: A) that if issued at all it must be issued only for good cause and with notice to all parties and the examinee, and B) the Order itself must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it. Fed. R. Civ. P. 35. An Order which fails to provide the time, place, manner, conditions, scope, and who shall perform the examination does not adhere to Rule 35 of the Federal Rules of Civil Procedure.

Rule 35 examinations are considered to be a special tool of discovery but because of their invasive and humiliating nature these examinations have a heightened standard for when a Court

should compel the adversarial examinations. Unlike other less-invasive discovery tools a movant requesting the Court to compel a plaintiff to be examined by a doctor, hand-picked and hired by the Defendants, and who owes no hippocratic duty to the examinee (as a treating doctor owes to his/her patients), must prove that the condition of the examinee is a) "in controversy" AND b) must demonstrate "good cause" for the examination. See *Schlagenhauf v. Holder*, 379 U.S. 104, 117-18, 85 S.Ct. 234, 242, 13 L.Ed.2d 152 (1964) (noting this distinction between FRCP 35(a) and other federal rules); *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962) ("there must be greater showing of need under Rules 34 and 35 than under the other discovery rules.")

The "in controversy" and "good cause" requirements of Rule 35 are not met by conclusory allegations nor mere relevance to the case – but require an affirmative showing that each condition as to which the defense medical examination is sought is really and genuinely in controversy and that good cause actually exists for ordering each examination. *Ford v. Am. River Transp. Co*., No. 5:11CV-00094-R (W.D. Ky. Sep. 12, 2012), *Taylor v. Morris,* 62 S.W.3d 377 (Ky. 2001), and *Daniels v. Jevic Transportation, Inc.*, 2008 WL 489255 (E.D. Ky.). "'The decision on whether to issue a Rule 35 order for a mental examination 'lies soundly within the court's discretion.'" *Beightler v. Suntrust Banks, Inc.*, 2008 WL 1984508 at *2 (W.D.Tenn.) (quoting Hodges v. Keane, 145 F.R.D. 332, 334 (S.D.N.Y.1993))." *Ford v. Am. River Transp. Co*., No. 5:11CV-00094-R, at *3 (W.D. Ky. Sep. 12, 2012).

**Defendants Have Not Even Met the "In Controversy" Requirement for a Rule 35 Exam**

Defendants have claimed, contrary to the aforementioned caselaw, that Plaintiff "seeking millions" (yet another misrepresentation of Plaintiff's position) for his injuries somehow undeniably placed "these conditions squarely at issue." First, "at issue" is not the standard but

3

Plaintiff's conditions for which the examinations are requested must be "in controversy." While some courts have held mere pleadings to be enough to establish controversy, the plain meaning of the word doesn't allow for such an interpretation, and interpreting the rule in such a way would cause the heightened standard to be arbitrary; reducing the heightened standard of Rule 35 examinations to the basic rule of discovery found in FRCP 26(b)(1) which is the "parties may obtain discovery regarding any matter, not privileged, which is relevant."

There must be a disagreement about the Plaintiff's condition; an actual controversy. If the Defendants are seriously contesting every injury reported at the emergency department immediately following this collision then they should be required to state as much in their motion. The Court is not able to make a reasonable determination as to which of Plaintiff's conditions are in controversy since the Defendant has not affirmatively stated which conditions and symptoms it is contesting. If the Court finds the Defendants have stated every condition for which is in controversy then the Court should include in its Order that the Defendants may not later claim any other condition not specifically mentioned in their Motion to Compel a Rule 35 Examination. The Defendants' blanket statement that Plaintiff has placed all of his injuries in controversy by stating they exist after the collision fails to affirmatively place every single condition in controversy. The Defendants must make an affirmative showing as to each condition for which the examination is sought and the blanket statement provided is entirely inadequate. Defendants' motion should be denied at least until a more specific statement on which conditions are in controversy is filed. Only then can the Plaintiff properly apprise his rights in relation to the motion, including whether or not the specific examinations requested are inappropriate, duplicative discovery, or if there is some other lawful justification to protect the Plaintiff from such adversarial prodding by a defense doctor.

**Defendants Have Not Established "Good Cause" for a Rule 35 Exam**

When Defendants requested an exam under Rule 35 without a Court order, Plaintiff has every right to perform his due diligence in understanding the course and scope of the examination prior to agreeing to submit to it. Plaintiff specifically requested the scope of the examination and the basis on which Defendants claimed good cause for the exam. It is well-established that these are the two items which a party seeking an order for a Rule 35 Exam must show. *Schlagenhauf v. Holder*, 379 U.S. 104, 117-118 (1964). It is baffling to the Plaintiff that Defendants could object to Plaintiff's counsel requesting the legal basis for a request, using the specific terminology found in case law and with which the Defendants should be familiar.

