2009 WL 3531649
Only the Westlaw citation is currently available.

Unpublished opinion. See KY ST RCP Rule 76.28(4) before citing.

NOT TO BE PUBLISHED
Court of Appeals of Kentucky.

ICG KNOTT COUNTY, LLC, Appellant
v.
Rondel THOMAS; Honorable R. Scott Borders, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2009-CA-001155-WC.
|
Oct. 30, 2009.

Petition for Review of a Decision of the Workers' Compensation Board, Action No. WC-08-00304.

**Attorneys and Law Firms**

Jeffrey D. Damron, Pikeville, KY, for appellant.

John Earl Hunt, Stanville, KY, for appellee Rondel Thomas.

Before LAMBERT and VANMETER, Judges; HENRY,[1] Senior Judge.

OPINION

LAMBERT, Judge.

**\*1** ICG Knott County, LLC (IGC) appeals from an opinion, award, and order of an Administrative Law Judge (ALJ) rendered on December 22, 2008, and affirmed by the Workers' Compensation Board on May 22, 2009. After careful review, we affirm.

Appellee, Rondel Keith Thomas (Thomas) was born on February 9, 1959, and has an eighth grade education. In 1996, while in the employ of Thacker-Grigsby Telephone Company (Thacker-Grigsby), Thomas suffered work-related injuries to his neck and back while setting utility poles. He subsequently filed a workers' compensation claim on December 24, 1997. In a decision rendered April 20, 1999, Administrative Law Judge Richard Campbell, Jr., dismissed Thomas' claim for failing to meet his burden of proof in establishing "he sustained a disabling work injury." Medical evidence presented for the ALJ's consideration at the time of the 1997 claim included medical records and reports from Dr. Usha Polisetty, a neurologist; Dr. Russell Travis, a neurosurgeon; Dr. Joseph H. Rapier, Jr., an orthopedic surgeon; Dr. James C. Owen, a disability specialist; and Dr. Daniel Primm, an orthopedic surgeon.

Following the injury at Thacker-Grigsby, Thomas remained off work from 1997 until 2004, during which time he received social security disability. In 2004, Thomas believed his condition had improved and elected to re-enter the labor market. Initially in 2004, he was hired by P & P Construction to perform utility work. Later that same year, Thomas entered the employ of ICG Knott County, LLC, where he worked as a roof bolter operator in an underground coal mine.

On February 18, 2005, Thomas re-injured his low back and neck while lifting a crib block at work. It was stipulated by the parties that following the injury, ICG voluntarily paid Thomas temporary total disability (TTD) benefits during three separate periods: from February 22, 2005, through April 12, 2005; from July 28, 2005, through October 31, 2005; and from January 11, 2006, to February 12, 2006. Thomas was treated by Dr. Ira Potter following the February 2005 work event.

On March 9, 2006, while working underground on his knees in low coal, Thomas again experienced severe pain involving his low back which radiated into his left leg. He returned to Dr. Potter for treatment and was eventually referred to Dr. Tibbs, who recommended low back surgery. It was stipulated by the parties that following the incident, ICG voluntarily paid Thomas an additional period of TTD from March 13, 2006, through November 10, 2006. Thomas has not returned to work since March 9, 2006.

On March 3, 2008, Thomas filed a workers' compensation claim against ICG seeking disability benefits as a direct result of the March 2006 injury. The claim was later amended to also include effects of the work incident of February 18, 2005. During litigation, the parties submitted medical evidence for the ALJ's consideration relative to Thomas' low back complaints spanning his

treatment and evaluation for both the 2005 and 2006 events, as well as from the time of the earlier 1996 claim.

 *2  Dr. Polisetty conducted a CT scan of Thomas' lumbar spine on October 10, 1996. Dr. Polisetty interpreted that test as revealing moderate annular bulging of the disc at the L4-5 with possible spinal stenosis, and a protrusion of the disc at the L5-S1 posteriorly and to the left, causing partial compression of the L5-S1 nerve root.

Dr. Russell Travis performed an evaluation of Thomas on November 4, 1996, on referral from Dr. Polisetty and reviewed an MRI scan of the cervical and lumbar spine at that time. Dr. Travis interpreted the MRI of the lumbar spine as showing a small bulge at the L5-S1 to the left, "which could be a small herniated disc." Dr. Travis reported, however, that Thomas' neck and back pain was no longer a significant problem and recorded that Thomas was requesting he be permitted to return to work. Dr. Travis released Thomas to resume his work duties "from the standpoint of his neck and back."

