UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | | |
|---|---|---|
| CHARLES L. WALDEN | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO. 5:22-CV-00238-KKC** |
| | ) | |
| VS. | ) | |
| | ) | **MOTION TO EXCLUDE CERTAIN** |
| | ) | **EXPERT OPINIONS OFFERED BY** |
| ENTERPRISE SERVICES GROUP, LLC, | ) | **DR. DAVID CHANGARIS** |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Come the Defendants, Enterprise Services Group, LLC, and Clarence M. Howard, by counsel, pursuant to Fed. R. Evid. 702, respectfully move to exclude certain opinions and testimony presented by Dr. David Changaris. First, Dr. Changaris' parroting of a conclusion drawn from a "very, very controversial paper"[1] that a single mild traumatic brain injury (mTBI) "cause[s] the early progression of neurodegenerative diseases such as Parkinson's and Alzheimer's Disease,"[2] is directly adverse to virtually every admissibility standard imposed by FRE 702, *Daubert*, and its progeny. Second, Dr. Changaris' opinion diagnosing Plaintiff with a mTBI and attributing the causation of same to the August 2020 collision is contrary to all evidence of record, deliberately ignores alternative obvious explanations in favor of Changaris' *ipse dixit* conclusion, and founded entirely on a methodology that is indisputably unreliable. Third, Dr. Changaris' opinion that Plaintiff is "beginning his progressive descent into loss of capacity with onset of Parkinson's Disease"[3] purportedly caused by the August 2020 collision is inadmissible because it is founded entirely on the deeply flawed and unreliable opinions previously mentioned. Fourth,

---

[1] **Exhibit 1**, Changaris Transcript at p. 173:2.
[2] R. 97-2 at p. 8, Changaris CR 26 Report.
[3] *Id.*

Dr. Changaris' unsubstantiated and unexplained opinions relating to long-term care, nursing home care, and their respective costs reflect a combination of pure speculation and rank hearsay addressing subject matters upon which Dr. Changaris is patently unqualified to render an expert opinion. Finally, Dr. Changaris' **causation**[4] opinions regarding multiple diagnoses[5] founded entirely on the subjective complaints of a "marginally reliable"[6] patient who provided a history directly contrary to the indisputably "critical evidence"[7] consisting of three-years of medical records subsequent to the collision and decades of pre-collision medical records – "critical evidence" which Dr. Changaris neither requested nor reviewed.[8]

## I.     Gatekeeping Under FRE 702 and *Daubert*

District courts have a "gatekeeping role" in screening the reliability of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The party proffering such testimony must show, by a preponderance of the evidence, that it is relevant and reliable. *Id*. at 592 n. 10. FRE 702 guides the court in its gatekeeping function. It provides that an expert witness, qualified by knowledge, skill, experience, training or education, may testify to scientific, technical, or other specialized knowledge that assists a trial of fact to determine a fact in issue, if:

> (1) The testimony is based upon sufficient facts or data;
> (2) The testimony is the product of reliable principles and methods; and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

---

[4] Changaris Transcript at p. 155:17-20 ("Q: How can you made a determination of causation? A: I - - I listen to the patient based upon his symptoms after the accident."); also see *id.* at p. 161:1-4,

[5] Dr. Changaris opinions and diagnoses founded exclusively on patient history include, but are not limited to, total disability (Changaris Transcript at pp. 153-154), headaches (*id.* at p. 203), dizziness (*id.*), vision complications (Id. at pp. 140-141), memory issues (*id.* at pp. 92-93)

[6] Changaris Transcript at p. 98:20-21, 141:4-6, 142:5-7, *et al.*

[7] *Id.* at p. 141:7-12.

[8] *Id.* at pp. 100:23 through 101:9.

*Id*. Where the subject of an expert's testimony is "scientific knowledge," "scientific" implies a grounding in the procedures of science, and "knowledge" connotes more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590. Where a plaintiff has the burden of proving causation, his or her expert must establish it to a reasonable degree of medical probability; but simply invoking this phrase does not cloak an opinion with admissibility. *Sakler v. Anesthesiol. Assoc., P.S.C.*, 50 S.W.3d 210 (Ky. 2001); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010).

