1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF KENTUCKY

3             LEXINGTON DIVISION

4        CASE NO. 5:22-CV-00238-KKC

5

6          CHARLES L. WALDEN,

7              Plaintiff

8

9                V.

10

11      ENTERPRISE SERVICES GROUP, LLC, ET AL.,

12            Defendants

13

14

15

16

17

18

19

20

21

22

23  DEPONENT:  DAVID CHANGARIS, M.D.

24  DATE:      JULY 16, 2024

25  REPORTER:  LILY CORNELL

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

APPEARANCES

1
2
3   ON BEHALF OF THE PLAINTIFF, CHARLES L. WALDEN:
4   Robert Morrin, Esquire
5   Morrin Law Office
6   214 West Main Street
7   Richmond, Kentucky 40475
8   Telephone No.: (859) 358-0300
9   E-mail: morrinlaw@gmail.com
10
11  ON BEHALF OF THE DEFENDANTS, ENTERPRISE SERVICES GROUP,
12  LLC, AND CLARENCE M. HOWARD:
13  Jay Ridings, Esquire
14  Marsha Ridings, Esquire
15  Hamm, Milby & Ridings, PLLC
16  120 North Main Street
17  London, Kentucky 40741
18  Telephone No.: (606) 864-4126
19  E-mail: jridings@hmrlaw.com
20          mridings@hmrkylaw.com
21
22
23
24
25

Page 3

APPEARANCES (CONTINUED)

1
2
3   ON BEHALF OF THE DEFENDANT, IPSI INSURANCE:
4   Catie Coldiron Joseph, Esquire
5   Ward, Hocker & Thornton, PLLC
6   333 West Vine Street
7   Suite 1100
8   Lexington, Kentucky 40207
9   Telephone No.: (859) 422-6000
10  E-mail: catie.coldironjoseph@whtlaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

INDEX

1
2                                           Page
3   PROCEEDINGS                               6
4   DIRECT EXAMINATION BY MR. RIDINGS         6
5   CROSS-EXAMINATION BY MR. MORRIN         194
6   REDIRECT EXAMINATION BY MR. RIDINGS     202
7
8                 EXHIBITS
9   Exhibit                                 Page
10  1 - Subpoena of Deposition                8
11  2 - Report dated November 17, 2023       22
12  3 - Office Records                        30
13  4 - Secondary Report dated June 11, 2024  44
14  5 - AANS Code of Ethics                   63
15  6 - Expert Opinion Ethics                 67
16  7 - Baptist Health Records              116
17  8 - Invoice                             174
18
19
20
21
22
23
24
25

Page 5

STIPULATION

1
2
3   The deposition of DR. DAVID CHANGARIS was taken at
4   AFTER ACCIDENT CARE, 801 BARRETT AVENUE, SUITE 103,
5   LOUISVILLE, KENTUCKY 40204, on TUESDAY the 16TH day of
6   JULY 2024 at 4:20 p.m. (ET); said deposition was taken
7   pursuant to the KENTUCKY Rules of Civil Procedure.
8
9   It is agreed that LILY CORNELL, being a Notary Public
10  and Court Reporter for the State of KENTUCKY, may swear
11  the witness.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

PROCEEDINGS

        THE REPORTER:  We are now on record.  The time
is 4:20.  Doctor, I'm going to swear you in, if you
don't mind raising your right hand.  Do you solemnly
swear or affirm the testimony you're about to give
will be the truth, the whole truth, and nothing but
the truth?
        THE WITNESS:  I do so affirm.
        THE REPORTER:  Thank you.  Counsel, you may
begin.
        MR. RIDINGS:  All right.
             DIRECT EXAMINATION
BY MR. RIDINGS:
    Q.   Good evening, Dr. Changaris.  My name is Jay
Ridings.  You're appearing today pursuant to -- for a
deposition, correct?
    A.   Yes, sir.
    Q.   And you're appearing pursuant to a subpoena
that I served and issued, correct?
    A.   I'm here because you want me to be here.
    Q.   Okay.  Did you receive a subpoena?
    A.   I suspect I did.
    Q.   Okay.
    A.   I don't --

Page 7

    Q.   Did you review the subpoena?
    A.   Probably not.
    Q.   Okay.  Well, you were kind enough to allow me
to sort of skim through in a -- or strike that.  And you
were kind enough to allow me to skim through, in advance
of your deposition, multiple records that you -- that
you brought with you to the deposition, and so I thank
you for that.  And I did notice that the subpoena --
    A.   This right here?
    Q.   -- that I issued was there.
    A.   Okay.  Good.  So I'll read it and see if --
how -- how far along I -- I don't know.  Oh.  Oh, you
have a schedule in there.
    Q.   I'm trying to make it easier with a schedule.
    A.   So making a list makes it easier?  So where --
    Q.   It does for me.
    A.   Okay.  All right.
    Q.   All right.  A number -- a nice, numbered list,
I would think would be easier than a paragraph saying --
    A.   Is this A1?
    Q.   That is it.  Correct.  Schedule A1 and --
    A.   Okay.  Well, I think I've done 1.  I've got 2.
    Q.   Okay.  Let's --
    A.   I've got 3.
    Q.   -- let's -- hold on.  Let's back up real quick

Page 8

and let me just -- I should have started off this way.
I'm -- I will tell you, I -- obviously, I noticed the
deposition, and I'm paying quite a bit of money to take
your deposition today.  And I've reviewed -- I'm very
familiar with the file.  I'm also relatively familiar
with deposition testimony that you've given in other
cases.  So against that background, I would ask that you
won't -- that when you answer, that when you provide
testimony, that it only be responsive to the question
that I'm asking you --
    A.   Sure.
    Q.   -- and I have quite a lot to get through
today.  And so if you would, just answer what I've asked
and don't elaborate unless and until I ask you to.  And
I'm -- obviously, there are lots of things that I will
need elaboration on, but we'll -- if it does -- if the
question does not call for elaboration, if you would,
please just answer the question, okay?
    A.   Okay.
        MR. RIDINGS:  So let's review the subpoena that
I issued.  And I'm going to make that the first
exhibit, so we'll do it Exhibit 1.  And is it okay,
Madam Court Reporter, if I forward that to you, e-
mail that to you?
        (EXHIBIT 1 MARKED FOR IDENTIFICATION)

Page 9

        THE REPORTER:  Yeah.
        MR. RIDINGS:  Perfect.  All right.
BY MR. RIDINGS:
    Q.   So the first -- Item number 1 was all records,
test results, documents you reviewed, considered, or
relied upon in relation to the November 17, 2023,
consultation report you authored in relation to Charles
Walden.  Did I read that correctly?
    A.   Yes.
    Q.   And did the records that you brought in today,
do they cover that request?
    A.   To the best of my knowledge.
        THE WITNESS:  I might ask that -- Mr. Morrin
here, does it look like I have at least an
approximate number of inches of data that you gave
me?
        MR. MORRIN:  I have no idea.
        THE WITNESS:  Okay.  Sorry.  Sorry.  I just --
BY MR. RIDINGS:
    Q.   No, no.  That's fine.
    A.   It's just -- I'm -- I'm -- I tried to produce
everything that he gave me.
    Q.   Okay.  And is it fair to assume that the only
medical records that you reviewed were those that were
provided by Mr. Morrin?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1    A.   Yes.
2    Q.   Okay.  If there were any other such records,
3  where would they be?
4    A.   That's a very good question.  When things go
5  on walkabout, I never know until I find them.
6    Q.   And I'll tell you, this one, we may come back
7  to it, but I'll move on for now.  I'll have you -- you
8  read number 2.  Do you believe that you have provided
9  all documents and evidence responsive to Item number 2?
10    A.   Well, that's -- that's a -- I don't have the
11  stuff that the people who submitted the 510(k) clearance
12  on these toys with -- with the FDA -- I don't have that
13  stuff.  And -- but I have all the generated data from
14  the toys, from the machines.
15    Q.   Okay.  What is the "510 clearance"?  Is that
16  what you said?
17    A.   Yeah.  These are things that people submit to
18  the FDA when they want to -- to market a medical device.
19    Q.   Okay.  So those records or evidence, that was
20  never in your possession, correct?  Is that correct?
21    A.   Correct.  But --
22    Q.   Would that be the same for Item number 3?
23  That is, a similar request but relates to VNG?
24    A.   Yeah.  The control data and everything would
25  be built into the machine.  I -- I have no way of

Page 11

1  producing that.
2    Q.   You do not have the control data?
3    A.   No.  That's in the machine.
4    Q.   Okay.  Are you familiar with the control data?
5    A.   Well, that could mean different things, but
6  maybe we might have two different definitions of what
7  control data is.
8    Q.   Very good point.  Are you familiar with the
9  control data that was utilized in the testing performed
10  on Mr. Walden?
11    A.   Yes.  I'm familiar with it, but what -- what I
12  suspect you're after is after the norm data.
13    Q.   Well, I -- right now, I'm just trying to --
14    A.   I understand.
15    Q.   -- see what you did produce or didn't produce.
16    A.   And the norm data is --
17    Q.   Well, let's not go there yet, okay?
18    A.   -- is --
19    Q.   We'll get into that, sir.  If you would --
20    A.   People would consider it to be very
21  proprietary, and they wouldn't let me anywhere near that
22  stuff.
23    Q.   Did you provide all video footage depicting
24  all posturography tests relating to Mr. Walden?
25    A.   That I don't know.  It's -- this is everything

Page 12

1  we have in here.  If you didn't get one of these, then
2  you need one of those.
3    Q.   Okay.  Is there video or would there be video
4  evidence relating to the video posturography test you
5  performed on Mr. Walden?
6    A.   Yes.
7    Q.   And that -- you have access to that video
8  evidence?
9    A.   It's right here.
10    Q.   Okay.  Have you ever been -- has Mr. Morrin
11  ever requested such video evidence from you?
12    A.   No.
13    Q.   If he had requested it from you or your
14  office, would your office have provided that?
15    A.   Oh, sure.  That -- that assumes a level of
16  understanding that is much higher than most people have.
17    Q.   Okay.  Is there video footage or evidence
18  related to the VNG tests that your office performed?
19    A.   Yeah.  I -- I actually, I -- I may have
20  misspoke.  I don't know that we have independent video
21  footage of the posturography.  We just have a video of
22  the -- of the VNG.
23    Q.   Okay.
24    A.   We -- we were -- it sounded to me like you
25  were blurring the two together in my responses.

Page 13

1    Q.   Okay.  All right.  Well, why is there not
2  video of the video posturography test?
3    A.   No reason.  It's an extra hassle to set up a
4  camera to do that.  It's not -- it's not central to the
5  -- to the readings.  But the -- the readings are done
6  with the -- with the person appropriately wired and
7  standing in the right position.
8    Q.   Okay.  So was any video footage created in
9  relation to the posturography test?
10    A.   No.  Not to my knowledge.  It's not a standard
11  part of that test.
12    Q.   Would this material contain all handwritten or
13  typed notes prepared by you or your staff relating to
14  Charles Walden?
15    A.   I believe so.
16    Q.   Okay.  And where would the handwritten notes
17  be?
18    A.   Somewhere in here.
19    Q.   Okay.  In the smaller file that's directly in
20  front of you --
21    A.   Right.
22    Q.   -- you believe, correct?
23    A.   (No verbal response.)
24    Q.   Did you bring with you all questionnaires
25  relating to Charles Walden?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 5 of 54 - Page ID#: 1929
The Deposition of DAVID CHANGARIS, M.D., taken on July 06, 2024
14..17

Page 14

1    A.   That's usually part of the report.  I'm
2  assuming that the report is in here.  Yes.
3    Q.   And when you refer to "the report," are you
4  referring to the November 17, 2023, written report
5  that --
6    A.   Yeah.  Yeah.  That should have just about
7  everything in it.
8    Q.   Okay.
9    A.   Which --
10   Q.   All right.
11   A.   -- if it's not, then we didn't do our job.
12   Q.   Okay.  But that's not what I was requesting.
13  Because a lot of times -- and I'll be honest with you,
14  in many of your depositions in the past, you have
15  testified and you have brought with you hand --
16  questionnaires that were -- they're form questionnaires,
17  but they look like someone has completed them or filled
18  them out that were not -- that were not part of your
19  report, and sometimes there's inconsistent information,
20  or sometimes there's additional information.  So that's
21  -- so let me go back to the question.  Have you brought
22  all questionnaires relating to or completed by Charles
23  Walden?
24   A.   I -- I honestly don't know.  My attempt was to
25  do so.  Without going through the -- entire

Page 15

1  document, I wouldn't know.
2    Q.   Okay.  Well, you indicated that all such
3  information would be in your report.  So tell me what
4  questionnaires would have been responsive to --
5    A.   We --
6    Q.   -- numbers 7 and 8?
7    A.   -- we do a VNG intake that has a number of
8  questions surrounding medical issues and drugs that
9  they're taking or not taking.  And then we have a -- a
10  dizziness handicap quotient and a brain injury index.
11   Q.   Okay.  Are --
12   A.   And then there's many hundred questions in --
13  in the -- in the surveys.
14   Q.   Okay.  Are --
15   A.   These are standard surveys --
16   Q.   And --
17   A.   -- and you can download them.  They're not --
18  they're not hidden.
19   Q.   Okay.
20   A.   They're not proprietary.
21   Q.   But if I download one, it won't have -- it
22  won't relate to Mr. Walden though, correct?
23   A.   No.  No.
24   Q.   So what I'm wanting are questionnaires that
25  were filled out relating to Mr. Walden.

Page 16

1    A.   Well, the only way I would know is if -- if
2  you look at your report, and you'll let me review it
3  page by page, and I'll -- I'll tell you whether you have
4  it all.  I would have to do it page by page since you're
5  being this precise.  I don't know what you have in your
6  report.
7    Q.   It's your report, Doctor.
8    A.   Right.  But if something is missing by chance,
9  I wouldn't know unless I went through it.
10   Q.   Okay.  Well --
11   A.   My -- my intent was to give it to you.  I'm --
12  I'm just trying to be helpful here without -- I -- I
13  can't know what's in that report unless I look at it and
14  do a page-by-page analysis of it.
15   Q.   Okay.  And that was sort of the purpose of the
16  subpoena, though, was --
17   A.   Right.  And I have the chart here.  If you
18  want to go through it page by page to see if you've got
19  it, you can do it.
20   Q.   Okay.  Well, we probably will do that --
21   A.   And if there's something --
22   Q.   -- in a little bit.
23   A.   -- something missing, we'll provide it.  My --
24   Q.   But there's no way for me to know if something
25  is missing if it's not there.  You would be the only one

Page 17

1  that would know that.
2    A.   No.  You can go through -- if it's not here,
3  then it doesn't exist.  Everything I have --
4    Q.   Okay.
5    A.   -- is here.  Now, if it didn't make it to you,
6  that -- my apologies.
7    Q.   Well, the only -- what's been -- the only
8  thing that would've made it to me is what's sitting in
9  front of us, correct?
10   A.   I have no idea what would be made to you.  I
11  would doubt that we -- we have given these to you.
12   Q.   Yeah.  And the subpoena requested production
13  today at the time of -- at the time of your deposition.
14   A.   Well, to my knowledge, I've complied with
15  producing it.  If you want to go through it line by
16  line, here it is.  It's yours to go through any way you
17  like.  If you find something you want, I'll -- I'll
18  photocopy it.
19   Q.   All right.  We will -- I will probably take --
20  or I will definitely take you up on that offer and --
21  we'll move on, and I'll take you up on that offer at the
22  end of the deposition.  And I appreciate that.  Number
23  10 requested all of the following posturography evidence
24  relating to Charles Walden.  And I think with respect --
25  as we go through these, it'll probably be easier for you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  to tell me first whether such evidence even would exist
2  because -- much like my assumption that there would be
3  video footage of the video posturography, and I was
4  incorrect.
5      A.  And we -- we don't call it a video
6  posturography.  We call it a computerized posturography.
7  We have a videonystagmography.  That's just for the
8  record.  I've said it a couple times.  If -- if we wrote
9  video posturography, then it -- it's an error.
10     Q.  Okay.  Let's turn to your report, then,
11  because I want to get this straight.  Let's go to Page 5
12  of your November 17, 2023, report.
13     A.  Okay.
14     Q.  And if you will look at the very top of that
15  chart and tell me where it -- see where it says FallTrak
16  Balance?  If you'll read the rest of that line for me.
17     A.  Well, there is a video that's played during
18  it.
19     Q.  Well, you said if it was called a video
20  posturography test, that would be an error?
21     A.  Well, that's my opinion.  I didn't realize
22  that they actually named it that.  I'm sorry.  I --
23     Q.  So how familiar are you with this --
24     A.  I'm familiar with the --
25     Q.  -- test, Doctor?

Page 19

1      A.  -- with the test.  But, you know, this is a
2  nuance.
3      Q.  Okay.  But --
4      A.  I'm around it every day and -- and --
5      Q.  Well, we'll move on.
6      A.  -- there's no -- there -- there's no video.
7      Q.  We've answered that.
8      A.  We have.
9          MR. MORRIN:  Objection.  Objection.  Let him
10  answer.  Let him answer the question, please.
11         MR. RIDINGS:  There is not a question.
12         MR. MORRIN:  You asked him how familiar he was.
13  Let him answer it.
14  BY MR. RIDINGS:
15     Q.  Doctor, you've already answered that question.
16         MR. MORRIN:  Objection.
17         MR. RIDINGS:  There's not a question.
18         MR. MORRIN:  Let him answer the question.
19         MR. RIDINGS:  It's my deposition.
20         MR. MORRIN:  He's entitled to answer the --
21  each question you ask.  You can't keep cutting him
22  off like that.
23         MR. RIDINGS:  Look.  You cannot -- it's not --
24  if you have an objection, you can --
25         MR. MORRIN:  Objection.  Argumentative.  Let

Page 20

1  him answer it.
2          MR. RIDINGS:  Okay.  But you cannot direct the
3  witness to -- if you want to follow up with these
4  questions, you are free to.
5          MR. MORRIN:  No.  He's entitled to answer your
6  questions when you ask them.  I do not have to come
7  up and follow up each time you cut him off.
8          MR. RIDINGS:  I --
9          MR. MORRIN:  He's entitled to answer.
10         MR. RIDINGS:  You can --
11         MR. MORRIN:  Let's call the judge.  I mean,
12  it's -- let him answer or let's call the judge.
13         MR. RIDINGS:  We're moving on.
14         MR. MORRIN:  Let's go off the record.
15         THE REPORTER:  All right.  We're now off
16  record.
17            (OFF THE RECORD)
18         THE REPORTER:  All right.  We are now back on
19  record.
20  BY MR. RIDINGS:
21     Q.  Say whatever you would like to say.
22     A.  What is the question you want me to answer?
23     Q.  I don't have a question.  You --
24         MR. MORRIN:  We --
25  BY MR. RIDINGS:

Page 21

1      Q.  So I'm moving on.  Okay.  Did you bring with
2  you today, Doctor, all evidence demonstrating the exact
3  manner in which body tilt was measured in Mr. Walden in
4  relation to the testing that you performed?
5      A.  I'd have to say no because -- because all the
6  things would require us actually doing the test.
7      Q.  Excuse me?  The --
8      A.  The measurement protocols and things like that
9  are intrinsic to the performance of the test.  I can't
10  physically bring them in.
11     Q.  So there would not be any such evidence; is
12  that correct?  Do I -- strike that.  That was a terrible
13  question.  Forgive me.
14         I'm stumbling over the word "all" because
15  "all" is a pretty tangential word.  You can pretty much
16  put anything into the word "all."
17     Q.  Did you bring any?
18     A.  Yes.
19     Q.  Okay.  What would the -- what evidence would
20  be responsive to identifying the manner in which body
21  tilt was measured in Mr. Walden?
22     A.  In the report --
23     Q.  Okay.
24     A.  -- that I generated.  I --
25         MR. RIDINGS:  Let's do this then.  Let's just

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1  go ahead, and I've already handed you a copy of your
2  November 17, 2023, report, and I'm going to mark
3  that as Exhibit B.  Do you prefer 1, 2?  B, C?
4       THE REPORTER:  I think you did 1 --
5       MR. RIDINGS:  Okay.
6       THE REPORTER:  -- so let's do 2.
7       MR. RIDINGS:  All right.  We'll refer to it as
8  Exhibit 2.
9       (EXHIBIT 2 MARKED FOR IDENTIFICATION)
10      MR. RIDINGS:  And here is a copy for you.
11      THE REPORTER:  Okay.
12      MR. RIDINGS:  Do you have a copy, Rob?  I'll
13  just give you a copy I brought.
14      MR. MORRIN:  Thank you.
15      MR. RIDINGS:  Brought plenty.  One for you too.
16      MR. MORRIN:  I'll take paper off your hands.
17  BY MR. RIDINGS:
18      Q.  All right.  Where in your report is evidence
19  demonstrating the exact manner in which body tilt was
20  measured in Mr. Walden?
21      A.  By the presence of the -- apparatus that
22  we use to perform the video posturography.  It's
23  intrinsic to the actual --
24      Q.  Okay.
25      A.  -- device.

Page 23

1       Q.  All right.
2       A.  I don't get into that.  It's a machine.  We
3  set it up.  We -- we put -- we put the person in the
4  right position.  The machine measures things, and then
5  inside it, it has all sorts of different ways of coming
6  about -- where the head is, where the neck is, and --
7  and the body and things like that.
8       Q.  Are you able to tell me where the anatomic
9  vertex point, the starting point for both rays that
10  formed each body tilt angle?
11      A.  Only approximately because that's something
12  inside the program.
13      Q.  Okay.  Well, tell me approximately.
14      A.  It'd be the top of his head.
15      Q.  Did you bring any evidence demonstrating the
16  results of all trials and tests for each of the
17  following components of posturography testing?  And
18  let's -- I'll just refer you to, on the subpoena, Item
19  10B and then Sub-Parts I, II, III, IV, and V, Roman
20  numerals.
21      A.  Okay.  Okay.  Hang on here.  10B.
22      Q.  And the -- let me add another question, if I
23  may.  Is there such evidence that is responsive to 10B,
24  Sub-Parts Roman numeral I through V?
25      A.  Probably not.

Page 24

1       Q.  Were posture trials performed in the
2  posturography testing that your office conducted?
3       A.  I'm not sure I understand what you mean by a
4  "trial."  Do you mean were there -- were -- did we run
5  the test without recording things?
6       Q.  Were there any --
7       A.  Do you mean how many times we performed the
8  test?  I -- I believe we performed the test three times.
9       Q.  Okay.
10      A.  And -- and you have reports on all three
11  trials, or three -- three times we completed the entire
12  procedure.
13      Q.  And when performing these tests and trials,
14  were any objectively recorded body tilt angular
15  measurements recorded or documented?
16      A.  I -- I'm sure they were recorded somewhere in
17  the machine.
18      Q.  Okay.  Is --
19      A.  This is -- this is run by a computer program
20  inside.  There's no human being doing these
21  measurements.
22      Q.  Okay.  Is it -- is there a way to obtain those
23  measurements?
24      A.  I'm unaware of it other than contacting the
25  manufacturer and getting that kind of clear information.

Page 25

1  I don't know that they'd be willing to give that to you.
2       Q.  Is there data that is -- I have a note here
3  that "responsive data is typically provided in a table
4  or chart format with each properly labeled trial
5  reflecting the corresponding angular measurements."
6  Does that help you out any?
7       A.  No.
8       Q.  Okay.
9       A.  What we do have is, if you see the report, on
10  each one, here -- so getting here, we do have the
11  printouts of -- of everything that was measured.  There
12  are charts where they do talk about percentiles and the
13  difference in the velocity of the movement --
14      Q.  Okay.
15      A.  -- on this, which means they have to be
16  measuring angle to get velocity.  So there's intrinsic
17  information there.  And here, you can see the -- the
18  movement of the top of the head in relationship to the
19  circle in relationship to norms and not norms.  And it
20  -- so there -- there's probably a vertex in there
21  somewhere, but I'm -- it's just not part of the report
22  that I -- I deal with.
23      Q.  Okay.
24      A.  It's -- it's in -- it's in there probably, I'm
25  guessing, because I'm an old math major, and I do

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 8 of 54 - Page ID#: 1932
The Deposition of DAVID CHANGARIS, M.D., taken on July 26, 2024
26..29

Page 26

1  computer programming, and I -- I know that when you do
2  this kind of stuff at the level of a computer, that you
3  have to have a point.  And that -- I'm assuming that's
4  what you mean by "vertex."  And by the way, a computer
5  angle is really different than the angle that you think
6  about where you have an actual compass where you can
7  actually demonstrate a line -- a line percent.  When you
8  deal with the computer, you're dealing with points.
9      Q.   Okay.  I just asked if it was in the report.
10     A.   Yeah.  But you're ask -- you're asking a
11 complicated question with very simple language.  And --
12 and the -- it -- it doesn't make sense to me.  The
13 questions don't make sense to me because --
14     Q.   I --
15     A.   -- I -- I understand the computer language
16 that they use in general, and I understand a little bit
17 about how the thing works, and it -- it doesn't fit the
18 structure of the program.  You have all the data that
19 our machines generated and printed out.  There's nothing
20 hidden here.
21     Q.   Is there evidence demonstrating the vertex
22 point?
23     A.   Again, I don't have any idea what you mean by
24 the "vertex point."
25     Q.   Okay.

Page 27

1      A.   Because the vertex --
2      Q.   That's all you need to say.
3      A.   -- the vertex point is -- there is a vertex on
4  the skull, but I have no idea if that's what you mean.
5  Do you mean the vertex in the room where they're --
6  where they're doing their angles or the floor?  Where --
7      Q.   I'm not allowed to -- I issued the subpoena.
8  And it -- if you didn't -- if it was something that
9  you didn't understand, then --
10     A.   And we're here today to understand it.
11     Q.   And --
12     A.   And today --
13     Q.   -- right now I'm just asking --
14     A.   -- today --
15     Q.   -- if you produced the documents.
16     A.   Well, I --
17     Q.   I promise we're going to get into this.
18     A.   Yeah.  I -- I promise you also that I'm trying
19 to answer it honestly.
20     Q.   Right.
21     A.   But the -- but the language, it doesn't
22 dovetail with the language that I use or haven't had
23 experience with this particular test.
24     Q.   Okay.  Is there evidence demonstrating the
25 terminal ray points?  Yes or no?

Page 28

1      A.   Again, I don't know what you mean by that.
2      Q.   Okay.  I should have added that as well.
3      A.   Well, I -- I asked you in the beginning, what
4  do you mean by vertex?  And I -- and you didn't give me
5  -- and I tried to give you my best answer.  I probably
6  shouldn't have tried to give you my best answer.  That's
7  been confusing for you, as I tried to be helpful.  I
8  need to just say no, I don't understand the question.
9      Q.   Was any neurological testing conducted
10 simultaneously with the posturography testing?
11     A.   No.  If you mean was -- was I doing things to
12 him personally while he was doing the posturography?
13 No.
14     Q.   Okay.  Was anybody observing it or taking
15 notes?
16     A.   We have an observer, and the person performing
17 the test has a procedure, and the person performing that
18 has been trained, and they follow the procedure.
19     Q.   Does that -- does part of that procedure
20 involve the taking of notes of their observations -- of
21 his or her observations?
22     A.   Usually that's part of the -- the physical
23 therapy report or the -- and usually they're minor.  And
24 usually they're included.  I'm assuming they're
25 included.

