UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| CHARLES L. WALDEN ) | |
| ) | |
|    Plaintiff ) | |
| ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:22-CV-00238-KKC |
| ) | |
| ENTERPRISE SERVICES GROUP, LLC ) | |
| CLARENCE M. HOWARD, AND ) | |
| NATIONAL INDEMNITY GROUP OF ) | |
| INSURANCE COMPANIES OR ) | |
| NATIONAL INDEMNITY COMPANY, ) | |
| VINCE KLINE, AND PROGRESSIVE ) | |
| CASUALTY INSURANCE COMPANY ) | |
| | |
|    Defendants amended | |

**\*\*\*\*\*\*\*\*\*\***

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF DR. CHANGARIS (R. 188)**
**\*\*\*\*\*\*\*\*\*\***

Comes the Plaintiff, CHARLES L. WALDEN, and for his Response to Defendants' Motion to Exclude Certain Opinions of Dr. Changaris (R. 188), hereby states as follows:

**INTRODUCTION**

Defendants wish to exclude the testimony of Plaintiff's Expert, Dr. Changaris, on the supposed basis that his conclusions do not meet the federal standards for admissible evidence under FRE 702. However, Dr. Changaris clearly meets the factors set forth in *Daubert* for reliable expert testimony. Furthermore, other Kentucky courts have conducted a similar analysis of Dr. Changaris's reliability as an expert witness and also concluded he meets the standards set forth in *Daubert*. Finally, the Defendants once again resort to their tactic of grossly misstating

1

Mr. Walden's medical history in an attempt to persuade the Court that he cannot possibly be found to be injured, thus any expert testimony indicating such is unreliable on its face.

## LEGAL STANDARDS

Federal Rule of Evidence 702 and the principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* govern the admissibility of expert opinion. Under Rule 702, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *Am. Cas. Co. of Reading, Pennsylvania v. Reynolds Concrete Pumping, LLC,* No. CV 5:19-488-DCR, 2021 WL 2936130, at *2 (E.D. Ky. July 13, 2021). The Sixth Circuit has interpreted Rule 702 to require that expert testimony must be (1) qualified, (2) relevant, and (3) reliable. *In re Scrap Metal Antitrust* Litigation, 527 F. 3d 517, 529 (6th Cir. 2006). The court acts as a gatekeeper to ensure that the expert's testimony is both reliable and relevant, considering factors such as whether the theory or technique can be tested, has been subjected to peer review and publication, has a known or potential rate of error, and enjoys general acceptance in the relevant scientific community. *United States v. Langan*, 263 F.3d 613, 621 (6th. Cir. 2001) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).

In evaluating the reliability of expert testimony, Federal Rule of Evidence 702 considers the following:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the

testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Ev. 702.

The rejection of expert testimony is the exception rather than the rule, emphasizing a liberal admissibility standard for relevant evidence while excluding misleading "junk science." *See Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

**ARGUMENT**

I.      **Dr. Changaris Holds Up to the *Daubert* Standard As a Reliable Expert.**

The standard applied to admitting expert scientific testimony in a federal trial is well-established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The Supreme Court granted certiorari to evaluate whether or not the Federal Rules of Evidence superseded the use of the "general acceptance" test found in *Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923)*; the Court found that it did. *Daubert* at 587. FRE 402 provides the baseline for admissible evidence:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (citing FRE 402). The Court said the Rules' basic standard of relevance is a "liberal one." Id. The Court next evaluated FRE 702, which specifically governs expert testimony, and found that nothing in the plain language of the Rule or the drafting history adopts a "general acceptance" standard. In fact, the Court notes that such a standard "would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' *Beech Aircraft Corp. v. Rainey*, 488 U.S. at 169 (citing Rules 701 to 705)." *Daubert* at 588. For an inference or assertion

3

to qualify as "scientific knowledge," it must be derived from the scientific method, and this "requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert* at 590.

Despite the implications of counsel for the Defendants, Dr. Changaris didn't simply sit down with Mr. Walden, ask him about his symptoms, and then proceed to make a string of diagnoses without basis. He noted on the first page of his report which medical records he reviewed; he conducted a neurological and physical exam of Mr. Walden that was quite similar to the one conducted by Defendants' expert, Dr. Kriss; he reviewed imaging from the incident itself, including but not limited to a CT scan of Mr. Walden's head from August 2020; he then reviewed the VNG data and came to his reasonable conclusions, based on all the data he received and his many years of experience in the field of neurosurgery.

