# Commonwealth of Kentucky
# Workers' Compensation Board

**OPINION ENTERED: June 12, 2020**

CLAIM NO. 201887385

RURAL TRANSIT ENTERPRISES COORDINATED          PETITIONER

VS.          **APPEAL FROM HON. STEPHANIE L. KINNEY,
ADMINISTRATIVE LAW JUDGE**

LUZANETE de LIMA AND
HON. STEPHANIE L. KINNEY,
ADMINISTRATIVE LAW JUDGE          RESPONDENTS

**OPINION
AFFIRMING**

* * * * * *

BEFORE: ALVEY, Chairman, STIVERS and BORDERS, Members.

**ALVEY, Chairman.**   Rural Transit Enterprises Corp ("RTEC") appeals from the
Opinion, Award, and Order rendered January 17, 2020 by Hon. Stephanie L.
Kinney, Administrative Law Judge ("ALJ"). The ALJ found Luzanete de Lima
("Lima") sustained a traumatic brain injury ("TBI") in a March 27, 2018 work-
related motor vehicle accident ("MVA") and awarded temporary total disability
("TTD") benefits, permanent partial disability ("PPD") benefits, and medical

benefits.  RTEC also appeals from the February 10, 2020 Order overruling its petition for reconsideration.

On appeal, RTEC argues the ALJ erred in relying upon the opinions of Dr. David Changaris since they are based upon testing methods that do not meet the evidentiary standard contained in KRE 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  RTEC also asserts the ALJ erred in relying upon the treatment records in determining Lima sustained a TBI as defined by the Act.  Therefore, RTEC asserts medical benefits are not compensable.  RTEC argues the ALJ erred in awarding additional TTD benefits from October 18, 2018 to August 7, 2019.  RTEC argues the ALJ erred in relying upon the impairment ratings assessed by Dr. Changaris since they do not comport with the 5th Edition of the American Medical Association, Guides to the Evaluation of Permanent Impairment ("AMA Guides").  RTEC argues the ALJ erred in finding Lima does not retain the physical capacity to return to the type of work she was performing at the time of her alleged work injury.  Finally, RTEC argues the ALJ erred in finding Lima did not commit a safety violation pursuant to KRS 342.165(1).  For the following reasons, we affirm on all issues.

Lima filed a Form 101 alleging she injured multiple body parts in a MVA occurring on March 27, 2018.  RTEC denied the claim and asserted the special defense of a KRS 342.165(1) safety violation.  RTEC filed a SVE alleging, "Plaintiff pulled the vehicle she was driving in front of an oncoming vehicle that had the right of way, causing a collision with the other vehicle."

-2-

RTEC filed the police report from the March 27, 2018 accident. The report indicates Lima was driving and failed to yield the right of way when making a left hand turn. A vehicle that was driving straight ahead struck the passenger side of the vehicle driven by Lima. The report indicates Lima "was transported to LCRH for a panic attack. There were no injuries reported at the scene."

Lima testified by deposition on March 8, 2019, and at the final hearing held November 18, 2019. Lima began working for RTEC as a driver in February 2018. Lima transported clients with special needs, some of whom were wheelchair bound. On March 27, 2018, Lima testified she reported to work and performed a check on her bus. Lima did not remember the MVA, nor did she recall receiving treatment at the Lake Cumberland Regional Hospital. Lima's next memory is from being at home later that day. Lima later treated with her family physician, Dr. Michael Rowe, as well as with Dr. Changaris. She received therapy at Total Rehab Center. Lima additionally treated with Dr. Piyush Patel and received counseling at Avalon Psychological Center ("Avalon"). At the time of the deposition, Lima complained of forgetfulness, and head and neck symptoms. Lima testified she was unable to drive, and did not believe she could return to work at RTEC.

At the hearing, Lima testified she has not returned to work for RTEC since the MVA. She continues to treat with Dr. Changaris and Dr. Patel. Lima testified Dr. Patel prescribes her Donepezil, Zonisamide, and a pain medication. Dr. Patel advised her to lie down in the dark in her room when she experiences headaches. Lima receives counseling once a week at Avalon. Subsequent to the MVA, Lima testified she was at home using a stepladder to reach a high cabinet.

-3-

Lima experienced dizziness and fell on her right elbow on the kitchen countertop, injuring her right shoulder and elbow. Lima reported this incident to the workers' compensation insurer, and underwent physical therapy.

At the hearing, Lima testified her headaches, dizziness, and symptoms in her right shoulder and neck have improved since her deposition. She continues to experience headaches once or twice a month, along with right shoulder pain radiating into her elbow and into her neck. Lima testified her medical expenses are paid through Medicaid. Lima indicated she was cleared to drive in the spring of 2019. Prior to that, she relied upon transportation services from RTEC to get to and from her doctor's appointments. At times, Lima drove herself to her appointments when RTEC failed to pick her up. Lima does not believe she is able to drive clients with special needs, and is unable to lift up to fifty pounds as required by her job description. In September 2019, Lima began working as a substitute teacher for the Pulaski County Board of Education and obtained a full-time position there in November 2019.

