```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
               CENTRAL DIVISION (at Lexington)


CHARLES L. WALDEN,         )
                           )
          Plaintiff,       )
                           )
                           )
v.                         ) CIVIL ACTION FILE NO.
                           ) 5:22-CV-238-KKC
                           )
ENTERPRISE SERVICE         )
GROUP, LLC, ET AL,         )
                           )
          Defendants.      )


June 14, 2024      11:00 a.m.    Atlanta, Georgia




      This is the video and Zoom deposition of
                   CLARENCE M. HOWARD
taken at 235 Peachtree Street, Atlanta, Georgia;
testimony is given before J. Robin Sawyer, Certified
Court Reporter, #4882-9574-0787-9168.


                    Signature Waived



              Janice Baker & Associates
      235 Peachtree Street, North Tower, Ste 400
              Atlanta, Georgia 30303
                    (404)969-1206
```

                                                                 1

                        A P P E A R A N C E S


For the Plaintiff:

Hon. Robert A. Morrin
Morrin Law Office
214 West Main Street
Richmond, Kentucky 40475
(859)358-0300

Counsel for Defendant, Clarence M. Howard

Hon. Jay Milby Ridings
Hon. Marcia Milby Ridings (via Zoom)
HAMM, MILBY & RIDINGS, PLLC
120 North Main Street
London, KY 40741
marcia@hmrkylaw.com
jridings@hmrkylaw.com

Counsel for Progressive Insurance Company

Hon. Clay Thornton (via Zoom)
WARD HOCKER & THORNTON, PLLC
Vine Center
333 W. Vine Street, Suite 1100
Lexington, KY 40507
claythornton@whtlaw.com

                                                                 2

                      INDEX TO PROCEEDINGS

                                              PAGE
EXAMINATION BY:

Mr. Morrin:                                   6, 93

Mr. Ridings:                                  77




Disclosure:                                   101


Certificate:                                  102










                     TRANSCRIPT CODES

--                 denotes interruption/change in thought
. . .              denotes incomplete thought
[sic]              denotes word/phrase written verbatim
(ph)               denotes word spelt phonetically
(unintelligible)   denotes word cannot be understood

                                                                 3

                        INDEX TO EXHIBITS

Exhibits                                           Page


Exhibit No. 1,
Photo:                                              52

Exhibit No. 2,
Photo:                                              52

Exhibit No. 3,
Photo:                                              54

Exhibit No. 4,
Photo:                                              86









            (Reporter's disclosure presented to counsel.)

