UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO.: 5:22-cv-00238-KKC

CHARLES L. WALDEN PLAINTIFF,

VS.

NATIONAL INDEMNITY COMPANY DEFENDANTS

**********

**PLAINTIFF'S MOTION TO EXCLUDE OR, IN THE ALTERNATIVE, LIMIT THE TESTIMONY OF DEFENSE EXPERT CHRISTINE SULLIVAN AND MEMORANDUM IN SUPPORT**

**********

Pursuant to Federal Rules of Evidence 104(a), 403, 702, and 704, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and this Court's March 27, 2026 Order (DE 224, modifying Scheduling Order DE 212), Plaintiff Charles L. Walden, by counsel, respectfully moves the Court for an Order excluding the testimony of Defendant National Indemnity Company's ("NICO") retained claims-handling expert, Christine Sullivan, MBA, CPCU, AIM, or in the alternative, strictly limiting her testimony on an opinion-by-opinion basis. In support of this Motion, Plaintiff states as follows:

## I. INTRODUCTION AND EXECUTIVE SUMMARY

Following the December 19, 2024 mediation settlement ($200,000) of Plaintiff Charles L. Walden's underlying motor-vehicle negligence claims against Enterprise Services Group, LLC ("Enterprise") and commercial truck driver Clarence M. Howard, the sole remaining claims in this action are Plaintiff's bad-faith claims against NICO and its adjuster, Vince Kline, under the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"), KRS 304.12-230(3), (4), (6),

(7), and (14) (Count X of the Complaint). To defend a four-year claims-handling record marked by an early zero-liability denial before ever speaking to its own insured or driver, an 18-to-19-month gap in substantive evaluation activity (June 30, 2021 to February 2023), a two-and-a-half-year delay in retaining an accident reconstructionist, a three-and-a-half-year delay in hiring a private investigator to locate its driver or contact the investigating police officer, and a conceded failure to communicate Plaintiff's January 13, 2023 demand to its insured, NICO disclosed former Allstate executive Christine Sullivan under Fed. R. Civ. P. 26(a)(2)(B).

Under Federal Rule of Evidence 702, as amended effective December 1, 2023, NICO bears the affirmative burden of demonstrating to this Court by a preponderance of the evidence ("more likely than not") that each discrete opinion offered by Ms. Sullivan is within her task-specific qualifications, will help the trier of fact, rests on sufficient facts or data (Rule 702(b)), is the product of reliable principles and methods (Rule 702(c)), and reflects a reliable application of those principles and methods to the actual facts of this case (Rule 702(d)). See *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.,* 93 F.4th 339, 345 & n.4 (6th Cir. 2024) (applying the former rule while explaining that the 2023 amendments clarify the preponderance standard and that the outcome would be the same under either version); *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1223 n.3 (6th Cir. 2025); *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 766, 771 (6th Cir. 2025).

A review of Ms. Sullivan's July 27, 2026 Report (marked as Dep. Ex. 1), her September 29, 2026 deposition transcript and October 27, 2026 Errata Sheet, and NICO's produced policy and underwriting records (NICO 003672 to 003680) demonstrates that her opinions fail the threshold gates of amended Rule 702 across five distinct areas:

**A. Impermissible Legal Verdicts, Statutory Conclusions, and Policy Construction (Rule 702(a), Rule 704, Rule 403).**

Ms. Sullivan's report repeatedly pronounces legal verdicts by declaring that "Any allegations with respect to violations of Kentucky's Unfair Claims Settlement Act are without merit" (Ex. 1, Report at 3), that "There is no indication that NICO is guilty of the allegations made against them" (id. at 6; see Berry v. City of Detroit, 25 F.3d 1342, 1353 to 1354 (6th Cir. 1994)), that failing to send 45-day letters "is not a violation of the Unfair Claim Settlement Practices Act and it does not amount to bad faith" (Ex. 1, Report at 9), and that NICO had valid legal grounds to forfeit coverage under Policy No. 70 TRS 105576 (NICO 003674 to 003676, including ISO Business Auto Coverage Form CA 0001 03/2010, Truckers Endorsement CA 2320 03/2010, and Georgia Changes CA 0109 10/2004) for "lack of cooperation," thereby usurping the Court's sole function to instruct the jury on the law and construe the policy terms (Sullivan Dep. Tr. 42:1 to 42:5, 68:18 to 68:21, 69:22 to 69:24, 74:5 to 74:9).

**B. Unqualified Technical Overreach into Accident Reconstruction, Nighttime Visibility, FMCSR Safety Materiality, and Clinical Medicine (Rule 702's qualification requirement and Rule 702(a) to (d))**.

Although Ms. Sullivan expressly conceded at deposition that she is not an accident reconstructionist ("No, I'm not," Tr. 59:3 to 59:4) and not a human-factors expert ("Correct," Tr. 59:5 to 59:6), and holds only economics, finance, and marketing degrees alongside insurance designations (Ex. 1, Report at 1 to 2; Tr. 26:1 to 26:9), she repeatedly offers substantive technical opinions on crash mechanics, sight distance, nighttime highway illumination, roadway lane-obstruction geometry, the materiality of Federal Motor Carrier Safety Regulation ("FMCSR") warning-triangle spacing under 49 C.F.R. § 392.22, and clinical orthopedics and traumatic brain injury ("TBI") medical causation (Ex. 1, Report at 5 to 6; Tr. 58:12 to 58:21, 66:10 to 66:19, 71:16 to 73:2, 121:20 to 123:14, 136:8 to 137:19).

**C. Pure *Ipse Dixit*, Failure to Review NICO's Internal Standards, and Absence of Meaningful Timeliness Criteria (Rule 702(b) to (d))**.

