**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| CHARLES L. WALDEN<br><br>Plaintiff<br><br>v.<br><br>NATIONAL INDEMNITY GROUP OF INSURANCE COMPANIES OR NATIONAL INDEMNITY COMPANY<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 5:22-cv-00238-KKC-EBA<br><br>**NATIONAL INDEMNITY COMPANY'S MOTION TO EXCLUDE AND/OR LIMIT EXPERT TESTIMONY OF FREDERICK J. FISHER** |

* * * * *

Defendant National Indemnity Company ("NICO") hereby moves the Court to enter an order excluding and/or limiting the testimony of Plaintiff's expert Frederick J. Fisher ("Fisher"). In support of its Motion, NICO hereby states and alleges as follows:

## INTRODUCTION

Fisher proposes to testify about the reasonableness of NICO's investigation and handling of Plaintiff Charles Walden's ("Walden") bodily injury claim against NICO's insured Enterprise Services Group, LLC ("Enterprise") and its driver, Clarance Howard ("Howard"). But in order to do so, he must be qualified to testify to the specific opinions he seeks to give *and* his opinions must be predicated on sufficient facts and be the product of a reliable methodology. This Court is the gatekeeper and must preclude expert testimony which does not meet those standards, and should do so here as Fisher and his opinions do not pass muster under Federal Rule of Evidence 702. Fisher is not experienced in Kentucky claim handling nor knowledgeable about the legal standards applicable to claim handlers in Kentucky. To this point, Fisher's report identifies so called "industry standards" which, in many respects, are inconsistent with or in contradiction to Kentucky law. Further, his opinions are also not based on a reliable methodology but rather on his

"unique" and "proprietary" techniques. (Fisher Report, Ex. 1 at 1.) Nor would Fisher's opinions be helpful to the jury. A jury can interpret NICO's actions without Fisher's aid. Any of these reasons standing alone requires this Court to exclude Fisher from testifying at trial and/or alternatively to limit that testimony.

## BACKGROUND

### I. Background Facts of Walden's Accident and Injury and NICO's Handling of The Underlying Bodily Injury Claim.

NICO incorporates by reference the factual background of this case set forth in its recently filed Motion for Summary Judgment, as if set out fully herein.

### II. Who is Frederick J. Fisher?

Plaintiff has retained Fisher as an insurance claims handling expert. According to his curriculum vitae, Fisher is the president of Fisher Consulting Group, Inc., a California-based consulting company. (Fisher CV, Ex. 2 at 18.) He has experience as an insurance broker, surplus lines broker, claims adjuster, claims consultant, and expert witness. (*See generally, id.*) Fisher was, until very recently, licensed as a California property and casualty insurance adjuster and holds licenses related to insurance brokerage and surplus lines placements. (*Id.* at 1; Fisher Depo., Ex. 3 at 13:14 to 13:15.)

Despite his lengthy history and experience in certain niche areas of the insurance field, Fisher's professional background is not rooted in the adjustment or handling of automobile liability claims in general, or certainly in the handling of Kentucky auto claims. His employment history reflects that the vast majority of his career involved professional liability insurance, surplus lines insurance, insurance brokerage operations, claims-made insurance products, risk management consulting, and professional liability claims handling. His experience is centered largely in California and national specialty-lines insurance markets rather than Kentucky automobile liability

claims. (Fisher Report, Ex. 1 at 18–20; Fisher Depo. Ex. 3 at 24:16 to 25:25.)

Importantly, Fisher's report expressly states, "I am not an attorney nor do I do legal research." (Fisher Report, Ex. 1 at 2.) Nevertheless, many of the opinions contained in his report purport to interpret Kentucky statutes, administrative regulations, and legal obligations governing insurer conduct. (*See id.* at 4–5, 22–23).

Moreover, Fisher's report demonstrates that he intends to base many of his opinions on generalized insurance-industry practices, model acts, insurance treatises, and his personal views regarding how claims should be investigated and resolved. (*Id.* at 2–5.) His report repeatedly relies upon purported "industry standards" and generalized claim handling principles to criticize NICO's handling of this claim. (*Id.* at 3–5, 22–23.)

## III. Fisher's Opinions in This Case.

On May 27, 2026,[1] Fisher served his initial expert report. In that report, Fisher offered numerous criticisms of NICO's claim handling and opined that the claim was not investigated, evaluated, or resolved in a manner consistent with accepted insurance-industry standards. (*See generally,* Fisher Report, Ex. 1.) Among other things, Fisher concluded:

- NICO improperly denied liability in February 2021 despite already knowing that its insured vehicle was partially occupying the roadway and despite not having obtained a statement from its insured driver. (*Id.* at 22.)

