# Expert Report
# of
# Frederick J. Fisher, J.D., CCP

## I. Background and Experience

I am the President of Fisher Consulting Group, Inc. (hereinafter "FCG"). FCG provides Professional Consulting services regarding Specialty Lines Insurance, Policy Quality Control, Risk Management, Claims Consulting, and Expert Witness Services. I previously was the Founder, President, and post-acquisition Sr. Vice-President of E.L.M. Insurance Brokers, (aka "ELM"), an insurance production facility which followed a Wholesale Business Model, and I also acted as a Managing Underwriter. Over the past 50 years, I have amassed extensive experience as an Insurance Broker/Agent, Surplus Lines Broker, Insurance Underwriter, Claims Adjuster, Qualitative Claims Auditor, and Risk Management and Insurance Consultant. I have authored several publications regarding professional liability insurance issues and related industry standard of care issues as they relate to Insurers.

As related to this matter, I have extensive experience with Fair Claim Practices, not only as an Educator, but also as a Claims Adjuster, and Third-Party Claims Administrator ("TPA"). In Kentucky, and in States where I held Non- Resident Licenses, I was the "Designated Responsible Licensee[1]" within my Firm, charged with being responsible for regulatory compliance consistent with the guidelines adopted by many States as put forth by the National Association of Insurance Commissioners (hereinafter referred to as the "NAIC"). Many of the courses I have taught included education as to issues involving Insurer Best Practices and the Insurance they offer to customers in order to protect them and any related Business Entity.

I have pioneered unique qualitative claims auditing techniques for insurance companies and self-insureds using proprietary techniques to identify and rectify claims issues. These techniques grew from my hands-on experience handling and resolving professional liability claims as a Claims Adjuster and TPA Manager and remain in use by many insurance company internal auditors and others.

My qualifications are in my C.V, attached hereto as **Exhibit A** and includes a list of cases in which I have been deposed an/or testified at trial for the current year and past 4 years.

## II. Scope of Retention

I was retained by Plaintiff's Counsel to review material provided me, and together with my experience, to render Opinions as to whether Defendants, National Indemnity Company (NICO) et. al. acted in accordance with their obligations as an Insurer in investigating and resolving the claim for damages asserted by Plaintiffs. This review included rendering opinions as to whether Defendants

[1] Kentucky requires every licensed Business Entity to identify the Designated Responsible Licensee, for instance, it is question #25 on the Application for a Business Entity license for an Insurance Production Application, see Form 8301-BE Bus Entity App CLEAN 9-21.pdf

acted in Good Faith as to the manner in which they investigated and resolved the underlying bodily case against the policyholders of the Insurance provided by the Insurance Company Defendants in this matter.

## III. Fee for Services

Fisher Consulting Group, Inc currently charges $599 an hour for my work, plus any out-of-pocket expenses at cost, and flat fee for out of State Travel time and any other itemized expenses. Emergency last minute work is charged at $809 per hour only for the duration of the last minute assignment. I have not, nor would FCG, accept any payment beyond the hourly rate and expenses. I also have no interest, financial or otherwise, in the outcome of this matter.

## IV. Materials Reviewed

Attached as **Exhibit B** is a list of all materials I have reviewed as provided by counsel or obtained on my own.

## V. Basis for My Opinions

In addition to the case specific materials reviewed, my opinions are based on my experience and training as an insurance claims adjuster, owner of a TPA, Principal Responsible Licensee, published author, and Claims Trainer. Another source is my extensive experience as a Qualitative Claims Auditor. My opinions are also based upon, among other sources, insurance industry texts and articles about handling insurance claims, and of the statutory and regulatory standards for handling insurance claims, such as the NAIC's Model Unfair Claim Settlement Practices Act (hereinafter the "Act"), which has been adopted in Kentucky as KRS 304.12-230 and any related Regulations[2]) and which applies to claim handling in Kentucky.

The Act and the Regulations collectively form some of the many important sources of information for insurance industry standards for the proper handling of claims.[3]

The Act and Regulations are often articulations of the general insurance industry standards for claims handling. As one well known author on insurance claims handling has pointed out, "insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a nationally recommended standard of conduct which provides a guide for insurance regulators in every state to establish reasonable claim practices"

---

[2] I am not an attorney nor do I do legal research. However, as a former Non-Resident Licensee in Kentucky, I was the Designated Responsible Licensee and had to be familiar with their laws and Regulations.

[3] The Act and the Regulations are based upon the NAIC Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations. More than forty-five states have adopted the Model Unfair Claims Settlement Practices Act, either in its original form or in a modified form, including Kentucky. Likewise, many state insurance commissioners have adopted the Model Unfair Claims Settlement Practices Regulations. The Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations are used by insurance commissioners nationwide to perform market conduct examinations of insurance claims operations.

During my employment in handling claims from 1975 through 1995, it was necessary, upon notice of an accident or occurrence, for me, or my employees, to thoroughly investigate claims assigned to us, and to determine the scope and extent of damages, including the extent and nature of the loss, and then determine what coverages may apply to the loss. Our goal was to fully develop the facts as much as possible in 90 days or less. Such rapid claim development thus gave rise to more accurate and earlier claim reserving, thereby allowing for actuaries to better review the performance of a program of coverage and thus make any necessary adjustment to assist in profitability.

I also learned about proper claims handling standards from my own employer (and later, my own Company), which was the source to my Firm's proper implementation of same. I also contributed to the claims handling procedures and standards of many insurers, as stated in my C.V. In addition, I conducted numerous classes, workshops, seminars, and similar programs regarding the handling of insurance claims.

## VI Basic Insurance Industry Standards and Practices Relevant to this Matter

Many of the Principles discussed in this section were not followed in the Claim investigation and handling in this matter by the Defendants**.** Rather, the Claim investigation and handling, if that's what it was, ignored traditional methods. Hence my discussion of traditional standards is necessary.

### A.Insurance Claims Personnel Are Trained in the Standards for Claims Handling.

Insurance company claims representatives must be routinely trained in the standards of insurance claims handling. This is mandated by the NAIC Model Act as adopted by Kentucky. Annual certification of the same is also a requirement.

Claims personnel are expected to know these standards and apply them in their daily work by actions and not merely words. This requirement is underscored in a text on insurance claims, which has been used nationwide to train insurance claims personnel. In the book, The Claims Environment by Markham, he authors and contributing authors, all of whom are or were employed in the insurance industry, point out that "claims representatives should have expert knowledge of insurance policy coverages, the law, and determination of damages[4]"

A claims professional in Kentucky, or one who handles claims in Kentucky, thus should be trained and knowledgeable in the standards of insurance claims handling. Within that context, one is reminded of what insurance is about, i.e., "The product being sold is "insurance," which is a service that provides protection against a possible loss. … The claims department is the only place that produces this product."[5]. Insurance Industry Claims Personnel Must Be Trained in the Proper Conduct required of them to assure the purposes of Insurance Are Fulfilled.

---

[4] Markham, James J. [Ed.], et al., The Claims Environment [Insurance Institute of America, 1st ed., 1993], p. 297 (hereinafter, "Markham").

