UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO. 5:22-CV-00238-KCC

CHARLES WALDEN PLAINTIFF

VS. VIDEO DEPOSITION OF FREDERICK FISHER

ENTERPRISE SERVICES GROUP, LLC; CLARENCE M. HOWARD; and NATIONAL INDEMNITY GROUP OF INSURANCE COMPANIES, OR NATIONAL INDEMNITY COMPANY DEFENDANTS

* * * * * * * * * *

The video deposition of FREDERICK FISHER was taken before Stephanie A. Blanton, Certified Court Reporter and Notary Public in and for the State of Kentucky at Large, via Zoom videoconference, on Monday, September 28, 2026 commencing at the approximate hour of 12:04 p.m. Said deposition was taken pursuant to Notice, heretofore filed, to be read and used as evidence on behalf of the Defendants, the above-captioned action and all other purposes as permitted by the Kentucky Rules of Civil Procedure.

* * * * * * * * * *



APPEARANCES:

Hon. Kyle R. Bunnell
DINSMORE & SHOHL, LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
COUNSEL FOR THE DEFENDANTS

Hon. Robert A. Morrin
MORRIN LAW OFFICE
214 West Main Street
Richmond, Kentucky 40475
COUNSEL FOR THE PLAINTIFF

ALSO PRESENT:

Angela Edwards, Video Technician



I N D E X


WITNESS: FREDERICK FISHER PAGE(S)
COLLOQUY ................................ 4-5
EXAMINATION
By Mr. Bunnell ................... 6-238
By Mr. Morrin .................. 238-274
REPORTER'S CERTIFICATE ................... 275


* * * * * * * * * *

E X H I B I T I N D E X


| Exhibit | Description | Page(s) |
|---|---|---|
| Number 1 | Revised Notice of Video Deposition | 8 |
| Number 2 | Curriculum Vitae and case list | 11 |
| Number 3 | Fisher Case List | 51 |
| Number 4 | 5/13 Email Correspondence | 56 |
| Number 5 | 5/15/26 Engagement letter | 57 |
| Number 6 | Spreadsheet | 59 |
| Number 7 | List of files reviewed | 77 |
| Number 8 | 12/11/25 Charles Walden depo | 79-80 |
| Number 9 | First reservation of Rights Letter, October 21 | 151 |
| Number 10 | Complaint | 164 |
| Number 11 | Walden's testimony pages | 176 |
| Number 12 | Photograph | 203 |




VIDEO TECHNICIAN: We are on the video record. My name is Angela Edwards, the video technician. The court reporter is Stephanie Blanton. We're here today to take the deposition of Mr. Frederick Fisher via Zoom technologies with all parties in their preferred and respective locations. This deposition is being taken pursuant to notice in the U.S. District Court, Lexington, Kentucky Division, styled Charles L. Walden versus Enterprises Services Group, LLC, et al. The date is September 28th, 2026, and the time is 12:04 p.m. Eastern Standard time. Counsel will now introduce themselves, and state who they represent, please.

MR. MORRIN: Rob Morrin, representing the plaintiff, Charles Walden.

MR. BUNNELL: Kyle Bunnell, for the Defendant, National Indemnity Company.

COURT REPORTER: Mr. Fisher, would you please raise your right hand? Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: I do.
COURT REPORTER: Thank you.
* * * * * * * * * *
The witness, FREDERICK FISHER, after first being duly sworn, was examined and testified as follows:

EXAMINATION

By Mr. Bunnell:
Q Well, good morning to you, Mr. Fisher. It's afternoon here. But it's nice to meet you. My name is Kyle Bunnell, and I'm a lawyer representing National Indemnity Company in this case.
And I'm going to be taking your deposition today. I know you've given several depositions before, so I don't want to belabor the rules of the road or anything, but just a few gentle reminders to make things go easy today that I think are always



a good refresher for everybody.
If you need a break at any point, please let us know. I just ask that the question that's on the table be answered before we take a break. I'll be having some virtual exhibits for you today, so if you have trouble seeing those, I can blow those up and--and try to help with clarity and things like that if--if need be.
If you don't understand my question, just let me know and I'll try to rephrase it. But if you answer it, I'll assume you understood it. And you know all the rules about yes and no and don't nod your head and everything. So I'm--I'm not going to go over all of those with you today.
But I am--with that, I--I think we're--we're ready to dive right in. And I will attempt to--if there's a little delay here and there, it's me trying to navigate my technology and ask you questions at the same time. So I've gotten fairly proficient at multitasking but not always the most seamless process. So do bear with me occasionally for that, if you don't mind.



A Not at all.
Q And, Mr. Fisher, I'll start out by asking you to state your--your full name.
A Frederick John Fisher.
Q And where are you located, Mr. Fisher?
A My office is in El Segundo, California.
MR. BUNNELL: All right. And, Mr. Fisher, I'm going to ma--pre-mark this as Exhibit 1 here.
(WHEREUPON, EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q Do you recognize this document?
A Yes.
Q And is this a notice of deposition that you received in this matter?
A Yes.
Q Okay. And there was also a--a subpoena that was served to you requesting some items that you're--that the plaintiff's counsel has provided. And does this look like the subpoena that--that was received by you?
A Yes, sir.



Q And as I mentioned, Mr. Morrin has provided us some documents, and--and we'll be talking about those. I did want to ask you on Number 3 here, Number 3 asks of any export--expert reports or disclosures of yours and any other cases in the past four years, specifically involving liability of damages disputes in vehicular accidents and whether an insurer's raising of such liability or damages disputes constituted a violation of industry standards or bad faith.
I didn't see any such expert reports or disclosures in that file. Do you know if you have had any such cases in the last four years?
A I have, but I haven't--you know, I don't normally keep my reports. And some of them are also under--and--and many of them are covered by protective orders.
Q Okay. All right. Do you have any recollection of any of those cases as we sit here today?
A No.
Q Okay.
A It's too many of them. My--you

know, this--I have two--for instance, I have two lists of cases, and on--I have the federal rule version and then I have a--a master list that goes beyond the federal rules because not every state follows federal rules.
Q Okay. And what did you do to prepare for today's deposition, Mr. Fisher?
A Reviewed everything in my file and added that, you know, I took more notes that I--of important items. That was about it. I mean, I reviewed a really--I spent part of the weekend doing it, last night doing it, and again this morning.
Q And do you have any documents in front of you or anything today that you're going to be relying upon or using?
A Nothing other than I do have a printout of all the different people involved, you know, just for name's sake, there's like 30 plus names. I can't remember it all.
Q Okay. Well, let's start by--by looking at your CV here. And I'm going to pull this up, and we'll pre-mark this as



Exhibit 3 (sic).
COURT REPORTER: Mr. Bunnell?
MR. BUNNELL: Uh-huh, (affirmative). Bunnell. Yes.
COURT REPORTER: Bunnell. I apologize. Can we go off the record for a second?
MR. BUNNELL: Sure.
COURT REPORTER: Angela?
VIDEO TECHNICIAN: Just a second, Stephanie. My fingers are not moving as fast as I want them to.
(OFF THE RECORD)
VIDEO TECHNICIAN: At 12:10, we are back on the video record.
MR. BUNNELL: All right. Had to get our technology worked out.
By Mr. Bunnell:
Q Thanks so much there, Mr. Fisher.
MR. BUNNELL: As I mentioned, I'm going to pre-mark this as Exhibit 2.
(WHEREUPON, EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q And, Mr. Fisher, have you seen this document before?



A Yes.
Q And is this a--a--a CV and a case list that you've prepared and disclosed as part of your expert disclosure in this case?
A At the time, yes.
Q Okay. Is this--this has May 2026. Is this the most up to date copy of your CV?
A No. Another one was provided on September 18, last Friday. And I--and it was provided to counsel.
Q Okay.
A As--as well as additional emails were also provided to him for--for disclosure from the original disclosure materials provided. And what he's provided to you I can't comment on, but I know his office had them.
Q Sure. And--and I'm going to work off this May 16th resume. Do you recall what, if anything, has changed, anything material has changed between the one that you mentioned that was provided on September 16th and this one?
A Two more webinars on--that were--were the only additions, I believe.



Q Okay. All right. Perfect. First of all, I want to ask you about your educational background. It--you graduated from law school in 1976 from what's now San Francisco College of Law; right?
A Yes.
Q Mr. Fisher, have you ever practiced law?
A No.
Q Okay. Have you ever taken the Bar?
A Yes.
Q Okay. Where--are you admitted to practice law in any states?
A Nope.
Q Did you pass the Bar exam?
A No.
Q Did you take it in California?
A Yes.
Q Okay. And then did you just take it the one time?
A I took it a couple of times, but I really wasn't interested in practicing law so I wasn't stan--I wasn't studying for it, so you can't pass if you don't study it.

Q Fair enough. And aside from being a law clerk that's indicated I think on page 20 of your CV at--at a few places in between your summers in law school, you've not prosecuted or acted as an attorney for any sort of bad faith cases; right?
A I have never acted as an attorney under any circumstance.
Q Okay. On your professional affiliations, I see here that you're a licensed California property and casualty insurance adjustor since 1979. Did I read that correctly?
A Yes. And I just let it lapse August 30th.
Q Okay. And you in--you anticipated one of my questions. And tell me what it entails to become a property and cas--casualty insurance adjustor in California.
A Property and casualty insurance adjustor is licensed to investigate claims on behalf of insurers or self insureds, it's actually a broadly de--broad definition, arising from insurance policies.



Q And--
A Or involving insurance policies.
Q And what specific training did you have to do to do those investigations and to obtain that license?
A Was on-the-job training.
Q Okay. And where did you complete your on-the-job training for your adjustor license?
A Working for Miller & Gilbert.
Q Is Miller & Gilbert still in business?
A No. Well, yeah. No. I'm sorry.
Q All right. And how long did you work for Miller & Gilbert?
A Oh, gosh. '75 until '8--when did I resign? '81, I think it was.
Q And--
A And then ultimately bought them out.
Q Okay. And did you--have you adjusted claims since 1981 then?
A Well, I shut down the company in 1995 officially.
Q Okay. So from the time that you



bought Miller & Gilbert out in '81, were you adjusting any claims after that?
A Oh, yes.
Q Okay. And why did you shut the company down? You mentioned shutting it down.
A Well, the business model was rapidly changing. And partly my fault. But the problem was is that insurance companies were cutting back on outside referrals, especially in professional liability.
And most of the work that Miller & Gilbert and ultimately the Fisher Associate Adjustors did was professional liability matters involving--as well as product liability and sophisticated and complex claims. We handled everything from ad--adjustor malpractice, count--accountants, attorneys, insurance agents and brokers, real estate agents and brokers, and anything sophisticated that required in-depth analysis and--and rapid claim development.
We also acted as a third party claim administrator for certain clients when we were handling the claim literally cradle to



grave and had settlement authority and--and attorney authority to hire attorneys or refer cases to attorneys subject to an approve list. And we also did a lot of qualitative claim auditing.
Q And tell me, most of the claims that you were dealing with while at Miller & Gilbert, you mentioned professional liability, was that the majority of the claim handling that you did?
A Yes.
Q Okay.
A But it also, as you may know, especially when it comes to attorney malpractice cases and insurance broker malpractice cases, I think the phrase used today is a claim within a claim. And it's one thing to investigate whether or not there was a breach of professional duty, it's another matter to--to look at what the damages may be. And so you end up having to look into what the underlying loss was.
And that could be anything from a small fender-bender to a failure to procure a tower of $25 million in--in coverage

Page 17

properly. And the same with attorney malpractice cases, we'd see everything from blown statutes of limitations to, you know, merger and acquisition issues and everything in between.
Q And after Miller & Gilbert, did you--while at Miller & Gilbert, did you adjust any bad faith cases?
A Yes.
Q Okay. After Miller & Gilbert, you mentioned that you continued to adjust claims. Where did you continue to adjust claims after that?
A Well, it was mostly in California. We--at one point, we had three offices in the San Diego area, in the Los Angeles, and in northern California. Occasionally, we would be sent out of state on large exposure matters.
But we had to be careful with that because of licensing issues. But--so we usually were working in conjunction with somebody local for that purpose. But, you know, we handled a lot of different matters.
Q And was that as part of your

Page 18

Surplus Risk Services?
A Yes, that was the actual corporate name, Surplus Risk Services, d/b/a the Fisher Associates Adjustors.
Q Okay. And did you handle any bad faith cl--claims and adjust any claims while at Surplus Risk Services?
A Yes, as a--as more and more--as--as a few insurance companies starting wr--writing what is called insurance company E&O.
Q Okay.
A Would be hired into those.
Q Okay. So specifically in the E&O context then?
A Well, when an insurance company sues for bad faith, especially smaller insurance companies, they would turn it over to their E&O carrier and they would retain us to go in and review the file, then--and do the usual and customary work-up. And one of the reasons they were hiring us is because internally our goal was to have the claim as fully developed and fully investigated to the extent we could in 90 days or less.

Page 19

Q Okay. And after your work at Surplus Risk lines, it says that--your CV indicates you went to ELM Insurance Brokers. And tell me a little bit about ELM. Did you adjust any bad faith claims while you were working at ELM?
A Well, ELM actually was a corporation that was formed after the proprietorship. Originally, when I decided to shut down the claim adjusting company and jump to the production side of the industry, I wanted to follow a wholesale model. And it was easier to get a surplus line license in my personal name than in a corporate name at that point in time.
So that was how it was launched. And then by 20--I guess by 2001, we had gotten so big it was like ridiculous to be operating as a proprietorship, so we formed the corporation. And it launched officially I think on December 31st, 2001.
Q So--so by the time you were transitioning from surplus lines into becoming a producer in your brokerage firm, you're not actually adjusting claims at this

Page 20

point; is that fair to say?
A Well, I had shut down the claim adjusting company in 1995. But with--and I think we even stopped--well, I--wait. I think we did one more audit if I recall after that. But that could be done--you didn't need a license for that. But, yes, that's generally true, we were acting in the production mode.
Q Okay.
A Exclusively at that time.
Q So you mentioned 1995 as being the--that--that date where you're transitioning out of and shutting down your--your claims adjusting portion of your company. So is it also fair--it--it's fair to say then that you haven't adjusted a--any bad faith claims since 1995?
A I have not done any adjusting of--of claims since 1995 is accurate. I have consulted, however.
Q Okay. And during your years, whether it was at surplus lines or Miller & Gilbert, in those years from, you know, 1976 to 1995 when you were doing some adjusting,

Page 21

did you ever--were you ever a claims handler for any bad faith claims in Kentucky?
A Probably, yes, but that was in conjunction with a massive insurance company, if you want to call them that. Massive fraud going on starting in about 1989 and lasted through 1994 when insurance companies were phony offshore insurance companies who were coming into the United States and writing out a surplus line basis in those states that would allow a non-admitted carrier to literally file their intent to write business at a particular company.
And those states were what are called file and write business. They didn't have to get pre-approval. At that time, a handful of states had a white list that's like New York, for instance. And these offshore companies were doing business throughout the United States in those states that filed a--what's called file and write model.
That included Florida, Texas, Alabama, Kentucky, and California, and I think Washington perhaps. But the--we were being retained as adjustors to look into it because

Page 22

we had--we were doing insurance broker malpractice cases, and they were being sued all the time for placing coverage with what turned out to be a phony insurance company. And it was a massive fraud.
I was in coordination with the Department of Insurance in Kentucky on one major matter involving a fellow named Robert Campbell who owned a phony company called--God, it went out of my head--Northen Commercial Fire & Casualty Limited of the Turks and Caicos Islands. That's--Caicos, I think is C-A-I-C-O-S. And--but that company had been formed by a fellow in--in Atlanta called Alan Teale, T-E-A-L-E, and then he sold it to Robert Campbell.
And I was heavily involved with the Department of Insurance in Kentucky because they were one of the few states doing anything about it. As a matter of fact, I think Kentucky was the only state to ever prosecute a citizen in their state that was writing this kind of insurance. No other state did that.
Q So--

Page 23

A Robert Campbell was convicted and went to prison. He was also the only bad guy that was served with a RICO complaint by the--by the federal government, which is kind of a sad state of affairs.
Q So your--your recollection and--and your conversations and--and adjusting experience would have been in the context of surplus lines insurance and--and not bad faith claim handling; is that--is that right?
A Well, there was certainly bad faith alleged against these phony insurance companies because they literally were writing business. And when I say the money was premium money, it was just coming in the front door and going out the back door, I'm not joking.
It was massive. California alone want--wanted--Alan Teale Company left behind 17,000 unpaid auto claims. Northern Commercial wrote trucking, and so did several others. So we were investigating those cases, and including, you know, the classic case within a case. You can't determine

Page 24

damages without looking into the underlying matter.
So we--we were certainly involved in investigating a lot of the liability issues involving underlying losses involving trucking. And the--that's where Northern Commercial came into play. In one instance, one family had a--had to mortgage their home to cover $450,000 cargo loss.
Q So I--I understand that the case you remember, it sounds like working on some in Kentucky and your interactions with the DOI. There was this case within a case, there was these undertones of professional liability and everything. But as far as first and third party bad faith, do you recall any claim handling experience in Kentucky regarding handling first or third party bad faith claims?
A Well, not per se. But, you know, Northern Commercial was being sued for bad faith even though it was--but again, you--this was part of the problem. You know, too many people were looking at these companies as being legitimate, and they were

never legitimate to begin with.
I even got a very nice letter from Steven Cox from the Kentucky Department of Insurance. He was assistant general counsel there. Complimented me on the work we did.
Q So other than--other than that instance, have you ever handled any other claims in Kentucky that you can recall?
A No.
Q Okay. And I'm going to move back up to your C--to your CV here. And I'm going to go--I wanted to ask you about your designation as a CCP, a Certified Claims Professional, that you received in September of 2015. So how long is the training to obtain a CCP?
A Well, first you have to have a number of years of experience to even enroll in the program that's sponsored by the Claim and Litigation Management Alliance. And then you would have to ta--at that time, they had three parts, part one, part two, and part three. And those parts were all a part of a--I think four day conference that was very intensive.



And you would go through--a student that had enrolled in the program would have to go through a three or four day program of sitting in on a number of intensive seminars. And the--and also, there would be workshops at night, and it was not a junket by any stretch. And then there would be an exam at the end of each part.
And then, once you--a student completed the three parts, there were--and--and passed the fi--the exams and the final exam, they were grant--they were given a CCP designation in what specialty they had enrolled in. The Claim and Litigation Management Alliance has several schools as part of this program, and I was a faculty member of the School of Professional Lines. And that also included director and officer liability and employment practice and other C-suite coverages.
I did not attend the conference as a student. I wrote the--I wrote the original course material for the School of Professional Lines, all three parts. Either co--either wrote or co-wrote them, as well as



the exams.
Q Was there also a bad faith line or a bad faith Level 1, 2, and 3? You mentioned professional liability and your experience there.
A That's correct. But I--my under--my--my recollection is I think bad faith permeated all the different programs, because, you know, bad faith would exist in--in not only professional lines, it would exist in auto and--and workers' comp and--and all the other schools that were part of that program. I think there were se--several, seven or eight.
Q Do you remember if there was a--a specific one then, or were there just some bad faith modules incorporated into Levels 1, 2, and 3 of these other lines?
A Bad faith was always part of the program, but I can't recall if it was Level 1, 2, or 3. I don't think you would cover it extensively three--in three different courses or three different parts, Level 1 through a 3. It's probably in part 2 or 3 if I--if I recall.



And then--and then, you know, I can't speak for the other programs. I know that bad faith would have been covered in all of them. Where it would have been covered in the other programs I can't comment on. I'm only affiliated with the professional lines one that I helped write or co-write.
Q So you mentioned it was covered in--bad faith was just covered in one part; right? So that would have been just a few hours or a module, an hour or something in Level 1 or 2; is that fair to say?
A Well, again, I'm not going to speak for the other eight schools, I'm only going to address the school of professional lines at the time since I wrote the program, or co-wrote it. But if I recall, bad faith would have been covered in part 3. And it--and I--and there would be--it would be a little bit extensive because, you know, bad faith is certainly going to be a major issue when you're dealing with professional lines and specialty lines because you're dealing with claims made policies, you're dealing with problems with--and--and complex claims.

So that would certainly be an element that would be covered, and somewhat heavily if I recall, because you can never get around it. And one of the things that I'm sure the Claim and Litigation Management Alliance is very interested in doing is trying to train people so as to keep the frequency of such matters to a minimum possible. Of course, we can't control what plaintiffs will do, but from the insurance perspective, nobody likes to have a bad faith case pending over their heads. It's counterproductive.
Q Sure. But your--your recollection here and your experience and--and your CCP training is more along the lines of this professional liability designation; is that right?
A I--I don't understand that. What do you mean by professional liability designation?
Q So you were an instructor for the professional liability lines for 1, 2, and 3. Did you also go through the class as a student and do Levels 1, 2, and 3?
A For the--for the school of



professional lines?
Q For--for your CCP designation?
A I taught--I wrote and taught the courses, all three of them.
Q I see. Okay.
A So as a result, I didn't realize it at the time, but as far as the CLM was apparently was concerned is giving the courses and writing them, it's the same as being a student and passing the exam. So all of a sudden in the mail I've got my certificate of completion as--as a CC--as a certified claim professional.
Q I--
A But that was a decision they made.
Q I understand. So it's no--you--you didn't register to--to go to a CCP training then, you were teaching the professional lines course?
A I wasn't just teaching them; I wrote them.
Q Okay. I under--
A Or I co-wrote them. So from their perspective, if I wrote the classes and, you know, was--was the instructor or



co-instructor on--on them, I could--I can understand they're allowed to say, gee, I guess I'm qualified to be a certified claim professional.
Q So in writing those course materials, you're--you're mostly talking about professional lines. Do you recall incorporating anything about first or third party bad faith specifically into--
A I know--I know it had to be there because that's always an underlying current in any claims profession and professional designations and--and continuing education classes. Bad faith is--is something that, you know, you need to know about, and of course, as we know, the states in adopting the NAIC, it stands for the National Association of Insurance Commissioners, almost all the states have adopted almost verbatim the Fair Claim Practice Act that has been in existence and updated occasionally by the NAIC since, what, 1982 or '3, something like that, '84, somewhere around in there.
Q Are--are you familiar, Mr. Fisher, with the charted property and casualty



underwriting, or CPCU designation?
A Yes.
Q And that's distinct from a CCP; correct?
A It's distinct from a--a what? CC what?
Q From a CCP, from a certified claims professional?
A Yes, it stands for Chartered--Chartered Professional Underwriter or Cas--it's Charted Professional Casualty Underwriter, something like that, CPCU; yeah.
Q And you don't have your CPCU; correct?
A No.
Q Okay.
A I didn't see any reason for it for me. However, I just taught a course for them last week. That was one of the reasons that my CV was updated on Thur--on Friday, because I did back to back webinars with a colleague, and one of the sponsors was the Chartered Property and Casualty Underwriter Association, which is now no longer an independent organization, they're now part of

what's called, the institutes.

Q And what--what was your webinars covering in your sessions last week?

A The return on investment and the claim

Q Okay. So didn't present on bad faith or anything like that?

A Oh, I wouldn't say that at all.

Q Okay.

A The--this is--I think the CPCU and then followed up by SITE on Friday. SITE stands for the Society of Insurance Trainers and Educators. The background of that is, in 1994--or actually, 1986 or '7, my claim adjusting firm that I mentioned had done a lot of qualitative claim audits.

And one of the ones--of all those audits, one of the only surviving reports were for the Southern California Rapid Transit District, also known as the SCRTD. And those audits were quite revealing because for the first time it was documented in a before and after process how investing in the claim department and staffing up and requiring rapid claim development reduces



costs, reduces claims.

And--and as a result, it supports something I've always said, and that is that the claim department is a profit center, it is not a cost center. And the RTD audits, the first one we did, the claims were out of control. They had 8,000 open files they were staff for four, and the money was bleeding like you wouldn't believe.

I had to go in front of the board of directors and basically--in a tele--it was--they were public--a public entity. And so this was like even on TV. I had to tell the board that they needed to double the contract price to be able to get control of the claims. And it--it was going to cost them about a million dollars.

And they wanted to know what the return on that would be, and I guesstimated that it would be, roughly, five to one. For the first three years that was correct, and then it doubled to ten to one. In the first three years, they saved over $17.5 million. And that's hard money.

The claims were getting under control,



file closures started approaching 100 percent, so that for every new claim that came in one was being closed, the amount of money being spent on defense costs fell to the floor. It was enormously successful. And it proved the point that every claim person knew back then is that the claim department is not a cost center, it's a profit center.

