# Rebuttal Expert Report
# of
# Frederick J. Fisher, J.D., CCP

## I. Background and Experience

The Background and Experience set forth in Section I of my Expert Report dated May 27, 2026, together with my C.V. and testimony list attached to that report, are incorporated as though fully set forth here.[1] I do not repeat all of it because repetition would add pages, not expertise. The experience most relevant to this rebuttal remains my work as a Claims Adjuster, TPA Manager, Underwriter, Qualitative Claims Auditor, Claims Trainer, Insurance Broker/Agent, and Designated Responsible Licensee.

My opinions continue to be offered from the standpoint of insurance claim practices. I am not an accident reconstructionist, physician, or treating provider. I do not decide disputed law, weigh witness credibility, or tell the Court what verdict to reach. I explain what the insurance claim record shows, what it does not show, and whether the documented process is consistent with generally accepted property and casualty claims-handling practices.

## II. Scope of Rebuttal

I was asked to review the July 27, 2026 report of Christine A. Sullivan, MBA, CPCU, AIM, submitted with National Indemnity Company's Rule 26(a)(2) disclosures, and to state my rebuttal opinions concerning NICO's investigation, evaluation, communication, and settlement handling of the bodily-injury claim made by Charles L. Walden.[2]

This is a rebuttal report. It is not a second original report and should not become an excuse to invent a new theory because an opposing expert has now appeared. I therefore address the opinions Ms. Sullivan actually expressed, correct or narrow language in my Original Report where the record requires it, and identify the claims-practice opinions that remain. I do not offer a new measure of damages, a medical causation opinion, or an accident-reconstruction opinion.

## III. Fee for Services

Fisher Consulting Group, Inc. currently charges $599 per hour for my work, plus out-of-pocket expenses at cost and a flat fee for out-of-state travel time. Emergency last-minute work is charged at $809 per hour only for the duration of the last-minute assignment. I have not accepted, and would not accept, any payment dependent upon the outcome of this matter. I have no financial or other interest in the result.

## IV. Materials Reviewed

The materials reviewed for this rebuttal are supplemental to the materials identified in Exhibit B of my Original Report. They include the following:

- Defendant NICO's Rule 26(a)(2) Disclosures dated July 29, 2026, including the Sullivan

[1] See Expert Report of Frederick J. Fisher, J.D., CCP, dated May 27, 2026 (hereinafter "Original Report"), Section I and Exhibit A.
[2] See Expert Report of Christine A. Sullivan, dated July 27, 2026 (hereinafter "Sullivan Report"), attached as Exhibit 1 to Defendant National Indemnity Company's Rule 26(a)(2) Disclosures dated July 29, 2026.

Report and attached curriculum vitae;

- My Original Report dated May 27, 2026;
- The June 14, 2024 deposition of Clarence M. Howard;
- The January 4, 2023 deposition of Charles L. Walden;
- The July 29, 2024 deposition of Officer Jason Taylor Curry;
- The July 31, 2024 deposition of Edward R. Crum;
- The June 1, 2024 Collision Analysis Supplement Report of Crum Investigations, LLC;
- The claim-file excerpts and Bates-numbered material quoted or reproduced in my Original Report; and
- The Kentucky statutory and administrative-regulation text discussed below, subject to counsel confirming the version in effect during each relevant claim-handling period.

I also reviewed the uploaded counsel memoranda and secondary articles for issue identification. They are advocacy or secondary material, not substitutes for the claim file, certified testimony, policy, medical record, or original correspondence. I therefore do not use them as independent proof of a claim fact.

Ms. Sullivan identifies medical reports, medical depositions, and other claim-file material that were not included in the set supplied for this rebuttal. I accept that those materials may support a genuine medical causation and future-treatment dispute, but I do not independently interpret medical evidence I have not reviewed. Where a primary claim document was not supplied, I identify the limitation rather than fill the gap with memory, inference, or optimism.

## V. <u>Basis and Method of Rebuttal</u>

My underlying claims-practice foundation remains the same as stated in the Original Report. For this rebuttal, I applied several additional controls because a fair rebuttal should not simply turn every sentence of the opposing report upside down.

**1.** Primary sources control. A contemporaneous claim note, letter, report, photograph, or certified transcript controls over either expert's later summary of it.

**2.** The claim must be evaluated by time period. A decision made in February 2021 is judged by what was reasonably available then, not by a deposition taken in 2024.

**3.** Activity and evaluation are not the same thing. Locating a witness, collecting records, defending a lawsuit, setting a reserve, granting settlement authority, and making an offer are related claims functions, but they are not interchangeable.

**4.** The evidence must be stated both ways. The record contains facts supporting comparative negligence by Mr. Walden and facts supporting negligence or exposure by the insured driver. A claim professional does not make one side disappear merely because the other side is inconvenient.

**5.** Later outcome is relevant but not dispositive. The $200,000 settlement informs the history. It does not, by itself, prove that every earlier denial, delay, evaluation, communication, or offer was reasonable; nor does it establish that the January 2023 demand or any internal figure was the objectively correct settlement value.

**6.** My role is limited. I may explain how statutes and regulations inform claim practices, but counsel and the Court determine their legal application, whether a legal duty was breached, and whether conduct constitutes bad faith.

## VI. Corrections and Clarifications to My Original Report

Ms. Sullivan is correct on some points, and the record requires me to narrow several expressions in my Original Report. An expert should not defend an adjective after the evidence has shown that the adjective was too large for the fact. The following corrections are made voluntarily and should be read as part of my opinions.

