KENTUCKY
COURT REPORTERS

schedule@kyreporting.com
859.410.2415

www.kyreporting.com

UNITED STATES DISTRICT COURT
EASTERN DIVISION OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO. 5:22-CV-00238-KKC

CHARLES L. WALDEN,
Plaintiff

V.

ENTERPRISE SERVICES GROUP, LLC
CLARENCE M. HOWARD, AND
NATIONAL INDEMNITY GROUP OF
INSURANCE COMPANIES OR
NATIONAL INDEMNITY COMPANY,
VINCE KLINE, AND PROGRESSIVE
CASUALTY INSURANCE COMPANY,
Defendants

DEPONENT: OFFICER JASON CURRY
DATE: JULY 29, 2024
REPORTER: MADISON HAVEN

APPEARANCES

ON BEHALF OF THE PLAINTIFF, CHARLES L. WALDEN:

Robert Morrin, Esquire
Morrin Law Office
214 West Main Street
Richmond, Kentucky 40475
Telephone No.: (859) 358-0300
E-mail: rob@morrinlawoffice.com

ON BEHALF OF THE DEFENDANT, ENTERPRISE SERVICE GROUP:

Marcia Ridings, Esquire
Hamm, Milby & Ridings, PLLC
120 North Main Street
London, Kentucky 40741
Telephone No.: (606) 864-4126
E-mail: marcia@hmrkylaw.com

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, IPSI INSURANCE:

Catie Coldiron Joseph, Esquire
Ward Hocker Thornton
333 West Vine Street
Suite 1100
Lexington, Kentucky 40207
Telephone No.: (859) 422-6000
E-mail: catie.coldironjoseph@whtlaw.com

# INDEX


| | Page |
|---|---|
| PROCEEDINGS | 6 |
| DIRECT EXAMINATION BY MR. MORRIN | 6 |
| CROSS-EXAMINATION BY MS. RIDINGS | 17 |
| REDIRECT EXAMINATION BY MR. MORRIN | 28 |


## EXHIBITS


| Exhibit | Page |
|---|---|
| 1 - Kentucky Uniform Police Traffic Collision Report | 21 |
| 2 - Photograph Depicting Fog Line | 21 |
| 3 - Photograph Depicting Fog Line and Plaintiff's Vehicle | 21 |
| 4 - Photograph of Box Truck, Rear View | 22 |
| 5 - Photograph of Box Truck Over Fog Line, Front View | 22 |
| 6 - Photograph of Box Truck Over Fog Line, Side View | 23 |
| 7 - Photograph of Interior of Plaintiff's Vehicle | 24 |
| 8 - Photographs of Location of Accident, 4 Views | 25 |

STIPULATION

The deposition of OFFICER JASON CURRY was taken at MORRIN LAW OFFICE, 214 WEST MAIN STREET, RICHMOND, KENTUCKY 40475 on MONDAY the 29th day of JULY 2024 at 11:16 a.m. (ET); said deposition was taken pursuant to the KENTUCKY Rules of Civil Procedure.

It is agreed that MADISON HAVEN, being a Notary Public and Court Reporter for the State of KENTUCKY, may swear the witness.

PROCEEDINGS

COURT REPORTER: We are now on the record.

Officer Curry, will you please raise your right hand? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: You may begin.

DIRECT EXAMINATION

BY MR. MORRIN:

**Q. Thank you for giving us your time, Officer Curry. I appreciate it.**

**Can you state your full name, please?**

A. Jason Curry.

**Q. Okay. No middle name?**

A. Oh, Taylor. Jason Taylor Curry.

**Q. Okay. What was your last year of traditional education? I would say undergrad?**

A. Oh, I've got a -- a bachelor's degree from Eastern Kentucky University in 2003.

**Q. 2003. Okay. And then after EKU, what was your employment look like, your employment history?**

A. I was -- I went through the Kentucky Police Corps program from June until November of 2003, at which point I was, technically, hired by the Richmond Police

Department.

