**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| CHARLES L. WALDEN | ) | |
| | ) | Civil Action No. 5:22-cv-00238-KKC-EBA |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL INDEMNITY GROUP OF INSURANCE COMPANIES OR NATIONAL INDEMNITY COMPANY | ) | **NATIONAL INDEMNITY COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Defendants | ) | |

* * * * *

Defendant National Indemnity Company ("NICO"), by counsel, submits this Memorandum in Support of its Motion for Motion for Summary Judgment:

## INTRODUCTION

This is a third party bad faith case that arises from NICO's handling of Plaintiff, Charles Walden's ("Plaintiff" or "Walden") bodily injury claim. Around midnight on August 10, 2020, Walden drove his pickup truck into the back of a parked tractor trailer truck on a well-lighted interstate exit ramp in Madison County, Kentucky. The police report indicates Walden told the responding officer that he was tired and never saw the tractor trailer before he ran into it. Walden sued NICO's insured, Enterprise Services Group, LLC ("Enterprise"), and its driver, Clarence Howard ("Howard"), for his alleged accident-related injuries and NICO for statutory and common law bad faith. Walden's underlying disputed injury claims were ultimately settled for $200,000, but he continued to pursue his bad faith claims against NICO thereafter.

Walden alleges that NICO intentionally caused an unreasonable delay between the time it received notice of Walden's claim and the settlement. Walden complains that NICO acted in bad

faith and violated the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA") because it did not pay his claim in a timely fashion. But even when viewed in a light most favorable to Walden, the record facts here do not establish bad faith and summary judgment must be entered in NICO's favor.

Indeed, Kentucky sets a high bar for bad faith and KUCSPA violations. It is not enough that a claimant wishes he had been paid sooner. He must show that the insurer had an obligation to pay (because the fault of the insured and causation for damages was "beyond dispute") and that its conduct was "outrageous" in order to sustain his claim. As his complaint is predicated on NICO's alleged delay, Walden must further prove that the delay's purpose was to harass, extort a more favorable settlement from him, or to deceive him as to the applicable coverages. Walden cannot clear any one of those hurdles. Here, the fault of NICO's insured for causing the accident was never reasonably clear or "beyond dispute." By Walden's own account (as well as expert testimony in the underlying bodily injury case), the parked tractor trailer that Walden rear-ended was visible from at least 770 feet, he did not see it until he was about ten (10) feet away, there was another eight (8) feet of open lane beside it, and there was no fog or rain. Causation for and the amount of Plaintiff's accident-related injuries and damages were also matters of legitimate dispute. His damages too were not "beyond dispute." While Walden attributed headaches, memory and cognitive losses and his inability to labor or earn money to the 2020 accident, in truth Walden had a lengthy physical and mental health history before this accident. He had been in significant car accidents in 2011 and 2017, and he suffered serious injuries because of them. He was deemed disabled from the Social Security Administration and received monthly benefits. He also had documented substance abuse conditions including a heroin overdose followed by inpatient drug rehab. He had a head injury earlier in 2020, and a doctor's note written a week *before* this accident

recorded that Walden's headaches were "getting worse" and he suffered from baseline memory loss.

Walden's proof of NICO's bad faith is gossamer thin (if non-existent). After all, he never really sought to develop any proof. His case rests solely on a retained expert, Frederick Fisher ("Fisher"), whose rebuttal report and deposition testimony backtracked and withdrew many of the assertions made in his initial expert report. In truth, this Court should not consider Fisher's opinions or testimony as they are inadmissible. (NICO has simultaneously moved to exclude Fisher). But as his testimony makes clear even Fisher concedes he is "not sure" liability ever became reasonably clear—and as such it is undisputed that there was a fair disagreement about who was at fault as well as causation of damages considering Walden's long medical history. Fisher also testified that he saw no evidence of an improper motive and would say only that he thought NICO's handling of Walden's claim was "beneath the standard of care"—because NICO should have hired an accident reconstructionist and tried to locate their insured and the driver sooner. Negligence, however, does not constitute outrageous conduct or bad faith. Nor is there evidence that NICO's alleged delays damaged Walden. When asked how NICO's handling hurt him, Walden answered: "I'm going to pass on the question." NICO is entitled to judgment as a matter of law.

Alternatively, if the Court does not fully grant summary judgment in its favor, NICO is at least entitled to partial summary judgment on Walden's claims for recovery of attorney's fees and prejudgment interest, because neither is available under Kentucky law to a third party claimant like Walden.

## FACTUAL BACKGROUND

**1. The August 10, 2020 Accident.**

Late on August 10, 2020, Walden was driving north in his pickup on the I-75 Exit 87 off-ramp in Richmond, Kentucky, when he struck the rear of a parked 2012 Freightliner owned by NICO's insured, Enterprise, and driven by Howard. (D.N. 1-1, at ¶¶ 8–9; Police Report, NICO 3750-53).[1] Before the accident occurred, Howard's truck had overheated; he pulled onto the ramp as far right as he could, called his dispatcher, set out reflective triangles, and walked to a nearby hotel. (Howard Dep. 28:2–18, 34:1–38:24, 46:4–15, attached as **Exh. 2**)

The police report recorded that Walden "stated that he was tired and did not see Unit 2 parked on the edge of the ramp." (Walden Dep. at 17:21–18:9, attached as **Exh. 3**). No citation was issued to either driver. Police photographs NICO obtained in December 2020 of the accident scene show triangles behind the truck, whose rear sat slightly over the fog line; Walden does not dispute the placement of the vehicles, agreeing the truck was "not halfway in the road" as his attorney had previously alleged. (NICO 003834–53; Exh. 3, at 22:19–23:5, 24:6–11).



