**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| CHARLES L. WALDEN | ) | |
| | ) | Civil Action No. 5:22-cv-00238-KKC-EBA |
| Plaintiff | ) | |
| | ) | **DEFENDANT'S RESPONSE TO** |
| v. | ) | **MOTION TO EXCLUDE OR, IN** |
| | ) | **THE ALTERNATIVE, LIMIT** |
| NATIONAL INDEMNITY GROUP OF | ) | **THE TESTIMONY OF DEFENSE** |
| INSURANCE COMPANIES OR | ) | **EXPERT CHRISTINE SULLIVAN** |
| NATIONAL INDEMNITY COMPANY | ) | |
| | ) | |
| Defendants | ) | |

* * * * *

Defendant National Indemnity Company ("NICO"), by counsel, responds in opposition to Plaintiff's Motion to Exclude or, in the Alternative, Limit the Testimony of Defense Expert Christine Sullivan (D.N. 231), and states as follows:

## INTRODUCTION

Plaintiff Charles Walden ("Walden") seeks to exclude the testimony of NICO's claims-handling expert, Christine Sullivan ("Sullivan"), suggesting she is giving legal opinions when opining on the disputed liability questions in this case or that her testimony about accident reconstruction, human factors, or causation is outside her expertise. He also criticizes typographical errors in her report, and casts isolated quotations from a two-hundred-page transcript as failures undermining the reliability of her opinions under Rule 702. None of his criticisms land and this Motion should be swiftly denied.

After all, insurance claims handling is a subject on which most lay jurors have no frame of reference. Rule 702 permits a witness with specialized experience, like Sullivan, to assist them in that endeavor. And there can be no serious question that Sullivan lacks sufficient qualifications

and experience in handling claims like Walden's. Sullivan has more than fifty (50) years of insurance claim handling experience. Thirty-five (35) of those years were spent with Allstate, where she started as a claim adjuster. She thereafter rose through the ranks, serving in state, regional, and national management roles. Later, as Vice President of Casualty Claims and/or the company's Chief Claim Compliance Officer, she was responsible for Allstate's auto liability and bodily injury claim handling practices and procedures across the country. In retirement, she has continued to teach and consult in the insurance field. After reviewing the claim file materials, as well as deposition testimony and the report of Plaintiff's retained expert, Sullivan concluded that NICO's handling of Walden's third party bodily-injury claim was reasonable and consistent with auto claims handling standards. This testimony is relevant, reliable, helpful to the jury and admissible. Any criticism Walden may level goes to the weight of her testimony, not its admissibility.

## FACTUAL BACKGROUND

### A. Walden's Claim.

NICO incorporates the factual background set out more fully in its pending Motion for Summary Judgment. (D.N. 233-1 at 4–11). In summary, late on August 10, 2020, Plaintiff Walden drove into the back of a tractor-trailer parked on the I-75 Exit 87 off-ramp in Richmond, Kentucky. The police report recorded that Mr. Walden said he was tired and did not see the truck parked on the edge of the ramp, that reflective triangles had been set out behind it, and that no one was cited. (*Id.* at 4–6).

NICO first received notice in an October 2020 letter from Plaintiff's counsel. It opened a file on November 3, 2020, retained an independent adjusting firm the next day, and spent the following years trying to reach its named insured, Enterprise Services Group, LLC ("Enterprise"),

and the driver, Clarence Howard ("Howard"), through two adjusting firms, an ISO search, letters to multiple addresses, Georgia Secretary of State inquiries, two reservation-of-rights letters, and hiring a private investigator. (*Id.* at 6, 8, 19; NICO 003668–69).

On February 26, 2021, NICO's adjuster, Vince Kline ("Kline"), wrote Plaintiff's counsel that, based on the investigation to date, NICO did not believe its insured was at fault; the letter invited additional information, and the file stayed open. (D.N. 233-1 at 7). Plaintiff filed suit in August 2022, and made his first demand, for $846,676.07 and with no deadline, on January 13, 2023. (*Id.* at 8). NICO's retained reconstructionist, Eddie Crum ("Crum"), reported that the truck sat about three (3) feet into the lane with roughly eight (8) feet of clearance beside it. A Claims Committee evaluated the claim on February 22, 2024; Mr. Howard surfaced in April 2024; and NICO offered $100,000 that month. (*Id.* at 9–10). The underlying claim settled at mediation on December 19, 2024, for $200,000—well below the $1 million policy limit. (*Id.* at 11).

**B. Sullivan and Her Opinions.**

Sullivan holds an MBA and the Chartered Property Casualty Underwriter ("CPCU") designation and has some fifty (50) years in the casualty claim insurance business. (Sullivan Rep. at 1–3, attached hereto as **Exh. 1**; Sullivan Dep. 19:10–16, attached hereto as **Exh. 2**). NICO retained her in this case, asking her to opine on whether NICO's coverage investigation, liability investigation, damages investigation and evaluation, and communications with the claimant and his counsel were adequate, timely, and appropriate under the circumstances, measuring each against claim handling standards and the subjects addressed by KRS 304.12-230, Kentucky's Unfair Claims Settlement Practices Act ("KUCSPA"). (Exh. 1 at 3). To answer that inquiry, Sullivan reviewed the pleadings, the policy, NICO's production of more than 6,000 pages (NICO

000004–006369), including the claim diary and correspondence, the police report, the medical records, nine (9) depositions, and Mr. Fisher's report. (Exh. 1 at 2–3).

