**CAS Consulting, LLC**
**1160 S Michigan Ave, Suite 3905**
**Chicago, IL 60605**

## Introduction

I was retained by Dinsmore and Shohl, LLP, on behalf of National Indemnity Company ("NICO"), to provide analysis and expert opinions regarding claims advanced against National Indemnity Company, in the matter entitled Charles L. Walden, vs. Enterprise Services Group, LLC, Clarence M. Howard, National Indemnity Group of Insurance Companies or National Indemnity Company, Vince Kline, and Progressive Casualty Insurance Company, filed in the United States District Court, Eastern District of Kentucky, Lexington Division, Case No. 5:22-cv-00238-KKC (the "Lawsuit"). Specifically, my opinions will address National Indemnity Company's claims handling and whether they breached their duty of good faith and fair dealing to the claimant, Charles L. Walden.

The following report contains a statement of my opinions, the basis on which those opinions were formed, a description of my qualifications, a list of all matters in which I have provided reports, deposition or trial testimony, and a list of publications and speaking engagements.

## Qualifications

I have a Bachelor's degree in Economics and a Master's Degree in Business Administration with a concentration in Finance. I also hold Chartered Property Casualty Underwriter (CPCU) and Associate in Management (AIM) designations from the American Institute for CPCU and the Insurance Institute of America (The Institutes).

I have over 50 years of experience in the Insurance Industry, primarily in claims, and I have held both field and staff positions. I was a Vice President in Claims for the Allstate Insurance Company for over 11 years with responsibility for claims handling practices and procedures countrywide for both personal and commercial lines. In that capacity, I have participated in reviewing thousands of personal lines and commercial claim files handled throughout the United States, including the state of Kentucky. As the Chief Claim Compliance Officer for Allstate during 2009 - 2011, I oversaw regulatory reviews in field claim offices and NAIC market conduct exams with specific emphasis on compliance with state laws and regulations including various versions of the Unfair Claims Practices Acts as adopted by each state.

Since 2011, as President/Owner of CAS Consulting, LLC, I have provided claim subject-matter expertise to a variety of businesses and law firms, including reviewing claim files and providing expert reports in litigated matters as well as preparing analyses and/or educational materials. I was an adjunct Assistant Instructional Professor at Illinois State University, where I taught a Commercial Liability Insurance Course as well as an introductory Risk Management and Insurance Course. I am an adjunct professor at the University of Olivet, where I teach Risk Management, Economics, and Strategic Management in the MBA in Insurance Program. I am also a Professor at Lake Forest Graduate School of Management in Illinois, where I teach Corporate Finance, Advanced Healthcare Finance, Economics,

Business Ethics, Strategic Thinking and Capstone courses in their MBA program.

My resume is attached to my Report and includes a list of all matters in which I have provided expert opinions/reports including deposition/trial testimony, and a list of publications and speaking engagement. **(Exhibit A.**)

**Compensation**

CAS Consulting, LLC will bill for my time in this case at the rate of $350/hour for review/analysis and $450/hour for testimony plus expenses.

**Analysis and Review Process**

This matter arises out of a claim made for bodily injury liability coverage under the Commerial Automobile Policy issued to Enterprise Services Group, LLC of Alpharetta, Georgia by National Indemnity Company, Omaha Nebraska, policy number 70 TRS 105576 for a 2012 Freightliner XCL Chassis. The loss involves an automobile accident on 8/10/2020 in Kentucky, where the plaintiff, Charles L. Walden, was a driver in an owned vehicle, a 2004 Chevrolet Colorado, which collided with the insured vehicle, a parked and unattended 2012 Freightliner. The Lawsuit was initially filed (Madison Circuit Court in Kentucky) on August 10, 2022, whereby allegations were raised as to whether National Indemnity Company's handling of the claim, including the liability and damage investigation and evaluation of Mr. Walden' claims were a violation of good faith and fair dealing. Subsequently, the Lawsuit was moved to Federal Court.

My review of this matter included the following documents:

- The complaint(s) entitled Charles L. Walden, vs. Enterprise Services Group, LLC, Clarence M. Howard, National Indemnity Group of Insurance Companies or National Indemnity Company, Vince Kline, and Progressive Casualty Insurance Company, including subsequent pleadings

- National Indemnity Company's Declaration Pages and the Commercial Auto Policy issued to Enterprises Services Group, LLC, policy number 70 TRS 105576, for the policy period 11/18/2109 to 11/18/2020

- National Indemnity Company's document production, including electronic claim file(s), claim diary notes (portions redacted), police report, insurance policy, medical records and correspondence (Bates # NICO 000004 – 006369)

- Plaintiff's document production, including correspondence and medical records

- Depositions:

    - Charles L. Walden (January 4, 2023)
    - Clarence M. Howard (June 14, 2024)
    - David Changaris, MD (July 16, 2024)
    - Rebecca Clay, RN (July 17, 2024)

- Timothy Kriss, MD (July 18, 2024)
- Jason Curry (July 29, 2024)
- Timothy Wilson, MD (July 30, 2024)
- Edward R. Crum (July 31, 2024)
- Charles L. Walden (December 11, 2025)

- Plaintiff's expert report, Frederick J. Fisher, J.D., CCP

During my review, I focused on the claim handling conducted by NICO in connection with the above-mentioned claim. First, I considered the basic steps in the loss adjustment process that are standard in the industry: the insured's first notice of loss; insurer/insured acknowledgment of first notice of loss and ongoing subsequent communications; the insurer's coverage investigation and determination; the insurer's liability and damages investigation; and the insurer's evaluation of damages. I also reviewed the relevant policy in effect, as listed above. Second, I considered whether NICO acted in accordance with industry standards, including compliance with applicable insurance regulations and the Kentucky's Unfair Claim Practices Act, including the following:

- Whether NICO's coverage investigation was adequate, timely and appropriate under the circumstances;
- Whether NICO's liability investigation was adequate, timely and appropriate under the circumstances;
- Whether NICO's damage investigation and evaluation was adequate, timely and appropriate under the circumstances;
- Whether NICO's communication to the claimant and his legal representative was timely and appropriate.