To be successful on a Motion to Compel a Rule 35 Exam, the movant must show that "the condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Id*. at 118. A mere showing of relevancy is insufficient to establish "good cause." *Id*. In addition, the court should consider whether the desired information can be obtained by means other than an IME. *Id*; see also *Page v. Hertz Corp*., 2011 U.S. Dist. LEXIS 131808 (D.S.D. Nov. 15, 2011).

Despite the Defendants' lengthy Motion, containing a number of misleading statements which flirt with violating the duty to of candor to the tribunal, Defendants have not established the good cause necessary to. Our Federal Rules of Civil Procedure specifically protect Plaintiffs from abusive, duplicative discovery. FRCP Rule 26 (b)(2)(C)(i). Our federal court system has held that when the defendant has access to medical records and reports that conduct the same testing an "independent physician" proposes, good cause for the exam may not exist. *Hughes v Groves*, 47 F.R.D. 52, 57 (E.D. Mo. 1969); see also *Martin v Tindell*, 98 So.2d 473, 475 (Fla. 1957).

The Defendants argue the damages claimed by the Plaintiff independently establish "good cause," yet this is an impossibility since an affirmative showing is required. Interpreting Rule 35 without requiring specific affirmation by the movant renders the heightened two-prong requirement of compelling Rule 35 examinations arbitrary. The Defendants would have this Court ignore its duty to give meaning to the heightened standard of "in controversy" and "good cause."

The Defendants mention a previous collision with similar injuries in their motion. While not binding on this Court, the Kentucky Court of Appeals has helpfully opined "good cause" is not found when the defendant's only stated reason for a Rule 35 examination was because the plaintiff had been in similar accidents and claimed similar injuries. *Peeples v. Allstate Prop. & Cas. Ins. Co.*, No. 2019-CA-1432-MR, 2020 Ky. App. Unpub. LEXIS 697 (Ct. App. Oct. 16, 2020).

Furthermore, even if the Court considers "good cause" to have been established, there is no requirement to Order the Rule 35 examination as the Court has complete discretion as to whether or not Order the injured plaintiff to suffer further injury by subjecting him to an adverse medical examination by a doctor who has a clear track record of bias against Plaintiffs and Claimants.

**Defendants' Motion Would Have Dr. Kriss to Determine Scope; Lacks Detail**

The Defendants have failed to affirmatively and specifically enumerate the conditions "in controversy," the "good cause" establishing why the specific examinations requested are necessary to obtain relevant information, nor did they even include the actual specifics of the examinations requested; instead calling them "standard." Plaintiff should not be required to submit to a scopeless and amorphous examination, subject to the whims of a defense-hired

doctor. Instead of identifying specific tests, the Defendants call the examinations they are requesting "standard examinations." This is not specific enough to meet the requirement. The Defendants also failed to include in their motion a definite scope of the examination, stating instead, "Dr. Kriss should attempt to stay within the confines of the testing described in the [Proposed] Order, unless, in his professional opinion, Dr. Kris determines that additional testing is required." This proposal doesn't even allow the Plaintiff the right to contest these hypothetical, mystery tests as duplicative discovery, abuse, or to otherwise protect his privacy and legal rights in the context of a Rule 35 examination. If any Order compelling a Rule 35 examination is issued the Order itself must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it. An Order simply granting a motion without itself enumerating such limitations on the examination does not comply with the Federal Rules of Civil Procedure. Of course, there is no requirement to grant the Order whatsoever, regardless of whether or not "in controversy" and "good cause" are actually established through affirmative statements; since it cannot merely be established by the nature of the claim or the Plaintiff's prior medical condition.

Defendants' email itemizing the testing to be conducted by Dr. Kriss contains numerous repeat exams that have been conducted on the Plaintiff at length by his treating providers, yet notably not conducted by Dr. Changaris. Since the results of the tests performed by Plaintiff's treating doctors are readily available to the Defendants, those proposed tests are duplicative discovery should be limited by this Court.

| | |
|---|---|
| Long tract signs (Babinski, Hoffman's, clonus, etc.) (para. ii) | Kentucky Orthopedics and Spine 04/17/2023 |
| Reflexes (para. iii) | Kentucky Orthopedics and Spine 04/17/2023; BHMG Primary Care 01/09/2023; BHMG Primary Care 01/27/2021 |
| Gait (para. iv) | Kentucky Orthopedics and Spine 04/17/2023; |

|  | BHMG Primary Care 10/21/2022 |
| Straight leg raise (para. xi) | Kentucky Orthopedics and Spine 04/17/2023 |
| Patrick sign (para. xiii) | Kentucky Orthopedics and Spine 04/17/2023 |
| Greater trochanter examination (para. xiv) | UK HealthCare Radiographic Imaging 08/10/2020; UK HealthCare Radiographic Imaging 09/21/2020; |