Dr. Rapier performed an independent medical evaluation of Thomas on November 24, 1997. At that time, Thomas' chief complaints were neck and low back pain. Thomas presented with copies of a CAT scan dated November 10, 1997, which Dr. Rapier interpreted as showing an eccentric L5-S1 disc to the left side producing "some displacement of the nerve root." Following a physical examination, Dr. Rapier noted evidence of one-half inch atrophy of the left calf when compared to the right. Dr. Rapier diagnosed Thomas as having: 1) a cervical strain aggravating pre-existing dormant degenerative disc disease; and 2) a lumbar strain aggravating pre-existing dormant degenerative disc disease producing "some left radiculopathy." Pursuant to the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (AMA Guides), Dr. Rapier assessed Thomas as having a 5% whole person impairment rating relative to the cervical complaints and a 10% impairment rating due to the injury to the lumbar spine.

Dr. Daniel Primm performed an independent medical evaluation of Thomas on May 5, 1998, for complaints of neck and back pain. X-rays of the cervical spine revealed disc space narrowing and spurring at C5-6. X-rays of the lumbar spine were interpreted by Dr. Primm as demonstrating mild disc space narrowing at L5-S1. A CT scan of the lumbar spine was interpreted by Dr. Primm as normal, showing only early degenerative facet changes. Following a physical examination, Dr. Primm diagnosed Thomas with mild degenerative changes of the cervical and lumbar spine, with a history of superimposed injury and arousal. Dr. Primm did not believe Thomas had sustained a significant or permanent injury as a result of the 1996 incident at Thacker-Grigsby. Dr. Primm felt that Thomas could return to work and recommended temporary restrictions of no climbing or lifting over thirty-five pounds for eight weeks. Dr. Primm assessed Thomas as qualifying for between a 0 and 5% impairment rating under the AMA Guides based on residual symptoms, representing an aggravation of pre-existing dormant conditions.

 *3  On March 16, 2005, Thomas underwent an MRI of the lumbar spine performed by Dr. Ashok Patel, a radiologist, on referral from Dr. Potter. The scan was interpreted by Dr. Patel as demonstrating evidence of mild degeneration of the L4-5 and the L5-S1 disc spaces, as well as a left paracentral bulge at L5-S1. A CAT scan of the cervical spine performed by Dr. Patel the previous day was interpreted as demonstrating mild degenerative changes at C5-6. No other abnormalities were noted.

An EMG/Nerve Conduction study, performed by Dr. Ira Potter on April 4, 2005, was interpreted as confirming left S1 radiculopathy and bilateral sensorimotor demyelinative neuropathy.

X-rays of Thomas' lumbar spine taken on July 28, 2005, and performed by Dr. Allen R. Bond, a radiologist, were interpreted as showing degenerative disc disease at L5-S1. An MRI of Thomas' lumbar spine conducted on September 8, 2005, was interpreted by Dr. Bond as showing minimal disc bulging at the L4-5 with a small left foraminal narrowing inferiorly, and a small to medium-sized central/left paracentral disc herniation at L5-S1 causing mild compression of the left S1 nerve root. An MRI of Thomas' lumbar spine conducted on June 1, 2006, was interpreted by Dr. Bond as showing a minimal left foraminal disc protrusion at L4-5 with findings suspicious for a small annular tear, and a small left paracentral disc herniation at L5-S1.

Dr. Kriss performed an independent medical evaluation of Thomas on July 21, 2006. Thomas reported to Dr. Kriss that he had sustained three separate work injuries. Thomas stated that the first injury occurred in June 1996,

when he experienced low back pain while lifting at work for Thacker-Grigsby. Thomas explained he eventually returned to work for Thacker-Grigbsy later that same year and later entered the coal mining industry, when he went to work for ICG. According to Dr. Kriss, Thomas stated that following the 1996 injury, he always had a "little low back pain" that persisted. Thomas denied any leg symptoms following the 1996 work injury. Thomas informed Dr. Kriss that he injured his low back for a second time while lifting a crib block on May 18, 2005. Thomas stated that in addition to pain in his low back as a result of the second injury, he also experienced pain into his left leg. According to Dr. Kriss, Thomas reported these symptoms never improved despite treatment with medication and physical therapy. Thomas reported that on March 9, 2006, he injured his back for a third time while lifting a cable. Thomas reported that the third incident resulted in a permanent worsening of his prior symptoms.