### 1. Is the expert qualified to answer the question at issue?

An expert must be qualified through knowledge, skill, experience, training or education. The issue with regard to expert testimony is whether a witness's qualifications provide a foundation for a witness to answer a specific question. *Hamilton v. Pike County, Ky.*, at *3 2012 WL 6570508 (E.D. Ky. Dec. 12, 2012) (*quoting Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). A court should exclude proffered testimony if its subject lies outside the witness's area of expertise. *Ashburn v. General Nutrition Centers, Inc.*, 2007 WL 4225493 at *1 (N.D. Ohio Nov. 27, 2007). For example, without recent, specialized and unique training, a nurse will generally not be qualified to opine as to a physician standard of care; and as a general rule, nurses are not qualified to give expert testimony regarding causation in a medical negligence case. *Id.* (*quoting Rogers v. Integrity Healthcare Servs., Inc.*, 358 S.W.3d 507, 512 & n. 4 (Ky. App. 2012).

### 2. Is the proposed testimony relevant?

Expert testimony is admissible only if it is both relevant to the task at hand, and rests on a reliable foundation. *Daubert*, 509 U.S. at 597. To be relevant, expert testimony must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute; this has been described as "fit." *Id.* at 591. The testimony must also assist the trier of fact, and the

3

expert must testify to something more than what is obvious to a layperson. *Birge ex rel. Mickens v. Dollar General Corp.*, 2006 WL 5175758 at *9 (W.D. Tenn. Sept. 28, 2006).

**3. Is the proposed testimony reliable?**

Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses, on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Daubert*, 509 U.S. at 592. To be reliable, testimony must be supported by appropriate validation ("good grounds"), based on what is known. *Id.* at 590. FRE 702 only permits relevant testimony from a qualified witness if it is based upon (1) sufficient facts and data, (2) the product of reliable principles and methods, and (3) the witness applies the principles and methods reliably to the facts of the case.

Not everything a knowledgeable person says is "knowledge" under Rule 702, no more than everything a scientist says is "scientific." *Tamraz*, 620 F.3d at 677. The court must determine whether the evidence is "genuinely scientific," as distinct from "speculation offered by a genuine scientist." *Id.* (*quoting Rosen*, 78 F.3d at 318). Where a party brings forth a theory based on a homemade methodology, crafted by a witness with no particular expertise to craft it, administered by persons with no particular expertise to administer it, tested by no one, and accepted only by the witness himself, this methodology should be excluded. *EEOC v. Kaplan Higher Education Corp.*, 748 F.3d 749, 754 (6th Cir. 2014). A low threshold for making a decision may serve physicians well in the clinic, but not in the courtroom; and what medicine treats as a useful or untested hypothesis, the law should generally treat as inadmissible speculation. *Tamraz*, 620 F.3d at 673, 677.

A.  Reliability: Is the testimony based on sufficient facts or data?

Courts look to whether the expert employs the same "rigor" as an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. Pertinent considerations may be whether the expert has taken action to verify or substantiate the factual or scientific bases for his or her conclusions, and whether the expert has made any assumptions (and if so, whether they are reasonable). *Coffey v. Dowley Manufacturing, Inc*. 187 F.Supp.2d 958, 973-74 (M.D. Tenn. 2002). The courtroom is not the place for scientific guesswork, even of the inspired sort. *Tamraz*, 620 F.3d at 671 (*quoting Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). No matter how good the experts' credentials may be, they may not be permitted to speculate. *Id*. (*quoting Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)).

Additionally, a judge assessing expert scientific testimony under Rule 702 should be mindful of other rules. *Ashburn*, 2007 WL 4225493 at * 2 (*quoting Daubert*, 509 U.S. at 595). Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion that rests entirely upon them must be excluded. *Id*. (*quoting In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994) (citations omitted).

   B.   Reliability: Is the testimony the product of reliable principles and methods?

An expert opinion that is based on scientifically valid principles will satisfy Rule 702; an expert's subjective belief or unsupported speculation will not. *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (*citing Daubert v. Merrell Dow Pharm., Inc*. (On Remand), 43 F.3d 1311, 1316 (9th Cir. 1995). Experts are permitted to tie observations to conclusions through the use of generalized truths learned through specialized experience. *Kumho Tire*, 526 U.S. at 152-53.