Page 29

1      Q.   Included with what?
2      A.   With what we've given you already.
3      Q.   Okay.  Do you mean what you've given here?
4      A.   When we give a report, usually we give all --
5  all the data, all these questions.  Did you not get
6  these questions?
7      Q.   I did not get those questions.
8      A.   Then you didn't get the full report.  So I
9  need to give you the full report of -- of all this stuff
10 here, right?
11     Q.   Correct.  Yes.  And now, I did --
12     A.   And -- and this may -- whoever your expert is,
13 when they look at this, they may say, this is -- this is
14 what I'm after.
15     Q.   Do you know who my expert is?
16     A.   I have no idea who your expert is.
17     Q.   Okay.  I will show you -- on June 13, 2024, I
18 did receive a -- I believe it was a CD-ROM.  It might
19 have been a flash disk.  From your office that included
20 what the -- if you will hand that to the court reporter,
21 and I will give you another copy.  And here's your copy,
22 Doctor.  Oh, you know what?  Actually, they all -- I did
23 all those in color.  So you can keep either one.
24          THE REPORTER:  Are you marking this as 3?
25          MR. RIDINGS:  Yes.  This will be 3.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DAVID CHANDARIS MD, Taken on July 26, 2024

30..33

Page 30

1        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
2        THE WITNESS:  I do believe you have everything
3    that I have.
4    BY MR. RIDINGS:
5        Q.   Hold on.  Which one did you -- which one is
6    that?  We'll mark it 3.
7        A.   You have everything I have.
8        Q.   All right.  Let me ask you, Doctor, if --
9    where in your -- where in that file is -- is this in
10   here?
11       A.   I have no idea.
12       Q.   Okay.
13       A.   That's the scheduling.
14       Q.   Okay.  So the -- I will represent to you that
15   I did not receive a document that says XXX scheduling.
16       A.   Okay.  The initial report.  You should have
17   that.
18       Q.   Where's the one that says, Jay's copy?
19       A.   Here it is, VNG Initial Report.
20       Q.   Okay.
21       A.   Okay.  And here is a scheduling something or
22   other for the VNG.
23       MR. MORRIN:  Jay, do you want to go off the
24   record and go ahead and get a copy of everything
25   that's in there?

Page 31

1        MR. RIDINGS:  Well, I would've liked --
2        THE WITNESS:  Well, I -- I'm not going to --
3    going to do that right now.
4        MS. RIDINGS:  Why not?
5        THE WITNESS:  I won't do that for him.  I --
6        MS. RIDINGS:  I mean, you were subpoenaed to
7    produce everything you had.
8        THE WITNESS:  I produced it, but I'm not going
9    to photocopy it.  I will promise to photocopy it.
10       MS. RIDINGS:  That's where I wish the judge
11   were still in town.
12       MR. RIDINGS:  We'll do it however he wishes.
13   Fine.  That's fine.
14   BY MR. RIDINGS:
15       Q.   All right.  The head -- do you see "head
16   injury symptom scale"?
17       A.   It should be here.
18       Q.   It is.  I recognize that now.
19       A.   And we sent you a video too.
20       Q.   I --
21       A.   And the video has the -- all the video stuff
22   in it too.
23       Q.   And there was one video file contained on --
24       A.   That -- that's all we have is one --
25       Q.   Okay.

Page 32

1        A.   -- one video file.  So you have the video.
2        MS. RIDINGS:  This is what you're looking for.
3        MR. RIDINGS:  That one.
4        THE WITNESS:  Yeah.  So you -- you pretty much
5    -- I mean, I do believe you have it all,
6    especially --
7    BY MR. RIDINGS:
8        Q.   It appears that I --
9        A.   -- that -- with that.
10       Q.   Did we --
11       A.   Because what I would --
12       MS. RIDINGS:  Hand it to him.
13       THE WITNESS:  -- for them to generate this
14   second thing means that I have to probably give them
15   instructions to give you everything, including the
16   video in here.  So you -- now that I see that
17   there's a second stash of -- of documents from my
18   record, that was the -- every corner here that I can
19   think of for my staff.
20   BY MR. RIDINGS:
21       Q.   Did the documents that you produced include
22   evidence establishing the control measures to which
23   Mr. Walden was compared for purposes of analyzing the
24   posturography testing?
25       A.   No.

Page 33

1        Q.   Does such evidence exist?
2        A.   Yes.
3        Q.   Is such evidence available to you?
4        A.   I would doubt it, but I don't know.
5        Q.   Do you -- are you familiar with the control
6    measures that were, in fact, used and to which
7    Mr. Walden was compared for purposes of the
8    posturography testing?
9        A.   I don't have access to those.  That's provided
10   by the company that makes the test.  They consider that
11   proprietary.  They're pretty tight about that one.
12       Q.   Did you analyze the posturography test -- or
13   strike that.  Did you interpret the posturography test?
14       A.   Yes.  I even wrote a personal report on it.
15       Q.   But you didn't -- you did not personally
16   interpret the VNG test, correct?
17       A.   I personally interpreted the VNG test.  I
18   didn't write a separate report.
19       Q.   Okay.  All right.  Number 15, that one was a
20   big one.  "Copies of all articles, studies, and reports
21   that were referenced in Footnotes 1 and 2 of your
22   November 17, 2023, consultation report."  And then I
23   identified them specifically, each separate article or
24   study or report that you referenced.  Did you bring
25   copies of those with you today, Doctor?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 10 of 54 - Page ID#:
1934
The Deposition of DAVID CHANGARIS, M.D., taken on July 10, 2024
34..37

Page 34

1     A.   No.
2     Q.   Do you have access to such evidence?
3     A.   Possibly.
4     Q.   Okay.  I --
5     A.   I'm -- I'm not going to be -- able to
6  reproduce them for you, though, because they're -- if I
7  bought them, they were for single copies.  You can --
8  you can go online, and you can buy these yourself.
9     Q.   Okay.  But I --
10    A.   They -- they're -- they're -- they -- you have
11 to go online to buy these things.
12    Q.   So why did -- did you refer to them in
13 preparing your report?
14    A.   Probably.
15    Q.   Okay.  So you did buy them at that point,
16 correct?
17    A.   Yeah.  Or I had them in my possession.
18    Q.   Okay.  Which ones did you have in your
19 possession?
20    A.   All of them at some point when I wrote the
21 report.
22    Q.   Okay.  Where would they be now?
23    A.   I -- I wouldn't know.  I'd have to go back
24 through --
25    Q.   Okay.

Page 35

1     A.   -- see where they are.
2     Q.   Well, you were --
3     A.   I can't --
4     Q.   I subpoenaed these from you, Doctor.
5     A.   Yeah.  But you can't make me go out and buy
6  them over again.
7     Q.   Well, no.  You indicated that you would --
8  that you --
9     A.   You're -- you're playing games here.
10    Q.   No.  I'm not, Doctor.
11    A.   Nobody has ever asked me to produce these
12 things.  They're available on the web, and you can buy
13 them.  You --
14    Q.   Where would I find them?
15    A.   Type in the DOI, and you will find it on the
16 web.
17    Q.   Okay.  There were -- is that true for every
18 last one of these reports or articles?
19    A.   Somewhere on the web, they are.  You can get
20 them.
21    Q.   Okay.
22    A.   These -- these are all published things.
23 They're on the web.
24    Q.   Well, Doctor, I did my level best to obtain
25 them and was not able to obtain a great many of them.

Page 36

1     A.   If you want me to do that, my charge for that
2  is $500 an hour, and I will be glad to print them out
3  for you.  I will go on the web myself, pay for them,
4  you'll pay for the licensing fees, and I'll get them for
5  you.
6     Q.   Okay.  But you had them, correct?
7     A.   At one point.  Some of those things are only
8  available -- you pay for 24 hours.
9     Q.   Which ones?
10    A.   Some -- I don't know.  Some of them.  You go
11 online and you -- they -- they -- you've got a license
12 fee to read them for 24 hours.  The world has changed
13 when it's come to these things.
14    Q.   Okay.  Did you review each and every one of
15 these reports --
16    A.   Yes.
17    Q.   -- in preparing the report that you've --
18    A.   Yes.
19    Q.   -- completed?
20    A.   Yes.
21    Q.   Just for the record, I reserve the right -- or
22 no, strike that.  Do you have -- did you search your
23 office or your records to determine if you have any of
24 these reports listed in Number 15 of the subpoena?
25    A.   I don't recall.  I'm just saying my current

Page 37

1  recollection is some of these things, I can find.  Some
2  of the these, I can't.  I -- I maintain a very extensive
3  database of -- of articles.
4     Q.   So it is likely that you do have --
5     A.   Many -- many of them, I don't keep physical
6  copies of because of -- of trademark issues and -- and
7  things like this.  I just keep their abstracts in it,
8  and then I keep track of it.  Having read it, I know
9  what's in it.
10    Q.   So --
11    A.   These are things that I have relied on.  And I
12 usually -- when I quote them, I usually give you the
13 reason why I relied on it.
14    Q.   Okay.  Well, it was in a footnote.  But you --
15 one thing you said that was interesting to me, though,
16 is you referenced -- you said sometimes, I believe you
17 said, just rely on the abstract?
18    A.   Sometimes.  If -- if I can only get ahold of
19 an abstract, then I'll -- you know, I'll just do the
20 abstract.
21    Q.   Okay.
22    A.   But most of these things, I try to deal with
23 -- most of these articles, they're pretty easy to get if
24 you know your way around or you have access to a big
25 database.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 11 of 54 - Page ID#: 1935
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024
38..41

Page 38

1    Q.  Do you refer to these commonly in your
2  reports?  Are there any that you referred -- ever
3  referred to more than six times in the last year?
4    A.  Probably.
5    Q.  Okay.  And the ones that you commonly cite or
6  refer to, would it be a fair assumption that those you
7  actually saved or -- on your computer or print, or --
8    A.  It is -- it is my understanding that it is not
9  my job to provide you with the primary articles that I
10  -- that I quote.
11    Q.  Okay.
12    A.  And if it is, have the judge direct me, and
13  I'll -- I'll be glad to do it.
14    Q.  Okay.  Well, I -- that's what I'm trying to
15  create a record for.  I'm trying to create a record of
16  the documents that you have or have -- are reasonably
17  available to you, and also determine which ones you
18  have.
19    A.  Here -- here's the list.  If you want the hard
20  copies of the things, I'll be glad to provide them for
21  you, but you're going to pay for it.
22    Q.  Well, that's what I did today, Doctor.
23    A.  No.
24    Q.  I'm paying you today.
25    A.  No.  No.

Page 39

1    Q.  I issued a subpoena today --
2    A.  You paid me to sit here for three hours.
3    Q.  No, Doctor.  I issued a subpoena to you
4  today --
5    A.  But that doesn't guarantee that I'm going to
6  be able to do that.  If -- if you want this, you're
7  going to have to agree to pay my fee, which is $500 an
8  hour for research.  In my estimate, it was probably
9  going to take between six and 12 hours to produce these.
10  If you want them, I'll be glad to do that under those
11  terms.
12    Q.  I wanted them today.
13    A.  Okay.  But we -- are you willing to pay that
14  fee?  You're not going to get them without paying the
15  fee.  No one else has ever asked me for this because
16  most people can do their own literature search.  These
17  are very readily available for somebody to have access
18  to the evidence.
19    Q.  But it is your testimony that you reviewed,
20  and, in fact, relied on all of these articles in forming
21  the opinions that you made in relation to this case?
22    A.  Yes.
23    Q.  Okay.
24    A.  But if you want me to produce them --
25    Q.  No.  There's not a question, Doctor.  You

Page 40

1  answered my question.  You understand that I'm here
2  today to learn every opinion you're going to offer at
3  the trial of this case; is that fair?
4    A.  Yes.
5    Q.  Will you agree that you will tell me all of
6  those opinions?
7    A.  To the best of my capacity at -- at this time.
8    Q.  Okay.  And can we agree that when I refer to
9  your report, I'm referring to the November 17, 2023,
10  report that I believe we marked as Exhibit 2?
11    A.  That -- that there are -- are you -- there are
12  two reports.
13    Q.  There are two reports?
14    A.  That I've made.
15    Q.  Okay.  I have only -- I've only received one,
16  Doctor.
17    A.  Okay.
18    MR. RIDINGS:  Rob, is there a second report
19  that was given to you that we have?
20    MR. MORRIN:  There's not a second report.
21    MR. RIDINGS:  Excuse me?
22    MR. MORRIN:  A second report?
23    MR. RIDINGS:  It's what your doctor just said.
24    THE WITNESS:  I'm pretty sure.
25    MR. RIDINGS:  And I -- and frankly, I saw one

Page 41

1  in his file.
2    MR. MORRIN:  Yeah.  He did go back to the
3  office, and then there should be a second.
4    THE WITNESS:  There should have been --
5    MR. MORRIN:  There should be a second report.
6    MR. RIDINGS:  All right.
7    MR. MORRIN:  Like an office report on that.
8    MR. RIDINGS:  And for the record, you'll agree
9  that report has not been provided to us, correct,
10  Mr. Morrin?
11    MR. MORRIN:  I do not know.  It should have
12  been provided to you.  It should have been.
13    MR. RIDINGS:  Okay.  Can you -- do you have the
14  ability to tell me when?  Because I will represent
15  that I am wholly unfamiliar with a second report.
16    MR. MORRIN:  After we received it, you should
17  have received it.
18  BY MR. RIDINGS:
19    Q.  All right.  May I see the report?
20      And what you've handed me, Doctor, is -- there
21  is a cover letter on your letterhead dated June 12,
22  2024, addressed to Robert Morrin, correct?  And it
23  states, "Attached is my office note from June 11, 2024,
24  for Mr. Charles Walden.  I have seen him again in my
25  continued evaluation of him as a treating physician."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 12 of 54 - Page ID#: 1936
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024

42..45

Page 42

1  Does that sound accurate?
2       A.   (No verbal response.)
3       Q.   And then included with that is -- well, looks
4  -- it looks like the first page at the very bottom left
5  says, Page 1 of 2.  The next page, that includes your
6  signature at the end, but it's -- or I'm sorry, that has
7  a signature line for you that is unsigned, though, but
8  it doesn't have a page number.  But I assume that is
9  Page 2 of the report?
10      A.   I -- I would think so.
11      Q.   Okay.  And then the third page is -- says 2 of
12  2, but is otherwise blank, correct?
13      A.   It probably got shoved --
14      Q.   Okay.  Printer issues, computer issues.  But
15  the -- this is not -- the document states Page 2 of 2 is
16  not part of your substantive report, correct?
17      A.   Well, it's not part of the substantive report,
18  but it is part of the report.
19      Q.   Right.  We'll make it part of the record.  All
20  right.  So we have --
21      A.   You're not going to be able to do anything
22  with this.  I will be glad to get you a photocopy of it.
23      Q.   Yeah.  I'm not going to mark on it.  No.  I'm
24  not doing anything with it.  I'm just -- I'm creating
25  the record.

Page 43

1       A.   Okay.  This is my office note here.
2       Q.   If I may have it back, Doctor?
3       A.   Okay.
4       Q.   I'm just trying to create a record first, and
5  then we'll --
6       A.   Okay.
7       Q.   All right.  So that's your -- so we have your
8  report.  It's a cover letter and then three additional
9  pages.  And then it looks like there are two pages that
10  you said are your office notes, and I assume those are
11  associated with this second report.
12      A.   Yes.
13      Q.   Is that correct?
14      A.   Yes.
15      Q.   May I review your office notes as well?
16      A.   Sure.  Sure.
17      Q.   Thank you.  And the first page of -- the first
18  of your office notes is one page front and back, that is
19  a form that has -- that has been filled in with your
20  handwriting, I assume, correct?
21      A.   The majority of that is my scribbles, yes.
22      Q.   Okay.  And then the second page -- well,
23  excuse me, that would be the third page if you count the
24  first page is front and back.  So that's 1 and 2.  And
25  then the third page has a date of 11 June '24 at the top

Page 44

1  right and bottom right, but no signature.  And it --
2       A.   My -- my error.
3       Q.   I'm not being critical.  I'm just trying to
4  describe it for the record.  And is there any
5  substantive information contained?
6       A.   No.
7       Q.   Okay.
8            MR. RIDINGS:  All right.  Let's go off the
9  record real quick.
10           THE REPORTER:  All right.  We are now off
11  record.
12           (OFF THE RECORD)
13           THE REPORTER:  All right.  We are back on
14  record.
15           MR. RIDINGS:  All right.  While we were off the
16  record, Dr. Changaris was kind enough to produce a
17  copy of the report that we were just referring to,
18  and which I have marked as Exhibit 4.  Is that
19  correct, the next exhibit?
20           THE REPORTER:  Yes.
21           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
22  BY MR. RIDINGS:
23      Q.   Okay.  And also within that report, there are
24  three handwritten pages, which, in the bottom right-hand
25  circle, I have written 1 -- or I'm sorry, bottom

Page 45

1  right-hand corner, I have written numbers with a circle
2  around them, 1, 2 and 3, based on Dr. Changaris'
3  representation that that is the correct order of the
4  office notes, including the second page, which I believe
5  he just -- or which he described while were on break as
6  the money shot, correct, Doctor?
7       A.   Yes, sir.
8       Q.   Okay.
9            MR. RIDINGS:  And that'll be Exhibit 4.
10           MS. RIDINGS:  Rob, would you -- we're giving
11  her our only copy.  Would you send us a copy
12  tomorrow?
13           MR. MORRIN:  I will send you a copy as soon as
14  I can find one in my inbox.
15           MS. RIDINGS:  Okay.
16           MR. RIDINGS:  Okay.  And just for the record --
17           MR. MORRIN:  I've not been able to find one so
18  far.
19           MR. RIDINGS:  Okay.  And for the record, I
20  think we've come to a consensus that -- or there's
21  an agreement that this report has not been provided
22  to Defendants.  Are you in agreement with that, Rob?
23           MR. MORRIN:  I'm looking now.  It doesn't seem
24  to have been, but if we received it, then you
25  would've received it.  So I'm looking to see where

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 13 of 54 - Page ID#: 1937
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024

46..49

Page 46

1   we received it to.
2        MR. RIDINGS:  It was certainly not filed in the
3   Court, the record -- the official court record,
4   correct?
5        MR. MORRIN:  I don't think it happened, no.
6        MR. RIDINGS:  Okay.  Do you recall receiving
7   that report?
8        MR. MORRIN:  I do not.
9        MR. RIDINGS:  Okay.
10  BY MR. RIDINGS:
11       Q.   All right.  Going back to Exhibit 2, which is
12  your report -- your first report, Dr. Changaris.  What
13  date was this report authored?
14       A.   It -- I can't specify exactly when it -- it
15  was completed, but it was in reference to my meeting
16  with November -- on November 17th.  So it was probably
17  authored sometime within the next two or three weeks.  It
18  had to be after the -- the videonystagmography because
19  that's in the report.
20       Q.   Okay.  Were there any -- have there been any
21  revisions to -- I'm going to strike that.  Bad question.
22  Did you finalize -- or sorry, strike that.  When you
23  author a report, do you finalize it before sending it to
24  Counsel, to Mr. Morrin?
25       A.   What do you mean?

Page 47

1        Q.   Do you send him draft reports?
2        A.   I don't do that ordinarily.
3        Q.   Okay.  Did you in this case?
4        A.   I would doubt it.
5        Q.   Okay.  Does your report contain every opinion
6   you have formed relating to Charles Walden?  That was
7   too broad.  Does your report identify every opinion you
8   intend to offer in this case relating to Charles Walden?
9        A.   I'm having trouble because I'm taking care of
10  him as both a -- I was initially asked to do the
11  consultation, but now I'm treating him.  And so there
12  are -- there probably will be opinions that will evolve
13  growing out of my personal care of him.
14       Q.   When did you begin to treat him, sir?
15       A.   I think I had him come back and -- and -- on
16  -- in June as -- as part of a treatment plan.
17       Q.   Is that June of this -- of 2024?
18       A.   Yeah.
19       Q.   Okay.  Would --
20       A.   And the -- when we -- when I do a
21  consultation, that's an ambiguous statement.  That means
22  I'm trying -- I'm trying to decide if I want to take
23  them on as patient.
24       Q.   Excuse me.  Can I -- would you repeat that
25  again?

Page 48

1        A.   In other words, I'm -- I'm -- when I do a
2   consultation, it's not just an independent medical exam.
3        MR. RIDINGS:  Okay.  Rob, I thought per your
4   request, that was a word that you did not want used
5   in depositions?  I don't have a problem with it, but
6   it's part of the Court order.
7        MR. MORRIN:  In depositions?
8        MR. RIDINGS:  I assume that you -- it was your
9   demand.  Did you review that order with --
10       MR. MORRIN:  In deposition?  I don't recall
11  saying that.
12       MR. RIDINGS:  Pull the --
13       MR. MORRIN:  I don't know.  I don't know, Jay.
14       MR. RIDINGS:  Okay.
15       MR. MORRIN:  I don't know off the top of my
16  head.
17       MR. RIDINGS:  Okay.  I have no problem.
18       MR. MORRIN:  I remember what I requested, but I
19  don't recall --
20       MR. RIDINGS:  You did.
21       MR. MORRIN:  -- requesting deposition.  I
22  recall in the actual report, I don't want to -- and
23  I think we can redact that if it's in there before
24  it gets to the jury.
25       MR. RIDINGS:  Well, I just wanted to make sure

Page 49

1   that -- okay.  So you --
2   BY MR. RIDINGS:
3        Q.   So as part of your initial consultation, you
4   were trying to determine whether to take him on as a
5   patient?
6        A.   Yes, basically.
7        Q.   Okay.  Did Mr. Morrin send Mr. Walden to you?
8        A.   I believe he did, yes.
9        Q.   Is there any indication in your report -- and
10  again, I'm only going to -- I'm not going to discuss
11  this second -- Exhibit 4 today because I haven't had it
12  -- I haven't seen it until today.  So when I refer to
13  your report, I'm referring to November 17, 2023, report.
14       A.   Okay.
15       Q.   Is there any indication in that report
16  suggesting that one of the purposes is for you to decide
17  whether or not you're going to treat him?
18       A.   Just in there -- in the -- if it were just for
19  an independent medical exam, I would've written XXX.
20       Q.   Okay.
21       A.   And then I would only be able to reference
22  things based upon things that happened on that day or
23  before.
24       Q.   When did you make the determination that you
25  would agree to treat him?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 14 of 54 - Page ID#: 1938
The Deposition of DAVID CHANGARIS, M.D., taken August 16, 2024

50 .. 53

Page 50

1    A.  Somewhere along the line in May, June, when --
2  around time when I had him come back.
3    Q.  Did you reach out to him to ask him to --
4    A.  I -- I -- it's my ordinary thing to -- to ask
5  the -- I would -- I would've asked Mr. Morrin to have
6  permission to see him as a -- if he had a problem with
7  me seeing him as a --
8    Q.  Okay.
9    A.  -- as a treating physician.
10    Q.  What considerations took you seven -- six to
11  eight months to decide whether or not you were going to
12  take him on as a patient?
13    A.  Basically, the -- recognizing that -- that
14  there's a chance that he might deteriorate without
15  active intervention.  So I -- I view it as -- as a kind
16  of a -- a --
17    Q.  So as of November 17, 2023, you -- there was a
18  question, at least in your mind, as whether -- that he
19  might not continue deteriorating without treatment,
20  correct?
21    A.  No.  I would hope, okay, that based upon this,
22  that since I -- I put this on the table, that he
23  would've found somebody besides me to take care of him
24  for these issues.  And if -- if they don't in six months
25  or so, then I -- I'm -- I feel bad for these people

Page 51

1  because they -- it's hard to find people who understand
2  this kind of an issue and -- and are -- are able and
3  willing to treat them.  And so I -- I offer my services
4  in that context.
5    Q.  Okay.
6    A.  Because without them, they -- they do
7  progressively deteriorate, in my opinion.
8    Q.  So what other opinions do you intend to offer
9  in this case that are not included in your first report?
10    A.  I -- I can't even begin -- this -- I -- I
11  haven't -- I've only seen him once.
12    Q.  Okay.  That --
13    A.  And -- and I want to see him a couple more
14  times.  I want to -- I might want to repeat --
15    Q.  Okay.  Over that --
16    A.  -- the -- the -- different tests, and maybe
17  he'll be deteriorating more rapidly.  I could see where
18  some of these people accelerate in their clinical
19  problems.
20    Q.  Okay.  So as we sit here, do you have any
21  additional opinions that you intend to offer in this
22  case that are not in your first report?  Just yes or no?
23    A.  I -- I don't know if I can answer that.  It's
24  yes and no.  Because without reading my thorough report
25  -- my report thoroughly and the nuances of it, there

Page 52

1  might be something --
2    Q.  Did you not come prepared to testify about
3  your report today, Doctor?
4    A.  I -- I am.
5    Q.  Okay.
6    A.  But I'm -- I'm talking of things that would
7  grow out of me being a treating doctor, that -- that
8  some of this -- some of these statements would be
9  forward-thinking, like he -- he might deteriorate over
10  this.  I -- I'm not making a comment on --
11    Q.  Well, here's the problem, Doctor.  I'm going
12  to tell you.  I'm not -- I don't want your hypotheticals
13  or what you may or may not.  I'm asking what your -- as
14  we sit here today, your current opinions, have you
15  identified every current opinion that you have relating
16  to Mr. Walden, and is that included in your first
17  report?
18    A.  Some of the -- just so you understand, that's
19  a yes/no question.  Some of the --
20    Q.  Just give me a yes/no, Doctor, because -- and
21  here's why.
22       MR. MORRIN:  Objection.  Argumentative.
23       MR. RIDINGS:  Yes.  It's going to be
24    argumentative, but he has indicated that it -- he's
25    only going to be here for a limited amount of time.

Page 53

1  BY MR. RIDINGS:
2    Q.  And I want you to answer just my questions --
3    A.  If -- it's my understanding that a yes and no
4  question -- answer is -- is appropriate -- is a
5  reasonable response.
6    Q.  Yes or no?
7    A.  No.  It's yes and no.
8    Q.  Okay.  Let's do this.  Doctor --
9    A.  I understand I'm allowed to give that answer,
10  and you're not letting me answer it.
11    Q.  Doctor, I'm the one that's paying you.  So I
12  -- and you made that abundantly clear.  I want you to
13  answer my questions and only answer my questions.  And
14  if I -- and then if I ask you to elaborate, please
15  elaborate, okay?
16       MR. MORRIN:  Objection.  Argumentative.  You
17    tell him to answer yes or no.  He's telling you it's
18    not a yes or no answer.
19       MR. RIDINGS:  Well, then --
20       MR. MORRIN:  I mean, he can't give you what you
21    want just because you want it real bad.  If it's in
22    there between, he's going to have to be able to
23    explain.
24  BY MR. RIDINGS:
25    Q.  It's fair to say that in some of your



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 15 of 54 - Page ID#:
1939
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024                54..57

Page 54

1  opinions, you're going to directly disagree with certain
2  of Mr. Walden's other treating medical providers or
3  other experts in this case.  Do you agree with that?
4       A.   I don't know them all.  And I don't know what
5  specifics you're referencing.
6       Q.   I did notice that, or I believe that a copy of
7  a report from Dr. Timothy Kriss was contained in your
8  file.  Do you recall reviewing an opinion from
9  Dr. Timothy Kriss?
10      A.   Yes.
11      Q.   Okay.  Do you agree with everything Mr. Kriss
12  said -- Dr. Kriss said?
13      A.   No.
14      Q.   Okay.  So it's fair to say that in some of
15  your opinions, you're going to disagree with certain
16  other doctors' or experts' opinions in this case.  You
17  agree with that, right?
18      A.   At least Doctor -- from what I've read with
19  Dr. Kriss, I can -- I can say yes to that.
20      Q.   Okay.  And given that there's going to be
21  disagreement between experts on certain issues, is it
22  fair for our jury to assess your credibility and
23  everyone else's credibility as a witness and a doctor
24  when they consider opinions that are offered?
25      A.   That's a legal question.