While the Court in Daubert did not provide a "definitive checklist or test," some general observations on establishing "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue" and "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-593.

The first factor the Court provides for use in the analysis is "whether it can be (and has been) tested." Dr. Changaris's methodologies (i.e. oral history from the patient, review of relevant medical records, physical and neurological exam, and VNG Posturography) are all well-established methods of determining appropriate diagnoses for an individual, particularly in the context of a Medical Examination such as those conducted by Dr. Changaris and Dr. Kriss. In

fact, Dr. Kriss follows a similar methodology, except that he spends pages criticizing the VNG machines instead of evaluating their data.

The Court provides another factor for consideration, that is "whether the theory or technique has been subjected to peer review and publication." *Daubert* at 593. Despite the criticisms of Dr. Kriss, posturography and vestibulonystagmography are well-established tests, accepted by the U.S. military and Worker's Compensation courts in multiple jurisdictions—including Kentucky, Colorado, and Rhode Island. *See* attached Opinion of the Kentucky Worker's Compensation Board, Claim No. 201887385, at pages 8 and 9. In the attached Opinion, the Board upheld the ALJ's Daubert analysis on the use of VNG to diagnose a traumatic brain injury after a severe motor vehicle collision, over the objections of the Respondent's expert, who stated he had "never heard of the posturography and vestibulonystagmography that Dr. Changaris uses." The Kentucky Rules of Evidence that were applied by the ALJ and subsequently the Board mirror the Federal Rules of Evidence on expert testimony. The Board noted that Dr. Changaris provided the ALJ with "abstracts and comments from over a dozen articles on VNG and posturography, and a bibliography containing 80 standard references dealing with these studies. He notes, 'numerous other peer-reviewed publications identify the utility of the VNG and PG to diagnose vestibular injuries.' [ . . . ] Dr. Changaris attached the first two references, which deal with military use of the VNG in blast injuries and VNG use in mild traumatic brain injuries." *See* attached Opinion of the Kentucky Worker's Compensation Board, Claim No. 201887385, at pages 9 and 10. Dr. Changaris's methodologies for determining his diagnoses of Mr. Walden are well-established in peer-reviewed publications, especially the use of posturography and vestibulonystagmography.

5

The Court provides yet another factor for consideration, "the known or potential rate of error." *Daubert* at 594. In the attached Opinion of the Kentucky Worker's Compensation Board, Claim No. 201887385, supra, the Board accepts and adopts Dr. Changaris's statement that "the posturography and VNG provide objective data, do not have false positives, and have a lost history of studying balance disorders after trauma in determining whether there has been a peripheral, or a central, injury, or both." *See* attached Opinion of the Kentucky Worker's Compensation Board, Claim No. 201887385 at page 10.

Under all the factors the Court provides to guide the admission of expert testimony in *Daubert*, Dr. Changaris meets the standard for providing reliable expert testimony.

The Defendant's implication of a comparison between the methodologies rejected by the court in *EEOC v. Kaplan Higher Education Corp.*, 748 F.3d 749, and those employed by Dr. Changaris are nothing short of laughable. In *EEOC v. Kaplan*, the EEOC alleged that Kaplan's use of credit checks for positions that provide access to students' financial information caused Kaplan to screen out more African-American applicants than white applicants, creating a disparate impact in violation of Title VII of the federal Civil Rights Act. The EEOC's expert, Kevin Murphy, who holds a doctorate in industrial and organizational psychology, compiled statistical data to reach his conclusions. The court held that Murphy's methodologies were not scientific or peer-reviewed, in fact holding that "the process was crafted by Murphy himself, specifically for purposes of litigation—though the record contains no indication that Murphy has any particular expertise in constructing methodologies to identify race by visual means." *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 751. Thus, the court stated that the EEOC's case was based on "a homemade methodology, crafted by a witness with no particular expertise to craft it, administered by persons with no particular expertise to administer it, tested by no one,

6

and accepted only by the witness himself." *EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 754. This is so readily distinguishable from Dr. Changaris's methodologies in evaluating and diagnosing Mr. Walden. As established supra, Defendants' own expert, Dr. Kriss, used a similar method of evaluation of Mr. Walden, save the VNG. The VNG itself has been well-established, by peer-reviewed sources, to be a reliable test for diagnosing vestibular injuries such as traumatic brain injuries.