Sheila Stallsworth ("Stallsworth"), the EEO benefits manager for RTEC, testified by deposition on April 5, 2019. Stallsworth testified Lima was hired as a driver on February 21, 2018. The inside of the bus driven by Lima was equipped with cameras at the time of the MVA, and video from that day was attached as an exhibit. Pictures taken of the bus driven by Lima after the MVA were also attached as an exhibit.

The RTEC driver handbook was also introduced. The handbook requires drivers to be alert and to look all around any time they come to a place

-4-

where others may cross, including intersections. Lima acknowledged receiving of the driver handbook on February 21, 2018. A "Letter of Reprimand: Warning" was sent to Lima on the day of the MVA indicating three points were assessed against her driving record for RTEC due to "inattention; failure to yield" and "preventable by RTEC driver."

Stallsworth testified the workers' compensation insurer notified RTEC that Lima could return to full duty work without restrictions on October 26, 2018. Stallsworth testified Lima did not return to work for RTEC after the MVA due to complaints of dizziness.

John Blanton ("Blanton"), a private investigator, testified by deposition on July 19, 2019. Blanton conducted surveillance of Lima on April 23, 2019, April 24, 2019 and May 9, 2019. The surveillance reports were attached as exhibits. Blanton observed Lima pressure washing the front of her house, driveway, and truck on April 23, 2019. The following day, Blanton observed Lima driving herself to Dr. Patel's office and to the grocery store. Blanton did not observe any activity on May 9, 2019.

Lima submitted the July 6, 2018 posturography report. The test was administered by a physical therapist and reviewed by Dr. Changaris. Based upon the testing results, Dr. Changaris concluded Lima "has a significant balance disorder with risk for falling that appears to be permanent." He diagnosed Lima with impaired balance, dizziness, and at risk for falls status-post MVA. Lima also submitted the July 6, 2018 videonystagmography ("VNG") report. The VNG was performed by a physical therapist and interpreted by Dr. Richard Newman. The

VNG evidenced significant peripheral vestibular dysfunction and central vestibular dysfunction. Balance rehabilitation was recommended. Dr. Changaris opined the posturography and VNG demonstrated Lima sustained a TBI.

Lima treated with Dr. Patel, a neurologist, on January 11, 2019 for confusion following the MVA. He noted Lima was initially diagnosed with a concussion, and she continues to have intermittent periods of confusion, dizziness, loss of focus and time, and headaches. Dr. Patel performed an examination and diagnosed Lima with post-concussive syndrome, partial symptomatic epilepsy with complex partial seizures, not intractable, without status epilepticus, PTSD, and dizziness. Dr. Patel ordered labs and recommended an EEG. Dr. Patel noted Lima "has been suffering from symptoms of post-concussion syndrome. She had been having marked cognitive deficits. She has been having some symptoms of depression . . . She has amnesia regarding the accident. She has positive Romberg sign. She is also having cognitive difficulties. She has difficulty with her short-term memory..." An EEG was performed on January 23, 2019, which revealed abnormalities, including a localized sharp wave activity in Lima's left frontal area. Lima was hospitalized for suicidal ideation for several days in February 2019.

Lima began treating with Dr. Vauette Baker, a psychological practitioner at Avalon in August 2018. She diagnosed Lima with adjustment disorder with anxiety and mild neurocognitive disorder due to her TBI. In a note dated December 17, 2018, Dr. Baker opined Lima was not malingering and continued to have cognitive problems from her injury.

-6-

Dr. Joseph Zerga evaluated Lima on October 15, 2018 at RTEC's request. Lima reported she did not remember the March 27, 2018 MVA. She complained of headaches, forgetfulness, difficulty with focus and communicating in conversation, confusion, dizziness, and vertigo. He noted Lima had recently injured her elbow at home when she fell due to dizziness. Dr. Zerga performed an examination and reviewed the records.

Dr. Zerga suspected the history Lima provided was coached. Based upon his review of the video, "it is evident that she did not suffer any head trauma and was immediately purposeful after the event. There is no evidence she suffered any physical trauma. Therefore, in my opinion, this case is fictitious." He found no evidence of any head, cervical, or upper back injuries, or that Lima could not return to work. Dr. Zerga opined the subsequent right upper extremity injury is unrelated to the MVA. Dr. Zerga opined Lima retained a 0% impairment rating, and has no need for permanent restrictions or medical treatment.

Dr. Zerga reviewed the video surveillance taken on the day of the MVA inside the bus. He concluded the video confirmed Lima did not suffer any head trauma. He noted Lima did not suffer any significant flexion/extension trauma or blunt trauma in the incident. He also noted Lima was immediately purposeful after the accident, and there was no evidence of any weakness or unsteadiness. He concluded there was no evidence Lima sustained a concussion or other significant trauma.