                                                                 4

```
 1   Q    -- just to make sure we're on the same page.
 2        And with that in mind, if you answer a question I
 3   ask, can I assume that you understood it?  Can I assume
 4   that you understood the question?
 5        MR. RIDINGS:  Objection to that.  I'm going to
 6        object to that because he can't know what the
 7        question is in advance.  And there's -- that would
 8        be pure speculation.
 9   BY MR. MORRIN:
10   Q    If you answer a question --
11        MR. MORRIN:  Are you directing him not to
12        answer that question?
13        MR. RIDINGS:  I'm not directing him not to
14        answer, but --
15        THE DEPONENT:  I'll answer it.  Go ahead.
16   BY MR. MORRIN:
17   Q    If -- if I ask a question and you provide an
18   answer to that question --
19   A    Uh-huh.
20   Q    -- are we on the same page that that's because
21   you understood the question?
22   A    Yes.
23   Q    Okay.  Are you on any medications right now?
24   A    No.
25   Q    Okay.  Have you -- have you used any substance
                                                            9
```

```
 1   or gone through anything this morning that could prevent
 2   you from testifying truthfully?
 3   A    No, sir.
 4   Q    Okay.  And I hope you don't get offended by
 5   these questions.
 6   A    No, no.
 7   Q    I just want to make sure that we're all on the
 8   same question.
 9        (Indiscernible crosstalk.)
10        Sure.
11   Have you ever been convicted of a felony or a
12   misdemeanor?
13   A    Yes.
14   Q    Okay.  When was that?
15   A    Convicted of a misdemeanor probably like two
16   years ago.
17   Q    Okay.  This would be in 2022?
18   A    Somewhere around there, yeah.
19   Q    Okay.  Which county?
20   A    That was Cobb County.
21   Q    Cobb County?
22   A    Uh-huh.  Cobb County, Georgia.
23   Q    Thank you.  And if you don't mind, the actual
24   charge?
25   A    What was it?  I want to say family violence,
                                                           10
```

```
 1   something like --
 2   Q    Domestic violence?
 3   A    Yeah, like a domestic, yeah, situation,
 4   basically.  No kids were involved.
 5   Q    Okay.  Any -- any other convictions in your
 6   history?
 7   A    No, sir.
 8   Q    Okay.  If you don't mind, summarize your
 9   education history for me starting with high school.
10   A    I graduated high school.
11   Q    Graduated high school?
12   A    Uh-huh.
13   Q    Any formal education beyond that?
14   A    No.
15   Q    Okay.  Other than maybe the commercial
16   driver's license, did you have any training --
17   A    I don't have no CDL.
18   Q    You don't have a CDL?
19   A    No.
20   Q    Did you have a CDL before?
21   A    No, I never had a CDL.
22   Q    Okay.  Have you ever had a DOT number?
23   A    Not personally.
24   Q    Okay.  For the -- let's go with your -- how
25   old are you again?
                                                           11
```

```
 1   A    I'm 42 years old.
 2   Q    42 years old.  Before -- how did you -- how
 3   did you get this position driving that truck?
 4   A    I worked with the lady that owned the company.
 5   It was her and her brother.
 6   Q    Okay.  When did you start working with -- what
 7   was her name?
 8   A    Her name was -- it started with an S --
 9   Shanta, if I'm not mistaken.
10   Q    Shanta.  Do you remember her last name?
11   A    I would have to try to go look in my phone
12   records.
13   Q    And did she -- did she own Enterprise Service
14   Group?
15   A    Her and her brother did.
16   Q    Her and her brother?  Do you know her
17   brother's name?
18   A    No, sir.
19   Q    Okay.  And when did you start working for
20   Shanta and her brother?
21   A    In 2020.
22   Q    Is that when you met them?
23   A    No.  I met her --
24   Q    When did you meet Shanta?
25   A    -- at my other job that I worked at before
                                                           12
```

```
 1   that.
 2   Q   Where was that?
 3   A   I can't think of it. I forgot.
 4   Q   Okay. You don't remember what you did?
 5   A   What you mean what I did?
 6   Q   So the job --
 7   A   Occupation?
 8   Q   Yeah, the job.
 9   A   Warehouse.
10   Q   Say again.
11   A   Warehouse --
12   Q   Warehouse?
13   A   -- forklift operator.
14   Q   Okay. Do you know about how long you did
15   that?
16   A   You mean how long I worked at that job?
17   Q   Yes, sir.
18   A   Maybe two years.
19   Q   And what did you do before the job you had as
20   a forklift operator?
21   A   Forklift operator.
22   Q   Just at a different company?
23   A   Yep.
24   Q   Do you remember the other company you worked
25   for?
                                                      13
```

```
 1   A   Not offhand. It's been years ago, man. My
 2   mom passed away since that time. Like, a lot of stuff
 3   has happened.
 4   Q   Yeah. I'm sorry to hear that.
 5   A   Uh-huh.
 6   Q   When did -- when did that happen?
 7   A   2020 -- well, 2019.
 8   Q   2019.
 9   A   Uh-huh.
10   Q   I'm very sorry to hear that.
11   A   That's no problem.
12       MR. RIDINGS: Real quick, Rob, before your
13   next question --
14       MR. MORRIN: Yeah?
15       MR. RIDINGS: I'm going to -- since there's
16   no -- okay. Sorry. Give him a note.
17       MR. MORRIN: Okay. What was the note?
18       MR. RIDINGS: Privileged; it had nothing to do
19   with testimony.
20       MR. MORRIN: Okay. Well, I guess what I don't
21   want to see is him being coached in the middle of
22   our deposition.