Ms. Sullivan never reviewed and never even requested NICO's written claims manuals or internal handling guidelines, which NICO refused to produce in discovery (Tr. 36:4 to 36:22, 37:10 to 37:22, 92:12 to 92:18). When asked how she could opine that NICO maintained and followed reasonable investigation standards under KRS 304.12-230(3) without reviewing NICO's standards, she testified: "So you could have, like, a huge manual and nothing is really followed, and that's okay, as long as the handling is okay." (Tr. 21:17 to 21:19). When asked what methodology determines whether handling is "okay," she offered textbook *ipse dixit*: "And so I can tell how a claim is handled... I mean, it's like it is what it is. You know, it's, like, I can tell that this person handling this claim was well versed in what needed to get done." (Tr. 94:2 to 94:9). Furthermore, when pressed for the professional criteria governing when an insurer must retain a reconstructionist in a missing-driver comparative-fault case, she testified that waiting ten years "could very well be" reasonable, exposing an absence of meaningful criteria connected to the circumstances of this claim (Tr. 90:25 to 91:7).

**D. Insufficient Facts or Data, Material Factual Omissions, and Self-Contradictory Application on the Policy File, the February 26, 2021 Denial, and Investigation Gaps (Rule 702(b) and (d))**.

Ms. Sullivan's testimony and written report suffer from an inadequate factual foundation and self-contradictory application regarding the policy file, the February 26, 2021 denial, and key investigation gaps. Under oath, Ms. Sullivan admitted that she performed no chronological or line-by-line review of the claim file, stating, "I never do a chronological thing... I don't do a line-by-line thing. That's not my usual practice" (Tr. 119:4 to 119:17). While isolated clerical mistakes do not automatically establish inadmissibility, the 2023 Advisory Committee note to

Rule 702 distinguishes mere weaknesses in an otherwise sufficient foundation from an inadequate factual foundation. Here, Ms. Sullivan's omissions directly undermine the reliability of her core conclusions.

First, her opinion that NICO went "above and beyond" to contact Enterprise and had no reason to question driver coverage rests on a direct misreading of the policy and underwriting file. Ms. Sullivan testified that NICO's policy merely indicated the vehicle and did not identify the driver (Tr. 131:23 to 131:25), and claimed Enterprise had no reachable contact points (Tr. 38:21 to 39:5, 68:13 to 68:25). However, the very first page of the policy file (NICO 003672) features an MVR underwriting screen for a different driver, Corey Tabious Pullin, whose Class C non-commercial license lacked commercial privileges. This detail explains why confirming driver Clarence Howard's status for the 45,000-lb. GVW Freightliner (NICO 003677) was a critical open liability and coverage question on February 26, 2021. Furthermore, Enterprise's Truck Application (NICO 003673) and Declarations (NICO 003674 to 003675) clearly listed Enterprise's direct telephone number, direct email address, and producing broker. Despite having this contact information, NICO's own file note (NICO 003675) indicates that staff was not even tasked to prepare a certified copy of the policy until September 2, 2022, well after Plaintiff was forced to file suit.

Second, her repeated date errors reflect a broader failure to master the claim chronology essential to evaluating investigation timeliness. She misstates the policy period on page 2 as "11/18/2109 to 11/18/2020" rather than the correct 2019 date, incorrectly lists the date of NICO's February 26, 2021 denial letter as "1/19/21" three separate times (Ex. 1, Report at 4, 9; admitted at Tr. 48:23 to 48:25, 127:10 to 127:13, 128:10 to 128:18, 146:2), and misstates investigating Officer Jason Curry's July 29, 2024 deposition date as "8/3/24" (Ex. 1, Report at 6 vs. 3; Tr. 183:14 to 183:17).

Third, her endorsement of the February 26, 2021 denial ignores NICO's contemporaneous knowledge of the disabled tractor-trailer's lane encroachment. At her deposition, she initially testified that NICO did not even possess the police report when it denied liability (Tr. 46:9 to 47:11), before conceding that NICO actually had it on the very first day, November 3, 2020 (Ex. 1, Report at 3; Tr. 53:1 to 53:9, 146:16 to 147:2). She then claimed the initial adjuster did not know whether the disabled tractor-trailer encroached into the travel lane (Tr. 60:24 to 60:25, 120:17 to 121:10). This claim directly ignores Page 4 of the Police Report, which listed Unit 2 as an "Improperly Parked Vehicle[]" (Dep. Ex. 2 at 4; NICO 003757, 11/03/2020 log), as well as NICO's own December 9, 2020 adjuster log, which explicitly admitted: "You will note the insured unit is partially in the lane of Travel at the time..." (NICO 003817).

Fourth, Ms. Sullivan engaged in post-hoc rationalization by inventing the characterization of a "preliminary denial." She retroactively relabeled Vince Kline's unconditional February 26, 2021 denial letter (Dep. Ex. 3) as "preliminary," despite admitting that the word "preliminary" appears nowhere in the text and that the letter's 30-day file-closure ultimatum is not typical of a preliminary decision (Tr. 155:10 to 156:9). In doing so, she violated her own foundational rule that the reasonableness of a liability decision must be judged solely on the information available to the adjuster at that time (Tr. 35:16 to 35:20). She admitted under oath that the other evidence relied upon in her report, including the 2023 reconstruction, 2024 depositions, and independent medical examinations, was entirely developed after the February 26, 2021 denial was issued (Tr. 197:18 to 198:2).