[1] The initial expert disclosure deadline was March 31, 2026. (R. 212.) Plaintiff obtained an extension shortly before that deadline based on representations that his expert was experiencing cardiac health issues. (R. 223 at 1.) Yet Fisher's engagement letter reflects that he was not retained until May 14, 2026, more than six weeks after the original disclosure deadline had expired. (Fisher Engagement Letter, Ex. 4 at 1.)

- NICO failed to comply with Kentucky claim-handling requirements by not providing periodic forty-five-day status notices and by failing to timely affirm or deny liability. (*Id*. at 22.)
- NICO did not conduct a reasonable investigation because it failed to promptly retain an accident reconstructionist and failed to retain a private investigator sooner to locate the insured driver. (*Id*. at 22–23.)
- NICO improperly relied on the insured driver's disappearance and effectively "weaponized" that disappearance as a liability defense. (*Id*. at 22.)
- NICO's increase of reserves to $150,000 in June 2021 was inconsistent with its continued refusal to make any settlement offer. (*Id*. at 18–19.)
- NICO failed to continually reevaluate the claim as additional information became available. (*Id*. at 22.)
- NICO ignored Plaintiff's January 2023 demand and failed to meaningfully evaluate or negotiate that demand. (*Id*. at 22–23.)
- NICO should have made a reasonable settlement offer earlier and failed to do so even after locating the driver and obtaining the opinions of accident reconstruction expert Edward Crum. (*Id*. at 22–23.)
- NICO failed to communicate Plaintiff's demand to its insured while simultaneously pursuing reservation-of-rights positions. (*Id*. at 23.)
- NICO failed to promptly and fairly settle the claim once liability became "reasonably clear" and effectively compelled litigation. (*Id*. at 22–23.)

On August 19, 2026, however, Fisher issued a rebuttal report in which he substantially narrowed, corrected, or withdrew several of the most aggressive opinions contained in his original

report.[2] (*See generally* Fisher Rebuttal, Ex. 5.) In particular, Fisher:

- Withdrew his characterization of Plaintiff's January 2023 demand as a "time-sensitive" or "policy-limits" demand. (*Id.* § VI(A), at 3.)
- Retracted his assertion that NICO engaged in "zero evaluative activity" and "completely ignored" the claim, acknowledging that NICO continued to investigate, retained experts, and engaged in claim-related activity. (*Id.* § VI(B), at 3.)
- Agreed that reserves are not settlement offers and withdrew any implication that NICO was required to offer the amount of its reserves. (*Id.* § VI(C), at 5.)
- Withdrew the accusation that NICO "weaponized" the insured driver's disappearance and expressly disclaimed any opinion regarding motive. (*Id.* § VI(D), at 4.)
- Retracted definitive opinions regarding the placement of warning triangles and whether the truck's lights were off, now suggesting the evidence did not establish either subject with certainty. (*Id.* § VI(E), at 4–5.)
- Withdrew his reliance on the thirty-day and forty-five-day Kentucky regulatory provisions as direct third-party claimant opinions. (*Id.* § VI(G), at 5.)
- Withdrew his reliance on KRS 304.12-230(7)'s "compelling litigation" provision. (*Id.*)

---

[2] Fisher's substantial retreat from his original opinions is unsurprising given the circumstances under which they were formed. Plaintiff's counsel retained Fisher on May 14, 2026, leaving him less than two weeks to review the claim file, deposition transcripts, and supporting materials before his May 27, 2026 disclosure deadline. (Fisher Engagement Letter, Ex. 4; Scheduling Order, R. 224.) Fisher himself admitted this multiple times in his deposition. *See, e.g.,* Fisher Depo., Ex. 3 at 103:13 to 103:17: A: "this was a rush deal, I was working late at night, I was trying to get it done as fast as possible, and there were some things that, you know, I think needed clarification, and I did that;" *See also id.* at 185:13 to 185:14: A: "I did tone down the language significantly, as you can see;" 189:19 to 189:21: A: "I'm backing off on some of what I consider to be strong language. I don't think that was called for;" 189:24 to 190:01: A: "I was being a little more inflammatory originally, and ... I've corrected it."

- Repeatedly emphasized that he was not offering legal conclusions regarding bad faith, UCSPA violations, or the ultimate legal consequences of NICO's conduct. (*Id.* §§ V(6), XI(K), at 2, 14.)

Importantly, Fisher now concedes that the record supports a genuine comparative-negligence dispute as to fault and that legitimate disputes regarding medical causation and future treatment existed. (*Id.* § VI(F), at 5.)