[5] See "The Return on Investment of Insurance Claims Staffing", by Frederck Fisher and Chantal Roberts (the actual phrase being exclusively authored by Ms. Roberts), May 1, 2026, an Article published by the International Risk Management Institute- E-publication "Expert Commentary" which includes a link to Ms Roberts' White Paper on "The ROI of Claims Staffing and Education: How Skilled Adjusters Make Carriers More Profitable"

Insurance claims personnel are guided in their claims handling by the insurance industry standards for claims handling, including their training regarding their duty to uphold generally accepted standards when handling claims. Insurance claims professionals are commonly taught about avoiding bad conduct. As Markham noted, "[c]laim representatives must know what bad faith is, how it evolved, and how it affects everyone in the claims business. More important, they must know how to investigate, evaluate, and settle claims in a way that protects the interests of both the insured and the insurer and avoids the problems that lead to bad faith claims."[6]

Throughout the insurance industry, it is widely and generally understood that failing to conduct diligent investigations may constitute a breach of the standards required of them.

**B. Insurance Industry Claims Handling Standards Exist to Assure the Purposes of Insurance are Fulfilled.**

Insurance is typically defined as "the pooling of fortuitous losses by transfer of such risk to the insurer, who agrees to indemnify insureds for such losses, to provide other pecuniary benefits on their occurrence, or to render services connected with the risk[7]. As the definition reflects, a key, if not critical component of insurance is the transfer of risk from the insured to the insurer. If this transfer is interfered with so that the insured does not receive the full benefits owed under the insurance policy, then the purpose of insurance is defeated. To avoid this outcome, the insurance industry has adopted various standards and practices for handling insurance claims. The aim of these standards and practices is to assure the purposes of insurance and the insurance contract are fulfilled when the insured submits a claim. Insurance industry claims handling standards are among the many standards for claims handling as are general standards applicable to this matter, either as standard of industry practices, or as required by Kentucky statutes and regulations that apply to claims handling[8]:

The following are most relevant to this matte, but the list below may not cite all potential relevant items:

1. **From the Kentucky Insurance Code:**

Kentucky's **Unfair Claims Settlement Practices Act (UCSPA)**, codified at **KRS 304.12-230**, is the state's statute that prohibits certain unfair or deceptive practices by insurers in handling claims. It was adopted in 1984 and is modeled after the NAIC Model Act. KRS 304.12-230 lists 17 specific prohibited acts or omissions. Relevant provision in this matter include:

Failing to adopt reasonable standards for prompt investigation
Not attempting in good faith to settle promptly and fairly when liability is clear.
Compelling litigation by offering lowball settlement offers
Attempting to settle for less than a reasonable person would believe owed.
Failing to provide a reasonable explanation for denial or compromise.

---

[6] Markham, Supra. p. 12;
[7] Rejda, George E., Principles of Risk Management and Insurance [Addison Wesley, 8th ed., 2003], p. 18.
[8] See footnote 1, supra whereby I am required to be familiar of the Fair Claim Standards as a Licensee in Kentucky.

2. **From the Kentucky Administrative Code** :

**806 Ky. Admin. Regs. 12:095, § 6(1)(a).** Affirm or Deny Liability 30 days

**806 Ky. Admin. Regs. 12:095, § 6(2)(b).** 45 days to get more time to complete investigation ( and repeat as necessary)

**806 Ky. Admin. Regs 12:095 (8) (**defines) Investigation" means all activities of an insurer related to the determination of liabilities under coverages afforded by a policy, certificate, or contract

To comply with the above standards for claims handling, insurers must not merely memorize and recite the concepts. Rather, one must behave under them through actions, not merely words.

### C. The Trend to Abandon Proper Claim Practices

Almost every day, the insurance industry is deluged with more and more examples of poor claims handing. There are many reasons which include lack of training of new persons in the claim department, a trend towards evaluating a claim by requiring others to supply the facts and information about damages rather than investigating the facts themselves.

Barry Zalma, Esq. is one of the more prolific authors on Insurance Fraud and Proper Claims handing and training. He is also one of the only providers of Claims and Adjuster Training (both for pre-licensing and post licensing continuing education). Even he has recently noted the disturbing trends seen above. Specifically, he found it necessary to state the obvious just last week:

> Insurers have, over the last three decades, decimated their professional claims staffs. Experienced claims adjusters were fired and replaced with young, untrained, unprepared people. A virtual clerk replaced the old professional claims handler. Software programs took over from the seasoned interviewer to analyze the right to claim proceeds. Hands-on human skill, empathy and judgment were removed from insurers' contact with those to whom they promised to provide indemnity fairly, promptly and in good faith. Money was saved from the insurer's expense column by paying lower salaries. Within three months of firing the experienced claims people's gross profit increased for a quarter of a year or two quarters. …..
>
> The insurance business must change — this time for the better — if it is to survive profitable business. Insurers must rethink and end the firing of experienced claims staff and reduction in training to save "expenses." Insurers must recognize that the expense to train, educate and maintain a staff of professional claims handlers is a small part of the money that flows out of an insurer's coffers. The major dollar expenditure is the money paid to insureds or claimants to pay claims. When inadequate or inexperienced adjusters pay claims the insurer did not owe, refuse to pay claims it did owe, or pay more or less than is appropriate, the potential for an insurer to make a profit is reduced much more than is saved by reducing the expense

incurred paying professional claims staff.

Insurers should, if they wish to succeed, adopt a program to promote excellence in claims handling. Only with a staff of claims handlers dedicated to excellence in claim handling can insurers promptly, fairly and in good faith keep the promises made by the insurance policy and avoid charges of breach of contract and the tort of bad faith in both first and third-party claims.[9]

## VII Neutral Facts in issue

I have reviewed all of the materials as indicated above and listed them in **Exhibit B**. What follows are some of the key facts, and (quoted ) notes as found in the materials reviewed and thus I am not waiving any rights to discuss other facts not listed below:

| DATE | Description | Source |
|---|---|---|
| 8/10/2020 | Date of Loss | Cnsl timeline |
| 8/10/2020 | Madison (sic) County Medical Intake- Possible Dislocation of hip, Abrasion to RT hand, Abrasion to head | Cnsl timeline |
| 8/28/2020 | MLO sent NOR to Hariston Brown Financial and Insurance Services | Cnsl timeline |
| 10/16/2020 | MLO sent NOR to National Indemnity Co (hereafter NICO) | Cnsl timeline |
| 10/16/20 | Morrin Letter of Representation to National Indemnity | NICO 003763 |
| 10/30/20 | Morrin Email- Notice of Representation | NICO003748 |
| 11/3/2020 | NICO "first notice of loss" per adjuster log. | Cnsl timeline |
| 11/03/20 | Southern Insurance Underwriters - Receipt of notice of Claim - to South U- Flagged for U/W Review? | NICO 003754, 3756 |
| 11/03/20 | Internal NIC Set up- See attached police report and letter of representation on a second accident for this insured on 8/10/20. The vehicle listed as involved is #1 on the policy, 2012 Freightliner, vin ending 5657. Per the police report it was improperly parked/left on the side of an off ramp and the CVD ran into it, causing potential serious injuries to the claimant. Matt, This LOR was received under claim# 557532 - The insured got into two different accidents on the same day. The loss that claimant is being represented for happened in Kentucky. Possible serious injuries to this claimant for prior hip surgery, same hip dislocated from this accident. The Police report is also attached. | NICO 003757 |
| 11/03/2020 | PR attached to loss notice. | Claim Handling, Internal Value Adjuster Log |