And another colleague of mine heard about this and wanted the copies of the audits. And I gave them to her because they were public record anyways, and she wrote this white--brilliant white paper, brilliant. And she came up with an even better phrase, and I will never use it without giving her full credit for it.

But I used to say the claim department is a profit center. She came up with the line that the claim department is the only place where the product is produced, which is extraordinary and absolutely accurate. And unfortunately, too many insurance companies say don't even think about that. They see the co--they see the claim department as a



cost center and something where costs need to be reduced and controlled.

I've seen attorney management guidelines, for instance, and I've even drafted the attorney management guidelines. I did that for the A--for AIG, for instance. Today attorney management guidelines that I've seen would strangle a horse. You can't even pra--you practically can't even go to the restroom without permission. It's unbelievable what's going on.

But anyways, it proved the point. And that hit like a bomb when--when it first was published. The International Risk Management Institute asked me to write--write a--to write an article. The white paper was too big for them to not put it behind a pay wall, and they wanted that white paper out.

So they allowed us to write an article with a link, and my colleague, her name is Chantal Roberts of CMR Consulting, she put the white paper up on her website and people could download it. The--that article came out on May 1st. On May 7th, the Academy of Insurance sponsored a webinar with the two of

us on a panel discussion. They rarely do that.

They also advertised it for six weeks, which they also rarely do. And the webinar was offered for free. And because of that webinar, other organizations got involved. The Chip Merlin company covered it in his blog, Merlin Law, I think it is.

And then the CPCU society sponsored it, so did SITE sponsor it, and we're doing another webinar for the Academy of Insurance this week on October 1st. This thing has got legs, and it struck a nerve. And all I can tell you is I've listened to more presidents of insurance companies talk about how well positioned they are and how they have wonderful levels of capital and on and on and on, and never mention insurance or never mention an insurance contract or never even mention the claim department, which is just sad, because the claim department is a profit center. It is the only place where the product is produced.

Q So--so tell me, Mr. Fisher, with the webinars that you're mentioning in your



CCP materials that--that you created and presented, you--you mentioned that you had your course materials included bad faith avoidance. Can you tell me some of the things specifically you would reference with bad faith avoidance in your presentations?

A Yes. It all boils down to rapid claim development. My firm, as I mentioned, our goal was to have a claim as fully developed as possible within 90 days or less, and that was our target. Now, not--you don't always get cooperation from the plaintiff or plaintiff attorney. And--and so fine, you may or may not get any cooperation from them.

But you can certainly investigate everything else. And that included in--interviewing in-depth all of the involved witnesses we could get, whether it was with the insured or other witnesses, if we--if we could get them to cooperate, reviewing any and all documents that we could find and analyzing them. Everyone in my firm is required to have, at least, a law degree or be in law school.

So--but again, we had to be careful



we're not practicing law here. But we also--we're certainly familiar with it and/or certainly getting assistance from lawyers at the time, staying up to date on the latest and greatest appellate decisions in two areas, coverage issues and/or liability issues. Because that would not--it's not that we were applying the law, we wanted to make sure that we covered our investigation, was able to get the facts that would be very important with respect to the latest decisions that were coming down with respect to liability of the type of people we were involved with as far as covering.

I mean, we--we were doing attorney malpractice cases and insurance broker cases. And they could be pretty minor, or they could be very complicated. But we were considered by many, including Lloyds, as being the best in the business because we attacked it. We wanted a fair and thorough investigation, and our goal was to have it done within 90 days.

I still have letters of recommendation from some of the law firms we worked with about how we were saving the insurance



company money because if we had to refer the matter--we were told to refer the matter to approved defense counsel, they got a complete work-up. And they didn't have to redo it, and the--and the issues were outlined.

Now, can--they would probably have to, at that point, deal with--with the plaintiff counsel and do what they have to do to deal with getting a--you know, see what they have to say about it. But that was the point. And only in the rarest of circumstances was an insurance company sued for bad faith. But never because of anything my firm did or failed to do on time.

Q So other than the rapid claim development that you're mentioning, what other bad faith avoidance strategies have you implemented or did you implement or do you lecture on?

A Well, under California law and the st--and most states, for instance, when the Fair Claim Practice regulations were adopted. All--claims people were required to be familiar with the Fair Claim Practice regulations of that particular state. Not

Page 41

only with respect to the actual reg--Fair Claim Practice statute which usually has 15 or 16 items, but some states like California, for instance, would even put--put out extensive set of regulations as authorized by the Fair Claim Practice statute.
And so, under California law, for instance, you have to certify in writing every year that you are up to date on the Fair--Fair Claim Practice regulations and understand your obligations. That applies to any licensee, including insurance adjustors who are licensed, it also applies to insurance agents and brokers. The statute doesn't distinguish.
And then, of course, if you're a company employee, you ought to have to do that in certain states. And, you know, I have mine. You have to keep them for five years. I'd be happy to show my letters that--where I have to sign it.
You don't send it anywhere, but you have to produce it if the Department of Insurance comes in your office. And you'd better be able to produce the fact that you

Page 42

are up to date on the Fair Claim Practice regulations. And they are all very extensive.
Like I said, my firm was never responsible for a bad faith case filed against an insurance company. It doesn't mean that they weren't sued, but it wasn't because of anything my firm did or didn't do.
Q And, Mr. Fisher, are--were--are there instances where you can't work up a--a--a case within 90 days or--you mentioned earlier that there might be lack of cooperation or something--
A Yes, that's--
Q --like that.
A That--that certainly happened. There's no doubt about it. I can't force somebody to talk to us.
Q Sure. And that could not only be plaintiff, for plaintiff counsel, that could be with an insured; is that fair?
A That's fair. It did happen on occasion.
Q Sure. And certainly, you know, you're doing other things to work up the

Page 43

claim, but that doesn't expose a--an insured to bad faith just because they can't get a rapid case assessment done in 90 days; right?
A Well, that's fairly broad. And so I--I wouldn't necessarily go that far. And even--and usually the only times that we had a problem with a policyholder not cooperating with us was during the offshore phony insurance company days. Believe me, there were--that was a pretty sad time.
There was some very culpable insurance producers. Not only at the retail level but certainly with surplus line brokers, as well. And sometimes we were having problems getting what we needed to get, and we'd have to play hard ball and--or have counsel come in, coverage counsel, and make it clear to the policyholder, if you want a defense, if you want to, you know, have--have any benefit under your--policy, you will cooperate. And so there was--there was some of that. Too many to mention.
Q Okay. And I'm going to shift gears now and we're--we're sticking with your CV, and I want to talk to you a little bit

Page 44

about the cases that you list starting on page 21 here; okay?
A Sure.
Q And these are for the last four years; is that--
A Yes.
Q --that right?
A Yes.
Q And--and I want to ask you, I--I went through and I--I counted a couple of these, and it looks like there were eight bad faith depositions, things that you identified as being insurer bad faith depositions that you provided. Does--does that seem right?
A Yes.
Q Okay. And I wanted to ask you about each of these cases, just very briefly a couple of questions. So this first one is U.S. Specialty v. Hardrock, and you gave a deposition in this case. Were you testifying for plaintiff or defendant?
A I'm pretty sure that was plaintiff.
Q Okay. Do you know what the--what type of bad faith allegations were made in

this case; do you recall?
A Yeah. It was a--a store, but they--not in your classic sense. Somebody was looking to--needed some special type of rock to put in their rock in their backyard, if I recall. And so this was a store where you could go in and see samples and then decide what you wanted to buy, and then they would order it for you and maybe even install it for you. And the insurance broker had gotten the wrong kind of insurance policy, he--that would have been more appropriate for a retail store much like going to your local, you know, Lowe's or something like that.
And that's not what these folks did. And so it was not only a combination of insurance agent or broker malpractice, but they were also an appointed agent of the insurance company. And under California law and other--and other states, as an appointed agent you're deemed an agent of the insurance company.
And you may be acting as a dual agent for the insured because the broker represents the insured and the agent represents the



carrier under California law. And the insurance company was acting like we--the agent didn't do anything wrong so we didn't do anything wrong, which was clearly absurd.
Q Do you remember the outcome of that case?
A Yeah, it was settled.
Q Okay. And this one here, the Flatiron Constructors versus Lexington Insurance Company, did you testify for plaintiff or defendant in that case?
A Oh, gosh, I don't remember.
Q All right. Do you remember the outcome of that case?
A I think it went to arbitration, and I don't know whatever happened with that.
Q Okay. What about TKO versus Can--
A Canopius.
Q Canopius; yeah.
A That was plaintiff on that one for sure.
Q Okay. Do you know--
A And I don't really remember what that one was about, either.
Q Okay. What about TDIC versus



Joseph Yousefian?
A Oh, God. Yeah, I remember that case. Yeah, I was definitely a plaintiff expert on that. But this was the dumbest thing I had ever seen an insurance company do. Jesus.
Q And--
A And it--it had to do with water damage that was clearly not the fault of the policyholder, it had to do with a--a neighbor upstairs. And this insurance company just didn't want to pay the--the damage to his--to his dentistry office. And--and it took so long to--to repair that he was--the landlord decided he didn't want any more dentists in the--in the building, so the--the guy had to move out. It was unbelievable.
Q Do you remember--
A And then it--it settled.
Q Right.
A For a lot of money.
Q What about Linsao versus--and others versus First American Property, did you testify for plaintiff or defendant in that one?



A I think that was plaintiff, but I don't really remember what that one was about.
Q Okay. You don't remember the outcome, either?
A No.
Q Okay. What about Meadowview Mountain Lodge, LLC versus Certain Underwriters at Lloyd's, London?
A Yeah, I testified for Lloyd's.
Q Okay. Testified for the defendant in that one.
A Yes.
Q Do you remember the outcome?
A It--it was settled for not a lot of money.
Q Okay. What about this Mercury Casualty case, do you--who did you testify for in that one?
A Plaintiff.
Q Okay. Do you know what the outcome of that case was?
A Goes to trial next year.
Q Okay. And the McKenney v. Mark Johnson, did you testify for plaintiff or

defendant in that case?
A Oh, I'm not even remembering that case. I have--oh, that's--oh, that's the one in Fresno. Yes, they--yeah. They settled that one.
Q Okay.
A God, that was a stupid case. Unbelievable.
Q Did you testify for plaintiff or defendant in that one?
A Plaintiff.
Q All right.
A I've never seen a major insurance company behave so badly in my life. Even the judge told them their position was out to lunch.
Q So tell me, what percentage of cases do you think you testify on behalf of plaintiffs versus defendants in?
A Mostly, I--I would say it's probably 50/50. But, you know, average is out that way. But the--the pendulum swings somewhere around 60/40. You know, I may get two or three defense cases in a row, but they can swing one way--I may get two or three



cases that--that are plaintiff and--and it swings the other way.
You know, to me, I--I take a case because I think, at least initially, my initial impression would be, you know, I think I can--I think the position you're taking may be correct, and--and--but, you know, that's--ends up not always being the case. There's been a few times I've had to withdraw from a file because I wasn't told everything I needed to know until it's too late, and I wouldn't withdraw anyways. I had that right in my--my letter of engagement.
MR. BUNNELL: So I--I wanted to--I'll pre-mark this as Exhibit 3.
(WHEREUPON, EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q And, Dr. Fisher, I--or, Mr. Fisher, I pulled this from your website, this is a comprehensive list of--of cases that you put on your website. Do you--
A Yeah.
Q --recognize this? Okay.
A Yeah.
Q I'll mark this as Exhibit 3. Do



you know if you have ever been limited or excluded by a court?
A Well, only once, and it was a magistrate who thought I had crossed the line on interpreting of insurance policy, and so he struck part of my written report. But I've never been denied the ability to testify. I may have my testimony limited for some reason or another, that has happened a couple of times, but I've never been refused the--or been subject to a Daubert motion.
Q Where--where was that striking or limitation?
A That was in Nevada, and I can't remember if it was state court or federal court. It may have been federal. But Nevada you--follows the federal rules, so--but I think with a--I'm sure with a magistrate so it would have been federal court.
Q Tell me a little bit about--on--on what I'll call page 8 here, the Floyd case, the Floyd v. USI, Marsh.
A Yes.
Q Was there any sort of limitations that the federal court in Florida found to



any of your opinions in that case?
A No, absolutely not. But I can't really discuss that because that, too, has a protective order on it.
Q Okay. And what about the--what about summary judgment after you have been retained as an expert, do you know of any cases where you've authored a declaration and the court hasn't found it persuasive and entered summary judgment?
A You mean while we were the opposing party hoping to win a summary judgment in addition to my declaration? Is that what you're asking?
Q Yes, sir.
A Well, I know we've won some.
Q Okay.
A And there--there have been other cases where summary judgment was denied. But I know we won some.
Q What about the jobs in the Allstate case, do you recall that one?
A No, but I think, if I recall, I've got the word result, I think they stepped in--I think the insurance company paid off on

that one. I don't remember.
Q Okay. So just looking through these, does anything strike you or do you have any recollection of how many of these cases are third party bad faith cases that arise from CGL policies like this case?
A Well, there were several, and they were also--especially with the Lloyd's, those were first party property cases.
Q What about third party?
A A lot of those. But most of the cases that, you know--I would say the vast majority of the cases I'm retained on, whether they're bad faith or otherwise, settle. Very few end up going to trial.
Q Okay. And just looking through here, other than the instant case, have you ever offered any opinions in a Kentucky bad faith case?
A I can't--I--I know I've probably handled some--a couple of other cases in--in--that involved Kentucky. I've had cases all over the place. I don't recall. I--I don't recall that.
Q I--I didn't see any listed on this



more expansive case list from your website other than the instant case. So these go back to--
A What's the date on this at the top?
Q Let's see.
A Oh, the 2026. All right. Well, that's relatively current.
Q Okay. Looks like it goes back to 2007. So it would have--if you did testify in a Kentucky case, it would have been before 2007 then; does that sound right?
A Yeah, it could be, because I've been doing this since the late 1980s. Although back then, you know, I had a company to run so I couldn't take too many cases. It was really just something that people thought I could add value to. And I figured that some day I might actually retire and might be--I have to have a reason to get up in the morning, so to speak, so--
MR. BUNNELL: Okay. I'll--I'll mark that as Exhibit 3, and I'll pull up what I'm going to mark as Exhibit 4.



(WHEREUPON, EXHIBIT NUMBER 4 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q And, Mr. Fisher, do you recall when you were first contacted about testifying as an expert in this case?
A Yeah. It was right around then, May 13th.
Q Okay. So--so this May 13th correspondence you--you've seen this before, you received this email?
A Oh, yeah. It's in my file.
Q And it notes that--please note we need rush services to review documents to prepare a pro--a report by May 27th. Do you see that there?
A I do.
Q Were you aware of any of the scheduling orders or anything like that that had been previously entered in this case?
A No.
Q Okay. Didn't have any knowledge that any sort of previous disclosures were due in March 2027, on March 27th of 2026 and that those had been pushed back for any reason?



A No, I knew nothing about it. I mean, as you can see, this was a solicitation from counsel. Well, maybe that's a bad word. This was the first email I think I received from him.
Q Okay.
A And so--
Q And--
A --I responded. I wasn't sure if I could fit it in or not.
MR. BUNNELL: And then I'll mark Exhibit 5 as your engagement letter here.
(WHEREUPON, EXHIBIT NUMBER 5 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q You've seen this document before?
A Yes, sir.
Q Okay. And your--your rushed rate or your urgent rate is $809 per hour, which is what you charged here; right?
A That's my understanding, my re--my recollection; yeah.
Q Okay. As opposed to your standard rate of 599, right, which any--any work after your urgent rate is--that's what it's billed

at; right?
A That is correct. That's the--about the amount I charge when I'm dealing direct with someone normally, yeah, in normal retention, shall we say. It--actually, this is the first time I've ever taken a rush case.
Q Okay. And let me ask you, so your first--the first document you received in this case would have been on--looks like May 14th of 2020, and you were sent a--a demand that had been provided to opposing counsel, and Plaintiff's counsel sent you that document; is--is that your recollection?
A Yes.
Q Okay. And did you receive any other documents on May 14th that you recall?
A Well, you've--you've got my file. And the date stamp on the Dox review would answer that question.
Q Okay.
A So there were some documents that came in on the 14th and more on the 15th and the 21st. Yeah. Then more doc--yeah, more--a lot of documents on the 21st it looks



like.
Q So you got a--a US--did you receive those via USB or something?
A I think it was via email or--or--or Dropbox transfer.
MR. BUNNELL: Okay. And so I'll mark this--I think I'm at Exhibit 6 now.
(WHEREUPON, EXHIBIT NUMBER 6 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q In one of your emails you mention some consolidated case notes. And I'll pull this up here. And you attached this spreadsheet.
A Yes. Now--now I know what you're referring to; yeah.
Q Do you recognize that?
A Yes.
Q Okay. So by the time--this was attached to a--a May 19th email; right?
A Well, I assume so. I think this would have been part of my--of my orig--I think when my original deposition was scheduled, I transferred my file the first time. And so this would have been part of



it. I do a Dropbox transfer from my file.
Q Okay. So the--no reason to dispute that if this was attached to emails on May 19th or 20th, it would have been authored around the same time then?
A Well, it's an ongoing process what--depending on what tab you're in.
Q Okay.
A But I have this kind of a spreadsheet for every case that I handle. It's actually a--I've got a--a template, so to speak, and so whenever I create a file there's always a--a billing subfolder, a Dox review subfolder, an email subfolder, initial contact retainer subfolder, and then I will add additional subfolders as necessary.
And--but every file does have a spreadsheet like this so it's multi-tabbed. And then, again, depending on the nature of the case, I may have to add additional tabs or what have you. But it's a--it's a way of organizing all the information.
Q Okay. So it's a living document. So this is--
A And you should have--like I said,



last week I guess I supplied an updated file with additional emails and--and an updated spreadsheet I'm sure to counsel so that it could be given to you before my deposition today.
Q Yes, sir, I understand. So I'm--I'm asking you about the one that was attached in the May 19th email, though. So it's--
A Yeah.
Q --it's a living document.
A Yes.
Q But I'm--I'm asking about this one specifically. Would you have reviewed the entire--the entirety of the materials you received and input that into this document then by May 20th?
A Well, yes, but I only inputted I think the things that I think are really pertinent to the scope of my retention and--and opinions. There may be a--and som--and of course sometimes I might miss something, too, and pick it up later. But, yes, it's a--a living document, and I do put in what I think are the important events in

Page 61

the timeline and--and then go from there, depending on the nature of the case.

Q So tell me a little bit about this issue summary tab. Some of these are bolded and some of these are not. What's the significance of the bolding?

A Just the fact that it got bolded by accident perhaps. And as you can see, it's very incomplete. I never really finished this.

It was a--it wa--there was a lot of time being spent, and I knew what I wanted to cover, and I--I didn't want to spend additional time and--because I think this was part of the--the higher urgency rate. And I actually reduced the urgency rate. I just couldn't--I just thought it was way too much money.

Q And so tell me, you've--you've listed out some various regulations here and some statutory provisions. Do you see--

A Correct.

Q --that? And you have XXX here under 806 KAR 12:095, Section 6.1A. What is the--

Page 62

A Yeah.

Q --XXX?

A XXX means that the statute may be triggered by the particular fact that I'm citing. And actually, it really should have been on the next column over, as well, the 45 days as opposed to 30.

Q You--you said statute, but you meant regulation here?

A Yeah, the regulation. Yeah.

Q Okay.

A It probably should have been in the--in the next column. Like I said, I didn't--I never really finished this. And as--as things progressed rapidly on this, I just didn't feel it was necessary to do at the time. It was more important to get it all in my report.

Q So where did you--

A So--

Q Did you independently gather these various regulations and statutes, or were those provided to you?

A No, I--I went ahead and did that just to see what they were, because at one

Page 63

time I was licensed in Kentucky as an insurance producer. And--and I--actually I was licensed I think in 40 states. And almost every single state required producers to be familiar with the Fair Claim Practice regulations.

So I certainly had copies of them if I have to sign a document saying I'm familiar with them. And--so I was very careful about that. And even after I stopped producing, I--I maintained, at least, my California license. I eventually ended up dealing--doing away with the others. It was too much paperwork.

Q So did you--did you have these from memory then or from your own documents, these various statutes and regulations?

A No, I rely on attorneys for that. I get a lot of feeds from a variety of online systems like Lexology and Mondaq and JD Supra. And I'm also a subscriber to a number of law firms for, you know, their information.

And I--I keep all that stuff, I've--I've got thousands of files on

Page 64

appellate decisions and--and whatever, because that just keeps me up to date, not only--in a variety of different ways. It's not just to be able to testify as an expert. It's--it's coverage issues and the--and deals with the consulting that I do on--on coverage and watching how the industry is, you know, rapidly changing, you know, with respect to the way policies are being written and coverages are being provided.

Q So where would you have gathered these various statutes and regulations?

A I would have gone right to the source probably.

Q Oh, okay.

A I don't--you know, and even--for instance, I've got an article that Koser and O'Connor--Koser and O'Connor did, but it's 2007. You know, I wouldn't rely on that. I'd want to see if any statutes they're mentioning have been updated. Especially if I'm going to be retained on a case, I want--I want the latest and greatest information.

And then, of course, if I, you know, have a good communication with the law firm

that's retaining me, you know, we will chat about this stuff, too, because I have to be very, very, very careful not to cross the line and--and interpret statutes or interpret policy forms or whatever. I'm required, however, to be aware of them. And as--you may be unaware of the concept of a designated responsible licensee, but that is something that's been adopted by most states to a--when you apply for a business entity license as a producer or even as a claim adjustor, there is somebody who has to be the designated responsible licensee. And that phrase may be different amongst the state.

But in essence, what that represents is that you're the guy that the Department of Insurance is going to look to for regulatory and statutory compliance. So if I'm going to be the designated responsible licensee in any given state, you better believe I knew what--exactly what my obligations were.

Q So in your process of--of gathering and looking through the statutes and regulations, would you have looked through the claim file first and then went



through the Unfair Claim Settlement Practices Act and said, I'm going to target these, or how would you have determined these were the universe of regulations and statutes that you wanted to--

A Well, first, I would--

Q --opine on?

A First I have to familiarize myself with the basics of the case and what may be an issue. And this is in--again in general. I would have to under--understand what--what type of case it is, what type of bad faith issues may be involved, whether it's property or liability or what have you, and first party versus third.

And then I would look at the code and regulations that would deal with that. And then, as I'm reviewing all the materials, I would spot--I might see a fact or a document that in my opinion might be affected by those obligations. But as I said, I never finished this analysis for this case.

Q So this--

A There is a case that you pointed out earlier on my case list that's going to



trial next month--next year, that is a fully extensive usage of--of this--this kind of layout. So that here's a fact, and here's what statute or regulation is triggered by it. And as well as you can see, you know, I've got page number and--listed so that, you know, everything is cited.

I have the source for every fact. And I--like I said, I never finished it. A good--a good example of being fully up to speed and fully up to date and fully filled out is the ?? 1:04:08 case.

Q Okay. So these--again, just--just so I'm clear, these would have been things that you would have created and put in with the intent of going back through and creating a living document here. But these are threshold issues that you sort of identified as you were looking through the file?

A Yeah, I would say that that--you know, threshold is a good word. These may be the statutes and regs that could be affected by a particular fact. And then now it's just a matter of going through all the material I've been provided and see what, you know,



may or may not trigger one of these statutes or regulations. That would be the process.

But a--you know, again, I was on a short time frame on this, and so I never really took the time to do it on--for this case. And I didn't want to do this kind of work at $800 an hour--800 plus dollars an hour.

Q So tell me, you would have--you may change your mind then after this initial or threshold determination then that you think these are in play but as you go through the file it may be that, you know, what Subsection 3 or 4 or 6 or 7 doesn't apply; is that fair?

A Well, not necessarily. I--I see a reason--no reason to do that now. I mean, I--I've written a report, you've got an expert that's written a report, I've issued a rebuttal report, and I--so I don't see any reason to really do this because it's all covered in my reports now.

Q I--yeah, I don't think you're understanding my question. And maybe that was my--inartful on my part.