### A. The January 2023 Demand

My Original Report described the January 2023 demand as "time sensitive" and as a "policy limits demand."[3] Based upon the material now reviewed, that description was too broad. Ms. Sullivan states exactly:

> "On 1/13/23, NICO receives a demand from the plaintiff counsel for $ 846,676.07; the letter indicates it is an 'initial' demand which will increase as additional medical is received. There was no time limit to respond."[4]

The amount stated was below the reported $1,000,000 liability limit, the demand was described as initial, and no response deadline is identified. I therefore withdraw the characterization of that letter as a time-limited policy-limits demand unless the original demand letter establishes otherwise. It remained a substantial post-suit demand requiring appropriate acknowledgment, evaluation, documentation, and a reasoned response. Those are different questions from whether it was a technical policy-limits demand.

### B. The Phrase "Zero Evaluative Activity"

My Original Report stated that the adjuster "logged zero evaluative activity between June 2021 and March 2023" and "completely ignored]" the demand.[5] That might be read too literally. The record describes continuing attempts to locate the insured, post-suit activity by defense counsel, requests for information, and the retention of an accident reconstructionist. Ms. Sullivan also states that defense counsel acknowledged the demand and requested additional information on February 2, February 21, and March 8, 2023.[6]

I replace "abandoning," "completely ignoring," with a narrower and supportable opinion that the materials supplied do not show a timely, clearly documented claim-department valuation, comparative-fault analysis, settlement range, or negotiation strategy during important periods. The question is not whether NICO did something. It did. The question is whether the file shows what NICO concluded, when it concluded it, and why.

---

[3] Original Report, P. 22: "Abandoning a file and failing to substantively evaluate a time sensitive, policy limits demand during active litigation is a massive deviation from standard claim handling and file monitoring practices."

[4] Sullivan Report, P. 5 (Exhibit 1 to NICO Rule 26(a)(2) Disclosures; PDF P. 9 of 26).

[5] Original Report, P. 22: "The NICO adjuster logged zero evaluative activity between June 2021 and March 2023, completely ignoring an $846,676.07 demand."

[6] Sullivan Report, P. 10 (Rule 26 Disclosure PDF P. 14 of 26): "Defense counsel reached out to the plaintiff on 2/2/23 acknowledging the demand letter and requesting additional information SO that NICO could properly evaluate the claim. Defense counsel reiterated this request on 2/21/23 and 3/8/23."

### C. Reserve, Expected Value, Authority, and Offer Are Different

Ms. Sullivan states:

> "Reserves are an estimate of costs associated with a claim and are required by insurance departments to ensure solvency; reserves are not an evaluation of a claim for settlement purposes."[7]

I agree with the essential distinction. A reserve is not an offer. It is not settlement authority. I withdraw any implication that increasing an indemnity reserve to $150,000 required NICO to offer $150,000, but that reserve allows them to do so. They are, however, required to make a reasonable offer and $150,000 would have been reasonable The reserve remains part of the claim history because it may reflect an anticipated claim cost, but it cannot be treated as a confession of liability or a mandatory settlement amount. The February 22, 2024 Claims Committee expected-value and authority entry is more directly related to negotiation than the 2021 reserve. However, generally accepted property and casualty reserving standards require an adjuster to set reserves based on anticipated financial exposure (Ultimate Net Payout). Raising an internal exposure reserve to $150,000 while maintaining a $0.00 external offer without documenting the connecting rationale remains a claims-handling inconsistency. Ultimate Net Payout was a Standard adopted by the National Association of Insurance Commissioners in the 1980's. Such an approach was requested of my Claims Firm when we acted as a Third Party Claims Administrator (TPA). It was the standard we were contractually required to use during our Qualitative Claims Audits of other TPA's and Insurance Companies.

### D. The Word "Weaponized" and Any Inference of Motive

My Original Report stated that the trier of fact could conclude NICO "weaponized the driver's disappearance."[8] I withdraw that motive-laden word. The record may support a more disciplined question: NICO was handling parallel coverage/non-cooperation and liability-merits issues while lacking the insured driver's account. The claims-practice issue is whether those tracks were clearly separated, whether the external liability position was appropriately qualified, and whether the merits evaluation was revisited as information developed. I do not opine that anyone acted from a particular motive.

### E. Warning Triangles and Vehicle Lighting

My Original Report described the warning triangles as grouped together and stated the truck had no lighting. The photographs show post-impact conditions; they do not establish the precise pre-impact position of each triangle, thus is a triable issue of fact for the Jury to determine. Mr. Crum testified:

> Q. "Why are those triangle placards so close to that parked vehicle?" A. "I'm not sure. I'm not sure if they were there, if they were picked up and carried, I don't know how many was put out, how far they were put out at the time of the collision. That would be a question for the driver."[9]
>
> A. "Could have been close to the -- the location that it was put at, or again, it could have been carried during the crash." Q. "Carried during the crash? How so?" A. "It could have been whenever the pickup truck hit it, it could have moved it along the roadway some. There is -- it looks like there is debris from the placard all over the shoulder in that photo."[10]

---

[7] Sullivan Report, P. 8 (Rule 26 Disclosure PDF P. 12 of 26).

[8] Original Report, P. 22: "In essence, the Trier of Fact could conclude the Insurer effectively weaponized the driver's disappearance as a liability defense externally while treating it as a coverage issue internally."