**Q. Okay.**

A. And I worked there until three years ago when I quit and went to the Eastern Kentucky University Police.

**Q. So until -- was that 2021?**

A. Yes.

**Q. Okay.**

A. And I was also in the National Guard until -- during that -- during that time period --

**Q. Okay.**

A. -- so then I had two deployments involved in there.

**Q. Okay.**

A. Well, I had another one in 2002 also. So three, total.

**Q. Thank you for your service. We appreciate it.**

A. Thanks. Thanks.

**Q. Are you still in National Guard now?**

A. I gave it up after my last deployment.

**Q. Yeah.**

A. Three was enough.

**Q. Long enough, yeah. Now, do you recall an accident that happened August 10, 2020?**

A. I recall going to the wreck. I don't remember

much about the wreck.

**Q. Somewhat, yeah. Have you taken a look at the collision report?**

A. I -- I do.

**Q. You got it. Have you seen -- have you reviewed pictures of the accident?**

A. Yes.

**Q. Okay. Recently?**

A. A couple months ago, around Easter.

**Q. Okay.**

A. And then looked at a couple of them just a little while ago.

**Q. Okay. I do have more pictures if that'll help. But if you've reviewed --**

A. Yeah.

**Q. -- the pictures, then I'm not going to make you thumb through those, necessarily. Let's see. Were you the first officer on the scene?**

A. I don't remember who got there first. I just know it was my -- my call, so I --

**Q. Okay.**

A. -- the way it works is we're split out into four districts and each district has two beats. And who -- wherever the -- it happens, that district officer works the wreck.

**Q. Okay.**
A. Or any other -- whatever other calls showed up.
**Q. So that was your district?**
A. It was -- that was my district.
**Q. Any other accidents happened in that district that night, you'd be the one in charge of --**
A. Yeah. Anything that happened -- unless I was getting -- unless I had too many, then somebody else would help me out.
**Q. Okay. And so you, basically, coordinate all first responder efforts and the collision report --**
A. Dispatch. Pretty much everything I recall. But --
**Q. With dispatch, yeah.**
A. -- but once it comes in, dispatch starts -- they -- it's an automatic trigger. If somebody says they're injured, it automatically triggers an EMS and fire response.
**Q. Okay. What do you recall when you arrived on the scene?**
A. I don't really recall a whole lot. I just remember there being a wreck and I remember that it was between a truck and a semi. That's about really all I remember.

**Q. Do you recall speaking to Charles Walden?**
A. Not -- not really.
**Q. Okay.**
A. I don't really remember talking to anybody.
**Q. Do you remember the individual who was injured there?**
A. I don't really remember any.
**Q. Okay. You don't remember any conversations you had with anybody at the time --**
A. Uh-uh.
**Q. -- and that -- and -- and that's --**
A. I -- yeah, I don't. It was --
**Q. -- I don't ask that with any kind of --**
A. Yeah, I --
**Q. -- judgment attached to it. It happened four years ago --**
A. It's four years ago, yeah.
**Q. -- so I understand, yeah.**
A. There's -- there's been a lot of -- a lot stuff happen in the last four years.
**Q. Okay. How long were you on the scene. Do you recall, did you -- let me -- yeah, let you answer?**
A. At the time, what was -- was the dispatch. Because I left -- wait, this -- these things are such a pain in the neck to read. Which occurred at midnight. I

left this -- I left the scene around 1:30. That is when the roadway opened.

**Q. Okay.**

A. And that's when I left the scene.

**Q. Do you recall anything about why the truck was inoperable or if it was inoperable?**

A. I believe the driver said that it -- it had broken down.

**Q. Okay.**

A. And the driver pulled it over and left it. I don't think I ever actually spoke with the driver. I don't have any notes that I spoke with the driver, so I'm thinking I might have spoke with the dispatcher.

**Q. Okay.**

A. But that's just what I would normally do. You just get the contact information from the -- the truck and call the dispatcher if you can't find the driver.

**Q. And did you go to the hotel where the driver was?**

A. No.

**Q. Do you know if any other officers did?**

A. I don't -- I don't know. I don't --

**Q. Okay.**

A. I don't believe so.

**Q. Okay. Are there any memories that you have of**

**this incident, whatsoever, that are not, necessarily, in the collision report or from these pictures?**

A. No. I can't think of any. It's one of those where I just wrote it up and moved on.

**Q. Okay. But you did -- did you -- you said you did speak with dispatch? The --**

A. Yes.

**Q. -- the driver's -- is that your dispatch or the driver's?**

A. The driver's dispatch.

**Q. The driver's --**

A. I think that's how I -- that's how I collected all the information.

**Q. Okay.**

A. And that's -- that's just how I -- how I would do the investigation to find -- to find out if I don't know. But I don't --

**Q. That's pretty typical.**

A. -- that's pretty typical, but I -- I don't 100 percent remember because the main thing -- if the vehicle's parked, the main thing is who owns it, not who was, necessarily, operating it at the time?