Guardrail face area. Figure-3



Evidence of reflective warning triangles. Figure-5

NICO retained accident reconstructionist Eddie Crum ("Crum") in the underlying tort case who measured more than 770 feet of sight line, found the truck about three (3) feet into the lane, and found about eight (8) feet of open lane through which Walden could have passed. (Crum Rep. at 4, 8, 11, attached as **Exh. 4**). Walden did not see the truck until about ten (10) feet away, agrees

[1] All bates stamped documents referenced are attached in numerical order collectively as **Exh. 1**.

there was no fog or rain, and has "no reason to disagree" with Crum's measurements. (Exh. 3 at 24:12–20, 30:23–32:23). The police officer who responded to the accident, Jason Curry ("Curry"), testified the ramp was "lit up like a football field." (Curry Dep., 26:9–24, attached as **Exh. 5**; Exh. 3 at 25:11–14). Although Walden seems to recall it being dark and claims he crawled from the accident scene towards the intersection where he was found, he inextricably also claims to have had no memory of the collision or of what he told the officer. (Exh. 3 at 18:10–20:10).

Walden spent seven (7) days in UK hospital and had surgery for a right hip fracture/dislocation. (*Id.* at 32:25–33:11). The EMS report, which his counsel sent NICO, records that Walden denied other complaints and was texting on his phone during the entirety of his ambulance ride from Richmond to UK Medical Center.[2] As NICO obtained Walden's medical records, those records demonstrated a complicated medical history including: a traumatic brain injury and hip replacement in a 2011–12 collision; a 2017 collision breaking his collarbone and ribs; a June 2017 heroin overdose; and, seven (7) days before this accident, a record noting headaches "getting worse," a head injury four (4) months earlier, and baseline memory loss. (*Id.* at 45:2–46:25, 114:22–115:22, 124:1–2, 130:2–15).

**2. Walden Hires a Lawyer Before NICO Knows of the Accident.**

On August 17, 2020, the day Walden left the hospital, he signed a contingent-fee contract with his present counsel. (*Id.* at 33:23–35:8). He agrees he did not hire counsel (and thereby obligate himself to incur attorney fees in the course of seeking reimbursement for his claim) because of anything NICO did or did not do. (*Id.* at 35:11–16, 36:5–9, 37:4–22). NICO first

[2] Walden initially claimed his telephone was in his pocket and was destroyed in the collision. (*Id.* at 26:8–29:9, 30:12–22). After being confronted with the records that undermined that testimony, he claimed that he "might" have been using a phone that he borrowed from his father (who came to the accident scene). (*Id.* at 54:24–55:17). Even if his testimony was true, it does not account for the inherent inconsistency between Walden's claims he was grievously injured from the accident and objective third party proof that he was able to employ the cognition, dexterity, and focus needed to continuously text others for the entire 30-minute ambulance drive.

received notice of this accident on October 16, 2020—sixty-seven (67) days after the accident—in a letter from Walden's counsel. (NICO 003749).

### 3. NICO Opens the Claim and Undertakes Numerous Efforts to Locate Its Insured and the Driver, Who Do Not Respond.

NICO opened its file on November 3, 2020, and the next day retained a local adjusting firm to photograph, investigate, and interview its insured and the driver. It also left the insured a voicemail, and acknowledged the claim to Enterprise and to Walden's counsel. (NICO 003754–57, 3764–73, 3796, 3798, 3814–15; Sullivan Rep. at 3–4, attached hereto as **Exh. 6**). The adjusters could not reach Enterprise or Howard; given this difficulty, in December 2020, NICO issued a reservation of rights to the insured Enterprise under the policy's cooperation condition. (NICO 003816–17, 3855–57). On January 15, 2021, NICO's file review recorded that the police report indicated the truck had broken down, reflective triangles were out, the claimant said he was tired, and no one was cited. (NICO 003670). In January 2021, and after having had no luck in getting a response from the insured, NICO now assigned a Georgia-based adjuster to help locate Enterprise and Howard; an ISO report on Howard followed on February 4; and reports on February 26, March 17, and April 18 recorded receiving no response from the insureds despite sending them letters using multiple addresses. (NICO 003865-68, 3872–74, 3905-08, 3918-23).[3] On February 3, 2021, Walden's counsel sent only EMS and ER records to NICO and wrote that he would "send over a formal demand package when [Walden] has completed his treatment." (Exh. 3. at 38:12–39:5). None followed for nearly *two years*.

[3]Plaintiff's own expert, Fisher, acknowledges NICO's "significant attempts to locate their insured and insured driver." (Fisher Rep. at 18, attached as **Exh. 7**).

**4. NICO Initially Sent a Denial Letter to Walden on February 26, 2021 Based Upon the Police Report, But Requested Additional Information and Kept Its File Open.**

On February 26, 2021, NICO's assigned claim examiner, Vince Kline ("Kline"), wrote that, based on the information then available, NICO did not believe its insured was responsible, explaining that the police report recorded Walden's fatigue and failure to see the truck, that it was a rear-end collision, and that reflective triangles had been set out. (Exh. 3 at 47:24–48:25; NICO 003901). Despite the letter's invitation to provide additional information, Walden (a now represented party) relayed no objections. In fact, his counsel sent *nothing* in response. (Exh. 3 at 48:23–49:2).

**5. NICO Provides Its Policy Limits Information and Asks for Records; Walden's Counsel Does Not Respond for Fourteen Months.**

Walden's lawyer next wrote to NICO on May 13, 2021, seeking the declarations page and advising that his client would not settle without litigation unless it was provided. (May/June 2021 Correspondence, attached as **Exh. 8**). On May 19, Kline agreed to send it if counsel provided a written statement of Walden's version of the accident facts, injuries, treatment, records, bills, and theory of liability. (*Id.*). Walden acknowledged it was fair for NICO to ask for those things. (Exh. 3 at 52:11–53:20). Walden's counsel responded on May 25 and asserted that the truck was "parked halfway on the ramp" without lights, described Walden's injuries as a broken hip, cut hand, head abrasion, and bruised ribs, sent only the EMS and ER records, and promised other records "upon receipt." (Exh. 8). None of the initial information provided suggested Walden suffered a concussion, brain injury, or headaches because of the accident.