Based on that review, Sullivan concluded that NICO's handling was consistent with industry standards, customs, and practices. (*Id.* at 3, 11). In her opinion, NICO promptly opened the file, acknowledged the claim, and retained an independent adjuster; reserved its rights when its insured and driver, despite repeated efforts, would not respond; based its initial liability position on a police report recording that Walden was tired and did not see the parked truck, while expressly inviting additional information and leaving the file open; and then continued to develop liability and damages through a reconstructionist, a records review, an independent medical examination, and a Claims Committee evaluation before offering $100,000 and ultimately settling at mediation. (*Id.* at 3–7). She also concluded that the claim presented a fairly debatable dispute over liability and future medical treatment, and she responded to Mr. Fisher's opinions point by point. (*Id.* at 6–11). She explained that these are the steps the claims profession expects, and that the standards she applied derive from her decades of claim-handling and compliance experience, the Insurance Institute's claims curriculum, state statutes and regulations, and market-conduct examinations. (Exh. 2 at 31:6–32:21, 41:15–43:6, 93:2–94:25).

**C. Sullivan's September 29, 2026 Deposition.**

Plaintiff deposed Sullivan on September 29, 2026. (Exh. 2). She confirmed that her report contains all of the claims-handling opinions she presently intends to offer. (Exh 2. at 25:9–12). She testified, among other things, that NICO's February 2021 liability denial was reasonable based on the information then available and was not a closed door, because the letter invited more information and NICO kept the file open (*id.* at 62:8–16, 123:11–14, 149:6–17); that NICO's efforts to locate its insured and driver went "above and beyond" (*id.* at 69:4–6); and that when to

retain a reconstructionist depends on the facts of each loss (*id*. at 88:13–89:24). She did so without the claim file in front of her. (*Id*. at 101:13–19).[1]

## LEGAL STANDARD

Admissibility of expert testimony in this diversity action is governed by Federal Rule of Evidence 702. A witness "qualified as an expert by knowledge, skill, experience, training, or education" may give opinion testimony if the proponent shows that it is more likely than not that the testimony will help the trier of fact, rests on sufficient facts or data, is the product of reliable principles and methods, and reflects a reliable application of those principles and methods to the facts. Fed. R. Evid. 702. The Sixth Circuit reduces this to qualification, relevance, and reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). As proponent, NICO bears the burden by a preponderance of the evidence, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993); *Pride v. BIC Corp*., 218 F.3d 566, 578 (6th Cir. 2000); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001), and accepts it.

Three points frame the dispute. First, Rule 702 applies to experience-based testimony, and the reliability inquiry is flexible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–52, 156 (1999). The Advisory Committee has long recognized that experience alone can be a sufficient foundation, and that a witness who relies on it must explain how the experience leads to the conclusion, why it is a sufficient basis, and how it is reliably applied to the facts. Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Sullivan did that.

Second, the 2023 amendment clarified that the proponent's burden is a preponderance and that the sufficiency of an expert's basis and the application of her method are questions for the

---

[1] Sullivan read the transcript and, on October 27, 2026, submitted an errata sheet correcting transcription errors and clarifying several phrases. (*Id*. at 211–12; *see* Errata Sheet and Affidavit, attached as **Exh. 3**).

Court under Rule 104(a), not categorically for the jury. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. NICO does not argue otherwise. But the same note cautions that the amendment does not require courts to "nitpick an expert's opinion" in search of perfection, *id*., and once the Court finds the Rule's requirements met, the opponent's remaining attacks go to weight. *Id*. Rejection of expert testimony remains "the exception rather than the rule." *Scrap Metal*, 527 F.3d at 530 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). As this Court has noted, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Webb v. Whitley Cty.*, No. 6:23-188-KKC, 2026 U.S. Dist. LEXIS 87212, at *2 (E.D. Ky. Apr. 21, 2026); *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-cv-379-KKC, 2026 LX 324514 at *6–7 (E.D. Ky. July 20, 2026) (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998)). "Mere weaknesses in the factual basis of an expert witness's opinion . . . bear on the weight of the evidence rather than on its admissibility." *Id.* (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)). "Courts should confirm that 'the factual underpinnings of the expert's opinion [are] sound,' but generally '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (citing *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999) and *Daubert*, 509 U.S. at 596."

Third, an expert may give an opinion that embraces an ultimate issue, Fed. R. Evid. 704(a), but may not tell the jury what the law is or what legal conclusion to reach. *Torres v. County of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985); *Berry v. City of Detroit*, 25 F.3d 1342, 1353–54 (6th Cir. 1994); *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). Testimony describing the practices of an industry, and whether particular conduct conformed to them, is not a legal conclusion; it is the specialized knowledge that Rule 702 contemplates. Admissibility is assessed

opinion by opinion, as Plaintiff himself reads *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213 (6th Cir. 2025) (*see* Mot. at 10), and a challenge to a few isolated phrases is a matter for objection at trial, not a basis for excluding the witness.

## ARGUMENT

### I. Sullivan Is Indisputably Qualified to Evaluate Claims Handling and Her Testimony Will be Helpful to the Jury.

Rule 702 asks whether a witness's qualifications "provide a foundation for a witness to answer a specific question." *Berry*, 25 F.3d at 1351 (quoted at Mot. 11). The question here is whether NICO's handling of a bodily-injury liability claim, from coverage through investigation, evaluation, and communication, was consistent with the practices of the claims profession. Sullivan has spent her career on such questions.

Sullivan began as a liability adjuster with Allstate and was promoted to unit manager, then district claim manager, claim development manager (responsible for training adjusters across six states), and territorial claim manager in New York. (Exh. 2 at 7:11–24). At Allstate's home office, she became a director and then a vice president responsible for claim-handling practices and procedures for injury and liability claims, personal and commercial, across the United States and Canada. (*Id*. at 8:1–12; Exh. A (CV) to Exh. 1 at 1). From 2009 to 2011 she was Allstate's Chief Claims Compliance Officer, charged with ensuring that claim practices complied with each state's (including Kentucky) unfair claims practices laws and with supervising market conduct examinations. (Exh. A to Exh. 1; Exh. 2 at 8:13–19). She also supervised claims in which bad faith was alleged, including claims that originated in Kentucky[2]. (Exh. 2 at 9:2–4, 9:11–20).