## Statement of Opinions

Based on my review and analysis of this matter, it is my opinion to a reasonable degree of certainty based on my experience and education in the insurance industry, that NICO met the industry standards, customs and practices for proper claims handling and did not breach its duty of good faith and fair dealing to the claimant, Charles Walden. This conclusion is based on the following analysis and comparing the claim handling of this claim to industry standards and the standards required by the applicable Kentucky Unfair Claims Settlement Practices Act (KS 304.12-230). Any allegations with respect to violations of Kentucky's Unfair Claims Settlement Act are without merit. The pertinent portions of the Act that apply to this loss are as follows, including NICO's actions which evidence compliance with the Act:

1. Misrepresentation of Policy Provisions

   NICO accurately investigated the coverage applicability and the policy provisions to the insured and the claimant for this loss. The loss occurred on 8/10/20; the plaintiff's counsel called and/or emailed both the broker for NICO as well as the insurance company between 10/16/20 – 10/18/20 to advise them of the loss and their representation of Mr. Walden. NICO set up a claim file on 11/3/20 based on the plaintiff's letter of representation and the police report. The

following day, 11/4/20, NICO hires a local independent adjusting firm to conduct a liability investigation to include an interview with the insured and the insured operator. On the same date, 11/4/20, NICO sends out letters acknowledging the receipt of the claim to Enterprise Services Group and the Plaintiff's Counsel and also requests a recorded statement from the claimant and medical status/information. On 12/16/20, NICO sends a Reservation of Rights Letter to Enterprises Services Group and the insured driver outlining the section of the policy entitled 'duties after loss,' specifically the duty to cooperate. Although coverage was in question based on both disputed liability and non-cooperation, NICO provided the plaintiff's counsel with a copy of the declarations page of the policy as requested while it continued its investigation under the Reservation of Rights. As indicated, NICO did not misrepresent policy provisions, nor did they withhold information from the plaintiff.

2. <u>Failing to Promptly Settle Claims, where Liability has become Reasonably Clear</u>
3. <u>Refusing to Pay Claims Without Conducting a Reasonable Investigation</u>
4. <u>Failing to Promptly Provide a Reasonable Explanation of the Basis in the Insurance Policy for Denial of a Claim</u>

As stated above, the loss was reported to NICO via a letter of representation from the plaintiff's counsel on 11/3/20. NICO set up a claim file and assigned an independent adjusting firm to complete a liability investigation, including interviewing the named insured and the insured operator. Correspondence produced from the claim file indicates there were multiple follow-ups by the independent adjusting firm to contact the named insured and the insured operator. On 12/16/20, NICO sent a Reservation of Rights letter to the named insured and insured operator based on the policy condition entitled 'what to do after a loss.' On 1/19/21, NICO assigned a second claim investigation firm to attempt contact with the named insured and the insured operator.

Based on the information received from the police report and the initial independent adjusting firm, NICO issued a preliminary denial based on liability to the plaintiff's counsel on 1/19/21. The letter specifically stated the basis for the denial; i.e.: inattentiveness of the claimant operator and a rear end collision to the parked and unattended insured vehicle. The police report included statements from the investigating officer as well as pictures. The letter also stated that if there was additional information that plaintiff had which was material to this decision, to forward same to NICO for consideration. Although there were questions of the placement of the reflective triangles and the exact location of the insured vehicle based on the 'line' delineating the breakdown lane and the travel lane, the information that NICO had at the time of this denial was reasonable based on the fatigue and inattention of the claimant driver as mentioned in the police report.

On 5/13/21, the plaintiff's counsel again requested the declarations page of the policy showing the available limits and indicated no settlement would occur short of litigation without that information. The plaintiff also responded with a description of the injuries that the claimant sustained. Their theory of liability rested on the fact that the insured vehicle was not completely pulled off the road and should have been moved before the driver left the location. Generally, insurers are not required to voluntarily divulge policy limits, nor do they do so without the

insured's agreement. Given the difficulty in getting the named insured to respond, NICO decided to send the requested information to the plaintiff while still handling the matter under the Reservation of Rights. On 10/21/21, another ROR was sent to the named insured and the insured operator, noting the policy conditions 'your duties after a loss.'

On 8/10/22, suit was filed in state court.

On 1/13/23, NICO receives a demand from the plaintiff counsel for $ 846,676.07; the letter indicates it is an 'initial' demand which will increase as additional medical is received. There was no time limit to respond. Defense counsel responds on 2/2, 2/21 and 3/8/23 to plaintiff requesting some additional information to respond to the demand. On 2/16/23, NICO's accident reconstructionist reports back that the insured shouldn't have left the vehicle on the off ramp, but the photos show that the triangles were out, the vehicle was pulled over as far as possible, and that there was room for the plaintiff to go around the vehicle. The report that was received by the accident reconstructionist indicated that the insured vehicle was 3 feet into the travel portion of the roadway but there was about 8 feet of clearance to go around the vehicle. The 'fatigue' of the claimant operator per the police report is consistent with the plaintiff not noticing the vehicle until it was 10 feet away. Additionally, a routine visit to the primary care physician group treating the plaintiff on 8/3/20 noted headache, fatigue and a prior TBI to be key complaints. The accident reconstructionist, Crum Investigations, LLC, submitted their report to defense counsel on 4/1/24. On 6/1/24, Crum visited the accident site per the discussion with defense counsel at 11:30 pm to document the lighting in the area; his correspondence to defense counsel indicates that the area was well illuminated from the highway.