In addition, the following tests from Defendants' list have never been conducted on the Plaintiff, and Defendants have refused to give any explanation for their necessity, other than that they are "routine" examinations: Electronic inclinometer with automatic sensing (para. v); Lehrmitte's sign (para. vi); Spurling sign (para. vii); Romberg sign (para. viii); Phalen's sign (para. ix); Tinel's sign (para. x); Neer sign (para. xvi); and Hawkins sign (para.xvii).

Of the tests provided for Dr. Kriss to conduct (paragraph b of Defendants' email), only the following were conducted by Dr. Changaris: hip examination (para. xii), shoulder examination (para. xv), Nystagmus (para. xviii), facial sensation (para. xix), and air conduction (para. xx). Dr. Changaris conducted range of motion testing on the Plaintiff's cervical spine (as part of a cervical neurological exam), shoulder range of motion, and lumbar range of motion; nonetheless, "complete range of motion" testing is far too broad.

In paragraph d of Defendants' email, they indicated that Dr. Kriss would conduct:

Verbal inquiries relating to Plaintiff's current physical condition, pre-MVA physical condition, nature of improvements or declines in physical condition since subject MVA, mechanism of injuries regarding subject MVA and prior injury-related incidents/events, current medical treatment, medical treatment between subject MVA and date of IME, pre-MVA medical treatment, medication regiment (current, pre-MVA, period between MVA and IME), Occupational status (current and pre-MVA), pre-MVA medical history.

All of these items are **well** documented in Plaintiff's medical records. Defendants have absolutely not established good cause to continue to ask Plaintiff questions about his medical history, when he has provided it via written discovery, deposition testimony, extensive medical records provided by the Plaintiff, and medical records obtained by the Defendants themselves.

**Defendants' Misrepresentations of Plaintiff's Medical Records**

8

The Court's Order granting Defendants' Motion to Compel CR 35 Exam [DE 122] did not appear to address the misrepresentations of Plaintiff's medical records made by the Defendants. Instead, the Court indicated that "Defendants provided a thorough summary of Walden's medical records." Thus, once again, Plaintiff brings these issues – ranging from misrepresentations to directly and knowingly false statements – to the Court's attention.

The Defendants have treated the Plaintiff's complex and largely undisputed medical history like a buffet, where they can grab items as they please, leave those they don't care for, a present a plate of their own crafting to the Court. While they make clear misrepresentations of certain facts – misrepresentations which become clear as soon as one consults the medical record they purported to have originated from – other "facts" are clearly false and nothing more than a thinly veiled attempt to minimize the severity of the subject wreck, the Plaintiff's injuries, and by extension, their own negligence. In an era of "alternative facts," let the judicial system be the refuge of truth.

To begin to address the multiple factual inaccuracies, Defendants claim that in the EMS record from 08/10/2020, the date of the subject collision, "Plaintiff's only complaint was **left** hip pain with movement" (emphasis in original) [Defendants' Motion, DE 115, page 2]. The EMS medical record, attached hereto as Exhibit "A," can speak for itself that Plaintiff never complains of "left" hip pain, only hip pain. The medical record further documents that the EMTs intentionally and with an effort to make their patient as comfortable as possible placed the Plaintiff on his left side: "On board patient rested in a left lateral position." The collision report, attached to Defendants' Motion as Exhibit 1, also makes no mention of "left" hip pain.

Defendants move on to claim that at the University of Kentucky Emergency Department, Plaintiff's "**only diagnosis** was a right acetabulum pelvis fracture." Once again, the medical

record speaks for itself in the falsity of this statement. Plaintiff's "Active Problems" listed his fracture of right acetabulum, but also posterior dislocation of hip and a concussion. See Exhibit "B." The "Hospital course" summarizing his 7-day stay at the University of Kentucky Hospital noted he was found to have a "periprosthetic acetabulum fracture, right hip dislocation, and a concussion." See Exhibit "C." Defendants have grossly misrepresented Plaintiff's initial complaints, but further tried to minimize his severe hip and head injuries. Despite Defendants' assertion that Plaintiff "only" suffered a right pelvis fracture, in reality, his injuries were so severe that he spent 7 days in the hospital, had surgery that was described by his surgeon as "complex" due to the Plaintiff's "significant marginal impaction greater than 30% surgical effort." See Exhibit "D." In layman's terms, the Plaintiff's pelvis was crushed by the Defendants' vehicle. Plaintiff required the use of a wheelchair or walker for months following this collision (see Baptist Health Medical Group Primary Care medical record from 09/14/2020, where Plaintiff reported to his primary care physician for the first time after his collision and is noted to ambulate with a walker); required assistive equipment at home, including a shower chair (see Baptist Health Medical Group Primary Care medical record from 09/14/2020); required extensive physical therapy and occupational therapy, both while at UK Hospital and after discharge; and was discharged under the conditions of staying with his father and having his mother available to provide assistance (see Exhibit "E").