Following a physical examination and review of medical records, Dr. Kriss diagnosed Thomas with a chronic left S1 lumbar radiculopathy and left L5-S1 paramedian disc herniation compressing the left S1 nerve root. Dr. Kriss assessed Thomas as having a 12% whole person impairment rating pursuant to the AMA Guides. Dr. Kriss assigned the entirety of Thomas' impairment to the effects of the 1996 work-related injury at Thacker-Grigsby, concluding that Thomas' complaints of symptoms were virtually unchanged based on medical records accumulated at that time. Dr. Kriss stated he could find no evidence of any new harmful change produced by the work incidents described by Thomas as occurring in 2005 and 2006. Instead, Dr. Kriss characterized those events as temporary exacerbations of a "pre-existing active long-standing chronic back condition." Dr. Kriss recommended continued conservative treatment consisting of medications for pain, use of a back brace and home exercise. However, given that Thomas' left L5-S1 disc herniation with left S1 nerve root compression and left radiculopathy had been present in his opinion for "roughly 12 years," Dr. Kriss recommended against surgery.

 *4  Dr. Rapier performed a second independent medical evaluation of Thomas on April 24, 2007. Dr. Rapier recorded that Thomas' chief complaint was "back pain" with radiation into the left leg. Dr. Rapier noted that approximately twelve years earlier, Thomas experienced "a rather significant low back injury which caused him to miss approximately seven years of work." Upon physical examination Dr. Rapier determined Thomas exhibited three-fourths inch atrophy in the left calf when compared to the right. Dr. Rapier reviewed an MRI scan of the lumbar spine performed June 1, 2006, which he interpreted as demonstrating degenerative disc disease with a sequestered disc fragment present at L5-S1 to the left. Dr. Rapier diagnosed Thomas as having a "[h]istory of three significant injuries to the lumbar spine aggravating pre-existing degenerative disc disease" with radiculopathy. Dr. Rapier stated that, in his opinion, Thomas' low back condition was work related. Pursuant to the AMA Guides, Dr. Rapier assessed Thomas as having a 22% whole person impairment attributable to the low back. Dr. Rapier further opined that Thomas had an active impairment "prior to this injury," but did not elaborate further nor testify concerning apportionment or restrictions. It was Dr. Rapier's opinion that Thomas no longer retained the physical capacity to return to the type of work he was performing when injured.

Dr. Tibbs first saw Thomas for treatment on referral from Dr. Timothy Wagner on August 23, 2006. Dr. Tibbs received a history of the March 9, 2006, work injury. Dr. Tibbs further noted that Thomas reported "he had some problems with his back, a long time ago, that got better with physical therapy." Following a physical examination and review of a lumbar MRI dated June 1, 2006, Dr. Tibbs diagnosed Thomas as suffering from a left sided disc herniation at the L5-S1 with left S1 radiculopathy, and recommended surgery. Dr. Tibbs also took Thomas off work at that time. Dr. Tibbs last saw Thomas for follow-up on October 11, 2006. The recommended surgery was never performed.

Dr. Tibbs completed a Form 107 medical report on October 13, 2008, on the basis of his 2006 medical records, and no new physical examination of Thomas was conducted. Dr. Tibbs again diagnosed Thomas as having a lumbar disc herniation at the L5-S1 with left S1 radiculopathy. Dr. Tibbs stated that "[b]y history" within reasonable probability Thomas' reported injury of March 9, 2006, was the cause of his complaints. Dr. Tibbs stated that "[t]he injury described is sufficient to produce a disc herniation in a patient with pre-existing dormant degenerative disc disease." Relying on the AMA Guides, Dr. Tibbs assessed Thomas as having a 12% whole person impairment rating as a result of his low back injury.

Dr. Tibbs found that Thomas did not have an active impairment prior to the March 9, 2006, work injury. Dr. Tibbs stated that Thomas would have reached maximum medical improvement on April 9, 2007, "[o]ne year after injury since patient declined surgery." Dr. Tibbs stated that in his opinion, as a result of the injury, Thomas no longer retained the physical capacity to perform the type of work as a coal miner and laborer that he was performing at the time of the injury. Dr. Tibbs stated that as of the date he last saw Thomas, he exhibited symptomatology "to the point he could not safely return to work activities at the time...."

 *5  By opinion, order and award dated December 22, 2008, the ALJ ruled that Thomas was entitled to an award of permanent partial disability benefits based on a 12% impairment, all of which he found attributable to the March 9, 2006, work injury. The ALJ enhanced the award by the three-time statutory multiplier (finding Thomas did not retain the physical capacity to return to the type of work he was performing at the time of his injury) and 4/10th (Thomas only having an eighth grade education with no GED). The ALJ found Thomas was not permanently and totally occupationally disabled.

ICG filed its petition for reconsideration on January 2, 2009, arguing that the ALJ erred by relying on Dr. Tibbs' opinion and erred in finding that Dr. Tibbs was aware of Thomas' prior back injury because Dr. Tibbs had not been given a full and accurate medical history. ICG also argued that Thomas had at least some degree of pre-existing active impairment. The ALJ denied the motion for reconsideration, finding that Dr. Tibbs was given a history of prior back problems and had considered Thomas' prior history of low back pain and treatment when Tibbs completed the Form 107. Thus, the ALJ conclusively found that Dr. Tibbs had considered Thomas' prior back injuries.