However, courts may question whether the expert has attempted to validate or test his hypotheses or determine if projections made are accurate, using the scientific method. *Coffey*, 187 F.Supp.2d at 975. An expert's conclusion might be a plausible hypothesis -- and may even be right -- but its accuracy is irrelevant to its admissibility. *Tamraz*, 620 F.3d at 670 (*citing Daubert*, 509 U.S. at 595). If an expert uses and relies upon an analysis that is the product of "guesstimations" and speculation, once that house of cards is disproved as a foundation, the whole analysis collapses. *Coffey*, 187 F.Supp.2d at 976. Moreover, if an expert relies solely and primarily on experience, he or she must explain how that experience leads to the conclusion reached, and how that experience is reliably applied to the facts. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). A district court abuses its discretion by admitting testimony when those generalizations are too speculative and attenuated to support the expert's conclusion. *Barnette v. Grizzly Processing, LLC*, 2012 WL 293305 at *4 (E.D.Ky. Jan. 31, 2012) (*citing Tamraz*, 620 F.3d at 671). Similarly, testimony based on personal opinion, rather than science, is inadmissible. *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992).

The party attempting to introduce the testimony must close the "analytical gap between the data and the opinion offered"; the *ipse dixit* of the expert alone is not sufficient. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert opinions based upon nothing more than the logical fallacy of *post hoc ergo propter hoc* ("after this, therefore because of this"), typically do not pass muster. *Rolen v. Hansen Beverage Co.*, 193 Fed.Appx. 468 (6th Cir. 2006) (citations omitted). Judges may no longer indulge in the assumption that an expert's conclusions and reasoning can all be corrected by cross-examination. *Greenwell v. Boatright*, 184 F.3d 492, 502 (6th Cir. 1999). Even where an expert's credentials show that he or she is intelligent and knowledgeable about the subject matter, the court must nonetheless determine whether the testimony is genuinely

6

scientific. *Tamraz*, 620 F.3d at 677. A glittery resumé and an impressive career do not necessarily open the door to federal court. *Barnette*, 2012 WL 293305 at *2. The question is whether the witness's testimony is sufficiently reliable to allow the trier of fact to deem it "expert." *Coffey*, 187 F.Supp.2d at 975 (*citing Greenwell v. Boatright*, 184 F.3d 492, 495-96 (6th Cir. 1999).

    C.    <u>Reliability: Has the expert reliably applied the principles and methods to the facts of the case?</u>

Finally, a court undertaking its gatekeeping function should consider whether the expert applied scientifically valid principles and methodology to the facts. *Coffey*, 187 F.Supp.2d at 977. In the case of scientific testimony, courts often consider whether the methodology:

        (1) Has been tested and subjected to peer review;
        (2) Has a known error rate and whether standards controlling the technique's operation exist; and
        (3) Is generally accepted within the relevant scientific community.

*Barnette* at *2 (*citing Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002)

Proposed expert testimony must be supported by appropriate validation. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (*quoting Daubert*, 509 U.S. at 591). Where an expert simply forms a hypothesis based on his observations, but neither supports it through reference to existing scientific literature nor conducts his own tests to prove its reliability, these methodological shortcomings favor exclusion. *Downs v. Perstorp Components, Inc.*, 26 Fed.Appx 472 (6th Cir. 2002). The party seeking to admit testimony bears the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Meemic Ins. Co. v. Hewlett-Packard Co.*, 717 F.Supp.2d 752, 766 (E.D.Mich. 2010) (*quoting Daubert* (On Remand), 43 F.3d at 1316). Similarly, subjecting a theory to peer review and publication is plainly relevant to a determination of whether the theory is based upon good science. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

7

Finally, widespread acceptance of a theory can be an important factor, as a known technique that is able to attract only minimal support within the community may properly be viewed with skepticism. *Daubert*, 509 U.S. at 593 (*citing Downing*, 753 F.2d at 1238). Where an expert testifies to esoteric, underground knowledge that is based on unsubstantiated and undocumented information, and untested and unknown to the scientific community, the expert's sincerity in doing so is not an indication of reliability under *Daubert* or any other reasonable standard for admission of expert testimony. *Alfred v. Mentor Corp.*, 479 F.Supp.2d 670, 673-74 (W.D.Ky. 2007) (*quoting Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).