Page 55

1       Q.   You don't think it's fair for the jury to
2  consider credibility?
3       A.   I -- I think the way you phrased the question
4  is a more legal one than -- than a medical one.
5       Q.   Do you --
6       A.   I'm here for giving -- render medical
7  opinions.
8       Q.   -- do you --
9       A.   I -- that's -- you're asking me to render an
10  opinion about the jury?
11      Q.   Do you believe it's --
12      A.   I -- I don't examine juries.
13      Q.   -- do you -- yes or no, do you believe it's
14  fair for our jury to assess your credibility?
15      A.   I don't know how to answer that.
16      Q.   Okay.
17      A.   I'm not a lawyer.
18      Q.   When it comes to assessing your credibility or
19  any other expert in this case, is it fair to evaluate
20  whether your opinions are consistent with and based upon
21  the facts and evidence in this case?
22      A.   Well, if everybody agrees to the facts, that
23  would be ideal, but I understand that some people have
24  their own facts.
25      Q.   In evaluating the credibility of you or any

Page 56

1  other expert, is it fair to consider whether you are
2  impartial or unbiased?
3       A.   I -- I think there's a component that somebody
4  is going to have to make -- the jury is going to be
5  responsible for that.  Yeah.
6       Q.   Do you think that's a fair factor to consider
7  when assessing credibility?
8       A.   I like the jury system.
9       Q.   Okay.
10      A.   I think it's --
11      Q.   That wasn't my question, Doctor.
12      A.   -- I think -- I think it's the best thing --
13  it is better than sliced bread.  And I think -- yes, I
14  think they will assess the -- the integrity and -- and
15  honesty of -- of the -- of the -- your experts.
16      Q.   Is that one of the -- you, is that a criteria
17  that you would personally agree with -- agree is an
18  appropriate factor to consider when assessing
19  credibility?
20      A.   All factors are appropriate in assessing
21  credibility.
22      Q.   Okay.  If you don't want to answer my
23  question, you don't have -- I'm not --
24      A.   I'm answering --
25      Q.   -- going to force you.

Page 57

1       A.   -- I'm -- I'm answering it as best as I can.
2  They aren't yes/no questions.
3       Q.   Is it fair to consider whether your opinion is
4  ethical?
5       A.   Sure.  Yes.
6       Q.   Is it fair to consider whether your opinion is
7  consistent with the facts and evidence in the case?
8       A.   Again, that's a yes/no question because
9  sometimes facts and evidence can be -- can be disputed.
10      Q.   Okay.  If an opinion from an expert witness is
11  not based on or consistent with facts and evidence, do
12  you agree it would be reasonable for the Court and/or
13  the jury to disregard such an opinion?
14      A.   I think that's for the Court to decide, not
15  me.
16      Q.   If any of -- if an opinion from an expert is
17  not ethical, is it reasonable for the Court and the jury
18  to disregard such an opinion?
19      A.   Again, you're asking me a legal question.
20      Q.   I'm asking your -- just your opinion, Doctor.
21      A.   I -- I -- I'm here to render medical opinions.
22  That's not a medical opinion.
23      Q.   I'm --
24      MR. MORRIN:  Objection.  Calls for legal
25  conclusions.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 16 of 54 - Page ID#: 1940
The Deposition of DAVID CHANGARIS, M.D., taken August 10, 2024

58..61

Page 58

1          MR. RIDINGS:  It does not.
2    BY MR. RIDINGS:
3          Q.   I'm asking your personal opinion, if it's fair
4    -- or I'm asking just your --
5          A.   You're asking me --
6          Q.   -- personal opinion, just your thoughts on
7    your -- on how you view your role.
8          A.   I'll tell you what, if the judge wants me to
9    answer it, my personal opinion, I'll be glad to do it.
10         Q.   But otherwise, you're unwilling to give me
11   your personal opinion?
12         A.   It's not appropriate here.
13         Q.   All right.  Okay.  If an opinion from an
14   expert -- strike that.  In your opinion -- this question
15   is asking -- I'm asking for your opinion.  If your
16   opinion is not impartial, would it be reasonable for a
17   jury to disregard your said opinion?
18         A.   You're asking me legal questions, and I don't
19   know how to answer them.
20         Q.   I'm asking --
21         A.   These are legal questions.
22         Q.   Sir --
23         A.   I don't understand the -- the things that -- I
24   don't understand all aspects of the jury system.
25         Q.   I'm not asking -- I'm strictly asking -- we're

Page 59

1    going to get to it in a sec, but I think you'll -- I
2    will -- would hope you would take back some of those
3    words, and I'm just seeking your personal opinion and
4    how you see your role as an expert.
5          A.   I -- I'm not comfortable giving personal
6    opinions about --
7          Q.   Well, don't they --
8          A.   -- things that -- that have to do with legal
9    matters.
10         Q.   With respect, I'm not concerned with whether
11   you're comfortable or not.  I'm paying you to answer my
12   questions.
13         A.   And I'm answering as best as I can within the
14   confines of what I think is reasonable and appropriate.
15         Q.   If you saw an opinion from an expert on the
16   other side in this case, and you thought that that
17   opinion was not based on the facts and evidence or was
18   biased or unethical, would you have any problem calling
19   that opinion to task?
20         A.   In the context of making comments about
21   medical opinions, I can say this is medically valid in
22   my opinion, but I can't make a -- a -- any -- any kind
23   of judgment on whether or not -- I mean, that's --
24   that's the -- the foundation of a Daubert.  The judge
25   does that.  I -- I don't do that.

Page 60

1          Q.   All right.  Will you agree that all of the
2    opinions that you offer in this case will be consistent
3    with the facts and evidence?
4          A.   I -- I endeavor to do that.  Whether I do it
5    or not, I guess I'll find out.
6          Q.   Okay.
7          A.   But I really want to do that.
8          Q.   Okay.  Will you agree that all the opinions
9    you are offering in this case will be impartial and
10   ethical?
11         A.   As best as I can.  I really want to do that.
12         Q.   Are you currently a member of the American
13   Association of Neurosurgical Surgeons?
14         A.   No.
15         Q.   Or excuse me, Neurological Surgeons?
16         A.   No.
17         Q.   Is it -- you're familiar with that
18   organization?
19         A.   Yes.
20         Q.   Okay if we just shorten it to AANS?
21         A.   Yes.
22         Q.   Do you agree --
23         MS. RIDINGS:  What page are you on?
24         MR. RIDINGS:  7.
25   BY MR. RIDINGS:

Page 61

1          Q.   You agree that AANS is a very well-respected
2    organization in your field?
3          A.   I cite them frequently.
4          Q.   Okay.  You agree that AANS is a very
5    well-respected organization in your field?
6          A.   It's the only one.
7          Q.   Do you -- in your opinion, is that a
8    well-respected organization in your field, yes or no?
9          A.   I don't know why it's relevant here.
10         Q.   In your opinion, is AANS a well-respected
11   organization in your field?
12         A.   Okay.  Again, I don't understand how to --
13   it's an organization.
14         Q.   Do you respect AANS?
15         A.   Oh, yes.
16         Q.   Have you ever been a member of AANS?
17         A.   Yes.
18         Q.   When was the last -- no, strike that.  In your
19   opinion, is it a credible, first-rate organization?
20         A.   They're -- they're responsible for the Journal
21   of Neurosurgery, which most neurosurgeons hold as a -- a
22   great resource for scientific information.
23         Q.   And that's just one of the many, many things
24   they do.  You would agree, correct?
25         A.   Yeah.  And -- and for that, I have nothing but



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1  the highest regard.  There are also many, many, many
2  people from the AANS -- come from the AANS to the board,
3  and they set the standards for -- for all neurosurgeons.
4  So they -- they -- this is a -- very powerful, complex
5  body filled with men with --
6       Q.   And women.
7       A.   -- incredible -- men and women of enormous
8  capacity.
9       Q.   Okay.  Creme de la creme, you would agree?
10      A.   Well, they like to believe that.
11      Q.   Do you believe that?
12      A.   They have very smart people.
13      Q.   Okay.  You said, I think, they set -- they
14 often set the standards in your field, right?
15      A.   Yeah.  They don't.  They -- people often from
16 that organization become members of the board.
17      Q.   Okay.  As a member -- or as a former member, I
18 assume you are certainly aware that they have adopted a
19 code of ethics?
20      A.   Absolutely.
21      Q.   Okay.  And are you familiar with that code of
22 ethics?
23      A.   I've not read it of late, but I believe -- I
24 -- I -- I'd love to see it.
25      Q.   I can --

Page 63

1       A.   I am familiar with the code of ethics that's
2  incorporated into KRS statutes.
3       Q.   I think I can help you on that.
4       MR. RIDINGS:  What's our next exhibit?
5       THE REPORTER:  5.
6            (EXHIBIT 5 MARKED FOR IDENTIFICATION)
7       MR. RIDINGS:  If you would hand that to the
8  court reporter.  Sorry.
9       MR. MORRIN:  Thank you.
10 BY MR. RIDINGS:
11      Q.   All right, Doctor.  I have handed you what
12 I've marked as Exhibit 5, and it -- are you able to just
13 skim through real quick just to confirm that --
14      A.   I'm skimming it.  Go ahead.
15      Q.   You agree that is -- I like your
16 terminology, but those -- I just messed up my question.
17 You agree that what I handed as Exhibit 5 is AANS Code
18 of Ethics?
19      A.   Yes.
20      Q.   Okay.  Did you abide by this code of ethics in
21 all respects while serving in your capacity as an expert
22 witness in this case so far?
23      A.   I'd have to look at each and every part, but
24 my -- my aspiration would be yes.
25      Q.   Okay.  Do you intend to abide by this code of

Page 64

1  ethics in all respects, including during your deposition
2  today?
3       A.   My aspiration is yes.
4       Q.   Okay.  All right.  I do want to review a few
5  aspects of it.
6       Have -- have at it.
7       Q.   All right.  We'll just start with Paragraph A
8  and the -- just the -- there aren't any questions, but I
9  would like to just read it into the record to make sure
10 we're on the same page.  But it's the general statement
11 of purpose and applicability.  And it states, "This code
12 of ethics establishes standards of conduct that define
13 the essentials of honorable behavior for the
14 neurological surgeon.  This code of ethics, while taking
15 into account the legal requirements of medical practice,
16 calls for and espouses a standard of ethical behavior
17 that is often higher than that required by law."  And it
18 goes on.  But do you agree with that assessment?
19      A.   I -- I am aware that AANS serves as that
20 function for their members.
21      Q.   Okay.  And do you intend to abide by this?
22 I'm going to strike that.
23      A.   I'm not a member of the group.
24      Q.   Okay.  All right.  Let's move on to
25 Paragraph C, Section 2, or Subparagraph 2.  You with me

Page 65

1  on the first page?
2       A.   Sure.
3       Q.   And it states, "You are to work
4  collaboratively with colleagues and other healthcare
5  providers to reduce medical errors, increase patient
6  safety, and optimize the outcomes of patient care."  Do
7  you agree with that portion?
8       A.   I spend my life doing that every day.
9       Q.   You agree that's a good rule then?
10      A.   I -- I think that's a great rule.
11      Q.   Let's move on to C3, still on the first page.
12 "To ensure a high standard of care for patients, you
13 shall, when appropriate, use consultants and other
14 healthcare providers with recognized records of
15 excellence in patient care."  Do you agree with that
16 assessment?
17      A.   Yes.
18      Q.   Do you agree that's a good rule or --
19      A.   It's aspirational, yes.
20      Q.   We'll come back to this, but I want -- you can
21 set it aside for now.
22      A.   Well, you haven't asked for this.  I just want
23 you to know that the book I've written on mild traumatic
24 brain injury -- are you -- are you listening?
25      Q.   I am.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 18 of 54 - Page ID#:
1942
The Deposition of DAVID CHANGARIS, M.D., taken August 19, 2024
66..69

Page 66

1      A.   I've actually sent to the board because I
2  think it's that important, because I think it needs to
3  be incorporated for the training of all neurosurgeons.
4      Q.   And what was the book?
5      A.   Mild Traumatic Brain Injury, the book I wrote.
6      Q.   Minor Traumatic Brain Injury?
7      A.   No, Mild Traumatic Brain Injury.
8      Q.   Mild.  When did you write this book?
9      A.   Last year.
10     Q.   When did you send it in?
11     A.   Last year.  And I'll be sending in probably
12  30 more books because I want the whole board to get it
13  again.
14     Q.   Is there -- would you mind sharing a copy of
15  that book with me?  In the event that I agreed that I
16  would not --
17     A.   You can buy the book.  It's on Amazon.
18     Q.   Okay.
19     A.   And if you have a -- one of their reader
20  services, you can download it for free.
21     Q.   If I have one of their --
22     A.   Kindle services, you can download -- or know
23  somebody with a Kindle service, they can download it for
24  free.
25         MR. RIDINGS:  Okay.  Would you mark that report

Page 67

1  for me?
2         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
3  BY MR. RIDINGS:
4      Q.   All right.  You're also familiar or also aware
5  that AANS has issued rules for neurosurgical
6  medical/legal expert opinion services.  Agreed?
7      A.   Actually, I was not aware of that, but I'll --
8  I -- I do know that they have -- it's very, very
9  important to them that -- that neurosurgeons, especially
10  members of their community, represent real science.
11     Q.   Okay.  I'm going to hand you those rules,
12  Doctor, and I will represent to you that I -- that I
13  obtained these rules within the last week and a half
14  from AANS.
15     A.   Just for the -- just for the record --
16     Q.   Doctor, if you would let me --
17     A.   Okay.
18     Q.   -- I will represent that I obtained these
19  rules from the AANS website within the last week and a
20  half, okay?
21     A.   Okay.  I would also point out to you that the
22  Kentucky --
23     Q.   Doctor, there's not a question.
24     A.   -- Revised Statutes incorporate many of the
25  things that you're -- you've -- you've mentioned, and

Page 68

1  they're part of Kentucky law.
2      Q.   Well, I --
3      A.   I mean, they're -- they're required by
4  physicians to -- to be ethical and do all these things.
5      Q.   But you told -- I think you told me that AANS
6  goes above and beyond what state and Kentucky law is,
7  and you strive to abide by AANS, correct?
8      A.   You -- you're -- you're mincing words here.
9      Q.   No.  Well --
10     A.   And you're -- you're making it very hard to
11  deal with.
12     Q.   Well, Doctor, I apologize.  That's not my
13  intention, but --
14     A.   Aspirationally, we all want to be above
15  everything.
16     Q.   All right.  Let's just have some -- let's just
17  go with questions then, okay?  So I take it you are not
18  familiar with these rules that I just handed you and
19  marked as Exhibit 6; is that correct?
20     A.   This is -- this is the first time I've read
21  them.
22     Q.   Okay.  Well, let's --
23     A.   I've not been a member of the -- that
24  organization for over 20 years.
25     Q.   I do want to review a few of them with you,

Page 69

1  all right?  And this is two pages -- or actually about
2  one and a quarter pages, and it contains really ten
3  simple rules.
4      A.   Okay.
5      Q.   Agreed?
6      A.   Sure.
7      Q.   And I would just ask that you review them and
8  let me know when you're done.
9      A.   Okay.  I'm done.
10     Q.   Okay.  Did you comply with each of these ten
11  rules in your role as an expert retained by Mr. Walden?
12     A.   My aspiration is yes.
13     Q.   Are each of these rules applicable to your
14  role as a retained neurosurgical expert in this case?
15     A.   It would appear to be in some form.  Legally,
16  I don't think it has any value.
17     Q.   I'm just seeking your opinions, Doctor.
18     A.   Well, my opinions really don't count on this.
19  I'm here to render medical opinions, not medical-legal
20  opinions.
21     Q.   There was not a question, Doctor.  I do have a
22  question, though.  Let's review the first paragraph, and
23  you'll agree with me that it says, "The American legal
24  system often calls for expert medical testimony.  Proper
25  functioning of this system requires that when such

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40202

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 19 of 54 - Page ID#: 1943
The Deposition of DAVID CHANGARIS, M.D., taken on July 10, 2024
70..73

Page 70

1 testimony is needed, it be truly expert, impartial, and
2 available to all litigants." Did I read that correctly?
3     A.  That's aspirational.  I think that's a great
4 idea.
5     Q.  And then it goes on in the third sentence to
6 state, "These rules apply to all AANS members providing
7 expert opinion services to attorneys, litigants, or the
8 judiciary in the context of civil or criminal matters."
9     A.  Sir --
10    Q.  "And include written expert opinions as well
11 as sworn testimony."
12    A.  I -- I am tired -- I am tired of this.  I'm
13 not a member of the AANS.  You are cramming down rules
14 and regulations that have no bearing on Kentucky, and I
15 no longer want to go down this road with you.
16    Q.  Well, you don't have a choice, Doctor.
17    A.  That --
18    Q.  If you want -- if you want to leave, you can
19 leave.
20    A.  Yeah.  I'm -- I -- I am here to answer
21 questions, but I'm not going to answer any more
22 questions on anything from the AANS.
23    Q.  I simply asked you if that's what -- is what
24 it said.  Did I read that correctly?
25    A.  I am not -- let me repeat.  I'm not going to

Page 71

1 answer any more questions about the AANS.
2     Q.  Okay.
3     A.  I'm not a member.  I haven't had a chance to
4 read this.  It's aspirational.  It's a wonderful
5 document.  I have no idea where it's going with it.
6     Q.  Well --
7     A.  If -- if you think there's some ethical thing
8 that I've done that -- that is not -- go to the Kentucky
9 Revised Statutes that identify problems with ethical
10 expert testimony.
11    Q.  Doctor, I'm trying to understand your approach
12 to the practice of medicine.  I'm not in any way
13 suggesting that you have done anything unethical.  I'm
14 trying to understand.
15    A.  Then why don't you deal with an organization
16 that I have a relationship with --
17    Q.  You --
18    A.  -- like the AMA?
19    Q.  It's my deposition.  I noticed the deposition,
20 Doctor.
21    A.  I'm not a member of this organization, and I'm
22 not familiar with this document.  I've not had a chance
23 to read it.  It -- it sounds like a wonderful document,
24 but I'm not going to answer any more questions on
25 nitpicking legal interpretation of this anymore.

Page 72

1     Q.  Okay.  All right.  Just in your opinion,
2 just --
3     A.  I'm not going to render my opinion about the
4 AANS ethical.
5     Q.  I'm not asking you about the AANS, okay?  Just
6 in --
7     A.  Or anything from the AANS.
8     Q.  In your opinion, is the neurosurgical expert
9 witness -- strike that.  In your opinion, agree or
10 disagree, "The neurosurgical expert witness shall be an
11 impartial educator for attorneys, jurors, and the Court
12 on the subject of neurosurgical practice"?  Agree or
13 disagree?
14    A.  I've already told you, I'm not going to render
15 any more opinions on anything from the AANS --
16    Q.  Okay.
17    A.  -- simply because I don't use my -- my
18 position.
19    Q.  Agree or disagree, "The neurosurgical expert
20 witness shall identify as such any personal opinions
21 that vary significantly from generally accepted
22 neurosurgical practice"?
23    A.  I have no idea what you're trying to do here.
24 Please, please stop this.  This is crazy.  Absolutely
25 crazy, okay?  This is crazy.

Page 73

1     Q.  Agree or disagree that "The neurosurgical
2 expert" --
3     A.  I'm not going to agree or disagree on anything
4 on personal opinions about opinions and goals and
5 aspirations of the AANS.  It's not my position.
6     Q.  Did any of the opinions you plan to offer in
7 this case vary significantly from generally accepted
8 neurosurgical practice?
9     A.  I would have to say no, and I would go so far
10 as to say all medical practice.
11    Q.  Agree or disagree -- this one seems to be
12 pretty on point.  Agree or disagree, "The neurosurgical
13 expert witness shall not be evasive for the purpose of
14 favoring one litigant over another"?
15    A.  I am not being evasive.
16    Q.  I didn't ask -- I just asked you --
17    A.  I -- I'm not going to answer any more
18 questions.  I've had it.
19    Q.  Agree or disagree?
20    A.  I'm not answering.
21    Q.  Okay.  Agree or disagree, "The neurosurgical
22 expert shall answer all properly framed questions
23 pertaining to his or her opinions on the subject matter
24 thereof"?
25    A.  On the subject matter?  On this patient, if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 20 of 54 - Page ID#: 1944
The Deposition of DAVID CHANGARIS, M.D., taken on June 12, 2024

74..77

Page 74

1  you have a question, I'll answer.  But I'm not going to
2  ask about the subject matter on the subject matter,
3  which is what you're asking for.
4      Q.   So you -- just for the record, you are
5  refusing to answer my last question, correct?
6      A.   I'm refusing to answer any further questions
7  on the AANS ethical.
8          MR. MORRIN:  Can we take a break, please?
9          MS. RIDINGS:  Well, sure.
10         MR. MORRIN:  Five minutes?
11         MS. RIDINGS:  Okay.
12         THE REPORTER:  We're now off record.
13         (OFF THE RECORD)
14         THE REPORTER:  Back on record.
15         MR. RIDINGS:  It's now 5:53.  Within the last
16  minute, Mr. Morrin asked to take a break.
17         THE REPORTER:  All right.  Off record at 5:53.
18         (OFF THE RECORD)
19         MR. RIDINGS:  So we are back on the record, and
20  it is 5:56 p.m.
21         MS. RIDINGS:  Good job, guys.  Girls couldn't
22  do it that quickly.
23  BY MR. RIDINGS:
24      Q.   All right, Doctor.  Agree or disagree, "The
25  neurosurgical expert shall review all pertinent

Page 75

1  available medical information about a particular patient
2  prior to rendering an opinion about the appropriateness
3  of medical or surgical management of that patient"?
4      A.   I think that's wonderful.  Yes.  I -- I
5  endorse that.
6      Q.   Okay.  Agree or disagree that "the
7  neurosurgical expert witness shall review all pertinent
8  available medical information about a particular patient
9  prior to rendering an expert opinion in the case in
10  which he intends to testify"?
11     A.   I think aspirationally that's a wonderful
12  perspective.
13     Q.   Do you agree that -- what were your words?
14  That is a --
15         MS. RIDINGS:  Aspirational.
16  BY MR. RIDINGS:
17     Q.   Aspirational?
18     A.   Aspirationally, it's a wonderful perspective.
19     Q.   Okay.  Do you agree that this rule should
20  apply to the opinions that you offer in this case?
21     A.   Aspirationally, I think that's a wonderful
22  perspective.
23     Q.   Did you comply with that rule in all respects
24  in your -- in the role you were playing in this case?
25     A.   Aspirationally, I have done that.

Page 76

1      Q.   Will you agree that any -- I'm back on 2 --
2  agree that any opinion that you testify to today will be
3  based on a reasonable degree of medical certainty unless
4  you tell me otherwise?
5      A.   It -- it's usually the medical probability,
6  not medical certainty, as I understand it.
7      Q.   Will you -- okay, will you -- same question,
8  but we'll replace certainty with probability, that all
9  opinions that you offer will fit that criteria unless
10  you tell me otherwise?
11     A.   I think that's reasonable.  Yes.
12     Q.   Okay.  And you testify pretty regularly under
13  oath that it is your regular practice to document in
14  your medical record or reports every document or item of
15  evidence that you reviewed, every test you performed,
16  and every substantive observation upon which you're
17  relying; do you agree?
18     A.   Aspirationally, I really try to do that.
19  Whether I succeed on that on any given case is always a
20  point of contention.
21     Q.   Okay.  And I'll just use your words from prior
22  depositions, but, "If I didn't record it, then I didn't
23  do it."
24     A.   That's the general rule, and I -- I'd say it
25  again.

Page 77

1      Q.   All right.  "And if I didn't document the
2  medical record in my chart, then I didn't see it."
3      A.   That's a good way of looking at it.
4      Q.   Okay.  And is that essentially your standard
5  practice?
6      A.   That -- that's my goal, but when you get very,
7  very large amounts of -- of records, it is possible that
8  I've reviewed records that don't get recorded.
9      Q.   Is it fair to describe this practice of yours
10  as a habit?
11     A.   Yeah.  Yes.  Very much so.  It's something I
12  do aspirationally every time I -- I pick up a chart.
13     Q.   And did you utilize or employ this habit of
14  yours in this case?
15     A.   It -- that's problematic because there's so
16  much records and, quite frankly, I don't know that we --
17  I've done a -- a thorough job of -- of documenting all
18  this ten inches of record in this chart.
19     Q.   All right.  Well, let's ask: If it was
20  significant enough that it was something that you relied
21  on, would you have documented it in your chart?
22     A.   Again, that's a yes/no question because the --
23  the challenge here is there's so much of it, and they
24  weren't codified.  In other words, they -- they weren't
25  put together like everything from this hospital between

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  this date and that date.  And so there -- there --
2  there's -- there's a mishmash of things, and so we try
3  to put the stuff that I relied on in -- in the record,
4  okay?  But in this setting -- and part of the reason why
5  I brought everything is because I'm not certain that
6  I've listed everything that I've read.
7      Q.   How did you determine which ones -- strike
8  that.  In full candor and to your credit, your report
9  did identify about five sets of medical records for
10 Mr. Walden.  How did you determine which ones to
11 identify in your report versus which ones not to?
12     A.   We -- we try to identify all of them.  But
13 what I'm trying to say is there's so much here, I -- I
14 can't be absolutely certain that I've gotten them all.
15     Q.   As far as the ones that you did identify, is
16 it fair to say that you did review those?
17     A.   Yes.
18     Q.   Okay.  And putting aside medical records, did
19 you document every test or procedure you performed
20 during your examination?
21     A.   That I don't know.  I -- I documented all the
22 ones I thought relevant.
23     Q.   Okay.  Isn't that your habit?  Why would you
24 have diverged from your habit?
25     A.   I don't know that it's a divergence.  I -- I

Page 79

1  tried to -- if sometimes my tests aren't meaningful or
2  they don't give any information, I -- I'll -- I'll let
3  it go.  I won't put it down.
4      Q.   Are there any tests or procedures that -- as
5  we sit here today, that you did perform that are not
6  documented in your report?  And I realize that's a bad
7  question.  Can you tell -- as we sit here today, can you
8  tell me any procedures that are -- you performed that
9  are not documented in your report?
10     A.   No.
11     Q.   So for all intents and purposes, as far as
12 your opinion testimony and what you will remember down
13 the road, if it's not in your report, it didn't happen,
14 correct?
15     A.   Well, it's -- yes.  That's true, but I -- I
16 would like to reserve in this setting that if something
17 is not written down, if I really do recall it, I'd like
18 to be able to put that forward.
19     Q.   All right.  Well --
20     A.   And if you want to object to it, that it's not
21 in the report --
22     Q.   No.  I'm --
23     A.   -- I'll -- I'll stand by.
24     Q.   I'm going to give you the opportunity.  Tell
25 me --

Page 80

1      A.   I -- these things -- memory doesn't work that
2  way.  Memory will come up when we're talking about it.
3  I -- I can't predict how I'm going to remember in any
4  given moment something I didn't write down.  I'm just
5  saying that it happens rarely, but sometimes I'll have a
6  -- a memory of something that I didn't write down, and
7  I'll offer it in that context if it's not in the chart.
8  I'll say, it's not written in the chart, but I sort of
9  remember I did this, and this is what I recall on it.
10 And to the value that it's still allowed in -- in the --
11 in the Court, then it'll be accepted or rejected.
12     Q.   But you would agree that if there's -- if that
13 were to happen and it were to support your testimony,
14 that would be a little curious, wouldn't it?
15     A.   Well, I -- I don't know, curious or not, but
16 it -- I'm -- I'm under the obligation to give both
17 things that support my -- if you will, supporting my
18 testimony and things that don't support my testimony,
19 okay?
20     Q.   And did you do that?
21     A.   I -- I aspirationally tried to present
22 everything both for -- for and, if you will, against the
23 opinions that I have.
24     Q.   Did you document in your report every
25 clinically relevant observation you made during the

Page 81

1  course of your examination?
2      A.   No.  Nobody can do that.  We -- we make a --
3  we make a -- a selected view, a very narrow view of what
4  we decide to record.  All physicians do that.
5      Q.   Did you document every diagnostic test that
6  you conducted?
7      A.   Well, every -- every major one, I'd have to
8  say, you know, things like -- yeah, the VNGs and things
9  like that.  Yeah.
10     Q.   All right.  The same with respect to any
11 procedures, which is probably to a layman, I --
12     A.   I don't do -- I don't do -- I didn't do any
13 procedures to this man.
14     Q.   Okay.  Okay.  And what I'm getting at, and I'm
15 obviously not a neurosurgeon, and I'm just trying to be
16 all encompassing to make sure that I cover diagnostic
17 tests that you perform in the office, the -- or even the
18 smaller ones, like not the VNG or the posturography, but
19 the straight-leg raise or a --
20     A.   And this -- this gets into really, really hard
21 things because not everything gets documented and not
22 everything is done.  And -- and when you -- when you
23 start using words like all and everything --
24     Q.   We're all --
25     A.   -- it -- it's very hard to answer those

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1  questions with any -- I mean, it -- it's -- they're --
2  they're not clear questions.  It's like when -- when
3  have you stopped -- like, questions like, have you
4  stopped beating your wife, or when did you stop beating
5  your wife?  And there are lots of -- and that -- I view
6  that as very -- as trap-like questions when you say
7  things like, did you do everything possible?  Or -- or
8  did you -- did you -- were you the best that you ever
9  possibly could?  I mean, those are hard, hard questions.
10     Q.   I'm just trying to determine what you did or
11  did not do, Doctor.
12     A.   Well, if -- just as a basis, if you just look
13  at my report and rely on that, that's pretty much what
14  I'm going to testify to.
15     Q.   And that's what I was getting at.
16     A.   And I've said to you, it's pretty much
17  everything here --
18     Q.   Agreed.  I --
19     A.   -- and -- and in the second report.  Those two
20  comprise my report.  Now, the only thing I've stipulated
21  is that I -- I would like to help this man, and in the
22  process of helping him, if I see something new, I'll be
23  -- I'm going to put it on the table.
24     Q.   I'm just wanting to give you an opportunity to
25  identify any additional reports that you may have left

Page 83

1  out of --
2     A.   I -- I have no -- no desire to identify any
3  further reports than what's in my reports.
4     Q.   And I used the wrong terminology.  I meant
5  procedures and --
6     A.   I have no procedures.
7     Q.   -- and diagnostic tests.
8     A.   I have no other procedures or diagnostic tests
9  in this.
10     Q.   Prior to today, it was my understanding that
11  you had only encountered Mr. Walden on a single
12  occasion, that being November 17, 2023.  But earlier in
13  your deposition, you told me that you have recently,
14  within the last few weeks, latter part of June, you
15  encountered Mr. Walden on a second occasion, correct?
16     A.   Yes, sir.
17     Q.   Okay.  Are those the only two encounters you
18  have ever had with Mr. Walden?
19     A.   To my recollection, yes.
20     Q.   And do you -- as we sit here today, do you
21  have any -- or does Mr. Walden currently have any
22  appointments scheduled with you in the future?
23     A.   I don't know, but I would like to see him,
24  yes.
25     Q.   Okay.