## II. Defendants Once Again Grossly Misclassify Plaintiff's Symptoms and Treatment.

Defendants claim there is "zero evidence Plaintiff sustained mTBI." This is not the first time Defendants have grossly misclassified the Plaintiff's medical history (*see* R.119, Plaintiff's Response to Defendants' Motion to Compel CR 35 Exam, pages 8-11), and based on the pattern, likely won't be the last. However, the medical records can speak for themselves in proving the falsity of this statement by the Defendants. Plaintiff's medical records from UK Hospital on the date of loss (and subsequent hospital stay), which have been entered into the court record already, indicate he had a concussion. *See* R.119-2 and R.119-3. The Madison County EMS medical record from the night of the collision indicates that Mr. Walden had an abrasion to his head, indicative of hitting his head on something. *See* R.119-1. Mr. Walden's poor memory is also well-documented, and in particular, is the reason he missed doctor's appointments with his primary care physician on 04/02/2021, 06/17/2022, and 11/21/2022. His primary care physician noted he complained of "headaches" on January 9, 2021, and the Emergency Department at UK Hospital indicated on August 26, 2020 that he showed "mental status changes" and "post-traumatic epilepsy."

Dr. Changaris based his diagnoses *in part* on the parts of Mr. Walden's history that was supported by the medical records he reviewed. It is up to a jury to decide which version of events is most credible—Mr. Walden's version of events, supported by his medical record, or the Defendants' version of events, which uses broad generalizations and a multitude of incorrect statements. Nonetheless, at this juncture, exclusion of Dr. Changaris's testimony based on this objectively false statement of "zero evidence plaintiff sustained mTBI" would be wholly inappropriate, as it is supported by multiple medical records.

Finally, Defendants' commentary about Dr. Changaris's deposition conduct is nothing more than a red herring designed to distract the Court from the issues at hand. Nonetheless, since Defendants have raised the issue, Mr. Walden simply wishes to point out that counsel for Defendants tried very hard during Dr. Changaris's deposition to steer him into the answers he wanted, namely by regularly and repeatedly cutting off Dr. Changaris in an attempt to prohibit him from explaining his answer. *See* Deposition of Dr. Changaris, R.188-1, pages 18-21, 26-27, and 87-88. Defendants' counsel actually refused to restate a question after asking it, actively obstructing his own deposition and refusing to allow Changaris to answer; *see* Deposition of Dr. Changaris, R.188-1, pages 19 – 20. Defendants' counsel has taken an obstructionist approach to multiple depositions, using the same conduct during Defendant Howard's deposition as well; even coaching Defendant Howard with notes passed to him on the record. *See* Deposition of Clarence Howard, pages 14 – 15; s*ee* also Deposition of Clarence Howard, pages 9, 14-16, 61-63, 64, and 65, attached hereto.

## CONCLUSION

Dr. Changaris clearly meets the factors set forth in *Daubert* for reliable expert testimony. In addition, the Defendants grossly misstate Mr. Walden's medical history, but the medical

records themselves, upon which Dr. Chngaris relied upon in part, reasonably support his analysis of Mr. Walden.

**WHEREFORE**, Plaintiff respectfully requests this Court DENY Defendants's Motion to Exclude Opinions of Dr. Changaris, and any other relief to which Plaintiff may appear entitled.

Respectfully Submitted,

MORRIN LAW OFFICE

 /s/*Robert A. Morrin*
Hon. Robert A. Morrin (KBA # 94368)
214 West Main Street
Richmond, KY 40475
(859) 358-0300
*Counsel for Plaintiff*

\* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September, 2024, a true and correct copy of the foregoing was filed through the Court's eFiling system, which serves a copy on all counsel of record.

 /s/*Robert A. Morrin*
Hon. Robert A. Morrin (KBA # 94368)
MORRIN LAW OFFICE
*Counsel for Plaintiff*