Dr. Changaris prepared a report on November 26, 2018. He noted Lima complained of pain in her neck and shoulders, as well as headaches, dizziness,

and changes in her sleep, vision, and concentration.  Dr. Changaris noted the positive VNG and posturography.  Dr. Changaris performed a neurological and physical examination, and reviewed the medical records.  Dr. Changaris diagnosed a TBI, right shoulder restrictive disease, and cervical restrictive disease all due to the work-related MVA.  He assessed a combined 59% impairment rating pursuant to the AMA Guides, attributing 15% to headaches, 25% to dizziness, 16% for the right shoulder, 18% for right hand weakness, 5% for the cervical spine, and 3% for pain.  Dr. Changaris opined the MVA caused Lima's injuries based upon her history, the results of his examination, his training, and his experience.  Dr. Changaris opined Lima had attained maximum medical improvement ("MMI") and recommended treatment with anti-depressants and pain management.  He restricted Lima from driving, walking on uneven surfaces, and climbing.  Dr. Changaris also advised Lima she was at serious risk for falling, and she should have had balance rehabilitation prior to her fall at home resulting in injuries to her right upper extremity.

Dr. Changaris disagreed with Dr. Zerga's October 15, 2018 report.  He reviewed the video footage taken inside the bus at the time of the MVA.  He concluded the impact of the MVA caused sufficient angular acceleration, or twisting, producing a demonstrable brain injury.  He noted the VNG and posturography evidenced severe findings, and the injuries she sustained in the MVA caused her to have extremely poor balance.

Dr. Changaris reported two other workers' compensation systems, Rhode Island and Colorado, have identified VNG and posturography as legitimate tools to diagnose and treat traumatic brain injuries.  He noted the military also uses

-8-

VNG and posturography. He also stated the VNG is considered an objective test for TBI and consists of a computer-based tracking of pupil movement in different postures.

RTEC filed a motion to strike Dr. Changaris' reports arguing he based his opinions on the VNG and posturography, which do not meet the standards of reliability pursuant to KRE 702 and Daubert v. Merrell Dow Pharmaceuticals, supra. In support of its position, RTEC filed the April 23, 2019 supplemental report by Dr. Zerga. He stated as follows:

> I have never heard of the posturography and vestibulonystagmography that Dr. Changaris uses. There are some vestibular tests that are performed usually by audiologists but I seriously question the reliability of tests that are performed by a physician whose practice seems to be maintained by plaintiff/attorney and plaintiff referrals. I don't know of any peer review publications to substantiate the validity of these tests . . . . I know of no one else in the medical community that uses these tests.

Dr. Zerga reiterated his opinion that Lima had been coached, there is no evidence of an injury due to the MVA, and the claim is fictitious.

Dr. Changaris prepared a May 30, 2019 report in response to the motion to strike. Dr. Changaris noted he is a board certified neurological surgeon and outlined his medical background, education, and training. Dr. Changaris cited and discussed two "meta analyses" papers dealing with the evaluation and management of TBI by the Colorado and Rhode Island workers' compensation systems. He noted both systems have recognized the reliability of the tests in diagnosing and treating balance injuries related to traumatic brain injuries. Dr. Changaris also attached abstracts and comments from over a dozen articles on VNG

-9-

and posturography, and a bibliography containing 80 standard references dealing with these studies.  He noted, "numerous other peer reviewed publications identify the utility of the VNG and PG to diagnose vestibular injuries."  He also noted that a google search of "vestibulonystagmography and traumatic brain injury" returns 17,600 references.  Dr. Changaris attached the first two references, which deal with military use of the VNG in blast injuries and VNG used in mild traumatic brain injuries.

Dr. Changaris stated he used sound scientific methodology in concluding Lima has a balance disorder with continuing dizziness and headaches. Dr. Changaris reached his conclusions by taking a medical history from Lima, performing an examination, and reviewing the medical records.  He additionally performed generally accepted balancing tests through VNG and posturography which identified both a peripheral and central vestibular injuries.  Dr. Changaris stated the posturography and VNG provide objective data, do not have false positives, and have a long history of studying balance disorders after trauma in determining whether there has been a peripheral, or a central, injury or both.

Dr. Changaris opined Dr. Zerga misinterpreted the MVA video and has limited understanding of vestibular testing.  He opined the angular acceleration of Lima's head was within the known range to cause tearing of her brain and that this was confirmed by her positive VNG and posturography showing brainstem dysfunction.  Dr. Changaris stated the positive VNG and posturography could not be fabricated.  Dr. Changaris attached several review articles and studies on both VNG and posturography, all of which are peer reviewed.

-10-

RTEC filed Dr. Zerga's July 23, 2019 supplemental report. He reviewed surveillance footage taken of Lima power washing the driveway and her truck on April 23 and 24, 2019. Based upon the video, Dr. Zerga concluded that Lima's statement that trying to do vestibular movement testing made her dizzy is untrue. Dr. Zerga stated he continues to believe this is a fictitious case. He noted Lima moved, stood, walked, and bent over at a severe degree several times without difficulty.