23       So if you need to take a break and talk to
24   them, that's fine. But while I'm questioning, if
25   you don't mind not passing notes to him, I'd
                                                      14
```

```
 1   appreciate it.
 2       MR. RIDINGS: Oh, we will -- certainly.
 3       I was trying to speed this along. We will go
 4   off the record next time.
 5       MR. MORRIN: Well, if I know what's going on,
 6   I won't ever stop you from trying to speed it
 7   along. Okay?
 8   BY MR. MORRIN:
 9   Q   Where -- let's see.
10   Mr. Howard, what did you do to prepare for today's
11   deposition?
12   A   Went to sleep good last night because I know I
13   was going to have to wake up early this morning.
14   Q   That's good. A good night's sleep does a lot.
15   Did you do anything else to prepare?
16   A   Went to sleep.
17   Q   Anything else other than go to sleep?
18   A   (No verbal response.)
19   Q   Okay. Did you look at any discovery responses
20   you -- you provided?
21   A   I didn't have to.
22       MR. RIDINGS: I just -- I think the audio
23   froze up again.
24       MR. MORRIN: Jay --
25       THE VIDEOGRAPHER: I am afraid it's the local
                                                      15
```

```
 1   internet.
 2       MR. MORRIN: Okay. Jay, do you have a copy
 3   of -- can I use that original just for purposes --
 4       MR. RIDINGS: You sure can.
 5       MR. MORRIN: Because I don't have the
 6   signature --
 7       MR. RIDINGS: It did not -- I guess --
 8       MR. MORRIN: I won't -- I won't break it up.
 9   I'll give it right back to you.
10       MR. RIDINGS: It's not stapled.
11       MR. MORRIN: Okay.
12       MS. RIDINGS: I can't hear.
13       MR. RIDINGS: Can we go off the record real
14   quick?
15       MR. MORRIN: Yeah. Let's see if we can fix
16   that so they can hear and not just --
17       THE VIDEOGRAPHER: Going off record at 11:27.
18       (Off the record at 11:27 a.m.)
19       We're going back on the record at 11:29.
20       (On the record at 11:29 a.m.)
21   BY MR. MORRIN:
22   Q   Mr. Howard, you indicated that you've never
23   had a commercial driver's license.
24   A   Yes, sir.
25   Q   Okay. Is this a -- a picture of you?
                                                      16
```

```
 1    further guidance as -- I mean, that's a -- that's a
 2    very broad request.
 3            He's not -- I'm not going to let him agree to
 4    go --
 5            MR. MORRIN:  I'll object to counsel now
 6    testifying, though.  I -- I think he's required to
 7    answer the question unless you're instructing him
 8    not to answer.
 9            MR. RIDINGS:  You -- I am instructing you not
10    to answer and open a -- as to whether we will --
11    broad- -- agree to that very broad request without
12    some limitations.
13            THE DEPONENT:  I agree.  I 100 percent agree.
14            MR. RIDINGS:  So just don't answer.
15            THE DEPONENT:  Uh-huh.
16  BY MR. MORRIN:
17    Q    What reason is preventing you from -- from
18    logging into your email address and providing Shanta's
19    contact information?  Because she has some very
20    important information that we need to get access to in
21    order to get justice for my injured client.
22            MR. RIDINGS:  Objection to form; argumentative
23    and assumes facts not in evidence and misstates his
24    position as well as my position.
25                   //////////
                                                          61
```

```
 1  BY MR. MORRIN:
 2    Q    What is preventing you from getting that
 3    identifier information from your email address?
 4    A    I want to go on advice of my counsel and not
 5    answer that question.
 6    Q    But this -- but this is a different question.
 7    If he's instructing you not to answer, I'm not
 8    going to tell you to answer.  I -- I'll make a note of
 9    it, and I'll bring it in front of the judge.
10            MR. RIDINGS:  I am not telling you not to
11    answer, but I am asking that we take a break and --
12            MR. MORRIN:  I am not going to agree to a
13    break.  I want to finish my line of questioning
14    right now --
15            MR. RIDINGS:  Well --
16            MR. MORRIN:  -- unless they -- unless --
17            MR. RIDINGS:  -- he can take a break anytime
18    he wants to, Counsel.
19            MR. MORRIN:  Not -- that's fine.  But let's
20    just make a note that it -- they're taking a break.
21    You're not answering my question.  You're
22    going -- you guys are going to go take a break and
23    talk about it.
24            MR. RIDINGS:  That's correct.
25            MR. MORRIN:  Okay.  Let's take a break for
                                                          62
```

```
 1    that.
 2            MR. RIDINGS:  The record says what it says.
 3            MR. MORRIN:  As long as the record reflects
 4    that, I'm good with it.
 5            THE VIDEOGRPAHER:  Going off record at 12:27.
 6            (Off the record at 12:27 p.m.)
 7            We're going back on the record at 12:38.
 8            (On the record at 12:38 p.m.)
 9            MR. RIDINGS:  Just for the record, I want
10    to -- we had a long discussion off the record, but
11    I am retracting my direction earlier -- my earlier
12    direction of Mr. Howard to not answer a question.
13            It was only once that I did it.  I don't
14    remember what it was, but that is retracted.
15            And feel free to ask -- ask again.
16            MR. MORRIN:  Okay.  Thank you.
17  BY MR. MORRIN:
18    Q    Mr. Howard, you've had an opportunity to
19    confer with your counsel.  I'd like to pick up on that