**D. Unsupported Testimony on Subjective Adjuster Beliefs, Unverified Claims Committee Valuation Opinions, and Unfounded Counterfactuals on the Uncommunicated Demand (Rule 702(a) to (d)).**

Although experts may rely on record evidence under Rule 703 without conducting personal interviews, Ms. Sullivan's assertions as to what NICO adjusters "truly believed," "wanted," and subjectively intended are unsupported by the actual claim records and contradict the contemporaneous file logs (Ex. 1, Report at 11; Tr. 102:15 to 102:16, 103:8 to 104:8, 133:24 to 134:10, 201:23 to 202:6). She likewise vouches for NICO's February 22, 2024 Claims Committee valuation (stating NICO authorized $234,269 while NICO's correspondence states $234,249 and NICO 006516 displays 250.0) despite admitting she does not know how NICO's Claims Committee operates and cannot identify any formula or breakdown behind the figure (Tr. 188:13 to 189:16, 192:16 to 192:22). Finally, she offers an unsupported factual counterfactual and legal causation conclusion that NICO's conceded failure to communicate Plaintiff's January 2023 demand to its insured had "no impact on the outcome of the underlying case" (Ex. 1, Report at 10).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The chronological record from the produced NICO policy and claim file (NICO 000004–006369, NICO 003672–003680, NICO 006516), Ms. Sullivan's July 27, 2026 Report (Ex. 1), and her September 29, 2026 deposition establishes the following undisputed timeline:

| Date | Documented Event in Policy / Claim File Record | Record Pinpoint |
|---|---|---|
| 11/18/2019 | NICO issues Business Auto Policy No. 70 TRS 105576 ($1,000,000 CSL) to Enterprise Services Group, LLC (135 Nakomis Pl., Alpharetta, GA 30004) covering two 2012 Freightliner trucks (45,000 lbs. GVW, VINs ending 5657 and 0843). Application (NICO 003673) and Declarations (NICO 003674) record Enterprise's phone (404-396-7788), email (shanta.esgexpress@gmail.com), and broker (030022 - Hairston Brown). MVR screen in policy file (NICO 003672) is for Corey T. Pullin (Class C non- | NICO 003672–003680; Ex. 1, Report at 2. |

| Date | Documented Event in Policy / Claim File Record | Record Pinpoint |
|---|---|---|
| | commercial license), not driver Clarence Howard. | |
| 08/10/2020 | Plaintiff Charles Walden collides with NICO's insured 2012 Freightliner tractor-trailer left parked and unattended on the I-75 Exit 87 off-ramp in Richmond, KY, suffering a fractured hip requiring surgical repair. | Compl. ¶¶ 7–15; Dep. Ex. 2 (Police Report); Ex. 1, Report at 2, 5. |
| 11/03/2020 | NICO opens claim file upon receiving Plaintiff's letter of representation and the Police Report. Adjuster log notes: *"Per the police report it was improperly parked/left on the side of an off ramp and the CVD ran into it, causing potential serious injuries to the claimant."* Page 4 of Police Report designates Unit 2 under Vehicular/Environmental Factors as **"Improperly Parked Vehicles."** | NICO 003757; Dep. Ex. 2 at 4; Ex. 1, Report at 3; Tr. 53:1–9, 62:17–24. |
| 11/04/2020 | NICO assigns local independent adjusting firm to interview named insured (Enterprise) and driver (Howard). | Ex. 1, Report at 4; Tr. 125:4–6. |
| 12/09/2020 | NICO log records independent adjuster report: *"You will note the insured unit is partially in the lane of Travel at the time; however the photographs and the police report do indicate that the insured driver had placed reflective cones behind the insured unit…"* | NICO 003817; Tr. 126:19–22. |
| 01/19/2021 | With no contact made with Enterprise or Howard, NICO assigns a second investigation firm to attempt contact with the named insured and insured operator, and logs a call to Plaintiff's counsel's office regarding injuries and liability theory. | Ex. 1, Report at 4; Claim Log 01/19/2021; Tr. 127:8–11, 128:5–25. |
| 02/26/2021 | Without ever speaking to driver Howard, named insured Enterprise, or investigating Officer Curry, NICO adjuster Vince Kline issues a formal letter denying all liability, stating *"no fault was placed on the insured"* and warning: *"Otherwise, I'll proceed to close my file in this matter in 30 days from the date of this letter."* Same-day IA report notes inability to contact NI or IVD. | Dep. Ex. 3 (Denial Letter); Claim Log 02/26/2021; Tr. 145:17–147:21, 154:8–156:9. |

| Date | Documented Event in Policy / Claim File Record | Record Pinpoint |
|---|---|---|
| 05/25/2021 & 06/30/2021 | After Plaintiff's counsel submits EMS/ER/orthopedic records confirming a fractured hip and Plaintiff's liability theory that the truck was parked halfway on the ramp before the driver went to sleep at a nearby hotel, NICO logs on 06/30/2021: *"increaseing exposure to BI reserve to $150k based off coverage confirmed…"* while maintaining its external denial and making $0 offer. | Claim Log 06/30/2021; Ex. 1, Report at 4, 8; Tr. 173:13–174:10. |
| 06/30/2021 – 01/13/2023 | Over 18 months pass with zero substantive liability or damages evaluation activity logged (apart from an October 2021 ROR letter and Georgia Secretary of State check). Suit is filed August 10–11, 2022; NICO requests a certified policy copy on 09/02/2022 (NICO 003675). On January 13, 2023, Plaintiff serves an $846,676.07 settlement demand. NICO never communicates the demand to its insured or driver. | NICO 003675; Ex. 1, Report at 4–5, 9–10; Claim Log 10/26/2021; Tr. 174:22–24, 200:1–201:22. |
| 02/16/2023 | One month after Plaintiff's demand, NICO's newly retained reconstructionist, Eddie Crum, reports back that **the insured should not have left the vehicle on the off-ramp** and that the truck encroached **3 feet into the travel portion of the roadway**, finding negligence on both drivers. Crum's formal report is not submitted until April 1, 2024. | Ex. 1, Report at 5, 9; Tr. 171:15–172:10, 175:10–23. |
| 02/22/2024 – 04/20/2024 | On 02/22/2024, NICO's Claims Committee authorizes an expected value of 234,249(234,269 in Sullivan's report; 250.0 on NICO 006516) with no formula produced. NICO retains a private investigator on 03/27/2024, contacts Officer Curry for the first time on 03/30/2024, speaks to driver Howard for the first time on 04/20/2024, and makes its first-ever offer ($100,000) on 04/20/2024—less than half its committee authority. | NICO 006516; Ex. 1, Report at 5–6; Tr. 180:20–185:12, 192:6–22. |
| 12/19/2024 | Underlying tort claim settles at mediation for $200,000. | Ex. 1, Report at 6, 9; Claim Log 12/19/2024. |