Accordingly, after Fisher's rebuttal report and subsequent deposition testimony, his remaining opinions can be reduced to a far narrower set of claims:[3]

- NICO should have conducted a more aggressive and timely investigation. (*Id.* § XII at 14–15.)
- NICO should have retained an accident reconstructionist earlier. (*Id.*)
- NICO should have retained a private investigator earlier to locate the insured driver. (*Id.*)
- NICO should have better documented its claim evaluation, settlement rationale, and negotiation strategy. (*Id.*)
- Earlier investigation and claim development could have placed NICO in a better position to evaluate the claim and potentially resolve it sooner. (*Id.*) But he concedes this is only a possibility. (*Id.* at 110:04 to 110:08; 110:10 to 110:17; 130:02 to 130:05.)

[3] Notably, Fisher no longer maintains that NICO ignored the claim, was required to offer its reserves, "weaponized" the missing driver, violated the forty-five-day regulation, improperly compelled litigation under KRS 304.12-230(7), or that warning-triangle placement and vehicle-lighting facts cannot be established. And importantly, he concedes that liability was an issue of legitimate dispute.

## ARGUMENT

### I. Legal Standard.

When a case invokes the Court's diversity jurisdiction, the question of admissibility of expert testimony is governed by federal standards. *Ramsey v. Lowe's Home Ctrs., LLC,* No. 24-CV-001, 2025 LX 373773, at *3 (E.D. Ky. Sep. 5, 2025). As a result, Federal Rule of Evidence 702 governs the use of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Sixth Circuit has explained that an expert's opinion is admissible under Rule 702 only if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable.

*In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 528–29 (6th Cir. 2008) (citing and quoting Fed. R. Evid. 702). The trial judge ultimately serves as a "gatekeeper, ensuring that expert testimony satisfies the requirements of reliability and relevance." *Ramsey,* 2025 LX 373773, at *5 (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993)). The proponent of the testimony bears the burden of establishing the expert's admissibility by a preponderance of the

evidence. Fed. R. Evid. 702; *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. 579, 592 n.10 (1993)).

## II. Fisher Is Not Qualified To Testify as an Expert in This Case.

In determining whether an expert is qualified, courts must consider whether the expert has expertise with respect to the specific subject matter of the expert's opinion. *See Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 378–79 (Ky. 2000). It is not enough that the expert generally has knowledge or experience in the industry – the expert must be qualified to render the specific opinions at issue. *Id.*; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

To be sure, Fisher possesses certain knowledge about insurance claim handling based upon his years in the industry. But Rule 702 does not ask whether an expert is experienced in the abstract; it asks whether his experience qualifies him to offer the specific opinions at issue. *See Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (courts do not evaluate "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question").

Here, Fisher's professional experience is not in auto liability claims at all, much less those in Kentucky. It is overwhelmingly rooted in California insurance markets, surplus-lines insurance, professional liability claims, and brokerage operations, rather than Kentucky automobile claims handling. (Fisher CV, Ex. 2 at 1, 18–20; Fisher Depo., Ex. 3 at 17:14 to 17:24 (stating that his adjusting work was conducted "mostly in California.").) Thus, while Fisher may possess extensive knowledge of insurance in those areas, that experience does not qualify him to opine on NICO's handling of this Kentucky auto claim.

After all, Fisher is not nor has he ever been a Kentucky-licensed claims adjuster. Fisher admitted that, other than a surplus-lines matter from the early 1990s, he had no meaningful

experience handling Kentucky claims and could not identify any other Kentucky claims he had handled. (Fisher Depo., Ex. 3 at 25:06 to 25:09.) Indeed, Fisher ultimately admitted that, other than claim advocacy performed as a broker, he had no experience actively adjusting or handling Kentucky claims of any kind – much less Kentucky auto liability claims. (*Id.* at 91:14 to 91:25.) Nor has Fisher testified as a claim handling expert in a Kentucky case. (*Id*. at 53:17 to 53:24: Q: "other than the instant case, have you ever offered any opinions in a Kentucky bad faith case?" A: "I don't recall.").

Because he has no experience with Kentucky auto claims and/or lacks even the most baseline understanding of Kentucky auto claim handling standards, his testimony must be excluded.

**III. Fisher's Opinions are Unreliable.**

Fisher's testimony is also unreliable. Rather than applying the standards established by Kentucky courts, Fisher's report, as explained in his deposition, substitutes his own claim-handling philosophy for Kentucky law, repeatedly suggesting that NICO should have investigated faster, retained its experts sooner, and attempted to settle earlier, even though he admitted liability remained disputed.[4] (*See* Fisher Depo., Ex. 3 at 194:19 to 195:01.)