[9] See American Insurers Need to Adopt and Implement Excellence in Claims Handling, Mach 11, 2025, www.zalma.com

| | | |
|---|---|---|
| 11/04/20 | NIC hires McIntyre Glligan Adjusters (MGM)- Photo in detail etc | |
| 11/04/2020 | Left v/m with insured to discuss claim and gave them MGM adjuster's contact info. as well. | Claim Handling, Internal Value Adjuster Log |
| 11/20/2020 | MLO File note: The liability adjuster said he will send written questions since we denied our client giving a recorded statement. | Cnsl timeline |
| 11/20/20 | MGM Initial Report to NIC - "You may wish to have someone local to the Atlanta, GA area attempt to make a cold call to the insured's premises to obtain information from the insured."- Photo's do not show where truck was parked- Heavy damage on more on right side of car... NICO 3800-3807 | How dod we find out truck was in readway ?? |
| 11/23/2020 | Rec'd adj. report. Asked adjuster to confirm insured involved vehicle. Other party rearended insured. | Claim Handling, Internal Value Adjuster Log |
| 11/30/2020 | Asked adjuster to confirm if passenger in insured vehicle was an employee or not. | Claim Handling, Internal Value Adjuster Log |
| 12/09/20 | Updated report with Official report and Policy photos "We have obtained the attached official photographs from the Richmond Police Dept. **You will note the insured unit is partially in the lane of Travel at the time ; however the photographs and the police report do indicate that the insured** (emphasis added by fjf)<br>driver had placed reflective cones behind the insured unit at the time of the incident."- But - no mention of visibility at the curve- nor exit Speed of the car- See Photos at NICO 003834 -3853 | NICO 003817 |
| 12/10/2020 | Rec'd adj. report. Evidently no passenger in IV. Adj. having trouble contacting either party. Will put out ROR next diary date if it continues. | Claim Handling, Internal Value Adjuster Log |
| 12/14/2020 | MLO file note: National Indemnity group of insurance companies hired out local adjusters to handle this claim. We should direct everything to MGM adjusters. Also, National Indemnity's letter stated that the policy info was enclosed. When I asked Tom Wesley about this, he informed me that it was a mistake and that they don't provide policy info unless a suit has been filed. | Cnsl timeline |

| | | |
|---|---|---|
| 01/15/2021 | Review file transfer. Coverage: At this time no coverage issues have been identified. Insured vehicle is a 2012 Freightliner which is scheduled on the policy as vehicle #1. Liability: The police report indicates the insured's vehicle was broken down and parked on the right side of the exit ramp. It had broken down and the driver had set out reflective triangles behind the truck. The claimant indicated to the investigating officer he was tired and did not see the insured vehicle parked on the exit ramp and struck the insured vehicle in the rear. No citations were issued to either driver. We have not been able to make contact with the insured driver. Damages. The Police report references the claimant had hip surgery and had dislocated his hip. He was transported to the University of KY for medical treatment. The claimant driver is represented by an attorney. Per the local adjuster they have been unable to get a hold of the insured, The insured is located Alpharetta, GA. Have the IA in KY close their file. Hire a local adjuster in Georgia to track down the insured. Why was their truck broken down? Contact the claimant attorney and obtain information as to the injuries and medical treatment received? (fjf- inconsistent with notes of 12/09/20) | Claim Handling, Internal Value Adjuster Log |
| 01/19/21 | NIC here GA Adjuster to contact Insured | NICO 003865 |
| 01/19/2021 | To GA IA: Limited assignment to track down NI and IVD and get their version of the facts of the accident –(fjf see 3-8-23) | Claim Handling, Internal Value Adjuster Log |
| 01/19/2021 | Called PC to see about injuries, theory of liability, etc. but was told the legal assistant who has been talking with Mr. Walden is out today but she will have her call me tomorrow | Claim Handling, Internal Value Adjuster Log |
| 2/3/2021 | Email from MLO (Zoie Webb) to darren@mgmadjusters.com with EMS medical records and billing (email says ER MR and billing, but UK records not included; the billing from UK was received by MLO on 3/19/2021) | Cnsl timeline |
| 02/03/21 | Plaintiff provided EMS records to NICO's local adjuster, MGM. | |
| 02/04/21 | Local Adjuster report on attempts to tack down owner-No-Coop- Did comprehensive Report on Charles Howard See ISO Claim Seach @ NICO 003875- 24 pps | NICO 003872 |
| 02/11/2021 | To IA: Copy of IVD Comprehensive Report | Claim Handling, Internal Value Adjuster Log |
| 02/26/21 | NICO issued a letter denying all liability- NO Contact with Insured- relied solely on Police Report | |
| 2/26/2021 | NICO Liability denial letter (had not made contact with their insured)- Finds No liability for loss- Policy report noted claimant at fault- Reflective Triangles in place | Cnsl timline , 3.1 DOC 2021-02-26 Letter from National Indemnity re Denial of |

| | | |
|---|---|---|
| | | Liability- No Bates |
| **02/26/2021** | **To PC: Liability Denial Letter** | Claim Handling, Internal Value Adjuster Log |
| 02/26/2021 | GA IA 1st Report: Unable to get in touch with NI or IVD; will continue efforts | Claim Handling, Internal Value Adjuster Log |
| 03/17/21 | CJ Hester -GA Adjuster- Second report - Inconclusive as to Where Howard was.. Letters sent to multiple addresses | NICO003906 |
| 03/24/2021 | IA: No luck finding IVD yet; will continue efforts | Claim Handling, Internal Value Adjuster Log |
| 04/18/21 | 3rd Report- GA Adjuster - No Contact | NICO 003918 |
| 04/20/2021 | IA: More unsuccessful attempts at reaching IVD | Claim Handling, Internal Value Adjuster Log |
| 5/13/2021 | Letter from MLO to NICO - 2nd request for policy info | cnsl Timeline |
| 5/19/2021 | Email from adjuster Vince Kline to MLO: While we do not believe we are required to disclose our Insured's policy limits (if you believe there is some authority requiring that we disclose our policy limits, please provide it to me and I will reconsider your request), I will agree to send you a copy of the Declarations page upon if your office will provide a written statement concerning your client's version of the incident in question, his injuries, treatment, medical records and bills incurred to date, and your theory of liability against the Insured. I look forward to hearing from you. | cnsl Timeline |
| 05/19/21 | email to Counsel form NIC_ will provide Dec page and "While we do not believe we are required to disclose our Insured's policy limits (if you believe there is some authority requiring that we disclose our policy limits, please provide it to me and I will reconsider your request), I will agree to send you a copy the Declarations if your office will provide a written statement concerning your client's version of the incident in question, his injuries, treatment, medical records and bills incurred to date, and your theory of liability against the Insured. I look forward to hearing from you. | NICO 003928 |
| 05/19/2021 | In response to email from PC requesting a copy of the dec page, I sent a copy of the liability denial letter but agreed to send a copy of dec page upon receipt of written statement concerning Claimant's story, injuries, treatment, records, bills, and theory of liability | Claim Handling, Internal Value Adjuster Log |