Page 69

A Okay.
Q I'm saying, in your process, Mr. Fisher, as you would go through this, you may have a threshold determination that these statutes or these regulations apply, but you may change your mind as you go through the file, whether it's on a living document or whether it's in your re--your report; right?
A Well, I would prefer to say that I think they may apply. They seem to be consistent with this type of case, for instance. For instance, you note there's probably nothing here dealing with, you know, first party property other than the 30 days statute.
Q Okay.
A But the--so it--these are the--the regs and statutes that may apply given the facts, the general facts as I understand them of the case. And then on--then it's not like I'm looking for a problem, I just want to be able to say, gee, here's a factor, here's something that happened, and that doesn't hit me right, and is that--does that trigger a particular statute that's up there at the

Page 70

top.
And so it--it's done on a good faith bas--as far as I'm concerned, a good faith basis. This fact is disturbing, or this document bothers me. And is it--does it trigger one--or potentially trigger one of these items. I'm not looking for problems, but if I find them, I'm going to categorize them.
Q Okay. So as you're reviewing the files at this point in your initial determination, is the only document that--did you abandon this process, or did the only thing that you found was 806 KAR 12:095?
A I abandoned it, Counselor. I told you that. I never fini--never really put the time in to really do this right.
Q Okay.
A I didn't have time. And so I did abandon it, and once the report was done and then I had do the rebuttal, I saw no reason to spend this money needlessly, because everything is going to have to be in my reports anyways. These--these are all--you know, are either factual or support opinions.

Page 71

And so if it's in my reports, why bother.
Q Gotcha. Okay. So tell me, on the administrative regulations, you'd agree with me under Kentucky, at least, those don't create a private right of action for bad faith; right?
A Well, if you're talking about suing an individual for private right of action, that to me is not even an issue. I'm not aware that the claim people have been--been individually sued. And most states don't even allow for that, although there seems to be a question about that now, maybe in Florida. But private right of action to me, if I define it and understand it, is where you're trying to sue an individual, whether it's a claim adjustor or a claim person at the insurance company as opposed to just suing an insurance company.
Q And these regulations, though, are not the Unfair Claims Settlement Practices Act; you'd agree with that? They're not statutory, they're administrative regulations; true?
A Well, regulations have--

Page 72

regulations, to my knowledge, cannot be created unless there's a--a statute that authorizes them. So they would be--like in California, you've got the Fair--you've got the 790.03 which is the Fair Claim Practice Act, and then you've got the regulations that--as interpreted by the Department of Insurance I think that starts in 2986 or something like that of the California Code of Regulations. So those states that do have regulations, they still have to--I would imagine would have to be authorized by statute to begin with.
Q Okay. So regulations in and of themselves, though, are not a violation of the Unfair Claims Settlement Practices Act; right?
A Well, I don't know that I would conclude that, but I think you're asking me for a legal conclusion. You can't have a regulation unless it's authorized by the statute. And so if there's a Fair Claim statute, for la--like they have in California, and I know that Kentucky did adopt that or a version of the Fair Claim

Practice regulations promoted by the NAIC, then if Kentucky wants--if the Department of Insurance has the authority to do it, they can adopt regulations on how they feel the statute should be applied.
Q Right. So the Department of Insurance is the entity that would pursue those regulations and enforcement of those regulations?
A Well, the enforcement, yes. But does it create also a standard of care? And that's--and that would be my interpretation that these do create a statute or a--a standard of care for insurance companies. This is what you're supposed to do. And you're supposed to do it in a timely way.
And so when you add it all up, there is a possibility the enti--speaking hypothetically. And when you look at a situation like in other cases I've handled, I--I spotted 74 violations in the Rahaney ?? 1:10:35 ?? case. And to me, that more than justifies that the--the manner in which that claim was handled by the insurance company was not consistent with what they were



supposed to be doing in California.
Q Okay. So let's talk a little bit about--you produced your invoices, I saw those as part of your file, and I've pulled up two invoices here, Mr. Fisher, the May 27th, 2026 invoice and the August 20th of 2026 invoice. Are these the only two invoices that you have issued in this case?
A Yeah, but I don't think the one--isn't the one labeled draft, August 20th?
Q Oh, it is. So you haven't sent that one yet?
A No.
Q Okay.
A And it's also wrong, because it's picking up the previous invoice which had been paid.
Q Let's see. Both--
A It has not been released. It is part of the file, that's why it's labeled draft. It has not been released.
Q Okay. So your total costs here in this case is around $21,000 as of the 20th or whenever this draft was completed; right?



A That's correct.
Q Okay. And aside from--
A And understand as well that in reality it's only another 2500, or 2400 and change.
Q Gotcha. So aside from that--and that's for your testimony today here; right? That's a--is that a flat fee for your testimony today?
A I don't charge a flat fee. Everything is by the hour.
Q Okay. Gotcha. So other than prepping for this deposition today and sitting for this deposition, no other charges to this file since the 19th?
A That is incorrect.
Q Oh, okay. Tell me what else.
A Well, there's a lot more time that's been input into the system for time spent preparing for this deposition today and my review of the file, etcetera. So, you know, there's more time on the file than--since August 19th.
Q I--I--I'm--
A I just haven't created a report on



it.
Q I--I think we're saying the same thing. I said preparing for the deposition and sitting for the deposition. Other than--
A Oh, I'm--I'm sorry. When I heard limited, you know, to that--no, I--I misinterpreted your--
Q Yeah.
A --your question.
Q No, no, no. No--no worries. No worries.
A There's more time. I just haven't--I just haven't created the draft.
MR. BUNNELL: So I wanted to--you produced also--and I'll mark these as Exhibit--I think I'm on 6. And I'll mark 7.
(WHEREUPON, EXHIBIT NUMBER 7 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q Mr. Fisher, this is a list of files that you reviewed that was attached as Exhibit B to your--to your expert report. Do you recognize this?
A Yes.
Q Okay. I'll mark this as 7. I

wanted to ask you, on Number 2 here, I think it--it should be 3, you have the deposition of Charles Walden condensed. Do you recall if that was his bad faith--his deposition in the bad faith case or the underlying case?

A I don't recall. And just for the record as well, I'm using the exact names of the file--data files, computer data files, you know, PDF or what have you, I'm using the exact names as they were sent to me.

Q Gotcha. Okay. And do you recall reviewing both of Mr. Walden's depositions?

A I don't know if there's two or not.

Q Do you think it would have been important to review both depositions in this case?

A If I knew about them. Let's see what I've got. You've got my file. What I'm showing as the caption of that deposition is Charles Walden versus Enterprise Services Group, Clarence Howard, National Indemnity Company, Vince Kline, etcetera, and Progressive as defendants. That's the caption.



So this looks to be the bad faith case, not the underlying tort case. I have not seen the underlying tort case deposition, and frankly, I didn't even--I don't think I even knew there was one. My letter--my--if you look at my letter of engagement, counsel's responsible for making sure that I have everything I need to have. I don't know what he's got.

Q The--the underlying deposition, we can look a little bit more, Mr.--Mr. Walden's underlying deposition is cited in your report, though?

A I must have had something on it. Let me look. Do you have a deposition from him?

Q I do.

A Yeah. Charles Walden versus Enterprise Service taken on June 14th, '24. So I obviously have that. And--

Q Okay.

A --where that comes from.

MR. BUNNELL: So I'll show you what I'll mark as Exhibit 8 now.

(WHEREUPON, EXHIBIT NUMBER 8 WAS MARKED FOR



IDENTIFICATION AND ATTACHED HERETO)

Q This is the deposition of Mr. Walden taken in the bad faith case on December 11th of 2025.

A I have--I have one that the file name is Charles L. Walden condensed, and I think that's the one you're looking at. I have another one that--this is why it was out of order. The file name on the other one is 5560.061424, Clarence Howard depo cond--C-O-N-D.PDF.

Q Okay.

A And that's--and that should be on my list. But sometimes my list is not complete or thorough. But I'm going to sa--yeah, there it is.

Q Oh, yeah.

A And--and to me the list of documents is not as important as the documents themselves. I have produced my entire file.

Q Okay. So as we sit here today, you--you are sure you reviewed both of them then?

A Oh, yes. If I have it, I reviewed



it.

Q And Number 6 here is a letter that's referenced. And Number 23 is also the same--that seems to be the same letter; right?

A Could be.

Q Okay. And tell me, Walden Memoranda Re: Missing driver and UCSPA. What memorandum is this referencing?

A I'll have to find it.

Q Is this something you would have created?

A No.

Q Okay.

A Not if it's on my file list. Let me see if I've got that, where that might be. Walden Memorandum--oh, here it is. This is a memo from Mr. Morrin's law office.

Q Okay. And I think I did review that. And then, also, you have a cover list listed on the things that you had reviewed at Number 24. Is this the cover list that you're referencing?

A Could be. Where--what is it on the list again?

Page 81

Q It's--it's Number 24.
A Cover index. Okay. Yeah, let's see. I do have that. This was not prepared by me.
Q Okay.
A And it was produced.
Q Okay. And I see from your files reviewed and--and the cover list that you looked at, specifically looked at Bate's Label 3672 to 6369.
A Yeah, it--it's on the list, I--that means I have it and I've looked at it.
Q Okay. Do you recall looking at any Bate's ranges before that from 3671 to Bate's Stamp 1?
A I don't know. If I have it, then I've--then I reviewed it. I mean, I've got a lot of documents in this file, and the naming conventions are not mine. But everything I received has been produced.
So if you look at a folder in--in my file that's called Dox sent May 26th, I've got seven subfolders, framing documents, claim handling adjustor's log and internal

Page 82

notes, denial and reservation of rights, internal valuation and reserves, NAICO's own expert Eddie Crum--that's in parentheses so I added that--settlement communications and offer of judgment, and discovery responses. Again, Peck Stonley ?? 1:19:50, that's in parentheses. And that's what I received.
Q Okay.
A And I--these have all been produced. So you have what I--what I have.
Q Okay. And so would you have cre--created that nomenclature that you just listed in your file, or is that--would--would someone else have al--al--also created that?
A What I just read to you was as I received them from counsel with the exception of anything I might have put in parentheses, that's why they're in parentheses.
Q Gotcha. Okay. Mr. Fisher, did you review the actual language of the Unfair Claims Settlement Practices Act before you--as part of your review of the file?
A Well, I'm sure I did. And I already answered the qu--a similar question earlier.

Page 83

Q Okay.
A And there are a number of reasons I do that. Again, it's not just for this case, but at one time I was the designated responsible licensee in--in Kentucky and--and--and 39 other states. Like--as I testified, you--you better have a pretty darn good idea what I'm required to do.
Q Okay. Thank you for that. So did you also review any case law about bad faith in Kentucky before you started your--during your review and--and preparing your report?
A I don't review case law. I do, however, keep a library of articles written by law firms that may report on cases. And sometimes I may actually down--if they have a link to it, I will download the case if only because you're going to get more facts from the case, because sometimes the reviews that I read don't make sense, there's something missing.
And so, you know--and then I can find it in the case. But I don't do that norm--but I do that on an educational basis, I don't do it with respect to a specific

Page 84

matter in which I've been retained. I get--as I mentioned, I get feeds every day on the latest and greatest appellate decisions. Some of those blow my mind.
But--and that helps me stay up to date in a number of ways. I am an educator. I do--I--I do a lot of educational stuff. And say I've--for my CV, you know, the non-federal one, I would say 90 percent or more of the articles I've had published and the present live and--and webinar presentations I've done fall into one of two categories.
Q Mr. Fisher, you're--
A And number two, what you need to know about specific types of things to avoid number one. I'm--I'm anti-litigation, believe me. I want to avoid litigation at all costs.
Q So you mentioned your--you froze just a second there. That's what I was trying to tell you.
A Oh, I'm sorry.
Q Oh, that's okay. I think we heard most of it. But you mentioned that you don't

review any case law as a standard practice in--in preparing for your expert--
A That mis--misstates it. I understood your question do I do that specifically. Well, I--I do have to keep up to date on the Fair Claim Practice Act if it's a bad faith case. And--but I--but in a typical case that I handle where I'm involved in the standard of care for an insurance producer, I'm pretty up to date on that anyway just from the feed--the article feeds I get regularly.
Q Okay. So--
A I don't do--I don't necessarily do that for a specific case. What I may look at, however, is articles I've received and--and looked to see if I've got anything that involves an insurance producer standard of care in--in--in Nebraska or in Hawaii or what have you, so, you know, I can zero in on it. But I'm an educator, so I--a lot of it--what I do is from the standpoint of educating others.
Q Okay. Try to let me finish my question; okay?



A Oh, I'm sorry.
Q No, that's okay. That's okay. Because there's--we're--we are getting a little bit off the rails when I'm not able to finish my question; okay?
A I'm sorry.
Q No, that's--that's okay. So tell me, you were talking about educational purposes and--and keeping sort of a repository. I think that was your word of case law. Did you go to that for any reason or review any--any of those things as you looked at this file? Do you recall that?
A I'm sure I--I did just to see if I had anything current on--on Kentucky. And the only one--the only thing I could find was back in 2017.
Q Okay. And what--what was that?
A With a bad faith case. It was an article that was in--in Lexology.
Q Okay. Do you recall what it had to do with?
A Just the definition--it--it--it showed a--I think there was a case that stated even though an insurance company



defended and ultimately settled a case, does not--does not mean that they still can't be sued for bad faith, if I recall.
Q Do you remember the citation or anything like that?
A No, but I could probably look it up for you at a break if you'd like to have it.
Q Sure. I--I'd like to have it at some point; yeah. Sure. But did that have any basis or bearing on your report?
A Well, if it did, I would have mentioned--I would have cited it or worded it that way. My reports and--and the rebuttal speak for themselves. It didn't surprise me that that can happen, because I've seen that happen in many instances anyway, so I wasn't shocked by the decision at all.
Q Okay. So let's get into your report now. There's been a couple of times that you've mentioned being a--a designated responsible licensee; okay? And I--I want to understand this just a little bit more. For whom were you a designated responsible licensee?



A It's--it's--it's something that had to be done as business entity structures changed starting in about the 19--late 1980s. And as--due to merger and acquisition activity, more and more executives, C-suite executives for insurance producers and claims producers--or claim adjustors, what have you, were administrators. They were--they were the CEO. They're not going out and taking recorded statements.
So--or they're the CEO but they're not knocking on doors looking to sell a--company insurance. They're--they're really administrators. And so the NAIC decided that they had--there had to be somebody who was licensed that was going to be the person that the Department of Insurance would look to for regulatory and statutory compliance. And that was the reason behind it.
And as a result, business entity--when you apply for a business entity license, whether it's for a claim adjusting company or even an insurance brokerage production facility, it may be a corporation, it may be an LLC, it may be a limited partnership or a

partnership, somebody has got to be licensed. And they want to know who that is.
And so just about every application I've ever seen for a business entity license has a spot where you can identify who the designated responsible licensee or licensees may be. In California, for instance, they have room for four. If you need more than that, then you've got to attach, you know, an addendum.
And if you have branch offices, then there's got to be a designated responsible licensee in each branch office if each branch office has to be, you know--the Department requires they be notified that that even exists. In California, for instance, I had three offices, we had to notify the Department of Insurance of the addresses and who the designated responsible licensee was for that office. And as I mentioned, that's a person the Department is going to point the finger at for regulatory and statutory compliance.
Q So in Kentucky, what did it entail? You--you--



A In--as I recall, Ken--they do require business entities to be designated and cited where it is, 2--Application Number 20--it's Question Number 25 in the application for a business entity license for an insurance production application. So I don't know if that's required for an independent claim adjustor or--and--and I think insurance company employees may be exempt from that perhaps. They may--but the context of this is my production license that I had in Kentucky. So it was Question 25 on the application.
Q So I--I understand it's for a production license, but it doesn't mean that you're adjusting or handling bad faith claims. It just means that you're signing off as a responsible licensee?
A Well, as a--as a production it was--of course it didn't have anything to do with claims.
Q Okay.
A Well, I take that back. It--it could if you had a claim facility in your off--in your company, because some people



do--some larger brokers do have risk management people in there that act as claim advocates for their policyholders.
Q Okay.
A And I don't think that--that triggers the--the adjustor license.
Q Gotcha. So just--just because you signed off on the 8/3/01 form, though, doesn't mean you're adjusting claims in Kentucky. This was--this--
A That's for sure.
Q It's a producer; okay.
A That's correct.
Q And other than what we discussed earlier as far as, you know, the activity that you recall back in the '80s and early '90s with the surplus lines, there was no other time where you were actively adjusting or handling claims in Kentucky?
A That would be correct.
Q Okay.
A At least not a--not as far as, you know, third party or first party claim. I might do claim advocacy, but that would be acting as a broker.



Q Okay. Gotcha. So we've talked about--I wanted to ask you, on your materials reviewed, obtained on my own, that was just some of the--what materials, if any, did you obtain on your own here?
A I don't know that I got anything because I--if I did, I--it would have been in the file and produced if I was relying on anything specific. But sometimes, for instance, one of the things I'm--I really do, even do it on the phone, I got the first phone call, if somebody wa--has got a problem with an insurance broker or the defending an insurance broker, even before I even know what the case is about I'm already looking at the license. I'll do that immediately. Doing it on--on a phone call.
Q Looking at the license for whom? I'm--I'm sorry. I--I don't really under--
A Oh, well, let me--let me clarify. My apologies. I often get phone calls from people saying, we have an insurance broker professional liability case or a lawyer professional liability case or what have you, and I can discuss it with you, and the first

Page 93

thing I'll ask them is--is--after doing conflict check, what's the name of the business entity.

And that way I can look up the license immediately. It's amazing the stuff you can find or--or the stuff that might be missing. And I--that could be a game changer with a case the attorney hadn't even thought about.

Q Okay. Not something applicable to your--to your work here in this case re--in the bad faith context, though; right?

A I don't think I looked up anything, no, licensing-wise with respect to this particular matter. That would be correct.

Q Okay. And we talked a little bit about this goal earlier, about developing facts--as many facts as possible in--in 90 days. And again, this is a goal; right? It's not a violation of the Unfair Claims Settlement Practices Act?

A Well, it--it--in context, there may be times that that could be, because you are supposed to investigate cases rapidly. And--and in some states, they even have

Page 94

requirements of making a reasonable offer of settlement that may be time sensitive. But that said, there are many reasons you want to develop a claim as quickly as possible.

Number one, mem--memories are fresh. Number two, documentat--documents may be available. It may still be able to--to look at whatever--handle on the case, you're able to make recommendations or the insurance company may make rec--be better equipped to set more accurate reserves earlier in the file.

That's something that the NAIC is very strict about, or at least they attempt to be. And that is--I guess in the early 1980s they adopted the concept that you must--you--your reserves should be based on ultimate net payout. And that includes expense reserves and maybe even subrogation recovery if you're able to--to support it.

But the real basis of that triggers many things. One of which is it goes to solvency that you have the money set aside or at least a--from a counting perspective, money set aside to be able to pay the claim.

Page 95

And more importantly, from an actuarial standpoint, if the reserves are more accurately set earlier, then that helps the ac--actuaries test a book of business to see if it looks like it's going to be profitable.

And if it's not, then--for one reason or another, or maybe it's going to be really profitable, they can make whatever adjustments premium-wise or coverage-wise that may be necessary. And you can't do that if you don't develop a claim rapidly and have more accurate reserves set earlier. And that was one of the whole bases of this white paper that Chantal did was ex--you know, deals exactly with that issue.

If you've got accurate reserves earlier than a gu--again, adjustments can be made. I'm testifying in a case very--I don't know when, within the next two weeks, on that very issue. Were--was the insurance company acting within generally accepted practices as to the manner in which they set their reserves? And the answer to that was clearly no.

And a matter of fact, I think their

Page 96

claim person even admitted, we're--we've just started thinking about doing that. Well, gee, welcome to the club, guys. That's about 40 years too late. But that's--and so when it comes to smaller insurance companies, and--and National Indemnity wouldn't fall into that category, but with a smaller insurance company, it's critical that it be--be accurately reserved. And critical that they're doing it right.

Otherwise they're going to be under-reserve and--and it's going to get really bad really fast. In one instance, the insurance company had to be acquired by a big one because they were going to be taken over by the Department of Insurance.

Q Okay. I--I want to--I want to drill down on this statement just a little bit, though--

A Sure.

Q --as far as the goal being. There is not any hard and fast requirement or a violation of the Kentucky Unfair Claims Settlement Practices Act if you don't--if--if you're not able to investigate in 90 days or

if things come up like some of the things we were talking about earlier. I mean, circumstances warrant that rapid may be different depending on the circumstances; right? I mean, that's true; isn't it?
A Well, it depends on what you're referring to. That's overly broad. But if you're talking about uncooperative policyholders or uncooperative plaintiffs or plaintiff attorneys, that's certainly--if you're making the attempt, then I would say that's probably accurate that it--there's no consequences for that.
As claim auditors, for instance, we look at the claim handling from two perspectives. What the Code requires with respect to develop--claim development, and of course the contract, because TPAs have contracts with their--their clients. And so we were looking at it from two perspectives.
And we would give a good grade if they made the attempts in a timely manner. You--you ca--you can't--them doing that in a timely manner. And so we'll--we never docked anybody for--for that purpose.



Now, how--if--it's possible that lack of cooperation could have an effect on reserves, as well. Either you're over-reserved or under-reserved. But, you know, there's other ways in which you can look at a claim and say, even with lack of cooperation it's a--this is looking good, or this is not looking so good.
And then it's just a matter of continuing to develop. As I said, the goal was to get it mu--as much as possible done in 90 days or less. We were pretty darn good in getting it done most of the time, but there was always a case where it can't be done. And so you have to take that into consideration.
Q Right. Okay. And--and that's the point I'm--I--I think we agree on that point then that there are things that may factor in where you're not able to get it done in 90 days, and it's certainly not bad faith claim handling. And I'm talking about more broadly right now.
A Okay.
Q Ms. Fisher, you've--you've frozen.



A --in those situations, and I'm sure we'll get into that in the--in the case shortly.
Q Yeah, you're freezing up on us just a little bit, Mr. Fisher.
A Yeah, I don't know what to do about that. That's--I'm a Regent suite, and usually their system is pretty good.
Q Yeah, that's--no, that's all right. So every--every now and then I--we--we may pause or something if there's any intermittent connection issues; okay?
A Worst comes to worst, I do have a WiFi hotspot of my own.
Q Okay. All right. And you'd also agree with me, insurers have to rely upon the facts that they have at the time; right? So when they're making liability and coverage decisions, and it's certainly, you know, bad faith if they continue to investigate and learn new things; right?
A Well, that's rather broad. But there are times I would agree with that. On the same token, there--the real question is is whether they're taking a matter seriously



and really doing their best to get what they need as quickly as possible and to be somewhat aggressive about that. So it--that really has to be looked at in a case by case basis.
Q Okay. So I want to continue on page 3 here. And I want to ask you: You mentioned in this sentence here under Heading 6, and you state here that traditional--ignore--that--that rather the claim investigation claim handling, if that's what it was, ignored traditional methods. Tell me a little bit--it--are the headings here the traditional methods that you're referring to?
A Well, I mean--
Q Or what's the--
A --this is my--this is my report, my fir--my initial report?
Q Uh-huh, (affirmative).
A All right. You call it.
Q I want to understand what specific traditional methods that you're referring to and where you derive those from?
A Well, I think that came--comes later. That's a generalized statement. What

page is that on?
Q That's page 3.
A Okay. Basic industry standards. The other's introductory. And the rest of it goes into a generalized discussion. I don't get into the specifics of this case until much later in the report.
Q Okay. All right. So this is a--a preview then I guess?
A Yeah, it's a generalized preview.
Q Okay.
A I don't actually look at or start discussing the handling of this matter until we get even past the--the factual exceptions. So that goes on for--God, forever.
Q So I want to ask you a question then before we--we develop what you would consider those traditional methods about Number--your--what you call Neutral Facts in Issue. And--and you--you list several facts from pages 6 through pages 14. Why are those neutral facts?
A Well, I try and deal with neutral facts. I--I--this is one of the reasons why I made some changes once--once I read your



expert's report, I actually conceded some issues. I try to be as neutral as possible. I don't ad--I don't want to be an advocate.
I know that there are a lot of sometimes--and I'm not saying this is true of your expert at all. I'm talking general now. I've run into a lot of other experts who take the position of the attorney that hired them. And they will advocate, they will do things that I think are completely inappropriate for an expert to do.
I won't decide questions of fact, for instance. I will do an either--I try and do an either/or analysis. I don't--I don't want to cite case law. I--but--because experts can't do that anyway.
But I've seen many instances where I'm up against a licensed attorney, and I know right away 99 percent of the time they're going to advocate like they're doing--they're going to write a report that sounds like their closing argument. And I've been really good at calling them out at that. And 99 percent of the time I've had either their entire report tossed or most of it for that



very reason. They're advocating, they're citing case law, they're acting like they're acting as counsel for whoever hired them. And that's not right.
And I don't--I do my best not to do that. If--if the facts are in dispute, I--I try and do an either/or analysis and not draw a conclusion that's favorable to my client. I--I try and be really neutral about that.
And unfortunately, I'm sure you--you noticed in my rebuttal report, I retracted some things for that very reason. I--this was a rush deal, I was working late at night, I was trying to get it done as fast as possible, and there were some things that, you know, I think needed clarification, and I did that.
Q So we're--we're going to get to your rebuttal report just a little bit later. I do want to go through the initial report, and I--
A Sure.
Q --know some of these may be clarified in the rebuttal report. So I--I--I want to give you that disclaimer as we're



going through now; okay?
A Fair enough.
Q So I want to ask you, it looks like after you get through these neutral facts, then you go into the deposition of--of Edward Crum, Eddie Crum who was an accident reconstructionist. Do you see that here?
A Yes.
Q And I want to ask you specifically about this statement here. This should have been--this being retaining Mr. Crum, should have been obtained much earlier, and why did it take several years before he was retained. What difference would it have made if Mr. Crum would have been retained earlier?
A I think he would have had access to more evidence, if it had been done quickly, because there was a lot of stuff that could not be determined because of the accident scene was now worthless. Why would he--why would he want to go to the accident scene at this point in time? It's--you know, in a different--you know, several years later.
And in addition, memories are going to

be faded. And hard evidence, you know, may not be available. And even--if I recall, he may even have conceded that point in his deposition as a result. But I--I find that--the faster you can get an accident reconstructionist in--onboard, the better off you are.