[9] Deposition of Edward R. Crum, July 31, 2024, P. 32, L. 15-23.

[10] Deposition of Edward R. Crum, July 31, 2024, P. 34, L. 1-8.

The sustainable point is that the spacing issue was material, the governing spacing standard existed, and the original placement could not later be reconstructed with confidence.

The same discipline applies to the truck's own lights. Officer Curry testified that he did not remember whether the disabled truck had hazard lights or headlights on.[11] I therefore do not state as an established fact that the lights were off. I state that the record supplied does not establish that they were on. Ambient roadway lighting and the disabled vehicle's own lighting are separate subjects.

**F. Comparative Liability and Medical Causation**

The record supports a real comparative-negligence dispute. Mr. Walden did not see the truck until he was approximately ten feet away and testified to exiting at approximately 45 to 50 miles per hour.[12] The police report attributed fatigue and inattention, although Mr. Walden denied being tired in his deposition.[13]

I also accept that medical causation, recovery, and future treatment were disputed. I do not opine that NICO was required to pay the January 2023 demand, pay policy limits, or accept every future-medical claim. My remaining opinion concerns the timing and documentation of NICO's evaluation of its insured's non-trivial comparative exposure, not a conclusion that Mr. Walden was free of fault.

**G. Thirty-Day, Forty-Five-Day, and "Compelling Litigation" Language**

My Original Report used the thirty-day and forty-five-day provisions of 806 KAR 12:095 as though they directly governed this third-party bodily-injury claimant. That formulation requires correction. The current official text states that the recurring forty-five-day letter is sent to a "first-party claimant."[14] It separately requires an appropriate reply within fifteen days to pertinent claimant communications that reasonably suggest a response is expected.[15]

I therefore withdraw the fixed thirty-/forty-five-day third-party opinion unless counsel identifies a different controlling historical provision. The current regulation states that insurers shall affirm or deny liability "within a reasonable time," with the thirty-day tender provision applying after liability is affirmed and the amount is determined and not disputed.[16]

I likewise do not rely upon KRS 304.12-230(7) as a direct basis for saying this third-party claimant was compelled to sue. The statute's text refers to "insureds."[17] The broader industry questions remain prompt communication, reasonable investigation, documented evaluation, and a reasonable

[11] Deposition of Officer Jason Taylor Curry, July 29, 2024, P. 30, L. 17-20: Q. "The truck that was improperly parked, did -- what -- as far as you can recall, did it have lights on, hazard lights or headlights?" A. "I don't -- I don't remember."
[12] Deposition of Charles L. Walden, January 4, 2023, P. 40, L. 2-20: Q. "How far in front of you was it when you first saw it?" A. "About -- I guess roughly 10 feet, I guess." ... Q. "How fast were you going as you exited?" A. "About 50. I was trying to get off the interstate and I dropped down to 45, 50 and then -- the rest of the way."
[13] Deposition of Charles L. Walden, January 4, 2023, P. 33, L. 21-25: Q. "Is it true that you didn't see the vehicle parked on the edge of the ramp?" A. "Yes, ma'am." Q. "Is it true that you were tired?" A. "No, ma'am."
[14] 806 KAR 12:095 § 6(1)(d) (current official Kentucky Legislative Research Commission text): "If the investigation remains incomplete, the insurer shall, forty-five (45) calendar days from the date of the initial notification and every forty-five (45) calendar days thereafter, send to the first-party claimant a letter stating the reasons additional time is needed for investigation." Counsel should confirm the version applicable during 2020-2021.
[15] 806 KAR 12:095 § 5(3): "The insurer shall make an appropriate reply within fifteen (15) days on all other pertinent communications from a claimant which reasonably suggest that a response is expected."
[16] 806 KAR 12:095 § 6(5): "Subject to subsection (1)(a) of this section relating to first-party claims, insurers shall affirm or deny liability on claims within a reasonable time and shall tender payment within thirty (30) days of affirmation of liability, if the amount of the claim is determined and not in dispute."
[17] KRS 304.12-230(7): "Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."

explanation for a denial or compromise position. The legal consequences are for counsel and the Court. In essence, forcing litigation through unreasonable lowballing remains a direct violation under KRS 304.12-230(6) (failing to attempt in good faith to effectuate prompt, fair, and equitable settlements when liability has become reasonably clear

## VII. Areas of Agreement with Ms. Sullivan

The disagreement between experts should not hide the portions of the record on which there is meaningful agreement. I agree with Ms. Sullivan on the following:

- NICO promptly opened a claim file after its November 2020 notice and retained outside adjusters or investigators to seek information;
- the insured's and insured driver's lack of cooperation created a genuine coverage and fact-gathering problem;
- the police report provided substantial evidence of inattention and possible fatigue by Mr. Walden;
- the claim involved comparative liability rather than an obvious sole-fault case against the insured;
- the medical record presented legitimate causation and future-treatment issues;
- the January 2023 demand had no stated response deadline on the materials described by Ms. Sullivan;
- a reserve is not a settlement offer or settlement authority; and
- the $200,000 settlement is relevant to evaluating the history, even though it does not decide whether every earlier claim-handling step was reasonable.

Those agreements matter. They prevent a rebuttal from becoming an advocacy brief dressed in an expert's clothing. They do not resolve the separate questions addressed below.

## VIII. Source and Chronology Issues in the Sullivan Report

Several dates and amounts in Ms. Sullivan's report conflict with other source descriptions. I do not treat every discrepancy as misconduct or as outcome-determinative. Claims files are large, experts make mistakes, and twenty dollars can become lost in a long chronology. But the decision date and the information then available are central to a claims-practice analysis. Primary documents must control.