**Q. Right.**

A. Because there wasn't an operator in the vehicle.

**Q. Right. Do you recall there being triangle hazard placards set out?**
A. There were notes in the report and there's -- they're in the photographs.
**Q. Yeah. Would -- and in the photographs, those placards looked like they were fairly close to the vehicle. Is that pretty standard. Do you -- if there's an accident like that, are the placards closer to the vehicle or are they pushed out further?**
MS. RIDINGS: Objection.
THE WITNESS: I can't --
BY MR. MORRIN:
**Q. Not sure?**
A. Really say. That's --
**Q. No?**
A. -- I mean, that's -- that's up to the driver.
**Q. Yeah. Right.**
A. You know, and I will say when you're walking -- I've put those out -- when you're walking those out, it seems further than it is when you're putting them out than when you come back and look at them.
**Q. Yeah.**
A. But I can't -- I can't say what the standard is. I don't know if there's a DOT standard or not on

that.

**Q. Right. I believe these are all pictures we got from the police file. Is this the accident that you saw pictures of when you were --**

A. Yes.

**Q. -- reviewing your file?**

A. Yes.

**Q. Okay.**

A. I was going to say this is -- and that's only part of them.

**Q. That's -- yeah, that's not all of them. I think there were 20.**

A. Well, I just know -- I just know I always take pictures. One of the first things I do is take pictures of the license plates and put it in the scene.

**Q. Okay.**

A. And then do a -- I try to do an outer scene and like that and try to put the vehicles with landmarks so you could go back and realign them.

**Q. Okay.**

A. So --

**Q. What kind of landmarks do you put on?**

A. Just something that's going to be stationary so that if you go back to look at the scene later on, you can put where --

**Q. Like a description of something in the road?**

A. -- yeah.

**Q. Or something --**

A. Or -- well, like, if there's going to be light poles, those you're not going to remember so I'll try to get a picture of the vehicle in reference to that light pole or a sign post.

**Q. Okay.**

A. And that way it's -- you can narrow down the accident.

**Q. Okay.**

A. If we're -- if they -- we're going to do a reconstruction, we go ahead and call a reconstructionist out at that time. And then they can -- they can either reconstruct at that time or label spray paint markings and go back and do it later.

**Q. Okay. Now, is that truck parked properly?**

MS. RIDINGS: Objection.

THE WITNESS: The --

BY MR. MORRIN:

**Q. The -- the box --**

A. The semi?

**Q. -- the box truck -- yeah.**

A. Oh? No, it was -- from the -- it was a little bit over the outside right fog line.

**Q. Okay.**
A. It looked like it was maybe -- from the picture, it looked like 3 or 4 feet onto the end of the travel lane.
**Q. Okay. I'm looking at Page 2 of the collision report. Do you have a copy of this? I've got --**
MS. RIDINGS: I gave him mine.
MR. MORRIN: Here, I've got it so -- yep.
MS. RIDINGS: Okay. Thanks.
MR. MORRIN: Yep.
BY MR. MORRIN:
**Q. Looking at Page 2 of the collision report, I believe it indicates that the collision occurred approximately 20 minutes prior to the collision being reported. How is that time difference figured out?**
A. Just by talking to the --
**Q. Did -- taking statements?**
A. -- just talking around.
**Q. Okay.**
A. Usually we know what time we get there, how long it takes us to travel to get there. And then however long it takes the person to call the -- it's just usually just a rough estimate, but it's usually pretty accurate.
**Q. Did you have any communications with the truck**

**driver's dispatcher the following day?**
A. I don't believe so. It's --
**Q. Okay. It's not a gotcha question. I'm just --**
A. Oh, well, I'm not -- I'm not worried about gotcha questions. I'm just trying to remember.
**Q. Yeah.**
A. It's -- yeah, that's -- I just don't think I did.
MR. MORRIN: Okay. I think your memory is what it is andI really don't have a ton more questions to ask. It is what it is, so I'll yield the witness to miss --
THE WITNESS: Okay.
MR. MORRIN: -- Ms. Ridings.