On June 3, 2021, Kline sent the declarations page, restated NICO's confidence in its insured's liability defenses, and again asked for Walden's records so he could "see if there's any kind of meaningful offer I can make on this claim." (Exh. 8). Walden sent no further records, and

his counsel did not again contact NICO for the next fourteen (14) months. (Exh. 3 at 64:23–65:6, 69:4–22). During those fourteen (14) months, NICO raised its reserve to $150,000, kept searching for Howard, sent another reservation of rights letter to its insured in October 2021, and confirmed with the Georgia Secretary of State that Enterprise was still in business. (NICO 003669, 3953–58, 3975, 3977–82).

**6. Walden Does Not Send Any Demand and Files Suit Against NICO, Enterprise, and Howard on August 10, 2022.**

On August 10, 2022, exactly two (2) years after the accident, Walden filed suit in the Madison Circuit Court against Enterprise, Howard and NICO. With regard to NICO, Walden alleged that NICO "compelled Plaintiff to institute litigation . . . by not making a reasonable offer" and parroted other alleged violation of the KUCSPA. (Exh. 3 at 68:17–69:3; D.N. 1-1, ¶ 43). Notably, the demand package Walden's counsel promised would follow was never sent prior to the time suit was filed. The case was removed (D.N. 1), and on October 18, 2022, the Court bifurcated the bad faith claims and stayed discovery on them. (D.N. 12). NICO retained attorney Marcia Ridings ("Ridings") to represent Enterprise and Howard; on November 15, 2022, NICO reserved rights as to excess exposure.

**7. Walden's First Demand Was Made in January 2023 For Less Than the Policy Limits and Was Not Time-Limited.**

On January 13, 2023, Walden's counsel made his first demand: $846,676.07, described as an initial figure that would rise with additional medical records. (NICO 004919–43; Exh. 6 at 5). The demand letter set no deadline for a response.[4] It also asserted claims for future medical expenses and household services – claims never raised before. (Exh. 9 at 136:24–137:6).

[4] Fisher's original contrary characterization was withdrawn. (Fisher Dep. 136:16–136:17, attached as **Exh. 9** ("I was wrong on that"); Fisher Rebuttal Report § VI(A), at 3, attached as **Exh. 10**.

NICO's January 28, 2023, claim note records the demand, that liability was disputed, and instructed Ridings to obtain verbal opinions from the reconstructionist and an orthopedist on causation and to schedule mediation. (Exh. 3 at 80:23–81:24; NICO 003666). Ridings wrote to Walden's counsel on February 2 that she needed authorizations, discovery responses, and other items "before I can move forward," adding that she would "love to be in a position to settle this case." (NICO 004947–48). When no response was received, Ridings followed up with Walden's counsel on February 21 and March 8. (NICO 004965–66, 4988). Even Walden agreed it is "not really accurate to say the insurance company just kind of blew [me] off." (Exh. 3 at 83:24–84:10). In fact, the claim file confirms that Ridings had already conferred with the accident reconstructionist, Crum, on January 12, the day *before* the demand. (Exh. 9 at 135:4–351:14; NICO 004913–15). Crum visited the scene in February 2023 and reported on March 8: the truck was about three (3) feet into the lane, Walden had about eight (8) feet of clearance, and his failure to see the truck until ten (10) feet away could be consistent with fatigue. (Exh. 4 at 4, 8, and 11).

Walden's damages on account of the accident also remained unsettled. In September 2023, Ridings sent Walden's records to an orthopedic surgeon, Dr. Timothy Kriss ("Dr. Kriss"). Walden's counsel moved for more time to disclose experts because Walden was "actively treating," had not reached maximum medical improvement, and awaited treating physician opinions that never came. (NICO 003665). The Court ultimately granted Walden more time for his expert disclosures—until December 5, 2023. (*See* D.N. 87, 10/6/23 Order). Walden does not attribute this "delay" to NICO. (Exh. 3 at 91:20–94:22).

A mediation was set for February 6, 2024, but Ridings' email recounts that Walden's counsel had written that he felt it was "destined to fail." (NICO 005752–65). The mediation did

not go forward. NICO's insureds still could not be found and, despite attempts to contact them, NICO's reservation of rights letter was "returned with no forwarding address." (NICO 003665).

**8. NICO Evaluates the Claim, Finds the Driver, and Makes Offers, While Disputes Continue in the Underlying Bodily Injury Case.**

On February 22, 2024, NICO's Claims Committee including Kim Hodgen, a claim professional who replaced Kline on the file ("Hodgen"), evaluated the claim, and considering disputed liability, Walden's own negligence, and causation and damage questions, set an expected settlement value of $234,249, and approved authority in that amount. (NICO 003664–65; Exh. 6 at 5–6). (Plaintiff's expert Fisher actually "compliment[s]" NICO for using a claims committee. (Exh. 9 at 266:24–5)). On March 26, Hodgen called Walden's counsel to discuss settlement. (NICO 003665). NICO retained a private investigator March 27 (*id.*); Ridings corresponded with the investigating officer, Curry, on March 30 (NICO 003664); and on April 20, the insured driver Howard finally responded to NICO's efforts to reach him. (*Id.*). He contacted Ridings and reported that his vehicle overheated, he got over as far as he could on the side of the road, put out reflective triangles and walked to a nearby hotel and notified Enterprise. (*Id.*). That day, Hodgen left Walden's counsel a message offering $100,000, noting liability was highly disputed and future medical expenses were unsubstantiated. (*Id.*). Walden has no reason to disagree that this offer was made (although his counsel incorrectly later called the June 2024 offer of judgment the "very first offer.") (Exh. 3 at 88:20–91:18; NICO 006525–6528).

Over Walden's objection, the Court compelled an independent medical examination (affirming the magistrate judge on May 3, 2024), and Dr. Kriss examined him May 10. (NICO 003664; D.N. 139). Dr. Kriss concluded that the hip surgery had restored function and range of motion, that later treatment concerned conditions unrelated to this hip injury, and that a future surgery proposed by Walden's retained physician lacked support. (Exh. 6 at 5; NICO 005538–62).