---

[2] In the past, she was designated by Allstate to testify as its corporate representative in response to several Rule 30.02(6) Notices served in Kentucky bad faith cases regarding Allstate's processes for handling Kentucky bodily injury claims. In one such case, *Hager v. Allstate*, the Plaintiff even called Sullivan in his client's case-in-chief to testify to such matters. *See Hager v. Allstate Ins. Co.*, No. 98-CI-2482 (Ky. Cir. Ct., Oct. 1, 2007).

Since 2011 she has taught and consulted on these subjects, chaired the Insurance Research Council's advisory board, contributed to the Insurance Institute's claim-handling textbooks (writing on general adjusting standards and participating in the section on good faith claim handling), and prepared expert reports in numerous matters, including cases in Kentucky state and federal courts. (Exh. A to Exh. 1; Exh. 2 at 26:12–24).

Plaintiff does not dispute any of this. Plaintiff does not (and cannot) challenge Sullivan's qualifications to render opinions on handling an auto liability claim. Any argument that Sullivan is unqualified to testify as an auto liability claims handling expert is contrary to established caselaw. Courts applying Kentucky law test a bad-faith expert's qualifications against claim-handling experience and have excluded witnesses only when they lack *any* experience. *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 378 (Ky. 2000) (affirming exclusion of lawyer with no claim-handling experience); *Sullivan v. Am. Int'l Grp., Inc.*, 2008 WL 2876534 (E.D. Ky. July 22, 2008) (excluding former jurist who had never adjusted claims or worked for an insurer from testifying on claim handling and bad faith). Sullivan has the experience those witnesses lacked.

Nor can Plaintiff seriously dispute that Sullivan's testimony would not be helpful to the jury. Whether an insurer's investigation was prompt and reasonable is a subject on which the average juror has no frame of reference. They have never read a claim diary, issued a reservation of rights letter, or decided when an investigator or reconstructionist is warranted. "Best practices" testimony is a common and proper means of helping jurors understand how a party's conduct compares with expected norms. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 439 (6th Cir. 2009) (expert required to explain hazards and best practices); *Dossett v. Wal-Mart Stores East, L.P.*, 2015 U.S. Dist. LEXIS 112061, at *9 (W.D. Ky. Aug. 25, 2015) (expert permitted to testify that, in his experience, defendant violated best practices).

**II. Sullivan Does Not Offer Legal Conclusions: Questions about the Insured's Liability for Causing the Accident and Causation for Damages are Claim Handling Opinions.**

Plaintiff argues *ad nauseam* that Sullivan's opinions impermissibly state legal conclusions. (Mot. at 11–14). Plaintiff alleges that, "Ms. Sullivan repeatedly crosses from explaining insurance industry procedures into instructing the jury on Kentucky [law]." (*Id.* at 11–12).

While an expert may not tell the jury what the law is, *Torres*, 758 F.2d at 150–51; *Berry*, 25 F.3d at 1353–54, that is not what Sullivan did here. Indeed, she is permitted to opine on how claims professionals and claims departments make decisions on the important questions of liability and damages with respect to claims. This does not constitute an impermissible legal opinion and—at most—is an opinion that embraces an ultimate issue. Rule 704(a) permits an expert to give an opinion that embraces an ultimate issue, and the line the Sixth Circuit draws runs between testimony about facts and practice and testimony that defines or applies legal terms of art to those facts. *Blackjewel Liquidation Tr. v. Javelin Glob. Commodities U.S. LP*, No. 6:26-CV-11-REW-EBA, 2026 U.S. Dist. LEXIS 68675, at *19-20 (E.D. Ky. Mar. 31, 2026) ("[T]here is a 'subtle,' but 'nonetheless important' distinction between 'opin[ing] on the ultimate question of liability' (impermissible), and 'stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue' (permissible).") (citing *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019)).

Here, Sullivan's testimony falls on the permissible side of that line: she explains what claim handlers do and whether NICO's handling complied with standard claims handling practices. Claims adjusters routinely make determinations about the insured's liability and whether the damages presented are caused by the accident. It is part of their job. Providing an opinion on how an insurer handles a claim and makes determinations regarding liability, damages, and other matters essential to resolving a claim is not a legal conclusion—and the propriety of how NICO

did so here—is a claim handling opinion not a legal one. Even if her opinions (that it was reasonable and consistent with industry standards for NICO to dispute liability and the Plaintiff's accident-related damages based on the facts in this case) may "suggest" to the jury that NICO did not violate the KUSCPA or act in bad faith here, such opinions are entirely permissible, and necessary context for the jury to hear and interpret when they decide the ultimate issue in this case.

Plaintiff also tries to cobble an argument together that a handful of isolated phrases in Sullivan's written report[3] (phrases or words such as "without merit" or "guilty") are also legal opinions and the Court should exclude her entirely or alternatively prevent her from referencing them. (Mot. at 12–14, 24). This is nonsensical. For one, Sullivan's report and its contents (including the allegedly offending reference) is inadmissible hearsay and will not come into evidence at any trial. *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994). Regardless, read in context, these phrases are not legal conclusions and do not instruct the jury on Kentucky law. Rather, they are shorthand expressions of Sullivan's broader opinion that NICO's handling of the claim was consistent with industry standards, customs, and practices, which is precisely the subject matter on which she was retained and is qualified to testify. (Exh. 1 at 3, 6, 7, 11). Sullivan's statements must be evaluated in context, not by isolating a handful of words from an otherwise admissible opinion. At most, Plaintiff identifies potential objections to particular phrasing that can be addressed contemporaneously at trial. They do not justify exclusion.