Throughout this time, defense counsel had been securing medical information on the claimant and sent the medical record to Dr. Kriss for review on 9/14/23. Dr. Kriss reviewed the medical records pertaining to the plaintiff on 10/31/23. He also reviewed the independent medical exam performed by Dr. Wilson on 11/30/23. Based on this review of the medical information provided in the records, the reviews of the exam performed by Dr. Wilson, and his own interview and independent medical exam of the plaintiff on 5/10/24, Dr. Kriss concluded that the surgery performed to repair the fractured hip from the accident on 8/10/20, including the physical therapy that the plaintiff participated in, was successful in restoring previous functionality and range of motion. The medical records, including those provided by the treating physical therapists, document the success of the surgery and the resolution of the post-operative pain. Mr. Walden sought treatment subsequent to 2021, but the records indicate the visits were for medical issues related to accidents before the 8/10/20 accident, for issues not related to a hip or back issue associated with the 8/10/20 accident and/or for other non-automobile accidents. It was not until January 2023 that Mr. Walden complained of right hip pain, but he did not attribute the pain to the 8/10/20 accident; an exam by his physician performed on 8/17/23 indicated full range of motion without any pain. Dr. Kriss' opines that any potential future surgery suggested by Dr. Wilson is without merit based on the medical evidence reviewed.

On 11/23/23, a mediation was tentatively scheduled for 2/6/24. On 2/22/24, a Claim Committee review was conducted to determine the expected value of Mr. Walden's bodily injury liability claim. Based on the disputed liability in this pure comparative negligence venue, and the fact that there is some negligence attributed to the insured operator for the position of the vehicle as

documented by the police report and the accident reconstructionist, an evaluation was completed. The complicated nature of the medical information provided, including two previous significant auto accidents with ongoing cognitive issues, some hospital admissions for drug overdoses, could obscure the fact that the injury attributed to this accident was a fractured hip, contusions and lacerations and that the plaintiff made a good recovery from this injury. NICO evaluated the value to be $234,269 and authorized that amount. On 3/26/24, NICO attempted to contact the plaintiff's counsel to discuss settlement. On 3/30/24, defense counsel contacted the investigating police officer and they agreed to discuss the case. On 4/20/24, the insured driver finally contacted the defense counsel and discussed the facts of the loss. He reiterated that he parked the truck as far right as he could, put the triangles out, and walked to a hotel near the highway after speaking to his dispatcher. He was awakened by the police after the accident occurred and went back to the scene to cooperate. NICO contacted plaintiff's counsel and offered $100,000, indicating that both liability and the need for future medical treatment was disputed. On 8/3/24, the investigation police officer was deposed and stated there were flood lights at the scene and the visibility was good. Mediation was reset for 12/19/24; the underlying tort case settled for $200,000 at mediation.

The Lawsuit alleges that NICO was not acting in good faith and breaching its responsibilities to the plaintiff. There is no indication that NICO is guilty of the allegations made against them. NICO investigated the liability of its insured based on the information available to them and appropriately issued a Reservation of Rights for lack of cooperation pursuant to the policy condition 'what to do after a loss.' The liability was questionable at the outset based on the police report; NICO denied the claim based on the information they had at the time but appropriately requested the plaintiff to submit any additional information. Based on the nature of the alleged injuries and the plaintiff's theory of liability, NICO continued to search for the insured to gather additional information and hired an accident reconstructionist. NICO also continued to request updated medical information, while operating under a Reservation of Rights for lack of cooperation by their insured and insured operater, until the issue of liability was resolved. Based on the facts they had once the insured driver was found, even though there were significant questions regarding the liability for the accident, NICO evaluated the claim and the underlying tort matter was settled at mediation.

As indicated above, NICO handled the liability investigation properly despite the difficulty in contacting the insured and the insured driver. NICO also continued to investigate and evaluate the damages portion of the claim properly under a Reservation of Rights. The initial denial of the claim was based on the disputed and questionable liability based on the information NICO had at that time. Appropriately, and consistent with industry standards, NICO requested that the plaintiff provide them additional information to consider at the time of the denial. The plaintiff provided information regarding the nature of the injuries as well as their theory of liability; NICO left the claim file open and continued to investigate both liability and damages under a Reservation of Rights. Once NICO had the necessary information to evaluate both liability, including the facts as elucidated by their insured operator, and damages, including an independent medical exam, an offer was made. The matter subsequently settled at mediation.

It is clear that this claim involved significant questions and a fairly debatable dispute over both liability and potential future medical treatment causally related to this accident. The lack of

cooperation by their own insured presented additional challenges for NICO at the outset. NICO, however, met the industry standards, customs and practices for proper claims handling, including Kentucky's Unfair Claims Practices Act, and did not breach its duty of good faith and fair dealing to the claimant Charles Walden.

5. Replying to Pertinent Communications

A review of this claim file, and as articulated above, NICO demonstrated it complied with the Kentucky Unfair Claim Practices Act in replying to both oral and written communications to the plaintiff and his legal representative in a reasonably prompt and timely manner.

6. Reasonable Standards of Investigations and Settlement of Claims

NICO demonstrated it followed reasonable claim handling standards for the investigation and settlement of Auto Injury Claims throughout the handling of this claim. In reviewing the claim file, which includes the claim diary and correspondence, the claim employees who handled this claim promptly sent out Reservation of Rights letter(s) to both the insured and the operator. Attempts were made to contact both the insured and insured operator through the use of a local adjusting firm who used both in person and correspondence methods, and secondly, an investigative firm. In addition to the written police report, contact was made with the investigating officer and an accident reconstructionist worked to review the evidence once it was known that there was a significant dispute regarding liability. Follow-up for medical information by both the claim adjuster and defense counsel, including review of medical records by a doctor and an Independent Medical Exam were part of the damage investigation needed to properly evaluate the injury. These are all common practices aligned with industry standards and designed to conform to various versions of the Unfair Claims Settlement Practices Act, including Kentucky. NICO demonstrated the use of reasonable practices and standards for the prompt investigation and settlement of claims.