Next, the Defendants move on to cherry-picking words from the Plaintiff's medical record, pulling it completely out of the context in which it was made, and indicating that it is clearly demonstrated that the Plaintiff wasn't seriously injured, despite the remainder of his medical records. Specifically, Defendants have classified the notes "Doing well" from the University of Kentucky Orthopedics to mean that he had a "virtually complete recovery of

injuries sustained in this accident." Considering the Plaintiff had just underwent major and complex surgery to repair a dislocated and fractured hip, considering he was discharged from the hospital under the specific conditions of having assistance, considering that Plaintiff was receiving IVs of morphine and dilaudid to control his pain, and considering that Plaintiff continued with physical therapy treatment upon his discharge from University of Kentucky Hospital, the doctor's note of "doing well" is plainly not an indication that the Plaintiff was ready to return to his activities as normal.

Consistent with their misclassifications and complete fabrications of the Plaintiff's medical records thus far, the Defendants allege that Mr. Walden was released from physical therapy because he had improved so miraculously and beyond what his therapists had expected, that of course he should be discharged from treatment. Plaintiff respectfully directs the Court to the third page of his Discharge Summary from Results Physiotherapy, attached hereto as Exhibit "F," which states "The patient is discontinuing therapy due to insurance visit limitations." Furthermore, Mr. Walden is noted to have met 80% of his therapy goals, is discharged with a Home Exercise Program, and is noted to only be able to walk for 41-50 minutes, struggles with endurance and fatigue, and requires more time in therapy to achieve his goals related to using the stairs. See Exhibit "F." Considering that Mr. Walden was discharged from physical therapy at UK Hospital because he was released home with assistance he could not even "ambulate greater than or equal to 200 ft with appropriate assistive device," his ability to walk for 40 minutes is certainly an improvement and worth celebrating. However, the Plaintiff was far from a "virtually complete recovery" from his injuries, as Defendants claim. Once again, the Defendants have ignored evidence in the medical record in order to fit the narrative they hope to pursue, regardless of the facts of Mr. Walden's health.

Defendants move on to misclassify and misrepresent Plaintiff's treatment following his release from physical therapy. Alleging that Plaintiff's attorney requested an "out of the blue" memory workup and that Plaintiff didn't begin complaining of decreased memory and increased headaches until January of 2023, Defendants conveniently ignore the documented history of headaches, "mental status changes," and the abrasion to his head noted by EMS from the collision itself. Plaintiff's poor memory is well-documented, and is the reason he missed his primary care physician appointments on 04/02/2021, 06/17/2022, and 11/21/2022. In fact, Plaintiff's medical record reflects diagnoses of traumatic brain injuries as well as commonly associated symptoms, both prior and subsequent to the 08/10/2020 collision, including "right frontal lobe encephalomalacia" (diagnosed by UK HealthCare on February 28, 2013), "mild to moderate neurocognitive disorder" (diagnosed by UK Healthcare on May 7, 2014), "mental status change" and "post-traumatic epilepsy" (diagnosed by UK HealthCare on August 26, 2020), and "headaches" (noted by Baptist Health Medical Group Primary Care on January 9, 2021).

**Defendants' Misrepresentations of Plaintiff's Expert Witnesses**

Defendants did not stop with misrepresenting Plaintiff's medical records, but moved on to misrepresent and disparage Plaintiff's retained experts, Dr. Timothy Wilson and Dr. David Changaris.

It isn't clear why the Defendants use this motion as an opportunity to attack Dr. Wilson and his report, as Dr. Wilson is an orthopedic surgeon who evaluated the Plaintiff and provided an opinion regarding Plaintiff's orthopedic injuries. Defendants are seeking an examination of the Plaintiff by a neurosurgeon, Dr. Timothy Kriss. Thus, Plaintiff will address Defendants' criticisms of Dr. Changaris. As an initial matter, Defendants state "Dr. Changaris apparently

conducted an examination of Plaintiff, but his report neglects to identify the date of same." Since the Defendants are having difficulty reading Dr. Changaris' typewritten report, Plaintiff directs them to page 1, which begins with "Office record from D. Changaris, MD [Neurosurgeon]; left-justified and immediately above "Consultation," Dr. Changaris notes "November 17, 2023" as the date of his examination.