ICG filed its notice of appeal to the Workers' Compensation Board (the Board) on February 18, 2009. By opinion entered May 22, 2009, the Board affirmed the ALJ's opinion and order, and ICG now appeals to this Court.

If the decision of the ALJ is supported by any substantial evidence of probative value, it may not be reversed on appeal. *Newberg v. Armour Food Co.,* 834 S.W.2d 172, 175 (Ky.1992) (*citing Special Fund v. Francis,* 708 S.W.2d 641 (Ky.1986)). Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men. *See Smyzer v. B.F. Goodrich Chemical Co.,* 474 S.W.2d 367, 369 (Ky.1971); *O'Nan v. Ecklar Moore Express, Inc.,* 339 S.W.2d 466, 468 (Ky.1960). The ALJ, as fact-finder, has sole authority to determine the weight, credibility, substance, and inferences to be drawn from the evidence. *Paramount Foods, Inc. v. Burkhardt,* 695 S.W.2d 418, 419 (Ky.1985). When conflicting evidence is presented, the ALJ may choose whom and what to believe. *Pruitt v. Bugg Bros.,* 547 S.W.2d 123, 124 (Ky.1977) (internal citations omitted). The ALJ and the Board had the right to believe part of the evidence, and disbelieve other parts of the evidence whether it came from the same witness or the same total proof. *Caudill v. Maloney's Discount Stores,* 560 S.W.2d 15, 16 (Ky.1977).

On appeal, ICG argues that the opinion of Dr. Tibbs as to causation, impairment rating, and pre-existing active disability relative to the March 9, 2006, injury does not constitute substantial evidence upon which the ALJ could have relied, because Dr. Tibbs' opinion did not consider Thomas' prior back injury. Furthermore, ICG argues that Thomas had an active pre-existing disability stemming from a July 31, 1996, work injury while he was employed by Thacker-Grigsby and that no such mention of this pre-existing active disability was made in Dr. Tibbs' records, rendering them further invalid and corrupt. ICG also argues that the Board erred when it distinguished the case at bar from *Cepero v. Fabricated Metals Corp.,* 132 S.W.3d 839 (Ky.2004) and argues that *Cepero* applies to the facts of the instant case.

 *6  In *Cepero,* the Kentucky Supreme Court held that "[w]here it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence." *Cepero,* 132 S.W.3d at 842. ICG argues that Dr. Tibbs' records could not constitute substantial evidence because Tibbs' records did not include the previous back injury and were thus incomplete and corrupt.

Further, the record reflects that both the ALJ and the Board found that Dr. Tibbs had an accurate and complete history before him when he considered Thomas' injuries and impairments in completing the Form 107. The ALJ

specifically found that Dr. Tibbs did consider the prior injuries. Thus, ICG's claims that this case is comparable to *Cepero* are also without merit. In *Cepero,* the patient completely failed to inform the testifying physicians of a non-work related injury that preceded an alleged work-related injury. *Id.* at 842-843. In the instant case, Dr. Tibbs was informed of Thomas' prior injury and in fact considered the injuries when rendering his opinion and filling out the Form 107. There is no indication that Thomas concealed his prior injury from Dr. Tibbs, and in fact Dr. Tibbs' records indicate he was aware of Thomas' prior back problems. Thus, we can not say with certainty as the Supreme Court did in *Cepero* that the doctor's actual knowledge pertaining to the claimant's prior condition was so "substantially inaccurate or largely incomplete" as to render his expert opinions regarding causation wholly unreliable and lacking of probative value, or that the ALJ's reliance on those opinions was "fundamentally unjust." *Id.* at 842.

Further, Dr. Rapier assigned a 22% whole person impairment after evaluating Thomas for the March 9, 2006, work accident, after having previously assigned a 10% impairment rating in 1997. The increase in Dr. Rapier's impairment rating equals 12%, which is exactly the impairment rating Dr. Tibbs' assigned. Thus, we find further evidence that Dr. Tibbs' impairment rating was supported by substantial evidence, and it was proper for the ALJ and the Board to rely on Dr. Tibbs' medical opinions in rendering their decisions.

Because the Board's decision is supported by substantial evidence would be improper to set it aside on appeal. Accordingly, we affirm the May 22, 2009, opinion and order of the Workers' Compensation Board affirming the opinion and order of the ALJ entered on December 22, 2008.

ALL CONCUR.

**All Citations**

Not Reported in S.W.3d, 2009 WL 3531649

Footnotes

1    Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

---

End of Document     © 2018 Thomson Reuters. No claim to original U.S. Government Works.