## II.    Changaris' Opinions

When taking a break from mocking counsel for misstating a date,[9] interrupting counsel to inject non-responsive answers and commentary,[10] revealing a previously undisclosed supplemental report,[11] or outright refusing to answer questions,[12] Dr. Changaris conceded the following:

1. Each and every opinion was based, "in large part," on the history provided by Mr. Walden, Changaris Transcript at p. 142.

2. Dr. Changaris found Mr. Walden to be only "marginally reliable. So you have to be circumspect about accepting what he says." *Id.* at p. 98.

3. An accurate medical history is "absolutely critical" for purposes of determining the reliability of an expert's opinion of the issue of causation, *Id.* at pp. 96-97.

---

[9] Changaris Transcript at p. 190:6-14.
[10] See, e.g., 65:20-24 ("Q. We'll come back to this [Exhibit], but you can set it aside for now. A: Well, you haven't asked for this. I just want you to know that the book I've written on mild traumatic brain injury – are you – are you listening?"), 55:18-24, 55:25 to 56:25, 61:7-13,
[11] *Id.* at pp. 40:8 to 41:17; *see also* Changaris Deposition Exhibit 4
[12] *See, e.g., id.* at p. 73:11 to 73:20 (refusing, quite ironically, to state whether he agreed with the notion that "[t]he neurosurgical expert witness shall not be evasive for the purpose of favoring one litigant over another.") and pp. 73:21 to 74:7 (**Q.** Agree or disagree, "The neurosurgical expert shall answer all properly framed questions pertaining to his or her opinions on the subject matter thereof"? **A.** On the subject matter? On this patient, if you have a question, I'll answer.  But I'm not going to ask (sic) about the subject matter on the subject matter, which is what you're asking for. **Q.** So you -- just for the record, you are refusing to answer my last question, correct? **A.** I'm refusing to answer any further questions on the AANS ethical."). *See also id.* at pp. 58:10-12, 70:21-22, 70:25 to 71:1, 71:24-25, 72:14-15, 72:19-25, 73:1-5, *et al.*

4. Dr. Changaris did not review a single medical record documenting Mr. Walden's medical condition prior to the August 2020 collision. *Id.* at p. 101:6-9; *also see* R. 97-2 at p. 1, Records Reviewed.

5. Dr. Changaris formed all of his opinions based on a single encounter with Plaintiff more three years following the August 2020 collision. Changaris Transcript at p. 83.

6. All of Dr. Changaris' opinions on causation were based on Dr. Changaris' "listen[ing] to the patient based upon his symptoms after the accident." Id. at p. 155

7. The only diagnostic testing Dr. Changaris performed consisted of a Posturography Test and a Videonystagmography ("VNG").

8. With the exception of the patient-reported, unspecified brain injury occurring in the past, Dr. Changaris was completely unaware of the severe traumatic brain injury Mr. Walden sustained in 2012 resulting in an extended comatose state. Id. at p. 112:23-25, 114:2-5 ("I'm waiting to get more information on the first TBI. I don't want to render an opinion until I get more information. I tried to limit my [ ] comments to the impact of the [2020 collision].").

9. Dr. Changaris does not know if Mr. Walden was demonstrating signs of Parkinson's disease prior to the August 2020 collision. Id. at p. 118:12-15.

Notwithstanding these concessions, and in spite of same, Dr. Changaris proceeded to diagnose Plaintiff will all of the following injuries which Dr. Changaris attributed exclusively to the 2020 collision:

1. Mild Traumatic Brain Injury (mTBI) (R. 97-2 at pp. 7 and 8);

2. "[P]rogressive descent into loss of capacity with onset of Parkinson's Disease" (Id. at p. 8);

3. Total disability; unable to return to any gainful employment (Id. at p. 9);

4. Vertigo of central and peripheral origin (Id. at p. 6);

5. Low-level constant background headaches (Id. at p. 7);

6. Memory/Concentration difficulties (*id.* at p. 1; Changaris Transcript at p. 92-93);

Each of these opinions are inherently unreliable on multiple fronts and are not admissible under FRE 702.