Page 84

1     A.   Patients get to decide whether they show up.
2     Q.   Would you --
3          MR. RIDINGS:  Madam Court Reporter, could you
4     hand me -- I believe it was Exhibit 4.  It was the
5     June report.
6  BY MR. RIDINGS:
7     Q.   To your knowledge, did this -- did the
8  June 11, 2024, encounter with Mr. Walden occur at the
9  request or direction of Mr. Morrin?
10     A.   No.  I probably asked him.
11     Q.   You contacted mister --
12     A.   Morrin, asked him if he would mind.  That's my
13  usual thing.  I don't recall whether I did.
14     Q.   Okay.
15     A.   That's how I usually do it.
16     Q.   Okay.
17     A.   When I think there's -- there's a chance that
18  somebody hasn't gotten any treatment, and there's a
19  chance that they could have deteriorated because they
20  didn't get any treatment, then I want -- then I want to
21  see them.
22     Q.   What made you believe -- and I -- well, strike
23  that.  Isn't there a chance with every patient -- or not
24  -- with every person you see for the purposes of
25  providing a single report as you did in this case?

Page 85

1     A.   But oftentimes they're -- they're actually
2  under the care of somebody else who's -- who's seeing
3  them on a continuing basis.  And they have
4  responsibility in -- in the primary area of -- of -- in
5  question.  So I -- that's not an issue.  But in this
6  setting, because this is a mild traumatic brain injury
7  in large part, and not something that very many people
8  delve into for a lot of different reasons, I'm -- I'm --
9  and because people deteriorate neurologically in the
10  absence of -- of follow-on, I'm -- I'm very cautious
11  about and -- and worried about my patients when they
12  have a mild traumatic brain injury, that they will
13  deteriorate.
14     Q.   You agree you didn't give any -- Mr. Walden
15  any directions or recommendations for seeking care
16  related to these conditions?
17     A.   I -- my -- no, I did not give recommendations
18  for care --
19     Q.   Okay.
20     A.   -- in the consultation, but I did make the
21  diagnosis.  And hopefully he would take the diagnosis
22  and go find the appropriate care.
23     Q.   But you didn't tell him what that care would
24  be?
25     A.   There's enough information that somebody who's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA Doc #: 188-1 Filed: 09/03/24 Page: 23 of 54 - Page ID#: 1947
The Deposition of DAVID CHANGARIS, M.D., taken on July 18, 2024
86..89

Page 86

1 knowledgeable in the field, where they would -- if they
2 could either -- they could take over from what I wrote.
3    Q.   Did you send a copy of this first report
4 directly to Mr. Walden?
5    A.   No.  But I sent it to his representative.
6    Q.   Okay.  Did you --
7    A.   And that counts.
8    Q.   -- did you include -- when you sent it to his
9 representative, did you include a cover letter saying, I
10 highly recommend that you provide this to Mr. Walden and
11 that he review it to seek care?
12    A.   No.  No.  Because it -- legally, they're one
13 and the same.
14    Q.   Okay.
15    A.   If I give something to Mr. Morrin, then I'm
16 giving it to the patient.
17    Q.   Was this encounter, the June 2024 encounter,
18 strictly for the purpose of rendering care wholly
19 unrelated to this litigation?
20    A.   No.
21    Q.   I'm confused.
22    A.   He has problems in this litigation that he's
23 not being treated for.
24    Q.   So this is not a -- this is -- this record is
25 not for purposes of treatment, but it's for purposes of

Page 87

1 this litigation?
2    A.   It's a record of my -- of my encounter.
3    Q.   And not for purposes of providing treatment
4 though, correct?
5    A.   I -- I did not offer him treatment at that
6 time.  We're still in the process of deciding what that
7 looks like.
8    Q.   How long does it take -- strike that.  That's
9 not important.
10    A.   These -- these --
11    Q.   I don't -- there's not a question on the
12 table, Doctor.  You agree with me that there is no
13 documentation or indication in this report that a
14 follow-up appointment was scheduled for Mr. Walden?
15    A.   I would -- I would have to say that I'm not
16 sure that that's true.  The -- what I'm concerned is, is
17 that -- that his right hand --
18    Q.   That was not -- that has nothing to do with my
19 question, Doctor.  Let's --
20    A.   Yes, it does.
21    Q.   Let's get it --
22    A.   It has everything to do with the question.
23 Because the reason why, when I put a clinical
24 observation down, which is the extended wrist location,
25 and -- and it -- and I mentioned that it's markedly

Page 88

1 rigid, that means that he's progressing.
2    Q.   Okay, Doctor, where --
3    A.   And there --
4    Q.   -- in this report does it show that you
5 scheduled a -- you did or did not schedule a follow-up
6 visit with Mr. Walden?
7    A.   I -- first of all, I don't even know if I have
8 or not.
9    Q.   Does it state it in this record --
10    A.   No.  It doesn't state it.
11    Q.   -- Exhibit 4?
12    A.   No.  But I -- I have --
13    Q.   That was my question.  You agree that it --
14    A.   But what I'm saying is, is that once --
15    Q.   I wasn't --
16    A.   -- that the person is not doing well since my
17 last examination.  So therefore the need for clinical
18 intervention is a much higher need now than -- in my
19 opinion, than it was.  So I'm going to make sure that he
20 gets the care --
21    Q.   Okay.
22    A.   -- one way or another.
23    Q.   Explain to me then -- or no, that's right.  I
24 have a question.  The concluding sentence in this report
25 states, "The opinions offered are rendered within

Page 89

1 reasonable medical probability."
2         How does that relate to treatment you are
3 providing to Mr. Walden?
4    A.   It -- this -- it's a -- I want this to be part
5 of the record, and in that sense --
6    Q.   That's not my question.
7    A.   -- and -- and I -- and I'm treating him.  I'm
8 trying to treat him.  This is the beginning.  This is
9 what he looks like.
10    Q.   When did you receive the -- when did you
11 review the report authored by Dr. Kriss?
12    A.   I have no idea.
13    Q.   Is there any way to find out?  Would that be
14 in your records?
15    A.   Probably not.
16    Q.   Who provided it to you?
17    A.   I didn't get it, so it'd have to be from
18 Mr. Morrin.
19         MR. RIDINGS:  Make a note to -- Do you know,
20    Rob?
21         MR. MORRIN:  No.
22 BY MR. RIDINGS:
23    Q.   Had you ever met Mr. Morrin prior to
24 November 17, 2023?
25    A.   No.  I don't think so.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 24 of 54 - Page ID#: 1948
The Deposition of DAVID CHANGARIS, M.D., taken on August 16, 2024

90..93

Page 90

1    Q.   Had --
2    A.   Is that true?  I --
3         MR. MORRIN:  I don't think so.
4         THE WITNESS:  I don't think so.
5    BY MR. RIDINGS:
6    Q.   I don't think so either, but I'm just here for
7    your testimony, Doctor.
8    A.   I'm -- my -- my memory on cases is poor, and
9    I've been in business for a long time.
10   Q.   Is it fair to say you did not communicate with
11   him at any time prior to the November 17 encounter?
12   A.   No.  I can't say that because he -- may have
13   talked to him about brain injuries in the past.  I -- I
14   just can't recall.
15   Q.   Did I say Mr. Morrin?
16   A.   Yeah.
17   Q.   I'm sorry.  I meant Mr. Walden.
18   A.   Oh, no.  I've never seen Mr. Walden before
19   that day.
20        MR. RIDINGS:  Did my last question --
21        MS. RIDINGS:  You said Morrin both times.
22        MR. MORRIN:  I was like, this thing is turning
23     right at me.
24   BY MR. RIDINGS:
25   Q.   Excuse me.  I understand you have only

Page 91

1    encountered Mr. Walden on -- I'm going to strike that.
2    You had never met Mr. Walden prior to November 17, 2023,
3    correct?
4    A.   To my knowledge, no.
5    Q.   And you had not communicated with him prior to
6    your examination on November 17, correct?
7    A.   No.
8    Q.   That is correct?
9    A.   Right.  That is correct.  I have not
10   communicated.  Now, my staff did, but I did not
11   personally.
12   Q.   Okay.  Was anyone present during your
13   examination of Mr. Walden during the November 17
14   encounter, other than --
15   A.   I don't know.  I can't recall.
16   Q.   Would you have documented it in your report if
17   someone had been?
18   A.   Rarely.  If -- if it were important.
19   Q.   Okay.  And I'm not -- I'm not -- this is
20   exclusive of your staff.  I'm asking if -- did anyone
21   accompany Mr. Walden to the --
22   A.   I -- I can't recall.
23   Q.   Did you obtain information -- or strike that.
24   Would all of the information that you obtained during
25   the November 17 encounter have come directly from

Page 92

1    Mr. Walden?  Oral communications?
2    A.   Oh, yeah.  I -- I -- except for the -- this --
3    Q.   And I'm -- I was referring to oral
4    communications.
5    A.   -- and I -- and I'm not party to this -- this
6    12-inch stack of records.  The -- I take a history, and
7    -- and that largely focuses my report.
8    Q.   And what I'm trying to -- and I was referring
9    to the history.  And if the history had been provided by
10   someone other than Mr. Walden, you would agree, that
11   would have been something pertinent, and you would have
12   documented it in your report?
13   A.   You know, again, I can't recall the precise
14   things.  I've -- most of the time, that's probably true.
15   But if -- if there's family members, sometimes family
16   members chime in and -- and remind people that such-and-
17   such is true.  And the guy says yes, and I might not
18   mention that -- that there was -- the guy was -- was
19   prompted by a family member.
20   Q.   Well, let's consider the diagnosis in this
21   case, one of which he's -- Mr. Walden has complained of
22   memory issues, correct?
23   A.   Correct.
24   Q.   And that would certainly -- the source of the
25   history, to the extent it came from someone other than

Page 93

1    Mr. Walden, that would have been rather significant,
2    wouldn't it?
3    A.   Yeah.  You're right.  And if I didn't, that
4    was negligent on my part, but I -- I don't know one way
5    or the other.  I can't recall.
6    Q.   Did you obtain any history from any person or
7    source other than Mr. Walden, and excluding medical
8    records?  And let me strike that.  I'll ask a bit --
9    I'll just ask a more direct question.  Did you obtain
10   any history from Mr. Morrin?
11   A.   I'm -- I'm sure I had received some history
12   from Mr. Morrin somewhere along the line.
13   Q.   Okay.  Did you rely on that history in forming
14   your opinions?
15   A.   Not without corroborating it with the history
16   and physical that I did.  To the extent that it's part
17   of the general conversation when I'm communicating about
18   my findings or trying to learn about this individual, I
19   -- I will ask questions with the lawyer.
20   Q.   Has any court ever ruled any part of your
21   testimony inadmissible?
22   A.   Not to my knowledge.
23   Q.   Has any court deemed your opinion -- expert
24   opinion testimony unreliable?
25   A.   Not to my knowledge.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  Q.  Have you authored any articles, reports, or
2  studies relating to the reliability or validity of
3  utilizing VNG and posturography tests to diagnose TBIs?
4  A.  I've written a book on it.
5  Q.  Has that book been peer-reviewed?
6  A.  No.  Only in the sense that I've given it to
7  the American Board of Neurological Surgeons, asking them
8  to look at it.
9  Q.  To your knowledge, have they agreed to conduct
10  a peer review?
11  A.  They're not going to do that.  But if they
12  didn't like it, I suspect they could come after me.  They
13  don't like people putting things out that aren't
14  legitimate.
15  Q.  Have you submitted it to any other
16  associations for peer review?
17  A.  No.  But the Board of Neurosurgery is the --
18  is the -- the appropriate one for this.
19  Q.  Have you -- why are you so -- strike that.
20  Have you personally undertaken any controlled
21  scientifically valid studies relating to the reliability
22  or validity of VNG and posturography tests for the
23  purpose of diagnosing TBIs?
24  A.  I have to say, I'm -- I have thought of doing
25  this, and I am in the process of gathering my experience

Page 95

1  in it and publishing it, but I've not actually done it.
2  What I have done is I've published components --
3  components --
4  Q.  The answer is no, Doctor.  We're in a hurry.
5  Because if we -- if you could, just answer my question
6  and not be evasive.
7  MR. MORRIN:  Objection.  Argumentative.
8  BY MR. RIDINGS:
9  Q.  Have you authored -- strike that.  Or no.
10  Have you authored any articles, reports, or studies
11  relating to the effects, if any, that brain injuries
12  have in terms of causing Parkinson's disease?
13  A.  Yes.
14  Q.  Is that your book?
15  A.  No.  That's a peer-reviewed article that was
16  published in February of this year.
17  Q.  What was it published in?
18  A.  A journal called Cureus, C-U-R-E-U-S.
19  Q.  Journal of what?
20  A.  Cureus.
21  Q.  C-U-R?
22  A.  E.  Cureus.
23  Q.  Oh, Cureus.
24  A.  It -- it should be in my resume.  If it isn't,
25  I'll add it.

Page 96

1  Q.  Okay.  And is this journal associated with any
2  medical associations that -- similar to AANS?
3  A.  It's -- the dominant figure is a -- a
4  neurosurgeon from Stanford, and he created this journal
5  for publishing.
6  Q.  So the answer is no?
7  A.  I don't know.  He -- he -- the -- there's lots
8  of little societies that he's listed on.  You -- you
9  have to ask -- ask -- many -- almost all of the
10  reviewers are associated with -- with academic
11  institutions.
12  Q.  Okay.  The next set of questions I'm going to
13  try to go through quick, all right?  So if you can, tell
14  me if you agree or disagree.
15  A.  Okay.
16  Q.  Physical exams and medical tests alone are
17  insufficient to determine causation?
18  A.  In general, that's true.
19  Q.  Okay.  In this case?
20  A.  Probably.
21  Q.  You would agree with that?
22  A.  Yes.  You -- you always need to have a history
23  and physical and ancillary data.
24  Q.  Okay.  And so agree or disagree, at least with
25  respect to causation, in this case, an accurate medical

Page 97

1  history is critical for purposes of reliability of an
2  expert opinion on causation?
3  A.  Yes.  That is absolutely critical.  History is
4  the --
5  Q.  Agree or --
6  A.  -- history is perfect.
7  Q.  Agree or disagree that an opinion on causation
8  that relies on an inaccurate medical history has a high
9  probability of being inaccurate itself?
10  A.  I don't know.
11  Q.  I -- I'm not talking about this case.  I'm
12  just --
13  A.  I -- I -- it -- that may or may not be true.
14  Q.  Having a complete and accurate medical history
15  is critical to the reliability of causation opinions?
16  A.  Not always.
17  Q.  Is it in this case?
18  A.  Don't know.
19  Q.  Generally speaking, historical medical records
20  tend to be far more accurate than a patient's
21  recollection, agree or disagree?
22  A.  Well, what's the -- what's the question?
23  Q.  Agree or disagree, historical medical records
24  tend to be far more accurate than a patient's
25  recollection?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 26 of 54 - Page ID#:
1950
The Deposition of DAVID CHANGARIS, M.D., taken on July 19, 2024

98..101

Page 98

1    A.   No.  That's not true in many, many cases.
2    Q.   What about in -- what about a patient with
3    memory issues?
4    A.   Again, that's case by case.  Sometimes memory
5    issues are intact on certain issues.
6    Q.   Is a patient that complains of long-term
7    memory problems a big red flag in terms of reliability
8    of the history provided?
9    A.   It depends on the subject and the person.
10   Q.   Okay.  What am -- did you have -- did you come
11   across any evidence that allowed you to form any
12   opinions on the reliability of the medical history
13   Mr. Walden provided to you?
14   A.   I don't understand the question.
15   Q.   Yeah.  That's a bad question.  Did you form an
16   opinion as to Mr. Walden's reliability in terms of the
17   medical history he provided to you?
18   A.   Yes.
19   Q.   And what was that opinion?
20   A.   I think he's marginally reliable.  So you have
21   to be circumspect about accepting what he says.
22   Q.   Okay.  And what did -- what, if anything, did
23   you do to verify the history that he provided to you?
24   A.   Get more information.
25   Q.   Okay.  Such as?

Page 99

1    A.   More medical records.
2    Q.   And you --
3    A.   And -- and that -- and quite frankly, I look
4    forward to these kinds of interactions because you might
5    have information that might be very helpful to me in
6    terms of what's going on with this patient.
7    Q.   You would agree it's not my job, though, to
8    provide you with any such evidence; is that correct?
9    A.   I -- I -- well, this is where we get down to
10   the difference between how medicine and law practice
11   goes.
12   Q.   Okay.
13   A.   Medicine, you would.  Legal, maybe not.  But
14   ethically, you really should let me know.  If you know
15   something that's important to this guy's medical
16   condition, and you think I don't have it, shame on you
17   if you don't tell me.
18   Q.   Well, did you review Dr. Kriss's report?
19   A.   Poor Dr. Kriss.  Yes.
20   Q.   Okay.  You will agree that Dr. Kriss
21   thoroughly documented Mr. Walden's medical history,
22   correct?
23   A.   I am not going to comment on Dr. Kriss's
24   opinions at this time.  I'm sure I'm going to have an
25   opportunity.

Page 100

1    Q.   Okay.  That was not my question.  Did you
2    review Dr. Kriss's summary of Mr. Walden's medical
3    history?
4    A.   I -- I reviewed it, but I'm not in a position
5    to comment on it right now.
6    Q.   Why are you not?
7    A.   Because I'm not ready to.
8    Q.   Okay.  Have you -- you will agree that
9    Dr. Kriss identified all -- a significant amount of
10   medical records both after August 2020 collision and
11   before the August 2020 collision?
12   A.   Okay.  My -- my issue with Dr. Kriss is
13   that --
14   Q.   That was not my question, Doctor.  Did --
15   A.   Look, I don't have those records in front of
16   me, and I'm not in a position to do it without thorough
17   review.
18   Q.   Yet you're still critical of -- you've not
19   reviewed -- is it fair -- you would agree, you would --
20   you have not reviewed a fraction of the medical records
21   that Dr. Kriss describes and summarizes in his report?
22   A.   I don't know that.
23   Q.   Have you reviewed a single record of
24   Mr. Walden's that relates to treatment prior to the
25   August 2020 collision?

Page 101

1    A.   I believe I have some records, yes.
2    Q.   Where are -- which ones?
3    A.   I have no idea.  They're in that stack.
4    Q.   Okay.
5    A.   And I can't identify them.
6    Q.   Okay.  You would agree they're not -- you
7    didn't review them prior to forming any of the opinions
8    that are set forth in your November 17, '23 report?
9    A.   That's correct.
10   Q.   Okay.  And were any of the opinion -- were any
11   of the records that you did review, but you can't recall
12   right now -- were any of them pertinent to any of the
13   opinions you've offered in this case?
14   A.   I -- no.  Not without an -- an opportunity to
15   review it.
16   Q.   Well, you have reviewed them.  You just told
17   me you did.
18   A.   No.  I -- I have to take into -- there's
19   obviously some points here that you have.  I'm going to
20   go back and I'm going to review everything.
21   Q.   Well, okay.  You're certainly welcome to do
22   that, but I'm trying -- you told me that you have
23   reviewed -- that you have received records prior -- for
24   treatment prior to the August 2020 collision?
25   A.   You're asking me a very specific question

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 27 of 54 - Page ID#: 1951
The Deposition of DAVID CHANGARIS, M.D., taken August 16, 2024
102..105

Page 102

1 about Dr. Kriss, and --
2    Q.   No.  I'm not.  Doctor, just answer my
3 questions, okay?  Have you reviewed any records prior to
4 the August 2020 collision relating to Mr. Walden?
5    A.   I can't recall right now.  My brain is numb.
6 So right now I'm going to have to say, somewhere in that
7 chart of records.
8    Q.   All right.  Just generally, did any -- did
9 your review of any of those records change any of the
10 opinions set forth in your first report?
11    A.   I don't recall changing my opinions about my
12 report based upon reviewing prior medical records.
13    Q.   Agree or disagree that with respect to --
14 strike that.  Okay.  With respect to posturography and
15 VNG testing, I have a few questions, okay?  Clinical
16 correlation and clinical confirmation are absolute
17 prerequisites to validating the results of both of these
18 tests?
19    A.   No.
20    Q.   Okay.  When it comes to diagnosing a TBI,
21 clinical correlation and clinical confirmation are
22 absolute prerequisites to validating the results of
23 these tests?
24    A.   I don't know what you mean by "clinical
25 correlation."

Page 103

1    Q.   Evidence in medical records of -- prior to
2 these tests that are consistent with a TBI.  Conducting
3 examinations -- bedside examinations in your office
4 to --
5    A.   In -- in some situations, yes.  And in some
6 situations, no.
7    Q.   Okay.  What about in this situation?
8    A.   You know, for example, almost -- there's a
9 journal of -- of the American Medical Association
10 published --
11    Q.   In this --
12    A.   -- and neurology dealing with mild traumatic
13 brain injury and -- and trauma reviews in -- in the --
14 in Level I trauma units in -- in orthopedists' section.
15    Q.   Agree or disagree, to properly interpret VNG
16 tests, it must be determined if the test results
17 accurately reflect the physiologic and pathologic status
18 of the patient or whether they represent artifacts
19 caused by technical errors?
20    A.   Yes.  That's true.
21    Q.   And technical errors must be suspected when
22 results cannot be explained by any known physiology or
23 pathology?
24    A.   That's -- that's a weird one.  Because we -- I
25 -- I don't know how to interpret that.

Page 104

1    Q.   When it --
2    A.   Because any -- any known is -- is -- that --
3 that's a hard one to -- to hammer down.
4    Q.   Agree, there is no test for Parkinson's other
5 than to see if a patient responds to medication?
6    A.   No.  I don't agree with that.
7    Q.   Agree or disagree, it is a universally
8 recognized standard in the neurologic and neurosurgical
9 community that Parkinson's be diagnosed clinically,
10 meaning at bedside?
11    A.   Given everything I know, that's -- that's
12 absurd.
13    Q.   So you disagree with that?
14    A.   Yes.
15    Q.   Is your opinion consistent with the generally
16 accepted views of your peers?
17    A.   Yes.  I do believe so.  One -- one -- there's
18 so many -- right now, Parkinson's disease --
19    Q.   I just asked if it was --
20    A.   -- is very difficult to diagnose.
21    Q.   Yes or no.
22    A.   Okay.  That's fine.
23    Q.   Do you agree that there -- agree or disagree
24 that every diagnostic definition of Parkinson's disease
25 amongst your peers in the neurosurgical community is

Page 105

1 founded on confirmation of three cardinal motor signs?
2    A.   No.  That's not true.
3    Q.   Is that -- is your opinion consistent with the
4 general opinions of your peers?
5    A.   Yes.  And for that, I could really get you
6 some good articles.
7    Q.   Agree or disagree that is universal -- it is a
8 universally recognized standard that positive findings
9 of the following three signs are required to properly
10 diagnose Parkinson's: rigidity, resting tremor, and
11 bradykinesia?
12    A.   No.
13    Q.   You disagree?
14    A.   No.  I -- I don't -- I don't think you'll find
15 any neurologist who'll agree to it either.  Now those
16 are components in the past when -- when Parkinson's --
17    Q.   You just -- I got that you disagreed.  Agree
18 or disagree that the postural instability symptoms
19 associated with Parkinson's always occur late in the
20 disease process?
21    A.   No.  That's not true, either.
22    Q.   That they most often occur late in the disease
23 process?
24    A.   No.  That's not true either.  You must be
25 relying on Dr. Kriss for all these great opinions.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 28 of 54 - Page ID#: 1952
The Deposition of DAVID CHANGARIS, M.D., taken on June 19, 2024
106..109

Page 106

1    Q.   Can someone have -- strike that.

2         An individual with a massive amount of

3    psychomotor agitation does not have bradykinesia,

4    agreed?  By definition?

5    A.   I don't know what those mean, those two words.

6    Q.   Okay.  All right.  Then what -- I'm going to

7    refer to specifically.  Here is what I'm referring to as

8    a massive amount -- massive is a poor word.  A large

9    amount of psychomotor agitation: constant fidgeting,

10   shifting in a chair, sliding in a chair, rocking slowly

11   forward and back in a chair, grabbing thighs and hips

12   with hands, oscillating all four extremities, rubbing

13   hair and head with your hands, and picking at one's face

14   with your -- with one's fingers.

15   A.   Okay.

16   Q.   Okay?  If someone demonstrated those signs,

17   would that rule them out for a Parkinson's diagnosis?

18   A.   I don't believe that those components are

19   standard in -- in the diagnosis.  You're asking some

20   very esoteric questions that have -- that don't have an

21   answer.

22   Q.   I'm going to ask a hypothetical, now, all

23   right?  If you see a patient nearly three years after an

24   accident, and during this interim three-year period, not

25   a single medical professional, including those who saw

Page 107

1    him within the hours and days after the collision, had

2    diagnosed or documented a single complication or symptom

3    of brain injury, would that lead you to believe that

4    said individual did not sustain a brain injury from that

5    incident?

6    A.   Why don't you ask all the veterans living in

7    homeless shelters?

8    Q.   Doctor, that was not -- if you just answer my

9    question, please.

10   A.   That's an absurd question.  There -- that --

11   that doesn't correlate.  No.  I don't believe.  There

12   are lots of examples, but that's just not true.