Lima filed Dr. Changaris' August 19, 2019 report, who re-examined her on August 7, 2019 and reviewed the April 2019 surveillance video. He noted Lima was initially diagnosed with a concussion at the emergency room on March 27, 2018. Dr. Rowe later diagnosed Lima with a "post-concussive headache" on April 24, 2018 and "post-concussive syndrome" on June 13, 2018. He cited to the physical therapy record from September 19, 2018, indicating vertigo testing had been performed and resulted in vertigo, swaying, and loss of balance. He noted Dr. Patel referred Lima to Dr. Toufik Fakhoury, who ordered an EEG and prescribed Zonisamide, a well-known seizure/headache medication, and had excellent results.

Dr. Changaris noted the diagnoses of central and peripheral vertigo were made using VNG and posturography. His diagnoses were confirmed by both direct physical examination and the September 19, 2018 physical therapy record. He reiterated the angular acceleration documented in the video taken of the MVA was of sufficient magnitude to cause shearing of the brain.

Dr. Changaris altered his assessment of impairment in light of Lima's improvement since treating with Dr. Fakhoury. Dr. Changaris assessed a 10%

-11-

impairment rating for headaches, citing to Table 13-3 on page 312, Class 1, of the AMA Guides. Dr. Changaris assessed a 10% impairment rating for dizziness based upon the VNG and posturography, citing to page 253, Table 11-4, Class 2 of the AMA Guides. Dr. Changaris assessed a 17% impairment rating for the right upper extremity. Dr. Changaris reiterated Lima "has clear evidence of a brain concussion caused by the car accident and documented by the initial ER visit, subsequent treaters, my exams and treatments, and multiple physical therapists." He also opined Lima sustained shoulder and elbow injuries due to inadequate treatment of her underlying vertigo of central origin caused by the MVA.

Dr. Changaris opined Lima attained MMI on August 7, 2019 and recommended continuing Zonisamide. He restricted Lima from lifting overhead, repetitive activity of the right arm and using vibratory or percussive instruments, or lifting more than ten pounds. He opined Lima could return to work if given the opportunity to be absent as needed to manage headaches and dizziness.

Dr. Zerga prepared a supplement report dated November 5, 2019. He reviewed Dr. Changaris' August 19, 2019 report and stated his opinions remain unchanged.

A Benefit Review Conference was held on October 16, 2019. The parties identified the following contested issues: injury as defined by the Act, causation, temporary versus permanent injury, income benefits per KRS 342.730, average weekly wage, TTD, ability to return to work, unpaid or contested medical expenses, proper use of AMA Guides, and whether Dr. Changaris' opinion conforms

-12-

to Daubert.  At the Hearing, the alleged safety violation was added as a contested issue, and the parties stipulated to Lima's average weekly wage.

In her opinion, the ALJ concluded Lima sustained a TBI due to the March 27, 2018 MVA based upon the treatment records and Dr. Changaris' opinion. The ALJ noted the MVA caused moderate to significant damage to both the vehicle driven by Lima and the second vehicle involved in the accident, which was indicative of a severe and forceful impact.  The ALJ found Dr. Changaris' opinion that the mechanism of injury caused a TBI was persuasive in light of the police report and video of the accident.  The ALJ noted Lima was diagnosed with a concussion at the emergency room, Dr. Rowe later diagnosed a post-concussive headache, and also noted a subsequent EEG was abnormal.  The ALJ also noted Lima's counselor at Avalon found no evidence of malingering.  Thus, the ALJ rejected Dr. Zerga's opinion regarding causation.

Although the ALJ did not solely rely on Dr. Changaris' opinion to find Lima sustained a TBI, she provided the following analysis pursuant to Daubert v. Merrell Dow Pharmaceuticals, supra:

> To be clear, this ALJ's finding that Plaintiff sustained a traumatic brain injury is not completely based on Dr. Changaris' opinions alone. Rather, this ALJ felt the treatment records also supported Plaintiff's allegation of a traumatic brain injury considering the diagnosis rendered following the motor vehicle accident. However, this ALJ will provide a Daubert analysis in order to provide the parties findings on this issue for appellate purposes.
>
> Dr. Changaris utilized posturography and vestibulonystagmography in order to assess whether Plaintiff sustained a traumatic brain injury. Dr. Changaris felt Plaintiff's test results indicated she

-13-

sustained a traumatic brain injury. Dr. Zerga questioned these tests and indicated he had never heard of posturography and vestibulonystagmography. Of course, Dr. Zerga's unfamiliarity with these tests does not equate to a finding in Defendant's favor. Dr. Changaris explained these tests have been utilized by Worker's Compensation courts in other jurisdictions and the military and have been tested. Dr. Changaris indicated posturography is a generally accepted well-established test useful in monitoring neurologic recovery. Thus, Dr. Changaris provided an opinion addressing whether the testing he performed is generally accepted in this particular field. After conducting an analysis in accordance with Daubert, this ALJ finds Dr. Changaris' opinion, to the limited extent he relied on posturography and vestibulonystagmography, is reliable and credible. However, this ALJ feels compelled to note Dr. Changaris' causation opinion was also based on his clinical examination findings and review of Plaintiff's treatment records.

The ALJ next determined Lima's subsequent fall at home causing a right upper extremity injury was work-related because it was a direct and natural consequence of the symptoms and limitations of the work-related TBI.