20    last -- maybe not the last question I asked you, but the
21    subject of Shanta and her -- her contact information --
22    A    Uh-huh.
23    Q    -- because you had mentioned and -- I believe
24    you had mentioned that you had emails from her.  Is that
25    accurate?
                                                          63
```

```
 1    A    Yes.
 2    Q    Okay.  Do you know her email address?
 3    A    d_underscore_shanta@yahoo.com.
 4    Q    I'll read that back to you just to make sure
 5    I've got it.  D_shanta@yahoo.com.
 6    A    Yes, sir.
 7    Q    Okay.  And do you know Shanta's last name?
 8    A    Dixon.
 9    Q    And that's spelled --
10    A    D-i-x-o-n.
11    Q    Thank you.  Are you familiar with the Federal
12    Motor Carrier Safety Regulations?
13    A    Excuse me?
14            MR. RIDINGS:  Object to form and lack of
15    foundation.
16            But go ahead and answer.
17            MR. MORRIN:  I don't have to have foundation
18    to ask that, I don't think.
19  BY MR. MORRIN:
20    Q    But are you familiar with the Federal Motor
21    Carrier Safety Regulations?
22    A    Repeat that what you said, Motor Carrier
23    Safety Regulations?
24    Q    Uh-huh.  It's the Federal Motor Carrier Safety
25    Regulations.  Are you familiar with those?
                                                          64
```

```
 1   A    No.
 2   Q    Okay.  Have you ever read them at all?
 3   A    Yes, I have.
 4   Q    When did you read them?
 5   A    It's been some years ago.
 6   Q    Why did you read them?
 7   A    Because it -- it's what you have to do.
 8   Q    Who said you had to do that?
 9   A    I mean, it's not who said; it's just basically
10  like regulations that you need to know.
11   Q    When did you determine that you needed to know
12  those?
13       MR. RIDINGS:  Objection; asked and answered.
14       MR. MORRIN:  I don't believe I have.
15       THE DEPONENT:  Repeat the question again, man.
16  BY MR. MORRIN:
17   Q    When -- when did you determine you needed to
18  read the Federal Motor Carrier Safety Regulations?
19       MR. RIDINGS:  Objection; asked and answered.
20       THE DEPONENT:  I thought I just asked [sic]
21       that question.  But, I mean, whenever I decided to
22       go on the road and start driving trucks, box
23       trucks.
24  BY MR. MORRIN:
25   Q    When -- when you started renting the U-Hauls
                                                        65
```

```
 1  to do it?
 2   A    Uh-huh.
 3   Q    Okay.  Would it be you that rents the U-Haul,
 4  or would it be someone else?
 5   A    It was me when I first started doing it
 6  myself, like I stated earlier when I said I started my
 7  own stuff and I would get them on Craigslist.  Remember
 8  when I stated that earlier?
 9   Q    I think I do remember that.
10   A    Yeah.  It's vi- -- it's video documented.
11   Q    Did anyone else ever rent a U-Haul for you to
12  run a route?
13   A    No.
14   Q    Okay.
15   A    No, sir.
16   Q    Is it true that -- let me think of a better
17  way to ask that.  Strike that.
18       In working with Shanta --
19   A    Uh-huh.
20   Q    -- running routes for her, is that the only
21  time that someone else provided the vehicle for your
22  route?
23   A    Can you be more specific?
24   Q    Well, you provided the U-Hauls; right?
25   A    Uh-huh.
                                                        66
```

```
 1   Q    You would rent those.  And in this instance,
 2  was it Shanta that provided the vehicle for you to
 3  drive?
 4   A    Yes.
 5   Q    Okay.  Is that -- is -- did anyone else other
 6  than Shanta or -- and/or Enterprise Service Group ever
 7  provide a vehicle for you to run a route?
 8   A    You talking about outside of them?
 9   Q    Yes.
10   A    What does that have to do with this?  I mean,
11  this -- that would be on my personal time, I would
12  imagine.
13       But, I mean, I've had plenty of people rent
14  vehicles for me to drive.  But I don't have their names.
15   Q    Plenty of people have rented veh- -- not --
16  and -- and this is to run a route, to deliver -- you
17  know, haul --
18   A    I mean, I've had people rent trucks for me to
19  do moving jobs before.
20       You want me to give you all their names?  You want
21  me find them all?
22   Q    That's -- that's not what I've asked you.
23   A    Okay.  I thought that I just answered what you
24  asked me, though.
25   Q    Is -- is Enterprise Service Group the only
                                                        67
```

```
 1  entity that's rent- -- that's provided a vehicle for you
 2  on more than one occasion?
 3   A    No.
 4   Q    Okay.  Who else has provided vehicles for
 5  you --
 6   A    I don't know their names.
 7   Q    -- on more than one occasion?
 8   A    I don't have their names.
 9   Q    They're not people that you know personally?
10   A    I don't have their names.  I can't recall.
11  It's been a long time ago.
12       MR. RIDINGS:  Let's take a break real quick.
13       THE VIDEOGRAPHER:  Going off the record at
14       12:44.
15       (Off the record at 12:44 p.m.)
16       We're back on the record at 12:48.
17       (On the record at 12:48 p.m.)
18  BY MR. MORRIN:
19   Q    Okay.  Mr. Howard, on the exit ramp in which
20  the accident happened, was it a straight road?
21       Usually, those ramps are kind of curved.  Did it
22  have curves near it, or was it straight?
23   A    I can't recall.
24   Q    Was it on any incline at all?
25   A    Just going up a hill.
                                                        68
```