## III. GOVERNING LEGAL STANDARD UNDER AMENDED FRE 702

Effective December 1, 2023, Federal Rule of Evidence 702 was amended to clarify and enforce the district court's gatekeeping obligation under Rule 104(a):

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Sixth Circuit has repeatedly emphasized the rigor of this framework in three recent published decisions. First, in In re *Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig*., 93 F.4th 339, 345 & n.4, 346 to 348 (6th Cir. 2024), although the court applied the version of Rule 702 in force when the district court ruled in January 2022, it explained the significance of the 2023 amendments, noted that the result would be the same under either version, and held that an expert who selectively relies on favorable points while failing meaningfully to account for contrary evidence in the record fails the reliability threshold.

Second, in *Davis v. Sig Sauer, Inc*., 126 F.4th 1213, 1223 n.3 (6th Cir. 2025), the Sixth Circuit evaluated admissibility on an opinion-by-opinion basis, affirming the exclusion of unsupported accident-specific causation opinions while reversing the exclusion of separately supported design-defect and alternative-design opinions, and rejecting wholesale exclusion where discrete opinions rest on different foundations. While Davis noted that the 2023 amendment imposes no new specific procedural formalism and rejected an objection based merely on the absence of a particular specialization title where actual education, training, and experience supplied the necessary expertise, the inquiry remains whether the witness's actual

expertise and foundation support the specific question and opinion offered. See *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

Finally, in *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 766, 771 (6th Cir. 2025), the Sixth Circuit reaffirmed that Rule 702 permits testimony only when resting on sufficient facts or data, reliable methods, and reliable application, identifying reliability warning signs including reliance on anecdotal evidence, improper extrapolation, lack of verification, and failure to confront alternative explanations.

Where, as here, an insurance expert invokes decades of industry experience under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 to 152, 156 to 157 (1999), the reliability inquiry is flexible, but requires appropriate professional rigor and a reliable connection between the expert's reasoning and the particular opinion. As the Advisory Committee notes explain, an expert relying primarily on experience must explain how that experience leads to the conclusion, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts of the case. Fed. R. Evid. 702 advisory committee's note to 2000 amendment. A court is never required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV. OPINION-BY-OPINION GATEKEEPING AUDIT AND ARGUMENT

### A. Impermissible Legal Conclusions, Statutory Interpretation of the KUCSPA, and Non-Lawyer Policy Coverage Opinions Must Be Excluded (FRE 702(a), 704, 403).

In her July 27, 2026 Report and September 29, 2026 deposition, Ms. Sullivan repeatedly crosses from explaining insurance industry procedures into instructing the jury on Kentucky

statutory and contract law and pronouncing ultimate legal verdicts.

In her written report and testimony, Ms. Sullivan consistently attempts to pronounce NICO "not guilty" and dismisses Plaintiff's statutory claims as being "without merit." She explicitly declares in her report that any allegations regarding violations of Kentucky's Unfair Claims Settlement Act are "without merit" (Ex. 1, Report at 3) and that there is "no indication that NICO is guilty of the allegations made against them" (id. at 6). Furthermore, she concludes that NICO met the legal requirements of Kentucky's Unfair Claims Settlement Practices Act and did not breach its statutory duty of good faith and fair dealing to the claimant, Charles Walden (id. at 7, 8, 10, 11). She also asserts that NICO did not compel the plaintiff to institute suit to recover damages (id. at 8, 10). These sweeping legal conclusions were reiterated during her deposition (Tr. 19:14 to 19:25, 22:1 to 22:5, 37:2 to 37:17, 92:4 to 92:9).

Beyond general verdicts, Ms. Sullivan also issues pure legal rulings regarding the scope and effect of Kentucky administrative regulations, specifically the 45-day investigation-notice provision of 806 KAR 12:095 (reflected in § 6(2)(b) of the historical regulation prior to the November 30, 2021 amendment and § 6(1)(d) of the current regulation, which expressly addresses first-party claimants, while § 2(4) addresses regulatory enforcement). Regardless of how that regulatory provision applies to a third-party liability claim, an expert witness may not instruct the jury on what Kentucky statutes or regulations require or whether particular conduct constitutes actionable bad faith. Yet Ms. Sullivan definitively rules in her report: "Additionally, failure to provide this formal letter is not a violation of the Unfair Claim Settlement Practices Act and it does not amount to bad faith and unfair dealing." (Ex. 1, Report at 9).

Finally, Ms. Sullivan engages in impermissible contract construction regarding policy forfeiture based on a purported lack of cooperation. She opines that Enterprise's non-responsiveness under Policy No. 70 TRS 105576, which incorporates the Business Auto

Coverage Form CA 0001 03/2010, Truckers Endorsement CA 2320 03/2010, and Georgia Changes CA 0109 10/2004, was "clearly a violation of the policy" and that NICO "had good grounds to deny coverage." The defect in this testimony is not merely that Ms. Sullivan lacks a law license, as she conceded at deposition ("Would it have held up long term in a court of law? I don't know. That's not my decision. I'm not a lawyer," Tr. 41:20 to 42:5, 68:18 to 68:21, 69:22 to 69:25, 74:5 to 74:9), but that construing insurance policy terms and determining legal coverage forfeiture are exclusively legal functions for the Court.