"The concept of reliability implies that an expert's opinion must be based on something more than subjective belief or unsupported speculation. Rather, a reliable opinion requires that the expert use (1) a reliable methodology, and (2) base his or her opinion on reliable facts or data." *Ramsey,* 2025 LX 373773, at *6. Thus, "if an expert witness relies 'solely or primarily on

[4] Fisher's rushed preparation further undermines his methodology. He was first contacted on or about May 13, 2026, for "rush services" to prepare a report by May 27, 2026, and his engagement letter expressly described the assignment as an emergency basis report at the urgent rate. (Fisher Engagement Letter, Ex. 4, at 1-2.) Fisher confirmed this was the first rush case he had accepted, and later acknowledged that portions of his original report were written late at night, while he was tired, and had to be corrected or toned down in rebuttal. (*See* Fisher Depo., Ex. 3, at 57:11 to 57:24, 59:03 to 59:17, 103:17 to 103:21; Fisher Rebuttal, Ex. 5, § VI.)

experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Antioch Co. Litig. Tr. v. Morgan,* 633 F. App'x 296, 300 (6th Cir. 2015) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments). *Daubert* and its progeny have placed the district courts in the role of "gatekeeper," charging them with evaluating the relevance and reliability of proffered expert testimony with heightened care. *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007).

In *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012), the Sixth Circuit affirmed the exclusion of an expert's legal opinions and testimony because they contained numerous misstatements of the law and directly conflicted with controlling state law. The court held that the district judge, who is "the only person in the courtroom vested with the authority to definitively interpret the law," did not abuse his discretion under Rule 702 by excluding an expert's legal misstatements. *Id.*

As explained below, Fisher's opinions conflict with Kentucky law, rendering them unreliable and inadmissible.

**A. Fisher's methodology is flawed and the resulting opinions unreliable to the extent they are all based on so-called "industry standards" as opposed to Kentucky standards.**

A common theme throughout Fisher's report and deposition is his reliance on purported "industry standards" as the benchmark by which NICO's conduct should be judged. (*See, e.g.,* Fisher Report, Ex. 1 at 22–23 "Keeping an insured business entity completely in the dark about a massive policy-limits demand while threatening to abandon them violates basic industry standards of care and makes for a central element of a bad faith narrative . . .;" *see also* Fisher Depo., Ex. 3 at 100:21 to 101:03: "Q: I want to understand what specific traditional methods that you're

referring to and where you derive those from? . . . A: Okay. Basic industry standards.".) However, Fisher's methodology of evaluating NICO's conduct through an "industry standard" lens is fundamentally flawed. After all, there is no overarching "industry standard" which applies to all auto liability claims no matter where they arise or are handled. Insurance regulation is reserved to the states, and Kentucky has adopted its own statutory, regulatory, and common-law framework governing insurer conduct. *See* 15 U.S.C. § 1012(a) ("the business of insurance, and every person engaged therein, shall be subject to the laws of the several States"); *Admiral Ins. Co. v. Fire-Dex, LLC*, No. 22-3992, 2023 U.S. App. LEXIS 14822, at *9 (6th Cir. 2023) ("By and large, insurance rules and regulations are reserved to the states for crafting."). Thus, whether NICO acted appropriately in handling Walden's auto liability claim is governed by Kentucky standards, not "industry standards" nor Fisher's "unique" and "proprietary" techniques. Fisher has failed to identify any Kentucky standard which NICO allegedly violated by not engaging in certain claim handling tasks sooner than it did.

Courts have repeatedly rejected efforts to substitute generalized industry practices for the governing legal standard. *See Hollaway v. Direct Gen. Ins. Co*., 497 S.W.3d 733 (Ky. 2016) (existence of expert opinion from Bill Woolums that the insurer violated industry standards insufficient to preclude summary judgment on bad faith); *Scott v. Deerbrook Ins. Co.*, 714 F.Supp.2d 670, 675 (E.D. Ky. 2010) (excluding expert testimony of Judge Mike McDonald because he could not tie his own substantial experience to issues in the case); *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F.Supp. 1145, 1152 (D. Ala 2015) (excluding an insurance coverage witness because "[his] 45 years of overall experience in the insurance industry is not necessarily sufficient to qualify him to render an opinion about the specific industry standards at issue here").

**B. Fisher's testimony is unreliable and inadmissible as it is inconsistent with and reflects a fundamental misunderstanding of Kentucky claim handling standards.**