| | | |
|---|---|---|
| 05/25/21 | Email to NIC form Counsel with theory and records: Tuesday, Mr. Morrin's theory of liability is that the driver should have had the truck that was parked halfway on the ramp moved immediately before going to sleep at aa nearby hotel. Our client reports that he was getting off the interstate exit at 87, the truck did not have lights and he couldn't see it out in the road." See Updated Police Report with Pics- | NICO 003929 |
| 06/03/21 | NIC to - Adjusters- to continue to try and contact their insured | NIC 003933 |
| 06/03/21 | Vince Kline to Counsel- Stil confident in defenses?? | NICO 03949 |
| 6/3/2021 | Sent to PC copy of dec page and requested add'l med records when received and will evaluate to see if I can make an offer | Claim Handling, Internal Value Adjuster Log |
| 06/03/2021 | PC advised that Claimant suffered broken hip, cut hand, abrasion to head, and bruised ribs; treated at UK Ortho Surgery and Sports Medicine and Results Physiotherapy and provided a copy of EMS and ER records; they don't have other records at this time but will fwd upon receipt; their theory of liability is that the IV should have had the truck that was parked halfway on the ramp moved immediately before going to sleep at a nearby hotel; Claimant reports that he was getting off the interstate at exit 87 and the IV did not have lights and Claimant couldn't see it out in the road | Claim Handling, Internal Value Adjuster Log |
| 06/30/21 | NICO maintained its $0.00 external posture., yet Reserve at $150K | |
| 6/30/2021 | NICO Adjuster log: increasing exposure to BI reserve to $150k based on coverage confirmed, "liability appears favorable to insured (CV stated that he was tired and did not see IV parked on the edge of the ramp when CV rear-ended IV; PC"s theory of liability is that the IC should have had the truck that was parked halfway on the ramp moved immediately before going to sleep at a nearby hotel [....]" | cnsl Timeline |
| 06/30/21 | Reserve increase to $150K | NICO 003669 |
| 07/01/21 | * undated but fits timeline- Internal memo to U/W - Reserve at $100K | NICO 003952 |
| 07/09/21 | Continue attempts to contact Howard- the Driver - Well into Oct 2021- Moved from known Location?? | NICO 003957-58, 3978 |
| 10/26/2021 | NICO Adjuster Log: Named insured and driver are still not cooperating with the investigation […] . I checked with the Secretary of State in Georgia and the named insured is still in business. | cnsl Timeline, 3.2 DOC NICO Reservation of Rights, No Bates |
| 10/26/21 | Kim Hodgen- NIC_ Folles up for more info on injuries and issues R o R CO and Driver | NICO 003982 |
| 11/15/21 | NICO continued to assert liability defenses to Plaintiff. | |
| 01/05/22 | Subrogation Notice to NICO from Rawlings- Medicare - Subro Notice- follow up April 29, 2922 | NICO 004013, 4018 |
| 8/11/2022 | Complaint filed | cnsl Timeline |
| 08/24/22 | Notice of Lawsuit against NIC | NICO 004031 |

| | | |
|---|---|---|
| 9/7/2022 | NICO Adjuster Log: Suit filed in Madison County against Insured | cnsl Timeline |
| 11/15/2022 | NIC Reservation of Rights- re Judgment in excess of Limits | No Bates in Sec 3- Files |
| 11/15/22 | Partial Denial and RoR set to P/H | NICO 004862 |
| 12/8/2022 | NICO Adjuster log: Received the plaintiff's discovery responses. The plaintiff is claiming $123k in past medical expenses. No claim for past or future wage loss. The plaintiff will be making a loss of earning capacity in the amount of $41,155.80. The plaintiff is also seeking punitive damages in the amount of $368,874.15. | cnsl Timeline |
| 12/29/22 | Subro Co Follow up for Status on claim | NICO 004902 |
| 01/13/23 | Morrin Pos letter and demand to NIC Counsel- Post filing of Action | NICO 004919 |
| 1/28/2023 | NICO Adjuster Log: received [demand for] $846,676.07. […] "set a mediation so we can attempt to resolve." | cnsl Timeline |
| 02/02/23 | Opposing Counsel needs med Authorizations Followed up 2-21-2023 & Mar 8- 2023- NICO 4988 | NICO 004948 |
| 02/16/23 | NICO continued to ignore Plaintiff's January 2023 policy-limits demand. | |
| 2/16/2023 | NICO Adjuster Log: Our accident reconstruction expert has gone to the accident scene. Mr. Crum indicates that the insured should have not left his vehicle on the off-ramp attended. | cnsl Timeline |
| **03/08/2023** | Received a report from our defense accident reconstruction expert Eddie Crum. According to our accident reconstruction expert, there is an issue with our driver had left the vehicle unattended on the ramp. However, Crum found that our vehicle was located approximately 3 feet into the traveled portion of the roadway and that Walden would have had approximately 8 feet of clearance for him to maneuver around our vehicle. Crum also noted that Mr. Walden's failure to see our vehicle until it was 10 feet away could be consistent with a fatigued vehicle operator. | Claim Handling, Internal Value Adjuster Log |
| 03/08/2023 | Received a report from our defense accident reconstruction expert Eddie Crum. According to our accident reconstruction expert, there is an issue with our driver had left the vehicle unattended on the ramp. However, Crum found that our vehicle was located approximately 3 feet into the traveled portion of the roadway and that Walden would have had approximately 8 feet of clearance for him to maneuver around our vehicle. Crum also noted that Mr. Walden's failure to see our vehicle until it was 10 feet away could be consistent with a fatigued vehicle operator. | Claim Handling, Internal Value Adjuster Log |
| 09/14/2023 | Update: DC has sent the medical records for the plaintiff to Dr. Kriss for review. The plaintiff's counsel has noticed the deposition of Mr. Howard, the IVD. Defense counsel has been unable to locate the driver. We have sent RORs out to Mr. Howard, but they have been returned with no forwarding address. DC is going to set a mediation. | Claim Handling, Internal Value Adjuster Log |
| 09/14/2023 | Update: DC has sent the medical records for the plaintiff to Dr. Kriss for review. The plaintiff's counsel has noticed the deposition of Mr. Howard, the IVD. Defense counsel has been unable to locate the driver. We have sent RORs out to Mr. Howard, but they have been returned with no forwarding address. DC is going to set a mediation. | Claim Handling, Internal Value Adjuster Log |
| 11/22/2023 | NICO Adjuster log: Mediation scheduled for 2/6/24. | cnsl Timeline |