You really want to understand what you want to be doing. And I think the rest--I think my report and discussion of--of what he was able to do at the time he did it, you know, was about the best he could probably do, but I think it could have been done--I think that there would have been more available to him and mi--might have answered some unanswered questions as to what really happened that--that--that night. Because there certainly are lots of questions of fact.

And so by waiting, you know, some period of time to get him involved, to me it's beneath the standard of care doing a proper investigation and a timely one, especially if you know you're going to need to have experts of any kind for that matter.



You want to get them onboard early and have them do their work so you've got the facts and you know what's disputed and you're able to--to have a better--better assessment as to liability and potential damages and resolution. And the faster you can get things done, the faster the case can, you know, get closed. That simple.

Q Did Plaintiff obtain an accident reconstructionist here?

A I don't know that they did. That's--that's on them.

Q Okay.

A I'm not aware of it.

Q And how specifically did waiting to retain Mr. Crum damage Mr. Walden in this case?

A Well, it may have a direct impact on the decisions that were--the claim department made. That's the point. And there were--you know, as I said, it--Mr. Crum did, you know, clarify in his deposition several things that were wrong in this case, including discrepancy in the police report and the fact that the police report, you



know, mentioned how the truck, you know, was not fully over--pulled over to the shoulder.

And that was--that was a major--major situation. Plus physical evidence as well was gone. From the photographs, I mean, Mr. Walden's car, the front end, Jesus Christ, I'm--it looks like--I'm surprised he survived.

But I'm not an accident reconstructionist. Mr. Crum would be in a better position of--of doing that had he had access to more than just photographs. And so this is--this is the kind of thing that, you know, you want to jump on if you have the ability to do it. I don't know why this wasn't authorized earlier.

And it would be conjecture on my part to suggest that it was due to, you know, a typical claim department squeezing--you know, not wanting to expend money unnecessarily. But that would be conjecture. I don't know what the reason for it was. That's never been determined.

Q Okay. And there's certainly no evidence of that; right?



A That's correct. But, you know, ultimately, that's going to be a question of fact for a jury decide as to why certain decisions were made or not made earlier. And that's--that's really kind of the crux of the case.

Q Okay.

A You know, there's a lot--there's a lot that could have been done and should have been done earlier. And then, ultimately, that's going to be up to the jury.

Q Okay. And so--just so I'm--I--I--I want to make sure that I'm getting what you're saying, Mr. Fisher. If you had to give me a very high level overview of how not retaining Mr. Crum earlier damaged Mr. Walden, specifically, provide that overview to me. I want to understand specifically how it damaged Mr. Walden.

A Well, it goes to decisions--Mr. Crum was hired as an accident reconstructionist to see--to see if he can come up with what happened, how it happened, and whether or not Mr. Walden was sig--significantly responsible for his own

injuries, for instance. I mean, just hypothetically speaking. And these--and--and so when you hire any kind of expert of that case--nature, including an accident reconstructionist, you want a candid assessment, you want it to be fair and impartial.

And then based on what--what they--report may be is going to help you as a claim person make the appropriate decisions and recommendations to management as to whether this is a case that needs to be fought or settled or negotiated or go to mediation, etcetera. And so, in general, it's going to affect the decision-making process. And so if the accident reconstructionist is unable because of the time involved, the time difference involved, and, you know, cannot be absolutely definite as to what may or may not have taken place, that's going to affect resolution of the case.

And so whether or not that is a--a contributing cause to damages to Mr. Walden is going to be for the jury to decide



themselves. But that's--that's why you want experts in and that's why you want to get them in early.

Q Do you have an opinion or are you saying it did damage to Mr. Walden?
A That's for the jury to decide. I think there's enough questions of fact on either way.
Q Okay.
A So I think there's a possibility that if he had had access to the actual physical evidence at the time, he would have been in a better position to determine what he thinks were the causes of--ultimately of Mr. Walden's injuries and whether--what degree of responsibility, if any, Mr. Walden might have had. But that was--a lot of that was taken off the table because the physical evidence wasn't available.
Q Okay. Did you review the scheduling order in the underlying case?
A No.
Q Okay.
A I don't recall seeing that at all.
Q Okay. Would you agree with me



that, you know, scheduling orders dictate when experts are to be disclosed; right?
A Well, that is a procedural issue, and that is correct, not mean you can't hire one and get it rolling on your own.
Q Okay.
A Scheduling orders are only procedural, you know, when you can take--you know, when certain things must be completed, when you have to have your experts, whatever. But that doesn't mean somebody can't hire him, he's an expert, on day one of the case.
Q Okay.
A They just don't have to.
Q And tell me, what about--did you review any of the court's orders precluding--in the underlying case at least, any of the court's orders precluding identification of Plaintiff disclosing a rebuttal expert or opinions or anything like that?
A Well, no. But again, that doesn't mean you can't hire them early in the case.
Q Okay.
A You can always hire experts.



I--believe me, I'm a--I'm a big advocate of that. A good example was an horrendous insurance broker malpractice case I was hired--I think I was hired before the lawsuit was even filed. And that made all the difference in the world between a $35,000 bill having to review depositions and file materials, you know, two months before trial, and a $3200 bill because all I had was phone calls over a two year period, and ultimately the case settled because of the phone calls.
Q Okay.
A I actually had to give them a refund on my retainer. So you--you're mixing apples and oranges here. A scheduling order tells you when you must have certain things done. But there's nothing to preclude anyone, plaintiff or defense for that matter, of getting people onboard early so you can find out what happened and hopefully resolve a case early, which is what happened on that case. It was a multimillion dollar claim.
Q So do you think it would have been important, though, for Mr. Crum as part of his evaluation to have had the plaintiff's

deposition or to have information from the police officers or the insured driver? Do you think all of those things would have been important for Mr. Crum to consider?
A Well, I--I think he did have access to that. But that's not the problem--problem here. The problem is that he wasn't able to do a thorough accident reconstruction because the accident site was no longer available and physical evidence and other information was not available. And I think if he had been retained earlier he might have had a report that was more thorough.
Now, it--I'm not going to say which way it would have gone. That's for the jury to determine. But I think you want to have somebody like that in early. I'm a big proponent of that, because the key is to a claim department being truly a profit center it is closing files quickly, is to pay covered losses, whether they're third party or first party. And the faster you close the file, the cheaper it's going to be. It never gets any better over time.



Q But Mr. Crum did have the photographs, and he did have the police report, and he did have Mr. Walden's deposition. So are you--are you saying that his report wasn't thorough then?
A I'm saying that, you know, he did--he--later on in his deposition he acknowledged that there were certain issues that he thought were very important, including the fact that the original police report, you know, said one thing, but, you know, still thought the--or concluded that Mr. Walden was probably at fault for the accident because, you know, he--there was plenty of space, supposedly, for him to get around. And of course, a factual discrepancy as to whether or not Mr. Walden did tell the police officer that he was tired, which implies that he wasn't paying attention.
That's--and he retracted that, or he stated it differently in his deposition. At least of what I read. And so those are questions of fact that I don't--you know, I won't decide. But I think a lot of this could have been handled better and faster,



and--and this case could have been closed much sooner than--than--than it--than it was.
Q Okay. So tell me, on the key events that you're listing on page 16 and 17, you say, excluding deposition testimony of Defendant's accident reconstruction expert. What did you mean by that?
A I don't know if I'd seen it yet. I don't know--I can't remember at what point I had that. I think I had it. But I didn't put that in that initial timeline.
Q Okay. Bec--because you're considering it up here. You're talking--
A Yeah. I think--I probably did have it. I'll have to look at the time on that. I don't know why I didn't put it in the timeline. I think I was going by documents. And I wanted to make clear that I was--I was going to deal with Mr. Crum at a later point in--in my report, and I did.
Q So--
A I think I just--
Q --what--
A It may be that I had just gotten it, too. I can't remember when I received



it. But--
Q Okay.
A --it was--I know I had the report started. And--and then I looked at the deposition of Mr. Crum, and that appears in Roman Numeral VII.
Q Okay. So I--I want to go down to your conclusions now and get sort of to the--to the meat of your opinions. At least in your first report, and then we can talk about your rebuttal report a little bit.
A Sure.
Q So the first conclusion under Roman Numeral I here--
A Can I interrupt for a second?
Q Sure.
THE WITNESS: I don't want to--before you actually get to a question, can--can we take a short break? Because we've been going now for almost--well, it's 1:00.
MR. BUNNELL: Oh, yeah, absolutely.
THE WITNESS: It's been two hours.
MR. BUNNELL: Yeah. No, no, no.

Page 117

Perfect. Thank you so much.
Absolutely. Happy to take about a five minute break.
THE WITNESS: That would be fine. Thank you so much.
MR. BUNNELL: Okay. Thank you.
VIDEO TECHNICIAN: I'll stop the recording.
(OFF THE RECORD)
(A BRIEF BREAK IS TAKEN)
VIDEO TECHNICIAN: At 2:06 p.m. Eastern Standard time, we are back on the video record.
By Mr. Bunnell:
Q All right. Everybody had a nice stretch and bathroom break and everything. And, Mr. Fisher, we were just getting into your--your original report, the conclusions. And I was going to ask you about your first conclusion here; okay?
A Sure.
Q So it seems that the first conclusion that you're making here is that there was an obligation to make a reasonable offer when liability was clear. And your

Page 118

opinion is that liability was clear on December 9th. Did I state your first conclusion accurately?
A Well, I think so. The facts were there that there were certain questionable facts. But the--I think the key at that point in time, the key fact that even the police report ignored was the fact that that truck wasn't fully off the road.
Number two, there was no evidence to support whether or not the lighting triangles were properly set. I think it's 10 feet, 100 feet, and 200 feet. And the--the police I--report I think was inconclusive on that. They noted that the--supposedly the triangles were out but they didn't verify the distances involved.
And so, from that perspective and the fact that the truck was not fully off the road, I think is--is a problem. And--especially late at night. Now, lit up, there's evidence to suggest that there was adequate lighting.
So it--it really is a surprise that this thing happened, but the damages were

Page 119

extensive. And I don't decide questions of fact. I think there's enough there that there is a potential for liability. And so when you have that, it's a smart move to consider possibly settling the case if you can, or at least making a reasonable offer.
They actually ended up in a very short period of time actually denying liability I think in February. So I don't understand that decision at all. I don't think there was any facts to support it at that point. So I don't know. If that was my--that was what I had a problem with.
Q So your contention is liability--despite there being questionable facts, which I think were your words, I'm not trying to put words in your mouth, your contention would still be liability was reasonably clear as a--
A I think there was a potential for it. Absolutely. Because you--when you have con--conflicting facts, that means you've got to go through this entire process and roll the dice with a jury. And that--that's the reality of claim handling. Ultimately, the

Page 120

jury is going to decide one way or the other whether or not there was liability. And so these days you--these days especially with nuclear verdicts happening every time you turn around, that's a dice roll that--that a lot of people are very--very legitimately nervous about. I don't know why juries today are so angry, but it's--they seem to be that way.
Q But there's--
A I think that a reasonable offer could have been made back then.
Q But again, on the flip side of that, there--your--your--would you agree that it's possible that, on--on the reverse side, that liability was clearly in favor of the insured as opposed to Mr. Walden? I mean, just as easily as it could have--there was a dispute; right? I mean, so it couldn't have been reasonably clear.
A Well, you--that ends up being a judgment call, and ultimately the jury's going to decide that. I don't--you know, there is enough questions of fact in this case that I'm not going to take a position on

it on--like that. I know what it says here, and I know I--I changed that in my rebuttal, as well. But I don't like deciding questions of fact. That's not my role.

I think--I think from a claims perspective, that's what I would have been doing. I would have been looking hard at that. And--and--and then, of course, on top of this you--you didn't have cooperation of the insured, either. So that adds to it.

But I think from a claims perspective, I believe in closed files. I believe you make a reasonable offer of settlement, and if they don't want to accept it that's another matter. But that builds--you make multiple offers to reasonably settle a case, that certainly takes bad faith or--with--that's a legal conclusion, I think. That certainly takes the--the--the requirements off the table if you're making a reasonable offer based on what you knew at that point in time.

And then the question is, is what you know at that point in time reasonable, or should you have been able to know more. And that's where--the rest of the investigation



and the delays.

Q So what I--I'm--I am just trying to nail down, I understand--and we're going to talk about your rebuttal report, but in your initial report, your contention was it was bad faith for them not to make an offer because liability was reasonably clear?

A I don't think I said it was bad faith in this paragraph. I said--I said it's inconsistent with the obligation to make a reasonable offer. That's what I said.

Q Okay. So it would have been your opinion that it was inconsistent with the Unfair Claims Settlement Practices Act?

A Well--

Q As you read it?

A --I'm saying a reasonable offer when liability becomes clear. That's what it says. And that's--and it's inconsistent with that. Now, if you want to say that that--make a reasonable offer of settlement is part of the Fair Claim Practice statute I'm referring to, that's on you. I said what I said there and it's clear.

Q Okay.



A And I think any reasonable claim person who would have seen this, if there's potential serious injury, they had--I think they had the photographs at that point in time. And, you know, the front end of that car--or that pickup truck was--I--I'm really shocked he--he didn't get more seriously injured. I really am.

Q So I want to--I want to jump back on page 18 of your report--or actually, jump--I'm sorry. No, I'm--I'm in line. I'm sorry. Let me keep--let--let's stay there for just a second, because it's a claims handling decision whether or not--there's questions of--of fact here even at this early stage.

And it may be--I--I--I'm trying to understand, just because you're talking about inconsistent with their--with their obligation to make a reasonable offer. But it certainly--you're not saying then that they had to make an offer at this point. And that's indicative of bad claim handling; right?

A Well, it says what it says,



Counselor. But if you go back up to the date of 12/9/20 where I list out--it's on page 16.

Q I'm there.

A All right. This is a direct quote out of it. Updated report with official report and policy photos. We have obtained the attached official photographs by Richmond Police Department. You will note the insured unit is partially in the lane. Photographs and the police report do indicate that the insured driver had placed reflective cones.

But nobody stated that they were done in--in accordance with what was required. And there's no mention of the visibility at the curb, nor exit speed of the car. So those are all unresolved questions. But, you know, that--so this again goes to the heart of the quick and--you want to jump on the investigation.

Now--but at least they got the photographs. And--but I think it was enough already to raise a question here. And my main point I think at that point in time when we go back to page 18 was the fact that they seemed to play down the fact that that

vehicle, the truck was not fully off the exit lane. And that's a--to me, a--an issue of liability right there.
And then on top of it, I--I never brought it up so maybe it's a good time now. I--I still don't understand why the driver of the vehicle called the--his dispatch and not the police. I would have thought the first call would have been to the police, but, you know, that's just an interesting thing that he decided to do.
Q That doesn't have any bearing on your assessment--
A No.
Q --of the claim--
A That's why I didn't put it in there.
Q All right.
A It still is--to me is like--
Q So certainly--
A --I didn't get that.
Q --based on the information they had of 12/9/20, though, Mr. Fisher, you--you don't disagree with me that liability could go one way or another. It's not reasonably



clear, so they're still investigating.
A Well, that's true. But in the same token, you know, we all know that insurance companies are--we settle in question of fact cases. That's not unusual. Nothing unusual about that at all.
Q I--I'm--I'm not asking about the settlement posture or anything else. I'm asking about, you know, the specific allegations here. I'm--I'm--I'm really wanting to stay focused.
So you don't disagree with me, though, that based on, you know, this initial entry that you've listed here, the facts that they had at the time shows liability could have gone either way; right? And it wasn't reasonably clear. So--and certainly it's not bad faith for them to continue to investigate the claim and to gather more information; right?
A At that point in time, I would agree with that.
Q Okay. All right. So let me ask you about--and I know your rebuttal report covers this a little bit about this--the



reserves, the increase to the reserves. And you mention in this sentence here: The reserves were increased to 150 in June of 2021 but no such offer was made.
And I--I know you understand what a reserve is, Mr. Fisher. I know you understand that, you know, it's set aside by an insurance company to cover future liability. You're not--and you--I want to be clear, though, and again we'll clean some of this up with your rebuttal report, but you're not opining here that NICO had to offer its reserves in June of 2021?
A I would agree with that; yes.
Q Okay.
A Posting a reserve does not mean that's what you have to offer. And it does--it does mean that you--it's potentially what it might take to settle the case. But you're not obligated to offer the amount in reserve.
Q Right. And it's not an admission--a--a reserve is not an admission of liability or any sort of an--shows the extent of fault or anything like that?



A No. It just meets the requirements to--to try and post a--a reserve--that's equal to the ultimate net payout. And--and a--if you can settle it for less, fine. That's money recaptured.
And as from a--from an auditing standpoint, we usually looked at a 20 percent leeway either way and considered the reserve appropriate if it was--seemed to be correct. We--we gave a--there was always a 20 percent margin either way, either under-reserve or over-reserve, because it is a--it--reserves are gut level kind of stuff. Although there's plenty of claim bureaus where you might be able to get information with similar accidents and--and similar injuries, what they--what the--the value may be, which is interesting because I don't see any claim bureau action in this case at all. But that's another matter.
But, yeah, I generally would agree with that. Reserving does not re--does not require that that's what you pay out. But it is con--it's possible that you might.
Q Okay. And you don't disagree with

me that NICO was attempting--in fact, you--you say they were focused on trying to find their insured driver at this point; right?
A Yes.
Q And--
A I agree with that.
Q And--
A Generally.
Q --that's a good thing. That was an important part of the fact investigation, right, to be able to talk to the insured driver?
A Well, absolutely. But--but--
Q Okay.
A --you know, if you--if you want, we can save it for later or I can say it now. What would you like me to do?
Q You can say it now; sure.
A There was no reason to wait to get the--I don't see any legitimate reason why it took so long to get a private investigator involved to try and track him down. And he--and he was able to track him down fairly quickly. I think that could have been done a



lot earlier.
And whether or not that would have changed anything, I think there's a possibility it might have. But again, that's for the jury to determine. But there was a--a lengthy delay between--at this point in time, if they're not getting cooperation from the insured or they can't even find him, then--then hiring a private investigator would have been appropriate at that point in time.
It shouldn't have taken as long to get that person involved. I--I think his name was Jack Needum, maybe. I--I think that was who it was.
Q But you don't dispute that there were certainly efforts that were being made to hire folks to track down the insured and the insured driver even before the private investigator; right? You don't disagree with me that NICO tried several different times to do that?
A Oh, that--that is clear. But if your goal is get--find--if your goal is truly to find your insured or the insured driver



and if you can't do it through the traditional means, then you do it with a private investigator. And--and that I do have a problem with. They should have brought that gentleman involved in much earlier, and that would have--and then they would have done a much better situation to determine what they needed to do after that.
Q Okay. So how did not hiring a private investigator sooner damage Mr. Walden?
A Delayed--delayed things significantly. That's why.
Q In what way?
A Well, it wasn't until they finally found him and--and had some cooperation from him that--then I think the--a true assessment as to what the case might be settled for started taking place. And besides which, if it could have been done earlier, it should have been done earlier. At least that's my position on it.
If you can--if you can do it, you do it as soon as possible. And that goes right to claim development and reserve setting



and--and--and, hopefully, closure of the file.
Q But certainly they were trying here, and they were not able to make contact with the driver or their insured. And they're going to these efforts. So are you saying--
A Which--which--which is why they hired a private investigator eventually. But they should have done it earlier. That's my point. Why wait until when they finally got around to it? That's--that to me is--it is--is a significant problem.
And--and the same is true of--of, you know, the accident reconstructionist, similar problem. The longer you wait to do things, the harder it's going to be to document, you know, physical evidence and--and--and anything else that took place. And that affected even Mr. Crum's report. It was inconclusive on some issues because the--the evidence was no longer available, the physical evidence wasn't available.
This is the stuff you want to try and preserve if you possibly can. Especially

when you've got a case where the--there's some questions of fact that need to be resolved, especially from the police report. So that's the problem. It's timing involved.
Q Is--is your opinion--
A It shouldn't have taken that long.
Q Is your opinion then that the harm to Mr. Walden was that the claim--that money wasn't placed upon the claim and it wasn't settled quick enough because these things didn't happen?
A No. The problem that I had with it is that if they--if they had had--if they had done what they should have done, in my opinion, in the time--a more timely basis, they would have been in a better position to assess liability more accurately, have a reserve set more accurately, and ultimately resolve the claim sooner.
Q Okay.
A Now, whether or not there's any delays on Mr. Walden's part, you know, in providing some stuff, I--I didn't see that much other than perhaps some medical issues, but even the medical re--stuff that you-guys



would require be produced so they can assess the case, I think were, for the most part, timely--timely provided. But the facts of liability weren't really nailed down until 2024.
Q Okay.
A Maybe, or late 2023. So I have a problem with that. I--and I think, as I testified already, the experts that need to assist the claim department in understanding whether or not there was a potential for liability should be done earlier for so many reasons. And like I said, a closed--an early closed file is never going to be as high payment output as you're going to get when you wait for four years.
Q Okay. Let's talk about some--let's keep going here. And I--I want to understand this statement here with Number 3, Eddie Crum, the accident reconstructionist, was not retained until February of 2023. It's been represented to me that this was after Plaintiff made a policy limits demand. And again, I--I want to go over the demand really--first of all, I



want to ask you, you reviewed the privilege log in this case; right?
A I believe I did.
Q Okay. So I want to--I want to direct your attention here to this notation from January--January 12th of 2023. So Ms. Ridings is talking to Mr. Crum on the 12th of 2023; right?
A That's what it appears to say.
Q Okay. So I want to next turn to the--to the demand that was sent in this case. And that was done on the 13th. So the day after; you'd agree?
A Well, that's what that says.
Q Okay. So who represented to you, as stated in your report, that Crum was only--was not retained until after a policy limits demand was sent?
A I don't recall.
Q Okay.
A But certainly his work hadn't been concluded yet, either.
Q Sure. Okay. So let's talk about the demand just a little bit that was sent. And this is something you reviewed; correct?