### A. Liability-Denial Date

Ms. Sullivan states that NICO "issued a preliminary denial based on liability to the plaintiff's counsel on 1/19/21."[18] My Original Report chronology identifies January 19, 2021 as the assignment of a second Georgia investigator and February 26, 2021 as the liability-denial letter.[19] The denial letter and claim note authorizing it should be cited directly before a final report is signed.

### B. Reservation-of-Rights Dates

Ms. Sullivan uses December 16, 2020 and October 21, 2021 in one part of her report, but later refers

[18] Sullivan Report, P. 4 (Rule 26 Disclosure PDF P. 8 of 26).

[19] Original Report, P. 8: "01/19/2021 To GA IA: Limited assignment to track down NI and IVD and get their version of the facts of the accident"; and "02/26/21 NICO issued a letter denying all liability- NO Contact with Insured- relied solely on Police Report."

to December 1, 2020 and October 26, 2021.[20] The letters themselves should determine the dates and recipients.

**C. Claims Committee Amount**

Ms. Sullivan states that "NICO evaluated the value to be $234,269 and authorized that amount."[21] The claim-note language quoted in my Original Report states: "Determined expected value to be $234,249. Authority approved in this amount."[22] The twenty-dollar difference is not material to the claim value, but the primary note should be used.

**D. Officer Deposition Date**

Ms. Sullivan refers to the investigating officer's deposition as occurring on August 3, 2024. The transcript is dated July 29, 2024.[23]

**E. Crum Investigation Chronology**

Mr. Crum testified that the first site visit occurred February 9, 2023.[24] The claim note quoted in my Original Report states on March 8, 2023 that a report had been received and summarizes the three-foot intrusion, eight feet of clearance, and possible fatigue.[25] Mr. Crum also testified that his first written report was dated April 1, 2024.[26] Those documents should be reconciled before assigning significance to the report date.

## IX. Neutral Facts in Issue Relevant to This Rebuttal

The original claim history is lengthy. What follows is a condensed group of events most relevant to the rebuttal. Quoted language is reproduced from the identified report, transcript, or claim-file excerpt. Where the primary claim document has not been separately supplied, the source is identified as quoted in my Original Report.

| DATE | DESCRIPTION | SOURCE |
|---|---|---|
| 11/03/2020 | "Per the police report it was improperly parked/left on the side of an off ramp and the CVD ran into it, causing potential serious injuries to the claimant." | NICO 003757, quoted in Original Report, P. 6. |
| 12/09/2020 | "You will note the insured unit is partially in the lane of Travel at the time; however the photographs and the police report do indicate that the insured driver had placed reflective cones behind the insured unit at the time of the incident." | NICO 003817, quoted in Original Report, P. 7. |

[20] Compare Sullivan Report, P. 4 (Rule 26 Disclosure PDF P. 8 of 26): "On 12/16/20, NICO sent a Reservation of Rights letter ..."; and P. 5 (PDF P. 9 of 26): "On 10/21/21, another ROR was sent ..."; with P. 10 (PDF P. 14 of 26): "NICO sent a Reservation of Right letter ... on two separate occasions, 12/1/20 and 10/26/21."
[21] Sullivan Report, P. 6 (Rule 26 Disclosure PDF P. 10 of 26).
[22] Original Report, P. 12, quoting the February 22, 2024 Claim Handling, Internal Value Adjuster Log.
[23] Deposition of Officer Jason Taylor Curry, caption page and P. 6, L. 1-14, dated July 29, 2024.
[24] Deposition of Edward R. Crum, July 31, 2024, P. 8, L. 20-23: "The site visit was conducted on February the 9, 2023."
[25] Original Report, P. 11, quoting the March 8, 2023 Claim Handling, Internal Value Adjuster Log: "Received a report from our defense accident reconstruction expert Eddie Crum. ... Crum found that our vehicle was located approximately 3 feet into the traveled portion of the roadway and that Walden would have had approximately 8 feet of clearance for him to maneuver around our vehicle. Crum also noted that Mr. Walden's failure to see our vehicle until it was 10 feet away could be consistent with a fatigued vehicle operator."
[26] Deposition of Edward R. Crum, July 31, 2024, P. 9, L. 21-25 and P. 10, L. 1-2: "The first report being dated April the 1, 2024?" "Yes, that's the one I've got."

| DATE | DESCRIPTION | SOURCE |
|---|---|---|
| 01/15/2021 | "We have not been able to make contact with the insured driver." The same note asks: "Why was their truck broken down?" | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 8. |
| 01/19/2021 | "Limited assignment to track down NI and IVD and get their version of the facts of the accident." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 8. |
| 02/26/2021 | "NICO issued a letter denying all liability- NO Contact with Insured- relied solely on Police Report." | Original Report chronology, P. 8. |
| 06/03/2021 | "Sent to PC copy of dec page and requested add'l med records when received and will evaluate to see if I can make an offer." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 10. |
| 06/30/2021 | "increasing exposure to BI reserve to $150k based on coverage confirmed, 'liability appears favorable to insured ...'" | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 10. |
| 01/13/2023 | "NICO receives a demand from the plaintiff counsel for $ 846,676.07; the letter indicates it is an 'initial' demand ... . There was no time limit to respond." | Sullivan Report, P. 5; Rule 26 PDF P. 9 of 26. |
| 02/09/2023 | "The site visit was conducted on February the 9, 2023." | Crum Deposition, July 31, 2024, P. 8, L. 20-23. |
| 03/08/2023 | "Crum found that our vehicle was located approximately 3 feet into the traveled portion of the roadway and that Walden would have had approximately 8 feet of clearance for him to maneuver around our vehicle." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 11. |
| 02/22/2024 | "Determined expected value to be $234,249. Authority approved in this amount." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 12. |
| 03/27/2024 | "I retained a private investigator, Ricky Needham, to attempt to locate the named insured and driver." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 12. |
| 04/20/2024 | "I called the plaintiff's counsel and made an offer of $100,000.00. I indicated that liability is highly disputed and we also dispute the need for any future medical." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 13. |