CROSS-EXAMINATION

BY MS. RIDINGS:
**Q. All right. It's nice to see you. You and I did meet once before to discuss this matter. The police report that you had in front of you, it's a four-page report. Was that made in the course and scope of your employment for the Richmond Police Department?**
A. Yes, ma'am.
**Q. And did it reflect what people told you at the time?**
A. Yes, ma'am.

**Q. Was it kept in the ordinary course of business? Is it a formal business report?**

A. I don't know about business, but it's just a formal -- it's a standard report that we use.

**Q. That's kept --**

A. It's used and it's written on the -- the Kentucky open portal system software that everyone in the state uses.

**Q. Right. And this is the report that you made, probably the night of the accident; would that be accurate?**

A. Yes, ma'am.

**Q. And it looks like you were notified about 12:26 and you arrived at 12:28; is that right?**

A. Yes, ma'am.

**Q. Okay. You said the road was cleared at 1:29, so you hung around a while; is that right?**

A. Yes, ma'am.

**Q. And when you get there, your job is to ask people -- try to find out what happened; is that right?**

A. Try to find out what happened, treat any first aid until paramedics get there, arrange for tow trucks, photograph everything.

**Q. Okay. And you didn't refer to people by name, you referred to them by one and two. Who did you**

**identify as unit one?**

A. Unit 1 was the operator of the pickup -- or the pickup truck.

**Q. And what's his name?**

A. Charles Walden.

**Q. Okay. And you ask him what happened; is that right?**

A. Yes, ma'am.

**Q. And that's what you do, ordinarily, in an investigation of any business; is that right?**

A. Yes, ma'am.

**Q. And what did he tell you?**

A. Just said he was driving. He was tired. He -- wait one minute, make sure I didn't make any other notes. Said he -- said he was complaining of -- that he dislocated his hip. He'd had previous hip surgery. Just -- and then said he'd been tired and there were other --

**Q. Did he say that he did not see the truck --**

A. I believe so.

**Q. -- parked on the edge of the ramp?**

A. I believe so --

**Q. Look --**

A. -- but I don't remember.

**Q. -- look at your report. I don't want to put words in your mouth. It says unit one stated --**

A. I -- I was looking at the wrong spot. I'm sorry. I apologize. "Unit one stated he was tired. He had not seen unit two parked at the edge of the ramp and unit 1 struck unit two."

**Q. Okay. And he was able to tell you about his injuries; is that right?**

A. Yes -- yes, ma'am.

**Q. He was able to tell you he had an injury before?**

A. Yes, ma'am.

**Q. And that he requested that he go to UK because he had been treated there before; is that right?**

A. Yes, ma'am.

**Q. And on Page 3 under human factors for Mr. Walden, what did you list?**

A. Fatigue and inattention.

**Q. Okay. You also noted in your report -- go back to Page 2, if you will. It said unit two had been parked on the right side of the ramp; is that right?**

A. Yes, ma'am.

**Q. And it had broken down and the driver had set out reflective triangles behind the truck; is that correct?**

A. Yes -- yes, ma'am.

**Q. And they are shown in -- I'm going to give you**

**-- did you make those exhibits?**
MR. MORRIN: I don't -- no.
MS. RIDINGS: Do you want to or not?
MR. MORRIN: I did.
MS. RIDINGS: Okay.
MR. MORRIN: I'm okay.
MS. RIDINGS: I'll show you -- first of all, I want to make the police report Exhibit 1 --
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
THE WITNESS: Okay.
MS. RIDINGS: -- So we'll know what we're talking about. Secondly, Exhibit 2 and 3, I'll show.
(EXHIBIT 2 MARKED FOR IDENTIFICATION)
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
THE WITNESS: Yeah.
BY MS. RIDINGS:
**Q. Do these show that there was some reflectors?**
THE WITNESS: Yes, ma'am.
MS. RIDINGS: Okay. Let me pass these to court reporter.
BY MS. RIDINGS:
**Q. All right. You talked about you, like -- and you mentioned that you take pictures of landmarks, so you'll kind of know where it happened?**

A. Yes, ma'am.

MS. RIDINGS: And I kind of think that that's what happened in what I'll say would be Exhibit 4.