Howard, Officer Curry, and Crum were deposed in June–July 2024, and NICO served a $100,000 offer of judgment (consistent with Hodgens's earlier oral offer). (NICO 003664). On June 13, 2024, Walden filed a motion requesting leave to add four (4) experts to rebut Enterprise and Howard's experts, whose expert disclosures were timely filed and served on May 28, 2024. (D.N. 157). On November 15, 2024, the Court denied the motion for leave thus barring Walden's rebuttal experts in the underlying case as untimely. (D.N. 201). Mere days after this adverse ruling, Plaintiff agreed to mediation and it was scheduled for December 19, 2024.

**9. Walden's Underlying Claim Settles for $200,000 But Reserves His Bad Faith Claim.**

On December 19, 2024, the claim settled at mediation for $200,000: a small percentage of the $846,676.07 demand—the only demand ever made before mediation—or certainly of the $1 million policy limit. (Exh. 3 at 68:3–11; NICO 003664–65, 4919–43). A release and dismissal followed. (NICO 003664). However, Walden has continued to pursue his bad faith claim against NICO.

**10. Walden "Pursues" His Bad Faith Claim, Which Has Been Limited to Serving One Set of Written Discovery and Expert Discovery.**

In the bad faith case, the parties exchanged written discovery requests. In Walden's answer to NICO's interrogatories asking for the factual bases for his bad faith claim, he states that NICO (1) denied liability based on the police report without speaking to its insured; (2) "never responded" to his January 2023 demand; (3) made no written offer until the June 2024 offer of judgment; and (4) set reserves of $150,000 and $234,249 while offering less. (Walden's Resp. to Interrog. Nos. 5, 7–10, attached as **Exh. 11**).

Walden's deposition in the bad faith case was taken December 11, 2025. During his deposition, Walden could not explain ***any*** basis for his discovery responses. He does not know the basis for the damages he seeks or how interest was computed; he does not know what NICO did

to find its insured and cannot fault those efforts; he agrees NICO kept handling his claim; and asked how he was harmed by NICO's taking a liability position before speaking with Howard, he said, "I'm going to pass on the question," then, "I don't know." (Exh. 3 at 73:19–75:15, 76:11–78:8, 138:10–143:9). Indeed, when asked for anything else supporting his claim, he said, "I drew a blank." (*Id*. at. 131:5–132:2).

NICO responded to Walden's single set of discovery on June 5, 2025, and produced its claim file (over 6,000 pages) and a privilege log. No NICO employee has ever been deposed; none was requested or noticed. Fact discovery has long since closed. Walden's only evidence disputing the reasonableness of NICO's claim handling comes from his retained expert Fisher, whom he only belatedly hired on May 13, 2026, to serve a report by the deadline of May 27. (*See* Exhs. 7 and 10). Fisher's original report charged that NICO denied liability knowing the truck was partly in the road, sent no 45-day letters, retained Crum and a private investigator too late, "weaponized" the missing driver, "logged zero evaluative activity" from June 2021 to March 2023, ignored a policy-limits demand, and compelled litigation. (Exh. 7 at 21–23). In rebuttal and at deposition, Fisher withdrew or narrowed the majority of the opinions contained in his initial report. (*See generally* Exh. 10). NICO has separately moved to exclude him in its contemporaneously filed Rule 702 Motion.

## ARGUMENT

### I. Summary Judgment Is Proper Because Walden Cannot Satisfy Kentucky's Stringent Bad Faith Standard.

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-movant, here Walden, must "show sufficient evidence to create a genuine issue of material fact," *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002), more than a scintilla. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Judgment is mandated against a party who fails to establish an element on which he bears the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

To prevail on a bad faith claim, whether first or third party, statutory under the KUCSPA (KRS 304.12-230) or pursuant to common-law, a plaintiff must prove that "(1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) . . . the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993); *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000). "Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown." *United States Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. App. 2003).[5]

Instead, the plaintiff must show more than a technical violation or negligence: the conduct must be "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others," and it must have caused actual damage to the claimant. *Wittmer*, 864 S.W.2d at 890–91; *Motorist Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452, 454 (Ky. 1997); *Hamilton Mut. Ins. Co. of Cincinnati v. Buttery*, 220 S.W.3d 287, 294 (Ky. App. 2007). Where the theory is one of undue delay, "mere delay in payment" is insufficient and "does not amount to outrageous conduct absent some affirmative act of harassment or deception"; the claimant must show "the purpose of the delay was to extort a more favorable settlement or to deceive." *Glass*, 996 S.W.2d at 452–53;

---

[5] *See also Mann v. The Hartford*, 2005 U.S. App. LEXIS 17831, *15-16 (6th Cir. Aug. 18, 2005) (plaintiff must establish intent or systemic conduct); *Nevels v. Deerbrook Ins. Co.*, 2011 U.S. Dist. LEXIS 144887, at *13 (E.D. Ky. Dec. 16, 2011) ("outrageous conduct" is an element of a Kentucky bad faith claim); *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 679–80 (E.D. Ky. 2010) (delay without evidence of improper purpose is not outrageous).

*Nichols v. Zurich Am. Ins. Co.*, 630 S.W.3d 683, 690 (Ky. 2021). Delays attendant to requests for information or to defending litigation do not support that inference.[6]

As shown below, Walden's case falls well short of the high burden Kentucky law imposes for bad faith claims.

### A. At All Relevant Times, NICO Had a Reasonable Basis in Fact and Law to Dispute Its Insured's Fault for Causing the Accident and Walden's Accident-Related Damages, Entitling it to Make No Offer While it Disputed Liability.