Additionally, Plaintiff's objection that Sullivan construed the NICO policy (Mot. at 12–13) misreads her testimony. Sullivan acknowledges she is not a lawyer, adding that whether a coverage

---

[3] The same is true of Plaintiff's criticism of Sullivan's discussion of Kentucky's 45-day status-letter requirement in her report, which is not even a material issue here. Sullivan referenced that issue only in responding to Mr. Fisher's opinion that NICO violated 806 KAR 12:095. (Mot. at 12.) Plaintiff himself acknowledges that the regulation applies to first-party claimants, not third-party claimants such as Walden, and his own expert withdrew his opinion on this subject. (*Id.*; D.N. 232 at 5). Plaintiff's alternative request on this point (Mot. at 24, ¶ 1) should be denied, too.

position would have held up in court was "not my decision." (Exh. 2 at 74:5–9). She did not construe or interpret policy language. She instead explained why carriers issue letters reserving their rights to dispute coverage based on the insured's non-cooperation when an insured will not respond and that NICO's actions here are consistent with industry standards. Her opinions are about claim-handling practices. NICO did not disclaim its obligations on the underlying claim: it reserved its rights, kept investigating, retained defense counsel for its insureds, and settled. (D.N. 233-1 at 6, 8). Plaintiff's own expert has criticized NICO's reservation-of-rights practice (*see* D.N. 233-1 at 22), and if he is allowed to testify (which NICO challenges) the jury will necessarily hear about the subject, and Sullivan's explanation of industry practice to rebut Fisher will help the jury evaluate that criticism. Plaintiff's alternative request on this point (Mot. at 24, ¶ 2) should be denied.

Finally, Plaintiff's objection to the report's final paragraph (Mot. at 22), too, misses the mark. Again, the report and its contents will not be seen by the jury. Any testimony Sullivan may give that she found no evidence that NICO put its financial interests first, acted with careless indifference, or acted unreasonably, are not inadmissible legal opinions or those which might usurp the role of the jury. They are her claim handling opinions embracing an ultimate issue, which Rule 704(a) and case law permits, and the jury remains free to accept or reject.

## II. Sullivan's Testimony Does Not Stray into Accident Reconstruction, Human Factors, or Medicine.

Calling them "unqualified technical opinions" Plaintiff contends that Sullivan's opinions and testimony cross the line into matters only an accident reconstructionist, a human-factors expert, or a physician could give. (Mot. at 14–16). But Plaintiff, again, misses the point.

Sullivan is not seeking to give accident reconstruction, human-factors, or medical opinions, and she readily acknowledged as much. (Exh. 2 at 58:25–59:9). At no point in her report and during her deposition did Sullivan claim to be an accident reconstructionist, human factors expert, or attempt to diagnose Mr. Walden. (*Id*. at 25:9–12). Instead, Sullivan, with her vast amount of claim handling experience, is simply giving claims-handling testimony, which the federal rules allow. *See* Fed. R. Evid. 703. Adjusters analyze, make claim handling decisions about and rely on police reports, medical records, reconstruction reports, and independent medical examinations every day, and whether NICO did so reasonably here is the subject of Sullivan's testimony. And she is amply qualified and experienced to give such opinions.

Plaintiff's own citations bear that out in context. Plaintiff's criticism of Sullivan's comments about the lighting of the ramp where the accident occurred and the reference to Walden's inattention in the police report ignores her actual testimony about each. Plaintiff calls her opinion that Walden did not see the tractor-trailer a lay opinion, not an expert one. However, Sullivan's testimony makes clear that she was "talking about what this [police] report says," and about what a claims person would conclude from it: that, "if that's all the information I had," denying the loss on the initial information would be reasonable. (Exh. 2 at 58:19–59:9).

Plaintiff misstates Sullivan's testimony about reflective warning triangles. Plaintiff says Sullivan declared triangle spacing "not all that material" and insisted she was confident in her ability to opine on it. (Mot. at 15). But the selective quotations Plaintiff cites are the start of the exchange, not its entirety or its end. Sullivan clarified that what she was referring to when she stated it was "not all that material" was NICO locating and talking to the insured driver before making a liability decision, that "maybe I shouldn't have stated it that way," and that the real issue was the named insured's failure to respond to the reservation of rights letter. (Exh. 2 at 73:3–25).

Sullivan's observations about the police photographs of the accident scene are also not an engineering opinion. In rebutting Mr. Fisher, she noted that post-collision photographs cannot show where the triangles stood before impact (Exh. 1. at 8), a point so obvious that any person who reads the claim file would recognize it. Mr. Fisher, who also is not a reconstruction expert, examined the same photographs and documented such in his report. (Fisher Rep. at 7).

Plaintiff's complaint about Sullivan allegedly offering "medical" opinions also fares no better. The passages Plaintiff cites summarize what NICO's retained physician, Dr. Kriss, concluded after reviewing the records and examining Walden, and what the records showed, which are facts a claims professional must weigh in evaluating causation and damages. (Exh. 1 at 5–6; Exh. 2 at 42:22–43:6, 186:12–25). The remark that Walden's complicated history "could obscure" which of his injuries were related to the accident as opposed to preexisting conditions and what future treatment may have been casually related (or not) does not diagnose but simply recites other expert opinions. *E,g.*, *Hall v. Teleflex, Inc.*, 2012 U.S. Dist. LEXIS 4806, *16-17 (E.D. Ky. Jan. 17, 2012) (experts are "entitled to rely on the reports and opinions of other experts where those reports are of a type reasonably relied upon by the experts in the particular field."). Claims professionals seek and consider medical records and reports to assess a claimant's causation and damages. It was not beyond the pale for Sullivan to review expert medical opinions—or any underlying expert reports—to assess NICO's claim handling here. In fact, it is a central role of any claims professional.