7. Compelling Policyholders to Institute Suit

NICO made a good faith effort to investigate and evaluate the claim presented by Mr. Walden. As stated above, the initial loss was reported by the plaintiff two months following the loss. The information that NICO had via the police report was that the plaintiff hit the left rear of the insured's parked and unattended vehicle. Based on this information and operating under a Reservation of Rights for lack of cooperation, it was not unusual nor a violation of the unfair claim practices act for NICO to deny this claim based on liability. Their denial to the plaintiff specifically requested that any additional information they needed to consider be forwarded to them. The plaintiff did forward some basic injury information as well as their theory of liability. NICO properly left the claim file open and continued to investigate both liability and damages under a Reservation of Rights for lack of cooperation from their insured. Due to the difficulty in finding the insured and the ongoing treatment and medical issues for the plaintiff, the plaintiff files suit within the two-year statute of limitations (8/10/22). Once the liability investigation was completed, including a discussion with the insured operator, and the damages investigation was completed, including a records review and an independent medical exam, the claim file was

evaluated and an offer was made. The case was settled at a subsequent mediation.

NICO did not compel the plaintiff to institute suite to recover damages due to them. As indicated previously, this claim involved significant questions and a fairly debatable dispute over both liability and potential future medical treatment causally related to this accident. The lack of cooperation by their own insured presented additional challenges for NICO at the outset. NICO, however, met the industry standards, customs and practices for proper claims handling, including Kentucky's Unfair Claims Practices Act, and did not breach its duty of good faith and fair dealing to the claimant Charles Walden.

**<u>Statement of Opinions in Rebuttal of Expert Frederick J. Fisher</u>**

I have reviewed the report of Plaintiff's Expert Frederick J. Fisher and disagree with his conclusions and opinions. While Mr. Fisher conclusions and opinions are not actually summarized, the following will outline what I believe to be his 'summary' conclusions and opinions and my rebuttal to same:

1. "Condensed version of the facts clearly demonstrate different areas of focus, that is inconsistent when liability becomes clear."

   The first point that Mr. Fisher brings up is inconsistency in the facts. There is a significant dispute with respect to liability. The initial facts indicate the insured vehicle was 3 feet into the road way – not 'straddling' the roadway and the shoulder. Both the police officer and the accident reconstructionist determined that there was sufficient lighting on the exit ramp. The fact the NICO placed a $150,000 reserve on this claim in June of 2021, isn't indicative that that the evaluation of the claim was $150,000 at that time or that it was improper not to offer $150,000. Reserves are an estimate of costs associated with a claim and are required by insurance departments to ensure solvency; reserves are not an evaluation of a claim for settlement purposes. Mr. Fisher also comments on the fact that while there was significant effort made to locate the insured and the insured driver, once a private investigator was hired he was able to find them quickly and that NICO should have done that earlier. It should be noted that an outside adjusting and investigating firm was hired at the outset to locate the insured and insured driver, and made significant progress in narrowing down the search. The private investigator was the last attempt made. NICO's actions in their attempts to locate the insured and insured driver with both reasonable and appropriate.

2. " … the surprise is that they denied liability despite the fact that the truck was not safely parked….."

   Mr. Fisher's paragraph following this initial sentence talks about the insured driver's awareness of the requirements regarding the triangles; he also noted the triangles are grouped together in the picture. First of all, the pictures were taken after the accident so it's hard to determine exactly where the triangles were placed as it clearly shows some were moved by the plaintiff's vehicle as a result of the collision. Secondly, the driver's comments come much later and after NICO continued to investigate liability based on the information provided to them by the plaintiff.

The second paragraph under this conclusion is duplicative of the first conclusion as it discusses the timing of the hiring of the private investigator and that the reserve was never offered. I disagree with the conclusions made in this paragraph as noted above under item #1.

3. "Eddie Crum, the accident reconstructionist was not retained until February 2023. It has been represented to me that this was after Plaintiff's made a Policy Limit Demand."

   This conclusion is basically a reiteration of Mr. Crum's findings, including excerpts from a deposition. The comment "In essence, an insurer cannot retroactively cure a failure to investigate by pointing to an expert defense they didn't look for until almost 3 years later, and yet still maintaining little desire to make any reasonable offer for another 14 months after Crum confirmed the potential for liability" is a little misleading. Mr. Crum's report is consistent with the findings of the police report as to the position of the vehicle and the triangles; his report finds negligence and thus liability on both the plaintiff and the insured. Included in the demand, which Mr. Fisher does not address here, is the future medical expenses and Dr. Wilson's report as to the potential need for future surgery. As noted in the claim file on 4/20/24, defense counsel filed a motion for the plaintiff to attend his IME which was scheduled for 4/12/24 and the judge sustained the motion. A federal judge affirmed the magistrates' ruling that the plaintiff has to attend the IME on 5/3/24; the IME with Dr. Kriss occurred on 5/10/24.

   It should be noted that an offer of $100,000 was made on 4/20/24; mediation occurred on 12/19/24 and the claim settled for $200,000, significantly less than the policy limits of $1,000,000.

Mr. Fisher then provides his opinions as follows:

1. Plaintiff and Counsel was not receiving notice from the insurance company every 45 days stating that they needed more time for investigation. They never affirmed/denied liability until 2/26/21.

   I agree that a formal letter every 45 days stating that NICO needed more time for investigation was not sent. However, there were multiple calls and/or letters that were exchanged between plaintiff's counsel, NICO and defense counsel throughout this claim. Plaintiff's counsel was aware that there was difficulty in contacting both the insured and insured operator. The preliminary denial was sent to plaintiff's counsel on 1/19/21; the file remained open and the investigation was ongoing based on plaintiff's response to NICO's request for additional information as to liability and damages. While the Insurance Regulation requires ongoing notice that additional time is needed for investigation, NICO was not 'silent' as there were calls and/or letters exchanged between the parties during this time. Additionally, failure to provide this formal letter is not a violation of the Unfair Claim Settlement Practices Act and it does not amount to bad faith and unfair dealing. If anything, it speaks to NICO's attempt to continue to investigate based on the plaintiff's theory of liability.

2. The NICO adjuster logged zero evaluation activity between June 2021 and March 2023, completely ignoring an $846,676.07 demand. Abandoning a file and failing to substantively evaluate a time sensitive, policy limits demand during active litigation is a massive deviation from standard claim handling and file monitoring practices.