Next, Defendants indicate that Dr. Changaris' report is inconsistent with the Plaintiff's medical records because of Plaintiff's complaints of neck pain, left leg pain, right knee pain, left ankle pain, left foot pain, appetite changes, sleep difficulties, vision changes, relationship difficulties, hearing difficulties, emotional changes, and decreased activity. Plaintiff notes that most of these symptoms are in fact indicators of traumatic brain injuries, from which it is undisputed that Plaintiff suffers (Defendants may dispute that Plaintiff has suffered a traumatic brain injury from this MVA, but his medical record clearly establishes a history of TBI as well as at the very least a concussion from this MVA, which is a form of TBI).

## II.     OBJECTION TO DR. KRISS AS RULE 35 EXAMINER

Even if a physical examination is Ordered by this Court, the moving party has no absolute right to compel that examination by a particular physician of its own choosing. *McKitis v. DeFazio*, 187 F.R.D. 225, 227 (D. Md. 1999); *Stinchcomb v. United States*, 132 F.R.D. 29, 30 (E.D. Pa. 1990); 8A Charles A. Wright, Arthur R. Miller, Richard L. Marcus, Fed. Practice Procedure § 2234.2 at 485 (2d ed. 1994) (hereinafter "Wright Miller"). *Page v. Hertz Corp.*, CIV. 09-5098, at *11 (D.S.D. Nov. 15, 2011). "The court should appoint a physician different from the one proposed by a defendant only when the plaintiff raises a valid objection." *Powell v. United States*, 149 F.R.D. 122 (E.D.Va.1993)" *Holland v. United States*, 182 F.R.D. 493, 494 (D.S.C. 1998).

**Defendants' Chosen Expert Is Not An "Independent" Expert**

Kentucky courts have already established criteria for a physician conducting an Independent Medical Exam pursuant to the civil rules, and Dr. Kriss does not meet those qualifications in this matter. In *Fairchild v. S.C. DOT*, 385 S.C. 344, 683 S.E.2d 818 (Ct. App. 2009), the Court held that if a doctor had previously viewed a plaintiff's medical records and was a retained expert witness by a defendant, he would be too biased to conduct an Independent Medical Exam on the plaintiff. Defendants have already informed this Court that they selected Dr. Kriss because he has spent a significant amount of time reviewing the Plaintiff's medical records. In Defendants' Response to Plaintiff's Motion to Alter, Amend, or Vacate the 01/08/2024 Order [DE 109], they state "Plaintiff continues his efforts to fault Defendant' decision to utilize the same neurosurgeon to conduct an IME who has already expended an untold number of hours reviewing the mountain of Plaintiff's prior medical records." Clearly, Dr. Kriss is not "independent" in any sense of the word and should the Court Order the Plaintiff to submit to another Rule 35 Exam, it should be with a neurosurgeon not previously hired by any party to review records in this matter, selected by the Court after receiving neurosurgeon proposals from both parties.

**Defendants' Chosen Expert Has Been Repeatedly Found to Demonstrate Bias**

Respectfully, the Plaintiff's position on Dr. Kriss' bias has been mischaracterized. Plaintiff objects to Dr. Kriss as a Rule 35 medical examiner because he demonstrates bias against **<u>all</u>** claimants and plaintiffs, not just those with traumatic brain injuries. Plaintiff cited multiple cases demonstrating Dr. Kriss' bias in his Response to Defendant's Motion to Compel the Rule 35 Exam – incorrectly referred to in the Order [DE 122] as citing three cases when Plaintiff provided case citations to four (4) cases in support – but Plaintiff can provide the Court with

14

even more caselaw to support his assertions of Dr. Kriss' biases toward claimants and plaintiffs, writing medical reports that are not supported by these individuals' medical history and which are frequently rejected by the court.

Dr. Kriss reports the same or substantially similar findings in each of his reports, as it serves his bottom line to write reports favorable to employers and defendants regardless of the underlying facts and medical history of the claimants. In *Russell County Hosp v. Price et al*., 2009 WL 1108854 (Ky. 2009) (attached hereto as Exhibit "G"), he concluded that the claimant was merely suffering from naturally occurring degenerative disc disease. The ALJ rejected this assertion in favor of the claimant, which was upheld by the Worker's Comp Board, the Court of Appeals, and the Kentucky Supreme Court as being supported by substantial evidence.