### III.    Flagrantly Unreliable Methodologies

### 1.   Reliance on Flawed Meta-Analysis to Diagnose Onset of Parkinson's Disease (mTBI's cause Parkinson's Disease)

To support his diagnosis of "onset of Parkinson's Disease," Dr. Changaris relies exclusively on the results from a "very, very controversial paper"[13] authored by Dr. David Perry. See Changaris Transcript at p. 168; R. 97-2 at p. 7. As explained by Dr. Kriss, Defendants' expert neurosurgeon, the Perry article was a "meta-analysis, which is essentially a review article which 'combines' data from multiple previous medical studies and then draws conclusions from the pooled data from the multiple different studies." R. 149-2 at p. 35. Despite claiming to have "thoroughly" reviewed and become "very familiar" with the Perry study, Dr. Changaris was unable to provide any meaningful details of the study. See generally, Changaris Transcript at pp. 168-173. Nor was he familiar with the underlying studies upon which the Perry meta-analysis was based. *Id.* Fortunately, Dr. Kriss did take the time to undertake what Dr. Changaris was unable or unwilling to do. In performing a deep dive into not only the Perry article, but also the underlying studies upon which it was based, Dr. Kriss quickly discovered a plethora of common, yet terribly disconcerting flaws in the foundation of the study. As meticulously documented in Dr. Kriss CR 26 Report (R. 149-2 at pp. 35-40), the conclusion reached by Dr. Perry (and parroted by Dr. Changaris) reflects a "gross misinterpretation of statistics." Id. at p. 37. To be sure, the methodologies applied by Dr. Perry were so fundamentally flawed that they led to the exact opposite result of what the proper interpretation of the data conclusively demonstrates: "Traumatic brain injury does not cause Parkinson's. Parkinson's causes falling and falling causes mild traumatic brain injuries." *Id.* at p. 36.

---

[13] Changaris Transcript at p. 173:2.

As painstakingly detailed in Dr. Kriss CR 26 Report, Dr. Perry's conclusion that mTBI's cause Parkinson's disease is the product of the most unreliable principles and methodologies. Of course, it necessarily follows that Dr. Changaris' reverberation of such a flawed conclusion is equally unreliable. For each of the reasons cited in Dr. Kriss Report, which Defendants adopt and incorporate by reference, Dr. Changaris' general opinion that mTBI's cause Parkinson's disease should be excluded under FRE 702.

## 2. Zero Evidence Plaintiff Sustained mTBI

Dr. Changaris' opinion diagnosing Plaintiff with a mTBI and attributing the causation of same to the August 2020 collision is contrary to all evidence of record, deliberately ignores alternative obvious explanations in favor of Changaris' *ipse dixit* conclusion, and founded on a methodology that is indisputably unreliable. By his own admission, Dr. Changaris relies exclusively on a "marginally reliable" historian to support his opinion that Plaintiff sustained a mTBI from the August 2020 collision. By definition, "marginally reliable" evidence is precisely the opposite of demanding admissibility standards required by FRE 702 and *Daubert*. Worse yet, Dr. Changaris opinion is literally contrary to thousands of pages of Plaintiff's medical records in the three years following the collision (and prior to Changaris single encounter) which affirmatively refute the notion of any such injury. Once again, Dr. Kriss, unlike Dr. Changaris, did review the complete set of Plaintiff's medical records both before and after the August 2020 collision. As demonstrated in Dr. Kriss CR 26 Report, the objective, "absolutely critical" evidence documenting Plaintiff's medical history affirmatively dispels any suggestion that Plaintiff sustained a mTBI from the August 2020 collision.

Putting aside the highly questionable reliability of the VNG and Posturography testing, even Dr. Changaris concedes that the results of such testing are patently irrelevant to determining

causation. This is especially so where, as here, a far more obvious alternative explanation for these results is the infinitely more severe TBI Plaintiff suffered in 2012, second TBI sustained in 2017, "hit to the head" following a fall in 2019, Mr. Walden's life-long substance abuse of heroin, oxycodone, opioids, cocaine, methamphetamine, marijuana and alcohol, or any number of the many other factors identified in Dr. Kriss CR 26 Report. R. 149-2 at pp. 39-40. Dr. Changaris not only failed to dispel such factors; he didn't even consider them.

As the party proffering such testimony, it is Plaintiff's burden to satisfy the reliability standards by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n. 10. For all of the reasons demonstrated in Dr. Kriss' CR 26 Report at pp. 13-14, 22-23 (Patient Credibility), and 38-45, Plaintiff has failed to satisfy this burden.