13   Q.   Okay.  What if it was true with Mr. Walden?

14   He was not a veteran.  So would you expect to have --

15   would you expect that the plethora of medical

16   professionals he saw in the three years prior to you

17   would've at least -- have documented a sign or symptom

18   associated with traumatic brain injury if he, in fact,

19   sustained a traumatic brain injury?

20   A.   No.  Because the diagnosis is -- is too

21   subtle.

22   Q.   Because what?

23   A.   The diagnosis is too subtle.  You have to do a

24   VNG.

25   Q.   But I thought you agreed that a VNG alone is

Page 108

1    not -- cannot help you diagnose brain injury.

2    A.   Well, and you have to believe the symptoms.

3    In other words, you have to find that person really did

4    have an accident.  Was he dazed?  If he talks about

5    being dazed, a little confused around the accident, that

6    cause of the injury, then yes.  But -- but someone like

7    -- you mentioned Dr. Kriss.  Someone like Dr. Kriss

8    doesn't believe that.

9    Q.   Do other -- well, strike that.

10        How do you distinguish between instances that

11   require you to make your own diagnosis versus relying on

12   the mountain of evidence of records refuting any

13   indication of brain injury?

14   A.   The absence of information does not

15   contradict.

16   Q.   Okay.  But you don't know what's --

17        MR. MORRIN:  Objection.

18   BY MR. RIDINGS:

19   Q.   -- in the records --

20        MR. MORRIN:  Reference to facts not in

21   evidence.

22   BY MR. RIDINGS:

23   Q.   -- you don't know what's in the records

24   because you have only reviewed a very small portion,

25   correct?

Page 109

1    A.   I tell you -- I tell you what.  I'm -- I'm

2    going to, and I can promise you that if there's

3    something in those records, that I -- that contradicts

4    my opinions, you'll be the first to know.  I have no --

5    Q.   I will?

6    A.   Yes.

7    Q.   I would ask that you inform Mr. Morrin and --

8    A.   Well, and --

9    Q.   -- not me, okay?

10   A.   -- probably at the same time.

11        MR. MORRIN:  I'm not your attorney.

12        THE WITNESS:  Yeah.  I -- I am -- I am not in

13   the business of -- of ignoring data that doesn't

14   agree with my opinion.

15   BY MR. RIDINGS:

16   Q.   Tell me what -- okay.  In my review of your

17   report, I found a single passing reference to a prior

18   TBI.  Does that seem consistent with your understanding

19   of your report?

20   A.   There -- there is at least one other TBI, and

21   I'm not sure I have all his history.

22   Q.   Okay.

23   A.   And so I -- I really do want to have a better

24   records.

25   Q.   Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 29 of 54 - Page ID#: 1953
The Deposition of DAVID CHANGARIS, M.D., taken on July 10, 2024
110..113

Page 110

1    A.  And -- and I'll -- I'll grant you, there could
2  be things in there that could change my opinion.
3    Q.  Okay.  All right.  Then what is your
4  understanding of this prior brain injury?
5    A.  That it exists, and it was probably made worse
6  by this second injury, or third injury, whatever it is.
7    Q.  Okay.  Tell me, how -- was it more severe or
8  less severe than --
9    A.  They're -- they're additive in peculiar ways.
10    MS. RIDINGS:  I'm sorry?
11    THE WITNESS:  They're additive in peculiar
12  ways.  You don't -- you can't -- it's not an
13  algebraic thing.
14  BY MR. RIDINGS:
15    Q.  Okay.  So I -- so if it was extremely minor,
16  does that -- would that -- I assume, I take it, that
17  your opinion, your current opinion documented in this
18  report, though, is that -- is unreliable in the sense
19  that it is incomplete?
20    A.  No.  What I'm saying is that, given what I've
21  seen and given the history that he's given me, assuming
22  that he is as reliable as I believe he is, which is
23  partially reliable, not 100 percent, given everything
24  that I've read, I think he does have a brain injury
25  related to this event.

Page 111

1    Q.  How can you determine whether it was related
2  to this event versus whether it existed prior to the
3  incident?  What type of evidence would you be looking
4  for?
5    A.  From the -- from the history and the presence
6  of his neurological findings, and whether or not he's
7  progressing out of proportion.
8    Q.  Okay.  If he had -- just randomly, so within
9  the month before this incident, he had made complaints
10  of headache or other brain -- other symptoms associated
11  with TBIs.  Would that affect your opinion?
12    A.  Look, this is a hypothetical.  Everything
13  affects my opinion, good and bad.  And if something
14  contradicts it, I'll be the first to say it.
15    Q.  So what would contradict it?  What types of
16  evidence are you aware of that would contradict it?
17    A.  Anything that would contradict the opinion.  I
18  mean, if -- there's a self -- self -- I mean, something
19  that would really contradict it.
20    Q.  Okay.  Would the fact that he had a very
21  severe traumatic brain injury in 2012, would that alter
22  your opinion?
23    MR. MORRIN:  Objection.  References facts not
24  in evidence.
25    MS. RIDINGS:  Excuse me?

Page 112

1    MR. RIDINGS:  Evidence?
2    MR. MORRIN:  Uh-huh.
3    MR. RIDINGS:  Okay.
4  BY MR. RIDINGS:
5    Q.  Would that affect your opinion?
6    A.  In -- in theory, it would make him more likely
7  to deteriorate from a second accident.  So in that
8  sense, the history of being damaged by this would be
9  more relevant.
10    Q.  Okay.  Would we expect to see that damage,
11  that exacerbation, if you will, immediately after this
12  incident?
13    A.  No.  This is -- what happens, the -- the
14  traditional progression after a TBI is on the order of
15  months to years.
16    Q.  Okay.  But if he was already on -- I take it,
17  if the -- if, in fact, there was a severe TBI in 2011 or
18  2012, he was on that progression already, agreed?
19    A.  He could have been, but it might have been
20  very slow.  It might have been on the order of years,
21  and now, all of a sudden, gets to a second one, and
22  things progress more quickly.
23    Q.  Okay.  And is that what happened in this case?
24    A.  Don't know.  I'll have to review what the --
25  the first accident is.  I don't have access to it.

Page 113

1    Q.  Did you -- okay.  The mere fact that he --
2  there was a prior TBI, though, you were aware of,
3  correct?
4    A.  I -- this is still early in the case.  I've
5  been around this case now for five months.
6    Q.  For what?
7    A.  Five months.
8    Q.  Okay.
9    A.  And I -- I'm --
10    Q.  That was not my question, though.  You were
11  aware of the prior TBI?  You mentioned it in your
12  report?
13    A.  That is correct.
14    Q.  Okay.
15    A.  I'm always interested in more information.
16    Q.  Did you request that information from anyone?
17    A.  I -- I have a blanket order to be given
18  everything.  Whether -- whether it shows up or it
19  doesn't, that's not -- I'm not in control.
20    Q.  You did request everything?
21    A.  I have made it clear to everybody, I want
22  every bit of information from everybody.
23    Q.  What did Mr. Walden tell you about the prior
24  TBI?  How did he describe it?
25    A.  I don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    Q.   Would that have been important?
2    A.   I'm waiting to get more information on the
3  first TBI. I -- I don't want to render an opinion until
4  I get more information. I tried to limit my -- my
5  comments to the impact of the second.
6    Q.   Okay. But you were unequivocal in stating
7  that all of the diagnoses that you made were caused
8  exclusively by the August 2020 collision, correct?
9    A.   The changes that I -- I referenced, I thought
10 were caused by the accident, so yeah.
11   Q.   Okay. And that -- and you did that despite
12 the fact that you knew there was a prior TBI? So it --
13   A.   Because it is in the distant past, I
14 understand. And -- but I need more information before I
15 can be certain.
16   Q.   Okay. Then why -- did you say that in your
17 report?
18   A.   No.
19   Q.   Why not?
20   A.   Because we're early, and I'm still treating,
21 and I'm still getting information.
22   Q.   You were not treating at the time of this
23 report.
24   A.   But I anticipated that I would be treating
25 because I thought he was going to deteriorate.

Page 115

1    Q.   Okay. All right.
2    A.   And not only that. In litigation, things
3  percolate, and new information comes up constantly.
4    Q.   Is it relevant that, in a transfer note just
5  two days after this -- the August 2020 accident, the
6  medical provider states, "Mr. Walden does not have TBI
7  that requires monitoring"? Is that relevant?
8    A.   No. That -- that's expected.
9    Q.   Okay.
10   A.   Because -- because TBI, as far as monitoring,
11 would be considered a moderate to severe brain injury,
12 and his falls in the category of mild. You don't need
13 to monitor a mild -- a -- a mild traumatic brain injury.
14   Q.   All right, Doctor. I'm going to point you to
15 some of the records that you had that you identify in
16 your report as you -- as having reviewed and reviewed
17 objectively. 721. All right. You agree that you
18 reviewed a record from Baptist Healthcare --
19   A.   Six months ago.
20   Q.   -- of June 27, 2021, correct?
21   A.   Six months.
22   Q.   Yeah. Great. This is not a memory test. I'm
23 going to point it -- give it to you. But prior to
24 authoring this report, you, in fact, reviewed that
25 record, and you reviewed it objectively, correct?

Page 116

1    A.   Tried to.
2    Q.   Okay.
3        MR. RIDINGS:  All right. We will mark this as
4    the next exhibit.
5        THE REPORTER:  7.
6        (EXHIBIT 7 MARKED FOR IDENTIFICATION)
7  BY MR. RIDINGS:
8    Q.   And I will hand it to you. And if you would,
9  turn to -- and I'm going to reference -- see the numbers
10 in the bottom right-hand of the page? Like, the first
11 page, it says 165. Those are -- that's Baptist's
12 internal documentation.
13   A.   Okay.
14   Q.   All right?
15   A.   What page -- what page are we going to?
16   Q.   Give me one second. Okay. Let's go to Page
17 187. Oh, that might not have been what I was looking
18 for. Oh, yeah. And just want to call your attention
19 to, first, the medical history as of 01-27-21. In the
20 first part of the page, it references a head injury,
21 TBI in 2012. Do you agree with that?
22   A.   Yes.
23   Q.   And vision loss, that left eye vision loss
24 from that accident; do you agree?
25   A.   Yes.

Page 117

1    Q.   Okay. And then further down, on that same
2  Page 187, under "Past surgical history," brain surgery,
3  2012. And above that, you also see tracheal esophageal
4  puncture, correct?
5    A.   Yes.
6    Q.   You would agree that that tells us, at least,
7  that this was a pretty severe traumatic brain injury
8  from 2012, correct?
9    A.   Yes.
10   Q.   And you had this information prior to
11 authoring this report, correct?
12   A.   Yes.
13   Q.   And you didn't address it, though?
14   A.   Not clearly.
15   Q.   So why not? No. You didn't address it at
16 all.
17   A.   No. I -- I point out there was the existence
18 of it.
19   Q.   And you did know that it was far more severe
20 than this one, correct?
21   A.   I was under the impression that it was a
22 severe one, but I didn't have access to the information.
23   Q.   Why did you not -- or did you, being fair and
24 objective, give any discussion that the 2012 TBI was --
25   A.   Even with this, there -- there's not enough

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 31 of 54 - Page ID#:
1955
The Deposition of DAVID CHANGARIS, M.D., taken on April 19, 2024
118..121

Page 118

1  information to form a discussion.
2      Q.   Is brain -- a TBI with brain injury?
3      A.   I -- I want to see the medical records before
4  I comment on it.
5      Q.   Okay.  But you don't care about seeing the
6  medical records before stating that this accident, the
7  2020 accident, was the exclusive cause of Parkinson's?
8      A.   Well, just one moment.  What I'm saying is --
9  is that -- that can happen afterwards, but he's
10  beginning to show signs of it that -- that are evolving
11  after this accident, which is different.
12      Q.   Was he showing any signs, to your knowledge?
13      A.   I'd have to look at the record, but I'm not
14  sure he was showing very much signs when I first saw him
15  in November.
16      Q.   When you first saw him when?
17      A.   When -- when I did my exam.
18      MS. RIDINGS:  Showing signs of what?
19      THE WITNESS:  Let's see.  What -- what did I
20  write in terms of his signs?  Shoulder range of
21  motion.  I -- I didn't find very much in the way of
22  -- of --
23  BY MR. RIDINGS:
24      Q.   Of Parkinson's?
25      A.   Of Parkinson's in that.  Let me just check my

Page 119

1  office notes.  I -- it is a -- it's a theoretical thing
2  that can happen in the future in my report, I believe.
3      Q.   Then based on a reasonable degree of medical
4  probability, how could you diagnose him with
5  Parkinson's?
6      A.   First off, I didn't diagnose him with
7  Parkinson's.
8      Q.   You did not?
9      A.   I don't think so.
10      Q.   You did not state that he is in the early
11  onset of Parkinson's disease?  All right.  If you had
12  said that, would that have been in error?
13      A.   I don't -- I don't know.
14      Q.   Well, Doctor, it's your --
15      A.   Let me -- let me read it.  Let me read it.
16  See precisely what I wrote.  Flexion.  He has a
17  decreased shoulder range of motion.  Causation -- okay.
18  Now, this is about the history, okay?  I'm not relying
19  on past medical records.  The -- because I didn't have
20  them enough to make -- make a -- the -- the
21  definitive thing.  So I need more records, and -- and
22  then I'll make my physical -- my -- my determination on
23  that.
24      Q.   Well, shouldn't you have waited before you
25  diagnosed the man with Parkinson's?  Or --

Page 120

1      A.   Hang on.  Hang on.  Let's see what I wrote
2  specifically.  "The brain injury caused by this accident
3  has, by inflammation and neurotoxicity, likely caused
4  progressive anxiety and rigidity."  I still stand behind
5  that.  So he has progressive anxiety and rigidity by his
6  history.  He says he's -- he's more rigid than that.
7  I'm trying to figure out where I made the diagnosis of
8  Parkinson's disease.
9      Q.   What did you diagnose him with, Doctor?  In
10  your opinion, what is his diagnosis?  You saw him within
11  the last month.  What's your diagnosis of him?
12      A.   He fulfills the -- the criteria for
13  Parkinson's syndrome.  I don't know that he fulfills the
14  diagnosis of Parkinson's disease.
15      Q.   Okay.  Agree or disagree that "the combined
16  presence of balance disorder and rigidity firmly places
17  into the Parkinsonism delineation, beginning his
18  progressive descent into loss of capacity with onset of
19  Parkinson's disease"?  Do you agree or disagree with
20  that statement?
21      A.   I -- I think that's a fair statement.
22      Q.   And that is a diagnosis of onset of
23  Parkinson's; is it not?
24      A.   No.  Of Parkinson's syndrome.
25      Q.   Oh, okay.  So show me -- all right.  I'll

Page 121

1  highlight it.  And just for the record, I'm referring to
2  Page 8 of 9 of the first report in the last -- next to
3  last paragraph, last sentence.
4      A.   "The combined presence of balance disorder and
5  rigidity firmly places him into the Parkinsonism
6  delineation."
7      Q.   Yeah.  Yeah.  And then continue.  Show me
8  where it says, "Places him" --
9      A.   And that's all I've said.
10      Q.   "Beginning his progressive descent into loss
11  of capacity with onset of Parkinson's symptoms."
12      A.   Which means he still is working his way into
13  Parkinson's disease.  He's not there.
14      Q.   So it -- so where does it say Parkinson's
15  symptoms?
16      A.   It says -- that's what Parkinson --
17      Q.   "Onset of Parkinson's symptoms."
18      A.   No.  It says Parkinsonism --
19      Q.   Okay.  Well --
20      A.   -- which is a specific diagnosis.
21      Q.   So -- but you --
22      A.   Which is as I've defined it.  That -- that is
23  Parkinsonism.
24      Q.   All right.  In that sentence, starting with
25  "beginning," does that or does that not constitute an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA Doc #: 188-1 Filed: 09/03/24 Page: 32 of 54 - Page ID#: 1956
The Deposition of DAVID CHANGARIS, M.D., taken August 16, 2024

122..125

Page 122

1 opinion that Mr. Walden is beginning his progressive
2 descent into loss of capacity with onset of Parkinson's
3 disease?
4     A.    I think he's beginning that -- that tour.
5 He's not there yet.
6     Q.    Which means --
7     A.    He doesn't have Parkinson's disease.
8     Q.    Okay.  And that's what that says?
9     A.    Yes.  That's exactly what that says.  Nothing
10 more, nothing less.
11    Q.    So is it fair to say that you cannot state to
12 a reasonable degree of medical probability that
13 Mr. Walden will or will not develop Parkinson's disease?
14    A.    Nobody can.  I've never said that.  I'm saying
15 that it looks like he's begun his -- his journey into
16 it.
17    Q.    But you can't -- you are not saying he has
18 begun his "journey."  It --
19    A.    Yes.  I am.  I am saying he has begun his
20 journey.
21    Q.    So he does or does not have it?
22    A.    He doesn't have Parkinson's disease.
23    Q.    And he's not -- and we don't --
24    A.    He's on his way.
25    Q.    And is that -- he's certain -- with certainty,

Page 123

1 he's on his way?
2     A.    I believe it's more likely than not that --
3 that he's on -- on that path because he fulfills the
4 criteria.  He has had brain trauma, and he has signs of
5 Parkinsonism.
6     Q.    What was the cause of this?
7     A.    The cumulative thing is of all of his brain
8 injuries.  And by history, the -- proximate change
9 was his last accident.  But you can argue that -- that
10 prior problems were contributing to it substantially.
11    Q.    Does drug abuse affect one's journey into the
12 onset of Parkinson's?
13    A.    Depends on what drug it is.
14    Q.    Okay.  What drugs do play a role?
15    A.    Classically, an MDA.  Some -- some --
16    Q.    That's ecstasy, street name?
17    A.    I -- I -- no.  It -- it's usually a -- a
18 contaminant.  Classically, it was a contaminant.
19    Q.    Methamphetamine?
20    A.    No.  I -- I wouldn't say that.
21    Q.    Heroin?
22    A.    No.  No, I don't -- I don't think there's any
23 evidence on that.
24    Q.    Okay.  What about, what effect, if any, do
25 drug overdoses play into --

Page 124

1     A.    I'm not -- I'm not aware of any -- any
2 purported relationship between a drug overdose and the
3 onset of Parkinsonism and Parkinson's disease.
4     Q.    Okay.  And by drug overdose -- strike that.
5     A.    What I mean is someone being unconscious from
6 Sufenta or -- or something where they give Narcan or
7 something like that.
8     Q.    Yeah.
9     A.    No.  That's -- that's not associated with
10 Parkinson's disease.
11    Q.    Agree that you did not perform any cerebellar
12 testing of Mr. Walden?
13    A.    You know, the -- the question here is -- and
14 since I've done --
15    Q.    You did or didn't?
16    A.    From my perspective, I have -- I've done
17 cerebellar testing.
18    Q.    Okay.  And what -- is that documented in your
19 report?
20    A.    In the VNG.
21    Q.    Okay.
22    A.    I deferred cerebellar testing to the -- to the
23 VNG.
24    Q.    Okay.  But agree that you would need to then
25 clinically correlate the results of the VNG with

Page 125

1 additional cerebellar testing?
2     A.    If I -- if I was worried about -- if I wanted
3 to treat his cerebellum, then yes, I would probably want
4 to do that clinically.
5     Q.    Okay.
6     A.    But I've not really taken up treating him.
7 I've just gotten pictures of him.
8     Q.    Agree that you did not perform any axial
9 stability testing in your examination?
10    A.    When I have somebody that has a -- a serious
11 brain injury, I view it as inappropriate to do one-on-
12 one assessments of -- of vestibular function.
13    Q.    Agree that -- so the answer is that you did
14 not perform that?
15    A.    I think it's wrong.  I think it's -- I think
16 it's bad medicine to do it.
17    Q.    Okay.  Agree that you did not perform, in your
18 clinical examination, any appendicular coordination
19 examination?
20    A.    No.  I -- I sent him for a VNG.  That -- that
21 supersedes that.
22    Q.    Okay.  All of these questions I'm asking you
23 personally in your exam, outside of the VNG.
24    A.    But -- but the yes -- the yes and no component
25 is I didn't think it was relevant.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 33 of 54 - Page ID#: 1957
The Deposition of DAVID CHANGARIS, M.D., taken August 13, 2024
126..129

Page 126

1  Q.   Okay.  All right.  You did not personally
2  assess his gait?
3  A.   That isn't quite true.  I didn't comment on
4  it, but I'm -- I'm waiting on it.
5  Q.   Okay.  What was -- tell me what -- never mind.
6  You did not document it in this report?
7  A.   No.  Because I didn't think it was relevant.
8  Q.   Okay.  You did not assess his postural
9  stability, agree?
10  A.   No.  That's not true.  I did not think it
11  relevant.
12  Q.   If it didn't -- if it's not in the report, it
13  didn't happen.
14  A.   That isn't quite true.  As I've said --
15  Q.   You --
16  A.   -- if this matter was not relevant, then it's
17  not relevant.
18  Q.   I will stipulate that you --
19  A.   You can say -- you can say that.
20  Q.   -- you threw that clause in to cover yourself
21  and -- for things that you didn't report --
22         MR. MORRIN:  Objection.  Argumentative.
23  BY MR. RIDINGS:
24  Q.   -- and that you realize you should have.
25  Agree that you did not perform any Romberg testing of

Page 127

1  Mr. Walden with his eyes open?
2  A.   The Romberg test --
3  Q.   Agree --
4  A.   -- is an invalid test.
5  Q.   Did you --
6  A.   There is no such thing.  There's no value in
7  the Romberg test.
8  Q.   So --
9  A.   It's a laughable test.
10  Q.   -- agree or disagree that you did not perform
11  the Romberg test with eyes open?
12  A.   I -- I would never do a Romberg test.  It's --
13  there's no value to a Romberg test in clinical medicine.
14  Q.   Great.  So the simple answer would be, agree.
15  Agree that you did not perform any Dix-Hallpike
16  maneuvers targeting the vestibular system on Mr. Walden?
17  A.   No.  That's not true because the Dix-Hallpike
18  needs to be done with a physical therapist in tow for
19  someone this ill, and that was done in -- in the VNG.
20  Q.   I'm not talking -- all of these questions -- I
21  -- I'm aware you did the VNG.  I'm asking, did you --
22  A.   Because they're done in the VNG and because
23  they're done in a safe environment.  That's where it's
24  appropriate to do it.
25  Q.   What did you do clinically confirm the results

Page 128

1  of the VNG?
2  A.   One does not need to clinically confirm the
3  results of the VNG and for those findings.  I sense
4  you're believing a lot toward Dr. Kriss.
5  Q.   Excuse me?
6  A.   I -- I suspect you're -- you're taking a lot
7  of stock in doctor -- these are Dr. Kriss's opinions
8  that you're -- that you're foisting on the medical
9  community.
10  Q.   Your Honor -- Doctor, I am taking stock in --
11  A.   You're taking --
12  Q.   -- the one neurosurgeon in this case that I'm
13  aware of that actually reviewed medical records you
14  admit are highly relevant to making an informed opinion.
15  A.   One who has documented making weird,
16  outrageous conclusions that have never -- that have been
17  disregarded in legal settings.
18  Q.   Okay.  Tell me which --
19  A.   I will get them to you.
20  Q.   No.  Tell me now.
21  A.   I have the case reports.  I don't have them
22  off the top of my head in terms of workman's comp.  I'll
23  get them to you.
24  Q.   Okay.  Are you familiar -- you know what?  I
25  thought you didn't want to get into the law.  Do you --

Page 129

1  A.   We're not here.  We're talking about valid
2  opinions, and Dr. Kriss's are far from valid in this
3  area.
4  Q.   Are you familiar with the Court of Appeals
5  opinion that was issued in a workers' comp case in which
6  you testified, I believe it was Cepero v. Fabricated
7  Metals Corp?  Are you familiar with that case?
8  A.   No.
9  Q.   Okay.  Your attorney pointed me onto that one.
10  If a Court of Appeals is critical of the opinions of a
11  testifying expert, does that render them unreliable?
12  A.   It depends.  I'd have to see what the setting
13  is.  Dr. Kriss is not unreliable.  He just has certain
14  opinions I think are not valid.
15  Q.   So did you -- aside from the VNG and
16  posturography test, did you do any examinations to
17  confirm the validity of the results?
18  A.   I've already told you.  I felt it was
19  dangerous to do so.  So no, I did not.
20  Q.   Okay.  All right.  I want -- so I'm not
21  entirely -- I want to make sure that I'm clear on what
22  opinions you do intend to offer and not intend to offer,
23  okay?  So I'm going to start with, it's my understanding
24  that you are not offering an opinion addressing any of
25  the following injuries, and I'll go through them one by

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1   one and you let me know if I'm wrong, okay?
2       A.   Okay.
3       Q.   So I -- it's my understanding you are not
4   offering an opinion that Mr. Walden sustained a neck
5   injury?  And let me back up.  Let me be clear.  I'm not
6   asking -- I'm not saying that you are refuting that he
7   sustained that injury or not, but just that your opinion
8   -- you're just not addressing a neck injury one way or
9   the other?
10      A.   Let me just see.
11      Q.   Well, I will tell you, you do reference in
12  your report, in the earlier part --
13      A.   He has an abnormal range of motion in his
14  neck.
15      Q.   Okay.  But is it your opinion that --
16      A.   I restricted my opinions primarily to the
17  neurodegenerative diseases.
18      Q.   Okay.  So do you plan --
19      A.   But -- but does he have a neck problem?
20  Probably.
21      Q.   But do you intend to offer that opinion in
22  this case, that he sustained a neck injury from the
23  August 2020 collision?
24      A.   My read of this, he didn't have a substantive
25  neck injury that required surgery.