The ALJ determined Lima attained MMI on August 7, 2019, based upon Dr. Changaris' opinion and the fact she continued to seek treatment subsequent to the cessation of the voluntary payment of TTD benefits by RTEC. The ALJ awarded TTD benefits from March 28, 2018 through August 7, 2019. The ALJ determined Lima's TBI warranted a combined 19% impairment rating based upon Dr. Changaris' assessment of 10% for headaches and 10% for dizziness pursuant to the AMA Guides. The ALJ also determined Lima's right upper extremity injury did not result in a permanent injury or impairment, but she is entitled to an award of past and future medical benefits. The ALJ determined Lima does not retain the physical capacity to return to the type of work she performed at

-14-

the time of her work injury, relying upon her testimony and Dr. Changaris' restrictions.   Finally, the ALJ determined Lima's conduct in the MVA did not amount to a reckless disregard or willful misconduct by failing to yield the right-of-way to warrant the imposition of a safety violation pursuant to KRS 342.165(1). Therefore, the ALJ awarded Lima TTD benefits, PPD benefits based upon a 19% impairment rating, enhanced by the three multiplier contained in KRS 342.730(1)(c)1, and medical expenses related to the TBI and right upper extremity injury.

RTEC filed a petition for reconsideration making the same arguments it now raises on appeal.   RTEC did not request any additional findings of fact.   Lima filed a petition for reconsideration requesting the ALJ correct a clerical error.   The ALJ sustained Lima's petition and corrected the clerical error.   The ALJ denied RTEC's petition finding it amounted to no more than a re-argument of the merits of the claim.

As the claimant in a workers' compensation proceeding, Lima had the burden of proving each of the essential elements of her claim.   Snawder v. Stice, 576 S.W.2d 276 (Ky. App. 1979).   Since Lima was successful in her burden, we must determine whether substantial evidence of record supports his decision.   Wolf Creek Collieries v. Crum, 673 S.W.2d 735 (Ky. App. 1984).   "Substantial evidence" is defined as evidence of relevant consequence having the fitness to induce conviction in the minds of reasonable persons.   Smyzer v. B. F. Goodrich Chemical Co., 474 S.W.2d 367 (Ky. 1971).

In rendering a decision, KRS 342.285 grants an ALJ as fact-finder the sole discretion to determine the quality, character, and substance of evidence. Square D Co. v. Tipton, 862 S.W.2d 308 (Ky. 1993). An ALJ may draw reasonable inferences from the evidence, reject any testimony, and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. Jackson v. General Refractories Co., 581 S.W.2d 10 (Ky. 1979); Caudill v. Maloney's Discount Stores, 560 S.W.2d 15 (Ky. 1977). Although a party may note evidence supporting a different outcome than reached by an ALJ, such is not an adequate basis to reverse on appeal. McCloud v. Beth-Elkhorn Corp., 514 S.W.2d 46 (Ky. 1974). Rather, it must be shown there was no evidence of substantial probative value to support the decision. Special Fund v. Francis, 708 S.W.2d 641 (Ky. 1986).

The function of the Board in reviewing an ALJ's decision is limited to a determination of whether the findings made are so unreasonable under the evidence they must be reversed as a matter of law. Ira A. Watson Department Store v. Hamilton, 34 S.W.3d 48 (Ky. 2000). The Board, as an appellate tribunal, may not usurp the ALJ's role as fact-finder by superimposing its own appraisals as to weight and credibility or by noting other conclusions or reasonable inferences that otherwise could have been drawn from the evidence. Whittaker v. Rowland, 998 S.W.2d 479 (Ky. 1999).

We first address RTEC's challenge to Dr. Changaris' opinions pursuant to Daubert v. Merrell Dow Pharmaceuticals, supra. The Kentucky Rules of Evidence govern workers' compensation claims and, therefore, the principles

-16-

enunciated in Daubert apply to the admission of expert testimony pursuant to KRE 702. 803 KAR 25:010 §14(1). Thus, the ALJ is required to make a reliability determination, although a specific recitation of the Daubert factors is not required. City of Owensboro v. Adams, 136 S.W.3d 446, 451 (Ky. 2004).

> KRE 702 states as follows:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

In Adams, the Kentucky Supreme Court determined a physician's expert opinion concerning occupational exposure to toxic gas was sufficiently reliable to meet the admissibility standards of Daubert. The Court noted the indicia of reliability identified in Daubert: a theory's general acceptance in the scientific community, whether the theory has been tested, whether it has been subjected to peer review, and the potential rate of error. Daubert, 509 U.S. at 592-94. However, the Court emphasized the Daubert analysis is a "flexible" one designed to separate opinions reached by valid scientific methods from unsupported speculation:

> The subject of an expert's testimony must be scientific ... knowledge. The adjective "scientific" implies a ground in the methods and procedures of

-17-

science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation... Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science .... Indeed, scientists do not assert that they know what is immutably "true"—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena ... Science is not an encyclopedic body of knowledge about the universe. Instead it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement ... But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known.

Id. at 589-90.