While Federal Rule of Evidence 704(a) permits an opinion that embraces an ultimate factual issue, this Court and sister courts across the Sixth Circuit consistently hold that an expert may not instruct the jury on governing law, construe insurance policy provisions, or tell the jury what legal verdict to reach. In *Adkins v. Shelter Mut. Ins. Co.*, No. 5:12-cv-00173-KKC-REW, slip op. at 3 to 5 (E.D. Ky. Mar. 26, 2015), ECF No. 200 (Caldwell, J.), this Court excluded expert testimony attempting to interpret what Kentucky statutory law required, reaffirming that it is not proper for an expert "to testify as to a legal conclusion; it is the sole function of the trial judge to instruct the jury on the law." As this Court both explained in that opinion and clarified in a subsequent order, *Adkins v. Shelter Mut. Ins. Co.*, No. 5:12-cv-00173-KKC-REW, slip op. at 5 to 7 (E.D. Ky. Aug. 3, 2015), ECF No. 284, there is a critical distinction between admissible evidence of actual claims-handling decisions and impermissible expert instructions on governing legal standards. Likewise, in *Berry v. City of Detr*oit, 25 F.3d 1342, 1353 to 1354 (6th Cir. 1994), the Sixth Circuit excluded an expert's deliberate-indifference conclusion and illustrated why an expert may not pronounce a defendant "guilty" or define legal standards for the jury. And in *Carneal v. Travelers Cas. Ins. of Am.*, No. 5:12-cv-00174-TBR-LLK, slip op. at 5 to 7 (W.D. Ky. Nov. 5, 2013), ECF No. 50, the court excluded an experienced adjuster's policy-construction opinions as impermissible legal interpretation and barred conclusory bad-faith opinions that

tracked UCSPA statutory standards to tell the jury what result to reach. Ms. Sullivan's declarations that NICO is not "guilty," that Plaintiff's KUCSPA claims are "without merit," that particular conduct does or does not violate the KUCSPA or 806 KAR 12:095, and that NICO had legal grounds to forfeit policy coverage must be excluded in full.

**B. Unqualified Technical Opinions on Accident Reconstruction, Nighttime Visibility, FMCSR Warning-Triangle Materiality, and Clinical Medical Causation Must Be Excluded (FRE 702 Prelim. & 702(a)–(d)).**

Although Ms. Sullivan's education and career are exclusively in business, finance, marketing, and insurance administration (Ex. 1, Report at 1 to 2; Tr. 26:1 to 26:9), throughout her report and deposition she repeatedly offers independent technical and clinical opinions across specialized fields for which she lacks the relevant knowledge, skill, experience, training, education, and methodological foundation. First, she opines on crash mechanics, nighttime conspicuity, and human visual perception. She testifies that "there's lighting here. If you don't see a truck, that's kind of a problem, right? ... the fact that you don't see a tractor trailer truck means that you're not attentive" (Tr. 58:12 to 58:21). She further opines in her report that "the 'fatigue' of the claimant operator per the police report is consistent with the plaintiff not noticing the vehicle until it was 10 feet away" (Ex. 1, Report at 5), asserting that a driver exiting the ramp in a "fairly well-lit area" should see reflective triangles, assume the truck is disabled, and simply "go around it" (Tr. 66:14 to 66:19, 121:20 to 123:10, 136:8 to 137:19).

In addition to visual perception, Ms. Sullivan offers specialized opinions on roadway obstruction geometry and post-impact triangle movement. She claims that nothing in the police report indicated the truck was obstructing the roadway (Tr. 122:3 to 122:7, 137:9 to 137:12), despite admitting she never inspected the scene and never even had access to the nighttime

visibility video taken by NICO's reconstructionist (Tr. 169:19 to 169:22). Relying solely on post-crash photographs, she concludes that the warning triangles "clearly show[] some were moved by the plaintiff's vehicle as a result of the collision" (Ex. 1, Report at 8).

Ms. Sullivan also extends her testimony into the technical safety materiality of commercial warning-triangle placement under 49 C.F.R. § 392.22(b). When confronted with commercial driver Howard's admission that he did not know the federal regulation requiring warning devices to be placed at specified distances behind a stopped commercial motor vehicle and could not recall whether he placed the triangles 5, 10, or 50 feet behind the 45,000-lb. GVW Freightliner rig (NICO 003677), she declared that triangle spacing was "not all that material to the liability per se." She defended this stance by insisting, "I think as an expert [who] handled commercial claims before, I'm confident in my ability to opine about that" (Tr. 71:16 to 73:2).

Finally, rather than merely noting what medical records were in the claim file at a particular time, Ms. Sullivan offers independent clinical assessments regarding orthopedics, traumatic brain injury, and medical causation. In her written report, she asserts that Plaintiff's hip surgery and physical therapy were "successful in restoring previous functionality and range of motion." She proceeds to characterize an August 3, 2020 primary-care note regarding headache, fatigue, and a prior TBI, ultimately opining that Plaintiff's prior auto accidents and medical history "could obscure the fact that the injury attributed to this accident was a fractured hip, contusions and lacerations and that the plaintiff made a good recovery from this injury" (Ex. 1, Report at 5 to 6; Tr. 42:22 to 43:2).

Under Rule 702, a witness's qualifications must provide a relevant foundation to answer the specific question offered. *Berry*, 25 F.3d at 1351; see also *Davis*, 126 F.4th at 1223 n.3. While *Davis* recognized that an expert's actual education and experience control over rigid specialty labels, here Ms. Sullivan lacks any actual training, experience, or reliable methodology

in accident reconstruction, human factors, commercial-vehicle conspicuity, or clinical medicine. In *Carneal v. Travelers Cas. Ins. of Am.*, No. 5:12-cv-00174-TBR-LLK, slip op. at 5 to 7 (W.D. Ky. Nov. 5, 2013), ECF No. 50 (2013 WL 5939879, at *3), the court held that the proponent failed to establish that an adjuster with over thirty years of insurance experience was qualified to give a technical roof-causation opinion, particularly given his admissions concerning the limits of his expertise. Similarly, as persuasive authority under Kentucky's analogous Rule 702 illustrates, even a witness qualified in biomechanics may not cross into determining the medical causation of a particular plaintiff's condition without medical qualifications. See *Renot v. Secura Supreme Ins. Co*., 671 S.W.3d 282, 289 (Ky. 2023) (approving testimony within the witness's biomechanical expertise under KRE 702, but reversing where the testimony crossed into medical causation). Here, Ms. Sullivan directly admitted her lack of technical qualifications on the record:

> Q: That's not your opinion as an expert, though. That's your lay opinion. If you don't see a truck, then you must not be paying attention. You're not an accident reconstructionist, right?
> A: No, I'm not.
> Q: You're [not] a human factors expert.
> A: Correct.