Fisher's opinions are actually inconsistent with Kentucky claim handling standards. Courts routinely exclude expert testimony where the expert's opinions are based on an incorrect knowledge of the law and/or facts on which his opinion purports to rely. In *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996), the Court of Appeals cautioned trial courts to guard against admitting opinions based on "markedly incorrect law. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories." *See also United States v. 319.88 Acres of Land*, 498 F. Supp. 763, 766 (D. Nev. 1980) ("Where the opinion of an expert is based on erroneous assumptions of fact or law, the evidence is incompetent and insufficient to support a verdict."); *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Though the district judge serves as a gatekeeper for expert evidence, it is an important role designed to extract evidence by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all."); *Carapellucci v. Town of Winchester*, 707 F. Supp. 611, 619–20 (D. Mass. 1989) (noting the "uncontrollable risk of unfair prejudice if the jury is allowed to hear an expert opinion that a defendant's conduct constitutes negligence, or gross negligence, or violates a minimum standard, when the expert may be applying an erroneous definition of the legal standard"); *Justice v. Carter*, 972 F.2d 951, 956 (8th Cir. 1992) ("The district court did not abuse its discretion in not admitting expert testimony which was based upon an inapplicable interpretation of the law."); *Scalia v. Lafayette Life Ins. Co.*, 1995 U.S. Dist. LEXIS 15944, at *28 n.4 (D.N.J. Oct. 23, 1995) (disregarding expert affidavit and noting that it "expresses a legal opinion which is contrary to New Jersey law, i.e., that because insurers had opportunity to obtain further medical history they had a duty to obtain it); *Federal Realty Inv. Trust v. Pacific*

*Ins. Co.,* 760 F.Supp. 533, 538 (D. Md. 1991) (granting motion in limine to exclude expert because standard to which he was to testify was "wrong as a matter of law"); *Hacker v. Holland*, 570 N.E.2d 951, 959 (Ind. App. 1991) (reversing because expert's testimony "was an improperly admitted incorrect statement of law"); *Doolittle v. City of Everett*, 786 P.2d 253, 262 (Wash. 1990) (en banc) (stating that expert testimony "was entirely premised on an incorrect legal principle" and therefore "must be disregarded"). Fisher's opinions reflect four major and irreconcilable discrepancies with Kentucky law.

**i. Fisher concedes that liability for causing the accident was unclear.**

Fisher's most egregious inconsistency with Kentucky law is the fact that he readily admits there was a legitimate liability dispute:

Q: So you don't disagree with me, though, that based on, you know, this initial entry that you've listed here, the facts that they had at the time shows liability could have gone either way; right? And it wasn't reasonably clear. . . .

A: At that point in time, I would agree with that."

. . .

Q: I still am trying to figure out, Mr. Fisher, in your mind, when did liability become reasonably clear here? Or did it?"

A: "I'm not sure that it did..."

(Fisher Depo., Ex. 3 at 126:12 to 126:22; 171:19 to 171:22.) These admissions alone undermine Walden's bad-faith claim – and Fisher's testimony supporting it – because Kentucky law requires a plaintiff to establish that the insurer refused to pay a claim despite liability being "beyond dispute." *Coomer v. Phelps*, 172 S.W.3d 389, 395 (Ky. 2005); *Hollaway*, 497 S.W.3d at 736; *see also Lee v. Med. Protective Co.*, 904 F. Supp. 2d 648, 655–656 (E.D. Ky. 2012) (ruling that if the insured's liability is not beyond dispute, the insurance company has a right to defend the

case without making any offer until appellate review has been exhausted). Thus, Fisher cannot both concede that liability was unclear while at the same time be permitted to testify to the jury that NICO's conduct was contrary to "industry standards" or potentially violative of the KUSCPA.

To avoid this obvious inconsistency, Fisher suggests that Walden's case involved a comparative negligence dispute, and that because there was some evidence that NICO's insured was at least in some part at fault for the accident, NICO was required to accelerate its investigation and settlement efforts. (*See* Fisher Rebuttal, Ex. 5 § VI(F), at 5: "the record supports a genuine comparative-negligence dispute."). But that opinion, too, is contrary to Kentucky law. It is insufficient that NICO's insured may have been some degree at fault. If a reasonable juror could have concluded that the insured was not at fault or a substantial factor in causing the accident, then NICO's duty to settle could not have been triggered and it had an absolute legal right to continue to dispute fault and make no offer to Walden (even if the evidence may ultimately have supported some degree of comparative negligence).[5] *See Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 587 (Ky. App. 2019). Thus, under Kentucky law, the mere possibility that a jury could apportion fault does not create a duty to settle or require an insurer to abandon a reasonable liability defense.

Yet NICO's alleged obligation to have settled the claim sooner is precisely the premise underlying Fisher's opinions. Fisher testified that his "narrow and supportable opinion" is that earlier claim development, investigation, and expert analysis would have put NICO in a better position to assess what would have been a reasonable offer of settlement. (*See* Fisher Depo., Ex. 3 at 194:19 to 195:01.) This opinion misses the mark entirely. It is settled law in Kentucky that if an insurer has a good faith basis to contest its insured had any fault in causing the accident, then it

[5] Here, of course, NICO did not opt to pursue a "no offers" strategy. It made offers and ultimately settled Walden's negligence claim prior to trial.

can continue to contest liability without being deemed in bad faith *even if* there is a risk of apportionment. *Messer*, 598 S.W.3d at 588.