| | | |
|---|---|---|
| 11/22/2023 | Mediation has been scheduled for 2-6-2024 starting at 9:00 a.m. | Claim Handling, Internal Value Adjuster Log |
| 11/22/2023 | Mediation has been scheduled for 2-6-2024 starting at 9:00 a.m. | Claim Handling, Internal Value Adjuster Log |
| 02/22/24 | The NICO Claims Committee reviewed the file to determine expected exposure and explicitly set settlement authority at $234,249. | |
| 2/22/2024 | NICO Adjuster log: Claims Committee review to determine expected exposure. Determined expected value to be $234,249. Authority approved in this amount. | cnsl Timeline |
| 02/22/24 | Internal Evaluation of case @ $234,249 | NICO 003665, 64 |
| 02/22/2024 | Claims Committee review was conducted on February 22, 2024 to determine the expected value of exposure 2, the ABI claim of Charles Walden. Committee included Kim Hodgen, Jeff Striegel, Steve Hansen , Rebecca Messineo, Tom Mortland and Alicia Hoffmann. Determined expected value to be $234,249. Authority approved in this amount. | Claim Handling, Internal Value Adjuster Log |
| 02/22/2024 | Claims Committee review was conducted on February 22, 2024 to determine the expected value of exposure 2, the ABI claim of Charles Walden. Committee included Kim Hodgen, Jeff Striegel, Steve Hansen , Rebecca Messineo, Tom Mortland and Alicia Hoffmann. Determined expected value to be $234,249. Authority approved in this amount. | Claim Handling, Internal Value Adjuster Log |
| 3/26/2024 | NICO Adjuster log: Made a call to plaintiff's counsel 859-200-8144 and left a message to discuss settlement. | cnsl Timeline, Def email NICO 006525 |
| 03/26/2024 | Made a call to plaintiff's counsel 859-200-8144 and left a message to discuss settlement. The insured driver did not appear for his deposition and we have not been able to locate him. I am going to reach out to another private investigator in the Atlanta area recommended by local counsel to see if we can find him. Plaintiff's counsel has filed a 2nd Motion for Sanctions. | Claim Handling, Internal Value Adjuster Log |
| 03/26/2024 | Made a call to plaintiff's counsel 859-200-8144 and left a message to discuss settlement. The insured driver did not appear for his deposition and we have not been able to locate him. I am going to reach out to another private investigator in the Atlanta area recommended by local counsel to see if we can find him. Plaintiff's counsel has filed a 2nd Motion for Sanctions. | Claim Handling, Internal Value Adjuster Log |
| 03/27/2024 | I retained a private investigator, Ricky Needham, to attempt to locate the named insured and driver. DC let me know that Enterprise requested reinstatement as an LLC on 2/8/2024. | Claim Handling, Internal Value Adjuster Log |

| | | |
|---|---|---|
| 03/27/2024 | I retained a private investigator, Ricky Needham, to attempt to locate the named insured and driver. DC let me know that Enterprise requested reinstatement as an LLC on 2/8/2024. | Claim Handling, Internal Value Adjuster Log |
| 03/30/2024 | DC has contacted the investigating officer. He does remember the accident but agreed to meet with DC to discuss the case. | Claim Handling, Internal Value Adjuster Log |
| 03/30/2024 | DC has contacted the investigating officer. He does remember the accident but agreed to meet with DC to discuss the case. | Claim Handling, Internal Value Adjuster Log |
| 4/1/2024 | CRUM Inv. Collision report | NICO 005889 |
| 4/20/24 | NICO extended its very first offer verbally, followed by an Offer of Judgment for $100,000, Reiterated 6-10-2024 | See Adjuster Notes |
| 4/20/2024 | NICO Adjuster log: The insured driver has contacted DC. The driver indicated his vehicle was overheating and he needed to get it off the road. […] I called the plaintiff's counsel and made an offer of $100,000. I indicated that liability is highly disputed and we also dispute the need for any future medical. | cnsl Timeline, Def Email NICO 006525, Hodgen Notes |
| 04/20/2024 | The insured driver has contacted DC. The driver indicated his vehicle was overheating, and he needed to get it off the road. He pulled to the off-ramp and got his truck as far to the right as possible. He called his dispatcher, and they said they would call the police. He put his triangles out and walked to a hotel near the interstate. Sometime after, the police awakened him regarding the accident. He went back to the scene and cooperated with the accident. I called the plaintiff's counsel and made an offer of $100,000.00. I indicated that liability is highly disputed and we also dispute the need for any future medical. | Claim Handling, Internal Value Adjuster Log |
| 04/20/2024 | DC filed a Motion for the plaintiff to attend his IME scheduled for April 12th. The plaintiff's counsel has filed an objection and asked for restrictions on the exam. The Judge sustained our motion for the plaintiff to attend the IME. The plaintiff's counsel then filed for an emergency motion asking that his client not attend the IME because he had to have 72 hours notice to his rehab facility to travel. The Judge did grant the motion. | Claim Handling, Internal Value Adjuster Log |
| 04/20/2024 | The insured driver has contacted DC. The driver indicated his vehicle was overheating, and he needed to get it off the road. He pulled to the off-ramp and got his truck as far to the right as possible. He called his dispatcher, and they said they would call the police. He put his triangles out and walked to a hotel near the interstate. Sometime after, the police awakened him regarding the accident. He went back to the scene and cooperated with the accident. I called the plaintiff's counsel and made an offer of $100,000.00. I indicated that liability is highly disputed and we also dispute the need for any future medical. | Claim Handling, Internal Value Adjuster Log |

| | | |
|---|---|---|
| 04/20/2024 | DC filed a Motion for the plaintiff to attend his IME scheduled for April 12th. The plaintiff's counsel has filed an objection and asked for restrictions on the exam. The Judge sustained our motion for the plaintiff to attend the IME. The plaintiff's counsel then filed for an emergency motion asking that his client not attend the IME because he had to have 72 hours notice to his rehab facility to travel. The Judge did grant the motion. | Claim Handling, Internal Value Adjuster Log |
| 05/03/2024 | Update: The Federal Judge affirmed the Magistrate's ruling that Walden has to attend the IME with Dr. Kriss. The insured driver is cooperating with DC. The insured driver's depo is scheduled for 6/14 in Atlanta. | Claim Handling, Internal Value Adjuster Log |
| 05/03/2024 | Update: The Federal Judge affirmed the Magistrate's ruling that Walden has to attend the IME with Dr. Kriss. The insured driver is cooperating with DC. The insured driver's depo is scheduled for 6/14 in Atlanta. | Claim Handling, Internal Value Adjuster Log |
| 6/13/2024 | NICO Adjuster log: Discussed and decided to move forward with Offer of Judgement | cnsl Timeline |
| 6/13/2024 | Def Counsel email re Offer to settle @ $100K=- Responding to Pl Counsel demand of 6-10-2024 and 6-12 | NICO 006525-6527 |
| 06/13/2024 | We discussed filing an Offer of Judgment for $100K with DC. In KY, if the plaintiff gets less than $100K at trial, we can get our costs reimbursed. I decided to move forward with an Offer of Judgment. | Claim Handling, Internal Value Adjuster Log |
| 06/13/2024 | We discussed filing an Offer of Judgment for $100K with DC. In KY, if the plaintiff gets less than $100K at trial, we can get our costs reimbursed. I decided to move forward with an Offer of Judgment. | Claim Handling, Internal Value Adjuster Log |
| 08/03/2024 | The investigating officer was deposed. The officer recalls going to the scene of the accident. The officer indicated there were floodlights at the scene, which were "lit up like a football field." | Claim Handling, Internal Value Adjuster Log |
| 11/21/2024 | Mediation date is set for 12/19/24. | Claim Handling, Internal Value Adjuster Log |
| 12/19/2024 | NICO Adjuster log: Claim settled at mediation for $200,000 | cnsl Timeline |
| 12/19/2024 | Claim settled at mediation for $200,000.00. | Claim Handling, Internal Value Adjuster Log |
| 01/31/2025 | The signed release and dismissal are in the file. | Claim Handling, Internal Value Adjuster Log |

### VII The Deposition Testimony of Edward Crum

The deposition testimony of Edward Crum is equally telling. For instance, he confirmed that placement of warning triangles needed to be 10 feet off the rear, the second one is to be placed 100 paces later an angle toward the center of the lane that they are blocking, and the third one should be 200 feet[10], again angled toward Inc. oncoming traffic. He also acknowledged it does not appear that that was done, but couldn't definitively say so just from the photographs although he did concede that where the triangles were found could be inconsistent with what would be required[11]. As noted, this should have been obtained much earlier, why did it take several years before he was even retained.