A Yes.
Q So I want to--first of all, you--you referenced it as a policy limits demand, but it, in fact, was not a policy limits demand; right?
A Well, where is it? Where's the amount?
Q So--
A Oh, total claim value, 846,000.
Q This is the initial demand; do you see that? And do you remember what the policy limit was here?
A I think it was a million.
Q Okay. So this wasn't a policy limits demand; right?
A That's correct. I was wrong on that.
Q Okay. And it certainly wasn't a time limited demand; right? There's no, you've got to respond within X days or anything like that; right?
A I don't recall it being a time limit demand.
Q Okay. In this report--or in this demand, I'm going up to page 16. There's

Page 137

some information here about loss of household services. So probably a life care plan and future medical expenses and things like that. Do you--do you see that?
A Yes. That's--yes, that's what it says.
Q Okay. And you don't disagree here that it's not bad faith or bad claim handling for NICO to investigate any sort of causal relationship between these future medical expenses that they're hearing about and whether they're related to the accident; right? I mean, that may take some time?
A Oh, I generally would agree with that; yes.
Q Okay. And we can get to this in the rebuttal as well, but I--I think you don't disagree that there was some follow-up from underlying defense counsel in response to this demand asking for more information. If that's something that is mentioned in your rebuttal report, we can--we can handle it then. But certainly, as we sit here, you're not going to disagree that there was some follow-up contained in the claim file from

Page 138

underlying defense counsel asking for additional information and records on a few occasions; right?
A I believe that's accurate.
Q Okay. I want to go back to your report now, Mr. Fisher, and I want to ask you about this line right here on page 20, the first full paragraph. And you're saying an insured cannot retroactively cure a failure to investigate by pointing to an expert defense that they didn't even look at for almost three years and yet still maintaining little desire to make a reasonable offer for another 14 months after Crum confirmed the potential for liability.
I--I want to unpack that a little bit. Are the investigative failures that you're--you're talking about here, are they basically not retaining a private investigator sooner and not retaining Mr. Crum sooner?
A That's part of it. But you--
Q Okay.
A --want to thoroughly investigate a claim as quickly as possible and get all the

Page 139

evidence you possibly can as quickly as possible for--for a lot of reasons and this is one of them. And the fact that they didn't bring in their experts until much later means that--yeah, I don't know if they can do as thorough a job as they might have been able to do earlier.
Now, that--that could be a question of fact. I'm going to state that. And--and, ultimately, the jury's going to have to make that decision.
Q So because it's a factual determination, basically an insurer could--could have done the things like NICO did here and not subject themselves to bad faith then. Is that fair to say a jury could determine that just as easily as they could determine the other?
A Ultimately it will be their decision.
Q Okay. So tell me--and again, we talked about this a little bit earlier, this idea that NICO was making these attempts; right. And that's just a judgment call that you're making that they didn't do enough in

Page 140

trying to locate their insured, Mr. Howard; right? That's just something that you're saying they should have done more?
A Well, I think it's more than just that. I mean, if you want to focus in on just one issue here or one issue there, fine. I looked at it collectively.
And by the way, with respect to Mr. Crum, let's not forget his testimony is, well, that--this also appears on page 20, and what he conceded in--in that testimony and his deposition. So I will incorporate by reference all of that, as well.
Q Okay. So te--I--tell me--I--I'd like an answer to that question about, you're saying that they didn't do enough despite their continual attempts. I mean, the claim notes show that they were trying. So you're--you're faulting NICO for not just hiring a private investigator from the outset to locate this gentleman?
A No. That misstates my testimony.
Q Okay.
A Once they realized that they were having difficulty doing it through

Page 141

traditional means, if they really wanted to track him down right then and there, then they should have hired the private investigator before they did. And that to me is, again, delayed proper claim development. I'm not going to--you know, that simple. It's delaying proper claim development.
Q Okay. And do you think that's outrageous?
A I think it's beneath the standard of care.
Q Okay. And tell me, why is that beneath the standard of care?
A Because I think the outcome of this case would have been a lot different had they tracked down their--the--the driver much earlier, and they would have had a much more complete picture on what happened or what may have been--happened. And--and ultimately, again, there's discrepancies in the facts that--that only the jury can determine.
But the same would be true of--of hiring Mr. Crum earlier. It's not just the fact that they didn't track down their--their own insured right away, it's when they

Page 142

retained their expert, the accident reconstructionist expert.
Q How--
A If you really want to--if you really want to--I don't know, what's the phrase? If you really want to have accurate reserves and a closed file, you've got to move quick. And, you know, this case, you know, from the--from the onset, as far as I'm concerned, just looking at, you know, the pictures of the--of the vehicles, this could be a serious accident, this could involve serious injuries.
And so I would think that you would want to find out as much as you can as fast as you can. And again, you know, sometimes with the medical issues, it may take a little bit of time to--to develop that and have the cooperation and information coming from the plaintiff.
But if you want to have a well documented file as early as possible so you can have more accurate reserves set earlier, and that impacts a whole lot of different things. And--and also, try and close the

Page 143

file. The best file is a closed file.
Q So I want to go back to my question about NICO not retaining an investigator earlier. And I asked you if it was outrageous, and you said it was below the standard of care. So--
A Correct.
Q --are you saying it's not outrageous?
A No, I'm not saying that. That's a--that's an adjective I think the jury will have to contend with. I'm sure Mr.--I'm sure Plaintiff's counsel may raise that--use that word in his closing argument. I don't get involved in that.
It's beneath the standard of care, I think it was inappropriate. And if it's beneath the standard of care, that could possibly trigger other conclusions. That will be for the jury to decide. But I don't agree with that decision at all.
Q Okay. So likewise, you--you're not going to opine that it was outrageous for them--for NICO not to retain Mr. Crum earlier; right? That's not yours to opine

Page 144

about?
A That's a conclusion that could be supported by the evidence, but that's a conclusion only--that I think only the jury should be reaching.
Q And you'd agree it could--it's a conclusion that could be supported or could not be supported?
A Again, that's up to the jury to decide.
Q Okay.
A All I can do is say that, you know, it should have been done earlier, the stand--and the--not consistent with the standard of care.
Q Okay. You think folks can disagree about that?
A Obviously they do. We're--we're here; aren't we?
Q Yeah; sure. Okay. And certainly, you know, that doesn't--just because folks handle a claim in different ways doesn't evidence bad faith?
A Well, that's overly broad. I don't't--

Q Okay.
A --think that could be answered yes or no.
Q Okay.
A Depends on the facts because every case is going to have a different set of facts. I've seen some pretty wild cases.
Q Okay. So I--I want to keep going on page 20 here and get down to the police report a little bit more. You reviewed the police report, and it did talk about Mr. Walden's fatigue; is that fair?
A Well, that's a disputed fact.
Q Okay.
A Mr. Walden says he didn't say that. So I don't take positions on questions of fact. I will do an either/or analysis.
Q Okay. My question is: It was in the police report Mr. Walden's subsequent deposition may have disputed that he was fatigued. But it's in the police report that was available to NICO after the accident; that's fair?
A That is correct.
Q Okay. And you reviewed



doc--Mr. Curry, Officer Jason Curry who was the police officer who investigated this accident, and you reviewed his deposition testimony?
A I did.
Q Okay. So I want to ask you, you mention that it's not clear--and I think this is on page 21, or maybe it's on 20, that it's not clear--I'm trying to find it. You--you said it's not clear that the officer testified in his deposition that the place was lit up, whether it's unclear or not if there was any fault that night or anything else. And you're talking about Mr. Curry's deposition. And I'm--
A Where is it?
Q In your report. And I'm trying to find it, the--the line here, if you'll give me just a second.
A It's on 22.
Q I'm sorry. It's on--
A Page 22.
Q It--yeah, it's on 22 and 18 I think. So I'll go back to where I just--
A Well, I cited his deposition on



page 22.
Q Right. And--and you also mention on page 18 whether the police officer testified in--in deposition as well as in writing that the place was lit up. It's unclear whether or not there is any fault that night or anything else. Tell me what that sentence means in relation to Mr. Curry's deposition.
A Well, I have--let's go to his deposition where it's cited. It's on page 22, citation 31.
Q Okay. Tell me what--I--I didn't really understand the sentence. So tell me what you mean by the sentence on 18 as far as the deposition of Officer Curry.
A Prob--probably getting ahead of myself when I finally cited his deposition on page 22. Like I said, I wrote this late at night, I was tired. Oh, let's see, citation 31. So where is that?
Q I--I guess what I'm trying to understand, Mr. Fisher, is, wouldn't whether it was lit up and whether the area where the accident occurred, whether it was lit up like



Officer Curry testified to, wouldn't that have some bearing on the fault calculus here or the comparative liability calculus?
A Yes. But on the same token, so would the lights on the truck. They never conclude whether or not the lights on the truck were also working.
Q Right. And--
A And that's that--
Q --we're--
A --that's on--that's the cite for 31.
Q Okay.
A Crucially, the investigating officer noted that when they arrived at the scene he could not remember if the truck's lights were on or off. And that to me is--is a serious question. And so that's--that's what--the major reference there.
I know what he had to say about the place being lit up like a Christmas tree, or words to that effect, as far as the streetlights go, but warning lights on the truck, nobody could determine whether or not they were functioning at all or even on. And

of course, we don't know what the placement of the triangles were. We know that triangles were put out, we don't know if they were consistent with what they were supposed to be.
Granted, 100 feet, you know, are you really going to count your--your steps, but--and then the--and then another 100 feet. But, you know, I--nobody knows. That's--that's part of the problem. Nobody knows. These are all--
Q Okay.
A --questions of fact.
Q So--and you're certainly not looking at those things that you're mentioning, whether it's the triangles or Mr. Walden's fatigue or not or the lights on the truck or the area being lit up like a football field. I mean, these are all things that raise questions about liability; right? And you're not looking at them in a vacuum, they're all in their--in the totality; is that right?
A Yeah. I would agree with that.
Q Okay.



A But again, at the end of the day, it's going to be for the jury to decide.
Q Okay. So let's talk a little bit about the initial February 26, 2021 denial. You don't disagree with me that that was based on the information that NICO had at the time; right?
A Seems to be the case.
Q Okay. You don't fault it for that; right?
A Well, not necessarily. Like I said, there could have been a more rapid development. But I'm not as con--as I said, in essence, an insurer cannot retroactively cure a failure to investigate by pointing to an expert defense they didn't even look at for three years. So that's my problem.
When you look at everything that was done in the file, there were things that I think should have--could have been and should have been done much earlier to resolve this case. And I'm pretty satisfied had that been done you and I wouldn't be talking today.
Q Okay. So let me ask you this, though, I--after this initial letter on



February 26, you recall that NICO sent a reservation of rights letter on October 21st of 2021; right?
A Yes. You mean--
Q Okay.
A --to the insured?
Q Yes.
A Yes, because they weren't co--apparently weren't cooperating and they had--certainly had that obligation.
MR. BUNNELL: So I'll mark this--I think I'm at 10 or 11 (sic) now. I know Stephanie and Angela are probably going to kill me.
(WHEREUPON, EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q So this is the first reservation of rights letter that was sent to the driver and the insured; right?
A Well, I'm not going to dispute that. I'll take--October of '21. Yeah, that may--that may or may not be the first one.
Q Okay.
A I know that that's what that date is.



Q Okay. So do you think it was good claim handling to send this ROR and defend the insured and the driver here?
A Well, that's an interesting question, because it's strategic. I'm a firm believer that--that if you issue a reservation of rights that could trigger all sorts of--of things and maybe even private counsel being paid for at the expense of the insurance company. To me a reservation of rights, I understand why you have to do it, you don't want to wait or anything, but on the same token, is it really practical? Are you really going to enforce it?
And so to me, I've always been a little bit at unease of just routine reservation of rights. Now, is this routine? Probably not considering how long it took before they issued it.
But you've really got to think long and hard. Are you really going to try and enforce this? And if you are, then absolutely you're going to--you're going to have to do that.
But on--but on the same token, they

Page 153

ne--to my knowledge, they never filed a declaratory relief. And if they're not going to do that, seek enforcement of--of why they're reserving their rights, then why issue it. And--and that's a strategic decision. In my perspective, and that's just a personal opinion, not a--necessarily an expert position, if you're not going to enforce it, don't issue it.

Q So in this case you're--you're not critical of them, though, because they had a non-cooperative insured and driver. So this is not something that you're taking issue with that they--

A In and of itself, no, not in a vacuum.

Q And--

A I can understand why they--you know, they--they would consider that. And you want cooperation from the insured, they have a contractual obligation to--to comply. I have--I still don't understand why they had that problem, and to my knowledge, they never tracked down the owner of Enterprises Services Corp, they never even spoke with

Page 154

her. So I don't understand that thinking on the part of the policyholder at all.

Now, you're also getting into a real legal question here as well that, you know, I don't want to get involved, but that's not my role. And that is whether or not there would still be an obligation to a third party claimant. That's a legal issue, and--and I don't know what the law is on that, not my job.

Q Okay. So as far as the--the February 26 of 2021, that initial denial, you're not contending that damaged Mr. Walden in any way; right?

A Well, that--but it certainly didn't affect their--their continued--to their credit I might add, it didn't affect the fact they kept the file open, to my knowledge. I think--I don't--there were the previous closure note that may have taken place. I'd have to look at the timeline on that to determine when that was. But I don't think closing the file would have been a smart move at any time.

Q Okay. So they--you know, they

Page 155

kept investigating, they continued to do that. Then they issued this ROR letter in October of 2021. You're not contending that that damaged Mr. Walden, did you, that the actions they took here damaged him in some way?

A Well, I don't think I could look at any specific one event and say there's damage to him. I think you have to look at the whole case, you know. And you have to look at--

Q Well, I--

A --everything that was done and just nitpick--you know, or centering on this issue or that item, this--you know, did it or not. Did it contribute? I don't--you can't tell from the file notes.

I know they--they can--you know, continued doing to investigate to some extent, but there are long gaps for that. And again it goes back to why didn't they hire a private investigator at this point in time. They could have done it, but they didn't.

Q So--

Page 156

A And they could have found the driver, and they didn't. So you look--you've got to look at everything. I can't zero in on just one item at a time.

Q Well, so I--I guess my question would be then: Are you contending that the February of 2021 denial letter and this October 2021 reservation of rights letter, that that's part of the total circumstances that damaged Mr. Walden in this case?

A That would be for the jury to decide, but I think that's a possibility on their part.

Q Okay. How do you pinpoint those two things as part of the calculus?

A Well, again this will be for the jury to decide because you can't tell from the file notes, but the more--the more you want a--an insurance company wants to dig in its heels on--on coverage the less they're potentially willing to spend on outside expenses. It's going to have a direct impact on whether they want to spend the money to hire an accident reconstructionist. It's going to have a direct impact on whether they

want to hire a private investigator.
And they also have a direct impact on whether they want to hire or spend the money for an independent medical exam. So depending on how serious an insurance company is about enforcing their po--coverage rights was--is going to determine how much they're willing to spend to look at the underly--to look at the claim. And again, that will be for the jury to decide whether or not that had any influence on--on the--on what I consider to be denies.
Q So you're certainly not going to offer any opinions or testimonies as to the motives of doing that; right?
A All I can do is raise the issue like I just did.
Q Okay.
A And I will do that.
Q So tell me, are you familiar with any Kentucky case law that talks about mere delay in payment doesn't constitute outrageous conduct?
A I am not familiar with that. And I wouldn't research it to begin with. That's



a legal question for you and cou--and opposing counsel to deal with.
Q Okay.
A I can only deal with whether or not I consider the thing--the standard of care issues. And that's what I'm testifying to. They did not live up to the standard of care as far as I'm concerned. And beyond that I think are legal issues that you--
Q Okay.
A --you two will--can deal with or how you want to address the jury.
Q So I want to ask you: The--the ROR, you talk about stripping--stripping them of coverage, NICO stripping the insured of coverage and--and threatening to strip them of coverage. They're just quoting the policy language there, and I mean, that's what an ROR letter does; right? I mean--
A Yes. It also reserves rights to deny coverage.
Q Okay. And certainly it's not inappropriate to send an ROR letter when you're having trouble with an insured who's not cooperating under the terms of the



policy; right?
A Well, I think I already answered that. I--again, I'm really risk adverse to reservation of rights. If you're not going to enforce them, why issue the reservation?
Q Okay. But certainly here NICO is not handling a case--they're not exhibiting bad claim handling by issuing a reservation of rights. These are standard in the industry, this is something that lots of insurers do when folks are not cooperating with the policy?
A Well, that--I think I've also addressed earlier when I said it also could be a reason why they didn't want to expend the money for accident reconstructionists and a--a private investigator, because they're reserving their rights. And maybe the--and again, it's--it's speculative as to whether or not that influence, the timing of when they were willing to spend the money to find their--the driver as well as hiring Mr. Crum and spending that kind of money.
So it goes to how serious you want to be on enforcing your reservation of rights.



Why spend additional money if you're going to enforce it? And eventually, they obviously changed their mind.
Q Okay.
A So I don't know if I agree with your conclusion.
Q Okay. So this is going to go--your calculus for their breach of the standard of care, you would attribute this to their having a potential motive then?
A Well, I certainly think it's--certain it's going to be brought up on direct testimony. And ultimately, it's going to be up to the jury to decide all these things.
Q Okay. So you're mentioning some things in here about the communications that NICO had with their insured. And you're doing that on page 22 and 23 and talking about not communicating the reservation of rights and things like that. But this isn't Enterprise's first party claim; right?
This is Mr. Walden's third party claim. So how did anything about the correspondence with Enterprise have anything

to do with the claim as far as damaging Mr. Walden, the bad faith claim here?
A I don't understand the question.
Q So my--my question is: You're talking about--here in paragraph 22 and 23, there's no documentation that NICO ever communicated the policy limits. And we've talked about it wasn't a policy limits demand. And despite having issued the reservation of rights, keeping an insured business entity completely in the dark about a massive policy limits demand while threatening to abandon them violates basic industry standards of care and makes a central element of a bad faith narrative. So I--my question is: You understand this is Mr. Walden's third party claim and not Enterprise's claim; right?
A That's correct. But it affects your coverage and--and limits and availability for any additional coverage should there be another accident at that point in time. I think communication with an insured as to what the--what the position is of the company is--is important even if for



no other reason just to keep them informed on what the impact may be. You--you just don't want to keep your policyholder in the dark.
Q Okay. So how did that damage Mr. Walden in this case?
A My--I think again it just shows a potential for another standard of--issue of standard of care. It doesn't directly affect him, it's just whether or not the insurance company is treating its insured properly. If they're not going to treat their insured properly, they may not treat a third party claimant properly or--or live up to the standard of care. I think that was--that was the purpose of that.
Q Okay. So I'm going to direct you to some other things that you mentioned here. I know there was some language in your expert report about weaponizing the insured driver and the--the inability to find the insured driver. And I think we've walked off of that in the rebuttal, which we'll talk about in a little while.
But there's a couple of other things in your initial report that I would like to



ask about. And you mention that the foregoing may not necessarily constitute all of your opinions. Do you have any other opinions as we sit here today that are not quantified and--or that are not characterized in your initial report or your rebuttal report?
A Well, I think between the two I think I've covered some bases, including the--the items that my rebuttal report also, you know, retracted somewhat.
Q Okay.
A Toned it down. As I mentioned, there are some--one of the things I have been very critical about experts as well is when they do use inflammatory language. And--and then I--I did retract that, and--in my rebuttal, and this is one of them. It should not have been that inflammatory.
But like I said, it was late at night and I was tired. And so, you know, counsel did approve it, so what can I say. I--I don't think that was appropriate to use that kind of inflammatory language. But on--on the same token, I don't--I'm not changing a



lot of my other opinions with respect to the standard of care, either.
MR. BUNNELL: Okay. So I want to ask you about the Complaint in this case. And I think this is 12 (sic).
(WHEREUPON, EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO
Q Did you review the--the Complaint in this case, Mr. Fisher?
A Well, if I had it, I did.
Q Okay. Does this look unfamiliar to you?
A What would look familiar to me is for me to find it in my file is what I want.
Q Okay.
A Carving out a little paragraph is like, I don't have it memorized.
Q Okay.
A Let's see. Documents to review.
Q Well, just in the interest of time here, I--you don't disagree with me that this is a copy of the Complaint that was filed in this case and the entirety of the bad faith Unfair Claims Settlement Practices Act's allegations that were against NICO?

Page 165

A I am not in the position where I can answer that question without actually seeing the entire document, not just a--
Q Okay.
A --section of it. I'm sorry. I hate to be technical on that, but I'd rather find the place--
Q No, that's okay. But for the interest of time, please keep looking. But I do want to ask you some--some specific questions here about paragraph 44 and this--the various subsections of the Unfair Claims Settlement Practices Act that are listed here; okay?
A Sure.
Q So Number 3 is failing to--KRS 304.12-230(3) is failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurance policies. What reasonable standards can you point to that NICO failed to adopt here?
A Well, I have--if you're talking about their internal standards, I have not seen a copy of their--their--their internal

Page 166

claims procedure manual or--if they have one.
Q I'm talking--
A So I can't comment on that.
Q Okay.
A Other than what I've already testified to and put in my reports where I think they--they didn't live up to the standard of care. So I--without knowing what their claim manual requires of them internally and not having seen it, I can't comment on that. I can only comment on the facts that I've seen and whether it was consistent with or inconsistent with the standard of care.
Q Okay. So for this provision here, as far as reasonable standards, you're not--are you opining that the--the testimony you've given earlier--so the things that you were talking about in the totality, retaining Mr. Crum earlier, trying to locate the insured through a private investigator earlier, and some of those other things, is that the extent of the reasonable standards that you think NICO didn't--failed to implement for a proper investigation?

Page 167

A Well, I think--overall, I think they could have been a little more aggressive in developing all the facts to the extent they could, and they should have done it earlier. And, you know, so that certainly affects the retention of Mr. Crum, it certainly affects the--the independent--you know, I mean, the investigator that tracked down their insured. I think they could have handled that much earlier, and the reserves would have been set more accurately, and they would have been in a better position to decide how they--best to close the file.
I think you have to look at it from the totality standpoint. So there--there may be other factual issues as well, and I'm sure we'll get into it when we go over my rebuttal report, but I think those are the major items. You know, there--there were--for instance, there was some internal mistakes where, you know, Kim Hodgkin and--mislabeled the name of the insured driver, and there's a question of whether or not the insured driver had a passenger or not.
Tho--those are all minor things to me.

Page 168

You know, and I don't want to be nitpicky. But when--what they're talking about here is a more global question, and I think that's something that, you know, counsel is going to have to deal with at trial. All I know is that I've pointed out what I--where I think they dropped the ball. And other than that, I stand on that.
Q Okay. And--and that's--your testimony is their lack of being aggressive is a violation of the standard of care. That's your--
A I believe it is.
Q Okay. Now, Subsection 4 talks about refusing to play--pay claims without conducting a reasonable investigation based on all available information. Can you explain to me how NICO didn't do that here?
A Well, I think we just did in your--
Q Okay.
A --previous question. It's a--it's a lack of a very aggressive--I would have done an aggressive investigation, I would want to get as many facts as possible and as

Page 169

quickly as possible. And that way you can make more reas--more supportive decisions earlier. And I think that's exactly what that addresses.
Q So there's other ways to handle claims in good faith then. Are--you would agree with me that, you know, their attempts here certainly do evidence that they're trying to ha--that they're trying to make contact with their insured, they're trying to make these determinations.
So that's just a matter of--of your opinion here; it's not a matter of--to your point earlier, this is something a jury would have to decide; right? You're saying--
A All--
Q --it's a violation because you would have handled this claim differently?
A I think the--but I think the Code requires that, to investigate and develop a claim. And, you know, that--I don't want to appear nitpicky, but, you know, they're supposed to be issuing letters every 45 days notifying the claimant or--or counsel that, you know, their--their investigation is

Page 170

continuing. And they didn't do that.
But, you know, that to me is important, but it--it's still--you know, I don't want to be too nitpicky here. I'm looking at it from a total picture--
Q Sure.
A --and see what was done and what was not done and--and ultimately what was concluded and when it was concluded. And--and I think all things considered, they could have developed this claim faster, they could have had it resolved faster, and they didn't do it. Now, other--other than that, why they didn't do it is ultimately going to be, you know, a jury question. Just like the reservation of rights letter. I've seen insurance companies, you know, they issue a re--reservation of rights, I've seen situations where they--not enforcing it, and then they stop investigating at all. And I--
Q So--
A And one other thing, too, letting counsel develop the facts of the case through discovery to me is a less--less than accurate way of doing it.

Page 171

Q So the extent of your testimony is going to be as to what you perceive to be violations. You're not going to opine about the motive or whether this conduct was outrageous of anything like that. You're drawing the line at saying, it is your opinion that they should have been more aggressive and they should have done things quicker?
A Yes. And I think that would have ended up in a different result, and I believe we wouldn't be here today if that had been the case.
Q Okay. So I want to ask you about Number 6, pro--Subsection 6 here is not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims when liability has become reasonably clear. I still am trying to figure out, Mr. Fisher, in your mind, when did liability become reasonably clear here? Or did it?
A I'm not sure that it did, but on the same token that's not what goes into--that's not always a--what goes into settlement discussions, settlement de--

Page 172

decisions and resolution. From that perspective, seasoned adjustors and seasoned claim dep--claims departments, they've been doing this for a long time, and if they can't see that this is a potentially dangerous case, then I think that--that in and of itself is wrong. And if they had developed the claims faster, we wouldn't be here.
Q Okay.
A No question about it. That I'm--I'm absolutely convinced of. If they had known about some of the situations that came up later through Mr. Crum's investigation or what could have been discussed as well as with the driver, we wouldn't be here today. I think they would have settled the case much earlier and we--we'd all be happy.
Q And--and I understand that that's your position. I--I'm--and I'm not trying to play semantics. But under Subsection 6 it says, not attempting in good faith to effectuate the prompt, fair, and equitable settlement of the claim in which liability has become reasonably clear.