| DATE | DESCRIPTION | SOURCE |
| --- | --- | --- |
| 12/19/2024 | "Claim settled at mediation for $200,000.00." | Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 14. |

This condensed chronology does not establish that NICO was required to settle at any listed figure. It shows why the analysis cannot fairly be reduced to "rear-end collision" on one side or "parked truck" on the other. Both existed, and the claim file had to evaluate both.

## X. Deposition Testimony Relevant to the Rebuttal

The following testimony is quoted because it shows the balance of the liability record. It should not be shortened into a slogan.

### A. Officer Jason Taylor Curry

> Q. "Okay. Now, is that truck parked properly?" A. "Oh? No, it was -- from the -- it was a little bit over the outside right fog line." Q. "Okay." A. "It looked like it was maybe -- from the picture, it looked like 3 or 4 feet onto the end of the travel lane."[27]
>
> A. "Unit one stated he was tired. He had not seen unit two parked at the edge of the ramp and unit 1 struck unit two." ... Q. "And on Page 3 under human factors for Mr. Walden, what did you list?" A. "Fatigue and inattention."[28]
>
> Q. "But the place was -- the -- in the -- would -- would you agree that the intersection is very well lit?" A. "Yes, ma'am."[29]
>
> Q. "The truck that was improperly parked, did -- what -- as far as you can recall, did it have lights on, hazard lights or headlights?" A. "I don't -- I don't remember."[30]

Officer Curry therefore supports both sides of the comparative-liability record: lane intrusion by the insured truck, and fatigue/inattention evidence against Mr. Walden. He also distinguishes a well-lit area from the unresolved condition of the truck's own lights.

### B. Charles L. Walden

> Q. "Is it true that you didn't see the vehicle parked on the edge of the ramp?" A. "Yes, ma'am." Q. "Is it true that you were tired?" A. "No, ma'am."[31]
>
> Q. "How far in front of you was it when you first saw it?" A. "About -- I guess roughly 10 feet, I guess." ... Q. "How fast were you going as you exited?" A. "About 50. I was trying to get off the interstate and I dropped down to 45, 50 and then -- the rest of the way."[32]

That testimony is significant. It supports some comparative negligence and defeats any suggestion that NICO faced an obvious sole-liability claim. It does not erase the insured vehicle's intrusion into the travel lane.

---

[27] Deposition of Officer Jason Taylor Curry, July 29, 2024, P. 15, L. 17-25; P. 16, L. 1-4.
[28] Deposition of Officer Jason Taylor Curry, July 29, 2024, P. 20, L. 1-4 and L. 14-16.
[29] Deposition of Officer Jason Taylor Curry, July 29, 2024, P. 25, L. 7-9.
[30] Deposition of Officer Jason Taylor Curry, July 29, 2024, P. 30, L. 17-20.
[31] Deposition of Charles L. Walden, January 4, 2023, P. 33, L. 21-25.
[32] Deposition of Charles L. Walden, January 4, 2023, P. 40, L. 2-20.

**C. Clarence M. Howard**

> Q. "Does it look like his truck is over on the shoulder from that picture?" A. "No, it doesn't." Q. "Okay. Does it look like his truck, from that picture with a more clear angle, is in the actual lane that he was driving in?" A. "Yes."[33]
>
> Q. "But there are regulations on spacing for these placards." A. "Uh-huh." Q. "Did you know that?" A. "Yeah." Q. "Do you know what that spacing is?" A. "I can't recall." Q. "Okay. How do you know you know you followed all the regulations if you're not sure what the spacing is?"[34]
>
> THE DEPONENT: "I placed the placards according to where it would lead out into the streets so that way if a car was coming, they wouldn't have any choice but to see them. Now, were they regulations? I don't know. They could have been. But they were enough to where if you were a driver, you couldn't have missed them."[35]

Mr. Howard's testimony supports that he placed warning devices and believed they were visible. It also shows that he could not identify the required spacing. His account was material to liability, but NICO did not obtain it before the initial liability denial.