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

BY MS. RIDINGS:

**Q. Is that what you were doing so you would know exactly where the impact occurred?**

A. Yes, ma'am.

**Q. Okay. And that shows that the back of the truck was just in front of the sign that showed where EKU and so forth?**

A. Yes, ma'am.

**Q. So we would know exactly where on the ramp it occurred; is that correct?**

A. Yes, ma'am.

**Q. And you said in your report that it happened about halfway down -- that -- that's consistent with this?**

A. Yes, ma'am.

MS. RIDINGS: Okay. Let me show you Exhibit 5.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

BY MS. RIDINGS:

**Q. And that -- and, again, you said you thought that the truck was maybe about three or four feet over**

**the fog line; is that right?**

A. Yes, ma'am.

**Q. Does that show that?**

A. Yes, ma'am.

MS. RIDINGS: And how about Exhibit -- I'll make that Exhibit 6.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

BY MS. RIDINGS:

**Q. Does that, likewise, show that the truck was over -- against --**

A. Yes, ma'am.

**Q. -- the fog line. Did the truck get over pretty much as far as it could?**

A. I believe so. That's from -- that's what it looks like. It --

**Q. Okay.**

A. -- it's --

**Q. I may not make this an exhibit. I saw it, and I don't know what it was, but it looks like there is -- on the Walden vehicle that airbags deployed; is that right?**

A. Yes, ma'am.

**Q. There's a license plate right there on the seat, I don't think it's the same license number as --**

A. No.

**Q. -- do you have any idea --**

A. Now, it could have just been an old one that was in the vehicle. I don't know.

**Q. Okay. I just saw it -- truly I'm asking -- I'm doing what lawyers aren't supposed to do. I'm asking a question I don't know the answer --**

MR. MORRIN: Actual discovery.

THE WITNESS: I don't know. I mean, I could -- what we could do is run the license plate and see.

MS. RIDINGS: I'll make that an exhibit just in case.

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

BY MS. RIDINGS:

**Q. When I met with you before, you told me that you live close to where this accident occurred?**

A. Yes, ma'am.

**Q. And you're very familiar with this intersection; is that right?**

A. Yes, ma'am.

**Q. And are there big flood lights on that exit?**

A. Yes, ma'am.

**Q. Well --**

A. All over the place on the -- on the -- the bridge over the interstate and then the shopping center right there, there's -- there's lights everywhere.

**Q. Because the photographs are kind of dark. And I guess --**
A. Yes, ma'am.
**Q. -- that's because you -- it was taken at night; is that right?**
A. Yes, ma'am.
**Q. But the place was -- the -- in the -- would -- would you agree that the intersection is very well lit?**
A. Yes, ma'am.
**Q. I'm going to show you some pictures that were made sometime after the accident, but ask you if these show the big -- what I would call flood lights, which lit up the intersection?**
A. Yes, ma'am. That's --
**Q. If you'll look at both of them and --**
(EXHIBIT 8 MARKED FOR IDENTIFICATION)
THE WITNESS: Yeah, that's -- it's right in the -- real close to the same area.
BY MS. RIDINGS:
**Q. Okay. But and so the -- this was a well-lit intersection; is that correct?**
A. Yes, ma'am.
**Q. Is it -- would you call it a high volume? I mean, are a lot of people on that exit?**
A. Yes, ma'am.

**Q. Even late at night, there are a lot of people on that part?**

A. -I mean, a pretty good amount when it comes to -- yeah.

**Q. Okay. And that's one of the reasons that it's lit up; is that right? Well, I guess you don't know why, but it is lit up. Would you agree with that?**

A. Yes, ma'am.

MS. RIDINGS: Can I see your police report since I can't find mine.

BY MS. RIDINGS:

**Q. I'm looking on Page 1. It does say that the intersection was lit up?**

A. Uh-huh. It does.

**Q. It happened at night, but it was well lit; is that right?**

A. Yes, ma'am. Yes, ma'am.

**Q. And you drive on that nearly every night; is that right?**

A. Pretty close to it.

**Q. And it's -- I believe you told me it was lit up like a football field?**

A. It's very well -- like, even when it's foggy, it's pretty well lit up.

**Q. There was no indication of fog that night?**

A. No.

**Q. The plaintiff testified that the accident happened about 20 minutes before the accident occurred.**

MR. MORRIN: Yeah so --

BY MS. RIDINGS:

**Q. I'm sorry. Strike that.**

**The plaintiff testified that the accident occurred about 20 minutes before it was reported. Do you think that might be where this came from, or do you have any idea where?**

A. Usually we just walk it back, but I would say probably with his statement just from the impact, I'm going to guess his bell was rung pretty good because I -- the airbags and going from his speed to stop is going to be -- that's going to -- it's going to -- may take you a few minutes to come around to realize what happened.