KRS 304.12-230(6) requires an insurer to make an offer and/or to pay the claim only when liability is "reasonably clear," which Kentucky courts have construed to mean "beyond dispute." *Coomer v. Phelps*, 172 S.W.3d 389, 395 (Ky. 2005); *Hollaway v. Direct Gen. Ins. Co.*, 497 S.W.3d 733, 738 (Ky. 2016). In a third-party context like this one, "liability" has two components: 1) the insured's fault for causing the accident; and 2) that the plaintiff's alleged injuries and damages were caused by the accident (and the extent and severity of the claimant's accident-related damages). If there are legitimate disputes as to either or both of these components, then they are not "beyond dispute" and an insurer may dispute them. *Hollaway*, 497 S.W.3d at 738. If either component is not present, the insurer may "forego any effort to settle and . . . take a dispute about liability to a jury," and the bad faith claim fails as a matter of law. *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 586 (Ky. 2021); *Lee v. Med. Protective Co.*, 904 F. Supp. 2d 648, 656 (E.D. Ky. 2012); *see also Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 520 (Ky. 2006) (insurer may zealously defend itself). Even where the insurer recognizes the possibility its insured may be apportioned a share of fault by a jury, that too does not necessarily impose a duty to settle upon an

---

[6] *See Phelps v. State Farm Mut. Auto. Ins. Co.*, 736 F.3d 697, 706 (6th Cir. 2013) (summary judgment where insurer waited 6½ months to seek records on prior medical history); *Wells v. GEICO Gen. Ins. Co.*, 2021 U.S. Dist. LEXIS 137625 (E.D. Ky. July 23, 2021) (summary judgment where insurer offered $800, then settled for $300,000 after discovery on causation of alleged brain injury); *Powell v. Cherokee Ins. Co.*, 919 F. Supp. 2d 873, 881–82 (W.D. Ky. 2013) (delays from depositions and litigation scheduling did not show a scheme to deceive or delay).

insurer. As long as there is evidence to support the insurer's position that its insured is not at fault, the insurer – again – may make no offers and dispute liability before a jury without exposing itself to bad faith liability. *Messer*, 598 S.W.3d at 587.

Plaintiff can never meet the second prong of *Wittmer* because at all relevant times (and even after receipt of a policy limits demand)[7], its insured's liability for the accident and Walden's damages were not "reasonably clear" or "beyond dispute." As to fault, NICO had ample, reasonable grounds for disputing its insured's fault for causing the accident and/or in contending Walden was in fact not at fault for it. After all, from the outset, Walden told the police officer he was tired and did not see the parked tractor trailer truck (NICO 003750–53), even though that officer reported the ramp was "lit up like a football field" (Exh. 5 at 26:9–24), police photographs documented reflective triangles had been set out around the truck, there were 770 feet of sight line, no fog or rain, and 8 feet of open lane for Walden (Exh. 4 at 4, 8, 11), all of which would have allowed him sufficient time and space to recognize the existence of the truck and avoid the collision. Walden, for his part, initially also disclaimed any memory of the crash, then claimed he saw the truck only at 10 feet away. (Exh. 3 at 17:21–18:9, 24:12–20, 28:8–29:9, 31:13–32:23, 100:17–103:19). NICO's initial conclusions about Walden's fault were also subsequently supported by expert proof from the accident reconstructionist Mr. Crum, as well as deposition testimony from Officer Curry. While Howard's truck was partially in the road at night, and a jury could have apportioned fault to Enterprise/Howard as a result, that possibility (which NICO considered) did not translate into NICO having a legal duty to abandon its liability defense. Because it had legitimate grounds to argue that Walden should have avoided the accident and was

[7]Under Kentucky law, a liability insurer is not legally obligated to make an offer in the absence of a demand to pay the claim within the policy limits. *Am. Physicians Assur. Corp. v. Schmidt*, 187 S.W.3d 313, 317 (Ky. 2006). In this case, it is undisputed that Walden's first policy limits demand was made on January 13, 2023. Thus, NICO certainly had no legal duty to make an offer or pay the claim at least until its receipt of said demand.

thus entirely at fault for the accident, NICO was entitled to proceed and make no offer. *Messer*, *supra*.

*Hollaway* is on all fours: there, both drivers also blamed the other, the insurer questioned causation, and the insurer made lower offers before settlement. Despite this, the Kentucky Supreme Court nevertheless affirmed entry of summary judgment on a bad faith claim. *Hollaway*, 497 S.W.3d at 734, 738–39. As in this case, the existence of some evidence of fault by Enterprise or Howard (or the insurer's evolving view of the claim's value) does not raise a triable issue of fact. The record facts gave NICO a reasonable basis to conclude that a jury could assign Walden all—or at least substantial—fault for failing to avoid a visible truck despite ample lighting, sight distance and room to pass. Because the insureds' liability was never "beyond dispute," NICO never had a duty to pay and was, thus, entitled to contest liability without exposing itself to bad faith liability.

Indeed, both Walden and his expert concede the dispute. Asked whether liability was beyond dispute, Walden said, "I'm not going to answer that. I don't know." (Exh. 3 at 146:6–147:5). Fisher agreed that, on the initial facts, liability "could have gone either way" and "wasn't reasonably clear," and when asked when it became reasonably clear, he said, "I'm not sure that it did." (Exh. 9 at 126:7–22, 171:22–25). His rebuttal report further concedes "a genuine comparative-negligence dispute." (Exh. 10, § VI(F), at 5). (But *Messer*, again, stands for the proposition that the potential for comparative fault does not impose an obligation upon the insurer to make an offer if, as here, there is evidence to suggest that the insured is not at fault at all). Fisher does not rule out the possibility that a jury could have apportioned all liability to Walden. He called the question a "judgment call" and, when asked whether reasonable insurers could differ, answered: "Obviously they do. We're here; aren't we?" (Exh. 9 at 120:13–23, 144:16–19). Where

the plaintiff's own expert is "not sure" liability ever became reasonably clear, no reasonable jury could find that it was beyond dispute either.