Plaintiff's reliance on *Renot v. Secura Supreme Ins. Co.*, 671 S.W.3d 282, 289 (Ky. 2023), a state-court decision he offers only as persuasive authority (Mot. at 16), is misplaced. *Renot* concerned a biomechanical witness who crossed into medical causation. Sullivan does not similarly cross the line between offering claims handling opinions and those regarding medical

causation, engineering, human factors or any other expert field. She is qualified to render and only gives expert opinions on the reasonableness of the claim decisions and actions of the claim handlers at NICO in this case.

Because Sullivan offers no opinions outside her field of expertise, Plaintiff's alternative request for an order barring "independent technical or clinical conclusions" (Mot. at 24, ¶ 3) is unavailing and unnecessary. A ruling barring her from describing what the police report said, the photographs showed, and Mr. Crum and Dr. Kriss's findings, when NICO had them, how a reasonable claims professional uses such information, and the reasonableness of their use here would be error as her testimony on this score is admissible, reliable, relevant, helpful to the jury and Sullivan is qualified to opine on those subjects.

## III. Sullivan's Opinions Rest on Sufficient Facts and a Reliable, Explained Method.

Plaintiff's attack under Rule 702(b)–(d) boils down to complaints that Sullivan did not read NICO's manuals; that she articulated no criteria for timeliness; that she overlooked facts in the file; and that her defense of the February 2021 denial contradicts her own method. Each either misstates the record or goes to the weight of her testimony, not its reliability. At bottom, Plaintiff disagrees with how Sullivan weighed the claim file or the conclusions she reached, which shows only that the parties have competing views of the facts. That is a matter for cross-examination.

### A. Sullivan explained how her experience bolstered her conclusions.

The method Sullivan employed in considering the materials and providing her opinions is the same one claims professionals use to review any file: read the whole record, ask what the adjuster knew at each decision point, and compare what was done, and when, against the practices the profession follows. Here, she read the claim diary in full and all the correspondence produced; she looked at the timing, looked for gaps, and asked whether any gaps were explained. (Exh. 2 at

118:7–119:14). She tested each decision against the information available to the adjuster when it was made, a principle she agreed with at the outset. (*Id.* at 28:8–10, 35:16–20).

The benchmarks she used are not secret, and she identified their sources: the claim-handling practices she built and supervised at Allstate; the Insurance Institute's claims curriculum and textbooks, which she helped write and review; state statutes and regulations, including the model Unfair Claims Settlement Practices Act and the Kentucky Unfair Claims Settlement Practices Act; and decades of market conduct examinations, in which regulators judge claim files by what the files show. (*Id*. at 31:6–32:21, 82:11–18, 93:2–8, 94:14–25, 198:18–199:24). She then applied those benchmarks step by step, as summarized above, and at her deposition tied each step to the standards she was applying. (Exh. 1 at 3–8; Exh. 2 at 41:15–43:6).

Plaintiff's "*ipse dixit*" exhibits are two fragments pulled from longer answers. The first ("you could have, like, a huge manual and nothing is really followed," Mot. at 17) was Sullivan's explanation of why a company's manual is a reference point rather than the measure of reasonable handling. (Exh. 2 at 21:8–22:5). The second ("I can tell how a claim is handled," Mot. at 18) closed an answer in which she described, in order, her decades at Allstate, her work with the Insurance Institute and the Insurance Research Council, her curriculum review and exam-writing, and her market conduct work as her industry experience. (Exh. 2 at 93:13–94:25). That is what the 2000 Advisory Committee note expects an experience-based expert to do.

On this evidence, Sullivan's experience and method of applying her principles to the case at bar is not only consistent with Rule 702, but also something this Court has explicitly found to be admissible. In this Court's April 2026 opinion, it correctly noted that an expert's experience, however construed, "goes to the weight of [the expert's] testimony, which is a matter properly left to the jury." *Webb,* 2026 U.S. Dist. LEXIS 87212 at *4.

**B. No NICO manual was required.**

Plaintiff's central complaint is that NICO withheld claim handling manuals in discovery. (Mot. at 4, 17–18). Plaintiff then attempts to use that assertion as a basis to challenge the reliability of Sullivan's opinions and methodology. (*Id.*). The argument is unsupported by the facts and mischaracterizes both NICO's conduct and Sullivan's thorough review of the claim file.

NICO does not have a written claim handling manual. That criticism misses the mark. The absence of a written manual does not mean NICO acted contrary to law, failed to adopt and implement reasonable claims-handling standards, or rendered Sullivan's methodology unreliable. Nor does Plaintiff's suggestion that NICO "refused to produce" or withheld its claims manuals during discovery withstand scrutiny, as NICO had no claim manual to produce—a fact NICO disclosed and reiterated on many occasions. (Mot. at 4, 17; *see*, *e.g.*, NICO's Responses to Plaintiff's first set of discovery requests, and Letter dated July 31, 2026, attached hereto as **Exh. 4**).

Most fundamentally, the absence of a written claim handling manual is not a defect in Sullivan's methodology or a deviation from the statute. KRS 304.12-230(3) addresses the adoption and implementation of "reasonable standards for the prompt investigation of claims"; by its terms it does not require that those standards be reduced to writing in a claim manual. Sullivan so testified: the statute requires standards that produce a prompt investigation, not standards that must be written, and they may be conveyed through training and experienced supervisors. (Exh. 2 at 16:24–18:11, 95:11–17). She added that she did not need NICO's manual to evaluate NICO's handling, although she would have reviewed it had it been produced. (*Id.* at 20:6–23, 21:8–22:5, 37:10–17).