I disagree with this statement(s) and opinion. First, there is activity from NICO adjusters between the time mentioned. There are attempts to work with local adjusters/investigators to make contact with the insured and insured operator to make an appropriate liability decision – a decision that is clearly part of the evaluation process. The demand letter dated 1/13/23 did not have a time limit and was not time sensitive. Defense counsel reached out to the plaintiff on 2/2/23 acknowledging the demand letter and requesting additional information so that NICO could properly evaluate the claim. Defense counsel reiterated this request on 2/21/23 and 3/8/23. It is clear that NICO did not abandon this file and failed to evaluate a time sensitive policy limits demand.

3. The Trier of Fact could conclude that the Insurer effectively weaponized the driver's disappearance as a liability defense externally while treating it as coverage issue internally.

I disagree with this statement nor do I understand how Mr. Fisher arrived at this conclusion. First of all, the police report that was part of the FNOL received from plaintiff's counsel clearly stated there was inattention and fatigued on the part of the driver. Liability was not clear and became more disputed as additional information was received. The fact that the insured operator was not able to be found for quite some time impeded the ability of the insurer to protect the rights of the insured in determining liability. The policy condition requires the insured and the insured operator to cooperate in the investigation and defense of the claim. This was and is a coverage issue and pursuant to industry standards and practices, NICO issued a Reservation of Rights letter while they continued to investigate the loss. The term 'weaponized' is totally inappropriate and not accurate based on the facts of this loss.

4. NICO failed to attempt to promptly and fairly make an offer of settlement when liability had been reasonably clear and thus compelled litigation in this matter.

I disagree with this statement. This claim involved significant questions and a fairly debatable dispute over both liability and potential future medical treatment causally related to this accident. The timing of when an accident reconstructionist was engaged did not significantly impact the liability dispute as the findings continued to support negligence on both the insured and the plaintiff. The lack of cooperation by their own insured presented additional challenges for NICO at the outset. NICO, however, met the industry standards, customs and practices for proper claims handling, including Kentucky's Unfair Claims Practices Act, and did not breach its duty of good faith and fair dealing to the claimant Charles Walden. NICO did not compel the plaintiff to institute suit to recover damages due to them.

5. There is no documentation that NICO ever communicated the January 2023 policy limits demand to their own insured.

NICO sent a Reservation of Right letter to the insured and the insured on operator on two separate occasions, 12/1/20 and 10/26/21. While there is no documentation in the claim file regarding the January 2023 demand, there was no impact on the outcome of the underlying case which was settled at mediation for significantly less than the policy limits.

In conclusion, I disagree with Mr. Fisher's conclusions and opinions. NICO's handling of this claim, including the investigation and damage evaluation, is consistent with industry standards and in compliance with Kentucky's Unfair Claims Practices Act. Based on my review of the material involved in this claim and my experience and education in the insurance industry, I find no evidence that NICO put their financial interests ahead of their policyholder or the plaintiff, acted with careless indifference, acted unreasonably or in bad faith. This claim involved significant questions and a fairly debatable dispute over both liability and potential future medical treatment causally related to this accident, and a coverage issue regarding lack of cooperation on the part of the insured. If anything, NICO gave the plaintiff every opportunity to present their case as they continued to investigate both liability and damages.

This report and the opinions I have expressed are based on the information that I have been provided with and have reviewed as of the date of this report. My work on this matter is expected to continue, and I reserve the right to update my report and/or revise or supplement my findings and opinions based on my continued review and analysis of information that is provided to me.

Christine A. Sullivan
CAS Consulting, LLC
07/27/2026
(Attachment)

# EXHIBIT A

# Christine A. Sullivan

***Exhibit A: Walden v NICO et al***

1160 So. Michigan Ave Unit 3905
Chicago, IL 60605
CASConsulting.llc@gmail.com

## Professional

***President, CAS Consulting, LLC*** — ***8/11 - Present***

- expertise in injury and liability claim handling practices and procedures
- litigation and regulatory support
- training programs and best practices

***Lake Forest Graduate School of Management*** — ***2/13 – Present***

- Faculty: Corporate Finance; Advanced Healthcare Finance; Economics; Strategic Thinking; Business Ethics; Capstone
- Faculty Senate (2016 – 2020)

***Illinois State University*** — ***8/17-12/19; 2021-2024***

- Faculty: Risk Management & Insurance; Commercial Liability

***University of Olivet*** — ***8/19 – Present***

- Faculty: Economics; Organizational Behavior; Risk Assessment; Strategic Marketing; Capstone

***Allstate Insurance Company, Northbrook, IL*** — ***1973 - 2011***

**Vice President/Assistant Vice President** — **5/00 - 7/11**

- Chief Claims Compliance Officer (7/09- 7/11)
  - Oversaw multi state and individual state market conduct exams
  - Participated in regulatory hearings and presentations
  - Ensured claim processes complied with new and existing laws and regs
  - Responsible for internal control and SOx
  - Provided testimony at depositions and trials as company witness
- Casualty and Liability Claims Processes (5/00 - 7/09)
  - Responsible for the strategic direction and setting of claim policy, practices and procedures nationwide
  - Identified and implemented technology applications/solutions which improved efficiency and performance
  - Set performance standards and goals for casualty claim processes which accounted for over $ 4 billion in loss payments per year

  - Set performance standards and goals for employees
  - Responsible for reviewing changes in legislation and case law to ensure compliance
  - Oversaw the handling and authorized direction and payments on large exposure losses and complex litigation issues
  - Provided testimony at depositions and trials as company witness and expert

**Director, Northbrook, IL 2/93 - 4/00**

- Claims (8/97 - 4/00)
  - Responsible for setting claim policy, practices and procedures for third party bodily injury and liability claims nationwide
  - Set performance standards and goals for third party casualty claim processes
  - Set performance standard and goals for employees
  - Responsible for reviewing changes in legislation and case law to ensure compliance
  - Oversaw the handling and authorized direction and payments on large exposure losses and complex litigation issues
  - Provided testimony at depositions and trials as company witness and subject matter expert