In *Hitachi Automotive Products USA Inc v. Sanders et al*., 2009 WL 2708120 (Ct. App. 2009) (attached hereto as Exhibit "H"), Dr. Kriss accuses the claimant of symptom magnification and again attributed her pain to degenerative disk disease, stating her workplace injury was "a temporary musculoskeletal strain that did not cause any permanent harmful change" to the claimant. Once again, the ALJ rejected Dr. Kriss' report and opinion in the face of substantial evidence to the contrary. The Worker's Compensation Board upheld the ALJ's opinion, and the Court of Appeals affirmed.

In *ICG Knott County LLC v. Thomas et al*., 2009 WL 3531649 (Ct. App 2009) (attached hereto as Exhibit "I"), Dr. Kriss is retained to perform an IME on a worker's comp claimant, and again, as stated by he Court, "Dr. Kriss characterized those events as temporary exacerbations of a 'preexisting active long-standing chronic back condition.'" The ALJ rejected Dr. Kriss' report in favor of the substantial evidence in support of the claimant. The Worker's Compensation Board and the Court of Appeals affirmed the ALJ's decision.

15

In *Link Belt v. Campbell et al*, 2007 WL 2340840 (Ct. App. 2007) (attached hereto as Exhibit "J"), Dr. Kriss examined a claimant and opined that his injury could not have resulted from a work-related incident. Upon review of all the medical evidence, the ALJ rejected Dr. Kriss' report, who once again "found the pain associated with the lower back was a pre-existing condition that was not at all related to the work injury." The ALJ was instead persuaded by the medical evidence that the injury caused the arousal of a dormant degenerative condition. The Worker's Compensation Board and the Court of Appeals found that the ALJ's rejection of Dr. Kriss' report was supported by substantial evidence and thus affirmed.

Dr. Kriss is a professional expert; he rarely treats patients, instead generating all or nearly all of his income from writing reports that favor those who hire him in complete disregard for actual medical histories and facts. He has repeatedly and regularly testified that the overwhelming majority of his work is **defense** medical exams. See attached deposition transcripts from three (3) different cases, attached as Exhibit "K." Furthermore, as demonstrated by Enterprise's responses to Plaintiff's Interrogatories and Requests for Production, defendants' counsel alone has funded over $36,000 of Dr. Kriss' expert consulting business since July of 2020. See attached, "Enterprise_Howard 000184," attached hereto as Exhibit "L." Dr. Kriss has a well-established motivation for continuing to write reports that disparage claimants and plaintiffs, and he has a demonstrated history of ignoring facts in order to continue to line his own pockets.

To address the cases the Plaintiff has previously cited in his briefs, this Court took issue with Plaintiff's citation to *Taylor v. McCoy Elkorn Coal Corporation, et al*, 2017-CA-000137-WC (Ky. Ct. App. 2018), noting that the Kentucky Supreme Court overturned this decision because the Court of Appeals improperly reweighed evidence. Kentucky's Supreme Court held

that Dr. Kriss not acknowledging a stipulation as to timely reporting does not affect his medical evaluation. While that may be true, Dr. Kriss was still noted to be making knowingly false statements in his reports. The matter was not overturned because the Supreme Court found Dr. Kriss to be credible; it never opined such, rather overturning the decision because the Court of Appeals overstepped, not that their conclusions were incorrect. The question is bias of the examiner and in *Taylor v. McCoy Elkhorn Coal Corporation* further corroborates Mr. Kriss' bias against Plaintiffs.

This tactic employed by Dr. Kriss in his evaluations is why Plaintiff has such strong concern. Again, in *Burns*, Dr. Kriss' medical report contradicted clear objective evidence to the contrary. The Court of Appeals in *Taylor* specifically found: "It is Dr. Kriss' report that reflects a lack of knowledge of the complete factual picture. Dr. Kriss noted that [plaintiff] never notified his employer of his March injury, ***a statement which was demonstrably inaccurate even at the time Dr. Kriss made it***" (emphasis added) [pg 14].

In the *Leaseway Motor Co. Trasport* case, Dr. Kriss himself acknowledged that "his method for apportioning impairment might well be viewed as arbitrary."

If this Court finds that the Defendants have established good cause for an examination of the Plaintiff, and are sufficiently convinced that the scope is within those reasonably established by his actual medical history – as opposed to the false narrative of his medical history that the Defendants put forth – then the Plaintiff respectfully requests that he be ordered to an examination with an impartial, truly independent neurosurgeon who will evaluate the Plaintiff fairly and without the clearly pre-conceived bias that Dr. Kriss has already displayed. If the plethora of caselaw cited above in which Dr. Kriss has been found to offer reports that contradict

the substantial medical evidence the claimants/plaintiffs present, perhaps the Court will at the least see the value in ordering a videotaped examination.