### 3. Parkinson's Disease Causation Opinion Not Admissible if Either of the Prior Two Opinions Deemed Inadmissible

If this Court rules that either of Dr. Changaris' opinions addressed in III(1) or III(2) are inadmissible, it necessarily follows that Dr. Changaris must also be precluded from opining that the August 2020 collision caused Plaintiff's alleged Parkinson's Disease. If an expert uses and relies upon an analysis that is the product of "guesstimations" and speculation, once that house of cards is disproved as a foundation, the whole analysis collapses. *Coffey*, 187 F.Supp.2d at 976

### 4. Dr. Changaris is Not Qualified to Offer Opinions Related to the Costs of Long-Term Care, Nursing Home Care, or any other Medical Care Unrelated to Neurosurgery

Dr. Changaris' report referenced an unidentified "survey conducted by Genworth" that purportedly determined estimates for various forms of Long-Term and Nursing Home Care. On its face, Dr. Changaris' alleged opinions regarding such costs constitutes rank hearsay. Nothing within Dr. Changaris' CR 26 Report, CV, or deposition testimony provides the first indication that Dr. Changaris is remotely qualified to offer such opinions.

Even more generally, Dr. Changaris failed to demonstrate or explain how this "nationwide" "average" cost is applicable to Plaintiff's circumstances.

**5. Diagnoses and Causation Opinions Founded on "Marginally Reliable" Historian**

All of Dr. Changaris' opinions founded exclusively on self-reports made by Plaintiff three-years after the August 2020 collision are admittedly unreliable, contrary to all other evidence of record, and not based on any diagnostic testing or other independent determinations made by Dr. Changaris. With respect to both his diagnoses and causation opinions, Dr. Changaris effectively took Plaintiff at his word when opining that the August 2020 collision was the exclusive responsible for Plaintiff's total disability, headaches, dizziness, vision complications, and memory issues.

Each of these opinions is effectively hearsay and improper bolstering. Dr. Changaris failed to conduct any form of testing to confirm these diagnoses. Even if he had, such opinions would be, by definition, unreliable as having been based primarily upon "marginally reliable" evidence.

Worse yet, Dr. Changaris' diagnoses are directly at odds with literally all other evidence of record. With respect to Plaintiff's alleged disability, not even Plaintiff contends that the August 2020 collision resulted in any modification of his employment ability as it is undisputed that Plaintiff was determined to be totally disabled since the 2012 collision (and has not been employed since). In relation to increased headaches, memory complications, and vision complications, Plaintiff's medical records in the 2 ½ years immediately following the August 2020 collision are directly at odds with Dr. Changaris opinions. Of course, if Dr. Changaris had actually reviewed said evidence, he would know that Plaintiff did not make a single complaint. This, of course, is in stark contrast to Plaintiff's medical records preceding the subject collision which document frequent, long-term complaints of headaches and vision problems directly attributable to Plaintiff's

two prior collisions. Plaintiff's single encounter with Dr. Changaris on November 17, 2023, represents the first, and only, occasion Plaintiff has ever complained of dizziness.

In stark contrast to Dr. Changaris' opinions, Dr. Kriss' Dr. Kriss CR 26 Report, R. 149-2, not only substantiates the absence of such injuries by properly applying sound methodologies and practices, but also demonstrates the lack of reliability in Dr. Changaris' opinions. To that end, Defendants adopt and incorporate by reference Dr. Kriss original CR 26 Report, R. 149-2, and supplemental CR 26 Report, R. 159-1.

* * * * *

WHEREFORE, Defendants respectfully request that the Court enter the attached, or similar Order, excluding Dr. Changaris from offering the patently unreliable and inadmissible opinions detailed above.

Respectfully submitted,

HAMM, MILBY & RIDINGS, PLLC
120 North Main Street
London, KY 40741
Phone: 606-864-4126
Fax: 606-878-8144
Email: jridings@hmrkylaw.com
*Counsel for Defendants, Enterprise Services Group,*
*LLC, and Clarence M. Howard*


By:   /s/ Jay Ridings
        JAY MILBY RIDINGS


CERTIFICATE OF SERVICE

I certify that on the 3rd day of September 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

   /s/ Jay Ridings
Counsel for Defendants, Enterprise Services Group,
LLC, and Clarence M. Howard