Page 131

1       Q.   Okay.  Do you intend to offer any opinions
2   related to hip injuries caused by the August 2020
3   collision?  That's not your area of expertise, that you
4   intend -- correct?
5       A.   I'm -- it's in the record.  He -- he had
6   surgery on that area.
7       Q.   Doctor, that's not my -- just listen to my
8   question, okay?  I'm just asking what you intend to
9   offer an expert opinion on, okay?
10      A.   But he -- he -- obviously, simply from -- from
11  having surgery on that, he has an impairment there.
12      Q.   Doctor, I didn't ask you if he had a hip
13  injury or if he had a hip surgery.  I merely asked you
14  whether you intend to offer medical expert opinion
15  testimony related to a hip injury.
16      A.   If someone -- if someone asks me if he injured
17  his hip, I'm going to say yes.
18      Q.   Okay.  Do you intend to offer an opinion in
19  this case related to any low back injury?
20      A.   Probably not.
21      Q.   Okay.  Same question.  Headaches?
22      A.   I believe he has headaches that made -- made
23  worse by this accident.
24      Q.   And what evidence did you rely on to
25  differentiate the role this accident played versus how

Page 132

1   he was prior to August 2020?
2       A.   I relied on his history.
3       Q.   Okay.  In the event that this accident caused
4   an exacerbation of headaches, would you have expected
5   him to make complaints of headaches in the three years
6   from the time of the accident to the time he saw you?
7       A.   Not necessarily.
8       Q.   Why not?
9       A.   Sometimes, people just don't think they're
10  going to be listened to.
11      Q.   Okay.  What is your understanding of whether
12  -- of Mr. Walden's propensity to seek medical care?
13      A.   I -- I can't comment on that.
14      Q.   Why not?
15      A.   It looks like he goes pretty frequently.
16      Q.   Okay.
17      A.   But -- but why someone doesn't talk about a
18  symptom and another -- you just got to ask them.
19      Q.   So why are you -- you're making that
20  assumption, correct?
21      A.   I'm -- I'm holding that in reserve at this
22  point because I -- I -- obviously, there are lots of
23  things that I don't have fully -- fully -- and this case
24  is not going to trial for a year.  I'm going to be
25  treating him for a long while, so there's going to be

Page 133

1   some new information --
2       Q.   Okay.
3       A.   -- and new perspective.
4           MR. RIDINGS:  Counsel, we have some issues.
5   The deadline --
6           MR. MORRIN:  You want to go off the record?
7           MR. RIDINGS:  No.  I want this on the record.
8           MR. MORRIN:  Okay.  Well --
9           MR. RIDINGS:  I'm getting all kinds of new
10  opinions, opinions that are not included in his
11  report.  Reserving the right to revise my opinion
12  based on records that I haven't reviewed, that I
13  want to review.  We are long past that time, and I
14  want to -- I guess, what I'm asking is, it -- I
15  understand what Dr. Changaris' desires are, but what
16  are your intentions as far as these revised opinions
17  of mister of -- of Dr. Changaris?
18          MR. MORRIN:  Well, I intend to get to the
19  truth.  I think that's what we're here for on this
20  side.  That's what we care about.  I mean, if you --
21  whatever that takes, let's do it.  What do you mean?
22          MS. RIDINGS:  Well, for the record --
23          MR. MORRIN:  What are you talking about?
24          MS. RIDINGS:  -- the records have been
25  available for years.  The prior records have been.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 35 of 54 - Page ID#:
1959
The Deposition of DAVID CHANGARIS, M.D., taken on 06/13/2024

134..137

Page 134

1  It's not something, like -- I understand that he,
2  perhaps, saw him for the first -- for the second
3  time in June, but the records he says he would like
4  to have had and records he said he had asked for
5  have been available for years.
6      MR. RIDINGS:  And he said -- did you provide --
7      MR. MORRIN:  I'd have to look.  Off the top of
8  my head, I assume we provided everything that we've
9  received.  That's our modus operandi.  We don't --
10     MR. RIDINGS:  To Dr. Changaris, you mean?
11     MR. MORRIN:  Yeah.  We don't keep stuff and try
12 to hide it from the other side or try to hide it
13 from experts if that's what your question is.  Now,
14 if you got a question for me, I -- let's figure it
15 out, but I don't --
16     MR. RIDINGS:  There's not a single record
17 predating August 10, 2020, in this stack of records.
18     MR. MORRIN:  Okay.
19     MR. RIDINGS:  And Dr. Changaris has not
20 reviewed a single record predating August 10, 2020.
21 You have had those records because we got them and
22 provided them to you.
23     Did you provide those records to Dr. Changaris?
24     MR. MORRIN:  I would have to back and check,
25 yeah.

Page 135

1      MR. RIDINGS:  Okay.  Do you intend to stick to
2  this report -- or stick to his report, or do you
3  intend to present opinions that have been revised
4  today?
5      MR. MORRIN:  If we need to revise opinions,
6  we're going to revise opinions, but it's --
7      MR. RIDINGS:  The time -- that time has since
8  passed.
9  BY MR. RIDINGS:
10     Q.  All right, Doctor.  Would you -- strike that.
11 If there is -- in the event that the first time that
12 Mr. Walden ever complained of any memory or cognitive
13 issue to any treating medical professional after the
14 August 2020 accident was on January 9, 2023, would that
15 alter the opinions in your report?
16     A.  Not necessarily.
17     Q.  Okay.  If in that first report, the reason --
18 or strike that.  On January 9, 2023, Mr. Walden
19 presented to Dr. Geile with a chief complaint of,
20 "attorney wants a memory workup."  Does that -- or first
21 off, were you aware of that record?
22     A.  I don't recall.
23     Q.  Okay.  Would that have any effect on your
24 opinions or your consideration of this case?
25     A.  I would like to see the results.

Page 136

1      Q.  Agree or disagree that neurologic deficit
2  after traumatic brain injury is maximal immediately
3  after impact and then universally improves with time?
4      A.  No.  I don't agree with that.
5      Q.  Is that consistent -- strike that.
6      A.  By the way, it -- it goes contrary to articles
7  in the -- published in the Journal of Neurosurgery,
8  which is the agent action -- the agent of record for the
9  AANS.
10     Q.  I thought we weren't talking about the AANS.
11     A.  But the -- but the Journal of Neurosurgery --
12     Q.  I just want to go by my rules, Doc.  Let's
13 not talk about AANS.
14     A.  No.  But we're talking about -- we're talking
15 about the Journal of Neurosurgery.  There's an article
16 in there, in 2016, that talks about things progressing,
17 even with a very small, single, isolated --
18     Q.  Are you talking about that Perry meta-
19 analysis?
20     A.  Yeah.
21     Q.  Yeah.  I thought that.  Hey, let me ask you,
22 did you go back, and did you evaluate that analysis?
23     A.  Thoroughly.
24     Q.  Okay.  All right.  Good.  Once.  All right.
25 So I'm going to get back to, what are -- what your

Page 137

1  opinions are.  Are you offering opinion of any right
2  knee injury related to this collision, the August 2020
3  collision?
4      A.  I believe I mentioned that he injured his
5  right knee.
6      Q.  Okay.  You mentioned he reported complaints of
7  it, but I'm -- are you offering a medical expert opinion
8  of a medical knee injury attributable to the August 2020
9  collision?
10     A.  I'm -- I -- if asked, I will render an opinion
11 that he injured his right knee.
12     Q.  Same question.  Left ankle?
13     A.  Because -- because it's --
14     Q.  Is that based on his report of --
15     A.  No.  It's based -- just looking at the x-ray
16 report.
17     Q.  Okay.
18     A.  That's listed here.
19     Q.  What's the current status of that injury?
20     A.  I -- I don't have a comment on that.
21     Q.  You don't intend to --
22     A.  Not yet.
23     Q.  Okay.
24     A.  I don't know what people want from me.
25     Q.  I'm --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 36 of 54   Page ID#: 1960
The Deposition of DAVID CHANGARIS, M.D., taken on March 19, 2024

138..141

Page 138

1    A.   So when people are clear, I'll give them.
2    Q.   Okay.  Same question.  Left ankle?
3    A.   Do I see anything on the left ankle here?
4  Right knee, chest, left hand.  I -- I don't see anything
5  about the left ankle.
6    Q.   So your answer is you don't intend to offer an
7  opinion on that?
8    A.   If I don't have -- again, this is a situation
9  where I'm -- I'm going to stay -- stick with my record.
10  It's not -- it's not an area of primary focus here, so
11  I'm -- I'm going to say that I don't have evidence of an
12  injury to the -- to the ankle.
13    Q.   Okay.  Left foot?
14    A.   Left foot.
15    Q.   No.  I'm sorry.  New question.  Same question,
16  but left -- the topic being left foot.
17    A.   I -- I don't think I have any -- any reference
18  to any radiologic findings in his feet.
19    Q.   Any sleep complications attributable to the
20  August 2020 collision in your --
21    A.   I -- I did not --
22    Q.   -- opinion?
23    A.   -- I -- I did not review that symptom,
24  complication.
25    Q.   Okay.  Vision complications attributable to

Page 139

1  the August 2020 collision?
2    A.   I think he has some, yes.
3    Q.   Okay.  And what is that based on?
4    A.   The VNG.
5    Q.   Okay.  And what is your understanding of his
6  vision issues?
7    A.   I -- I will absolutely need more information,
8  but he's not tracking well.  He's not able to focus on
9  things.
10    Q.   What is your understanding of -- or is it both
11  eyes?
12    A.   The -- the test only picks up joint activity.
13    Q.   Okay.  So specifically then, is your opinion
14  on vision complications limited to tracking?
15    A.   Let's see.  There's a -- summarize the VNG
16  findings, or a summarize of VNG findings.  Saccades are
17  there.  Yes.
18    Q.   Your opinion on vision complications is
19  strictly limited to tracking?
20    A.   Saccades and -- and --
21    Q.   What is a saccade?  Never mind.  I'll look it
22  up.  Do you have any opinions on hearing complications
23  attributable to the 2020 collision?
24    A.   No.
25    Q.   What is your understanding of Mr. Walden's

Page 140

1  vision issues or -- if you will, prior to this
2  collision?
3    A.   Don't have very much information.
4    Q.   Okay.  Would that be important information to
5  have?
6    A.   Yeah.  But may -- may not be fully relevant
7  because what happens when you can't move your eyes in a
8  conjugate way and -- and a reasonable speed is that the
9  whole system falls apart --
10    Q.   Would --
11    A.   -- so -- so you can have lots of problems that
12  you can't fix from that point forward.
13    Q.   Would you expect a severe TBI to result in
14  vision complications?
15    A.   It could.
16    Q.   Okay.
17    A.   It could.
18    Q.   Is it likely?
19    A.   Again, this -- this is ten years ago.
20    Q.   Okay.
21    A.   More than ten years ago, so it -- that --
22  that's -- the -- the brain does heal.
23    Q.   If there were reports in the records of vision
24  complications following this -- following the 2012 TBI,
25  that would tend to show that it -- they were --

Page 141

1    A.   I'm sure that -- that there'll be something
2  there, but we have to ask the patient whether or not
3  this accident has caused increased difficulty.
4    Q.   Did you find this patient -- you said, I
5  believe, marginally reliable though, correct?
6    A.   Yes.  Yes.
7    Q.   So wouldn't it -- when you have a marginally
8  reliable patient, then the records are going to be
9  critical evidence?
10    A.   Yeah.  I've -- I've made that clear that if I
11  -- if I have more records and something contradicts,
12  we'll put this on the record immediately.
13    Q.   But didn't the -- your opinion of the marginal
14  reliability, why didn't that raise a red flag to you
15  that, hey, I need to go get these records before I can
16  -- before I'm willing to --
17    A.   Because --
18    Q.   -- put my reputation on the line and make
19  these opinions and attribute all of these injuries as
20  being caused by the -- exclusively by the 2020
21  collision?
22    A.   In part, because I -- I thought he was being
23  honest on this issue.  That's my -- my clinical
24  judgment.
25    Q.   Okay.  You thought -- did you document -- we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1  know what your report says.  You agree your report did
2  not document any concerns you had as to his reliability
3  in your report, agreed?
4      A.   Yes.
5      Q.   And you did not state that he was only
6  marginally reliable in your report, agreed?
7      A.   That's true.
8      Q.   And in fact, you state in your report that --
9  I believe every one of your opinions is based, in large
10 part, on patient history?
11     A.   Correct.  Because I thought that -- that parts
12 were reliable enough to do that --
13     Q.   Okay.
14     A.   -- within a reasonable medical probability.
15     Q.   Okay.  Are you aware of any evidence -- no.
16 Strike that.  What evidence caused you to have any
17 concerns about his reliability?
18     A.   His brain injury.
19     Q.   Okay.  Anything else?
20     A.   Well, his substance abuse history.
21     Q.   Okay.  Did you -- wouldn't that have been
22 important to document in your report?
23     A.   It wasn't fully presented.  Again, I -- I --
24 when it comes to substance abuse, I really want to have
25 a lot of data before I start talking about it in a legal

Page 143

1  document.
2      Q.   Okay.  Let's talk about your opinions you
3  intend to offer.  One, "substantial" -- am I -- make
4  sure I'm reading this right.  "Substantial mild
5  traumatic brain injury."  Did I read that right?
6      A.   Yes.  Mild does not mean insignificant.
7      Q.   Okay.  What does substantial mean?
8      A.   It means that it's probably going to get
9  worse, in my mind.
10     Q.   Not in your mind.  In medical -- medically?
11     A.   Well -- well, it's not clearly defined.  It's
12 my word, okay?  And for me, I mean, I think this is
13 going to get worse.
14     Q.   What would the medical -- because all of your
15 opinions are supposed to be on a reasonable degree of
16 medical probability and also accepted within the
17 community of your peers.  What would -- under that
18 standard, what would this diagnosis be?
19     A.   Just what I wrote.  I -- I feel this
20 communicates what I believe.
21     Q.   Substantial mild traumatic brain injury?
22     A.   This -- this is a significant mild traumatic
23 brain injury from this event --
24     Q.   Okay.
25     A.   -- and it's contributing to -- it's likely to

Page 144

1  contribute to rapid progression of his neurological
2  problems.
3      Q.   And that's based entirely on the history that
4  Mr. Walden provided?
5      A.   Yes.
6      Q.   Your physical exam?
7      A.   Yes.  And the records that I had available,
8  which have been marginal on findings.
9      Q.   Okay.  And then the two tests, VNG and
10 posturography?
11     A.   Correct.
12     Q.   Okay.  Anything else?
13     A.   Pretty much, that's it.
14     Q.   Okay.  And the medical records really didn't
15 play any role in that, correct?
16     A.   Oh.  Medical records play a lot of role.
17     Q.   What role?
18     A.   I -- I knew that he had a prior brain injury,
19 and I knew that that made this likely to be more severe
20 for progression.
21     Q.   Okay.  All right.  What about -- is that the
22 only role they played, though?
23     A.   That's a big one.
24     Q.   Okay.
25     A.   Besides that, Mrs. Lincoln, how did you like

Page 145

1  the play?
2      Q.   All right.  So in your report, where does it
3  say that you obtained information of the prior TBI from
4  medical records, and that that's what you were relying
5  on?
6      A.   It doesn't.
7      Q.   Okay.  And in fact, it says something quite
8  different, doesn't it?
9      A.   No.  It -- it just says, TBI present, and then
10 I list all the different things.  And apparently, I
11 mean, even you found it in -- in the old medical
12 records.
13     Q.   It just says, TBI present?
14     A.   No.  The history of, or something like that.
15     Q.   No?  Okay.  All right.  The way I'm reading
16 it, and you correct me if I'm wrong, and I'm on Page 1,
17 first paragraph, second sentence, "He had a prior
18 accident with fracture of the left hip with
19 patient-reported TBI"?
20     A.   That's the -- all that I had at that point.
21     Q.   Okay.  Not medical records.  Patient-reported?
22     A.   I can't -- I can't say that I didn't know from
23 the records that there was other corroboration.
24     Q.   I mean, if that's the way you -- never mind.
25     A.   I even make a point that I don't -- I had no

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 38 of 54  Page ID#: 1962
The Deposition of DAVID CHANGARIS, M.D., taken on July 19, 2024

146..149

Page 146

1  records of this accident.  I haven't reviewed them.
2      Q.  Well, you did have some, though.  You just
3  didn't review them objectively?
4      A.  When I wrote that opinion, I -- I had not
5  rendered -- done a thorough evaluation of it.  Okay.
6      Q.  Okay.  But you agree with that now?  Because
7  earlier, you told me you had reviewed them; you had
8  reviewed them objectively, and that that would be --
9      A.  Yeah.  I -- I -- you're -- you're playing
10  games here.  Let's -- let's -- I stand by what I've said
11  through this whole thing.  You're trying to catch me in
12  some -- some contradictions.
13      Q.  I am trying -- I'm not trying to catch you in
14  contradictions.  I'm trying to understand the truth,
15  Doctor.  As Mr. Morrin said, I'm just concerned about
16  the truth here, so when -- my concern is that when you
17  give me one statement early on, and then later, you
18  contradict it, I need to determine what's what.
19      A.  Well, you can bring -- bring that out, but --
20  and -- and quite frankly, this -- it's been such an
21  argumentative interaction between us, it's just been
22  very confusing to me to be consistent.
23      Q.  Well, I'm -- that was not my intent, and
24  I'm --
25      A.  Well, you -- you've --

Page 147

1      Q.  -- I apologize.
2      A.  You've succeeded --
3      Q.  Well, I sincerely apologize, Doctor.
4      A.  -- beyond -- beyond your wildest expectations.
5      Q.  Because I'm -- I will -- I appreciate your
6  time, and my experience has not been that, so I'm -- I
7  apologize that you felt that way.  All right.  So I have
8  -- I thought that you had diagnosed him with Parkinson's
9  disease, but you're telling me you have not made that
10  diagnosis, correct?
11      A.  Very clearly.
12      Q.  Okay.  But you have diagnosed him with onset
13  of Parkinson's disease?
14      A.  No.  I said that he has Parkinsonism that
15  falls within the path leading towards Parkinson's
16  disease.
17      Q.  What is Parkinsonism?  The medical definition?
18      A.  There are seven clinical signs of Parkinson's
19  disease, classically.
20      Q.  Okay.
21      A.  All of which are now being ignored by the
22  current bunch of neurologists to one degree or another.
23      Q.  What does that mean?
24      A.  Just what I said.
25      Q.  So --

Page 148

1      A.  So the diagnosis of Parkinson's disease is
2  really difficult right now to find consistency, but ten
3  years ago, it was pretty consistent.  If you had two of
4  the seven clinical symptoms, you had Parkinson's
5  disease.
6      Q.  What were the seven symptoms?
7      A.  I -- I can't remember them offhand, but -- but
8  one of them is bradykinesia, and the other is -- the
9  three things that Dr. Kriss talked about fall within the
10  -- the seven clinical signs of -- of Parkinson's
11  disease, okay?  And -- and if you had any two of those,
12  then you had Parkinson's disease.  One, you had
13  Parkinson's syndrome or Parkinson's -- Parkinson's --
14  Parkinsonism.
15      Q.  How many of those seven does Mr. Walden -- did
16  Mr. Walden have at --
17      A.  One.  One.
18      Q.  And that was which?
19      A.  Rigidity.
20      Q.  Okay.  And that -- the rigidity is based on
21  the range of motion in his shoulder?
22      A.  Part of it.  And -- and subsequently, his --
23  his extended wrist rotation.
24      Q.  What do you mean subsequently?  Like, from
25  subsequent --

Page 149

1      A.  In other words, he -- he -- I think he's
2  worsened, even in the last six months.
3      Q.  All right.  And I'm only interested in what he
4  had -- or not -- I'm only asking of what symptoms he --
5  signs he had on November 17, '23.
6      A.  I know.  But -- but I can't -- I can't ignore
7  the fact that I examined him --
8      Q.  Okay.
9      A.  -- in June, and he showed worsening.
10      Q.  But just answer my question, Doctor.  Please,
11  just answer my question.  Is it correct that he only had
12  one of these seven signs?  Or no, you said it was just
13  the one.  Rigidity.  But the only rigidity that you
14  observed on November 17, 2023, was related to the range
15  of motion in his shoulder?
16      A.  Pretty much.
17      Q.  Okay.  Are you aware if he had had any prior
18  shoulder injuries?
19      A.  Oh, yeah.  He has had lots of shoulder
20  injuries.
21      Q.  Okay.  Well, wouldn't that cause rigidity of
22  the shoulder?  Injury?
23      A.  It can, but there's certain types that make me
24  think it's more neurological.
25      Q.  What?  Explain that to me.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA Doc #: 188-1 Filed: 09/03/24 Page: 39 of 54 - Page ID#: 1963
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024

150..153

Page 150

1    A.   It has to do with the feel and look of the --
2  of the shoulder.
3    Q.   Just the -- your gut?
4    A.   It's more training.  I -- I do a lot of
5  examinations.
6    Q.   Just your gut feel?
7    A.   No.  It's not gut.  It's -- it's training on
8  what -- what rigidity is.  It more has to do with
9  identifying the beginning of agonist-antagonist
10 simultaneous interaction.
11   Q.   What prior shoulder issues did he have that
12 you were aware of?
13   A.   They're -- they're here.  Let's see, what --
14 I'm -- I'm saying that he had --
15   Q.   I'm sorry.  You said you were aware that he
16 had had prior shoulder injuries.  Lots of prior shoulder
17 injuries?
18   A.   My recollection is, is that he -- on -- on
19 these things here, that he had shoulder problems.
20   Q.   Okay.  What --
21   A.   I'd have to dust them off.
22   Q.   Well, wasn't that -- did you account for them,
23 and did you consider those and take them into account in
24 giving this diagnosis?
25   A.   Yes.  Yes.  Yes.

Page 151

1    Q.   All right.  Then what -- tell me, what was
2  your understanding?
3    A.   I went through it seven months ago, more
4  thoroughly, when I had the stack of papers and this, and
5  I haven't done it since then --
6    Q.   But did you --
7    A.   -- so I'm going to -- I'm going to have to go
8  through it, but he now has progression in the rigidity,
9  so whatever it is I had back in November, thoughts that
10 he had rigidity back then, is more than corroborated by
11 his progression.
12   Q.   But you didn't even note the prior TBI and
13 brain surgery?  You didn't make -- didn't even consider
14 that?
15   A.   I mentioned that he had a TBI, and that was
16 considered.
17   Q.   Okay.  All right.  This onset of Parkinson's
18 disease, that is, the Parkinsonism diagnosis, is that
19 based on the rigidity, one, and essentially the --
20 you're basing that on this Perry -- Dr. Perry
21 meta-analysis?  Is --
22   A.   No.  Dr. Perry didn't -- didn't define the
23 components of -- of the clinical conditions in his
24 articles that he was predicting.  He just said that the
25 definition of the disease for Parkinson's disease,

Page 152

1  Alzheimer's disease, and ALS, as -- as well as affective
2  disorders, which is basically anxiety or -- or
3  increased --
4    Q.   Well, those are three different things, right?
5  Or those are very different?
6    A.   No.  They're not.
7    Q.   How so?
8    A.   They all begin in the same part of the brain.
9  They -- they have lots of different things later on --
10   Q.   Well, they're --
11   A.   -- toward the end, but early on, they're very
12 much the same.
13   Q.   Parkinson's disease versus affective disorder.
14 One is far more significant than the other, agreed?
15   A.   It -- it depends on degree.  If you're so
16 anxious that you can't tie your shoelaces, then that's
17 pretty significant.  You can't work, and that happens.
18   Q.   But we're -- okay.  Strike that.  All right.
19 So we have the substantial mild traumatic brain
20 disorder, Parkinsonism, onset of Parkinson's disease.
21 Also have that one of your opinions is vertigo of
22 central and peripheral origin, agreed?
23   A.   Let me just see.  I want to make absolutely
24 sure.  Sometimes, it's one or the other.  Where's my --
25   Q.   It's under "Impression" on Page 6.

Page 153

1    A.   If I wrote it, then I'll stand by it, but he
2  has --
3    Q.   Page 6.
4    A.   Okay.  That's true.  That's what I wrote.
5  Let's see if I really stand by it.  Let me see this
6  report here.
7    Q.   Doctor, just, you know or you don't.  You saw
8  him less than a month ago.
9    A.   Look, I'm -- I am trying to be absolutely
10 clear on the diagnosis for you.  Can you -- I've been
11 patient with you looking through things.  Give me a
12 moment.  I'm not trying to waste your time.  I'm trying
13 to be thorough.  Okay.  Yes.  Yeah.  He has both.
14   Q.   And you base that exclusively on the VNG and
15 posturography test, correct?
16   A.   Yes.
17   Q.   And you -- it's also your opinion that he is
18 unable to return to any gainful employment.
19 Essentially, that he's totally disabled, correct?
20   A.   At this point, yes.
21   Q.   Okay.  What is your -- and that's attributable
22 exclusively to the August 2020 accident, agree?
23   A.   I think that that's the -- yes.
24   Q.   Okay.
25   A.   But within the eggshell perspective, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 40 of 54 - Page ID#:
1964
The Deposition of DAVID CHANGARIS, M.D., taken August 16, 2024
154..157

Page 154

1    Q.   Okay.  And it is your understanding that he
2 was working full-time as a bricklayer on August 19 or
3 thereabouts of 2020, correct?
4    A.   And that he can't go back to it.
5    Q.   Okay.  And to the extent that that is -- let's
6 strike that.  In the event that Mr. Walden has been
7 disabled since approximately 2014 -- or say, five years
8 or more preceding this accident, and not been employed,
9 would that render this disability opinion of yours
10 unreliable?
11    A.   Not without something, how shall I say,
12 contradicting what the patient told me.  Which, that he
13 was engaged in -- in pretty active employment at the
14 time of the accident.
15    Q.   Okay.  But if there were records indicating
16 that he had been totally disabled or at least found to
17 be?
18    A.   It depends on his work history.
19    Q.   Okay.  For example, if he had been granted
20 total Social Security Disability?
21    A.   Sometimes people return to work.
22    Q.   All right.  Has he returned to work at all
23 since this accident?
24    A.   I don't know.
25    Q.   Have you seen any records suggesting that he

Page 155

1 has?
2    A.   No.
3    Q.   Okay.  Would it -- would he be capable of
4 utilizing a metal grinder?
5    A.   I would doubt it.
6    Q.   Okay.  And in the event he had?
7    A.   He's taking his life in his hands --
8    Q.   Okay.
9    A.   -- at this point.  That would be the worst
10 thing in the world for him to do.
11    Q.   Okay.
12    A.   A vibrating instrument, that's a no-no.  Bad
13 judgment is part of brain injuries.
14    Q.   What is your understanding of how this 2020
15 collision --
16    A.   I don't have a detailed understanding of it.
17    Q.   Okay.  Well, how can you make a determination
18 of causation?
19    A.   I -- I listen to the patient based upon his
20 symptoms after the accident.
21    Q.   So the -- you mean symptoms three years after
22 the accident?
23    A.   What -- his recollection of the events, yes.
24    Q.   Okay.  Events or symptoms?
25    A.   Both.