We determine the ALJ provided a sufficient analysis pursuant to Daubert and committed no error in authorizing the admission of Dr. Changaris' opinions, based, in part, on the VNG and posturography. The fact that Dr. Zerga disagrees with Dr. Changaris' opinion is not conclusive. City of Owensboro v. Adams, 136 S.W.3d at 452. Similarly, Dr. Zerga's unfamiliarity with VNG and posturography does not mandate the exclusion of Dr. Changaris' opinion.

The ALJ noted Dr. Changaris explained the challenged tests have been utilized by Workers' Compensation courts in other jurisdictions and the military, and have been tested. She further noted Dr. Changaris indicated posturography is a generally accepted, well-established test in monitoring neurologic recovery. In the May 30, 2019 report, Dr. Changaris provided an extensive outline of his medical background, education, and training as a neurological surgeon. He discussed the fact that both the Colorado and Rhode Island workers' compensation systems recognize

-18-

the reliability of the tests in diagnosing and treating balance injuries related to traumatic brain injuries.  Dr. Changaris attached abstracts and comments from over a dozen articles on VNG and posturography, and a bibliography containing 80 standard references dealing with these studies.  He noted, "numerous other peer reviewed publications identify the utility of the VNG and PG to diagnose vestibular injuries."  Dr. Changaris further stated he used sound scientific methodology in concluding Lima has a balance disorder with continuing dizziness and headaches. Dr. Changaris reached his conclusions by taking a medical history from Lima, performing an examination, and reviewing the medical records.  He additionally performed generally accepted balancing tests through VNG and posturography, which identified both a peripheral vestibular injury and a central vestibular injury. Dr. Changaris stated the posturography and VNG provide objective data, do not have false positives, and have a long history of use in studying balance disorders after trauma to determine whether there has been a peripheral or a central injury or both. Dr. Changaris attached several review articles and studies on both VNG and posturography, all of which are peer reviewed.

We conclude the ALJ performed an appropriate analysis pursuant to Daubert, and likewise appropriately exercised her discretion in finding his opinion is consistent with the requirements contained in KRE 702.  Therefore, we will not disturb the ALJ's decision regarding the admissibility and reliance upon Dr. Changaris' opinions.

Similarly, the ALJ relied upon substantial evidence in determining Lima sustained a TBI in the March 27, 2018 MVA.  In addition to Dr. Changaris'

-19-

opinions, the ALJ also relied upon the video of the MVA, the police report, and the treatment records. The ALJ noted Lima required treatment immediately after the MVA for a panic attack. She was then transported to the emergency by ambulance and was diagnosed with a concussion. Dr. Rowe similarly diagnosed her with a post-concussive headache. The ALJ also noted the abnormal EEG. In his reports, Dr. Changaris noted he had reviewed the video of the MVA to determine the impact caused sufficient angular acceleration or twisting to produce a demonstrable brain injury. Dr. Changaris noted the posturography and positive VNG. Dr. Changaris obtained a history from Lima, examined her on two occasions, and reviewed the medical records. Based upon the above, Dr. Changaris diagnosed a TBI due to the MVA. The ALJ also explained why she rejected Dr. Zerga's opinion regarding causation. We determine the above constitutes substantial evidence supporting the ALJ's determination Lima sustained a TBI due to the work-related MVA.

RTEC next challenges the ALJ's award of TTD beyond October 17, 2018. RTEC voluntarily paid Lima TTD benefits from March 28, 2018 through October 17, 2018, based upon Dr. Zerga's opinion. However, the ALJ awarded TTD benefits through August 7, 2019. TTD is statutorily defined in KRS 342.0011(11)(a) as "the condition of an employee who has not reached maximum medical improvement from an injury and has not reached a level of improvement that would permit a return to employment[.]" In Magellan Behavioral Health v. Helms, 140 S.W.3d 579 (Ky. App. 2004), the Court of Appeals instructed that until MMI is achieved, an employee is entitled to TTD benefits as long as he remains disabled from his customary work or the work he was performing at the time of the

-20-

injury.  In <u>Central Kentucky Steel v. Wise</u>, 19 S.W.3d 657 (Ky. 2000), the Kentucky

Supreme Court explained, "It would not be reasonable to terminate the benefits of an

employee when he is released to perform minimal work but not the type that is

customary or that he was performing at the time of his injury."  Thus, a release "to

perform minimal work" does not constitute a "return to work" for purposes of KRS

342.0011(11)(a).  In <u>Livingood v. Transfreight, LLC, et. al.</u>, 467 S.W.3d 249 (Ky.

2015), the Supreme Court declined to hold a claimant is entitled to TTD benefits so

long as he or she is unable to perform the work performed at the time of the injury.

The Court stated, "... we reiterate today, *Wise* does not 'stand for the principle that

workers who are unable to perform their customary work after an injury are always

entitled to TTD.'"  <u>Id.</u> at 254.