(Tr. 58:25 to 59:6). An insurance claims consultant cannot serve as a conduit for independent accident reconstruction, nighttime visibility, trucking safety, or clinical medical causation opinions for which she possesses neither the expertise nor a reliable methodology.

**C. Pure *Ipse Dixit*, Failure to Review NICO's Internal Guidelines, and an Unfalsifiable "10-Year Delay" Methodology Require Exclusion of Her Investigation-Standards and Timeliness Opinions (FRE 702(b)–(d)).**

Count X of the Complaint alleges that NICO violated KRS 304.12-230(3) by failing to adopt and implement reasonable standards for the prompt investigation of claims, and KRS 304.12-230(4) by refusing to pay claims without conducting a reasonable investigation based upon all available information (Compl. paras. 43 to 44). Ms. Sullivan opines that NICO "followed reasonable claim handling standards for the investigation and settlement of Auto Injury Claims," went "above and beyond" in searching for its insured and driver, and acted timely in waiting until February 2023 to hire a reconstructionist and March 2024 to hire a private investigator (Ex. 1, Report at 7 to 10; Tr. 37:7 to 37:17, 38:11 to 38:18, 42:9 to 42:21, 82:4 to 92:25).

Her deposition testimony and the policy record establish that these conclusions fail to explain how her experience supports her opinion, why it supplies a sufficient basis, and how any reliable professional criteria were applied to the facts of this claim. In discovery, NICO objected to and refused to produce its claims manuals, training guides, reserve guidelines, and quality-control protocols (RFP Nos. 17 to 23). At deposition, Ms. Sullivan admitted she never reviewed and never even requested any NICO claims manual, diary rule, or supervisor escalation protocol (Tr. 20:24 to 21:4, 36:4 to 36:22, 37:18 to 37:22, 40:2 to 40:25, 92:12 to 92:18). When asked how she could evaluate whether NICO adopted and implemented reasonable investigation standards without ever seeing NICO's standards, she testified:

> A: So you could have, like, a huge manual and nothing is really followed, and that's okay, as long as the handling is okay. Because every claim is different, and adjusters don't sit there and review the manual every single time they handle a claim, because adjusters are trained to have experience.

(Tr. 21:17 to 21:22). When pressed on what criteria she applied to determine whether the handling was "okay" without NICO's written standards or any identified industry benchmark (admitting at Tr. 202:7 to 202:12 that she relied on no unidentified written or unwritten sources),

she offered pure *ipse dixit*:

> A: And so I can tell how a claim is handled, whether or not it's done in a reasonable fashion and it follows industry standards or whether or not it's, you know, better than industry standards or worse, you know? I mean, it's like it is what it is. You know, it's, like, I can tell that this person handling this claim was well versed in what needed to get done.

(Tr. 94:2 to 94:9). In *Wells v. GEICO Gen. Ins. Co.*, No. 5:19-cv-00500-DCR-MAS, slip op. at 22 to 25 (E.D. Ky. July 23, 2021), ECF No. 61, Judge Reeves excluded an insurance bad-faith expert who relied on training materials the insurer had stopped using, failed to identify a meaningful basis for his timeliness opinions, and failed to connect his conclusions reliably to the actual claim. While Wells did not announce a categorical rule that an expert must always obtain an insurer's manuals before offering any claims-handling opinion, Ms. Sullivan cannot opine specifically that NICO adopted and implemented reasonable investigation standards while neither reviewing NICO's standards nor articulating any reliable professional criteria by which she evaluated NICO's investigation.

This analytical gap is further exposed by her testimony regarding the two-and-a-half-year delay in retaining an accident reconstructionist. When asked what claim-specific circumstances or professional criteria govern when an insurer should retain a reconstructionist when its commercial driver is missing and the police report designates the rig as improperly parked in the travel lane, Ms. Sullivan articulated no criteria at all, stating, "You hire it when you think you need it, okay, is the best example I can give you" (Tr. 90:18 to 90:19), and testified that waiting ten years could be reasonable:

> Q: So it could be reasonable in a specific situation, if they waited ten years to hire them, it could be reasonable in that situation?
> A: It could very well be. You know, ten years might be reasonable in New York with how long it takes a case to get tried, but in most states, ten years would be a little off the wall. But a year or two, I don't think that's unreasonable.

(Tr. 90:25 to 91:7). Although an insurance expert need not identify a rigid numerical deadline applicable to every claim, Rule 702 requires the witness to identify the claim-specific circumstances she considered, the professional criteria she applied, and how those criteria support the actual delay she endorsed. Saying that an insurer acts reasonably whenever "they hired it when they felt they needed it" (Tr. 91:20 to 91:21) connects the opinion to the data only by the expert's *ipse dixit,* contrary to *Kumho Tire*, 526 U.S. at 156 to 157, *Joiner*, 522 U.S. at 146, and the general reliability principles of *Baker*, 141 F.4th at 766, 771.