In truth, the undisputed facts reflect that NICO had multiple reasons to dispute its insured's liability. Officer Jason Curry was at the scene shortly after the accident occurred, and his police report filed the night of the accident states that Walden was tired and did not see the truck parked on the edge of the ramp. (Police Report, Ex. 6. at 2.) His report also documented that the intersection was well lighted, a fact he thereafter communicated to NICO and/or its retained counsel – and then confirmed at his deposition:

Q: I'm looking on Page 1. It does say that the intersection was lit up?

A: Uh-huh. It does.

Q: It happened at night, but it was well lit; is that right?

A: Yes, ma'am. Yes, ma'am.

Q: And you drive on that nearly every night; is that right?

A: Pretty close to it.

Q: And it's -- I believe you told me it was lit up like a football field?

A: It's very well -- like, even when it's foggy, it's pretty well lit up.

(Officer Curry Depo., Ex. 7 at 27:12 to 27:24.) The report and the attached contemporaneous photographs he took also document the position of the truck (only slightly over the line) and the presence of reflective triangles. (Police Report, Ex. 6 at 2.)





(Photographs taken by Officer Curry on the night of the accident, as referenced in Crum's Report, Ex. 8 at 9, 11.)

Subsequently, NICO obtained an accident reconstructionist expert Eddie Crum, who further bolstered NICO's liability defense in the underlying case. His report indicated that "[t]he approximate, available line of sight to the collision area for traffic exiting from northbound I-75 was measured at approximately more than 770 feet" and that Walden should have identified the truck and warning devices long before reaching either. (*Id.* at 4, 12). Even more revealing of the legitimate dispute over liability is the fact that Walden had over eight feet of clearance to avoid the truck altogether. (*See id.* at 14.) Photos of the accident and diagrams found in Crum's report highlight the fact that there was ample time and distance to avoid the collision:




*Id.*

These facts and circumstances presented NICO with a legitimate dispute concerning liability. Indeed, Fisher himself conceded both that liability "could have gone either way" and that he was "not sure" liability ever became reasonably clear. (Fisher Depo., Ex. 3 at 126:12 to 126:22; 171:01 to 171:13.)

Yet despite acknowledging the existence of a genuine liability dispute, Fisher faults NICO for not investigating more aggressively and reaching a settlement sooner. That criticism reflects a fundamental misunderstanding of Kentucky law. Kentucky law does not require an insurer to accelerate settlement efforts merely because some evidence suggests its insured may share a portion of the fault. To the contrary, where liability remains legitimately disputed, an insurer may continue to investigate, evaluate, and contest the claim without incurring liability for a bad faith claim. *See Messer, supra; Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 586 (Ky. 2021) (citing *Hollaway*, 497 S.W.3d at 739 (Ky. 2016)) ("We found in *Hollaway* that because the insurer was not willing to concede liability of its insured, [it] was under no absolute duty to pay the plaintiff's claim . . . a liability dispute entitles the insurance carrier to forgo any effort to settle and to take a dispute about liability to a jury."). Because Fisher's opinion testimony is predicated on the existence of legal duties which are not owed under Kentucky law, Fisher's testimony is unreliable, inadmissible, and should be excluded.

**ii. Fisher refuses to acknowledge that NICO's conduct was outrageous.**

Fisher's next error lies in his desire to testify to NICO's alleged deficiencies but unwillingness to say that NICO's conduct was "outrageous." This is a fatal flaw in his opinions/testimony. It is settled law in Kentucky that in order to meet the high standard for prevailing in a bad faith claim, the plaintiff must prove that the insurer's conduct was outrageous. *See Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). Fisher testified as follows:

Q: So I want to go back to my question about NICO not retaining an investigator earlier. And I asked you if it was outrageous, and you said it was below the standard of care. So -- -- are you saying it's not outrageous?

A: No, I'm not saying that. That's a--that's an adjective I think the jury will have to contend with. I'm sure Mr.--I'm sure Plaintiff's counsel may raise that--use that word in his closing argument. I don't get involved in that. It's beneath the standard of care, I think it was inappropriate. And if it's beneath the standard of care, that could possibly trigger other conclusions.

. . .

Q: So the extent of your testimony is going to be as to what you perceive to be violations. You're not going to opine about the motive or whether this conduct was outrageous or anything like that. You're drawing the line at saying, it is your opinion that they should have been more aggressive and they should have done things quicker?

A: Yes. And I think that would have ended up in a different result, and I believe we wouldn't be here today if that had been the case.