He advised, that all commercial vehicle drivers are required to understand the federal motor carrier safety regulations with respect to the placement of warning triangles[12]. He also indicated that it was unclear as to whether or not any warning lights were left on with respect to the truck[13], and that it was too late to be able to determine whether or not the even existed or were functional[14]. This is as a direct result of the failure to have hired someone like Mr. Crum much earlier in the timeline.

What's interesting is that once the driver was found and deposed, Mr. Howard acknowledged he could remember what the rules were with respect to the placement of warning triangles[15]. This again is as a result of a failure to have hired a private investigator much earlier to try and find the driver of the insured vehicle.

During his deposition, Mr. Crum acknowledged that Mr. Howard was certainly part of the human factor in this loss for having parked a commercial vehicle on the travel portion of the roadway[16].

One other key fact it was pointed out as well was the fact that the driver, Mr. Howard, did not phone the police. Instead he called his dispatcher, and it was a dispatcher who may have eventually called the police[17]. Given the length of time it took to even obtain such facts, this was something that should have been determined much earlier, the hiring of a private investigator to locate the driver as well as the earlier hiring of an accident reconstructionist. These was not done.

### <u>VIII Opinions</u>

---

[10] See Deposition of Edward R. Crum, July 31, 2024, P. 24, L 4-22
[11] See Deposition of Edward R. Crum, Supra, P 28, L: 16-25, P 48, L: 15-25; P. 49, L: 1-21
[12] See Deposition of Edward R. Crum, Supra, P 26, L 22- 25; and P. 27, L: 1-25, P. 28, L: 1-14
[13] See Deposition of Edward R. Crum, Supra, P 28, L: 16-25, P 29, L: 1-25
[14] See Deposition of Edward R. Crum, Supra, P 29, L: 19-25, P 30, L: 4-25, P. 31, L: 1-16.
[15] See Deposition of Clarence M. Howard, June 14, 2024 Pps 34-35 Entire discuss, and P. 89, L 3-17 ., P 65, L: 1-25
[16] See Deposition of Edward R. Crum, Supra, P60, L: 12-25, and P. 61, L: 5-25, P. 62, L: 20-25; P. 63, L:1-17, P. 64, L: 1-23, P. 65, L;: 1-19.
[17] See Deposition of Edward R. Crum, P58, L: 1-24; Deposition of Clarence M. Howard, Supra, P28, L: 15-25, P. 29, L: 1-9, P. 47 l:1-22

Before discussing my Opinions, the above facts are admittedly a lot to remember. Sifting down to key events, are the following (excluding Deposition Testimony of Defendant's Accident Reconstruction Expert) :

| | |
|---|---|
| 12/09/20 | Updated report with Official report and Policy photos "We have obtained the attached official photographs from the Richmond Police Dept. You will note the insured unit is partially in the lane of Travel at the time ; however the photographs and the police report do indicate that the insured driver had placed reflective cones behind the insured unit at the time of the incident."- But - no mention of visibility at the curve- nor exit Speed of the car- See Photos at NICO 003834 -3853. |
| 01/15/2021 | Review file transfer. Coverage: At this time no coverage issues have been identified. Insured vehicle is a 2012 Freightliner which is scheduled on the policy as vehicle #1. Liability: The police report indicates the insured's vehicle was broken down and parked on the right side of the exit ramp. It had broken down and the driver had set out reflective triangles behind the truck. The claimant indicated to the investigating officer he was tired and did not see the insured vehicle parked on the exit ramp and struck the insured vehicle in the rear. No citations were issued to either driver. We have not been able to make contact with the insured driver. Damages. The Police report references the claimant had hip surgery and had dislocated his hip. He was transported to the University of KY for medical treatment. The claimant driver is represented by an attorney. Per the local adjuster they have been unable to get a hold of the insured, The insured is located Alpharetta, GA. Have the IA in KY close their file. Hire a local adjuster in Georgia to track down the insured. Why was their truck broken down? Contact the claimant attorney and obtain information as to the injuries and medical treatment received? |
| 2/26/2021 | NICO Liability denial letter (had not made contact with their insured)- Finds No liability for loss- Policy report noted claimant at fault- Reflective Triangles in place |
| 02/26/2021 | To PC: Liability Denial Letter |
| 02/26/2021 | GA IA 1st Report: Unable to get in touch with NI or IVD; will continue efforts |
| 05/19/2021 | In response to email from PC requesting a copy of the dec page, I sent a copy of the liability denial letter but agreed to send a copy of dec page upon receipt of written statement concerning Clmt's story, injuries, treatment, records, bills, and theory of liability |

| | |
|---|---|
| 05/25/21 | Email to NIC form Counsel with theory and records: Tuesday, Mr. Morrin's theory of liability is that the driver should have had the truck that was parked halfway on the ramp moved immediately before going to sleep at aa nearby hotel. Our client reports that he was getting off the interstate exit at 87, the truck did not have lights and he couldn't see it out in the e road." See Updated Police Report with Pics- |
| 06/03/21 | NIC to Historic- Adjusters- to Continue to try and contact their insured |
| 6/30/2021 | NICO Adjuster log: increasing exposure to BI reserve to $150k based off coverage confirmed, "liability appears favorable to insured (CV stated that he was tired and did not see IV parked on the edge of the ramp when CV rear-ended IV; PC"s theory of liability is that the IC should have had the truck that was parked halfway on the ramp moved immediately before going to sleep at a nearby hotel [....]" (FJF Comment IF Liability is favorable- why such a reserve that wasn't offered, not to mention on Dec 20, of 2020- they already knew the parked vehicle was partially in the roadway? |
| 06/30/21 | Reserve increase to $15oK |
| 8/11/2022 | Complaint filed |
| 1/28/2023 | NICO Adjuster Log: received [demand for] $846,676.07. […] "set a mediation so we can attempt to resolve." |
| 2/16/2023 | NICO Adjuster Log: Our accident reconstruction expert has gone to the accident scene. Mr. Crum indicates that the insured should have not left his vehicle on the off-ramp attended. |
| 03/08/2023 | Received a report from our defense accident reconstruction expert Eddie Crum. According to our accident reconstruction expert, there is an issue with our driver had left the vehicle unattended on the ramp. However, Crum found that our vehicle was located approximately 3 feet into the traveled portion of the roadway and that Walden would have had approximately 8 feet of clearance for him to maneuver around our vehicle. Crum also noted that Mr. Walden's failure to see our vehicle until it was 10 feet away could be consistent with a fatigued vehicle operator. |
| 02/22/24 | Internal Evaluation of case @ $234,249 |
| 02/22/2024 | Claims Committee review was conducted on February 22, 2024 to determine the expected value of exposure 2, the ABI claim of Charles Walden. Committee included Kim Hodgen, Jeff Striegel, Steve Hansen , Rebecca Messineo, Tom Mortland and Alicia Hoffmann. Determined expected value to be $234,249. Authority approved in this amount. |
| 02/22/2024 | Claims Committee review was conducted on February 22, 2024 to determine the expected value of exposure 2, the ABI claim of Charles Walden. Committee included Kim Hodgen, Jeff Striegel, Steve Hansen , Rebecca Messineo, Tom Mortland and Alicia Hoffmann. Determined expected value to be $234,249. Authority approved in this amount. |