Page 173

A Uh-huh, (affirmative).
Q Okay? I'm focusing on reasonably clear here. So if you and I as we sit here today are not sure that it did become reasonably clear, how could NICO have violated Subsection 6?
A Well, again, we don't know what they didn't get. That's the problem. And I think there were enough questions of fact in this case that I think they certainly would have resolved this earlier. And it--and so that's the same answer that I just gave.
Q Okay. So I--I'm not sure how we can--I feel like we're at a little bit of an impasse here on--on this, because I'm trying to understand, if liability is not reasonably clear, then how--how could NICO have not attempted in good faith to effectuate a prompt, fair, and equitable settlement?
A Well, because again it goes to the fact that that truck was not off the road.
Q But that doesn't make--
A And that to me is--is a major factor here.
Q Okay.

Page 174

A And--as--as well as the warning lights and everything else. And everything--and--and the behavior, of course, you know, of not cooperating, I don't know how the jury is going to react to that. I don't think--I think there's a lot here that really raises serious questions and--of liability. And both at the accident scene itself and post accident.
Q So you don't think it has to be a predicate here in order to violate the Unfair Claims Settlement Practices Act, you don't think a predicate to this--this subsection is that liability has to be reasonably clear?
A Well, there's no question that's what it says.
Q Oh, okay. So--
A We've all--we've all seen cases where that reasonably clear language, liability become reasonably clear, we've all seen cases blow up over that issue.
Q Okay.
A Right or wrong.
Q Okay. But you're not offering an opinion as to when liability became

Page 175

reasonably clear here or if it did?
A I'm only raising issues of--of--of--regarding standard of care. And I've done that.
Q Okay. Subsection 7 talks about compelling insureds to institute litigations to recover amounts due under the insurance policy by offering substantially less than the amounts ultimately recovered. How did NICO compel the insureds to institute litigation here? And you may want to punt on this one, because I think you walked this one back in your rebuttal report.
A No, that--we'll get to that. But one of the--one of the things that I may have failed to mention, too, was that when you've got a statute of limitations up again--you're running up against and you haven't got a reasonable offer, then you--then either you file a lawsuit or you don't. And I guess--that's part of the--that's another reality you have to face.
Q So do you feel like in this case that NICO compelled Mr. Walden to institute litigation here?

Page 176

A Well, that was the only way they were going to get their attention. I think--and that they didn't file a lawsuit on time, then they would have waived their right completely.
Q Did--I think we discussed your reading Mr. Walden's bad faith deposition back on December 15th of 2023; right?
A Whose deposition?
Q Mr. Walden's.
A Yeah, I'm sure I saw one of them.
Q Okay.
A Yeah, I saw them both. I take that back. Yes.
MR. BUNNELL: And I think this is 13 (sic).
(WHEREUPON, EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q I want to ask you specifically about some language in Mr. Walden's deposition. So you wouldn't disagree here--and I'll--I'll give you--to--to look at this. And I can blow it up just a little bit. Tell me when you're ready for me to scroll.

A I can see it. Okay.
Q So--so this is a line of questioning about when Mr. Walden retained counsel, and the engagement letter was dated 8/17 of 2020, which was just a few days after the accident.
A Yes, that's what it says.
Q Okay. So certainly that was before a letter of representation or anything was--before any communication happened with NICO in this case. You don't disagree with that; do you?
A No, I don't disagree with that.
Q Okay. So how did they compel Mr. Walden to retain an attorney and file a lawsuit?
A Well, com--it wouldn't have compelled him to hire a lawyer, but the filing of the lawsuit would--would certainly be necessary if they're not going to--if there's no offer of settlement and you've got a statute of limitations to worry about. You have no choice.
Q Okay. And the last provision that I wanted to ask you about that was mentioned



in the Complaint is Subsection 14, failing to properly provide a reasonable explanation of the basis in the insurance policy in relation to the fact or applicable law for denial of a claim or for an offer of a compromised settlement. Do you think NICO violated Subsection 14 of the Unfair Claims Settlement Practices Act?
A I don't know that I saw any significant communications that were consistent with that. I don't recall that.
Q Okay. Con--consistent with?
A What was required.
Q Okay. So it--you wouldn't--
A Show--show me--show me where they did, where they communicated that to counsel, Plaintiff's counsel. I don't remember seeing that.
Q Okay. So do you--you don't disagree with me that the first demand, though, was January of 2023; right?
A That's correct. But, you know, that doesn't absolve the--just because you haven't received a demand doesn't mean you can't make an offer.



Q Okay. So you think they should have made an offer here then?
A I don't see why not.
Q Okay. So tell me, you reviewed Ms. Sullivan's report; correct? And that's--that was the basis for your rebuttal report?
A That's correct.
Q Okay. So I'm going to pull up your rebuttal report now. And just a few quick questions on this. First of all, you're not arguing anything about Ms. Sullivan's experience or qualifications or anything like that; right?
A No, not at all.
Q So you reviewed--did you review all of the things that Ms. Sullivan cited and relied upon in her report?
A Yes.
Q Okay. And you felt the need to--to author this rebuttal report. Were you asked to do that, or did you do this on your own volition?
A I think I asked him if he wanted a rebuttal report. I'm sure I did, because



I--that would be the--that--that is quite common in cases to--to issue a rebuttal.
Q Okay. Okay. So I want to ask about the--let's see, the January--I want to go through your corrections and clarifications to your original report; okay? And this starts--
A Sure.
Q --on page 3. So the first thing I--I want to ask you about is this January 2023 demand Heading A here. We talked about this a little bit earlier, but just to make sure I'm clear--and--and it gets into this in B a little bit, you're not disputing that Defense--underlying Defense Counsel acknowledged the demand and requested additional information on February 2nd and February 21st and March 8th; right?
A It says what it says.
Q Right. And that's in the claim--claim file. You're not disputing that. So we discussed earlier in that January 2023 demand that there were some things about Mr.--Dr. Wilson and future treatment and things like that. Do you

recall that, Mr. Fisher?
A I being aware of it or--or our earlier testimony today?
Q Our earlier conversation today, do you recall us discussing Dr. Wilson and the mention in the January 13th, 2023 demand about Mr. Walden's allegations that he would need future medical treatment?
A Well, I don't remember the exact question, nor my exact answer. But I remember when they had it come up.
Q Do you recall us talking about that earlier, even--
A I think so.
Q Okay. So you don't hold NICO at fa--you know, you don't have any issue with them having investigated those claims for future treatment or anything like that and being able to look into that, right, to ascertain whether those were causally related?
A No, they certainly should be doing that, I would expect that.
Q Okay.
A Of--in and of itself, I don't have



a problem with that.
Q Okay. So your--your issue here with the demand, in your words here is, it remained a substantial post suit demand requiring appropriate acknowledgment, evaluation, documentation, and a reasoned response.
A Yes, I agree with that.
Q Okay. Please tell me how NICO didn't perform an appropriate acknowledgment, evaluation, documentation, and a reasoned response here.
A I don't remember exactly what their response was, but I remember at the time that my reaction to it was that I thought it was inadequate, and that's why I said that.
Q Okay. So your reaction to it was inadequate, so you think this violates the standard of care?
A That, and plus, you know, the--the question of liability and--and the fact that so many things had been missed and--and couldn't--you know, were--were very iffy, you know. Such as, you know, we've already--I



don't want to repeat myself, we've already covered a lot of that.
Q Okay. Had things been missed, or were things being developed and the investigation continued?
A A little of both. But if you want to deal with that again, I--I'll just tell you that the things that they were trying to develop should have been and could have been done earlier.
Q Okay.
A And--and as--and as we know, there was a lot of stuff even Mr. Crum couldn't accurately state because of how late his retention was in relation to the date of the loss. And I think that's where things fall apart. I--I don't know how many times I have to say it, the faster you develop the facts and the evidence, the--the quicker you're going to resolve a claim file. And that's what insurance companies are supposed to be doing.
Q But--but--
A And it's that simple.
Q --doesn't necessarily mean good



faith claim handling. Those are not synonymous things; are they, Mr. Fisher?
A I don't know that I agree with that if you get--I mean, you get too specific, that could very well have an impact on good faith. I mean, it--you are supposed to ca--investigate cases promptly, you are supposed to make reasonable offers of settlement promptly when--when--even in iffy cases you want to do that. And--and on top of it it's just good practices anyway for reserve setting and actuarial analysis and everything else.
Q Okay.
A And all--you know, the claim department is a profit center, and the faster they close the file the cheaper it's going to be.
Q Okay. So as far as your corrections here to your January 2023 demand, you agree with the things about it not being time sensitive and it not being a policy demand. But your opinion as far as you were talking about earlier as far as this universe of things that you allege that NICO violated

under the standard of care, one of those things is still that you feel like the--the demand, the post suit demand was not appropriately acknowledged, evaluated, documented, and--and reasoned?

A That's correct. And, you know, again, most of the corrections that I've made is because I thought I was being a little bit more inflammatory than I would normally allow from an opposing expert, let alone myself. So--

Q But--

A So I did tone down the language significantly, as you can see.

Q So tell me, the evaluation and the documentation, I mean, you reviewed in the claim notes where a claims committee was convened, where an offer was made. You don't think that those things are good enough then?

A I don't agree with the conclusions reached. I think the fact that they had a claims committee looking at this was--is actually quite laudable, because I--you--claims committees usually don't get involved in small claims. They're looking at



a potential--you know, they're--the claims committee usually gets involved in--in complex or high exposure potentials.

And you're not going to--you're not going to have a claims committee necessarily review something that's worth 25,000. But you are going to have a claims committee when you start approaching six figures and--and above. And so I give them credit for that.

There's a--don't get me wrong, there were certain things that were done here that, you know, think were quite correct. And I've said that in my rebuttal report. But on the same token, do I agree with some of the decisions made? No, I don't.

And I think they could--a lot of decisions were certainly influenced by some of the--lack of proper and rapid claim development that could have been done earlier. And I don't know how many times I can say it, this--we would not be here today had that been done and the case--and a reasonable offer of settlement could have been reached much earlier, and we wouldn't be here today. That simple.



Q Isn't that the case for most cases, though?

A Not necessarily. No, I don't agree with that.

Q Okay. Why? Tell me why.

A Well, I can give you examples if you'd like.

Q Sure.

A I was involved in a case where there was so much finger pointing going on behind the scenes, there was no way you were going to get a settlement on that in a--in a situation like that. And everybody was saying, we want a global settlement, we want a global settlement.

Well, in a situation like that, take out the plaintiff, stop the bleeding. Everybody agreed to cough up, you know, money po--on an equal basis with no waiver of any rights, and then you could mediate the difference later. Just get the plaintiff out of the case. And they wouldn't do it. And now, you know, this thing is going to go to trial on a bad faith case report for--I'm on--to me I'm--I'm dealing with the



reserving, so they have another expert for the ex--for the bad faith situation.

And that's not the only one. I was involved in another case where two insurance brokers were pointing their fingers at each other, even the judge was telling them, you can't win this case. But they wouldn't take the plaintiff out. They--they just wouldn't settle with the plaintiff and then mediate--they would have saved $3 million had they done that.

And the same--I--I've been involved as an expert on many cases like that. Get rid of the plaintiff if you can, and then you can mediate or whatever you need to do, you know, separately. And even in the situation where you have an uncooperative insured you can, you know, take the plaintiff out without waiving any rights, stop the bleeding, and then mediate with--with your own policyholder whether there's coverage or not. Especially if--if they're able to afford it.

Now, in this case, I don't know that that was possible here. I think she's--the woman who owned this trucking company was

Page 189

probably not--you know, not a--making a lot of money out of that. I have no way of knowing one way or the other, but it certainly wasn't a major company.

But I think I've answered your questions. There are times in which you definitely want to take the plaintiff out of the case and resolve other defenses later.

Q Okay. So tell me, you were backing off of this idea that NICO abandoned the--and completely ignored this file; is that fair to say?

A Where are you looking? What page?

Q B, page 3.

A I'm sorry?

Q B. Oh, I'm sorry. Do I need to show my screen here?

A I've got it. All right. The--the phrase zero value--yeah. I'm backing off on some of what I consider to be strong language. I don't think that was called for.

Q Okay.

A The overall conclusion is another matter, but I think I was being a little more inflammatory originally, and--and I--and

Page 190

I--and I've corrected it.

Q Okay.

A It--it violates my own standards. Yeah, I was--yeah, I was very embarrassed by it when I realized what--some of the stuff that I had said. I was like, oh, God.

Q Okay.

A And so I'm--I'm agreeing to that extent. I think it was inflammatory language, and it was not called for.

Q Okay.

A I don't like--I don't appreciate it from other experts, and I--I'm embarrassed that I did it myself.

Q So--so we've taken off the--the idea that, you know, they did nothing, which you concede they did. But your issue is that the--the actual evaluative activity they did. Not that they were evaluating the claim, you just don't agree with how they evaluated it?

A Yeah. I think it was incomplete, and I--if--I think, depending on the point in time we're talking, had they done the proper investigation earlier I think they would have a--been in a much better position to more

Page 191

accurately assess the exposure, potential jury verdict issues, and settle the case, which is their job. That's what claim departments do, they pay covered losses, period. That's the product.

Q So you--you go on to say that the materials supplied don't show a clear--a timely, clear documented claim department valuation, comparative fault analysis, settlement range, or negotiation strategy during important periods. What--what are those important periods?

A Every--well, number one, the initial investigation would certainly be important. The decisions to--to obtain experts or assistance from outsiders is something you would want to do early on. The conclusions you--you would reach or you were reaching, they certainly changed their mind on some of it.

Otherwise, it wouldn't have, you know, ended up resolving the case when they did. They could have done all that earlier. How many times do I have to say it? This was--this case really did not take--should

Page 192

not have taken three or four years to develop and--and--and start resolving.

That's the problem. I have a real problem with that. And having been a claim adjustor, I certainly understand the value of rapid claim development, because it impacts so much more than just closing a claim file.

It impacts reserving, it re--you know, and on and on and on, which is a whole--the whole point of the return on investment in investing in your claim department. To be honest with you that's a--that whole thing that I mentioned earlier, all these webinars we're doing on this subject is a career ender for me as far as I'm concerned. My goodness, I can't believe the--the audits I did back in--in 1990s have--have caused such a stir, and rightfully so.

Q Well, you mentioned changing--changing their mind, NICO changing their mind. But, you know, isn't it fair to say that when insurance companies investigate and they continue to investigate that they do find new facts and develop the case further. And that's certainly not bad faith to

Page 193

continue to investigate and figure these things out. Your issue--

A I'd agree with it if--if they had done it quicker. That's my problem in this case. How many times do I have to say it? What they did by keeping the file open and con--and--and, you know, getting around to it, you know, when they, you know, could or whatever, I don't know the reasons for it. I don't understand why some of this stuff wasn't done earlier.

And how many times do I have to say it? If they had done that and--and maintained the kind of level they were using with the claim committee, I doubt we'd be here today. We would not be talking today.

And I'm all about--like how many times do I have to say it--avoiding this kind of stuff? 90 percent of every article, every presentation I ever made 90 percent is focused on two things, how to avoid litigation, and what you need to know to be able to accomplish number one. I am anti-litigation period.

Q So--

Page 194

A I've been in the industry for 50 years. Believe me, I know the stress and trauma that litigation causes.

Q So your--your refined statement here, your--what you would call your narrower and supportable opinion, tell me how that damaged Mr. Walden in this case.

A I answered that question. And I--same answer I've been giving all morning long.

Q And--and, Mr.--

A And there's no change on that.

Q I--I--I appreciate that, but this is an opinion that you refined, and this is an opinion where you are--are making a statement, and I'm entitled to ask you the basis for that.

A Right. I understand. Like I said, it's the same answer, earlier claim development should have been done, earlier investigation should have been done, they should have brought in the experts earlier and they would have been in a better position to assess, you know, what have been--what would have been a reasonable offer of

Page 195

settlement. And they did not do that.

And--and if you go further down, you'll--you will see some of the specifics on this. You know, especially the warning triangles and the vehicle lighting and everything else were never known. They can't answer that question, because Crum got involved too late.

Q So let's move ahead to reserves; okay? And let's talk about reserving. I think that we've clarified that and it's no longer an issue, because you agree that reserves are not treated as a confession of liability. Now, I do want to ask you, this statement here about reserving an internal exposure reserve to 150,000 while maintaining a $0 external offer without documenting the connecting rationale remains a claim handling inconsistency.

That doesn't mean bad faith; right? That's not a violation of the Unfair Claims Settlement Practices Act?

A Well, if I don't have the rationale, I can't really answer the question as to what the rationale was for that. So I

Page 196

can't answer that because that's an unknown factor. I don't know what the rationale was. That's the problem.

Q So does this--

A Why would you put up $150,000 and not want to offer anything? That--that didn't make sense to me. And eventually, they--they increased the reserves and--and--now, whether the tie between what you're offering versus what the reserve is being evidence of bad faith depends on the additional facts and circumstances, which I can't determine.

Q So--

A It's possible.

Q Okay. I--I'm--I'm--I guess I'm having a little bit of trouble understanding that you're elevating what you are classifying as a claim handling consistency after saying that a reserve is not a concession of liability or a mandatory settlement amount. You're saying, well, wait, but there's not a connecting rationale, so this--this is bad faith claim handling?

A I didn't say that. I said I can't

Page 197

determine that because I don't know what the rationale was.
Q So does this have any bearing at all on your opinions?
A The lack of a rationale?
Q Right, because you can't connect the dots one way or another.
A Well, that's correct. So tell me what the rationale was for not--for having a--a six figure reserve and offering nothing. Then we can have that--then I--then we can have a--we can have a real conversation on it.
But I don't know what the rationale is. And I--it's--and that would be pure speculation. I just--I just don't understand it. But I also didn't want to draw a conclusion that I--you know, that's not supportable.
Q Okay. And similarly, I'll ask you, this idea about connecting a rationale and this external zero offer while maintaining the internal exposure reserve at 150, how do you think that that damaged Mr. Walden?

Page 198

A Without the rationale, I can't.
Q Okay.
A That's the whole point.
Q Okay.
A Now, bear in mind, too, that that 150,000 reserve was--it's my understanding or my impression that that was loss only. I don't know what the expense reserves were on this file.
Q Okay. So you've withdrawn your word weaponizing any inference of a motive. And I think we've talked about this here, but I do want to be clear, that you're--you're not opining that NICO had any sort of particular motive here?
A I have no--
Q And that--
A --evidence to support what that motive would be.
Q Okay. So--and I bel--
A I'll give an ex--I'll--I'll give you an example of one, though. NICO is a Class 15 insurance company, which means they have tremendous capital surplus. I'm involved in another case where the question

Page 199

is whether or not they kept the reserves low because they were a Class 10 company, and putting up a--a $6 million reserve could impair capital surplus significantly at a time when their rating with--was going down.
But on the same token, I can't draw that conclusion because there's no board minute that's saying, let's keep our reserves low. But then you're never going to see a board coming up with that decision. So, you know, I--I can't--I can't tie it, and--and so this is the same kind of issue.
Why would you put up a six figure reserve for loss and offer nothing? That--I don't have the rationale. But it is a concern. But I did withdraw what I consider to be unprofess--well, I won't use that phrase. What I consider to be overly inflammatory language. I've corrected that.
Q And you mentioned earlier that you don't review case law as part of your determination here typically, you do it more for educational purposes?
A I do it for educational purpose, and then, of course, that's going to--that

Page 200

could certainly affect me, but I don't cite cases, and I--and--and the only statutes I'm going to cite are things that I was required to know anyway.
Q Okay. And so certainly you don't have any reason to disagree with me that under Kentucky law in order to sustain a bad faith claim you have to show outrageous conduct?
A If that's the law, I'm not going to question it. That's between you and counsel.
Q So as part of your opinions here, you're not pointing to any sort of conduct that is outrageous, you're not making any--any sort of opinions or offering any sort of testimony that NICO exhibited such conduct here?
A That--that I--misstates what I testified to earlier. That's not for me to decide, that's for the jury to decide. They make--they can ea--they may decide what the conduct was outrageous. That's for them to do.
Q Okay.

A They're--I think--I don't decide questions of fact.
Q Okay. But you're certainly not saying here that no reasonable insurer could have engaged in such conduct or handled the claim like NICO did? And it's about--
A Oh, I'm not going--I'm not going to go that far, I've already told you why I think that NICO didn't live up to the standard of care, and I'll stand on those reasons that I've already testified to.
Q Okay. So when you say, I do not opine that anyone acted from a particular motive here, explain what that means to me. Just that it's a jury question and you're not going to opine about any particular motive? Is it as simple as that?
A Yes, it is. I don't--I--I will not decide questions of fact.
Q Okay. And you don't decide questions of law, either; right? If the law is--
A That's for sure.
Q Well--
A That's for sure. Although I don't



know that saying that somebody lived up to or didn't live up to the standard of care, I think that's allowable.
Q Okay. Okay. So warning triangles and vehicle lights. And--and we've talked about this a little bit. But I do want to ask: You talk about it being a--on page 5, the top of page 5 you talk about it being a sustainable point here and that it was material, the spacing issue was material.
How was it any more material than Officer Curry's testimony about the place being lit up at the football--like a football field, or the fact that the headlights of the truck were or were not on or anything like that? Again, how is that spacing of these triangles more material than any other disputed facts here?
A Because they're mandated to--because there--there are regulations that mandate how they're to be used. And a violation of that could give rise to liability as well, or--or contribute to liability. That's why.
MR. BUNNELL: So let me ask you



this--and I'll--I'll mark this as Exhibit 13 (sic).
(WHEREUPON, EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION AND ATTACHED HERETO)
Q And this is a photo of the--the tru--this is from Mr. Crum's report. But you don't disagree with me, this is a photo that was taken after the accident; right?
A It's my understanding.
Q Okay. So this is a photo showing those warning triangles, which we're--we're in agreement that those--they were out?
A Yeah, we just don't know where they were placed.
Q So how would we ever have known where they were placed? Because obviously, you know, Mr. Walden had this accident and drove over them. So how--how would we have ever known where those reflective triangles were placed when the accident occurred?
A Oh, well, the--if they had gotten a hold of the driver much earlier, then he might have had a better memory of how he placed them. He couldn't even remember what the spacing requirements were, if I recall.