**D. Edward R. Crum**

> Q. "Yeah. So, prior to even getting -- making it to the guardrail, it's possible he could have pulled over all the way over to the shoulder out of the lane of traffic?" A. "Yeah, I -- I think so. I mean, that truck was a tractor and trailer commercial vehicle and he was on the shoulder. So, I would think that the straight truck would have room to pull over there also."[36]
>
> A. "I think the first thing they need to do is try to look for a safe place to -- to get off the roadway and get out of traffic, get more of a safe haven to get their truck to."[37]
>
> A. "Once -- once they get the truck to where the -- get it off the roadway as far as possible, they have a duty to place warning triangles out for oncoming traffic within ten minutes at the rear of the truck. Those triangles have to be -- first one would have to be 10 feet off the rear. I think the second one is 100 paces and angled toward the center of the lane that they're blocking or the shoulder. And the third one would be, I think, it's 200 feet, angled more into the oncoming traffic lane."[38]
>
> Q. "Okay. If they're not placed out far enough, is that dangerous?" A. "It would give you less -- I think less of -- less -- less of time to react. And that's why there's a standard for those warning triangles."[39]
>
> A. "The human factor of parking a commercial vehicle on the travel portion of the roadway. That is, the human factor of the vehicle breaking down and not allowing him to get it off the roadway onto the shoulder. The vehicular factor of a mechanical breakdown was found to have contributed to the location of the Howard commercial vehicle. ... The human factors of either fatigue and/or inattention were found on the part of Mr. Walden."[40]

Mr. Crum did not eliminate comparative negligence. He identified factors on both drivers. That is precisely why his work supports a comparative-exposure evaluation rather than either a zero-liability

---

[33] Deposition of Clarence M. Howard, June 14, 2024, P. 99, L. 12-21.
[34] Deposition of Clarence M. Howard, June 14, 2024, P. 94, L. 13-22.
[35] Deposition of Clarence M. Howard, June 14, 2024, P. 95, L. 1-8.
[36] Deposition of Edward R. Crum, July 31, 2024, P. 14, L. 9-16.
[37] Deposition of Edward R. Crum, July 31, 2024, P. 16, L. 1-5.
[38] Deposition of Edward R. Crum, July 31, 2024, P. 24, L. 13-22.
[39] Deposition of Edward R. Crum, July 31, 2024, P. 25, L. 9-13.
[40] Deposition of Edward R. Crum, July 31, 2024, P. 48, L. 3-14.

slogan or a sole-fault conclusion against NICO's insured.

## XI. Response to the Opinions of Christine A. Sullivan

### A. Global Conclusion and the Limits of Expert Opinion

Ms. Sullivan concludes that NICO "met the industry standards, customs and practices for proper claims handling and did not breach its duty of good faith and fair dealing," and that UCSPA allegations are "without merit."[41]

I disagree with the claims-practice portion of that global conclusion for the reasons below. I do not answer her ultimate legal conclusion with another ultimate legal conclusion. Whether a statutory violation or bad faith occurred is for the Court and trier of fact. My opinion is that important claim-handling periods and decisions cannot fairly be declared proper merely by collecting the entire four-year history into one paragraph and ending with the settlement result.

### B. The 2021 Liability Denial

Ms. Sullivan states that, despite unresolved questions about triangle placement and the line between the breakdown and travel lanes, the information available at denial was reasonable because of Mr. Walden's fatigue and inattention.

> "Although there were questions of the placement of the reflective triangles and the exact location of the insured vehicle based on the 'line' delineating the breakdown lane and the travel lane, the information that NICO had at the time of this denial was reasonable based on the fatigue and inattention of the claimant driver as mentioned in the police report."[42]

I agree that the police report supplied a reasonable basis to investigate comparative fault and to resist an immediate full-value payment. I disagree that it necessarily supported a complete and unqualified no-liability denial while NICO knew the insured vehicle was partly in the travel lane, had not obtained the insured driver's version, and had not resolved the warning-device evidence. The December 9, 2020 outside-adjuster report quoted in the claim record already said the insured unit was "partially in the lane of Travel."[43]

A reasonable claim organization may take an interim liability position when its insured is unavailable. But an interim position should be identified as interim, should account for known adverse facts, and should be revisited as information develops. A rear-end collision is not a universal solvent that dissolves a commercial truck located three or four feet into the travel lane.

### C. Investigation Activity Is Not the Same as Liability and Damages Evaluation

Ms. Sullivan is correct that NICO retained outside firms and made repeated efforts to contact the insured and insured driver. I credit those efforts. I disagree that the existence of those tasks, by itself, establishes that the liability and damages evaluation was timely and adequately documented.

---

[41] Sullivan Report, P. 3 (Rule 26 Disclosure PDF P. 7 of 26): "Based on my review and analysis of this matter, it is my opinion ... that NICO met the industry standards, customs and practices for proper claims handling and did not breach its duty of good faith and fair dealing to the claimant, Charles Walden." The same page states: "Any allegations with respect to violations of Kentucky's Unfair Claims Settlement Act are without merit."

[42] Sullivan Report, P. 4 (Rule 26 Disclosure PDF P. 8 of 26).

[43] NICO 003817, quoted in Original Report, P. 7: "You will note the insured unit is partially in the lane of Travel at the time; however the photographs and the police report do indicate that the insured driver had placed reflective cones behind the insured unit at the time of the incident."

Searching for the insured was necessary. The search was not the claim evaluation. An outside adjuster can search addresses, send letters, and make calls. That work does not, by alchemy, become a comparative-fault analysis, an injury valuation, an authority request, or a settlement strategy. The current Kentucky administrative regulation expresses the documentation principle plainly: "The insurer shall maintain documentation in each claim file to permit reconstruction of the insurer's activities relative to each claim."[44]

The record supplied should permit a reviewer to determine what NICO believed the insured exposure was at each material stage, what information changed that belief, and what action followed. The materials show many events. They do not always show the connecting analysis.

**D. The Missing Driver and Parallel Coverage/Merits Tracks**

Ms. Sullivan states that the missing insured driver impeded NICO and that non-cooperation was a coverage issue.[45] I agree. But a coverage problem and a liability-merits decision are different tracks. The absence of the driver made the fact record less complete; it did not turn the truck's lane intrusion into a non-fact.