**Q. Do you know how fast he was --**

A. That it went well over 35 is all I can guess just from the airbag deployment and the damage. I would guess around 60. Between 35 and 60, which is a pretty big -- pretty big window.

**Q. You're not an accident reconstructionist?**

A. No, ma'am.

**Q. Can I have just a second, please?**

A. Sure.

(OFF THE RECORD)

COURT REPORTER: We're back on the record.

BY MS. RIDINGS:

**Q. In the police report if -- can I look at my Mac so I can read what it is on, like -- on the narrative part. Okay. Unit one stated that -- toward the end that he had previously had hip surgery and he felt he had dislocated his hip; is that right?**

A. Yes, ma'am.

**Q. Is that the only injury he reported to you, was hip injury?**

A. That -- that -- that's all I noted. That's all I put in the report.

**Q. There was no indication of any kind of head injury, was there?**

A. No, ma'am.

MS. RIDINGS: Okay. That's all I have.

REDIRECT EXAMINATION

BY MR. MORRIN:

**Q. I'm going to have you look at Page 3 on the report again. I know we had you read -- Ms. Ridings had you read some of the human factors in Subsection E.**

**Can you read Subsection J, the environmental factors, please?**

A. It's an improperly parked vehicle.

**Q. Okay. And you mentioned that the ramp was well lit. I think someone mentioned a football field. It -- it -- was it -- it lit like a football field, is that --**

A. Well, it's --

**Q. -- is that accurate?**

A. -- it's pretty well -- you can see pretty well, everything. And you can see from a -- at least the bottom of the ramp on pretty much everything up the ramp.

**Q. And those pictures, they seem much darker than -- you know, you go to a football game --**

A. Yeah.

**Q. -- you take pictures. I mean, you can see every detail?**

A. Part of that is the cheap point-and-shoot cameras that were issued.

**Q. Oh, okay.**

A. Like, if you have a better camera, you would get better -- better quality photos.

**Q. What kind of cameras were issued -- were issued. Do you know?**

A. I don't remember. Just some little Nikon. I think -- I think --

**Q. Okay.**
A. -- it was a Nikon. I don't remember.
**Q. Okay.**
A. We had -- they had several different models and we'd pass them around and loan them. I don't remember which one.
**Q. Did they have flashes on them?**
A. They did, but --
**Q. Okay.**
A. -- sometimes with the ambient light, they don't always work all that well.
**Q. Okay.**
A. It's -- it's -- it's kind of a trick to get good pictures with them.
**Q. Okay.**
A. With that.
**Q. The truck that was improperly parked, did -- what -- as far as you can recall, did it have lights on, hazard lights or headlights?**
A. I don't -- I don't remember.
**Q. Okay. And you've not had any accident reconstruction training?**
A. Just the -- the standard.
**Q. What's the standard accident --**
A. Just the standard classes in the academy.

**Q. Okay.**
A. On how -- basically, how to fill out the report and what --
**Q. Cover some of the basics?**
A. -- stuff I've picked up over the years of doing more -- learning to ask more questions.
MR. MORRIN: Okay. That's all I have.
MS. RIDINGS: Nothing else.
COURT REPORTER: And, Robert, how would you like your transcript order?
MR. MORRIN: Just PDF is good.
COURT REPORTER: And, Marcia?
MS. RIDINGS: Yes. The same. Oh, we send it to Jay.
COURT REPORTER: Okay.
(DEPOSITION CONCLUDED AT 11:43 A.M. ET)

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skills and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

madison haven

MADISON HAVEN,
COURT REPORTER / NOTARY
COMMISSION EXPIRES ON: 02/01/2028
SUBMITTED ON: 08/08/2024

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY COURT REPORTERS

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY COURT REPORTERS

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY COURT REPORTERS

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY COURT REPORTERS

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201