The insured's liability for causing Walden's damages and the extent of those damages was also never "beyond dispute" and was legitimately disputed by NICO. As detailed above, Walden's history—including a prior traumatic brain injury and medical records just days before the accident documenting headaches that were "getting worse," memory loss, and vision loss—supports a valid dispute over causation for damages. (Exh. 3 at 45:2–46:25, 114:22–117:22, 130:2–15). Walden's counsel described his injuries to NICO in May 2021 as a broken hip, cut hand, head abrasion, and bruised ribs, with no brain injury or headaches. (*Id.* at 54:8–60:4). However, the January 2023 demand added claims for future medical expenses, a life care plan, and household services—damages never raised before but also curiously coming immediately after Walden suffered a December 2022 "mechanical fall" and experienced right low back pain and reporting headaches, memory problems, and back pain not previously reported in his medical records. (*Id.* at 97:10–99:10, 105:19–106:8, 116:7–21). Walden himself could not say that this accident caused his headaches or that his providers linked his headaches or back pain to it. (*Id.* at 100:2–12, 117:11–23, 119:15–18). Dr. Kriss, after examining Walden, concluded that the hip surgery had been successful and that later treatment and a proposed future surgery were unrelated or unsupported. (Exh. 6 at 5; NICO 005538–62). Further, Fisher's rebuttal concedes "legitimate disputes regarding medical causation and future treatment." (Exh. 10, § VI(F), at 5). Fisher in fact conceded it is not bad claim handling to investigate whether future medical expenses are related to the accident, and he does "not opine that NICO was required to pay the January 2023 demand, pay policy limits or accept every future medical claim." (Exh. 9 at 137:7–15, 208:23–209:01).

Simply put, causation and the amount of Walden's claimed damages were also not "beyond dispute." NICO had sufficient grounds to investigate, debate, and question that the damages he sought were accident-related. As such, Walden cannot meet his burden as set forth in *Wittmer* and other Kentucky bad faith precedents. *See Hollaway*, 497 S.W.3d at 738–39; *Wells*, 2021 U.S. Dist. LEXIS 137625. NICO is entitled to a summary judgment in this case.

**B. NICO Had a Reasonable Basis for Each Step of Its Handling that Walden Challenges.**

In truth, NICO had reasonable grounds for the claims handling decisions that Walden challenges.

**1. NICO's initial liability denial position was reasonable, and the file stayed open.**

Walden bases his bad faith claim, in part, on NICO initially denying the claim on liability grounds given that the truck was "parked halfway on the ramp" (according to Plaintiff's counsel). However, when NICO wrote on February 26, 2021, and denied liability, it was in possession of sufficient data to support its denial. It had the police report recording Walden's own statement that he was tired and did not see the truck, NICO also had official photographs showing the truck only straddling the fog lane with ample space for a car to pass, and reflective triangles behind a truck marking it to oncoming motorists; it was also aware no citation had been issued to Enterprise/Howard (or Walden, either). (NICO 003816-17, 3823-26, 3750–53). Walden's counsel had declined/ignored requests to let his client provide a recorded statement and sent only EMS and ER records with a promise of a later demand package. (*Id.*; *see also* NICO 003950, 3982; Exh. 7 at 7; Exh. 8; Exh. 3 at 38:12–39:5). An insurer need not acquiesce in a claimant's version of events. *Hollaway*, 497 S.W.3d at 739. Insurers may reasonably rely upon police reports as to the accident facts. *Breedlove v. State Farm Fire & Cas. Co.*, 690 S.W.3d 904, 917 (Ky. App. 2024). NICO

explained its reasoning and invited more information, and Walden agrees it was fair to rely on his medical records and to ask for his theory of liability and medical information. (Exh. 3 at 43:19–25, 53:12–20). That is the "reasonable investigation based upon all available information" the statute requires. KRS 304.12-230(4).

Importantly, the initial denial did not end NICO's handling: Walden agrees—and the record evidence shows—that NICO continued searching for the insureds, requesting additional records and handling the claim. (Exh. 3 at 62:3–64:15, 77:7–78:8); NICO 003668–69). Walden, however, never responded; he knows of nothing sent in the fourteen (14) months after June 3, 2021, before he sued on the last day of limitations. (Exh. 3 at 64:23–65:6, 68:17–69:22).

**2. NICO's efforts to locate its insured were diligent and the timing of the retaining and investigator and reconstructionist was reasonable.**

Walden's principal complaint is that NICO denied liability without contacting its insured or its driver. But NICO tried repeatedly to do so: it retained two adjusting firms in two states; conducted an ISO search; wrote letters to multiple addresses; checked with the Georgia Secretary of State on other possible addresses; sent two reservations of rights letters; and, in March/April 2024, hired a private investigator. (NICO 003855–58, 3864–68, 3872–75, 3905–09, 3918–23, 3958, 3976–81, 6086–93). Enterprise and Howard did not respond for years, only doing so when Howard contacted defense counsel Ridings in April 2024. Walden has "no idea" what NICO did to find them and cannot call it unreasonable. (Exh. 3 at 73:19–74:2). When Howard surfaced, his account matched the police report and NICO's position, and Walden agrees it is the story he would have told earlier. (*Id.* at 75:17–76:10). When asked how he was damaged by the timing, true to form, Walden "passed" the question. (*Id.* at 76:11–77:6). Fisher, too, acknowledged that his premise that earlier work (finding the insured, hiring an investigator to do so or an accident reconstructionist) would have produced an earlier settlement is speculation ("we don't know what

they didn't get") (Exh. 9. at 173:7–8). For all these reasons, there is no proof that failing to contact the insured sooner caused actual damage to Walden, and as such it cannot constitute a violation of the KUSCPA or bad faith. *Glass*, *supra*.

Otherwise, Walden's gossamer "proof" that hiring Crum sooner would have caused the case to settle earlier is really only a disagreement about the sequence of investigative steps, which Fisher called "a question of fact," (Exh. 9 at 254:3–6), and at most, "[i]nadvertence, sloppiness, or tardiness" which will not suffice to sustain a bad faith claim. *Bult*, 183 S.W.3d at 186.