Plaintiff's reliance on *Wells v. GEICO Gen. Ins. Co.,* No. 5:19-cv-00500-DCR-MAS, slip op. at 22 to 25 (E.D. Ky. July 23, 2021) fares no better. Plaintiff concedes that *Wells* "did not announce a categorical rule" requiring a claims expert to obtain the insurer's manuals. (Mot. at 18). As Plaintiff describes it, the expert in *Wells* was excluded because he relied on training materials the insurer had stopped using and could not connect his conclusions to the claim. (*Id.*). Sullivan relied on no outdated standard. She measured NICO's handling against the practices of the claims profession as they are taught, regulated, and examined, and she has kept current in them: she has continued to teach, has spoken at PLRB claims conferences through 2023, and has prepared expert reports through 2026. (Exh. 1 at Exh. A). Her analysis rested on the claim file NICO generated, along with her decades of claim handling experience, not on another insurer's superseded materials.

Finally, to the extent Plaintiff believed additional written claims-handling materials existed and should have been produced, that issue was a discovery matter Plaintiff never pursued. (Mot. at 17). Plaintiff took no deposition of any NICO representative. He did not depose Mr. Kline, Ms. Hodgen, any member of the Claims Committee, any supervisor, or a Rule 30(b)(6) designee, and none was requested or noticed. (D.N. 233-1 at 12). In those depositions, NICO personnel could have explained their claim handling protocols. Plaintiff opted not to do so, and thus never asked a single NICO witness what standards, written or unwritten, guided the handling of this claim. Having elected not to develop that point in discovery, Plaintiff cannot fault the opposing expert for lacking it, and the omission does not make her method unreliable. For the same reasons, Plaintiff's alternative request to bar Sullivan from opining that NICO adopted and implemented reasonable standards because she did not review NICO's manuals (Mot. at 24–25, ¶ 4) should be denied.

### C. Sullivan's timeliness opinions rest on stated criteria tied to the facts.

Plaintiff says Sullivan "articulated no criteria at all" for when a carrier should retain a reconstructionist and would approve a ten-year wait. (Mot. at 18–19). The transcript says otherwise. She testified that no statute, regulation, or textbook sets a clock, a point Plaintiff's counsel accepted (Exh. 2 at 115:9–15), and that the decision turns on the facts of the loss: the severity of the impact and injury, how cloudy the liability facts are, whether the insurer can speak to its own driver, and whether the dispute is likely to be resolved by negotiation. (*Id*. at 77:19–21, 78:16–79:13, 88:13–89:5, 113:19–114:24). She explained that accident reconstructionists are often retained after suit is filed, to inform the evaluation or to support a position. (*Id*. at 89:1–5, 89:16–24.) And she applied those criteria here. The early information pointed to a rear-end collision into a parked truck displaying reflective triangles; and, as more facts became known to NICO (the truck's position over the line, the triangles, the missing driver), it retained an accident reconstructionist to further evaluate liability. (*Id*. at 44:12–45:16, 102:15–103:14).

Plaintiff resorts to some fancy footwork, indeed, about Sullivan's alleged statement that waiting ten years to retain a reconstructionist "could very well be" reasonable as a basis to exclude her as an expert. But that was never an opinion offered by Sullivan. Rather, in her deposition Plaintiff's counsel asked her the hypothetical of whether waiting ten years "could" be reasonable, Sullivan actually responded that ten years "might be a little too long" (*id*. at 85:7), would be "a little off the wall" in most states (*id*. at 91:5–6), and that a year or two is not unreasonable where, as here, medical and liability facts were still developing. (*Id*. at 85:7–86:6, 91:6–7).

Plaintiff also plays fast and loose with Sullivan's testimony about the timing of NICO's hiring of a private investigator to track down its insureds when they did not respond to direct outreach. Plaintiff contends it took three and a half (3.5) years from when NICO learned of the

claim until March 2024 before a private investigator was hired. But Plaintiff ignores the many efforts NICO made to find the insureds. The claim file is replete with documented activity by NICO including hiring two adjusting firms, the ISO search, the letters it sent, the Secretary of State inquiries, and finally its reservations of its rights. (Exh. 1 at 4, 9; D.N. 233-1 at 19). Sullivan's opinion that NICO's search was extensive, indeed that it went "above and beyond," rests on her own experience and the entire context of events, not on the date a single firm was retained. That she could not recall at deposition whether the interval was "months" or "years" (Exh. 2 at 39:18–23) does not undermine the admissibility of her testimony. It is at most a point for cross-examination at trial.

### D. The facts Plaintiff claims Sullivan overlooked were actually documented in the claim file and, as such, do not undercut her opinions.

One need only review the claim file to refute Plaintiff's contention that Sullivan overlooked Enterprise's contact information. Plaintiff says she overlooked the phone number, email address, and broker listed on Enterprise's application and declarations. (Mot. at 5, 20). NICO's diary shows that NICO called that very number and left a message. (NICO 003668 (Oct. 26, 2021 entry) (D.N. 233-2 at 5)). And Sullivan did not testify that NICO lacked contact information. She testified that NICO knew where Enterprise's offices were, that its letters were not coming back, and that Enterprise nonetheless never responded, which is why she found the named insured's silence, rather than the driver's absence, the more troubling fact. (Exh. 2 at 68:13–69:1, 71:2–7).

The motor-vehicle record NICO had for a different driver, Mr. Pullin (which Plaintiff calls the key to a "critical open" question), fits with, rather that contradicts, Sullivan's opinion. She testified that NICO needed to hear from Enterprise to confirm that Howard was an authorized driver and that the policy identified the vehicle, not the driver. (Exh. 2 at 128:1–4, 131:20–25).