- Field Education, Human Resources (1/97 - 7/97)
  - Responsible for the delivery of education products/services to all employees and agencies countrywide
  - Managed a staff of 36 Claim Education Managers and 26 Regional Education/Technology Managers

- Education Design/Delivery, Human Resources (2/93 - 1/97)
  - Responsible for the design, development, and delivery of training/education products and services, including leadership, professional, interpersonal, technical and business skills
  - Conducted performance based needs analysis
  - Designed and delivered instructor led, self paced, structured OJT, and multimedia products, including a course certification/maintenance process
  - Implemented measurement processes for effectiveness and service value
  - Designed and developed a leadership development model
  - Implemented on site professional education curriculum and graduate school program.
  - Managed a staff of internal and contract instructional designers and organizational design professionals

**Territorial Claim Manager, New York Region, Hauppauge, NY 2/88 - 1/93**

- Oversaw the handling of 200,000 auto, homeowner, and liability claims annually totally over $500 million
- Planned and administered an annual operational budget of $ 35 million
- Managed a staff of over 600 managers, claim professionals and support employees in 6 locations
- Participated in setting the strategic and operational direction of the New York Region

**Claim Development Manager, New England Region, Farmington, CT 1/87 - 1/88**

- Coordinated and implemented training and development programs for claim employees and managers.

- Developed training and development programs to introduce new products and/or processes.
- Trained and installed new claim managers.

**Senior District Claim Manager, New England Region** **5/85 - 12/86**

- Managed a claim office of over 150 employees and managers, handling auto, homeowner, and liability claims for metropolitan Massachusetts

**District Claim Manager, New England Region** **6/80 - 5/85**

- Managed a claim office of over 75 employees handling auto, homeowner, and liability claims in Rhode Island (6/82-5/85) and Western Mass. (6/80-6/82)

**New England Region** **6/76 - 5/80**

- Casualty Unit Manager, CT
- Initial Action Unit Manager, CT
- Claim Analyst. CT; Casualty Claim Adjuster, NH, VT

**Sears Roebuck & Company, Manchester, NH** **6/69 - 5/76**

## Education

***University of Illinois at Chicago,*** Chicago, IL
MBA, Finance and Marketing, May 1998

***American Institute for Property & Liability Underwriters Malvern***, PA
Chartered Property Casualty Underwriter designation, 1989

***Insurance Institute of America,*** Malvern, PA
Associate in Management designation, 1982
Distinguished Graduate award, 1982

***University of New Hampshire, Whittemore School of Business & Economics,*** Durham, NH
B.A. Economics and Political Science, Summa cum laude, Phi Beta Kappa, 1974
Omicron Delta Epsilon (Economics), Pi Gamma Mu (Social Science), Pi Sigma Alpha (Political Science), Psi Epsilon (Whittemore Business School), 1974

## Activities

***Phi Beta Kappa,*** National member 1974 - present
***Insurance Research Council,*** Advisory Board 2004 – 7/31/11; Chairman 2009 – 7/31/11
***Insurance Institute of America,*** Contributing Author, CPCU & AIC Programs, February 2011 - 2012
***Insurance Institute of America,*** INS Advisory Board, 1995 – 2008; AIC Advisory Board, 2005 – 2008; CPCU Advisory Board, 2009; API Advisory Board, 9/96-12/99; Contributing Author, API program 1996
***Injury Sciences, LLC,*** Advisory Board, 2011-2012
***Executive Service Corps of Chicago,*** Volunteer Consultant, 10/12 - present
***Literacy Works, Chicago, IL,*** Board 11/10-Present; Treasurer 9/11-9/13; 9/17 – 9/19; President 9/13-9/17
***Menttium, Chicago, IL,*** Volunteer Mentor, 2008 - Present
***Claims Professional of the Year 2004; Claim*** Magazine Editorial Advisory Board
***Insurance School of Chicago,*** Board of Directors, 5/95 – 8/98

***American Management Association,*** Chicago Area Training Council, 5/95 – 12/98
***Illinois State University, Katie School of Insurance,*** Guest Lecturer, 2011; Executive Advisory Committee, 3/95-8/98; Adjunct Faculty, 2014
***Society of CPCU,*** Chicago Chapter 9/14 – present; Chicago Northwest Suburban Chapter 1993 – 2014: Board of Directors 7/96 – 1999; Candidate Development Director 11/94 - 7/96, New York Chapter 1989-1993; National Society 1989-present
***Society of CPCU,*** National Claims Interest Section Group Committee, 1997 - 2000; National Regulatory & Legislative Interest Section Group Committee, 10/11 – 9/14; Coverage, Litigation & Expert Witness Interest Group Committee, 9/14 – present; Nominating Committee 4/13 – 4/17
***Stonybrook University of New York, Staller Center for the Arts,*** Advisory Board, 1992-1993
***Girl Scouts of America R.I. Chapter,*** Board of Directors 1983-1984; Troop Leader 1982

**Christine A. Sullivan**
**CAS Consulting, LLC**

**Expert Witness**

October 2014: Tesoro Refining and Marketing Company vs National Union Fire Insurance Company of Pittsburgh, Pa; Case No: CV 13-3228-ABC; United States District Court Central District of California (Report; Deposition)

February 2015: Companion Property & Casualty Insurance Company v F.A. Richard & Associates Inc.; Civil Action No. 3:14-cv-00260-MGL; United States District Court for the District of South Carolina Columbia Division (Report)

May 2015: Cooper Industries, LTD vs National Union Fire Insurance Company of Pittsburg, PA; Case No.: CV-01591; United States District Court of Texas (Report; Deposition)

May 2015: Carmen Tejada v. State Farm Lloyds, Civil Action No. 4:14-cv-00649; United States District Court for the Eastern District of Texas – Sherman Division (Report)

June 2015: Cathy Broxterman v State Farm Lloyds, Civil Action No. 4:14-cv-00661; United States District Court for the Eastern District of Texas – Sherman Division (Report)

July 2015: Jesus Alfonso and Rocia Chavez v. State Farm Lloyds, Cause No. 380-03448-2014; District Court, Collin County, Texas; 380th Judicial District (Report)