### III.      CONDITIONS

**Plaintiff Proposed an Agreed Order with Conditions for the Examination**

Defendants objected to Plaintiff's counsel professionally advocating for his client while attempting to hammer out the specific scope of the proposed examination, even implying dishonesty via "stall tactics" on the part of Plaintiff's counsel. However, courts have held that if a plaintiff voluntarily submits to an examination by a physician selected by the defendant, that plaintiff waives their rights to insist upon a Rule 35 motion for an order of examination. *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 689 (10th Cir. 2007).

Furthermore, despite Defendants' attempts to cast doubt on Plaintiff's counsel's advocacy, Plaintiff did provide a proposed Agreed Order with terms, attached hereto as Exhibit "K," to which he received no response. When Plaintiff's counsel followed up with Defense counsel, he was told the suggested terms and attending questions about the would-be examination were both interpreted as a rejection of the examination in spite of the plain language of such inquiries.

Should Defendants be ultimately successful in their motion, after having amended it to include the requisite specificity required by Rule 35, then the following conditions should be placed on the examination:

1.   A date for the selected examiner's deposition shall be provided to Plaintiff at least ten (10) days before the date of the physician's trial testimony deposition. Mr. Walden is entitled to a thorough cross-examination of Dr. Kriss, should he be allowed to examine Mr. Walden despite his well-documented track record of bias against Plaintiffs on behalf

of paying Defendants, and disallowing his counsel time to study and sort the discovery deposition prior to the trial deposition would unduly prejudice Mr. Walden and ultimately serve as an undue burden/hardship on him.

2.  A date for the selected examination shall be provided to Plaintiff with seven (7) days notice. As a result of the Defendants' negligence, Plaintiff suffered a relapse in his sobriety and is currently treating at Genises Recovery Center in Grayson, KY, Mr. Walden does not have his vehicle with him and must arrange transportation in advance. Failing to require reasonable notice to Mr. Walden will serve as an even greater undue burden/hardship on him.

3.  That Plaintiff, Charles L. Walden, may be accompanied to the proposed examination by a friend, family member, or other person of his choice (not including his lawyer or employees of his lawyer). Mr. Walden has suffered a significant concussion from the negligence of the Defendants and will likely not remember as much as a member of his family. He should not be made to pay further, in the form of an even more bias report not based on accurate information, simply because the Defendants couldn't follow safety rules. It would be unduly burdensome to force Mr. Walden to rely on his own memory when the Defendants' negligence caused memory deficiencies;

3.  That the examination shall be video recorded by the person chosen by Plaintiff, Charles L. Walden, who accompanies him to the proposed examination, or in the alternative by a court-approved videographer. Dr. Kriss' testimony in other cases has repeatedly been criticized, attacked, or outright rejected due to his consistently pro-defense conclusions not based on the actual medical record. The jury should be allowed to see the truthful examination. The presence of an accurate record should not unduly

influence either Mr. Walden nor Mr. Kriss as there is no evidence to suggest that it would, other than it may force Dr. Kriss to be more thorough and forthright. It would not increase any risk of exaggeration by Mr. Walden because 1) he has no history of exaggeration or malingering, and 2) doctors receive training on identifying exaggeration and malingering. If such exists, it would be beneficial for the jury to be able to see exactly what Dr. Kriss is referring to should he make such a claim. It would confuse the jury and unduly burden Mr. Walden to force him to conduct this adverse examination under shade of absolutely no objective record. Considering the plethora of issues with having a demonstrably pro-defense doctor conduct a Rule 35 examination, it would unduly burden Mr. Walden to not allow him to have and rely upon an objective record with which his counsel may impeach Dr. Kriss. The impending need to impeach this biased doctor is evident to Mr. Walden and his counsel, and it would serve as an undue hardship on Mr. Walden to disallow such an important tool of cross-examination.

4.  That in the event the examiner desires for Plaintiff, Charles L. Walden, to fill out any questionnaires or other written data request, any such questionnaire of written data request shall be submitted to his counsel no less than ten (10) days in advance of the scheduled examination, and he shall bring the documents with him to the examination. It would unduly burden Mr. Walden to surprise him with interview questions, especially considering his deteriorated memory caused by the Defendants;

5.  That the examination shall be limited to a physical examination, and any questions to be asked by the physician must specifically pertain to the particulars of the physical examination and the assessment of related injuries, to include the dynamics of any motion that occurred within the vehicle and whether he struck anything within the vehicle

compartment, in the collision, but otherwise may not include questions about witnesses, or any other matters not directly related to the physical examination itself. It would unduly prejudice Mr. Walden to not place these reasonable restrictions on any questioning he may face in his adverse medical examination. Alternatively, Plaintiffs counsel could attend the examination but that would seem like a more invasive solution;