Page 156

1    Q.   Okay.  So --
2    A.   The -- the -- was he made worse by it, what
3 happened, and things like that.
4    Q.   What did he tell you happened?
5    A.   It's my understanding that he told me that he
6 was made worse by this accident.
7    Q.   Okay.  And what did he tell you his symptoms
8 were in the three years prior to the accident?
9    A.   I -- I'd have to --
10    Q.   Is it what you've documented?
11    A.   It's what I've documented.
12    Q.   Okay.  And if that history is inconsistent
13 with the actual medical records, then your -- that would
14 render your opinion unreliable?
15    A.   No.  I'd have to see what -- or it could
16 change it.  I mean, I'd have to see what they said.
17    Q.   Okay.  You didn't review the police report in
18 here?
19    A.   No.
20    Q.   What type -- do you have an understanding
21 of --
22    A.   I don't have --
23    Q.   -- how the brain injury occurred?  Was it from
24 the collision, or was it from a subsequent event, or --
25    A.   I -- I got the impression that it was

Page 157

1 substantial enough to cause a brain injury.
2    Q.   Okay.  Did you -- I believe I saw his -- that
3 you were provided his -- Mr. Walden's deposition
4 testimony, and that may have been after this.  But have
5 you reviewed that?
6    A.   I did.  If I got it, I reviewed it.
7    Q.   Okay.
8    A.   I -- at this point, my -- as I said, I -- I'd
9 have to review it again to comment on it.
10    Q.   Okay.  Do you have any opinions on left arm
11 numbness specifically related to the August 2020
12 collision?
13    A.   Not at this time.
14    Q.   Do you agree that VNG does not define
15 traumatic brain injury without any other medical
16 evidence and without any clinical history?
17    A.   That's absurd.  You -- you don't do the VNG
18 without clinical evidence and clinical history, number
19 one.  Number two, the VNG diagnoses dysfunction of
20 pathways.  How you interpret it is based on -- on the
21 history.
22    Q.   Okay.  Then what -- all right.  What clinical
23 evidence were you relying on to make you perform the
24 VNG?
25    A.   Probably his dizziness and his headaches and



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1  his -- and his anxiety.
2      Q.   Just what he reported.
3      A.   Yeah.
4      Q.   Okay.  And would those have been present at
5  some point in the three years prior -- what's your
6  understanding if those were present at all three
7  years --
8      A.   Well, if he's willing to talk about them
9  through somebody, then probably get -- get recorded.
10  But if for some reason he feels people aren't
11  sympathetic to it, or he doesn't understand that they're
12  symptoms of a brain injury, then he might not talk about
13  it to people.
14      Q.   Okay.  One of the questionnaires is, you just
15  basically -- you're prompting him.  It's everything --
16  you're asking him about dizziness, correct?
17      A.   These are validated questionnaires.
18      Q.   Okay.
19      A.   For the purposes intended.
20      Q.   Okay.  Are they always reliable?
21      A.   Nothing is 100 percent reliable.
22      Q.   Okay.  What if you had to, for instance, say
23  -- strike that.  I'll save that for trial.  All right.
24  Can you point me to any peer-reviewed articles, reports,
25  or studies confirming VNG and posturography as valid

Page 159

1  tests for diagnosing traumatic brain injury?
2      A.   Yes.
3      Q.   Okay.  Tell me.
4      A.   It's in my book.  Just read about it.
5      Q.   Okay.  Any others?
6      A.   I mean, no.  The -- I gave all the references
7  in there.  There are references on every freaking page.
8      Q.   Well, I'm asking you to point me to any
9  others.
10      A.   I -- I'd have to get -- if you want a precise
11  citation, I'll be glad to get you that list.
12      Q.   At 1,000, $1,500 an hour?
13      A.   Yeah.  That would be about right.
14      Q.   No.  I'm asking you today if you -- you can't
15  point me to them today, correct?
16      A.   I point to it because they're listed in my
17  book.
18      Q.   How much is your book?  You said it was free
19  on Kindle?
20      A.   On Kindle, yeah.
21      Q.   Perfect.  Before we leave, I'll pull it up.
22      A.   There are lots and lots of references for
23  that.
24      Q.   Okay.  Can you identify any peer-reviewed
25  articles, reports, or studies confirming VNG and

Page 160

1  posturography as valid tests for diagnosing traumatic
2  brain injury more than one year after the injury-
3  inducing event?
4      A.   Let's -- let's look at this.  It is valid for
5  diagnosing certain kinds of brain dysfunction at one
6  year, two years, three years, ten years, okay?
7      Q.   Okay.
8      A.   Whenever.  It picks up a brain dysfunction.
9  And sometimes, if you can -- you're going to find it go
10  all the way back to brain injuries many, many years
11  before, okay?  And so the question is, you know, does
12  somebody do a codified thing on that?  No.  But it's
13  valid for determining whether or not you have a -- a
14  disorder.  And -- and in this case, he has a disorder in
15  tracking, and he has a disorder in -- in focusing.  And
16  then he has some middle ear problems, okay?
17      Q.   How do we distinguish that from the prior --
18      A.   By his history.
19      Q.   Okay.  As we sit here today, are you able to
20  explain --
21      A.   The -- the VNG would not be able to
22  differentiate a problem that happened ten years ago
23  versus now.
24      Q.   Not talking about the test.  I get that, and I
25  appreciate that.  I'm talking about as we sit here

Page 161

1  today, how can you -- how do you intend to distinguish
2  what injuries were caused by the 2020 accident versus
3  what was preexisting?
4      A.   Why, the patient history.
5      Q.   Meaning medical records, or meaning what he
6  told you?
7      A.   Well, the -- I -- I like medical records.
8  That's important.  That -- that's part of the picture.
9  But patient history is very important.
10      Q.   Okay.  Okay.  Well, can you identify -- you
11  remember the last question I asked you about
12  peer-reviewed articles?  For peer-reviewed articles or
13  reports that confirm the validity of these tests for
14  diagnosing traumatic brain injury more than one year
15  after the accident?
16      A.   I do -- I do want to make a little subtle
17  point here.  It's really not designed to diagnose
18  traumatic brain injury.  It's designed to diagnose
19  vertigo of central origin.
20      Q.   Okay.
21      A.   Which means you have a damage to the brain
22  itself, which means a brain injury.
23      Q.   Okay.
24      A.   So it's a technical point, but it's valid.
25  So --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 42 of 54 - Page ID#:
1966
The Deposition of DAVID CHANGARIS, M.D., taken on JULY 18, 2024

162..165

Page 162

1    Q.    Okay.
2    A.    -- if you just turn around and say, "Look,
3    it's not specifically for a brain injury," that's true.
4    Because you have to interpret the findings of vertigo of
5    central origin in the context of the history.
6    Q.    Then -- all right.
7    A.    Just like if --
8    Q.    Are there any peer-reviewed articles, reports,
9    or studies that confirm the validity of these tests?
10   A.    For -- for brain injuries?  For -- for a
11   dysfunctional brain beyond one year?  Yeah.  Lots.
12   Q.    Okay.
13   A.    If -- these things usually last far beyond one
14   year.
15   Q.    Okay.  What are they?  What are those
16   peer-reviewed studies?
17   A.    The -- you'd have to -- if you're looking just
18   for -- for --
19   Q.    In your book?
20   A.    In the book, it's -- there are -- this is 178
21   pages of -- of -- and a third of it's references.
22   Q.    Agree or disagree that it is generally
23   accepted in the neurologic and neurological community
24   that VNG and posturography tests -- strike that.  Is it
25   accepted in your community that VNG and posturography

Page 163

1    tests are reliable for diagnosing traumatic brain
2    injuries?
3    A.    In my opinion, yes.
4    Q.    Okay.  Can you identify any neurosurgeons in
5    Kentucky that rely on these tests to diagnose brain
6    injuries, other than yourself?
7    A.    I -- I haven't found anyone that doesn't
8    accept it.
9    Q.    Can you -- that wasn't my question.
10   A.    Well, my partner thinks they're valid.
11   Q.    Who's your partner?
12   A.    Nazar, Greg Nazar.
13   Q.    Okay.  And --
14   A.    And -- and when I present it to my
15   neurosurgical community, my residency program, it -- it
16   seems to be generally accepted as a valid.  Now,
17   remember, this is mild traumatic brain injury.  And this
18   is not the stuff that most neurosurgeons treat.  Most
19   neurosurgeons treat moderate to severe brain injury.  So
20   they -- so they don't have a lot of experience with mild
21   traumatic brain injury.
22   Q.    You reference Daubert, agreed?
23   A.    Yeah.
24   Q.    You're somewhat familiar with Daubert?
25   A.    Yes.

Page 164

1    Q.    And one of the standards is whether a practice
2    is accepted in the -- generally accepted in the
3    scientific community.
4    A.    If -- if you want to know the -- the absolute
5    issue --
6    Q.    I just want to know the answers to my
7    questions.
8    A.    Well, this has been subjected to a Daubert,
9    this very issue.
10   Q.    Okay.  In what case?
11   A.    In this workman's comp case.
12   Q.    Which workman's comp case?
13   A.    Lima versus something or other.
14   Q.    Lima?
15   A.    L-I-M-A.  I -- I'll get you that.
16   Q.    Well, I don't -- when you said you'll get it
17   to me, I worry that you're -- I'm going to get a bill
18   for thousands of dollars and --
19   A.    No.  No.  No, no, no, no.  If I'm just going
20   to --
21   Q.    Is that a Kentucky workers' comp case?
22   A.    Yes.
23   Q.    And it's one you're testifying in?
24   A.    Oh, I've already testified.  It's already been
25   through.

Page 165

1    Q.    Was it -- and it was a Daubert issue?
2    A.    They -- they -- the defense tried to Daubert
3    the use of the VNG, and it -- it stood the -- and there
4    are three other cases that supported it.
5    Q.    What, three other Kentucky cases?
6    A.    Yeah.
7    Q.    What other -- what cases were those?
8    A.    I'll tell you what I'll do.  I'll -- I will
9    get -- if you give me your e-mail, I'll send you a link
10   that you can download these cases.
11   Q.    Okay.  Wonderful.  You --
12   A.    Just give me your e-mail.
13   Q.    All right.
14         MS. RIDINGS:  Do you have a card with you?
15         MR. RIDINGS:  No.
16   BY MR. RIDINGS:
17   Q.    All right.  Can you identify any neurosurgeons
18   or neurologists in Kentucky that rely on these tests to
19   diagnose brain injuries?
20   A.    I -- I can't.  In particular, because very few
21   of them actually do mild traumatic brain injury work.
22   Q.    All right.  Can you --
23   A.    But -- but there's a -- a clinic in town that
24   uses the same test to diagnose brain injuries all the
25   time.  And -- and technically --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 43 of 54 - Page ID#: 1967
The Deposition of DAVID CHANGARIS, M.D., taken on July 18, 2024

166..169

Page 166

1   Q.   What type of clinic?
2   A.   It's a pain clinic in town.
3   Q.   Are they doctors or --
4   A.   Yeah.  They're doctors.
5   Q.   What was it?
6   A.   Kentucky Pain, I think has a -- the very same
7   piece of equipment that I use.
8   Q.   All right.  Can you identify any neurologists
9   or neurosurgeons in the United States that rely on these
10  tests to diagnose brain injuries?
11  A.   Yes.
12  Q.   Okay.  Tell me.
13  A.   Well, Dr. Newman is the one who interprets the
14  VNGs.  He's a neurologist.
15  Q.   Okay.  That's your associate who you send to
16  interpret your VNGs?
17  A.   Yeah.  Yeah.  And I think there's one -- in
18  fact, I think Dr. Frank accepts it here in town.
19  Q.   What's Dr. Frank?  What type of doctor?
20  A.   He's a neurologist.
21  Q.   Okay.
22  A.   I -- I really haven't found anyone not -- not
23  to accept it.  It's just that -- that it's just a
24  familiarity thing.  And -- and they -- they don't
25  necessarily do the test themselves.  And they're not

Page 167

1   really trained in trauma, not neurologists.  And
2   neurosurgeons don't really treat mild traumatic brain
3   injury because they -- they're too busy seeing the
4   hospital.  So it's kind of a -- a new area.  And -- and
5   that's why I submitted this to the board because the --
6   I think we need to raise consciousness about this.  It's
7   a very important issue.
8   Q.   But with the -- outside of your book, you
9   can't cite me to a single scientific or scholarly
10  article that supports this contention?
11  A.   Oh, no.  There are lots.  I can give you
12  hundreds.
13  Q.   And that are peer reviewed?
14  A.   Most of them are peer reviewed.
15  Q.   And just, they're in your book?
16  A.   They're in my book.
17  Q.   All right.  You know --
18  A.   We're -- we're kind of late here.  And I
19  really --
20  Q.   I'm almost done.  I'm getting close, okay?
21  You don't think much of chiropractic care in terms of
22  for this type of injury, agreed?
23  A.   It depends on what you're treating.
24  Q.   Like chiropractors -- render under
25  chiropractor -- I forgot what your quote was.  It was a

Page 168

1   good one.  I liked it.
2   A.   I -- I think chiropractors have a place, and
3   they -- and they're very good at what they do.  But
4   unless they have specialty training and things
5   neurological, they -- they probably shouldn't be messing
6   with the brain injury.
7   Q.   Do you agree that Mr. Walden doesn't need any
8   chiropractic care at this point in his --
9   A.   No.  I think -- actually, I think, to the
10  right chiropractor, it'd be better than getting nothing.
11  Q.   Okay.  All right.  You told me you were
12  thoroughly evaluated and were very familiar with this
13  Perry meta-analysis.  And I would assume -- Dr. Perry
14  meta-analysis, correct?
15  A.   Yes.
16  Q.   And you cite it quite frequently in your
17  opinions?
18  A.   I think it was sentinel for me in the 2016
19  article.
20  Q.   Because --
21  A.   And plus, there are four or five other
22  articles that have supported it since then.
23  Q.   And the fact of the matter is, in the great
24  majority of cases that you testify in, you opine that
25  your -- that the client has suffered -- or has

Page 169

1   Parkinsonism, correct?
2   A.   I don't -- I'm not -- I am called to testify
3   probably in less than five percent of the cases.
4   Q.   Your reports --
5   A.   My -- my -- but even my reports --
6   Q.   -- give that opinion?
7   A.   -- but I'm -- but I'm -- I'm called to even
8   render that in less than five percent of the patients
9   that I -- I probably make this diagnosis in less than
10  ten, 20 percent of the patients that I see.  And usually
11  late.  It's usually after three or four years.
12  Q.   How many total studies did Dr. Perry review in
13  connection with this meta-analysis?
14  A.   I'd have to review the -- the technical stuff.
15  Q.   Okay.
16  A.   Just a -- just the conclusions I -- I carry
17  with me.  If you want me to defend it, I can -- I think
18  that's another area.  It's a wonderful article.
19  Q.   Would you agree that the subjects -- the
20  patients that were part of this study, that 67,000 of --
21  or strike that.  Do you agree that there were 72,000
22  patients that were --
23  A.   It's been so long since I've looked at it.
24  Q.   Does that sound about right?
25  A.   It -- it was called a meta-analysis, which

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 44 of 54 - Page ID#: 1968
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024

170..173

Page 170

1   means the -- it was the review of everything that had
2   ever been done in -- in traumatic brain injury at -- at
3   that point.
4       Q.   Okay.  And 92 percent of the patients in this
5   meta-analysis came from one study out of Denmark.  Is
6   that -- did you dive that deep into the study?
7       A.   I'm not surprised.
8       Q.   Okay.
9       A.   Denmark has been a leader on brain injury.
10  They've, like, got the best data.
11      Q.   Okay.  And --
12      A.   By the way, they -- they don't have a PI
13  system in Denmark.
14      Q.   What did the -- what were the conclusions from
15  this Danish study of which 92 percent of the study has
16  been made up of?
17      A.   I -- I don't -- I don't carry that with me.
18      Q.   Okay.  Well, how --
19      A.   The part -- the part that I carry with me is
20  -- is the conclusions that there is a -- a correlation
21  between having a -- a single injury and -- and having
22  Parkinson's disease, clinically.
23      Q.   Is it just a statistical correlation?
24      A.   It is a statistical correlation.
25      Q.   Okay.  And that's it, though?

Page 171

1       A.   Well, it's -- it's an important --
2       Q.   Okay.  All right.  You would agree the
3   statistical correlation that --
4       A.   That it has been validated by other studies.
5       Q.   Okay.
6       A.   Subsequently.
7       Q.   We've all heard the study of -- the statistics
8   show that crime goes up in the summer.  Ice cream sales
9   go up in the summer --
10      A.   This --
11      Q.   -- therefore ice cream causes increase in
12  crime?
13      A.   -- I'm not -- I'm not going to argue
14  statistics.
15      Q.   Okay.  All right.
16      A.   If you want to argue statistics, I've had
17  graduate-level training in statistical regression
18  analysis.
19      Q.   I don't want to.  But I'm -- I do want to ask
20  you about the underlying study, the Danish study that
21  was 92 percent.
22      A.   I'm not prepared to do -- to -- to dive that
23  deep.  I'm just saying that the clinical correlates are
24  solid.  The outcome correlates.
25      Q.   Okay.

Page 172

1       A.   And correlates to that -- to future
2   impairments.
3       Q.   All right.  Then assume a hypothetical.  That
4   if this Danish study determined -- concluded that
5   postural instability as part of the diagnosis of
6   Parkinson's -- because patients with Parkinson's disease
7   fall a lot?
8       A.   Listen, you are cutting hairs here.
9       Q.   I'm not, Doctor.  I'm asking -- that was part
10  of the study.
11      A.   Look, I'm not going there.
12      Q.   Because you did -- do you disagree that that
13  was the conclusion of the Danish study?
14      A.   I -- I don't disagree.  I'm saying you're
15  trying to interpret, put a value to it that I may not
16  agree to.  Without having read it.
17      Q.   That --
18      A.   You're -- you're -- it's like quoting the
19  Bible.  You're -- you're doing a selective exegesis just
20  to prove your point.
21      Q.   I'm just trying to see what your understanding
22  is --
23      A.   Look, if you want to look at -- if you look at
24  the Perry article, there are some 15 -- ten, 15 really
25  good scientists that -- that put that paper together.

Page 173

1   And they put their heart and soul into that.  Because it
2   was a very, very controversial paper.
3       Q.   Was part of the controversy the criticism
4   pointed out by Dr. Kriss?
5       A.   I -- I have trouble validating Dr. Kriss's
6   opinion, so please find a better neurosurgeon.
7       Q.   Did you review his report and his --
8       A.   I -- I have reviewed some aspect of it, but I
9   have yet to find things that I find compelling in many
10  of his arguments.
11      Q.   Okay.  How much total time did you spend with
12  Mr. Walden on your first encounter?
13      A.   Probably an hour or two, somewhere in there.
14      Q.   One hour or two?
15      A.   Somewhere in there.  More than an hour, less
16  than two.
17      Q.   This is dated July 16, 2024, correct?  This
18  statement?  This is a statement you provided as part of
19  your file?
20      A.   Yeah.
21      Q.   Okay.
22      A.   That -- that's about right.
23      Q.   Does this reflect -- or no, strike that.  Any
24  objection to giving this to the court reporter to make
25  as an exhibit, or do we need to make a copy?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 174

1    A.   I -- I -- no.  That's fine.
2    Q.   Okay.
3    A.   We got -- that's an electronic thing.
4    MR. RIDINGS:  We'll make the next -- that the
5    next exhibit.
6    (EXHIBIT 8 MARKED FOR IDENTIFICATION)
7    BY MR. RIDINGS:
8    Q.   I will hand you --
9    MS. RIDINGS:  What is it?
10   THE REPORTER:  8.
11   BY MR. RIDINGS:
12   Q.   Here is my e-mail address, Doctor.
13   A.   Okay.
14   MR. MORRIN:  Please copy me on this.
15   MR. RIDINGS:  Let's take a quick break.
16   THE WITNESS:  No.  We -- we're done.
17   BY MR. RIDINGS:
18   Q.   No.  No, sir.
19   A.   It's -- it's 8:00.  You're way -- you're an
20   hour beyond.
21   Q.   Send me a bill.  I'll pay you, Doctor.  I paid
22   you in advance of this one.
23   A.   How much more time?
24   Q.   I don't know.  I cannot force you --
25   MR. RIDINGS:  This is on the record?

Page 175

1    THE REPORTER:  Yeah.
2    MR. RIDINGS:  Okay.
3    BY MR. RIDINGS:
4    Q.   I cannot force you to stay.  But if you tell
5    -- so I'm asking to take a quick break to review some
6    files.  Are you -- but if you are telling me that you
7    are not --
8    THE WITNESS:  Is this -- is this appropriate?
9    MR. MORRIN:  I think if you cannot continue,
10   necessarily, then we have to work around that.
11   THE WITNESS:  But -- but this is a reasonable
12   request from your perspective?
13   MR. MORRIN:  If you are unable to continue, if
14   you have -- if you must stop --
15   THE WITNESS:  No.  I -- I don't must stop.  I
16   just think it's unreasonable to go further, but
17   that's my personal opinion.  I'll stay if it's in
18   the -- in the -- to -- to further the cause of
19   justice and truth and the American way, I will stay.
20   MR. MORRIN:  I appreciate that.  And that's why
21   I like you as an expert.
22   THE WITNESS:  Okay.
23   THE REPORTER:  Do you want to go off record?
24   MR. RIDINGS:  Yeah.  Go ahead.
25   THE REPORTER:  We're now off.

Page 176

1    (OFF THE RECORD)
2    THE REPORTER:  All right.  We are back on
3    record.
4    BY MR. RIDINGS:
5    Q.   Is it your -- agree that Mr. Walden did not
6    lose consciousness on August 10, 2020?
7    A.   I believe that's the history -- well, there --
8    yes and no.  Because consciousness is -- is defined as
9    any -- any loss of capacity that -- basically, to think.
10   So he probably had some loss of consciousness.  He
11   probably was confused or dazed.
12   Q.   Okay.  Was he -- he didn't --
13   A.   He was not rendered unconscious.
14   Q.   Would he have had the capacity to text on his
15   cell phone?
16   A.   Oh, yes.
17   Q.   Okay.
18   A.   People -- the people who've been knocked out
19   can come back from a -- a knockout and -- and fight the
20   -- three, four rounds and have no memory of the -- of
21   the thing.
22   Q.   On the ambulance ride?
23   A.   Or even in the fight.  They'll fight three
24   more rounds.  They'll -- they'll wake from -- from a
25   knockout, or knocked down, where they're doing the

Page 177

1    count, and they survive the --
2    Q.   Right.
3    A.   -- the seven or eight.  They wake up, and they
4    fight the next three rounds.  They don't remember the --
5    fighting the last three rounds.
6    Q.   Agree that there are no medical records
7    documenting any alteration in consciousness on
8    August 10, 2020?
9    A.   That's irrelevant, but probably true.
10   Q.   Agree that there are no medical records
11   documenting any neurologic symptoms on August 10, 2020?
12   A.   I don't know that's true because neurologic
13   symptoms is poorly defined.  Having just a headache
14   would be a neurologic symptom.
15   Q.   What neurologic symptoms are you aware of that
16   were -- that Mr. Walden demonstrated on August 10, 2020?
17   A.   I'd have to go back over it, but probably
18   headaches.  I -- my bet is, he had headaches.  I'd be
19   surprised if he didn't.
20   Q.   Did he have headaches prior to the accident?
21   A.   Probably.
22   Q.   Okay.  Agree that there were not any
23   neurologic -- adverse neurologic findings on August 10,
24   2020?
25   A.   No.  What you -- again, you're

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA    Doc #: 188-1   Filed: 09/03/24   Page: 46 of 54 - Page ID#:
1970
The Deposition of DAVID CHANGARIS, M.D., taken on July 10, 2024
178..181

Page 178

1  misunderstanding.
2      Q.   Right.  I'm just asking the question.
3      A.   Because these -- you're asking questions about
4  moderate to severe traumatic brain injury, not about
5  mild traumatic.  If he had any of these things, he
6  wouldn't have mild traumatic brain injury.  So you're
7  asking me if he had a moderate traumatic brain injury,
8  and that's not in -- in -- on the record right now.
9      Q.   We had -- Doctor, I'm asking you if you agree
10 that there were no --
11     A.   To my knowledge, he had -- he had no evidence
12 of a moderate to severe brain injury, which includes all
13 those symptoms you just said.  Okay.
14     Q.   Agree that there were -- that there are no
15 concussive symptoms documented in the medical records on
16 August 10, 2020?
17     A.   I don't know what concussive symptoms are.
18     Q.   Okay.  Agree that there are no concussive
19 findings documented in the records on August 10, 2020?
20     A.   I don't know what "concussive findings" are.
21     Q.   Agree that there are no neurologic symptoms
22 documented in the medical records in the two and a half
23 years immediately following August 10, 2020?
24     A.   I don't know that.  I'd have to look for that.
25     Q.   Are you aware of any?

Page 179

1      A.   Again, I'm not not aware of anything, either.
2  I'd have to look at it one way or the other.
3      Q.   Did you document any such findings in your
4  report?
5      A.   I documented that was having symptoms through
6  that period of time, by his history.  Whether somebody
7  recorded that, I don't know.
8      Q.   Okay.  Agree that there are not any negative
9  neurologic findings in any medical records over the
10 course of the two and a half years immediately following
11 the August 10, 2020 accident?
12     A.   Again, I'd have to look at it to make sure
13 that there's not something like headaches or dizziness
14 or something like this.  There could be something
15 written.  I just don't have -- haven't looked at that
16 carefully.  When you start saying, any medical record
17 thing, then that requires a higher standard of
18 recollection that I don't have at the moment.
19     Q.   All right.  Same question: Any pertinent?
20     A.   Don't know.
21     Q.   Would --
22     A.   I --
23     Q.   -- would the absence of any such findings --
24 strike that.  You would agree that the absence of any
25 such documentations in the medical records would tend to

Page 180

1  undermine your opinions?
2      A.   No.  Absolutely not.  As a matter -- as a
3  matter of fact, that -- that's the whole point of all
4  this.  Because people aren't asking the right questions.
5  They're ignoring people.
6           They're not asking about dizziness.  They're
7  not asking about whether or not, when they bend over,
8  they're having troubles.  They're not asking whether
9  they're having short tempers.
10     Q.   You're certain about that?
11     A.   I'm pretty sure.
12     Q.   Okay.  So if there -- so if our -- let's
13 assume that there are specific records where those --
14     A.   You should --
15     Q.   -- questions were asked.
16     A.   And -- and he's not playing into -- there's
17 also a syndrome called -- called -- come on.  You got to
18 get it all.  You can't just get a little bit of it.  The
19 -- there's actually a diagnosis, a legitimate medical
20 diagnosis, called vertigo agnosia.  And it affects up to
21 half the people, where they have no insight into their
22 problems.
23     Q.   Would you like to hedge anymore?
24     A.   It doesn't have to do with hedging.
25           MR. MORRIN:  Objection.  Argumentative.

Page 181

1           THE WITNESS:  This -- this is a legitimate
2      medical diagnosis, and it happens.  If you want to
3      go into that, it's well-documented, even in the
4      military.
5  BY MR. RIDINGS:
6      Q.   Any other exceptions?
7      A.   Well, if you have it, you have it.  That means
8  you're not going to be able to recall things.
9      Q.   But any other exceptions that would --
10     A.   No.  That's -- that's the biggest one.
11     Q.   Okay.  So there's -- but there's nothing that
12 would undermine your report then?
13     A.   No.  Yeah.  There are lots of things that
14 would undermine it.
15     Q.   What?
16     A.   A negative VNG, a review by somebody who
17 really understands mild traumatic brain injury saying he
18 doesn't have it.
19     Q.   Okay.  You've reviewed the physical therapy
20 records objectively and thoroughly prior to forming your
21 opinion?
22     A.   Physical therapists have the least
23 understanding of what -- any group of people on mild
24 traumatic brain injury, that I've found.
25     Q.   Okay.  Did physical -- do physical therapists

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 47 of 54 - Page ID#: 1971
The Deposition of DAVID CHANGARIS, M.D., taken on July 10, 2024
182..185

Page 182

1  have any understanding related to observing balance
2  issues?
3      A.   Yes.  If they're interested in it.  But -- but
4  by and large, most are not.
5      Q.   Okay.  But --
6      A.   My -- my --
7      Q.   -- his were, though.  We know that, right? His
8  were because there was an occasion they specifically
9  documented a balance issue, right?  You're aware of
10 that?
11     A.   Look, you're nickel-and-diming me here.
12     Q.   I am nickel-and-diming?
13     A.   Yes.
14     Q.   Okay.
15     A.   Stick with the diagnosis that I have is.
16     Q.   Just take your word for it?
17     A.   No.  No.
18     Q.   And every other doctor is incompetent and
19 wrong?
20     A.   No.  They just have -- they just didn't ask
21 the questions.  They didn't look for this.
22     Q.   The physical therapists weren't looking for
23 balance issues?
24     A.   They were not looking for mild traumatic brain
25 injury.  They were probably treating his major symptoms

Page 183

1  with respect to broken bones and other things that he
2  had.  Pelvis, things like this.
3      Q.   How would a -- how does the VNG and -- or how
4  does the posturography test account for someone with a
5  broken hip?
6      A.   It can -- it makes it hard.  It -- it limits
7  its -- its interpretation.
8      Q.   Okay.  So how -- specifically, what --
9      A.   Hopefully --
10     Q.   -- what control data is used to compare -- let
11 me -- strike that.  My understanding is the comparative
12 -- the results -- the normal results, I believe, are
13 referred to in your report, and what Mr. Walden was
14 compared to was a normal person of his age, correct?
15     A.   Yes.
16     Q.   And this normal person is -- it does not, in
17 any way, account for or consider someone who had
18 suffered a right hip fracture three years earlier?
19     A.   Okay.  You're asking me --
20     Q.   Is that correct?
21     A.   No.  You're absolutely correct.  A right hip
22 fracture can affect posturography.
23     Q.   Okay.
24     A.   I'm not saying it doesn't.
25     Q.   And so how is that --

Page 184

1      A.   What we'd have to do is look at it from the
2  point of view of how he performed it.  Physical
3  therapists notice this kind of stuff.  And if they are
4  limping, or if they have active pain in the hip during
5  the procedure --
6      Q.   But you interpreted the posturography test.
7  You testified to that.  So how did you account for --
8      A.   I -- I -- technically, I rely on my physical
9  therapists to pick up on -- on joint pain.  And they
10 know -- I've trained them.  They know to let me know if
11 they have joint pain.  So during this test, joint pain
12 was not a significant factor, according to the reports
13 that I have.  And my team is pretty good on picking up
14 on it because we don't want to be making this diagnosis
15 without it being substantiated substantially.
16     Q.   Agree that not a single medical professional
17 that saw Mr. Walden in the nearly three years prior to
18 you documented any sign or symptom of Parkinson's?
19     A.   I didn't -- you're saying Parkinson's disease?
20     Q.   The seven symptoms that you --
21     A.   Yeah.  I think that it probably came on over
22 the three years.  And that was one -- I think this was a
23 late thing.
24     Q.   When did it start coming on?
25     A.   Well, it came on after the second and third

Page 185

1  year, a little bit.
2      Q.   And we would expect to see --
3      A.   No.  I'm not -- if you're not looking for it,
4  you're not going to see it.  And even I wasn't 100
5  percent certain at that point.  That's part of the
6  reason why I wanted to see him again, to see if there
7  was any further progression.  And his rigidity got worse
8  from the time I saw him in November and the time I saw
9  him in June.
10     Q.   Would you have expected that during this
11 three, three and a half years before he saw you, to --
12 there be some documentation in the record of a physical
13 -- or of rigidity?
14     A.   Not necessarily, no.
15     Q.   Because these other -- every other -- the 50
16 or so-plus doctors here are incompetent?
17     A.   My -- probably -- probably wasn't -- there are
18 many -- there are many times that I don't see it for
19 three and four years.
20     Q.   You've testified in the past that you can
21 determine a traumatic brain injury sort of just by your
22 gut, by your feelings, haven't you?
23     A.   Well, every -- every clinician sort of feels,
24 after a while, you can sort of pick it up that way.  But
25 that's why we do tests.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 48 of 54 - Page ID#:
1972
The Deposition of DAVID CHANGARIS, M.D., taken January 16, 2024
186..189

Page 186

1    Q.   And the two tests you did --
2    A.   Corroborated to a degree.
3    Q.   Okay.  Where is it documented in any of the
4  records that the VNG technologist checked Mr. Walden's
5  ears for ear wax?
6    A.   That's part of the routine.
7    Q.   Okay.  Where is it documented that the VNG
8  machine was calibrated prior to the test?
9    A.   Well, they're internally validated based upon
10 the signal that they get.  So it's basically an ongoing
11 internal validation process.
12   Q.   Did you do any drug tests of Mr. Walden prior
13 to --
14   A.   Just history.  Asking him to give us a list of
15 his current drug use, and we go through that.
16   Q.   You know he --
17   A.   We know -- we know that he is a drug user,
18 yes.
19   Q.   Okay.  And so -- and he's marginally reliable?
20   A.   He's marginally reliable.
21   Q.   And if he had been on drugs, that could have
22 absolutely --
23   A.   Depending on the drug, it would affect it.
24   Q.   Okay.  Would Xanax affect the results?
25   A.   It might.