The ALJ relied upon Dr. Changaris in determining Lima did not

attain MMI from her TBI and right upper extremity injury until August 7, 2019.  In

his August 19, 2019 report, Dr. Changaris noted he re-examined Lima on August 7,

2019.  He noted that when he first examined her in November 2018, Lima had not

been able to obtain appropriate medical treatment and he believed it was unlikely she

would obtain sufficient medical treatment.  Dr. Changaris subsequently noted Lima's

condition had substantially improved due the availability of medical care, mainly

treatment rendered by Dr. Fakhoury.   Therefore, Dr. Changaris opined Lima

attained MMI as of the August 7, 2019 examination and altered his assessment of

impairment.

Standing alone, Dr. Changaris' opinion that Lima attained MMI on

August 7, 2019 constitutes substantial evidence supporting the award of TTD

-21-

benefits through August 7, 2019. We note Lima did not return to any work until approximately September 2019. The ALJ also noted Lima continued to receive treatment after October 2018, and emphasized the fact her condition improved and plateaued only after she sought treatment with Dr. Fakhoury. Dr. Changaris' opinion, alone or in conjunction with other factors considered by the ALJ, constitutes substantial evidence supporting the award of TTD benefits until August 7, 2019.

We find no merit in RTEC's argument Dr. Changaris' assessment of impairment does not comport with the AMA Guides, and therefore cannot constitute substantial evidence. In this instance, the ALJ adopted the impairment ratings associated with Lima's TBI assessed by Dr. Changaris in his August 19, 2019 report. In Kentucky River Enterprises, Inc. v. Elkins, 107 S.W.3d 206 (Ky. 2003), the Kentucky Supreme Court held the proper interpretation of the AMA Guides is a medical question solely within the province of the medical experts. Where opinions from medical experts conflict regarding the appropriate percentage, it is the ALJ's function as fact-finder to weigh the evidence and select the rating upon which permanent disability benefits, if any, will be awarded. Knott County Nursing Home v. Wallen, 74 S.W.3d 706 (Ky. 2002).

In George Humfleet Mobile Homes v. Christman, 125 S.W.3d 288 (Ky. 2004), the Court further held that, while an ALJ is not authorized to independently interpret the AMA Guides, as fact-finder she may consult them in the process of assigning weight and credibility to evidence. Although assigning a permanent impairment rating is a matter for medical experts, determining the weight

-22-

and character of medical testimony and drawing reasonable inferences therefrom are matters for the ALJ. Knott County Nursing Home v. Wallen, supra. The ALJ is not required to engage in a detailed analysis under the AMA Guides, nor is she required to engage in a detailed explanation of the minutia of her reasoning in reaching a particular result. Shields v. Pittsburgh and Midway Coal Mining Co., 634 S.W.2d 440 (Ky. App. 1982); Big Sandy Community Action Program v. Chaffins, 502 S.W.2d 526 (Ky. 1973).

RTEC submitted no expert medical testimony demonstrating Dr. Changaris' assessment of impairment was not in conformity with the AMA Guides, and relies on the arguments of Counsel instead. We further note RTEC does not specifically argue Dr. Changaris' assessment of 10% for headaches and 10% for dizziness do not conform with the AMA Guides. Dr. Changaris altered his assessment of impairment in light of Lima's improvement in the August 19, 2019 report. Dr. Changaris provided specific citations to the AMA Guides supporting his assessment of impairment applicable to Lima's TBI. His opinion constitutes substantial evidence supporting the ALJ's determination of Lima's impairment rating. The ALJ acted well within her discretion in adopting Dr. Changaris' assessment of impairment in the August 19, 2019 report and it is not the function of this Board to disturb her conclusions.

We find unpersuasive RTEC's argument the ALJ erred in finding Lima does not retain the physical capacity to return to the type of work she was performing at the time of her injury since she admitted she drove while being restricted from doing so. In support of her determination, the ALJ noted Lima did

-23-

not return to work for RTEC, she was intermittently restricted from driving, and she requires ongoing treatment for her TBI. The ALJ concluded it would be ill-advised for a person with Lima's ongoing headaches and dizziness symptoms to return to work as a driver. The ALJ relied upon Lima's testimony and Dr. Changaris' restrictions in finding Lima does not retain the physical capacity to return to the work as a driver. Lima testified at both the deposition and hearing she did not believe she could return to work as a driver.

An ALJ may give weight to a claimant's own testimony regarding his retained physical capacity and occupational disability. Hush v. Abrams, 584 S.W.2d 48 (Ky. 1979). In the November 26, 2018 report, Dr. Changaris restricted Lima from driving, walking on uneven surfaces, and climbing. In the August 9, 2019 report, Dr. Changaris restricted Lima from lifting overhead, engaging in repetitive right arm/ hand activity, use of vibrating or percussive instruments, or from lifting over ten pounds. Lima's testimony, in conjunction with Dr. Changaris' restrictions, constitute substantial evidence supporting the ALJ's determination Lima does not retain the physical capacity to return to work as a driver.