Moreover, Ms. Sullivan's timeliness and investigation opinions rest on an demonstrably incomplete factual foundation under Rule 702(b) and (d). In her report, Ms. Sullivan explicitly disputes Plaintiff's expert's finding that NICO logged zero substantive evaluation activity between June 2021 and early 2023 (Ex. 1, Report at 9 to 10), and at deposition she testified that "no activity for six to nine months, I would worry about that... That didn't happen here" (Tr. 83:8 to 83:17) and that she would expect follow-up "at least monthly, if not more" (Tr. 111:4 to 111:8). Yet when asked to substantiate her timeline, she admitted she never performed a chronological review of the file: "I never do a chronological thing... I don't do a line-by-line thing. That's not my usual practice." (Tr. 119:4 to 119:17). Because she omitted a systematic review of the timeline and overlooked the underwriting and policy pages (NICO 003672 to 003677), Ms. Sullivan lacked the basic facts necessary to support her timeliness opinions. For instance, she could not tell whether the delay in hiring a private investigator was "months" or "years," testifying, "It was more than months. I don't think it was years, but I could be wrong" (Tr. 39:18 to 39:21). In fact, the delay spanned over three and a half years, from November 2020 to March 27, 2024. Similarly, she could not identify what date or diary entry triggered the February 2023 retention of reconstructionist Crum (Tr. 100:9 to 100:20, 167:20 to 168:2), and she was unable to state when NICO first documented the insured's negligence or revised its

February 2021 no-liability position (Tr. 170:20 to 171:8).

Her failure to account for material record evidence also undermines her conclusion that NICO went "above and beyond" to locate its insured and driver. She overlooked that Enterprise's Truck Application (NICO 003673) and Declarations (NICO 003674) provided direct contact points, including a direct telephone number (404-396-7788), an email address (shanta.esgexpress@gmail.com), and the producing broker (030022, Hairston Brown). She likewise overlooked that NICO's policy file contained a Motor Vehicle Record only for a non-CDL driver, Corey Pullin (NICO 003672), leaving the permissive-use and qualification status of the actual driver, Clarence Howard, unverified at the time of the denial. Applying the general reliability principles of *Onglyza*, 93 F.4th at 346 to 348, and *Baker*, 141 F.4th at 766, 771, an expert who omits material contrary facts in the record and lacks familiarity with the actual timeline cannot reliably opine that the insurer's investigation was prompt and thorough under Rule 702(b) and (d).

**D. Ms. Sullivan's Defense of the February 26, 2021 Denial Letter Violates Her Own Stated Methodology and Contradicts the Claim File (FRE 702(b) & (d))**

During her deposition, Ms. Sullivan established four baseline industry principles governing a liability decision. First, an adjuster must consider both favorable and unfavorable facts before making a liability decision (Tr. 26:25 to 27:18). Second, talking to the insured is "number one" (Tr. 150:23 to 150:24), including verifying that the driver was an authorized operator where the policy file does not list him (Tr. 128:1 to 128:4, 131:20 to 131:25; cf. NICO 003672), and an experienced handler must pursue open material questions bearing on liability (Tr. 96:16 to 96:19, 97:9 to 97:22). Third, in a pure comparative-fault state like Kentucky, comparative negligence requires assessing proportional exposure rather than issuing an all-or-

nothing denial where both drivers share fault (Tr. 42:18 to 42:21, 74:13 to 74:18, 185:13 to 186:25). Finally, the reasonableness of a liability decision depends solely on the information available to the adjuster at the time the decision is made (Tr. 35:16 to 35:20).

Yet when applying those principles to Vince Kline's February 26, 2021 denial letter (Dep. Ex. 3), Ms. Sullivan departed from every single standard she articulated. Ms. Sullivan initially testified NICO did not even have the police report when it denied the claim (Tr. 46:9 to 47:11), before admitting NICO had it on November 3, 2020 (Tr. 53:1 to 53:9, 146:16 to 147:2). She then claimed the initial adjuster did not know what "Improperly Parked" on Page 4 of the Police Report meant or whether the rig was in the roadway (Tr. 60:24 to 60:25, 62:18 to 62:22, 120:17 to 121:10, 132:1 to 132:6), a premise flatly contradicted by NICO's 11/03/2020 log ("Per the police report it was improperly parked/left on the side of an off ramp", NICO 003757) and NICO's 12/09/2020 log ("You will note the insured unit is partially in the lane of Travel at the time", NICO 003817).

Next, because Kline issued a 100% denial on February 26, 2021 while NICO's second investigator was still trying to locate the driver and insured (assigned Jan. 19, 2021) and without ever contacting Officer Curry (Tr. 147:17 to 147:21, 184:8 to 184:13), Ms. Sullivan labeled the letter a "preliminary denial" in her report (Ex. 1, Report at 4, 9). On cross-examination, however, she was forced to admit that the words "preliminary denial" appear nowhere in Exhibit 3, that Kline inaccurately wrote "no fault was placed on the insured," and that Kline's ultimatum ("Otherwise, I'll proceed to close my file in this matter in 30 days from the date of this letter") is not typical preliminary denial language (Tr. 154:8 to 156:9).

Finally, and most fatally, Ms. Sullivan admitted that the remaining evidence cited in her report to support the denial, including the 2023 reconstruction, 2024 depositions, and medical reviews, was developed after the February 26, 2021 denial letter (Tr. 197:18 to 198:2). Under her

own stated methodology (Tr. 35:16 to 35:20), post-2021 evidence cannot retroactively validate an unconditional February 2021 denial.

**E. Unsupported Testimony on Subjective Adjuster Beliefs, Unverified Claims Committee Valuation Opinions ($234,269 vs. $234,249 vs. $250,000), and Unfounded Counterfactuals on the Uncommunicated Demand Must Be Excluded (FRE 702(a) to (d))**