(Fisher Depo., Ex. 3 at 143:02 to 143:19; 171:01 to 171:13.) Fisher's testimony thus never reaches the standard required by Kentucky law. Rather than opining that NICO engaged in outrageous conduct, Fisher repeatedly limited his opinions to the assertion that NICO should have investigated more aggressively and moved more quickly. That may be Fisher's personal view of optimal claim handling, but it is not the legal standard articulated in *Wittmer*. Because Fisher expressly declined to offer an opinion on outrageousness – or even acknowledge NICO's conduct is not actionable absent proof it was outrageous – his testimony is insufficient and/or unreliable.

This Court has excluded claim-handling experts for the very deficiencies present here. In *Nevels v. Deerbrook Ins. Co.*, this Court considered a similarly unqualified claim handling expert, and held that he was not qualified to opine as to bad faith. No. 10-83-ART, 2011 U.S. Dist. LEXIS 144887 (E.D. Ky. Dec. 16, 2011). This Court excluded the expert's opinions on bad faith because he had "***neither any expertise in nor a complete understanding of Kentucky bad faith law***." *Id.* at *7 (emphasis added). The expert in *Nevels* disputed that an insurer's conduct must be considered

"outrageous" to constitute bad faith. *Id.* at *12–13. The court determined that the expert was simply "incorrect" in his understanding of Kentucky law because the Kentucky Supreme Court requires the factfinder to conclude that the insurer's conduct was "outrageous" in order to demonstrate bad faith. *Id.* (citing *Wittmer*, 864 S.W.2d at 890). The court concluded that "[b]ecause Huff presumed that bad faith could be proven without demonstrating outrageousness of some form, he is not qualified to express an opinion" on that issue. *Id.* at *14.

Just as in *Nevels*, Fisher's testimony demonstrates a lack of familiarity with, and understanding of, the legal standards governing Kentucky bad-faith claims. Because Fisher possesses "neither any expertise in nor a complete understanding of Kentucky bad faith law," he is "not qualified to express an opinion" on that subject. *Id.* at *7, *14. Further, his opinions are unreliable. Accordingly, Fisher's opinions should be excluded.

**iii. Fisher applies affirmative duties to NICO's conduct that do not exist under Kentucky law.**

A recurring theme throughout Fisher's report and deposition is that NICO should have investigated faster, retained experts sooner, located the insured more quickly, and attempted to settle the claim earlier. (Fisher Depo., Ex. 3 at 194:19 to 195:01.) Of course, he cites no Kentucky standard (statute, regulation, rule or case authority) that would obligate an insurer to, for example, locate the insured by any means possible or retain an accident reconstructionist within a defined number of days – even though those are among the purported obligations he claims NICO violated. He simply invokes ill defined "industry standards."

Regardless, even if such affirmative duties did exist and/or were applicable in some cases, they cannot as a matter of law have existed here in this case. Under Kentucky law, an insurer such as NICO has no duty to pay an auto liability claim such as this one unless the insured's fault for causing the accident is beyond dispute. Even Fisher concedes that he does not know if

Enterprise/Howard's liability was ever "reasonably clear." In such a circumstance, Kentucky law permits an insurer to continue to debate liability and make no offer to a third party claimant. *Coomer v. Phelps*, 172 S.W.3d at 395. Even where the insured's liability is clear, an insurer's limited duty to a third party claimant is not to simply pay what the third party demands but to pay a claim upon proof of loss provided by the third party. *Wittmer,* 864 S.W.2d at 892; *Hollaway,* 497 S.W.3d at 736. Fisher's inconsistent opinions that NICO had some obligation to Walden to expedite the claim investigation and pay what he demanded despite the disputed nature of liability here are irreconcilable with *Wittmer, Coomer, Hollaway, Messer* and other Kentucky bad faith precedents. Fisher's opinions are thus unreliable because they impose duties on NICO that Kentucky law does not recognize.

**iv. Fisher cannot state that NICO's alleged claim handling deficiencies altered the outcome of the underlying claim.**

Finally, Fisher repeatedly admitted at this deposition that he could not determine whether the alleged claim-handling deficiencies altered the outcome of the underlying claim. When asked whether delayed investigation damaged Walden, Fisher responded that such questions were "for the jury to decide" and acknowledged only that a different result was "a possibility." (Fisher Depo., Ex. 3 at 109:23 to 110:01; 110:10 to 110:17; 130:02 to 130:05.) This is critical, because delay alone is insufficient to prove bad faith. *See Motorist Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452–53 (Ky. 1997) ("Mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment or deception . . ."). Further, any alleged violation of the KUSCPA must have caused actual damage to the plaintiff in order to be actionable. *Id.* at 252. If the steps Fisher claims NICO should have taken wouldn't have changed the result for Walden, then the failure to implement them could not have caused actual damage to Walden.