| | |
|---|---|
| 03/27/2024 | I retained a private investigator, Ricky Needham, to attempt to locate the named insured and driver. DC let me know that Enterprise requested reinstatement as an LLC on 2/8/2024. |
| 4/1/2024 | CRUM Inv. Collision report |
| 4/20/24 | NICO extended its very first offer verbally, followed by an Offer of Judgment for $100,000, Reiterated 6-10-2024 |
| 4/20/2024 | NICO Adjuster log: The insured driver has contacted DC. The driver indicated his vehicle was overheating and he needed to get it off the road. […] I called the plaintiff's counsel and made an offer of $100,000. I indicated that liability is highly disputed and we also dispute the need for any future medical. |
| 06/13/2024 | We discussed filing an Offer of Judgment for $100K with DC. In KY, if the plaintiff gets less than $100K at trial, we can get our costs reimbursed. I decided to move forward with an Offer of Judgment. |
| 08/03/2024 | The investigating officer was deposed. The officer recalls going to the scene of the accident. The officer indicated there were floodlights at the scene, which were "lit up like a football field." |
| 12/19/2024 | NICO Adjuster log: Claim settled at mediation for $200,000 |

**Conclusions:**

**I** The above condensed version of the facts clearly demonstrate different areas of focus, that is inconsistent with the obligation to make a reasonable offer of settlement when liability becomes clear. First and foremost, there is an inconsistency in the facts and for some reason, got ignored with subsequent events. On December 9, 2020, it was already known that the insured vehicle was not fully off the road, but was straddling the road and the shoulder. This clearly gave rise to have the potential for dangerous parking of the truck especially when it was done at midnight. While the reserves were increased to $150,000 in June of 2021 , there is no such offer not any offer at all.

When the police officer testified in in deposition as well as in writing, that the place was lit up, it is unclear whether or not there is any fault that night or anything else. Further, the facts also show that despite significant attempts to locate their insured and insured driver, they were able to do so once a finally hired a professional private investigator. He was able to find the driver rather quickly, but this took place years later. That should have been done earlier.

**II** Given the foregoing, the surprise is that they denied liability despite the fact that the truck was not safely parked, and the photographs of the warning triangles were grouped together. That wouldn't have been done on the road itself. In fact, they are supposed to be placed 10 feet, 100 feet and then 200 feet from the truck[18]. The driver said he was not aware of those requirements, and it is clear they weren't spaced accordingly. Had that been done, there is no doubt that this accident might have been avoided.

[18] See deposition of Edward Crum, July 31, 2024, P: 24, L: 13-22

Outside investigators and adjusters were hired, but they were focused not on looking at some of the evidence as indicated above, but focused on trying to find their insured driver. While I complement them for doing so, why didn't they hire a private investigator as soon as possible. This could have saved a considerable amount of time given rise to an earlier opportunity for settlement. Nonetheless, it wasn't until June 30, 2021 when the reserve was increased to $150,000. However it was that was never offered. It is unclear at what point they comprehended the full severity of the medical exposure, but there certainly was a prior injury to the point of that was aggravated significantly by this accident. Medical themselves were quite significant, and eventually the insurance company received a notice of lien by the medical insurer. This lien placed more significant pressure for higher settlement, given that a significant amount of money was going to be paid to someone other than the insured party.

While there are notes in the file that indicated they felt that this was a case of little or no liability is significant compared to the reserves set. Apparently, the file handlers have forgotten that early in 2020, they were already aware that the truck was not adequately parked, and the scene investigation getting copies of the police report was delayed by several months. This could have been done earlier, and frankly, they might have been discovered or noticed that the required warning triangles were grouped together in the accident, which seems unlikely had been placed appropriately as required by federal regulations.

**III** Eddie Crum, the accident reconstructionist was not retained until February, 2023. It has been represented to me that this was after Plaintiffs made a Policy limit demand. During his July 31, 2024 deposition, Edward R. Crum, the defense accident reconstructionist, made several concessions consistent with the position that Mr. Howard should not have parked his truck where he did, , a fact the insurer could have deduced from the police report they possessed since December 2020 consist with the notes of Dec. 9, 2020 as noted above. Crum confirmed that the truck came to rest with the rear approximately three feet over the fog line, intruding into the lane of travel, while Mr. Walden's vehicle was lawfully traveling within its own lane at the time of impact.[19] He acknowledged that, prior to reaching the guardrail, there was a dirt shoulder area, marked by white warning poles, where a truck was observed fully parked off the roadway during his second site visit, "over all the way out of the lane of traffic," and that Mr. Howard's straight truck was approximately the same width (or slightly less) than that vehicle. Crum agreed that "it's at least possible that Mr. Howard, in this instance, could have parked all the way over in the shoulder prior to getting to the guardrail," stating: "Yeah, I — I think so. I mean, that truck was a tractor and trailer commercial vehicle and he was on the shoulder. So, I would think that the straight truck would have room to pull over there also."[20] He further agreed that this shoulder area before the guardrail offered "more room … to get off the road" and was therefore a safer alternative to the location where Mr. Howard ultimately stopped partially in the lane of traffic, and confirmed that with headlights on, Mr. Howard "should be able to see" that shoulder area. Crum also conceded, more broadly, that when a commercial driver first notices mechanical issues that may cause the truck to break down, the driver "need[s] to start looking for a safe place to put it," not wait until the vehicle can move no further.[21] Finally, Crum agreed that the scene would have been "more safe" had Mr. Howard done several things differently, and that a safer scene reduces the likelihood of a collision; an admission that necessarily implicates the

[19] See deposition of Edward Crum, Supra, P54; L: 2-19. See also P54; L: 25 – P55; L4.
[20] See deposition of Edward Crum, Supra, P13; L: 12 – P14; L: 16.
[21] See deposition of Edward Crum, Supra, P61; L: 5 – P62; L: 25.

location and manner in which the truck was ultimately parked.[22]

In essence, an insurer cannot retroactively cure a failure to investigate by pointing to an expert defense they didn't even look for until almost 3 years later, and yet they still maintaining little desire to make any reasonable offer for another 14 months after Crum confirmed the potential for liability.