Q You know, you took your driver's license test; right?
A Yeah.
Q Okay.
A Sure did.
Q Yeah. Yeah, I--so now I know that they--you know, they can start getting these learner's permits at 15 or something now, it's all crazy. But how far are you supposed to follow behind an ambulance?
A A hundred feet.
Q Okay. Your memory is better than mine. I don't remember that. I mean, I know that it's part of my driver's test. Would you expect this driver to have down to the centimeter walked off 100 feet then?
A I--I think I mentioned that earlier. That's what he's supposed to do is count it. But, you know--and he couldn't remember one way or the other. And--and he couldn't remember the distances. I think that's important. Now, is somebody going to be out there with a tape measure and say, oh, gee, this is 99 feet instead of 100?
I--I don't have--I have a problem with

Page 205

that. I--close enough is close enough, because I don't know anybody that could be that exact. But he couldn't remember anything about it.
And the fact that, you know, yeah, they were driven over. But I think if he had been contacted earlier, I think he would have been--had a better memory of--of what he did and what the rules were. And if I recall from his deposition, he couldn't remember whether it was 10, 100, and 200 or not. He--I think he waivered on that.
And, you know, I--that's what happens after, you know, a few years. But if you're, you know, fresh and, you know, you're trained and you're familiar with the regulations, then your memory is going to be a lot more accurate, you know, if he had been contacted earlier. And that was something that they failed to do. So--
Q Sure. And--
A You look at all these different things, and--and I'm looking at the big picture.
Q So let--let me--and--and again,

Page 206

I--I know you're not an accident reconstructionist, and you're not claiming to be. I know that's--that's not your wheelhouse here. But I am trying to figure out, as far as liability goes here and the materiality of these cones, I mean, if the area was well lit and Mr. Walden--you know, if a jury found him to be inattentive, it wouldn't have mattered whether they were 500 feet out or 5 feet out. A jury might have disregarded this. So this--this is not the end all be all as far as a liability determination; right?
MR. MORRIN: Ob--objection--
A Well, I'm not--
MR. MORRIN: --to speculation on that. But go ahead and answer.
A Yeah. I--I'd have to speculate on that, and I--I'm not willing--I--I think that would be inappropriate for me to comment on that. As a side note, though, my--I failed to mention this. I don't know, maybe this is a good time to bring it up.
As claim auditors, one of the audits we did for AIG was to do a claim audit of the

Page 207

trucking division for an insurance company for the State of Pennsylvania. And that audit was done in 1987. And shall we say significant changes were made as a re--as to the claim handling done by American International Adjusting Company.
Matter of fact, our audit report was si--I'm told was distributed to all the divisional presidents of AIG at their annual retreat in the Poconos. So just so you know, on--from a voir dire standpoint, you never--I--there wasn't a question I could answer so I'm going to volunteer it now. We audited about 800 claim files over the course of a weekend for the AIG trucking division. And these kind of issues were raised even then.
Q But this is just one of the many questions that were persistent about liability in this case. It doesn't weigh any more than the other questions that we knew like from Officer Curry's testimony about the place being lit up like a football field; right?
A Well, that's why you take a look

Page 208

at the entire case, not just one fact here or one fact there. And, yes, they say it was lit up like a football field, but the truck was still out--was not fully off the road, we don't know where the flashers were, and unfortunately, I can't ex--I don't know what was really going on. I do know that there was a question of fact as to whether or not he was tired. But even if you're tired, it doesn't mean you're nec--not necessarily paying attention.
Q Okay. So I want to go back to your rebuttal report.
A Sure.
Q And I want to talk a little bit more about--we've only got a few things left here, comparative liability and medical causation. And I think we agree that there was a comparative negligence dispute here. I don't think we disagree with that.
So you also go on to say that, I ac--I accept medical causation or covering future treatment were disputed. I do not opine that NICO was required to pay the January 2023 demand, pay policy limits, or accept every

Page 209

future medical claim.
A Yeah. That's because they didn't have enough facts to make a final determination because they hadn't done a proper investigation. I haven't retracted that portion of my original report.
Q Okay. So--but you're not saying that they were certainly acting in bad faith by investigating future medical claims and things like that. And they would have been--
A Well, if you're talking about medical claims, I would agree with you. But like I said, a lot of stuff could have been done earlier and faster. And that's to me the overall point of the case.
Q So--
A Why did it take so long.
Q I'm--I'm sorry if I'm getting confused then. So are you opining that--is it your opinion that--that NICO was required to pay this or not?
A I'm saying they should--they were required to do a full investigation much quicker than they did. They should have developed the claims a lot faster. And my

Page 210

opinion has been and still is, we wouldn't be having this conversation if they had done that.
Q Okay. So you stand by--
A I think that they would have settled this much earlier than they did.
Q Okay.
A I think it all could have been done much earlier.
Q Okay.
A And that's the whole--that's been the--what I've been testifying to all morning.
Q I understand, Mr. Fisher. I appreciate that. So this statement then in your report, you stand by that, you don't believe--I do not opine--you're not offering an opinion--that NICO was required to pay the January 2023 demand, pay policy limits or accept every future medical claim. That is what it says.
A Yes, that's what it says. It does not, however, negate the fact that they could have done a--developed that and developed the medicals much earlier. That I am not

Page 211

withdrawing.
Q But--
A Because to me it's--it's how much they knew and when they knew it. And that's been the overall theme here, especially today. That is not inconsistent with the sentence you just read.
Q Okay. So then, also, we talk about under G here this idea about compelling litigation, you're withdrawing that portion of your opinion?
A Only--well, with the exception of what I've testified to that, you know, as you're coming up against the statute of limitations, you've got no choice.
Q Okay. So you're not completely withdrawing it then. And likewise, we talked a little bit earlier about Subsection 7 of the Unfair Claims Settlement Practices Act. And you mention here that you're not relying on it, but your--your testimony a little bit earlier is that you thought it did come into play or you--you weren't--
A For the reasons just said. You're not going to run--you're not going to--if

Page 212

you're running up against the statute of limitations, you've got no choice.
Q Okay. So I--I guess I'm just--I'm--I'm--I may be confused here. So are you saying then that as a--as part of your opinions you--you are saying that NI--you--it is your opinion NICO violated Subsection 7 of the Unfair Claims Settlement Practices Act and you're not otherwise withdrawing it, or is it just you're saying this caveat that--this very limited caveat that--I--I just need to understand. I'm--I'm having trouble.
A All right. My apologies making--not making that clear. And I'll--I'll try and do my best here. I don't know whether the insurance company was hoping that the statute of limitations would run. There's no evidence to suggest that that I've seen.
But it is a--it is always a problem in any litigation or potential litigation when you're hoping to negotiate a settlement and you can't for whatever reason. And so you have no choice at some point and you're going

to have to file it. Otherwise, insurance company is going to say, well, you blew the statute of limitations, we're closing our file, thank you very much.
You don't want that to happen. You have no choice. Now, whether or not there was any--I have not seen facts to support that that was what the company--the insurance company was doing, but I had no facts either way.
I do know one thing, at some point in time, they had no choice but to file this lawsuit if they were coming up against the statute of limitations. And after that, it's going to be up to the jury to decide what reasons or rationale would be. But, you know, granted, if--a lot of that takes--you know, this--this investigation wasn't even completed until long after the statute of limitations would have run. So there you go.
Q Okay. So ex--I--I need to--I--I just want to be sure that I'm clear here. You've not seen any facts to evidence that that's the case, right, that NICO was trying to run out the clock?



A I have not seen facts to that case. But that doesn't mean that that wasn't a problem in any event, because, you know, I'm sure Mr.--I'm sure Plaintiff's counsel certainly wouldn't want to see the statute, you know, running. He has no choice. He's going to have to consider that.
Q But isn't that just speculative to say that this is one of the possible things and I'm saying that they could have been thinking about this, but I don't have any evidence of that? So that's just wholly unsupported.
A I think I've acknowledged I've seen no evidence that that was what was behind what was happening at the insurance company's claim department. That is accurate, I have not seen anything. But that doesn't mean that the statute of limitations doesn't exist, and that they--and that everybody knows that exists, and certainly Mr. Morrin knows--knows that exists.
And so whether or not that is still a possibility of--of--that they were compelled to file because of the statu--they're up



against the statute of limitations, that is a distinct possibility. What I was referring to in my retraction was--was a litt--a little broader, and maybe I wasn't clear in putting in the--the caveat that except for statute of limitations issues. But it's on the record now.
Q Okay. So although you don't have a basis in the evidence and the claim file that you have reviewed for a violation of Subsection 7, which is compelling insureds to institute litigation to recover amounts due under the insurance policy by offering substantially less. You're saying that it still may be something that you would opine that NICO violated their standard of care because the potential exists that there might have been a statute issue?
A Well, there's no--there's no potential for the statute existing. The statute exists. The lawsuit must be filed before the statute runs. I have not seen any evidence if that was an issue that was considered by the--by the claims people. But then on the same token, I wouldn't expect to



find any note in the file like that.
Q Okay. So let's talk about this statement, and then we'll get into where you agree with Ms. Sullivan. So you state here, in essence, forcing litigation through unreasonable lowballing remains a direct violation of KRS 304.12-230(6). Is it your contention then that there was a lowball settlement offer here?
A I don't know where--I don't know that they ever made an offer until later. So what--I can't recall.
Q I--
A I--I know that--the other thing I do know is they have ultimately settled for $200,000. And the basis--
Q Right.
A --for that I--I don't know what the nature of the ex--of the negotiations were at that point.
Q Okay.
A It's--it's not very clear. So I don't know.
Q Okay. Well--
A I would imagine is their--that may

come up with other witnesses. I really don't know what--what the case claim is on that, nor do I expect to.
Q But as we sit here today, you don't have an opinion as to whether there was any sort of lowball--lowballing in violation of that subsection that forced litigation?
A Well, what I do know, I can't remember that there ever was a really--an offer until that point in time. So that may be troublesome.
Q Okay. So--and you acknowledge--you remember there was a $100,000 offer made in--in this case in response to the January 2023 demand? Do you recall that from the claim notes?
A Yes. But in relation to the medical expenses con--con--that I think had been incurred or going to be incurred, I don't think the two were consistent with each other.
Q The medical expenses that I--
A The medical expenses that were incurred and would be possibly incurred in the future.



Q Right. And--and you don't disagree with me that the causal relationship and the basis of those were in dispute; right?
A They were in dispute, that's true.
Q Okay. So this next section, you wrote all of these--these things here that you agreed with Ms. Sullivan about. I--I'm not going to tread--retread this because these are your words; right? You're not--you stand by what you wrote as far as your agreements with Ms. Sullivan on these bullet points here on page 6?
A Yes, I did write that.
Q And you stand by them?
A Yeah. For the most part, yes. Other--whatever I've said, you know, that--today that is, you know, the caveat with respect to the statute of limitations in particular.
Q I understand. Okay. So the separate issues that you highlight in Ms. Sullivan's report, and I'm--I'm going to kind of categorize all of these into one grouping; okay? So you talk about a



liability denial date, you talk about reservation of rights dates, a claim committee amount, the date of the officer's deposition, and the Crum investigation. These are all what I would call typographical errors. Do you agree with that?
A Typographical?
Q Or Scribner--yes, typographical errors. They're typos?
A Where?
Q No, I'm--I'm saying--I think we're getting lost in translation here, Mr. Fisher. Let's take this first one, for example. It could just be a typographical error that Ms. Sullivan had 1/19/21 instead of 2/26/21?
A Possibly.
Q Okay. Same thing with the reservation of rights date, same thing with the claim amount, same thing with the deposition of the officer date. I--those are certainly not things that affects the substance of her report?
A No. And--
Q Okay.
A Technically, no. But they--they



do demonstrate similar mistakes, so kind of ones I made, too, so puts us on an even keel I guess.
Q Sure. Okay. So you--you're not--these are things that you--these are the things that you have taken issue with, though, but they certainly don't mean that she's not qualified or that her--the basis of her opinions are incorrect just because some dates were potentially incorrect?
A I would generally agree with that, with the reservation of the--whether or not the mistakes might have had an impact on something, but I failed to have raised them in my report, so I doubt that they exist.
Q Okay. And again, the neutral facts here in this next section, you say that NICO didn't evaluate the neutral facts here. It says, this condensed chronology--and I went down to page 9--does not establish that NICO was required to settle at any listed figure. Do you still agree with that statement?
A Well, I do to an extent. But it also says it shows why the analysis cannot

Page 221

fairly be reduced to a rear end collision on one side, a parked truck on--on the other. Both existed and the claim file had to evaluate both. There's--there's where my problem is.
Q Sure.
A And then, of course, we've already--you know, we spent I don't know how much time discussing all the stuff they didn't do that they should have done earlier.
Q Right. But as far as evaluating that, I mean, evaluating this from a comparative liability perspective, they did that. I mean, they looked into--they retained Mr. Crum, they obtained the officer's deposition, they eventually tracked down their insured and went to multiple efforts to do that. So they were looking at this with a lense towards comparative fault; were they not?
A Well, maybe. I mean, as we know, Mr. Crum even admitted in his deposition that there were some things he could not determine that left open the question as to--that could affect liability, you know. His report was

Page 222

one thing, his deposition was another. And we've covered that already.
And so there was a num--numerous instances there. And the fact that they were--their own insured driver couldn't remember a lot certainly opens a lot of--opens questions that could have been resolved earlier. And I think that's what I was trying to--to say for the--you know, differently than I've said it today.
Q Okay. And so looking at your--I think this is your--one of your last sections here is this deposition testimony relevant to rebuttal.
A What page is that?
Q This is page 9. Help me to understand, you--you start off with, the following testimony is quoted but it shows the balance of the liability record. It should not be shortened into a slogan. What do--what does that mean?
A I'm not just--I--I want to take it very seriously as opposed to simply something where--very simply are not taking it as seriously. And I've quoted some of the

Page 223

important testimony from Officer Curry and--and Mr. Walden, etcetera as to--you know, Mr. Curry sa--what--what it says is Officer Curry, therefore, supports both sides of the comparative liability record. Lane intrusion by the insured truck, fatigue and inattention involved Mr. Walden.
He also distinguishes a well lit area from the unresolved condition of the truck's own lights. So there are a lot of issues here that are unresolved and not clear and concise. And it--you know, again, these are decisions that the jury is going to have to deal with. But nothing about this case is 100 percent clean on either side by any stretch.
Q And so NICO did evaluate this case from a comparative liability standpoint; did it not, though? I mean, if you go up here and you look at the claim notes even, it talks about Mr. Crum and acknowledging that the vehicle was, approximately, 3 feet into the travel portion of the roadway and that Mr. Walden--
A Three feet is a fair amount, but

Page 224

look at the date. This was in 2023. This is three years--almost two and a half years after the accident.
Q Sure. But you also--
A That's the point.
Q Let--let me try to finish my question; okay?
A Oh, I'm sorry.
Q That's--that's okay. We were on a really good stretch there. So going back to Mr. Crum's report, though, I mean, taking a look at this picture that was taken at the time of the accident, this is not something that they needed Mr. Crum to establish. This was already shown by the evidence that they had at the time from the re--
A But what's it look--what's it look like from the rear?
Q So again, that picture--there's photographs here, though; right? I mean, there are some photographs. I'm not--you would agree with that that some of this stuff was developed and developing?
A Yes.
Q Okay.

A That is correct.
Q And that certainly NICO was taking it into account. Like they had the police report, they had the photographs, they were maintaining contact--they were trying to attempt to contact their insured. They were continuing to investigate this, and they were looking at this. They were never saying liability is 100 percent on Mr. Walden; were they?
A No, not to my knowledge.
Q Okay. Okay. So I'm going to go to page 11 and B, The 2021 Liability Denial here. And you talk about with this one, but an interim position should be identified as interim.
A Yes.
Q Are you--so is your issue then that--that NICO didn't identify this 2021--this February 26, 2021 denial as an interim? Is that your issue here with that?
A Well, it was also an incomplete investigation as we know. Other facts came out and other evidence came--was obtainable in 2023, two years later.



Q Okay.
A That's why.
Q Okay.
A This is based on an incomplete investigation at this point in time.
Q Okay. And certainly you're not minimizing that part of the issue with--part of the issues that you're describing would be attributable to trying to obtain contact with the insured; right? You're not minimizing that the insured was not cooperating here, and--
A No, I don't minimize not--what my problem is is that they could have hired the--the private investigator much earlier. And--and then a lot of the--these questions would have been resolved much earlier. That's what--I've said that all along.
Q Sure. Okay. And--and--and again, do you think it's also fair--I--I mean, liability and coverage questions, those have to be answered before damages questions or--you're looking at all of those in totality; aren't you? I mean, at first you have to make a determination on coverage and



liability before you even get to damages, because if there's not coverage or liability under the policy there's not a duty to pay; right?
A Well, I would say theoretically that would be correct. By the same token, coverage could be an issue, liability could also be an issue. And then you've got widows and orphans looking at, you know, a significant loss that they can no longer afford.
So there you have jury appeal. And--which is why both the defense and plaintiff hire jury experts for that very reason. You never--you--you can never tell. And a good example of that I think was in--in one of my audits we flagged the account as being under reserve, but we didn't dock the auditor--or the--the claim people for it, because it was strictly jury appeal.
I mean, what do you do when a woman steps off the curb not--and--and a bus slams into her? Nobody likes to see a grandmother--Grandma, you know, flattened by a bus. On the same token, she crossed



against a red light. So there was probably no liability, but I don't know that I would go against a jury in downtown Los Angeles with that.
And so, ultimately, we--we said that the case is under-reserved and should be kicked up to the serious--serious exposure unit. And ultimately they settled the case. We did not, however, down--we did not give them a negative grade on that, because that's a jur--that--that was strictly an emotional call. So there are times when you have to take that into consideration because nobody can guess what a jury is going to do.
Q So your statement here about they're being on separate different tracks, I understand that they're distinct things, but again they don't operate in a vacuum; do they?
A No, they don't. That's the whole point.
Q Okay. Let's see. I think we've covered--and you do, you know, concede here--back to the warning triangles, and this is on page 13, you do concede the original

Page 229

spacing is uncertain because the collision may have moved or damaged it. So even if Mr. Howard would have remembered, I mean, there may not have been anything retaining a reconstructionist or physical evidence. There may not have been anything to--to corroborate that; right?
A Well, that's correct. But Mr. Howard could not state the required spacing and that the original place was no longer reliably reconstructable. That's the point.
Q Okay. And--let's see. On the reserving here on G, you make the comment here that, an insurer is not required to offer its full authority on the first call. And--and I agree with that. But your--you seem to take issue, but when the company's own committee has identified an expected value and approved authority more than twice the opening offer, reasonable claim documentation should explain the negotiation strategy.
But you'd agree with me in the claim file there were instances where the adjustor

Page 230

was corresponding with Defense counsel, right, and they were--they called the--the Plaintiff Counsel to make an offer, there was a claims committee, you don't discredit any of those things as part of the negotiation strategy or the claim handling that was being documented? There was evidence of that?
A Well, that--there is that. I just don't und--I just don't know what the rationale was, that's all.
Q Okay. And it's that lack of rationale that you think violates the standard of care?
A I have problems with that. I didn't know what their decision-making process was.
Q Okay. And to my question specifically, do you think that violates the standard of care here? Do you think that's a violation of the Unfair Claims Settlement Practices Act?
A If--well, it depends on what the rationale was. The rationale's either sustainable or it's not. I just don't know.
Q Okay. Let's see. So, again,

Page 231

you--we've covered that you agree that NICO was a--entitled to obtain the medical information, it did.
A Yeah, that's correct. I--I have no problem with that.
Q And lastly, I--I wanted to ask you about this. Kentucky statutes and regulations, it says claim practices guidepost. This is on page 14. You say, I do not tell the Court that a statutory violation occurred. The current administrative regulation also states that a violation is found only by the Commissioner and does not create a private right of action.
So we talked about that just a little bit earlier. And--and again, it's--that in and of itself, those regulations, I--I understand what you're saying about--that there's a statute that lives and these regulations are born from that. But they do not, in and of it--themselves, mean that there was a violation of the Unfair Claims Settlement Practices Act; right?
A It only sets for the standard of

Page 232

care that must be followed. You've got, you know--whatever the claim regulations are, the claim regulations are. Either you live up to them or you're not. Can you--there is no private right of action for violation of that in Kentucky, or for that matter California when--when the Monroe Globe decision was overturned.
Q Okay.
A Thank goodness. But on the same token, it does set forth the standard of care.
Q Okay. So you'd also agree--and I'm going back through--these are your opinions in rebuttal here, this last--this--this--the last part of this report.
A Yes.
Q Other than your reservation of rights. You seem to acknowledge, Mr. Fisher, that the later reconstruction, medical review, deposition testimony, and the settlement are relevant to the overall history.
But then you seem to take issue

that--again, your issue here is those things didn't happen quick enough. You acknowledge that these things were happening in the claim handling?
A Yes. And it could be done quicker. And if they had done it quicker, they would have had more facts that, unfortunately, are lost to lack of memory or lack of being able to reconstruct properly, depending on whether we're talking about Mr. Crum or Mr.--you know, the driver.
Q Okay. And--let's see.
MR. BUNNELL: If I can have just a second, I think I'm almost done. If we can go off the record?
THE WITNESS: Sure.
VIDEO TECHNICIAN: Okay.
(OFF THE RECORD)
(A BRIEF BREAK IS TAKEN)
VIDEO TECHNICIAN: At 4:0--4:08 p.m. Eastern Standard, we are back on the video record.
By Mr. Bunnell:
Q Okay. Welcome back, Mr. Fisher. I've got just a couple of questions, and then



I'll--I'll be wrapped up. And Mr. Morrin may have some things for you. Thank you for your time today.
A I--
Q I--I--
A Thank you for the professional courtesy, as well, Counselor. I always appreciate begin--I expect tough questioning, but I appreciate it done in a--in a--in a calm way.
Q Well, it doesn't--
A And I appreciate that.
Q Well, I--that's very kind of you to say. It doesn't help anyone to--to be confrontational. Everybody has a job to do, and people have to do their jobs and not get personal about it. So--
A You haven't dealt with some New York lawyers.
Q Yeah. So that's why I practice down here, Mr. Fisher, in Kentucky. So--so in any event, I--I did want to just--this last sentence here under Number 9, withdrawing your formulations and deferring legal application and historical version



questions to counsel. And this is in regard to Subsection 7.
And those are withdrawn to the extent you--you want to try to opine about the statute of limitations that would have existed, although you don't have any evidence that you can point to as we sit here today in the claim file. I--I just--I want to make sure I understand that point.
A Yeah, the--the caveat is if you're up against a statute you have no choice. I do not have evi--I have seen no evidence that would suggest that that was the intent of--of the insurance company.
Q All right.
A I'm not going to say it didn't exist, but I've seen no evidence of it.
Q Okay. And as far as the intent of the insurance company in general, we talked about the motivations earlier; right? And that--
A Yes.
Q --you weren't going to get into the motivations. You--you--you don't--you're not going to opine whether any sort of



conduct by NICO here was outrageous or not; is that fair?
A Well, other than what I've already testified to. I--you know, the late--the late investigation, that's--fall into that category of course. And there's--and of course, the statute of limitations issue is--is always going to be on the table because, again, they cannot--the claimant cannot let that statute run.
Q Right.
A Period.
Q Now, I thought you said earlier that you--you weren't going to get into defining things as outrageous, you were going to let counsel do that. But I--I do want to be--
A On legal issues, yes, of course.
Q Okay. So I do want to be very clear, though, and make sure that I'm--I'm getting a response to your question so I understand, Mr. Fisher. So the--the conduct that you have described here that you violate, that--that you allege NICO violated, would you go so far to say that that conduct

is so unreasonable that no other insurer would have engaged in such similar conduct?
A I've only opined that it's beneath the standard of care. I--beyond that, it's going to be up to the--to trier of fact to determine whether--
Q Okay.
A --it rise--a whole--the whole case rises to the issue that you're referring to.
Q Okay. So you're cer--your--your testimony here today and the opinions that you're going to offer at least, are--are--that's where you draw the line is that you believe these are violations of the standard of care, and you certainly don't have any opinions as to the motive or anything that we have discussed today that you would attribute to the insurer, NICO, here?
A That's up to--that's up to the trier of fact and--and whatever other evidence or--counsel is going to be able to present.
Q Okay. So any other opinions that you haven't shared with me today, Mr. Fisher, or any other things that are not captured in



your report that you wish to offer?
A Not at this time other than, you know, I reserve the right to bring up subsumed opinions based on whatever questions you may ask me at trial.
MR. BUNNELL: Okay. Well, I think that--that concludes my questioning, and I'll pass the witness. Thank you for your time.
THE WITNESS: Thank you, Mr. Bunnell.
MR. MORRIN: Thank you, Kyle. If we can take--I think I need three minutes. I'm going to use the restroom and get my notes in order, and then I'll try to get--get you out of here pretty quick.
THE WITNESS: Fair enough with me.
(OFF THE RECORD)
(A BRIEF BREAK IS TAKEN)
VIDEO TECHNICIAN: At 4:15 p.m. Eastern Standard time, we are back on the video record.
* * * * * * * * * *
EXAMINATION



By Mr. Morrin:
Q Okay, Mr. Fisher. Thank you for your time and--and cooperation and providing those responses to opposing counsel. Some of my questions may seem a little redundant. I'm just making sure I get everything that I need to get, and I'll try to be quick. Please go ahead and restate your full name and your position.
A My full name is Frederick John Fisher. And I am Chief Executive Officer of Fisher Consulting Group.
Q Okay. How many years of experience do you have in the property and casualty insurance industry?
A Property and casualty industry, whew, 1973. So 53 years.
Q Okay. What specific operational rules have you held during your 50 year career?
A Well, I was a claim--it's on my CV I was a claim adjustor. I--well, no, I was a--a law clerk at Liberty Mutual Insurance Company. And then I was a claim adjustor at Miller & Gilbert.



And basically, in essence, left and formed my own company and bought them out, and now I own my own company that eventually became Surplus Risk Services, d/b/a The Fisher Associate Adjustors. I was president of that company and sole owner. We did claim adjusting, qualitative claim auditing, developed software for our use and--and the use of others, including a claim tracking system that tracks reserves and payments, etcetera, like any other system out there.
We got involved in risk management consulting and loss control and educating others on how to prevent claims, what to do to be able to prevent claims. But I--I--we called it loss control and--and claim prevention. Lawyers eventually caught onto it and thought it would be a good idea and called it best practices. But that didn't come about until the 1990s.
So I'm one of the four people that invented the concept. And I certainly wasn't the first. And then, as I testified earlier, I wound down the claim adjusting company and formed Wholesale Insurance Brokerage.