The proper claims-practice question is not whether the missing driver excused every delay or proved bad faith. It is whether NICO clearly documented: (1) the non-cooperation coverage issue; (2) the facts known independently of the driver; (3) the limitations of any interim liability decision; (4) escalation after repeated unsuccessful searches; and (5) reevaluation once the driver was found. The source materials show activity on several of those subjects, but they do not justify calling the 2021 no-liability decision complete merely because the driver was absent.

**E. Accident Reconstruction and Shared Fault**

Ms. Sullivan fairly notes that Mr. Crum found negligence or human factors on both sides. I agree. His testimony supports the insured driver's exposure from the truck's location and possible safer alternatives, while also supporting fatigue/inattention by Mr. Walden. That is not a finding that NICO's insured was solely liable. It is a reason to perform a comparative evaluation.

Mr. Crum's later work may have improved NICO's understanding of the case. It does not travel backward in time and make a 2021 denial reasonable by itself. The correct question is what NICO reasonably investigated and documented before the denial, and how promptly it reevaluated when Crum's findings became available.

**F. Ambient Lighting, Truck Lighting, and Warning Devices**

Ms. Sullivan states that both the officer and reconstructionist found sufficient lighting. The record supports that the intersection or general area was well illuminated, and Mr. Crum's May 30, 2024 site visit states: "During the documentation process, the area was well illuminated from the highway and the ambient lighting."[46]

That evidence deserves weight. It does not establish the condition of every roadway light four years earlier or establish whether the disabled truck displayed hazard or running lights. Ambient lighting

[44] 806 KAR 12:095 § 3(2), current official Kentucky Legislative Research Commission text.

[45] Sullivan Report, P. 10 (Rule 26 Disclosure PDF P. 14 of 26): "The fact that the insured operator was not able to be found for quite some time impeded the ability of the insurer to protect the rights of the insured in determining liability. ... This was and is a coverage issue ... ."

[46] Crum Investigations, LLC, Collision Analysis Supplement Report dated June 1, 2024, P. 2 (Doc. 160-1, Page ID 1490). The report states the documentation occurred May 30, 2024 at approximately 11:31 p.m.

and vehicle lighting are not the same thing. A well-lit intersection does not answer whether the disabled truck itself gave the additional warning that operating hazard lights would provide.

Likewise, warning triangles were present. The original spacing is uncertain because the collision may have moved or damaged them. A balanced report should not say the spacing was conclusively proper or conclusively improper. It should say that spacing affected reaction time, that Mr. Howard could not state the required spacing, and that the original placement was no longer reliably reconstruct able.

### G. Reserve, Claims Committee Authority, and the $100,000 Offer

I agree that the $150,000 reserve was not an amount NICO was required to offer. The more direct negotiation evidence is the February 22, 2024 Claims Committee entry: "Determined expected value to be $234,249. Authority approved in this amount."[47] The first documented offer was $100,000 on April 20, 2024, with the explanation that liability and future medical were disputed.[48]

An insurer is not required to offer its entire authority on the first call. Authority is a ceiling, not a starting confession. But when the company's own committee has identified an expected value and approved authority more than twice the opening offer, reasonable claim documentation should explain the negotiation strategy, the comparative-fault and medical assumptions, and the reason for the opening figure. The materials supplied show the figures; they do not fully show the bridge between them.

### H. The January 2023 Demand and Medical Investigation

Ms. Sullivan correctly states that the demand had no stated time limit, was described as initial, and that defense counsel requested information. I therefore do not say it was ignored in the literal communication sense. I also agree that NICO was entitled to obtain medical information reasonably needed to evaluate causation, recovery, and future treatment.

The remaining question is whether NICO performed and documented an interim evaluation using the information already available while the additional information was being gathered. A request for more records is often appropriate. It should not become a substitute for evaluating what is already in the file. I cannot independently resolve the competing medical opinions from the materials supplied, and I do not attempt to do so.

### I. Communication of the Demand to the Insured

Ms. Sullivan makes an important factual concession:

> "While there is no documentation in the claim file regarding the January 2023 demand, there was no impact on the outcome of the underlying case which was settled at mediation for significantly less than the policy limits."[49]

The first clause concerns process. The second concerns hindsight and outcome. A later settlement below limits may bear on prejudice or damages, but it does not create documentation that was absent when the demand was received. Nor does a general Reservation of Rights letter prove that the insured was informed of this particular demand, its amount, or its possible increase.

---

[47] Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 12.
[48] Claim Handling, Internal Value Adjuster Log, quoted in Original Report, P. 13: "I called the plaintiff's counsel and made an offer of $100,000.00. I indicated that liability is highly disputed and we also dispute the need for any future medical."
[49] Sullivan Report, P. 10 (Rule 26 Disclosure PDF P. 14 of 26).

In third-party liability claim practice, the insured should be kept reasonably informed of material developments, especially when non-cooperation and a Reservation of Rights may leave the insured personally concerned about protection. On the supplied record, I retain the limited opinion that communication of the January 2023 demand is not documented. I do not opine on the ultimate legal duty, prejudice, or damages, and I would revise this opinion if the primary file contains the missing communication.

**J. The $200,000 Settlement**

The underlying case settled for $200,000 at mediation. That result matters. It shows that the January 2023 demand was not the final negotiated value and that the parties compromised below both the stated demand and policy limit. It also shows that NICO ultimately paid twice its $100,000 opening offer and less than the reported Claims Committee expected value or authority.