### 3. NICO's response to the January 2023 demand was reasonable, and NICO did not "compel" this suit.

Walden says NICO "never responded" to his January 2023 demand. In truth, however, the record undisputedly shows the opposite, namely that within days of receiving it, NICO directed defense counsel to obtain reconstruction and orthopedic opinions and set a mediation. In turn, defense counsel reached out to Plaintiff counsel, asked for authorizations and information "before I can move forward" with the demand and followed up twice; Crum provided his report in March 2023; records went to Dr. Kriss in September 2023; a mediation was set for February 2024; and the Claims Committee met that month. Walden agrees NICO did not "blow [him] off." (Exh. 3 at 83:24–84:10). Importantly, the demand set no deadline for a response, did not seek the policy limits or any set amount of money—and for the first time raised a claim for future medical expenses and household services, amounts that an insurer is entitled to investigate—which Fisher concedes. (Exh. 9 at 136:2–136:17). Walden's own counsel told the Court in September 2023 that Walden was still treating and awaiting treating-physician opinions. (Exh. 3. at 91:20–94:22). An insurer cannot be faulted for not paying a claim the claimant himself admits is not yet developed. And, indeed, Fisher's "zero evaluative activity" charge was retracted. (Exh. 10 § VI(B), at 3; Exh. 9 at 190:15–191:5). The claim notes for that period record the reserve increase, continuing efforts to

find the insured, a second reservation of rights, and the January 2023 Crum conference. is in fact an ample record of prompt and reasonable claim handling on the part of NICO.

Nor did NICO "compel" Walden to hire counsel or file suit, despite Walden's allegations. (D.N. 1-1, ¶ 43). Notably, Walden admits that no act or omission by NICO caused him to retain counsel—or to incur the resulting attorneys' fees that reduced his recovery. (Exh. 3 at 37:4–38:3). He also admits he retained counsel before NICO knew of the accident, made no settlement demand before filing suit, and sued on the last day limitations allowed. (*Id.* at 35:11–37:22, 68:17–69:3, 79:14–25). A lawsuit filed on the last day of the limitations period, before all records were provided or any demand was made, was compelled by the calendar—not NICO. Fisher ultimately retreated from his opinion that NICO "compelled" Walden to file suit, saying only that "if you're up against a statute you have no choice," and he has "seen no evidence" NICO was running the clock. (Exh. 9 at 234:20–235:14; Exh. 10 § VI(G), at 5).[8]

**4. NICO did not concede fault or damages or have an obligation to pay because it posted a reserve.**

Fisher's complaint that NICO "put up a six figure reserve" and offered nothing (Exh. 9. at 199:13–19) conflates a reserve with an admission of liability and a duty to pay. However, this is inconsistent with Kentucky law which makes clear that an insurer's reserve is not an admission of liability or damages in a bad faith claim. *Messer*, 598 S.W.3d at 584–87; *Meador v. Ind. Ins. Co.*, 2007 U.S. Dist. LEXIS 27298, at *32–33 (W.D. Ky. Apr. 12, 2007). As such, NICO had no legal duty to make an offer or pay simply because, as required by law, it posted reserves. Fisher agrees reserves are not settlement offers (Exh. 10, § VI(C), at 5). He also admitted he could not say how the reserve damaged Walden: "Without the rationale, I can't." (Exh. 9 at 197:20–198:1). Absent

[8] KRS 304.12-230 (7) addresses compelling *insureds* to sue; Fisher withdrew reliance on it. (Exh. 10 § VI(G), at 5).

proof of actual damage, this allegation cannot constitute bad faith as a matter of law. *Glass*, *supra* at 452, 454.

### 5. Walden's other remaining criticisms of NICO are insufficient to base a bad faith claim upon.

Walden's other alleged claims of violations of the KUCSPA fare no better. Although Walden criticizes NICO for making no other offers after its $100,000 offer before the case ultimately settled for $200,000, NICO had no duty to make *any* offer as liability was not beyond dispute. *Mosley*, 626 S.W.3d at 586. NICO's first offer of $100,000 on April 20, 2024, was made in an effort to resolve the case—not because NICO had a legal duty to make an offer in this disputed liability case. This is substantiated by a contemporaneous Claim Committee evaluation report, which expressly notes that liability was highly disputed and future medical unsubstantiated. (Exh. 3 at 90:1–91:18). Opening offers below the eventual settlement amount are not evidence of bad faith. *See Hollaway*, 497 S.W.3d at 734, 738–39 (where the Kentucky Supreme Court affirmed summary judgment despite the fact that the defendant initially offered $5000 but the final settlement was $22,500); *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, 502 F. App'x 425, 429 (6th Cir. 2012).

Additionally, Fisher also faults NICO for not telling its insured about the January 2023 demand and for reserving rights. (Exh. 7 at 22–23). Yet, Fisher also agrees the insureds were unresponsive; Fisher agreed a reservation of rights reserves the right to deny coverage (Exh. 9 at 158:13–21), and non-cooperation is what prompted it. The case then settled for a fraction of the limit, so the insureds never faced excess exposure, and Fisher conceded the point "doesn't directly affect" Walden (i.e. damage him). (*Id.* at 162:4–15). And, most importantly, this is a third-party claim pursued by Walden—not a first party claim pursued by NICO's insured. Any duty to inform the insured runs to the insured, not to a third party claimant, like Walden. It is not among the

subsections Walden pled as a basis for his bad faith claim (D.N. 1-1, ¶ 44) and cannot ground his claim. *Nat'l Sur. Corp.*, 502 F. App'x at 429.

### C. The Record Contains No Evidence of Outrageous Conduct or Improper Purpose, and Fisher's Opinions Cannot Create a Fact Issue.