That uncertainty is a reason NICO reserved its rights, and the claims diary reflects that NICO ultimately confirmed coverage. (NICO 003669 (June 30, 2021 entry: "coverage confirmed")).

Plaintiff attempts to undercut the reliability of Sullivan's opinions by contesting her interpretation of NICO's claim file. To show Sullivan lacked the factual basis necessary to conclude that NICO's claim handling was timely, Plaintiff asserts that NICO engaged in "zero substantive evaluation activity between June 2021 and early 2023," (Mot. at 19; D.N. 232 at 5; D.N. 233-1 at 20.) This characterization misses the mark. Plaintiff's expert has since retracted that assertion.

The assertion that NICO engaged in no "substantive evaluation activity" is incorrect: the claim file reflects entries on July 20, August 17, September 16, October 26, and November 20, 2021, each recording NICO's continued efforts to investigate the claim. (NICO 003668–69). Sullivan took the entire claim file into account, and reached a different conclusion than Plaintiff. His issue with the purported "18-to19-month gap" is a disagreement about how the claim file is to be interpreted. This is an issue Plaintiff may cross-examine Sullivan about, as it is the jury's role to determine the credibility of her opinions. Construing a disagreement over the claim file as valid grounds to contest the reliability of her opinions is a bridge too far.

Moreover, the fact that Sullivan's report contained typographical errors does not make her opinions unreliable. Plaintiff lists a handful: "2109" for "2019"; "1/19/21" for "2/26/21"; "8/3/24" for "7/29/24" (the date of Officer Curry's deposition); and $234,269 for $234,249, a $20 difference on the Claims Committee's valuation. (Mot. at 5, 7). Sullivan recognized the "1/19/21" error herself before Plaintiff's counsel raised it, called it a typo, and agreed that February 26, 2021, is the correct date. (Dep. 48:23–49:1, 128:12–18, 146:2–5). Plaintiff concedes that "isolated clerical mistakes do not automatically establish inadmissibility." (Mot. at 4). Certainly, none of them

change the substance of any of Sullivan's opinion: that NICO's initial position rested on the police report, invited more information, and left the file open is the same whether the letter is dated January 19 or February 26. Again, while Plaintiff may seek to undermine Sullivan's testimony at trial by pointing to these immaterial typos, they do not go to the admissibility of her testimony.

**E. Sullivan's defense of NICO's February 26, 2021 denial follows her method.**

Plaintiff argues that Sullivan "violated her own foundational rule" by using post-2021 evidence to validate the February 2021 letter and that "preliminary denial" is a post-hoc invention. (Mot. at 6, 20–22). The record does not bear that argument out. Sullivan judged NICO's initial denial of the claim on February 26, 2021 based on the information adjuster Kline had at that time. Her report says so: the information NICO had at the time of the denial was reasonable based on the police report's account of a fatigued, inattentive claimant. (Exh. 1 at 4; Exh. 2 at 57:16–58:4, 137:9–19, 146:15–147:6, 149:6–10, 161:7–21).

Nor did Sullivan use later events to justify the propriety of the denial letter. She described these later events as what they were: subsequent investigation. Mr. Crum's findings, Mr. Howard's account, and the medical review bear on whether liability and damages remained genuinely disputed as the claim progressed. Her deposition testimony that these developments came after the letter (Exh. 2 at 197:18–198:2) only demonstrates that she accurately distinguished later-developed facts from the information available at the time.

Plaintiff's issue with the word "preliminary" is a quarrel over semantics. The word "preliminary" does not appear in the February 26, 2021 letter, a fact upon which Sullivan readily agreed. (Exh. 2 at 155:10–13). But according to the express language in that letter, the denial decision is based on NICO's investigation "to date," invites new information, and was followed by continued investigation of liability, damages, and the insureds' whereabouts. (*Id.* at 62:8–16,

147:4–6, 149:12–17, 153:2–7, 161:16–21). Sullivan testified she had seen carriers send letters like that. (*Id.* at 154:2–7). Whether the letter is called "preliminary," "initial," or something else, her opinion that a denial that invited more information and left the file open was consistent with industry practice rests on the letter itself, which is in the record. (D.N. 231-3). Plaintiff's quarrel about the meaning of the letter should be left to cross-examination. Plaintiff's alternative request to bar the term "preliminary denial" and any reference to later-developed facts (Mot. at 25, ¶ 5) should be denied for the same reasons: Sullivan judged the propriety of the denial based on the information NICO had at the time it was sent and explained that later events bear on the continuing investigation and on whether liability remained genuinely disputed.

Plaintiff's argument about the date NICO obtained the police report also does not render Sullivan's opinions unreliable. She could not remember when it arrived and wanted to check the notes. (Exh. 2 at 46:25–47:11, 53:8–16). Plaintiff did not provide the claim notes to her to review during this remote deposition. Her prior expert report, prepared with the claim notes in front of her, correctly states that NICO set up the claim file on November 3, 2020, based on the letter of representation and the police report. (Exh. 1 at 3). A deposition is neither a closed-book exam nor a memory test.

**F. Sullivan's allegedly "unsupported" assertions regarding the subjective beliefs and motives of NICO personnel" are simply answers to Plaintiff's counsel's questions.**

Plaintiff asserts that Sullivan offers "unsupported assertions" as to the motives and "subjective beliefs" of NICO personnel. Sullivan has no first-hand knowledge of any NICO employee's motive and said so. (Exh. 1 at 201:23–202:6). The remarks Plaintiff cites, that the first adjuster "truly believed" the claimant was responsible and that NICO hired a reconstructionist because it was trying to do the right thing (*id.* at 103:8–104:8, 133:22–134:10), were reasonable

inferences she reached from reviewing the claim file and were offered in answer to Plaintiff's counsel's repeated questions asking why NICO acted as it did. Notably, she prefaced them by noting that she had not talked to anyone at NICO. (*Id*. at 102:15–16, 133:22–24). Experts routinely draw inferences from the record on which they rely, *see* Fed. R. Evid. 703, and Plaintiff, who chose not to depose a single NICO witness, is poorly positioned to fault her for drawing them from the record evidence. Any disagreement goes to the weight, not reliability, of her opinions. Plaintiff's alternative request (Mot. at 25, ¶ 6) should be denied.