November 2015: Gustavo DeAvillez v. State Farm Lloyds, Civil Action No. 4:15-cv-00149; United States District Court for the Eastern Division of Texas, Sherman Division (Report)

December 2015: George T. Heflin v. State Farm Lloyds, Civil Action Case No. 429-03964-2014; Collin County Texas District Court; 429th Judicial District (Report)

December 2015: Re: Aldo Garcia v. State Farm Lloyds; Civil Action No. 4:14-cv-007725; United States District Court for the Eastern District of Texas, Sherman Division (Report)

January 2016: Michael Stelzriede v. State Farm Lloyds; Civil Action No. 1:15-cv-00031-P; United States District Court for the Northern District of Texas, Abilene Division (Report)

March 2016: _Market Lofts Community Association vs. National Union Fire Insurance Company of Pittsburg, PA, Case No: 215-cv-03904 CAS (PJWx); United States District Court Central District of California (Report)

August 2016: James McClinton v. State Farm Lloyds; Civil Action No. 3:15-cv-03919-D; United States District Court for the Northern District of Texas Dallas Division (Report)

November 2016: Mystical Rose Services LLC v State Farm Lloyds; Case No. 26446-8; District Court, 104th Judicial District, Taylor County, Texas (Report)

January 2017: Bruce L. Brown, et al v State Farm Fire & Casualty Company et al; Superior Court of the State of Arizona, County of Yavapai; Case No. P1300CV201400709 (Report)

April 2017: All Islands Inc. dba Century 21 All Islands vs Partners E & O Services, Inc., and Dan Tiez vs Burns & Wilcox, Ltd., vs Chartis Specialty Insurance Company, formerly known as American International Specialty Lines Insurance Company; Brown & Brown, Inc.; Circuit Court of the First Circuit State of Hawaii; Civil No. 13-1-0547-02 KKS (Report; Deposition; Trial Testimony)

May 2018: International Game Technology and IGT-UK Group Limited v. Illinois National Insurance Company, Civil No. 2:16-cv-02792-APK-NJK; International Game Technology and IGT-UK Group Limited v. Illinois National Insurance Company; United States District Court, District of Nevada; Civil No. 2:16-cv-02792-APK-NJK (Report; Deposition)

June 2018: Cooper Industries v Spectrum Brands, Inc. Cause # 2:16-cv-00039-CDP pending in the United States District Court, Eastern District of Missouri, Northern Division (Report; Deposition)

July 2018: Markel American Insurance Company vs. Internet Brands, Inc., Autodata, Inc., Autodata Solutions Company, Robert N. Brisco, Scott A. Friedman, B. Lynn Walsh vs. Markel Insurance Company, National Union Fire Insurance Company of Pittsburg, PA & Berkley Insurance Company; Case No.:2:17-CV-02429-MWF-AJW; United States District Court, Central District of California. (Report)

August 2018: Keoni Paul Kuloloia vs Ohio Security Insurance Company; Liberty Mutual Insurance Group, Inc. dba Liberty Mutual Insurance Company dba Liberty Mutual; Liberty Mutual Auto and Home Services, LLC; Liberty Mutual Insurance Company aka Liberty Mutual Insurance Co.; Does I through A; and ROE Corporations I through X inclusive; United States District Court, District of Nevada; Case # 2:18-cv-00405-JCM-PAL. (Report)

October 2018: Washington Barrow vs. Farmers Insurance Company of Arizona and Lien Dao; First Judicial District Court, County of Sante Fe, State of New Mexico; Case No. D-101-CV-2015-00931. (Deposition)

June 2019: Stephen C. Schmid v. Safeco Insurance Company of America, Does I through X, and ROE Corporation I through X, inclusive; District Court, Clark County, Nevada; Case # A-18-781027-C Department # 28. (Report)

July 2019: Nicolita Montoya v. Loya Insurance Company, a foreign corporation doing business in New Mexico; Case No.:1:18-cv-00590-SCY; United States District Court for the District of New Mexico. (Report; Deposition).

October 2019: Dusch v Dott Agency and Nationwide Insurance; Case No. GD-18-03339; Court of Common Pleas of Allegheny County, Pennsylvania Civil Division. (Report; Trial)

October 2019: Michael J. Beautyman v State Farm Mutual Automobile Insurance Company; Case No. 2010-02565; Court of Common Pleas of Montgomery County, Pennsylvania. (Report)

October 2019: Edward T. Paa and Kelly J. Paa vs. DTRIC Insurance Company, LTD., a Hawaii Corporation; Justin Whedbee; Frontier Adjusters Inc.; Jon Does 1-10; Jane Does 1-10; Doe Partnerships 1 -1 0; Doe Corporations 1-10; Doe Entities 1-10; and Doe Governmental Entities 1-10; Civil No 18-1-0177; Circuit Court of the Second Circuit, State of Hawaii. (Report)

November 2019: Lauren Carrell, individually and as mother and next of friend to her daughter, Dakota Stuck, a minor vs. Loya Insurance Company, aka Fred Loya Insurance Company, aka Fred Loya Insurance, LP, and Fred Loya Insurance Agency, Inc.; Case No.: D-504-CV-2018-00754; Fifth Judicial District Court, County of Chavez, State of New Mexico. (Report)

January 2020: Dynamic International USA, Inc., vs National Union Fire Insurance Company of Pittsburg, PA; Case No.: MER-L-366-17; Superior Court of New Jersey, Law Division, Mercer County, State of New Jersey (Report)

January 2020: Lake County Foods, Inc. and LCF/NGS, LLC v. Houston Casualty Co., Case No. 18-cv-734; United States District Court, Eastern District of Wisconsin (Report)

September 2020: Dennis Dickey and Cecilia Dickey v. Dustin Nelson, Farmers Insurance Company of Arizona, and Progressive Direct Insurance Company, Case No. D-202-CV-2019-01386; County of Bernalillo, Second Judicial District in New Mexico (Report; Deposition).