6. That mileage be paid to Plaintiff, Charles L. Walden, for travel to and from his current location in Grayson, KY, where he is receiving in-patient rehabilitation to the physician's office in Nicholasville;

7. That there is no reference in the report, the physician's testimony, or any of the subsequent proceedings in this matter that such examination is an "independent medical examination" or any other indication than it is anything other than an examination by an adverse party in this matter. The Defendants have hand picked this doctor for his demonstrated history of bias against plaintiffs who dare to seek their day in court. The Defendants, knowledgeable about Dr. Kriss' bias, didn't even bother to obtain the availability of other neurosurgeons in the area before filing an "Emergency" Motion due to Dr. Kriss' limited schedule. The Defendants' "emergency" was one of their own fabrication caused by their insistence on getting a biased expert to examine Mr. Walden. Other neurosurgeons, who do not have such indications of bias, are available to examine the Plaintiff and this Court should not allow the jury to be confused by calling this examination an "independent medical examination." ;

8. That the examining physician owes no Hippocratic duties to Mr. Walden since Mr. Walden is not his patient. This is a statement necessary to prevent undue prejudice to Mr. Walden and to avoid confusing the jury. Dr. Kriss, as any Rule 35 examining doctor, is

not treating Mr. Walden and, as such, owes no duty to him as a patient to "do no harm." Failing to include this important distinction will serve to unduly prejudice Mr. Walden and confuse the jury. It's a simple instruction which reflects the truth; and

9.  A copy of the report generated as a result of the examination shall be forwarded to counsel for Plaintiff, Charles L. Walden, immediately on receipt of same by defense counsel and without any edits, and copies of the examiner's reports of earlier examinations for examinees with the same condition. Rule 35(b)(1) clearly entitles Mr. Walden to a copy of the report created as well as other reports by the examiner in which he is examining the same condition for other rule 35 examinees.

10.  Reasonable time constraints on the examination. Rule 35(a)(2)(b) indicates the Order must specify the time of the examination. It would by unduly burdensome on Mr. Walden to force him to an endless examination, especially since he must arrange transportation with at least 72 hrs of advance notice. The Order should specify a start and end time, or in the very least, a limit on how long the examination may last.

**Videotaped Rule 35 Examination**

"Federal trial courts have produced mixed results when deciding whether particular circumstances warrant the presence of a video camera or other recording device in the examination room. See 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus Federal Practice Procedure: § 2236, at 496 (2d ed. 1994) (noting that federal courts have responded to issues of a third party or recording presence at Rule 35 examinations in "diverse ways that may, in large measure, be explained by the particular circumstances presented."); compare, e.g., *Zabkowicz v. West Bend Co.,* 585 F. Supp. 635, 636 (E.D. Wis. 1984) (allowing examination to be videotaped), with *Abdulwali v. Washington Metro. Area Transit Auth*., 193 F.R.D. 10, 14

(D.D.C. 2000) (denying request to videotape). Nevertheless, we are not left completely without direction. Courts have unanimously accepted the tenet that the conditions of a Rule 35 examination are left to the sound discretion of the trial court." *Metropolitan Pro. Cas. Ins. v. Overstreet*, 103 S.W.3d 31, 35-36 (Ky. 2003).

For the reasons aforementioned in Plaintiff's objection to Dr. Kriss being allowed to conduct a Rule 35 Examination on him, Plaintiff requests the objectivity of a video record of the examination. Plaintiff would still be subject to the unfair examination by a demonstrably biased neurological surgeon, as recognized by other courts, however there would at least be a video record which can be used to impeach Dr. Kriss.

**WHEREFORE**, Plaintiff respectfully requests that Defendants' Motion to Compel a Rule 35 Exam with Dr. Timothy Kriss be DENIED. In the alternative, Plaintiff respectfully requests that Plaintiff be ordered to attend a Rule 35 Exam under the conditions proposed in his Proposed Agreed Order and with an independent neurosurgeon other than Dr. Timothy Kriss.

Respectfully Submitted,

MORRIN LAW OFFICE

  /s/*Robert A. Morrin*
Hon. Robert A. Morrin (KBA # 94368)
214 West Main Street
Richmond, KY 40475
(859) 358-0300
*Counsel for Plaintiff*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of April, 2024, a true and correct copy of the

foregoing was filed through the Court's eFiling system, which serves a copy on all counsel of

record.

       _/s/_*Robert A. Morrin*_____
       Hon. Robert A. Morrin (KBA # 94368)
       MORRIN LAW OFFICE
       *Counsel for Plaintiff*