Page 187

1    Q.   It's known to.
2    A.   It -- I -- I think it -- it can make people
3  somnambulant and -- and be poorly responsive.
4    Q.   Okay.
5    A.   But remember, we didn't find any evidence of
6  -- of him -- of -- of any loss of mental acuity during
7  the testing.  We didn't feel that he was drugged or
8  impaired by a drug.  And we're -- we're highly sensitive
9  to this.
10   Q.   Is Trokendi -- is it -- I may have pronounced
11 that wrong, an antidepressant?  Are you familiar with
12 that?
13   A.   There are lots of antidepressants with names
14 close to that.
15   Q.   Okay.  Would that have --
16   A.   In general, antidepressants don't make a big
17 difference, and we actually ask people to not take it
18 immediately before we do the -- the VNG.
19   Q.   Did you ask Mr. Walden not to -- no.  Strike
20 that.  You did not make any request of Mr. Walden or
21 give him any directions prior to this VNG, correct?
22   A.   Oh, that's not true.  We gave him lots of
23 directions.
24   Q.   How so?
25   A.   We have a whole packet.  We'll be glad to give

Page 188

1  it to you.
2    Q.   I --
3    A.   It's a -- it's an exhaustive packet.
4    Q.   When did you provide it?
5    A.   Long before he shows up for his VNG.
6    Q.   Is that in the file?
7    A.   Probably.
8    Q.   I didn't see it.
9    A.   I don't -- I don't -- I -- I don't know that
10 it got there, but we have -- we have patient education
11 and --
12   Q.   Can --
13   A.   -- and we -- that -- some of it's summarized
14 in that sheet of paper where they say that the pre-VNG
15 -- where we talk about what drugs they're -- they're
16 taking.  We -- we have a packet that we give to the
17 patient.  It may -- we -- we probably should put it in
18 the chart, but we don't.
19   Q.   Okay.  Did --
20   A.   In that sense, we're --
21   Q.   -- did you send it to Mr. Walden or to his
22 attorney?
23   A.   Usually we send that to the attorney, and --
24 and then we have conversations that they got it, and we
25 go over it because this is an important thing for us.

Page 189

1    Q.   Okay.  Yeah.  If you would, could you -- would
2  you mind sending that to --
3    A.   Sure.
4         MR. MORRIN:  The intake packet?
5         THE WITNESS:  Yeah.  The intake packet --
6         MR. RIDINGS:  What I want is that --
7         MS. RIDINGS:  It's what he filled out.
8         MR. RIDINGS:  -- anything and everything that
9  was --
10        MR. MORRIN:  Sure.
11        MR. RIDINGS:  -- sent to Mr. Walden as far as
12 directions.  But actually, I would like what was
13 sent to you because you would have it.
14        THE WITNESS:  Not necessarily.
15        MR. RIDINGS:  Okay.
16        MR. MORRIN:  If it exists, we'll get it to you.
17        THE WITNESS:  My -- my staff is -- is --
18 BY MR. RIDINGS:
19   Q.   What's Mr. Walden's address?
20   A.   According to the chart here, 555 Mule Shed
21 Lane, Richmond, Kentucky.
22   Q.   Is the abnormal VNG results that you detected
23 measuring the 2000 TBI where he had an initial Glasgow
24 Coma Scale of 3?
25        MS. RIDINGS:  No. 3 was 2012.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 49 of 54 - Page ID#: 1973
The Deposition of DAVID CHANGARIS, M.D., taken on July 16, 2024
190..193

Page 190

1    MR. RIDINGS:  I'm sorry.  I said -- did I not
2 say 2012?
3    MS. RIDINGS:  You said 2.
4    MR. RIDINGS:  Okay.  All right.  So strike
5 that.
6    THE WITNESS:  You -- I mean, I just went -- you
7 got confused, and you made a mistake on dates.  Did
8 he really do that?  Did he really make a mistake on
9 dates?
10 BY MR. RIDINGS:
11    Q.   Is the abnormal VNG --
12    A.   Can we document that so that I can have a
13 point --
14    MR. MORRIN:  It's in the record.
15    THE WITNESS:  -- for forgiveness when I make a
16 mistake?  Just -- just saying.
17 BY MR. RIDINGS:
18    Q.   Anything else?
19    A.   No.  Just saying.
20    Q.   Okay.  It --
21    A.   We all make mistakes.  You're forgiven.
22    Q.   We ready to go on?
23    A.   Yes.
24    Q.   Okay.  Are the abnormal VNG results measuring
25 the 2012 TBI where Mr. Walden had an initial Glasgow

Page 191

1 Coma Scale of 3 and was comatose for four weeks in the
2 hospital, or are they measuring the 2020 --
3    A.   Don't --
4    Q.   -- collision?
5    A.   The -- the -- it's impossible to know.
6    Q.   Okay.  Which TBI is more medically likely to
7 cause an abnormal VNG and abnormal posturography?  One
8 from 2012, causing a GCS of 3 and requiring a
9 tracheotomy and gastrotomy and protracted ICU in the
10 hospital, or the August 10, 2020, accident with the GCS
11 of 15?
12    A.   Okay.  I can give you a personal opinion.  GCS
13 -- excuse me.  The VNG doesn't change much.
14    Q.   Look --
15    A.   The VNG doesn't change.  So it could very well
16 be a good part of this is from 2012.
17    Q.   I don't want your personal, I want your
18 medical.
19    A.   Well, personal, medical.  They're the same in
20 this one.
21    Q.   Okay.
22    A.   But from my personal experience, these brain
23 injuries can last for a long time, and VNG is still
24 positive.
25    Q.   Okay.  What is the lowest possible Glasgow

Page 192

1 Coma Scale?
2    A.   3.
3    Q.   Okay.  And if that's what Mr. Walden had in
4 2012, that would suggest a --
5    A.   A really -- a really -- a significant brain
6 injury.
7    Q.   Did you observe a tracheotomy scar?
8    A.   I -- I don't recall it, no.
9    Q.   That's typically something you can't miss,
10 though, right?
11    A.   No.  You can miss it if you're not looking for
12 it.  I wasn't looking for it.
13    Q.   Why not?  Wouldn't it -- if you observed that,
14 wouldn't that -- doesn't that typically tend to suggest
15 a significant injury?
16    A.   Yes.
17    Q.   Okay.
18    A.   So in that sense, you're -- you're right.  I
19 -- I should have seen it.
20    Q.   What effect would lifelong substance abuse of
21 heroin, oxycodone, opioids, benzos, cocaine,
22 methamphetamine, marijuana, and alcohol have on the
23 reliability of these two tests?
24    A.   Alcohol is the one I'd worry about.  The --
25 the other stuff I'm not too sure that has very much

Page 193

1 effect on -- on the imaging.  And alcohol would cause
2 cerebellar difficulties.
3    Q.   Wouldn't sleep issues such as sleep apnea and
4 difficulty falling asleep?
5    A.   I'm not aware that there's a correlation
6 between sleep apnea and VNG findings.
7    Q.   Okay.  What about the posturography though?
8    A.   Or even posturography.  I'm not aware of a
9 correlation.
10    Q.   Okay.
11    A.   It -- it could -- it could --
12    Q.   And that was just me.  That just seems common
13 sense.
14    A.   I -- I just don't know of one.  I -- I do know
15 that there are papers on amphetamines that say there's
16 no relationship on VNG, so --
17    MR. RIDINGS:  I have no further questions, but
18 I -- well, would you bear with me?  And this can be
19 off the record as long as it's okay by Counsel.  I
20 am on Kindle, and --
21    THE REPORTER:  If you're --
22    MR. MORRIN:  Are we off?
23    THE REPORTER:  -- done, let me get orders
24 really fast.
25    MR. MORRIN:  I've got just, like, three

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA   Doc #: 188-1   Filed: 09/03/24   Page: 50 of 54   Page ID#: 1974
The Deposition of DAVID CHANGARIS M.D., taken January 18, 2024
194..197

Page 194

1    questions.
2         THE REPORTER:  Okay.  Do you want to do your
3    questions first?
4         MR. RIDINGS:  Go ahead.  Yeah.
5         MR. MORRIN:  Yeah.
6         THE REPORTER:  Perfect.
7              CROSS-EXAMINATION
8    BY MR. MORRIN:
9         Q.   Doctor, how long have you been treating TBI
10   patients?
11        A.   Since I finished my residency in 1982, and
12   while I was a resident, I was doing it too, so --
13        Q.   Which is --
14        A.   -- probably since I began the neurosurgery
15   period, which would be 1978.
16        Q.   Okay.  Where was your residency at?
17        A.   Medical University of South Carolina.
18        Q.   Okay.  And your education before your
19   residency?
20        A.   I post-doc'd in neuropharmacology at Penn
21   State College of Medicine, and -- and that's where I did
22   my undergraduate career too.
23        Q.   Okay.
24        MR. RIDINGS:  I'll stipulate to his resume.
25   BY MR. MORRIN:

Page 195

1         Q.   You mentioned you sent in your book to the
2    AANS?
3         A.   No.  Not -- no.  To the American Board of
4    Neurological Surgeons.
5         Q.   American Board of Neurological Surgeons?
6    Okay.  Surgeons, did they send any kind of response back
7    to you, negative or otherwise?
8         A.   No.  Total -- total silence.  I'm going to
9    send them some more books and see if I can provoke a
10   response.
11        Q.   Would you think if they disagreed with your
12   book, they would've responded negatively in some way?
13        MR. RIDINGS:  Objection.  Calls for
14   speculation.
15        THE WITNESS:  It -- it -- well, speculation is
16   -- is -- and I don't think it's speculative to say
17   that if it were outrageous, they would respond.
18   Personal opinion.  The board is pretty strict on
19   certain behaviors.
20   BY MR. MORRIN:
21        Q.   It's kind of their job, isn't it?
22        A.   Their job.
23        Q.   Yeah.
24        MR. RIDINGS:  Objection.  Speculation.
25        THE WITNESS:  No.  Because my board is

Page 196

1    constantly under review.
2    BY MR. MORRIN:
3         Q.   It's okay.  It's okay.
4         A.   They -- they don't --
5         Q.   Don't worry about it.
6         A.   -- they review my board.
7         Q.   Don't worry about the objection.  What is a
8    mild traumatic brain injury, just the medical
9    definition?
10        A.   You know, the -- it's a term that grew out of
11   the -- the military for handling blast injuries without
12   any MRI or CT findings.  So they needed something.
13        Q.   Okay.
14        A.   And -- and they -- they hit upon the VNG as
15   being important for diagnosing these people.
16        Q.   Mild almost implies it's not a big deal; is
17   that --
18        A.   No.  No.  That -- that's the connotation, but
19   it's -- it is a big deal.  It's a very big deal.
20        Q.   Okay.
21        A.   It's not insignificant, to the point where
22   some people don't -- don't like the word mild, but
23   that's what the Army calls it, so I -- I just fell in
24   line with that.
25        Q.   How are the angles of your posturography test

Page 197

1    measured?
2         A.   Now, what do you mean by angles?
3         Q.   Well, what -- in a posturography test, are
4    there certain angles and certain -- explain to me how
5    the posturography test works.
6         A.   You -- you stand on -- on a -- on a platform,
7    either solid or with a foam rubber, and you -- you look
8    at something, and your head moves, and there's a camera
9    that measures your head movement.
10        Q.   Okay.  It measures how the head moves?
11        A.   Yes.  As a matter of fact, there's a drawing
12   of where the head is moving from it, and then it -- then
13   it does a -- a level interpretation of that.
14        Q.   And what's the machine you use, the specific
15   machine?  Do you know?
16        A.   It's -- it's on the report.
17        Q.   It's in the report?
18        A.   Yeah.  The -- the name of the thing.  Wherever
19   that --
20        Q.   So it has a camera that is measuring how the
21   head moves?
22        A.   It's called FallTrak Video Posturography Test.
23        Q.   FallTrak Video Posturography Test.  Okay.
24   And --
25        A.   And video is probably a misnomer, but that's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 5:22-cv-00238-KKC-EBA  Doc #: 188-1  Filed: 09/03/24  Page: 51 of 54 - Page ID#:
1975
The Deposition of DAVID CHANGARIS, M.D., taken on July 19, 2024
198..201

Page 198

1   all right.
2       Q.   Yeah.  Yeah.  I understand that.  Are you
3   familiar with how the actual machine tracks and
4   operates?
5       A.   No.  Not -- not the inner stuff, no.
6       Q.   How did you learn about the machine?
7       A.   It's very powerful and generally used.
8       Q.   Okay.
9       A.   The -- the -- Medicare relies on it to predict
10  falls.  They -- they pushed it early on as a fall
11  prevention analysis.  And by the way, it -- it's one of
12  the -- the only tests I know where the defense
13  literature really likes posturography.
14      Q.   Was there a moment in your examination of
15  Mr. Walden where it was like an aha moment, that this is
16  what we have?  Or was it just a total conclusion of all
17  your procedures -- or excuse me, tests and assessments?
18      MR. RIDINGS:  Object to form.  Leading.
19      THE WITNESS:  I -- I can't really say there's
20  an aha moment.  I have to say that this is an
21  unfolding -- and enough to generate a -- a VNG to
22  say that he had enough symptoms of dizziness.  And
23  -- and the history, to me, was compelling enough,
24  even though it was complex, and even though he is
25  not the world's best historian, that -- that he

Page 199

1   probably was injured in this accident.
2   BY MR. MORRIN:
3       Q.   Okay.  What can you tell us about what you
4   know of Dr. Kriss?
5       A.   I -- I've had a -- two or three encounters
6   with him, and they weren't rational when it comes to
7   this particular issue.  I'm sure -- I mean, he -- he has
8   a -- a weird obsession with Romberg, even though it's
9   been thoroughly disputed, that it's almost a joke
10  amongst neurologists.  I mean, we have no idea why in
11  the world it's in -- in the medical school
12  curriculum.  It was originally designed to detect
13  syphilis, you know, when we couldn't detect syphilis
14  with drug -- with medical testing.
15      MR. RIDINGS:  Just note an objection as to
16  Dr. Changaris' refusal to answer any of my questions
17  about Dr. Kriss, and then answered your questions.
18  BY MR. MORRIN:
19      Q.   What else do you know about Dr. Kriss and your
20  experience with him?
21      A.   Just for the record, I did make a comment that
22  -- that I -- if you recall, I did say Dr. Kriss's views
23  of Romberg were not reasonable or authoritative or any
24  level of medical thing.  And -- and I've got lots of
25  papers to support, and you'll get that in -- in the --

Page 200

1   in the cases when you download them for the workman's
2   comp thing.
3       So what -- specifically what the question on
4   Kriss is?
5       Q.   What else was your experience with
6   Dr. Kriss --
7       MR. RIDINGS:  The same objection.
8   BY MR. MORRIN:
9       Q.   -- if you can recall?
10      A.   This is my experience in general, is that he
11  was -- he doesn't cite the literature.  He didn't cite
12  one article on any of his opinions in -- in the -- in
13  the things that I've read.
14      Q.   Okay.  He says he didn't provide sufficient
15  methodological -- methodology -- am I saying that right?
16      A.   Methodological.
17      Q.   Thank you.  Thank you, Doctor.  Data for
18  proper interpretation of these tests.  Do you have any
19  idea what he could have been --
20      A.   No.  Because the -- what happens is, is that
21  -- that this thing is actually very simple.  I mean, it
22  -- it's -- it's a printout.  You see the squiggle.  You
23  -- there's a built-in control, and either it adheres to
24  the control within a certain level, or it doesn't.  You
25  can take a ruler on these things.  It -- it's not --

Page 201

1   there's not any question about this.  This is -- the
2   printout shows the answer.
3       Q.   And you mentioned that the machine itself is
4   internally calibrated?
5       A.   Yes.
6       Q.   Okay.  Is there any maintenance on that
7   machine that's --
8       A.   Yeah.  But we're constantly making -- we -- we
9   got to have the airflow right for the ear tests and --
10  and the signal has to be good.  But by and large, these
11  -- these are pictures of -- of eye movement.  And if --
12  if -- and they're very stylized.  So if the eyes aren't
13  moving the way we know traditionally, then they -- it's
14  not working.  But we know when the eye moves normally,
15  and we know when it moves normally slowly, but it still
16  should move normally, okay?  The eyes move from right to
17  left when you ask someone to look from the right to the
18  left, and you should be able to see it move in a certain
19  way.
20      It may do it more slowly, and that defines the
21  -- or, you know, for example, it -- there's one part of
22  the test where you literally have the person in the
23  dark, and you rotate the chair back and forth, and the
24  eyes start to shake, and the camera will track the
25  eyeball until there's no movement on -- on the pupil.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 202

1  And this is -- the person is totally in the dark.  That
2  -- that follows a very characteristic pattern.  There --
3  there's no really reasonable way for us to get a result
4  that -- where it isn't working.
5      MR. MORRIN:  I think you've been very patient,
6  and that's actually all I'm going to ask you right
7  now. I'm sure Jay might have a question or two for
8  you.
9      MS. RIDINGS:  Yeah.  One or three.
10     MR. RIDINGS:  Hold on.
11         REDIRECT EXAMINATION
12 BY MR. RIDINGS:
13     Q.   All right.  Tell me again, the board or
14 journal that you submitted the book to, MENSA?
15     A.   No, the American Board of Neurological
16 Surgeons.
17     Q.   American.  Any indication that anyone read
18 your book?
19     A.   No.
20     Q.   Okay.  Would you agree it's unlikely that they
21 didn't?  That it has not been read?
22     MR. MORRIN:  Objection.  Speculation.
23     THE WITNESS:  My -- my view that it has been
24 read.  I gave it to my old -- to the chairman of my
25 old department, and he -- he liked it.

Page 203

1  BY MR. RIDINGS:
2      Q.   Okay.  All right.  You testified that his
3  "history was so compelling" that that prodded you to
4  conduct a VNG.  And you said, quote, the -- I remember
5  exact quote what was, "history was so compelling."  What
6  is that history?
7      A.   Dizziness and headaches.
8      Q.   Okay.  First reported to you three and a half
9  years after the accident on a single location that you
10 saw him two -- for one to two hours?
11     A.   Yes.
12     Q.   That one event?
13     A.   Yes.
14     Q.   When not once in the three years before that
15 had he complained of dizziness?
16     A.   Again, this gets down to, did they really
17 look?  Did they really ask?
18     Q.   But so we're going to trust a marginally
19 reliable patient that is --
20     A.   Well, this --
21     Q.   -- contradict -- that is contradictory to a
22 mountain of medical records?
23     A.   This happens.  No.  It happens every day.
24     Q.   Okay.  I --
25     A.   This -- this is not --

Page 204

1      Q.   How did you make that determination of
2  reliability?
3      A.   Well, the fact that he's a drug -- drug
4  addict, and -- and he's been injured in -- in a prior
5  brain injury, so his -- his memory is going to be
6  impaired.  These are clinical judgements.
7      Q.   Did Counsel, when he provided you with
8  Dr. Kriss's report, did he provide you with Exhibit C,
9  which I will represent to you is 213 pages of various
10 articles, studies, reports, and journals?
11     A.   No.  I'd like to see it.  I'm -- I am
12 delighted to see that he's --
13     Q.   Okay.
14     A.   -- that he's finally gotten around to doing
15 articles.
16     Q.   Well, but you said he didn't cite any
17 literature in this case, so that's a false statement.
18     A.   No.  No.  No.
19     Q.   Would you agree that you don't know that?
20     A.   No.  Just one moment.  I'm saying that the --
21 that the reviews that I've seen in the past, there --
22 there were no -- there was no literature.
23     Q.   Okay.
24     A.   Okay.
25     Q.   You have his report in this case though,

Page 205

1  correct?
2      A.   I -- I have a report, but I don't know that I
3  have the references with it.
4      Q.   Okay.
5      A.   And I -- and I don't recall this -- this one.
6  I'm -- I'm -- I didn't want to comment because I really
7  haven't read it totally either.
8      Q.   Do you agree that it seems like you're only --
9  you're being -- the information you're being provided
10 has been very selectively spoon-fed?  And that's -- I'm
11 borrowing a term from mister -- or Mr. Morrin.
12     A.   Give me more information.
13     Q.   That's not my job.
14     A.   Yes.  It is.  You want the truth?  Give me the
15 truth.
16     Q.   I --
17     A.   Show me -- show me the records.
18     Q.   I've given it to your client.
19     A.   Okay.  You know, this is a --
20     Q.   Whose responsibility is it to provide it to
21 you?
22     A.   Well, I can only -- I can only interpret the
23 data that I'm given.
24     Q.   And you agree you have been provided
25 insufficient data?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1    A.   I'm saying -- I don't know.  Not until I see
2  all of it.  Oftentimes when I get a -- a full chart, it
3  doesn't change my opinion.  Sometimes it does.
4    Q.   In this case, it seems likely that it will at
5  least be pertinent, agreed?
6    A.   Well, I don't know.  I need to see it, but I'm
7  open to it being --
8    Q.   You say that in all your depositions, Doctor.
9  I'll just -- the five or six that I've read, I'll --
10  that you say that in every case.
11    A.   Yeah.  But --
12    Q.   Why don't you request them?
13    A.   I -- I want them.  I ask for them.  Sometimes
14  I get them.  Sometimes I don't.  I've asked for them
15  here.  I may or may not get them.  I can't do any more
16  than that.
17    Q.   Okay.  You're certain that you asked for them?
18  Or I'm sorry.  The --
19    A.   I did just now.  I want everything.
20    Q.   But you testified earlier, you asked for them
21  earlier.
22    A.   Look, I asked for everything available.
23    Q.   Okay.  And I -- do you have any objection to
24  Counsel providing me with a copy of your request to him
25  for --

Page 207

1    A.   It's -- it's implied.  I want everything.  I
2  don't want --
3    Q.   Oh, it's implied now?  You didn't -- you did,
4  or you -- is it implied, or was it explicit?
5    A.   If I talk to somebody, I always say, please
6  send me everything.  I don't say, send me the -- only
7  the stuff that supports this.  The last thing I want to
8  do is testify in a situation where half the record -- I
9  only have half the record, and the -- and the other half
10  refutes what I'm saying.
11    Q.   But that's what happened in this case, agreed?
12    A.   Don't know.  Let -- let me look at everything,
13  and I'll -- as I said, I'll put it on the record as soon
14  as I get it, if it contradicts me.
15    Q.   But you agree that you have not reviewed a
16  single record prior to August 10, 2020?
17    A.   I said, I can't say a single record.  I'm just
18  saying I'm not -- I have not reviewed, especially the
19  2010 in -- brain injuries.  You -- you used the thing,
20  saying on record so many times, you've beaten me.  I
21  might have said yes --
22    Q.   I --
23    A.   -- inadvertently.
24    Q.   -- I --
25    A.   What I mean right now today is, I can't

Page 208

1  guarantee I haven't seen some records prior to that.
2    Q.   They were not in the -- they're not in your
3  file.
4    A.   If -- if they're not in my file, then I didn't
5  see them.
6    Q.   Okay.
7    A.   But I don't know that this file doesn't have
8  some things in the prior -- this -- this is a big file.
9  It's possible there could be something in there dated
10  prior to 2019.
11    MR. RIDINGS:  No further questions.
12    MR. MORRIN:  No further questions.
13    THE REPORTER:  All right.  Before we go off
14  record, I'm going to get orders.  Jay, how do you
15  want to order?
16    MR. RIDINGS:  E-tran.
17    THE REPORTER:  Okay.  Perfect.
18    MR. RIDINGS:  And what's turnaround?
19    THE REPORTER:  When do you want it?
20    MS. RIDINGS:  Yesterday.
21    MR. MORRIN:  Tomorrow?
22    MR. RIDINGS:  I don't want to put you in a --
23    THE REPORTER:  Normal, seven days.
24    MR. RIDINGS:  Oh.
25    THE REPORTER:  Seven business days.

Page 209

1    MR. RIDINGS:  Oh, my God.  That's what I'm --
2  that's why I had the -- seven days is perfect.
3    THE REPORTER:  Perfect.
4    MR. RIDINGS:  That's why I had a conversation
5  with Mom last -- within the last two weeks that I'm
6  using Kentuckiana for all future reporting.
7    THE REPORTER:  That's great.  Because that's on
8  the record, so we appreciate it.  Bob, how do you
9  want to order?
10    MR. MORRIN:  PDF is fine.
11    MS. RIDINGS:  What, you didn't tell her what
12  you wanted?
13    THE REPORTER:  Awesome.  Perfect.
14    MR. RIDINGS:  I told her an e-tran.
15    THE REPORTER:  And off record.
16    (DEPOSITION CONCLUDED AT 9:01 P.M. ET)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 210

1              CERTIFICATE OF REPORTER

2          COMMONWEALTH OF KENTUCKY AT LARGE

3

4       I do hereby certify that the witness in the foregoing

5       transcript was taken on the date, and at the time and

6       place set out on the Title page here of by me after

7       first being duly sworn to testify the truth, the whole

8       truth, and nothing but the truth; and that the said

9       matter was recorded digitally by me and then reduced to

10      type written form under my direction, and constitutes a

11      true record of the transcript as taken, all to the best

12      of my skill and ability. I certify that I am not a

13      relative or employee of either counsel, and that I am in

14      no way interested financially, directly or indirectly,

15      in this action.

16

17

18

19

20      *Lily Cornell*

21

22      LILY CORNELL,

23      COURT REPORTER / NOTARY

24      MY COMMISSION EXPIRES ON:  01/18/2028

25      SUBMITTED ON:  07/29/2024

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com