Finally, we find substantial evidence supports the ALJ's determination that Lima's award should not be reduced by 15% pursuant to KRS 342.165(1) and a contrary result is not compelled. The purpose of KRS 342.165(1) is to reduce the frequency of industrial accidents by penalizing those who intentionally fail to comply with known safety regulations. See Apex Mining v. Blankenship, 918 S.W.2d 225 (Ky. 1996). The burden is on the claimant to demonstrate an employer's intentional violation of a safety statute or regulations, and conversely, the burden is upon the

-24-

employer to establish an employee's intentional violation.  *See* Cabinet for Workforce Development v. Cummins, 950 S.W.2d 834 (Ky. 1997).  KRS 342.165(1) provides:

> . . . If an accident is caused in any degree by the intentional failure of the employee to use any safety appliance furnished by the employer or to obey any lawful and reasonable order or administrative regulation of the commissioner or the employer for the safety of employees or the public, the compensation for which the employer would otherwise have been liable under this chapter shall be decreased fifteen percent (15%) in the amount of each payment.

The application of a safety penalty requires proof of a violation of a specific safety provision, whether state or federal.  Second, evidence of "intent" to violate a specific safety provision must also be present.  Finally, the violation must cause the accident.  Application of KRS 342.165(1) does not automatically flow from a showing of a violation of a specific safety regulation followed by a compensable injury.  Burton v. Foster Wheeler Corp., 72 S.W.3d 925 (Ky. 2002).

There appears to be no dispute Lima failed to yield the right of way to another vehicle and this was prohibited by the RTEC driver handbook.  However, there must also be evidence of the intent to violate the specific safety provision as noted above.  In Terry v. AFG Industries, WCB Opinion No. 2000-94292 (January 2, 2003), we stated the following regarding the element of intent:

> Inadvertent negligence by the employee is not enough. There must be a level of awareness by the party not merely with regard to the existence of a safety regulation or policy, but an immediate cognizance that the conduct causing the injury is in contravention to the policy or regulation. Barmet of Kentucky v. Sallee, Ky. App., 605 S.W.2d 29 (1980).  In other words, the injury must be the result of conscious wrongdoing. The act causing the injury must be desired by the doer, and the consequences reasonably foreseeable. The violation

-25-

must be advertent and rise to the level of at least reckless disregard or willful misconduct. See, Larson's Workers' Compensation, § 31. Only then, if the accident caused by the employee is attributable "in any degree" to his failure to use any safety appliance furnished by his employer, or his failure to obey any lawful and reasonable order or administrative regulation of the Commissioner or his employer for the safety of employees or the public, shall the compensation for which his employer is liable be decreased by 15% in the amount of each payment.

In the instant claim, we agree with Terry that the record is devoid of any evidence indicating that he consciously disregarded the safety policies of AFG or willfully ignored the required use of various safety appliances to prevent the destabilization of containers and flatbeds for loading purposes. REO Mechanical v. Barnes, Ky. App., 691 S.W.2d 224 (1985). On this single occasion, after already loading several trucks that day and in a rush to do his job, he inadvertently forgot to make sure the appliances were locked into place. The accident occurred, therefore, not as a result of any willful misconduct on Terry's part, but solely due to an act of simple negligence. Consequently, the ALJ's application of the 15% penalty to Terry's award was in error.

Slip opinion at 10.

The ALJ determined Lima did not intentionally fail to yield to another vehicle, which had the right of way, and outlined her reason for doing so. The ALJ determined Lima's actions amount to mere inadvertence or simple negligence and not reckless disregard or willful misconduct. The record is devoid of any evidence indicating Lima consciously disregarded the safety policies of RTEC or willfully ignored the requirement to yield to vehicles with the right of way. REO Mechanical v. Barnes, Ky. App., 691 S.W.2d 224 (1985). We believe the ALJ acted within her authority in drawing this conclusion. As fact-finder, the ALJ has the sole authority to determine the weight, credibility and substance of the evidence, and reasonable

-26-

inferences to be drawn.  <u>Square D Co. v. Tipton</u>, <u>supra</u>.  <u>Miller v. East Kentucky Beverage/Pepsico, Inc.</u>, 951 S.W.2d 329 (Ky. 1997)

Finally, in light of the above findings, RTEC's argument that the evidence does not support the finding of compensable medical benefits is rendered moot.

Accordingly, the January 17, 2020 Opinion, Award, and Order, and the February 10, 2020 Order rendered by Hon. Stephanie L. Kinney, Administrative Law Judge, are hereby **AFFIRMED**.

BORDERS, MEMBER, CONCURS.

STIVERS, MEMBER, CONCURS IN RESULT ONLY.


**DISTRIBUTION:**

**COUNSEL FOR PETITIONER:**                                    **LMS**

HON MARCEL SMITH
300 E MAIN ST, STE 400
LEXINGTON, KY 40507

**COUNSEL FOR RESPONDENT:**                                    **LMS**

HON MICHAEL F EUBANKS
225 W IRVINE STREET
RICHMOND, KY 40475

**ADMINISTRATIVE LAW JUDGE:**                                    **LMS**

HON STEPHANIE L KINNEY
MAYO-UNDERWOOD BLDG
500 MERO STREET, 3rd FLOOR
FRANKFORT, KY 40601