Finally, three additional sets of opinions offered by Ms. Sullivan lack a reliable foundation or helpfulness under Rule 702. First, she offers unsupported assertions regarding the subjective beliefs and motives of NICO personnel. In her report and deposition, Ms. Sullivan opines that she found "no evidence that NICO put their financial interests ahead of their policyholder or the plaintiff, acted with careless indifference, acted unreasonably or in bad faith" (Ex. 1, Report at 11; Tr. 46:6 to 46:8, 69:24 to 69:25). She further claims that NICO hired a reconstructionist years later because "they were trying to do the right thing" (Tr. 103:8 to 104:8), and asserts that initial adjuster Vince Kline "truly believed" the Plaintiff was 100% responsible (Tr. 133:24 to 134:10). While an expert is not subject to Rule 602's personal-knowledge requirement and may rely on record information under Rule 703, the expert's conclusions must still rest on sufficient facts or data and a reliable analysis rather than conjecture. Here, Ms. Sullivan's assertions about what Kline "truly believed" or what NICO subjectively intended are not only unsupported by any interview or testimony from Kline (Tr. 102:15 to 102:16, 201:23 to 202:6), but directly conflict with the contemporaneous claim logs showing NICO knew on November 3, 2020 and December 9, 2020 that the insured tractor-trailer was improperly parked partially in the travel lane (NICO 003757, NICO 003817). Unlike the expert in Wells v. GEICO Gen. Ins. Co., No. 5:19-cv-00500-DCR-MAS, slip op. at 23 to 25 (E.D. Ky. July 23, 2021), ECF No. 61, who lacked financial and executive background, Ms. Sullivan's business background is

not the issue here; rather, she has no reliable factual or methodological basis to tell the jury what an adjuster subjectively "truly believed" in the face of contrary claim-file entries.

Second, Ms. Sullivan improperly vouches for an unexamined Claims Committee valuation and settlement offer. She opines that NICO's February 22, 2024 Claims Committee valuation of $234,269 (reported as $234,249 in NICO's correspondence and 250.0 on NICO 006516) and its April 20, 2024 opening offer of $100,000 were reasonable, despite the offer being less than half of NICO's own committee authority (Ex. 1, Report at 5 to 6; Tr. 180:20 to 183:3, 187:21 to 195:25). However, she admitted at her deposition that she does not know how NICO's Claims Committee actually operates, stating, "I don't know how NICO actually operates their committee... I don't know what NICO's is" (Tr. 188:13 to 189:16). She also could not recall how the committee arrived at the valuation figure (Tr. 192:16 to 192:22). Because NICO produced no committee worksheet or calculation during discovery and Ms. Sullivan never reviewed the underlying calculation, she lacks sufficient facts or data under Rule 702(b) to vouch for a valuation methodology she never examined.

Third, Ms. Sullivan inappropriately attempts to excuse NICO's conceded failure to communicate the January 2023 policy-limits demand. She expressly concedes in both her report and deposition that there is zero documentation in the claim file indicating that NICO ever communicated Plaintiff's January 13, 2023 demand to its named insured, Enterprise, or the driver, Howard (Ex. 1, Report at 10; Tr. 200:1 to 201:22). Despite this, she asserts that "there was no impact on the outcome of the underlying case which was settled at mediation for significantly less than the policy limits" (Ex. 1, Report at 10). While an opinion is not inadmissible under Rule 704(a) merely because it touches on causation or damages, Ms. Sullivan's assertion fails Rule 702 because it combines an unsupported factual counterfactual about how the insureds and the litigation would have proceeded in January 2023 with an

impermissible legal conclusion on actionable bad-faith harm and statutory liability, without any factual foundation in the record.

## V. CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Plaintiff Charles L. Walden respectfully requests that the Court enter an Order excluding the testimony of Defense Expert Christine Sullivan in its entirety under Federal Rules of Evidence 702 and 403.

In the alternative, consistent with *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1223 n.3 (6th Cir. 2025), and *Berry v. City of Detroit*, 25 F.3d 1342, 1351, 1353 to 1354 (6th Cir. 1994), Plaintiff requests that the Court enter an Order limiting Ms. Sullivan's testimony on an opinion-by-opinion basis and strictly barring her from offering any opinion or testimony:

(1) pronouncing that NICO is not "guilty," that Plaintiff's KUCSPA claims are "without merit," that NICO complied with or did not violate the KUCSPA (KRS 304.12-230) or 806 KAR 12:095, or that NICO acted "in good faith";

(2) construing Policy No. 70 TRS 105576 (NICO 003674 to 003676) to opine that NICO's named insured or driver violated the policy or that NICO had valid legal grounds to deny or forfeit coverage based on "lack of cooperation";

(3) offering independent technical or clinical conclusions regarding accident reconstruction, crash dynamics, sight distance, nighttime highway illumination, human visual perception or driver inattention and fatigue, roadway lane-obstruction geometry, post-impact movement of warning triangles, the safety materiality of FMCSR warning-triangle spacing under 49 C.F.R. § 392.22, or clinical orthopedic and TBI medical causation and recovery;

(4) opining that NICO adopted, maintained, or implemented reasonable internal standards for the prompt investigation of claims under KRS 304.12-230(3) without having reviewed

NICO's manuals or guidelines;

(5) characterizing the February 26, 2021 denial letter (Dep. Ex. 3) as a "preliminary denial" or using post-February 26, 2021 events (such as the 2023 reconstruction or 2024 depositions and IMEs) to retroactively justify the February 26, 2021 denial;

(6) offering unsupported assertions regarding what Vince Kline or any other NICO employee subjectively "truly believed" or intended; and

(7) vouching for the unexamined methodology behind NICO's February 22, 2024 Claims Committee valuation ($234,269 / $234,249 / 250.0) or offering an unsupported counterfactual or legal conclusion that NICO's failure to communicate the January 2023 demand to its insured had "no impact on the outcome.”

Respectfully submitted,

MORRIN LAW OFFICE

_/s/ *Robert A. Morrin*_________
Hon. Robert A. Morrin (KBA # 94368)
214 West Main Street
Richmond, KY 40475
Telephone: (859) 358-0300
rob@morrinlawoffice.com
*Counsel for Plaintiff, Charles L. Walden*

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including Hon. Mindy G. Barfield and Hon Kyle R. Bunnell, Dinsmore & Shohl LLP, Counsel for Defendant National Indemnity Company.

_/s/ *Robert A. Morrin*_________
Hon. Robert A. Morrin (KBA # 94368)
MORRIN LAW OFFICE
*Counsel for Plaintiff, Charles L. Walden*