All Fisher really wants to say is that NICO took too long to settle this claim. *See* Fisher Depo., Ex. 3 at 194:04 to 195:01 (repeating his opinion that NICO should have made an offer of settlement sooner). But that testimony is inconsistent with *Glass* and Kentucky law (as it is devoid of any reference to proof of other outrageous conduct accompanying the delay, or that NICO's actions caused actual damage to Walden).

**v. The deficiencies in Fisher's opinions cannot be cured through cross-examination.**

Walden will likely argue that any deficiencies in Fisher's opinions can be addressed through cross-examination, rather than exclusion. That argument misses the mark. Cross-examination may be an appropriate tool for testing an expert's credibility, but it is not suited to cure opinions built upon an incorrect legal framework. As the Sixth Circuit has recognized, Rule 702 requires courts to focus on the reliability of expert testimony, not merely its credibility. *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 323 (6th Cir. 2015). Here, NICO does not challenge Fisher simply because it disagrees with his conclusions. Rather, NICO challenges his opinions because they are the product of an unreliable methodology, namely, the application of duties and claim-handling standards that Kentucky law does not recognize. Because NICO's challenge goes to the reliability, and therefore the admissibility, of Fisher's opinions, these defects can only be cured by the Court excluding his testimony.

## IV. Fisher's Testimony Cannot Assist the Jury.

Fisher cannot assist the jury in understanding claim handling standards in Kentucky because he does not know the applicable standards. In other words, his opinions are based on nothing more than his personal unsupported inferences, and conclusions that are inconsistent with Kentucky law. The jury does not need an expert to infer culpability from facts. *Stringer v. Commonwealth,* 956 S.W.2d 883, 889–890 (Ky. 1997); *Tindle v. Hunter Marine Transport*, 2016

U.S. Dist. LEXIS 7053, at *20 (W.D. Ky. Jan. 21, 2016) (drawing inferences belongs to the jury, not the expert). Fisher's opinion does not help the jury in any way.

## V. If the Court Does Not Exclude Fisher's Testimony Entirely, the Court Should Limit the Scope of Permissible Testimony.

Even if the Court declines to exclude Fisher's opinions in their entirety, his testimony should be narrowly constrained to prevent the jury from being presented with standards that are inconsistent with Kentucky law. At a minimum, Fisher should be prohibited from offering any opinion that NICO acted in bad faith, violated KRS 304.12-230, engaged in outrageous conduct, or otherwise satisfied the legal elements of a Kentucky bad-faith claim. Fisher repeatedly admitted that he would not opine whether NICO's conduct was "outrageous," whether liability ever became "reasonably clear," or whether NICO acted with any improper motive. Instead, he ultimately reduced his opinions to the assertion that NICO should have investigated the claim more aggressively, retained experts sooner, and attempted settlement earlier. (Fisher Depo., Ex. 3 at 174:24 to 175:04; 194:19 to 195:01; 237:03 to 237:09.) Having disclaimed any opinion on the core legal requirements of a Kentucky bad-faith claim, Fisher should not be permitted to imply to the jury that those requirements have been satisfied.

Likewise, Fisher should be barred from testifying that NICO had a duty to make settlement offers sooner, close the claim faster, or resolve the matter earlier notwithstanding the existence of a genuine liability dispute. Fisher expressly admitted that liability could have "gone either way" and that he was "not sure" liability ever became reasonably clear. *Id.* at 126:12 to 126:22; 171:19 to 171:22. Kentucky law permits an insurer to continue investigating and contest liability when a reasonable basis exists for doing so. Any testimony suggesting that NICO was required to settle earlier despite an ongoing liability dispute would improperly substitute Fisher's personal claim-handling opinion for Kentucky law, which would create a substantial risk of confusing the jury

regarding the governing legal standards. Accordingly, if Fisher is permitted to testify at all, his testimony should be limited to general matters concerning claim-handling activities and should exclude any opinions that NICO's conduct constituted bad faith, violated Kentucky law, or breached any purported duty to settle earlier.

## CONCLUSION

Fisher is not experienced in Kentucky claims handling, which is made apparent by the fact that he provides opinions inconsistent with Kentucky law. His testimony should be excluded. Fisher is not qualified to offer expert opinions in this case, his methodology in arriving at his opinions is unreliable, and his testimony can only confuse the jury. For these reasons and those stated more fully above, this Court should exclude the opinion testimony of Frederick J. Fisher.

Respectfully submitted,

*/s/ Kyle R. Bunnell*

MINDY G. BARFIELD
KYLE R. BUNNELL
Dinsmore & Shohl LLP
100 W. Main Street, Suite 900
Lexington, Kentucky 40507
Telephone: (859) 425-1000
*Counsel for Defendant, National Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Robert Morrin, Esq.
Morrin Law Office
214 West Main Street
Richmond, KY 40475
*Counsel for Plaintiff*

*/s/ Kyle R. Bunnell*
Counsel for Defendant

72935778