More telling is the following Deposition testimony of Edward Crum, Defendant's Expert Reconstructionist:

> Q.· ·Yeah.· So, prior to even getting -- making it ·to the guardrail, it's possible he could have pulled over all the way over to the shoulder out of the lane of traffic?
> A.· ·Yeah, I -- I think so.· I mean, that truck was a tractor and trailer commercial vehicle and he was on the shoulder.· So, I would think that the straight truck would have room to pull over there also.[23]
>
> Q.· ·Okay.· If they're not placed out far enough, is that dangerous?
> A.· ·It would give you less -- I think less of less -- less of time to react.· And that's why · ·there's a standard for those warning triangles… vehicle is -- is stopped.[24]

As to the issue that the Trucks lights were not on, Mr. Crum stated the following:

> Q.· ·Right.· But if -- so if Mr. Howard had turned his hazard lights on, flashing hazard lights, doesn't ·that make it more likely Mr. Walden would've seen them?
> A.· ·That would've been another -- another blanket ·of safety that they could have put out along with the triangles, turn the hazard lights on also.· Again, but I ·don't know what type of mechanical issue that he had, …it may have –
> Q.· ·Sure
> A.· ·-- prevented him from turning the lights on[25]

Mr. Crum's testimony as to the Placement of the Warning Triangles is equally disturbing and inconsistent with the Defense position taken:

> Q Okay.· About how far from the parked truck are those in your estimation?
> A.· ·20 feet maybe, something like that.
> Q.· ·20 feet.· Okay.· If the placards was set out 10, 100, and 200, why are there only two placards in any ·of the pictures from the police officers and then they're 20 feet out from the parked vehicle?
> A ·Can you repeat that question and I'll answer it for you?
> Q.· ·I'll ask a better question.
> A.· ·Sure.
> Q.· ·Why are those triangle placards so close to that parked vehicle?
> A.· ·I'm not sure.· I'm not sure if they were there, if they were picked up and carried, I don't know ·how many was put out, how far they were put out at the ·time of the collision.· That would be a question for the driver.[26]
>
> Q ·I can tell you, he says he doesn't remember, and he's not familiar with the Federal Motor

[22] See deposition of Edward Crum, Supra, P61; L: 5 – P65; L: 25.
[23] See deposition of Edward Crum, Supra, P14; L: 9-16
[24] See deposition of Edward Crum, Supra, P25, L: 1-14
[25] See deposition of Edward Crum, Supra, P 30, L: 11-20
[26] See deposition of Edward Crum, Supra, P 32, L: 6- 23

Carrier Safety Regulations.· So, if that's his testimony, then what is the likely explanation for those placards being ·so close to that parked truck[27]?
A. .Could have been close to the -- the location that it was put at, or again, it could have been carried ·during the crash.
Q.· ·Carried during the crash?· How so?
A.· ·It could have been whenever the pickup truck ·hit it, it could have moved it along the roadway some. There is -- it looks like there is debris from the placard all over the shoulder in that photo[28].

The Deposition testimony of the insured Driver, is equally telling and supportive of the fact there is no definitive finding the late night collision was avoidable by the Plaintiff:

Q So -- and I guess it comes back to a couple of things, you know, how -- how visible was this truck? I know you mentioned -- and you just mentioned that. You said you had -- you had followed all the regu- -- regulations; right?
A Uh-huh.
Q But there are regulations on spacing for these placards.
A Uh-huh.
Q Did you know that?
A Yeah.
Q Do you know what that spacing is?
A I can't recall.
Q Okay. How do you know you know you followed all the regulations if you're not sure what the spacing is?[29]

Continuing to the next Deposition page, Mr. Howard stated:

THE DEPONENT: I placed the placards according to where it would lead out into the streets so that way if a car was coming, they wouldn't have any choice but to see them. Now, were they regulations? I don't know. They could have been. But they were enough to where if you were a driver, you couldn't have missed them.
BY MR. MORRIN: Q Okay. Yeah. I know you -- I know you just said that there really wasn't anything preventing someone from seeing the truck; right?
A Yes, sir.
Q Okay. But you also stated earlier that it was on a bit of an incline
A Uh-huh.
Q Is that accurate?
A Yes [30]

My thorough review of the materials provided to me, combined with my knowledge, experience, and expertise regarding claims investigations and handling, as applied to through the methodology detailed above, led me to arrive at the following Opinions:

## Opinions

Based on the Standards for Claim Handling stated above, the following opinions are supportable.

---

[27] See deposition of Edward Crum, Supra, p 33 L: 18-22
[28] See deposition of Edward Crum, Supra, p 34 L: 1- 8
[29] See Deposition of Clarence M. Howard, June 14, 2024, P 94, L: 6-21
[30] See Deposition of Clarence M. Howard, Supra., P 95, L: 1-18

It is apparent that as minor at it may initially appears, Plaintiff and Counsel was not receiving notice from the insurance company every 45 days stating said the Insurer needed more time to complete their investigation. They also, never really affirmed or denied liability in the time prescribed until February 26, 2021. However, they already knew by that time that their insured vehicle was partially parked out of the lane. They also knew or should have known, that the required reflectors seem to be bunched together in the photographs provided them at that time.

Furthermore, industry standards dictate that an adjuster must continuously monitor a file and respond to major settlement demands during active litigation. The NICO adjuster logged zero evaluative activity between June 2021 and March 2023, completely ignoring an $846,676.07 demand. Abandoning a file and failing to substantively evaluate a time sensitive, policy limits demand during active litigation is a massive deviation from standard claim handling and file monitoring practices.

In essence, the Trier of Fact could conclude the Insurer effectively weaponized the driver's disappearance as a liability defense externally while treating it as a coverage issue internally.

While they are required to conduct a reasonable investigation of all activities, this was not in fact accomplished. They could have hired a accident reconstructionist earlier even without the cooperation of the insured driver. In addition, they could also have hired a private investigator much earlier as well who could have located the driver much earlier that had been done. Thus, whatever minor offers were made up until that point, was unsupported by any type of reasonable investigation together with its results. Yet, once the Driver (Clarence Howard) was found, and thereafter deposed, when questioned about whether the lights on his truck were left on or were on at the time of the collision, he could not and did not answer in the affirmative. Crucially, the investigating officer noted that when they arrived at the scene, he could not remember if truck's lights were on or off. [31] However, Defense Expert Edward Crum confirmed in his own deposition that the photographs showed no lighting on the truck when it was parked: "I think some of the photographs, it shows that there were no lighting on the truck that it was parked. And that the – the triangles were out behind, but the truck was no lighting."[32]

As a result, they failed to attempt to promptly and fairly make an offer of settlement when liability had been, reasonably clear and thus compelled litigation in this matter. This conduct represents a severe deviation from objective, widely accepted property and casualty insurance industry standards regarding the duty to promptly and fairly investigate and evaluate a claim when liability has become reasonably clear. There are certainly facts to support that. The recent deposition of the expert reconstruction was equally telling, with Mr. Crum agreeing with many failures that have been done by the driver of the truck. Again, had an accident reconstructionist been retained much earlier, this could have been known certainly in 2021, not in 2024.

As a final note, there is no documentation that NICO ever communicated the January 2023 policy-limits demand to their own insured, despite having just issued a Reservation of Rights letter threatening to strip them of coverage. Keeping an insured business entity completely in the dark

[31] See Deposition of Officer Jason Curry, July 19, 2024 ,P 30, L: 17-20

[32] See Deposition of Edward Crum, Supra, P28; L: 20 – 25.

about a massive policy-limits demand while threatening to abandon them violates basic industry standards of care and makes for a central element of a bad faith narrative, especially when coupled with everything above.

**Reservation of Right to Review Additional Evidence and Offer Additional Opinions**

The foregoing opinions may not necessarily constitute all of my opinions on this matter. I expect to review additional documents and depositions in the future. Therefore, I reserve the right to bring up additional opinions and conclusions at a further juncture.

Further, I may offer opinions in response or rebuttal of any other experts or witnesses offering opinions in this matter.

I am prepared to be deposed, testify at trial, mediation, arbitration, or otherwise offer testimony before any other competent forum or tribunal.

**Dated this 27th day of May 2026 at El Segundo, California**

______________________________
Frederick J. Fisher, J.D., CCP