Page 241

Focused on professional liability, executive liability, lines of coverages, anything sophisticated, including product liability.
We also acted as a managing underwriter for underwriters at Lloyd's for Westport Insurance Company. And almost for AIG, actually, and they pulled out at the last second. And did that for a number of years until I sold the company, and then they kept me on.
And then in 2014, I involuntarily retired, and I've been doing expert witness work for 30 years. And so I figured, well, I need a reason to get up in the morning so here I am.
Q Sure. Thank you. Have you ever held an insurance license or regulatory compliance responsibility in the Commonwealth of Kentucky?
A Yes, I had an insurance producer license in Kentucky.
Q Okay.
A I also--and--
Q What's--
A --the point of that, even though

Page 242

it wasn't licensed, I also worked with the Department of Insurance back in the offshore, you know, crisis.
Q Right. What is qualitative claims auditing?
A There's two kinds of audits. There's quantitative and qualitative. Quantitative audit is where somebody says, okay, we sent out a check for $100,000 and now you look at the loss runs and make sure that--that that matched. So it's really numeric. Is everything consistent?
A qualitative claim audit, on the other hand, looks at a number of factors. I think the audit forms that we used on looking at the way a particular claim file was handled, I think we had as many as 48 data points that we considered important. Such as, the date of first contact or first attempt to contact the insured.
We don't require that they actually be able to do it, as happened in this case, but I--you know, I have a--being timely and attempting it. The same with contact with the claimant or the claimant's

Page 243

representative. We looked at all those various dates, the dates in which the invest--investigation actually began and was completed.
Again--and, you know, no one can guarantee everything can be done, for one reason or another. It's--it's the attempt that we were looking at and the results. We also looked at reserve setting, both from loss and expense reserves, and whether the reserves were being adjusted in a timely fa--fa--timely manner and consistent with generally accepted practices.
We looked at the manner in which counsel was being used. If a claim had to be referred out for defense and whether the supervision seemed reasonable and timely. We looked at subrogation recoveries.
And then we had overall file review. You know, was the file--back then people had paper files. Were the files neat and orderly? Did it have everything we would expect to be contained?
We looked at the reserve strategy. And we also conducted what's called a

Page 244

hindsight study. We looked at--we were particularly focused on stair stepping of reserves or last minute increases to be able to cover the settlement. So it's called--
Q Your--
A --a hindsight reserve study.
Q Your connection froze out for a second. It was a hindsight--what--what kind of--
A Hindsight--
Q --study? I'm sorry.
A It's called a hindsight reserve study.
Q Okay. Thank you.
A We were looking to see how in closed files what the reserves were prior to offer and settlement, and when were there--there was reserves set. And we normally used a 20 percent factor either way. Either a 20 percent under--under-reserve or 20 percent over-reserve we considered acceptable, because they are judgment calls in the most part.
And that was just the file handling. Then we looked at staffing requirements and

education backgrounds and experience backgrounds. We looked at the--the manner in which you would have small claim authority, middle, higher, and higher.
Usually you would see reserve breaks at 1 to 5,000, 5 to 10, 10 to 20, or 25--25 to 50 and up to 100,000, and then over 100,000. And--and you would have different units that might be handling claims depending on exposure. And so we looked at all those factors. I--I think overall we were looking at maybe 150 to 200 items in--in every audit because between the file handling and--and administrative aspects of it, they were very comprehensive.
Q Okay. And I believe you said you've published and taught on this methodology, right, qualitative--
A All the--
Q --claims auditing?
A Well, I have; yes. And--and--and its importance and--and--and a number of other issues, as well. Most--I would say like I testified earlier, I would say 90 percent of all of my educational st--



materials fall into one of two categories of what you need to know and what you need to do.
And then here's--on specific areas of insurance, here's what you need to know to accomplish number one. I'm all about, always have been, avoiding litigation, whether it's how to avoid suit as an insurance agent or broker or real estate broker or what have you.
And I'm also an expert on claims made insurance policies, which are not an issue in this case at all. But I--I wrote a book on it, and I've written num--God, I don't know how many articles on the dangers of claims made policies, and the book was written for policyholders. And--and my biggest pet peeve on what's called absolute exclusions.
I'm all about coverage. I believe in--I believe in the insurance industry. And I believe it can work well, and I think it can work right, which is why Chantal Roberts--white paper on the--the return on investment in the claim department.
It's hit such a nerve. I mean, I



think there's been 180,000 views on LinkedIn over the--over the last four months. It's--it's unbelievable.
Q All right. Okay. Mr. Bunnell went over, you know, some of the--the figures regarding your pay to serve as an expert. You're not getting paid on a--any kind of outcome basis in this matter; are you? It's--your pay doesn't increase if--if your report wins the day; does it?
A Absolutely not. I'm not--I'm not paid for my opinions, I'm not paid for my results. I'm paid for my time and only my time.
Q Okay. And I think you've already indicated some of these documents that you reviewed today, you reviewed the unredacted NICO claim file; right?
A I reviewed everything that, you know, I've produced.
Q Okay.
A So, yeah, the unredacted--I don't know if I had the unredacted or redacted claim file. A lot of the--a lot of the files--



Q But that would include adjustor logs, it would include adjustor reports?
A Yes.
Q Okay.
A Everything that's on--that's been produced. And--and--
Q Internal notes; right. Okay. And the materials you reviewed, it's the type of facts and data reasonably relied upon by qualitative claims auditors in evaluating whether an insured complied with claims handling standards; is that right?
A Well, I certainly had that in the back of my mind. It's always been something that I've been concerned with. I know how I ran my claim adjusting company.
Q Uh-huh, (affirmative). And--but this type of data and the--this kind of information that you reviewed, that's relied upon in the industry, not just in your company; right?
A One would hope.
Q Okay. And did you apply the qualitative claims auditing methodology to your evaluation of NICO in this matter?

A Well, the standard of care is the standard of care. That was always--it's--it's always how we conducted our audits. And it certainly was the same methodology that I used in reviewing the documents that I've been provided.
Q So is--so you did use qualitative claims auditing in--in measuring NICO's conduct in this matter?
A Well, to the extent I could. I--I certainly wasn't in the position to deal with the internal workings of their claim department. I don't know what the file case loads were for each adjustor. I don't know their backgrounds and--and educational status.
I had none of that--that data available. I know what we used as a standard, and the typical would be about 250 cases on diary. When you get beyond 250 cases, they better be small.
Q Okay. And is--is qualitative claims auditing an accepted methodology in the insurance industry?
A Well, it was at one time. I don't



know if they're doing them anymore. I really don't. I wouldn't be surprised if they weren't. I don't think the C-suite is interested in that anymore. I don't think the C-suite even knows what a--a lot of C-suite executives don't even know what insurance is.
Q So it was an accepted methodology, it's--it's not an accepted methodology now?
A It--it should be if it's not. I just don't know that they're doing qualitative audits, and I don't know that they're bringing in independent auditors to do that. I know that some companies, they have internal auditing teams.
But now you're getting into in--internal politics. And I've experienced that myself. I mean, I was accused of--when we did the art--the--the audit for the AIG trucking division, we were being accused of rifling peop--through people's desks before we even arrived to do the audit. It was crazy.
Q So would you say--
A I think they're doing them.



Q We--are you saying it should be the standard?
A They should be doing internal claim auditing regularly. Absolutely.
Q Okay.
A And I don't know that they're doing that. It wouldn't surprise me if they weren't.
Q Is there any authority in the insurance industry that points to qualitative claims auditing as the standard?
A I've not seen anything from the NAIC on that. I do believe that it is necessary, and I know we insurers do audits now. And I know they do cri--qualitative audits. I don't know how often they do them.
One of our clients was a--the re-insurer, for instance, that had the professional liability program for the California State Bar Association. And we did qualitative audits of their claims team for two years, probably did five of them so--over a ten year period. But that--that differs from carrier to carrier.
And a lot of insurance companies today



are very profit motivated, and by doing that they want to cut expenses in a claim audit they think is going to be expensive, which it is. But after not pay--your claims aren't being handled correctly, that's going to cost you a lot more than the cost of an audit.
Q So for the insurance companies that don't view qualitative claims auditing as necessary and standard, is it your opinion that that's because they're deviating from best practices as established?
A Absolutely.
Q Okay. Is it more likely--
A That also applied--not to interrupt, but that would also apply to re-insurers.
Q Okay.
A I would expect--
Q Is it more--
A --re-insurers to be very concerned about that.
Q Okay. Okay. Thank you. Is it more likely than not that your opinions reflect a reliable application of these claims handling principles to the documented

facts in this matter?
A I'm sorry. Can you read that back?
Q I can. I can. Is it more likely than not that your opinions reflect a reliable application of these claims handling principles to the documented facts in this matter, in NICO's claim file?
A Oh, yes. To the extent that I--that I could. I mean, again, there were some things that we were looking at that the data is not available for that.
Q Sure. Okay. As--as you probably know, KRS 304.12-230 prohibits refusing to pay claims without conducting a reasonable investigation based upon all available information. When NICO issued its initial formal liability denial letter in this case, when was that?
A Formal denial? I think it was in--
Q Uh-huh, (affirmative).
A I don't know an exact date. I think it was like Fe--it was in--originally, I think it was in 2021, was it, at some



point.
Q 2021? Yeah.
A Yeah. A little--I--I don't think they had enough information at the time, but, no, I--it's going to be a question of fact ultimately.
Q Sure. At the time NICO issued the 2021 denial liability, what information did--possess in its claim file regarding the location of its freightliner?
A Well, I--in the police report I--I think they already had that at that point in time. So they had to have known that it was not completely off the roadway.
MR. MORRIN: I'm sorry, guys. I've got to--I've got to take just one minute here. I've got--the kids are home from school. Give me one second here.
VIDEO TECHNICIAN: I'll pause the recording.
(OFF THE RECORD)
VIDEO TECHNICIAN: Back on the video record.
By Mr. Morrin:



Q Mr. Fisher, from your review of NICO's file, is it accurate that their independent adjustor--adjustor in the file noted--made the notation--this would have been December 9th, 2020. You will note the insured unit is partially in the lane of travel at the time.
A Yes, that ha--that's accurate. And as well on I think it's November 3rd, they had the police report that noted that as well that the freightliner was in the--was not completely off. I think that was in there, too.
Q So we've got a police report saying their--their vehicle was parked in the roadway, and we've got catastrophic injuries, and yet they still denied before talking to their insured--their driver. Any issues with this based on the industry standard?
MR. BUNNELL: I'm going to object to the form.
A Well, I would say that that's jumping to conclusions a bit. But I--there are questions of fact that were raised in the police report, as well. And--but I've



testified extensively about the fact that they should have done a quicker or more-- investigation, including getting a private investigator. They were--certainly weren't getting any cooperation from their insured at this point, but there's--when you're--when you're raising, certainly raises a lot of questions of fact that need--need to be cleared up.
Q Is it consistent with industry standards for an insurance company to issue an unqualified zero dollar liability denial without interviewing their driver and with some indication in the collision report that there could be fault on their end?
MR. BUNNELL: I'm going to object to the form.
A Well, I'm not sure I--through all of it I think what's more important is the fact that they would issue such a letter where they hadn't talked to their insured, because the insured wasn't cooperating and responding and tracking them down. So I think that is more accurate. They--they needed to talk to their insured, and that was

very, very, very important. And they were running into roadblocks, so the issue with the denial letter under those circumstances, especially when you've got a police report that has got positive and negative things in it, I--I have a new--you know, I don't think it was justified, but ultimately the jury's going to have to decide that.
Q Sure. When is the insurance company's--when does their duty to have reasonable standards for prompt investigations of claims, when are they suppose--when does that duty arise?
A As soon as the claim--well, that's an interesting question. As soon as you get charted to write insurance business in Kentucky, you're obligated to follow the rules of the road, so to speak. So that's one of them. But the obligation is to comply with, you know, the requirements. Every--you know, every insurance company is under that--those guidelines. They have to.
Q Okay.
A They're supposed to be fair.
Q So it--I mean, it--it's--it's not



like they get to wait for a--a demand, a claim demand and then they have to have these reasonable in--investigations?
A Well, I'd agree with that generally. Yes, they have a duty to investigate, there are timelines they are supposed to be following. And if they complete their investigation because of lack of cooperation, they're supposed to be sending out a letter, what, every 40 days or 45 days, something like that.
And that's pretty common that--almost every state has that--those rules. And most states--you know, it's--a lot of times it's ignored. You see that here.
Q The collision was on August 10, 2020. How long after that did NICO wait--or strike that. The collision was August 10th, 2020. How long after that did NICO hire their accident reconstructionist?
A Well, it was quite some time. The accident reconstructionist was hired mu--in, God, couple--several years later, couple years later for sure.
Q I think--



A It's in--it's in my timeline, so I--it's not--certainly--where is it?
Q Looks like he might have been hired in February of 2023. Is that accurate from your review?
A Wait, I'm looking for the exact date. I think that's accurate. Yeah, the Crum--his report was in April, so he would have been hired before that, April of 2024. Are you referring to Crum, his--
Q Yes, Crum. Yes, Mr. Crum.
A Yeah. Crum's report was in Apr--April 1st, 2024. So it was several--I'm sure he was hired a couple of months before that.
Q But you--you saw the--the Complaint that was filed in this matter. Wasn't he hired after the Complaint was filed?
A Crum?
Q Yes.
A Oh, yeah, absolutely.
Q Are--is--I mean, are litigation driven investigations, is that a common subject in the insurance industry?



A Oh, gosh. I--I can't answer that. I don't know. I haven't got--
Q Okay.
A --my finger on that pulse.
Q Okay. Well, I was just asking. Yeah, I don't know, either. So I--I was wondering--
A All I can--
Q --if you had any information on it.
A Well, I know that there are some insurance companies that certainly delay hiring experts. And we've covered that today.
Q Uh-huh, (affirmative).
A You know, I--I've made it very clear that a lot of this stuff that was done, you know, later should have been done originally. I've made that very clear.
Q Well, I guess my question is is shouldn't this--and--and I--I think you have opined on this earlier, but shouldn't inves--reasonable investigation for prompt claim adjusting, shouldn't that have happened before the denial?

A Well, that's awfully broad. Generally, I--I would agree with that. But on the same token, you can't compel people to cooperate with you. And so to deny liability based on just a police report and--and whatever else they had I would say is very iffy.

That's why I kept harping on they should have done it--a thorough investigation as fast as possible. And it can't guarantee that things are going to be successful. I--I--I made that clear even--even in our audits.

We looked at the attempts, were the attempts timely. And that's something that I think I made very clear throughout Mr. Bunnell's questioning is that that's my problem here. And--now, would it have changed anything? I--I don't know.

And--and some of it we'll never be able to get the answer because some things might have been available early and--and not available later. And that's ultimately going to be for the jury to decide.

Q Okay. You reviewed Ms. Sullivan's



report; didn't you?

A Yes.

Q She had--she asserted in her--her report that NICO engaged in continuous investigative activity throughout the file. Is that confirmed between June 2021 through March 2023? I mean, were they active in the file?

A Well, my timeline shows there were things happening. But--but I testified already that not to my satisfaction. I think they could have done a lot more to try and get a thorough investigation done.

And so to do a denial letter on February 26th I think was--of 2021, was a bit premature. And they really didn't get a lot resolved until much later. And I--so I think I've made it clear what my position is on that.

Q In fact, Ms. Sullivan also stated that the January 2023 demand had no deadline and was therefore not time sensitive. Is that--how do you evaluate that position under industry standards and industry customs?

A Well, number one, it--it's



refreshing to see a--a demand letter go out that--that doesn't have a time limit on it. Usually--to be honest with you. But on the same token, they have to, I would think, want to look at it seriously, take whatever action they need to do to make clear what their position is and either counteroffer or not make a counteroffer and--and state their legitimate reasons for doing so.

And of course, if they don't have all the facts necessary to support it, then I don't know how--what they're going to do. But that goes back to whose got the obligation to do that, you know. Certainly, they have an obligation to investigate. You have no control over their policyholder, you have no control over that, Counselor.

You can't force your defendant to cooperate with the insurance company. Only the insurance company can--can--can do that. And the--subsequently, someone got it, but they should have done it earlier. And I've made that very clear.

If--if they could find him in--two or three years later, they could have find



him--they could have found the other driver earlier. That--as well as their accident reconstructionist. And--and because of it, some evidence we're never going to know the result of.

Q I think we were talking about how the--they didn't think that liability was reasonably clear. Is--is an insurance company allowed to, one, not have reasonable investigations in place, and then rely on the absence of those reasonable investigations to then say liability couldn't be determined reasonably clearly?

MR. BUNNELL: Object to the form.

A I'm not sure I got that at all.

Q I can--I can restate it. Yeah, that was a bad question. But again--let me--let me try again. If an insurance company fails to adopt reasonable investigation, right, they--they have not implemented it. The laws clearly states they need to so they can have prompt adjustments, right, prompt claim adjustments, if they do not adopt those--

A I agree with that--I--I've said it

all day, that's ex--that's certainly the standard of care.
Q Yeah. If they don't adopt those and then they later say, well, for years liability wasn't reasonably clear--
A Well, you can't determine--
Q --are they allowed--
A --liability without all the facts.
Q Right. Well, how are you--how are you going to determine the clearness of the liability if you don't investigate reasonably?
A Well, I--
MR. BUNNELL: Same objection.
A I--I just said that, you can't determine liability without getting all the facts. That's why, you know, I--that's why you want to do a rapid investigation as fast as possible, at least make the attempt. But that's a--that was our--that was our rule in our--in our firm. We want to get as much--
Q Earlier you men--
A --as you can get in 90 days or less on every single claim.
Q Earlier you men--sorry, I don't



mean to keep cutting you off, I just--I know we've got somebody who's got to go pick up kids, and--and I--I can certainly--certainly sympathize with that. But earlier you mentioned there's a 20 percent rule on reserve setting. Can--can you briefly explain that to me?
A Reserves are based on experience and gut level reaction, etcetera. And then you have to measure it by liability and not liability. I mean, is it a clear-cut case? Is it a 50/50 case or whatever?
And so a lot of it is just judgment and experience. Now, although there is a lot of data from the various claim bureaus that track all this stuff, and you can--you know, I don't see any evidence that the claim bureaus were contacted to see what a similar case was settled for. So that's number one.
But it is--it is based on a gut level and--and experience. And then, of course, if it gets into a lo--high reserve necessity, then you're going to go to a claim committee. And I--and I compliment NICO for that, they did have a claim committee involved.



Now, whether or not they had enough information to make reasonable decisions, well, I think we already know the answer to that. I don't think they did for the reasons I've already testified to. But a lot of it is gut level, and that's why you need--when it comes to reserves, you want to have--it can't be hard and fast.
You've got--so that was the reason for having a 20 percent leeway ov--being over-reserved or under-reserved. And I frankly would rather be over-reserved than under-reserved. But that also has its own problems as well that--that we need not get into.
COURT REPORTER: Mr. Morrin, it's time.
(OFF THE RECORD)
(A BRIEF IS TAKEN)
VIDEO TECHNICIAN: Okay. You can continue, Mr. Morrin.
MR. MORRIN: Okay.
By Mr. Morrin:
Q Mr. Fisher, Ms. Sullivan in her report she states a couple different times



that, you know, NICO acted reasonably because liability was fairly de--debatable. Do you recall seeing that in her report?
A Yes.
Q Okay. If liability is fairly debatable, is an insurance company allowed--are they excused from the Unfair Claims Settlement Practices Act? Does it still apply to them?
A That's a--that's a tough call. But ultimately, that's going to be up to the jury and--and--and the courts to determine whether or not their--the jury's decision is correct. I've testified as to what I think on that already.
I don't think a--and in instances were consistent with what was required, and I think the results would have been different had they done that. If they--if they knew back in--in 2021 or 2022 even what they--what we now know, I think that we wouldn't have did--we wouldn't be here today. I've said that repeatedly. But again, that's going to be--that's going to be a jury call.
Q Right.

Page 269

A I'd like to add something to the record if I may, too.
Q Go ahead.
A Just for the record, Mr. Morrin and I have had no conversation along these lines. I have not--he is not had any conversation with me where he asked me any of these questions. So the--these are all new to me with him. I just want to make that clear.
Q So I--I know we talked a lot--or--or Mr. Bunnell questioned you a little bit on--on the outrageousness of--of the insurance company's conduct. He said, was this outrageous, did this reach a--you know, a level of outrageousness.
Well, under Kentucky law, a bad faith claim requires an insured to act with reckless disregard for a claimant's rights. So I guess what I want to know is, in the insurance industry, is intentionally ignoring an accident file, failing to hire a required reconstructionist for years, is that going to be considered a reckless disregard for standard claims handling pro--practices?

Page 270

MR. BUNNELL: Object to the form.
A I think it's supportable, and if the jury wants to make that con--draw that conclusion, it is supportable.
Q Okay. Is it normal for an insurance comp--in your experience, is it normal for an insurance company, an adjustor to leave a catastrophic com--catastrophic claim completely uninvestigated for years--or maybe not completely uninvestigated, but largely uninvestigated for years?
A What do you define--
Q Is that normal?
A What do you define as catastrophic?
Q I think when you have these significant inj--like we--we had a--that's a--that's a good question. I guess more than whiplash, right, more than--more than soft tissue injury. In this case, my client hit a truck was illegally parked and had to crawl out and--and crawl--and walk down and try--try to hold his hip in, he ended up having surgery, he ended up having, you know, a--a year or more of recovery.

Page 271

So I guess I'd call that catastrophic. In--in those situations where it's clear there are significant injuries, is this--is this normal in your industry for--for the--there to be such a void of reasonable investigation?
MR. BUNNELL: I'm going to object to the form.
A Well, hypothetically speaking, if it's a severe injury and you know it's a severe injury, even with questions of liability, you would--I've been very clear. You want to thorough investigate a claim as quickly as possible period. So I just want to be consistent here.
Q If an insurer purposely avoids gathering the evidence, they do not gather the evidence that any reasonable investigation would have them gather, if an insurer does not gather the evidence, is that acting in good faith?
A Well, I think--I'm not sure that that doesn't call for a legal conclusion. I do be--I do ag--I've testified already that that is precisely what a claim department and

Page 272

a claim person is supposed to do.
Q Could that be considered reckless indifference?
A Well, on an individual basis I could see where that--somebody might conclude that. The real question is whether it's done with such frequency as to cross into the general business practice. And that--that cannot be determined on--on a one claim basis. And you have to do a claim audit for that, see if that's what's going on.
Q Sure. Almost done. Just making sure I didn't leave any that I wanted to ask you out. I think you testified earlier that there--there wasn't any affirmative evidence for you to conclude that NICO was trying to run out the clock on the statute of limitations.
A That is correct. I've not seen anything that would suggest that. On the same token, I also testified that I wouldn't expect to find anything like that in the file.
Q Sure. If--if that--if that was any kind of strategy, whether passed down

verbally or any other way, that would not be documented in the file usually?

A I--I feel like in--you know, I wouldn't expect somebody to leave behind ev--you know, evidence that I murdered somebody, either.

Q Sure. Right. Well, could a lack of a reasonable investigation that they're supposed to implement and adopt, by statute they're required to do this, they failed to do this, could that be considered evidence of them trying to run out the clock?

MR. BUNNELL: Object to the form.

A I testified I wasn't prepared to draw that conclusion. And frankly, I think it's something the jury will have to deal with.

MR. MORRIN: Okay. That's all I have. Mr. Bunnell may have--may have a--no?

MR. BUNNELL: I don't have anything.

MR. MORRIN: He's allowed to go then. Okay. You're free. You're free.



VIDEO TECHNICIAN: Well, I will stop--

MR. MORRIN: Thank you, Mr. Fisher. I really appreciate it.

VIDEO TECHNICIAN: I'll stop the recording.

* * * * * * * * * *

THEREUPON, the video deposition of FREDERICK FISHER was concluded at 4:58 p.m.

* * * * * * * * * *



STATE OF KENTUCKY )
COUNTY OF WOODFORD )

I, STEPHANIE A. BLANTON, the undersigned Notary Public in and for the State of Kentucky at Large, certify that the facts stated in the caption hereto are true; that at the time and place stated in said caption, the witness named in the caption hereto personally appeared before me via videoconference, and that after being by me duly sworn, was examined by counsel for the parties; that said testimony was taken down in stenotype by me and later reduced to computer transcription under my direction and the foregoing is a true and accurate record to the best of my knowledge of the testimony given by said witness.

No party to said action nor counsel for said parties requested in writing that said deposition be signed by the testifying witness.

My commission expires: November 19, 2028.

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal of office on this the 29th day of October 2026.

__/s/ Stephanie A. Blanton_______
STEPHANIE A. BLANTON, CCR (KY)
NOTARY PUBLIC, STATE-AT-LARGE
COMMISSION NUMBER: KYNP16678