The settlement is not a verdict on every earlier decision. A later settlement does not travel backward in time. It cannot prove that the 2021 denial was adequately investigated, that evaluation was timely during each intervening period, or that the insured was informed. Conversely, it prevents me from claiming that the demand, reserve, or authority was necessarily the correct settlement value. The result is a data point, not a time machine.

**K. Kentucky Statutes and Regulations as Claims-Practice Guideposts**

The relevant Kentucky statute identifies, among other subjects, prompt communication, reasonable standards for investigation, reasonable investigation based upon available information, good-faith settlement when liability becomes reasonably clear, and a reasonable explanation for a denial or compromise.[50]

Those provisions inform my understanding of accepted claim practices. I do not tell the Court that a statutory violation occurred. The current administrative regulation also states that a violation is found only by the Commissioner and does not itself create a private cause of action.[51] My opinions are therefore expressed as insurance-industry process opinions, not legal rulings.

## XII. Opinions in Rebuttal

After reviewing Ms. Sullivan's report, the additional deposition testimony, and the limitations identified above, my rebuttal opinions are as follows:

**I** Ms. Sullivan's broad conclusion that the entire claim handling met industry standards is not supported by a time-segmented analysis of the decisions actually made. Her report relies in material part on evidence developed years after the 2021 denial and on the eventual settlement result.

**II** The 2021 complete liability denial was issued before NICO obtained its insured driver's account

[50] KRS 304.12-230(2), (3), (4), (6), and (14), respectively: "Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies"; "Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies"; "Refusing to pay claims without conducting a reasonable investigation based upon all available information"; "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"; and "Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

[51] 806 KAR 12:095 § 2(4): "A violation of this administrative regulation shall be found only by the commissioner. This administrative regulation shall not create or imply a private cause of action for violation of this administrative regulation."

and while the claim material already reflected that the insured truck was partly in the travel lane. The police report supported comparative negligence by Mr. Walden, but the known lane intrusion and unresolved warning-device issues made a complete no-liability conclusion insufficiently developed under generally accepted claim-investigation practices.

**III** NICO did not do nothing. It opened the file, used outside adjusters or investigators, pursued the insured, obtained records, retained counsel and experts, and eventually evaluated and settled the claim. I withdraw language suggesting literal abandonment. The remaining claims-practice deficiency is the absence, in the supplied record, of a clear and timely documented connection between investigation activity, comparative-liability analysis, damages evaluation, authority, and negotiation during material periods.

**IV** The claim involved genuine comparative-liability and medical-causation disputes. I do not opine that NICO was required to accept the January 2023 demand, pay policy limits, offer the reserve, or treat Mr. Walden as free from fault.

**V** The $150,000 reserve was not a required offer and should not be equated with settlement value. The February 22, 2024 Claims Committee expected-value and authority entry is more directly relevant to settlement handling. An opening offer below authority is not inherently improper, but the claim file should document the assumptions and negotiation rationale connecting the reported $234,249 expected value or authority to the $100,000 opening offer.

**VI** Later reconstruction, medical review, deposition testimony, and the $200,000 settlement are relevant to the overall history, but they do not retroactively establish that the earlier denial, evaluation, communication, and settlement decisions were reasonable when made.

**VII** The original placement of the warning triangles and the operational condition of the truck's own lights are not established with certainty by the supplied evidence. I withdraw any definitive contrary statement. The record nevertheless establishes that warning-device placement and truck visibility were material investigation subjects and that the insured driver could not later state the required spacing.

**VIII** Ms. Sullivan agrees that the claim file contains no documentation of communication of the January 2023 demand to the insured. A later settlement below limits does not answer that process issue. Subject to review of any missing primary communication, the absence of documentation is inconsistent with sound third-party liability claim practices for keeping an insured reasonably informed of material developments.

**IX** The fixed forty-five-day continuation-letter theory and KRS 304.12-230(7) "compelling litigation" theory stated or implied in my Original Report should not be used as direct third-party claimant opinions on the present record. I withdraw those formulations and defer legal application and historical-version questions to counsel and the Court.

**X** The primary denial letter, Reservation of Rights letters, January 2023 demand, Claims Committee record, and original Crum reports should be used to resolve the date and source discrepancies identified in this rebuttal. If those primary documents materially differ from the quotations or summaries presently available, I will revise my opinions accordingly.

These opinions are not an assertion that every NICO claim activity was improper. They identify the specific process issues that remain after giving Ms. Sullivan appropriate credit and correcting my own overstatements.

## XIII. <u>Reservation of Right to Review Additional Evidence and Offer Additional Rebuttal Opinions</u>

The foregoing opinions are based upon the materials identified above. I expect that primary claim-file documents, certified transcripts, deposition testimony, or other evidence may be presented in the future. I reserve the right to revise or supplement these rebuttal opinions if additional information materially changes the factual basis stated here.

I also reserve the right to respond at deposition or trial to opinions or testimony offered by Ms. Sullivan that are within the scope of her disclosed report and to explain the corrections and limitations stated in this report. I do not intend this reservation to create opinions unrelated to the subjects disclosed in my Original Report and this rebuttal.

I am prepared to be deposed, testify at trial, mediation, arbitration, or otherwise offer testimony before a competent forum or tribunal.

**Dated this 19th day of August 2026 at El Segundo, California**

________________________________________

Frederick J. Fisher, J.D., CCP