Both Kentucky state and federal courts have entered summary judgments on bad faith claims because the alleged conduct was not outrageous as a matter of law[9]. Walden's bad faith claim also fails for this reason. He has not developed any evidence from which a jury could reasonably infer that the purpose of NICO's alleged delays in settling the claim were to harass him, extort him into a more favorable settlement, or deceive him about the applicable coverages – the Kentucky standard for when a delay may constitute "outrageous conduct" so as to support a bad faith claim. *Glass*, 996 S.W.2d at 452–53; *Nichols*, 630 S.W.3d at 690. Here, there is no evidence of deception: NICO never misrepresented the policy; it supplied its declarations page and told counsel what it believed and why. (Exh. 3 at 47:24–48:25, 62:3–64:15). There is no evidence of extortion: NICO never held a payment hostage, despite there being evidence that Walden could be assigned all fault for the accident, and Enterprise/Howard's liability was not "beyond dispute"; it offered $100,000 and settled at $200,000 in a case where it had no duty to settle. And there is no evidence of strategic delay. Fisher does not "know whether the insurance company was hoping that the statute of limitations would run," has "seen no evidence that would suggest that was the intent," and has "no . . . evidence to support what [any] motive would be." (Exh. 9 at 212:3–20,

[9] *See*, *e.g.*, *Martindale v. First National Ins. Co. of America*, 2012 Ky. App. LEXIS 296, *12-*14 (Ky. App. Dec. 21, 2012); *Nat'l Sur. Corp.*, 502 Fed. Appx. at 429; *Carneal v. Travelers Casualty Insurance of America*, 2013 U.S. Dist. LEXIS 158243 (W.D. Ky. Nov. 5, 2013); *Gale v. Liberty Bell Agency, Inc.*, 911 F. Supp. 2d 488, 498-500 (W.D. Ky. 2012); *Wilson v. State Farm Mutual Automobile Insurance Co.*, 795 F. Supp. 2d 604, 607 (W.D. Ky. 2011); *Scott*, 714 F. Supp. 2d at 679-82; *Allstate Insurance Co. v. Strong*, 2009 U.S. Dist. LEXIS 28660, *11-*12 (E.D. Ky. April 6, 2009); *Sazegari v. Geico General Insurance Co.*, 2008 U.S. Dist. LEXIS 54822, *13-*15 (W.D. Ky. July 14, 2008); *Meador*, 2007 U.S. Dist. LEXIS 27298, at *32-*33.

235:10–14, 198:16–19). He withdrew his "weaponized" accusation and disclaimed any opinion on motive. (Exh. 10, § VI(D), at 4).

In truth, any delay was caused by Walden. Initially, earlier efforts at mediation failed because Walden's counsel told Ridings he felt it was "destined to fail." (Exh. 3 at 84:22–86:22). An insurer that is trying to resolve a case, and is met with silence and resistance, is not extorting anyone. And, here, every "delay" has a documented, understandable cause: an unresponsive insured; claimant's counsel who declined a recorded statement and who sent no supporting documents for fourteen (14) months; made no demand before suing; who resisted an IME until the Court compelled it; who delayed taking proof while the driver Howard was located; and who after seeking prior extensions failed to timely disclose rebuttal experts. Delays of that kind do not support an inference of improper purpose. *See Phelps*, 736 F.3d at 706; *Powell*, 919 F. Supp. 2d at 881–82; *Wells*, 2021 U.S. Dist. LEXIS 137625; *Scott*, 714 F. Supp. 2d at 679–80. What Walden calls "outrageous" is, at most, a legitimate debate about pace and/or delays which are attributable only to him. As a matter of law, it does not satisfy the "outrageous conduct" element of a bad faith claim.

**D. Fisher's "beneath the standard of care" opinions are inadmissible, and thus this Court need not consider them in ruling on the instant Motion for Summary Judgment.**

In ruling on a Motion for Summary Judgment, this Court need not consider inadmissible evidence—including inadmissible expert opinions. *Wiley v. U.S.,* 20 F.3d 222, 225-26 (6th Cir. 1994); *Beyene v. Coleman Sec. Services Inc*., 854 F.2d 1179, 1181 (9th Cir. 1988); *Scott*, 714 F. Supp. 2d at 679–80. NICO has contemporaneously moved to exclude Fisher as an expert under Fed. R. Evid. 702 as his opinions are inconsistent with Kentucky law and otherwise inadmissible. This Court need not consider Fisher's opinions at all in ruling on the instant Motion. After all, at most, Fisher's opinions that NICO's conduct was "beneath the standard of care" describe

negligence, which Kentucky holds insufficient to sustain a bad faith claim. *Bult*, 183 S.W.3d at 186; *Glass*, 996 S.W.2d at 452.

**II. Alternatively, NICO Is Entitled to Partial Summary Judgment on Walden's Claims for Attorney's Fees, Costs, and Prejudgment Interest.**

At a minimum, this Court should enter a partial summary judgment in NICO's favor on Walden's claims for attorney's fees, costs, and prejudgment interest. (D.N. 1-1, Prayer ¶ E; *see also* Exh. 11, Resp. to Interrog. No. 12). KRS 304.12-230 does not authorize the payment of attorney's fees nor prejudgment interest to prevailing parties, and KRS 304.12-235—which Walden did not even reference in his Complaint—only authorizes them for first party insureds. *Glass*, 996 S.W.2d at 455. Walden is a third party claimant—not a first party insured—and thus is not among those entitled to seek a recovery for violation of KRS 304.12-235. *Id.* As such, this Court should at least enter summary judgment on these remedies sought by Walden.

## CONCLUSION

For all the reasons set forth herein, this Court should grant summary judgment to NICO on Walden's claims.

Respectfully submitted,

*<u>/s/ Kyle R. Bunnell</u>*
Mindy G. Barfield
Kyle R. Bunnell
DINSMORE & SHOHL LLP
100 W. Main Street, Suite 900
Lexington, Kentucky 40507
Telephone: (859) 425-1000
*Counsel for Defendant, National Indemnity Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of October, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Robert Morrin, Esq.
Morrin Law Office
214 West Main Street
Richmond, KY 40475
*Counsel for Plaintiff*

*/s/ Kyle R. Bunnell*
Counsel for Defendant