## V. Plaintiff's Criticisms of Sullivan's Opinions Go to the Weight of the Evidence, Not Admissibility of Her Testimony.

Plaintiff's Motion conflates disagreement with Sullivan's assessment of the claim file with a defect in the foundation for her opinions. The distinction matters: NICO must establish that her testimony satisfies Rule 702, but it need not establish her conclusions are beyond dispute. Once the Court finds a sufficient factual basis and a reliably applied method, weaknesses that remain are tested through cross-examination and contrary evidence, not exclusion. *McLean*, 224 F.3d at 801.

Here, Sullivan reviewed the extensive claim file, identified the claim handling practices informing her analysis, and explained how NICO's decisions compared with those standards in light of the information available when each decision was made. Plaintiff's criticisms of her discussion of the Claims Committee's valuation, her treatment of the demand to the insureds, and her inability to recall particular file details during the deposition do not sever that connection between the record, her experience, and her conclusions. Plaintiff may dispute the significance Sullivan assigned to particular facts and the persuasiveness of her explanations, but all such disagreements are those the jury can evaluate at trial. In short, all Plaintiff's criticisms go to the weight of her testimony not its admissibility.

For example, Plaintiff's contention that Sullivan "vouches" for the Claims Committee's valuation incorrectly describes her testimony. Plaintiff complains that Sullivan does not know how NICO's committee operates. (Mot. at 22–23). Sullivan described the event: that as noted on the face of its written report (maintained in the claim file) the committee met on February 22, 2024, to determine expected value in light of disputed liability and the insured's share of fault (Exh. 1 at 5–6; NICO 003665 (D.N. 233-2 at 2)), and she explained from experience how such committees work, why a valuation differs from a reserve (a solvency measure, not an evaluation of the claim), and why an opening offer need not equal a valuation. (Exh. 2 at 188:13–189:16, 190:8–191:19, 192:23–193:6). She was candid that she did not know the formal structure of NICO's committee (*id*. at 188:13–14, 189:14–16)—the formal structure of the committee is of no moment. At most, it goes to the weight of her testimony and can be explored through cross examination.

Plaintiff's criticism of Sullivan's discussion of the January 2023 demand is misplaced. Plaintiff targets the sentence in Sullivan's rebuttal of Mr. Fisher noting that, although the file does not document transmission of the demand to the insureds, the case settled "for significantly less than the policy limits." (Exh. 1 at 10). That sentence (again found in her expert report which the jury will not see) actually rebuts Fisher's contention that the failure to transmit the offer to the insured or to document that it had occurred was a deviation from standard practice. Sullivan acknowledged the missing documentation in her report and again at deposition (Exh 2. at 200:15–201:22)—the opposite of *ipse dixit*. The point Sullivan makes is that any missing documentation about transmitting the offer did not cause any damage (to the insured or Walden) since the case settled for far less than the $1 million limit. Kentucky courts require proof of actual damage, *Motorist Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452, 454 (Ky. 1997), and Fisher conceded he had not opined that the omission damaged Plaintiff (D.N. 233-1 at 22 (citing Fisher Dep. 162:4–15)).

Sullivan may also describe for the jury what carriers do when a demand arrives. (Exh. 2 at 175:24–178:12). Plaintiff's alternative request to bar her from vouching for the committee valuation or stating that the omission had "no impact" (Mot. at 25, ¶ 7) should be denied.

Plaintiff's remaining criticisms are also matters of weight, not admissibility. Whether Sullivan could say which diary entry triggered Mr. Crum's retention (Exh. 2 at 100:9–101:12, 167:20–168:10) or remembered the interval before the investigator was hired, concern a witness testifying months after she reviewed a file of more than 6,000 pages, without the file in front of her. While that kind of "gotcha" questions may be fair game for inquiry on cross-examination at trial, they do not raise an admissibility concern. Indeed, Rule 702(d) asks whether the experts' conclusions stay within what her basis and method can support, and Sullivan's do here. Plaintiff retains the opportunity to test her opinions before the jury, which is the proper forum to do so. *Smith v. Carbide & Chems. Corp.*, 2009 U.S. Dist. LEXIS 120133, at *9–10 (W.D. Ky. Dec. 21, 2009) (potentially contrary facts are "a proper matter for cross-examination").

**CONCLUSION**

For the foregoing reasons, NICO respectfully requests that this Court deny Plaintiff's Motion to Exclude or, in the Alternative, Limit the Testimony of Christine Sullivan in its entirety, including each of the alternative limitations Plaintiff requests.

Respectfully submitted,

*/s/ Kyle R. Bunnell*
Mindy G. Barfield
Kyle R. Bunnell
DINSMORE & SHOHL LLP
100 W. Main Street, Suite 900
Lexington, Kentucky 40507
Telephone: (859) 425-1000
*Counsel for Defendant, National Indemnity Company*

**CERTIFICATE OF SERVICE**

It is hereby certified that a copy of the foregoing was served via ECF on this 19th day of November, 2026 which will serve an electronic copy upon:

Robert Morrin, Esq.
Morrin Law Office
214 West Main Street
Richmond, KY 40475
*Counsel for Plaintiff*

*/s/ Kyle R. Bunnell*
Counsel for Defendant

74631433v3