January 2021: MTD Products Inc. vs Allied World Insurance Company (U.S.) Inc., et al, Case No. CV-13-810198; Court of Common Pleas Cuyahoga County, Ohio (Report)

May 2021: Jeannelle Faith v. Great West Casualty Company, Civil Action No, 3:20-CV-458-RGJ; United States District Court for the Western District of Kentucky at Louisville. (Report)

March 2022: Rialto-Capital Condominium Association et al v. First Mercury Insurance Company, et al; Superior Court of New Jersey, Hudson County, Docket No. Hud-L-002750-18. (Report)

April 2022: Broadway Ford Truck Sales, Inc. vs Depositors Insurance Company; United States District Court, Eastern District of Missouri Eastern Division, Case # 4:20-CV-00999-JAR. (Report)

April 2022: Debra McIntosh v USAA General Indemnity Company, et, al, filed in the United States District Court, Southern District of Illinois, Case No.: 20-CV-816-JPG. (Report)

November 2022: JLL CMG, LLC & Jones Lang Lasalle, Inc., v. Illinois National Ins. Co.; District Court of Dallas County Texas, 95th Judicial District, Case No. DC-21-09625 (Consulting)

February 2024: Kelvin T. Coates v. State Farm Mutual Auto Insurance Company; United States District Court, Western District of Kentucky at Louisville, Civil Action No. 3:22-cv-489-RGJ (Report)

June 2024: Ling Cai et al v Enterprise et al; United States District Court, District of Nevada; Case No. 2:23-cv-00050-ART-NJK (Consulting)

September 2024: Dominic Martinez vs. Young American Insurance Company and Mary D. Chavez; Case No.: D-202-CV-2019-07113; State of New Mexico, County of Bernalillo (Consulting)

October 2024: Joseph R. Baca v Alexander Hannaweeke, Frank De Bari, Michael Taggart, Keila Taggart, Heather Gossel, Geico, State Farm and America Automobile Association (AAA); Case No.: D-202-CV-2023-04537; State of New Mexico, County of Bernalillo, Second Judicial District Court (Consulting; Disclosed as Expert Witness)

October 2024: Kimberly Rae Smit v Margaret's Movers, Inc and State Farm Fire and Casualty Company; Case No.: 23-CI-002693; State of Kentucky, Jefferson Circuit Court Division 11 (Consulting, Disclosed as Expert Witness)

May 2025: Sonal Trivedi v Farmers Insurance Company; Case No,: 2022L009800; Circuit Court of Cook County, Illinois County Department, Law Division (Consulting; Disclosed as Expert Witness; Deposition)

December 2025: Joshua White v Progressive Advanced Insurance Company; United States District Court, Eastern Division of Pennsylvania, Civil Division; Case No: 2:25-cv-2064 (Report)

February 2026: Wesley Boyd, et al vs. National Indemnity Company, et al; Commonwealth of Kentucky, Campbell Circuit Court, Division I, Case No. 23-C1-00841 (Report)

April 2026: Loubna Hizouni v Progressive Advanced Insurance Company, United States District Court, Eastern Division of Pennsylvania, Civil Action No. 25-3534 (Report)

April 2026: Jeff Green, et al vs Dover Bay Specialty Insurance Company; United States District Court, Eastern District Texas, Beaumont Division, Civil Action No. 1:25-CV-00372 (Report)

May 2026: Jack Hering v. State Farm Mutual Insurance Company; United State District Court, Eastern District of Kentucky, Northern Division of Covington; Civil Action No. 2:25-cv-00031-DLB-CJS (Report)

**Publications**

AIC 33 Claim Handling Practices and Procedures; February 2011, 1st Edition
Reviewed, edited, provided subject matter expertise

AIC 30 Claim Handling Practices and Procedures; April 2012, 1st Edition
Contributing author

CPCU 556 Finance; 2011
Contributing author

**Speaking Engagements**

Insurance Forum, Illinois State University Katie School of Insurance 2010; "Change Management"

Insurance Regulatory Examiners Society (IRES); NAIC meeting, August 2011; "Use of Technology in Claim Handling"

PLRB Claims Conference 2012; "Claim Handling: Liability/Casualty"

CPCU Annual Meeting 2012; "Insurance Regulation"

PLRB Claims Conference 2013; "Claim Handling: Liability/Casualty"

CCC Claims Conference, 2013; "Casualty Claim Handling"

CPCU Annual Meeting 2013; "Insurance Regulation"

CPCU Annual Meeting 2013; participated in mock trial sponsored by the Coverage, Litigation and Expert Witness Interest Group

PLRB Claims Conference 2014; "Strength of Case"

CPCU Annual Meeting 2014; "Insurance Regulation"

PLRB Claims Conference 2015; "Strength of Case"

CPCU Society March 2016: "Ethical Blinders and Performance Metrics"

PLRB Claims Conference 2016: "Strength of Case"

CPCU Society September 2016: Panelist on coverage discussion

PLRB Claim Conference 2017: "Negotiation Strategies for Bodily Injury Liability Cases"

Hepler Bloom, LLC & Chicagoland Chapters of CPCU; Insurance Law & Coverage Seminar 2017: "Determining the Starting Point in Medical Insurance Investigation Claims

PLRB Claim Conference 2018: "Negotiation Strategies for Bodily Injury Liability Claims"

Hepler Bloom, LLC & Chicagoland Chapters of CPCU; Insurance Law & Coverage Seminar 2018: "Depositions in Insurance Coverage and Bad Faith Litigation: Claim Personnel and 30(b)(6) Depositions;" panel discussion

PLRB Claim Conference 2019: "Negotiation Strategies for Bodily Injury Liability Claims"

CPCU Annual Meeting 2019; participated in mock trial sponsored by the Coverage, Litigation and Expert Witness Interest Group

PLRB Claims Conference 2021: "Negotiation Strategies for Bodily Injury Liability Claims;" virtual session via webinar
PLRB Claims Conference 2022: "Negotiation Strategies for Bodily Injury Liability Claims"

PLRB Claims Conference 2023: "Negotiation Strategies for Bodily Injury Liability Claims"