UNITED STATES DISTRICT COURT EASTERN DISTRICT OF
KENTUCKY LEXINGTON DIVISION

________________________________

CHARLES L. WALDEN,
Plaintiff,
v. Civil Action No.
NATIONAL INDEMNITY GROUP OF 5:22CV00238KKC
INSURANCE COMPANIES OR NATIONAL
INDEMNITY COMPANY,
Defendant.

________________________________

DEPOSITION OF CHRISTINE SULLIVAN

DATE: Tuesday, September 29, 2026
TIME: 10:34 a.m.
LOCATION: Remote Proceeding
Morrin Law Office
Richmond, KY 40475
REPORTED BY: Chloe Fry
JOB NO.: 8441847

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF CHARLES L. WALDEN:

ROBERT MORRIN, ESQUIRE (by videoconference)
Morrin Law Office
214 West Main Street
Richmond, KY 40475
rob@morrinlawoffice.com
(859) 358-0300

ON BEHALF OF DEFENDANT NATIONAL INDEMNITY GROUP OF INSURANCE COMPANIES OR NATIONAL INDEMNITY COMPANY:

KYLE R. BUNNELL, ESQUIRE (by videoconference)
Dinsmore & Shohl, LLP
100 West Main Street
Suite 900
Lexington, KY 40507
kyle.bunnell@dinsmore.com
(859) 425-1045

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Morrin | 5 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Mrs. Sullivans Report | 25 |
| Exhibit 2 | Collision Report | 67 |
| Exhibit 3 | Denial Letter | 196 |

P R O C E E D I N G S

THE REPORTER: We are now on the record. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record?

MR. MORRIN: This is Rob Morrin for the plaintiffs.

MR. BUNNELL: Kyle Bunnell for National Indemnity.

MS. SULLIVAN: And Christine Sullivan, the witness.

//

WHEREUPON,

CHRISTINE SULLIVAN,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Okay. You all may begin.

EXAMINATION

BY MR. MORRIN:

Q Hi, Ms. Sullivan. Like I said earlier, my name is Rob Morrin. I represent Charles Walden in this matter. Just going to ask you a few questions today, see what I can find out. It's a discovery deposition, so in theory, we're all learning something here. But if you can, just go ahead and give me your full name and your title, please?

A Sure. I'm Christine A. Sullivan. I'm a consultant.

Q Okay. What kind of consultant are you, Ms. Sullivan?

A I do education and expert witness work.

Q Okay. How long have you been doing that?

A Since about October 2011.

Q Okay. In that time, have you been working on the plaintiff side or defense side?

A A little bit of both.
Q A little bit of both. Can you give an estimate of how often you work on each?
A Sure. It varies from time to time. In general, it's about -- between 88 and 90 percent defense and -- and 10 to 11 percent plaintiff.
Q And did you see a notice of your deposition and a subpoena for this morning?
A Yes, I did, sir.
Q Okay. And in that notice and subpoena, it asked you to provide some documents. Did you fully comply with those?
A Yes, I did.
Q Okay. And you provided those to your counsel?
A That's correct.
Q Okay. Let's see. Well, let me go a little bit further back. Before you were a consultant, what was your profession?
A I worked -- I was in insurance, and I worked for the Allstate Insurance Company.
Q Okay. How many years did you work for Allstate?
A Just shy -- just shy of 36 years, but I think about 35 years total.

Q Okay. And what was your role with Allstate?
A I had many roles over the years.
Q Okay.
A Would you like me to -- to give you a real brief --
Q If you can give me a summary, then that would be wonderful. Sure.
A How about a -- how about a real brief synopsis?
Q Great.
A Okay. I started as an adjuster. Okay. I started as a workers' comp and liability adjuster. Then I did some homeowner, and I did a little bit of auto physical damage. I became a supervisor. I was a unit manager. I became a district claim manager. I managed offices in Rhode Island and Massachusetts. I became a claim development manager responsible for the New England region, which is the training of adjusters, kind of supervising all the training in six states. Became a territorial claim manager in New York, responsible for, I think, seven claim offices at the time, approximately 1,000, 1,200 people, and -- and the total loss area for the -- for all of New York State, total loss and salvage.
And then I went to home office for Allstate,

which is in Illinois. And I went into the education department, and I was responsible for education and training, not for claims. I did sales and underwriting and IT for a while. I went back into the claim department as a director, and then I became an officer. I was responsible for claim handling practices and procedures for the United States and Canada. I had both auto and injury and liability at one point, and then I became a -- a full VP and I just had all of the injury claim handling practices and procedures for the United States and Canada, personal lines and commercial.

And I then became the -- I think the last ten years or so, I was the chief claims compliance officer, and I was responsible for ensuring that claim handling practices and procedures for all lines followed regulatory confines in all 50 states and the provinces we did business for in Canada, as well as supervising market conduct exams.

Q Okay. A little bit of everything. Worked your way up, it sounds like.

A I did.

Q Well, good for you. Do you have any experience and maybe a license or any kind of certification handling issues specifically related to

Kentucky?
A I don't have a license in Kentucky. I have handled or supervised claims that were handled in Kentucky when I was with Allstate.
Q Okay. But you've never been a -- an adjuster for just Kentucky?
A That's correct.
Q Okay. And it sounds like you kind of worked in so many different areas. Have you handled many bad faith claims or issues? Have those come up?
A When I was a director in home office as well as a vice president in charge of claims, I was responsible for supervising bad faith -- let me put it this way. I was responsible for supervising claims where bad faith was alleged, and they were referred to home office from our field offices.
Q Okay. And in that time, did you supervise any bad faith claims that were out of Kentucky, that originated in Kentucky?
A Yes.
Q Okay. Do you specifically recall any or just that you did handle some?
A When I say handle, I didn't personally handle the adjusting. I supervised the direction of the file, so I directed people to do certain things.

Q Okay. What --
A And worked with our legal department as well.
Q What would that look like in the claims handling process? The adjuster comes to you with maybe a question or an issue that they're not sure about. I mean, how did it look like for you to supervise those claims?
A Those claims were referred to analysts and home office. We had over -- you know, there were, like, 20,000 claim adjusters, so I didn't actually supervise the handling of 20,000 adjusters. And obviously not all of them handled claims where bad faith was alleged, but they would -- anytime a bad faith claim or lawsuit came about, it was referred to an analyst in home office and also our legal department. And then I was made aware of it and I would review the matter, have discussions, and provide direction where required and/or asked.
Q In those instances, were you reviewing, like, state-specific standards or industry? I mean, how would you conduct those reviews, I guess?
A Well, I would -- I would look at -- if I was asked to review the entire matter as opposed to just sitting there and talking to people about it, I would

look at whether or not they complied with the claim handling practices and procedures that we had at Allstate Insurance Company. We had specific procedures. Those procedures conformed to the various state regulations and -- and were in accordance with the Unfair Claim Practices Act or versions throughout the United States. And so we would look at that, and we would look at how the adjusters and supervisors and managers made decisions and handled those matters.

Q Okay. So do I understand correctly that Allstate had claim handling practices and procedures that were geared towards each state?

A We had national -- over the period -- over my tenure at Allstate, okay, towards the last 20, 30 year -- 20 years or so, we had fairly standardized claim handling practices and procedures to the extent that those procedures complied with the regulations in each state. But because state laws and regulations are different in each state, certain portions of those claim procedures were geared towards that state.

So an example would be if you had a state that was a pure comparative state and/or -- from a negligence perspective, and/or a no-fault state that either had a dollar or a verbal threshold, your claim practices and procedures that were approved for you to

handle complied with those regulations in those states.

Q Okay.

A I hope that makes sense.

Q Kind of, yes. I guess I'm curious as to, is there a separate subsection for each state or is there, like, an index where you've got your policy in front of you and you can flip -- you know, for example, if you've got a bad faith issue that you're overseeing, can you flip to the Kentucky section of that procedure or how does that interplay work exactly?

A Okay. So in each state, there -- there were training -- local managers did training regarding policies and procedures that applied to overall claim handling, and then specific guidelines for each state. So to the extent that a bad faith or an Unfair Claim Practices Settlement Act varied from the Model Act, there'd be specific training and -- and materials that were given to adjusters so they would understand what those variations were.

Q Okay. So the main procedure -- the main, I guess, authority that Allstate was using to guide their procedures, is that a book? What's that called? Is it called a handbook? What's the title of that

procedure?

A Okay. At the -- at the time I was there, okay, from the late '80s on, we had -- before that, we had a, for example, a bodily injury and then we had an auto physical damage claim handling manual, okay? Just basic information, okay?

Q Okay.

A The last --

Q By section? Is it by type, like, by claim type?

A It was -- it was segregated by claim type. That's correct.

Q Okay.

A Uh-huh. When I left, we had an overall claim handling practices and procedures manual with specific tabs for, like, auto physical damage, liability, those sort -- those sort of things.

Q Okay.

A Some of it -- and -- and then, you know, as technology improved, some of it went online. It wasn't always just a book.

Q Sure. Sure. And I guess in that claims handling procedures, that's not where the state-specific information was, though. Is that what you're telling me?

A In the overall manual, no. It was just --
Q Okay.
A -- claim handling practices and procedures.
Q Okay. And, I guess, would Allstate provide the state-by-state guides as needed or was that a separate -- that's a separate document, a separate compartment?
A I'm not sure what I mean by -- I'm not sure I understand what -- when you're saying, "as needed."
Q Sure. That probably wasn't a great question. Let me try to restate it. For example, an adjuster gets a claim, a bad faith claim, but there's another component to it, right? Like, maybe it's a motor vehicle. So it would go to the motor vehicle section, right? It would go to a motor vehicle adjuster?
A It -- that's changed over time. I'm sure it's different today, but yes, they would -- it would be separated by -- it would find the person that was the best trained and had the experience to handle the issue.
Q Okay. And who was in charge of appointing those, or was there a software that did that?
A Probably managers that assigned claims. It was --

Q The managers assigned it. Okay. All right.
A It was all done by software, not during my tenure.
Q Sure. Okay. And so generally they would go -- they've got the procedural manual, right? Generally, that's what most adjusters are looking at first. If they get a claim from Kentucky and maybe they haven't had a claim from Kentucky before, do they already have access to the Kentucky -- to Allstate's Kentucky claims database information?
A So at the time I was there, okay, adjusters that handled Kentucky claims handled Kentucky claims. They didn't necessarily handle claims outside of Kentucky.
Q I see. Okay.
A So there was not this -- I have no idea what it is now. I've been gone for a while, okay? But we had people that were dedicated to specific states, and they were trained in those states.
Q What was the last year you were at Allstate? You may have told me, but --
A 2011.
Q 2011. Thank you. Why did Allstate have those claim procedures? Was that something they voluntarily did just -- I mean, or was there any kind

of requirement for that?
A When we -- when I started with the company in the '70s, we had a -- a manual. Okay, so they just automatically -- you know, there was national -- there was state training where -- you know, local training, we had national training, and then we had reference material for adjusters.
Q Okay. Is there any requirement to have those procedures that you're aware of?
A Well, I think some states have requirements for making sure that a -- an insurer has standards for claim handling, but it doesn't mandate the type of how they're -- you know, whether it's a manual or whatnot. They're just standards for handling. Allstate, at that time, from the time I started with the company, chose to have separate documents for that.
Q Okay. Are you familiar with Kentucky's requirement for insurance companies to have standards for handling?
A Yes. I'm -- I'm familiar with Kentucky's Unfair Claim Settlement Practices Act.
Q Okay. And what does Kentucky require insurance companies to have?
A I don't think there's a specific requirement other than standards.

Q Okay.
A It doesn't say. I'd have to look at the actual -- to answer that fully, I'd have to actually review the actual act, and I don't have that sitting here at the moment.
Q Okay.
A But I don't -- my recollection is that there's not a specific requirement other than that there are standards.
Q So as far as your recollection goes, it's your understanding that Kentucky says, well, listen, you've got to have some kind of standard for your insurance adjusting claims and your procedures?
A I'm not sure it states that. I think it talks about having standards for claim handling practices and procedures.
Q Okay. But, as far as you can recall, it doesn't get more specific, right? It just says, have some standards?
A As -- as far as my recollection is here today, yes.
Q Okay. Is it your opinion that it's important for an insurance company to have these standards that take into account the state-specific requirements?

A I think it's important for insurers to train adjusters and claim practitioners around what is required in each state for the proper claim handling. How they document that, I think as long as they have reference material and/or training people available, experienced people available to talk to adjusters, I think that suffices. I wouldn't say they have to absolutely have a manual. And a lot of things are electronic nowadays. I don't even know if they call them manuals. You know, I don't think you can -- you know, some may still have books, others don't, so ...

Q Okay. What's your opinion about an insurance company that doesn't have a standard? Is that lawful? I mean, is that in compliance with industry standards? Is that -- I mean --

A I don't think I've ever met and/or come across an insurance company that doesn't have a standard.

Q Okay.

A I think insurance companies have different ways of documenting and training individuals. If they outsource claim handling, they're responsible for the vendor management, obviously, in terms of who they hire, as opposed to giving them something to actually work through. But I don't -- I don't -- you know,

over the course of my tenure, not just since I retired from Allstate, but even before, when I did industry work with the Insurance Institute, I don't think I ever came across a company that didn't have standards for claim handling.

Q Okay. And in this matter, the reason we're here today, Mr. Walden's claim, you were retained by NICO; is that correct?

A Correct.

Q Okay. And what were you retained to do?

A I was retained through the -- through the law firm that was handling on behalf of NICO. I was retained to review the claim file and other materials and determine -- form an opinion as to whether or not NICO's claim handling complied with industry standards and whether or not it was appropriate.

Q Okay. And what kind -- so is it fair to say you were retained to evaluate NICO's claim procedures in this matter?

A Claim handling in this matter.

Q Claim handling. Okay. In order to do that, did you need to become familiar with NICO's claim handling procedures?

A Not necessarily. I was looking at whether or not the claim handling complied with the Unfair

Claim Practices Settlement Act and whether or not it was consistent with industry standards.

Q Okay. So in your course of this particular job, you were not required to be familiar with NICO's claim procedures, their best practices?

A I could -- I could review the -- their handling without looking at their best practices. I can -- I can --

Q Okay. So is it fair to -- go ahead.

A One second. I could review their claim handling without looking at whatever documents they had with respect to their claim handling practices, best or not. I -- best -- I don't want to use the word best.

Q Sure.

A Just their claim handling standards. And I've done that before, right? I mean, I have enough experience and -- and education and understand the industry that I can look at a claim and determine whether or not it was handled appropriately. Am I asked sometimes to review the actual standards if they're available to me? Yes, but I don't necessarily need to look at those.

Q Okay. Were NICO's standards made available to you for review?

A You know, I've been so busy lately, I can't recall off the top of my head.
Q Okay.
A I'm -- I'm not sure.
Q So is it fair to say that if NICO did not abide by their own procedures, that is not necessarily something you would be aware of?
A If I had not reviewed their -- their procedures, I may not have looked -- have compared their handling to their procedures. Having had the experience that I have, both at Allstate and from -- in -- as an expert witness and then my industry experience, the procedures that most companies have are simply guidelines. They don't apply to every single claim.
Q Sure.
A So you could have, like, a huge manual and nothing is really followed, and that's okay, as long as the handling is okay. Because every claim is different, and adjusters don't sit there and review the manual every single time they handle a claim, because adjusters are trained to have experience.
So yes, I don't need to actually look at the procedures. If they've been produced and I have an opportunity to review them, I would look at them, but

that's not -- I'm -- I'm looking at whether or not the handling is appropriate from an industry perspective and whether or not they complied with the regulations in that state, specifically the Unfair Claim Practices Act.

Q Okay. You said something that I want to follow up with. You mentioned adjusters are trained to, I think you said use experience. I don't want to put words in your mouth. I want to make sure I'm accurately reciting what you've testified to. Are you saying that NICO trains its adjusters to rely on their experience and prioritize that over their written standards or their -- or any applicable standards, I guess?

A I don't think I would phrase it that way, and that's not what I was intending to say.

Q Okay.

A I will say that as you become more experienced -- and -- and I'll rely on my own personal experience here as well --

Q Sure.

A -- as an adjuster and a manager at Allstate. With my own personal experience, I did not -- you know, after a period -- when I was new, you look at material all the time and you ask somebody who has

experience, including your supervisor or manager, if you need assistance. But as you handle things day in and day out and get more experience with different types of claims and the venue in which you're operating in, you retain that. So you don't have to ask questions or look at reference material. So manuals and -- and best -- best standards or best practices or training aids that any company has put together are there for reference.

I don't think I've ever seen -- even when I was supervising adjusters directly as a supervisor, I've never seen an adjuster sit there and look things up day to day on the -- at their desk. Would they refer to a reference manual if something new and different came up? Absolutely. Would they -- if they had the experience, they wouldn't look at it.

Q Okay.

A I hope that clarified.

Q I think so. They're not pouring over the standards for every single claim, right? I mean --

A No, because they've been -- if you -- if you train them correctly and they're handling claims because you've assigned them the right claims, those are internalized and they know what to do.

Q Okay. Let's see. Let me see if I can share

my screen here.
A I have my super glasses on today, so --
Q Okay. I'll try to make it as big as I can.
A Just in case.
Q Okay. Can you see my screen?
A Not yet.
Q Okay. I'm trying to share it here. Wait until it -- okay. Here we go. How about now?
A It's coming. It says it's -- you're starting, so ...
Q Okay.
A I got it. All right.
Q And what I have here is the report you drafted in this matter, but I want you to tell me if this is an accurate and true copy of it. I can kind of scroll through it for you and I'll go down to the -- if you need me to stop at anything, then I will. But otherwise, I'll scroll through and I'll go down to the signature line.
A Okay. That'd be great.
Q Okay. Is that your signature?
A Yes, it is. And that's the correct one.
Q Okay. Is this an accurate and true copy of your report?
A It would appear to be, yes.

Q Okay.

MR. MORRIN: Chloe, I'd like to go ahead and mark this as Exhibit 1.

(Exhibit 1 was marked for identification.)

THE REPORTER: Okay. Got it.

MR. MORRIN: Thank you.

BY MR. MORRIN:

Q Now this report, Ms. Sullivan, it contains all the claims handling opinions that you presently intend to offer on the matter; is that accurate?

A Correct.

Q Okay. And do I understand correctly that you did not handle or supervise NICO's claim in this matter while it was being adjusted?

A That's correct.

Q You were not a participant in NICO's liability or settlement decisions in this matter?

A That's correct.

Q Okay. And your experience is what informs your industry practice opinions that you've drafted here, correct?

A And -- and my education, yes.

Q Yes. Okay. A bell went off. Can you please tell me what your latest education was?

A Oh, sure. I have two insurance designations. I have an AIM designation and a CPCU, Chartered Properly -- Chartered Property Casualty Underwriting Designation. I have an MBA from University of Illinois at Chicago with a concentration in both finance and marketing. I teach at three schools right now as adjunct, and -- and I'm a -- and that basically is my education, other than my 50 years of experience in the insurance industry.

Q Sure. We don't want to forget that.

A Small amount.

Q All right. Yeah. Okay. Let's see. And there's some AIC claims handling materials identified in this disclosure. You contributed to those?

A That's correct. One I edited the textbook and contributed to some revisions, and one I actually wrote part of the textbook.

Q Okay. What section of the textbook did you help write?

A It had to do with adjusters because it was a claims handling sort of textbook. And I believe I wrote about general adjusting standards and participated in the section on good faith claim handling.

Q Would you agree with me that an adjuster

should identify material facts favoring and disfavoring the insured before a liability decision?

A I think adjusters have to look at all facts, okay, both -- for both -- everybody involved in a particular loss. So to the extent that facts are favorable and unfavorable to their policy holder, I would expect them to look at the entire scenario and make an informed decision based on those facts.

Q You would expect them to do that. Do they have an obligation to do that?

A Adjusters have an obligation to protect the assets of their policy holder. So they want to ensure that they do a thorough investigation so that the assets that the policy holder has are protected from any litigation in -- currently and in the future. So that involves looking at all aspects of a particular loss in order to make an informed and appropriate decision on that claim.

Q So that way they can accurately measure the risk versus a potential cost?

A Could you clarify what you mean by that?

Q Yes, I can. Yes, I can.

A They --

Q They need to look at both the favorable and unfavorable facts because they need to be accurate in

their valuation because that is how they save -- that is how they protect their assets?

A They need to be informed and make an appropriate evaluation. Accurate, sometimes facts are -- are not straightforward. So accurate is in the eye of the beholder. That's why some cases are tried to a conclusion, okay? And you have a jury determine that. But they need to make an informed decision, an appropriate decision based on the facts that they have at the time they're making that decision.

Q Would you agree that if a material fact remains unknown, reasonable claim handling calls for an assigned follow-up or a documented reason to proceed without it?

A I guess they would have to -- I guess an adjuster would have to know that something that they didn't know was actually material, okay. Sometimes you don't know, okay? So I'm not sure exactly what you're -- what you're getting at. But if -- to the extent an adjuster has the information he or she needs or believes they need in order to make an informed decision for that period of time, I would expect them to make that decision. That's not to say that as new facts come to light, an adjuster's decision could change.

Q Okay. If an adjuster notices a gap in the facts, right? I mean, a logical gap, there's obviously something missing, do reasonable claims handling require them to follow up or at least document a specific reason to just go ahead and proceed anyway with a claims decision?

A I would expect them to do some sort of follow-up, and I would expect them to document -- if they make a decision at that time, I would expect documentation as to what the decision is. I don't think it's reasonable -- let me put it to you this way. There could be, you know, 30 different things that an adjuster is not even aware happened, so I wouldn't expect to see that type.

So if you're talking about that type of documentation, but if there's something that the adjuster feels is necessary but also feels that it's appropriate to make a decision, I would expect them to make a decision at that time because they're required to make decisions on claims and document how they got to that decision.

And I would expect them to also -- I also would expect a carrier and an adjuster, if new information came to light, to take that into consideration. It doesn't necessarily mean their decision could change,

but I would expect them to review the new information.
Q And when you say you would expect them to do these things, are you agreeing that that reasonable claims handling, that that's the industry standard that yes, you need to look into these things if you notice a gap, you really should look into it before moving forward; is that accurate?
A I'm -- I'm uncomfortable with the moving forward piece because that's a variety of different things.
Q Okay.
A I would expect that it is -- it is an industry standard to ensure that you complete a thorough investigation. And that thorough investigation means that you look at facts that you're aware of, and if there is something you feel that is not missing, you make an attempt to find out what that fact is. But there are facts sometimes you may never find out or know, okay? And you --
Q Sure.
A -- you know, companies are -- companies are in existent to fulfill a promise to their policy holder and pay claims, okay? So at some point you got to make a decision. But in fact, if new facts come to -- if you make a decision and an offer is made or you

tender an offer and it's not accepted and a new fact is presented to you, that fact may or may not be material, but I would expect the carrier to look at that fact and determine whether or not their decision needed to change based on the new fact.

Q Okay. Is there any industry standard manual or entity that publishes something that helps insurance companies understand what is a complete and thorough investigation?

A That's a great question. There's not -- there's not an industry manual. There are training materials that the Insurance Institute and IRMI publishes around claim handling practices and procedures. Carriers have some versions of -- of that.

Carriers also rely on what the regulations are in each specific state as well as, you know, what the state statutes are. I wouldn't say there's a specific manual that says these are the industry standards. The industry standards are a compilation, if you would, of claim handling practices and procedures that have been in existence for eons. They are documented in company procedures. They're documented in insurance institute manuals. They're documented in various states with respect to -- to legislation and

regulations.

Q So do I understand correctly that there's no specialty association or any entity that you're aware of that would publish best practices for thorough investigations or anything similar to that?

A I wouldn't say best practices. So for example, the -- the two textbooks that I was involved in at the Insurance Institute, part of the associate in claims, cover claim handling practices and procedures, okay? And, you know, it -- those procedures in terms of, you know, investigate liability, investigate damages, et cetera, et cetera, et cetera, are standards. That's what the industry does, but there's not one manual.

I mean, you could pull that same information from different textbooks by different authors and it would be pretty much the same. So there is not one manual that says this is the industry standards, but there are textbooks and materials out there that outline what the standards are for an appropriate claim handling procedure or practice.

Q Are you aware if the textbooks you were involved in included sections that were based -- sections about thorough investigations or the investigative process?

A Yes. Those two manuals had sections around claim handling practices and procedures.

Q Okay. There's a -- if there's a liability decision in a specific matter, a material development after that would require an evaluation, correct? A reevaluation?

A You would always as a carrier or -- and handled by an adjuster, you would always expect an adjuster to look at new information that came in. If it was material and it had the import of perhaps changing their decision, you would expect that to happen. Not all new information changes a decision. That's my experience over the years.

Q Yeah. And it -- so not all new information, but I would think important new information that based on the claims procedure and best practice of handling would affect it. So yeah, so that makes sense. I mean, you know, if you learn that the car was blue instead of green, that's not going to require a reevaluation, right?

A Correct.

Q But if you learned that the car was going 25 miles an hour versus 75 miles an hour, that would require an evaluation, right?

A Depending on how the accident occurred and

what type of road, yes.
Q Okay. You've -- did you say you've trained adjusters before?
A Yes, I have.
Q Okay. If one of those adjuster students come to you know, an adjuster in training, and they come to you and they say, "How do I make sure I do a thorough investigation?" Is there a resource you can point them to or is there an elevator speech that you give them about that?
A In -- for me personally, I did a little bit of both.
Q Okay.
A Okay. I wanted them to be aware of the reference material that we had at hand, but I also didn't want to just point them to written material. I wanted to make sure they understood what our -- the goal was in terms of handling a claim and the types of things you would do in order to investigate a claim properly.
Q Okay. And those reference materials would've been specific to your company, correct?
A And specific to the type of claim they were handling, yes.
Q Okay. But I guess what I'm asking is those

were all internal documents. It wasn't an outside source?

A Well, if it was an Unfair Claim Practices Act issue, there would be an outside source. It may be available within the Allstate documentation, but it wasn't something that Allstate wrote.

Q Okay. What kind of source would you point them to? Can you give me an example?

A We had written -- you know, way back when, before PCs, we had a lot of printed paper and -- and written documents, like a library in an office for an adjuster to look at. So if they needed to look up a particular regulation or a statute, that material was available. Years later, you could go online and find it, that sort of thing.

Q A liability -- an adjuster making a liability decision, the reasonableness of that decision, would you agree, depends on information available to that adjuster at that time?

A Yes.

Q Okay. I believe in your report, and correct me if I'm wrong, I don't have the specific section, so I'll -- we'll find it if we need to, but if I'm misstating anything, I certainly want to know, but I believe you stated that in your evaluation, you

compared NICO's conduct in adjusting this claim and handling the matter with industry standards?

A Correct.

Q Okay. What written NICO policies or claims manual did you review?

A I'd have to look at my report to see if I actually reviewed a claims manual, but I looked at -- I reviewed their claim handling and the documentation in their claim notes.

Q You reviewed the claim file?

A Correct.

Q Okay. So as I'm looking at -- you've got a list here. My review on page 2, "My review of this matter included the following documents," and I'm looking at these documents. Can you see those on my screen?

A Yes, I can.

Q Okay. I'm looking at those documents, and I don't see any kind of claims manual, or any kind of procedure or anything like that in the documents you reviewed. Am I just missing it?

A I don't know. There -- there -- I believe I've been handling a couple cases, not just for National Union. So if you could go down a little further where I talk about --

Q Sure. Yep.
A -- the different things I looked at under the Unfair Claim Practices Act. I have a copy of my report with me here, so ...
Q Okay. Yeah. Let's find it. If we've got it in here, then let's pull that out.
A Okay. So under -- on page 7, where I talk about reasonable standards of investigation --
Q Okay.
A -- and then of claims, I don't specifically reference a manual for -- for NICO, okay? Again, having reasonable claim handling standards doesn't mean there needs to be or that I need to review a manual because I have sufficient industry knowledge based on the work I did with the Insurance Institute, as well as my experience to understand what those standards are.
Q Okay. But no -- I mean, no document was provided to you as their claims handling standards, right?
A As -- as far as I can remember based on this report as well, that's correct.
Q Okay. So what were the -- what's the NICO rule governing follow-up when an insured driver cannot be located?

A Well, the industry standard is to attempt to find that -- that driver. So you would -- you could outsource it to, you know, if they're in a different state, you could use your own employees that work in a different state, you could hire an independent adjusting firm to help you. And in this instance, they did that initially. They hired an independent adjusting firm to locate them, and at -- at the very end, they actually hired a private investigator to find the individuals.

Q And that's all in line with the industry standard, everything that they've done there. And that's based on your experience?

A It's based on my experience, and quite frankly, and in my opinion, I think that they did as much, if not more, than they could have done to find -- I think they went over and above trying to find these people.

Q Even though once they hired a private investigator, you found them pretty quickly?

A You don't necessarily hire -- you know, when you have an insured that provide -- that sends you information or knows they've had an accident, okay, can't find -- the driver I get in a commercial truck thing, but the named insured not having an office and

not being available, that's a little suspect, in my opinion, in -- just my opinion. I'm not saying the individual was. And, you know, being able to not find them using an independent adjusting firm in their -- in their local staff was -- was problematic.

Q Okay. How long was it from NICO hiring the independent adjuster to find the driver until they -- this NICO decided to hire the private investigator?

A Off the top of my head, I couldn't tell you the exact time. Did you just stop looking at the --

Q Yeah, I pulled the share down.

A I thought maybe something -- yeah.

Q Yeah, I pulled the share down. No, I'll put it back up if we need to look at it again, I'll put it back up.

A That's okay. Off the top of my head, I -- I couldn't tell you.

Q Okay. Do you recall if it was years or months?

A It was more than months. I don't think it was years, but -- but I could be wrong. It's -- you know, I teach. I have a lot of students, so I'm always reading something.

Q Sure. I bet, you know, always reading something that'll cause some things to blur sometimes.

A Yeah.
Q Let's work on this. What NICO diary or escalation requirement did you review?
A When you say escalation requirement, what are you referring to?
Q When does NICO decide to escalate an issue? If they're having a problem, for example, can't find the driver, do they -- do you escalate that to a manager? How does the adjuster supposed to handle that either by NICO's best practices or industry standards?
A So depending on the adjuster, typically, okay, depending on the adjuster experience, okay, the adjuster has the authority to handle the claim. If the adjuster doesn't have the authority to claim -- to handle the claim, you would expect them to seek advice from -- from a manager. I don't think -- you know, some -- some companies have specific processes in terms of you must ask for this, others don't.
Q Okay. Was there a NICO rule that you were aware of that governs supervisor review of a disputed serious injury claim?
A I don't recall seeing a specific requirement. I believe that the information -- I believe that the adjuster that handled this had the

necessary experience, and they were also using an outside firm to assist them. I don't think there was a specific requirement stated for review of a particular adjuster. And -- and you wouldn't find that a routine review like that typically for most carriers. It's based on the experience of the adjuster.

Q Okay. So these industry standards that you know from experience and from working in the industry, are there -- is there any materials that NICO -- that you saw from NICO to determine that they had adopted the industry standards, that they had -- they've been complying with it? Is there any -- anything written that you reviewed at all that indicates that?

A I looked at the claim handling. So for -- for me, I was looking at, did they -- did they confirm coverage and -- and what does that require? Typically, that requires to look at the facts of the accident, the conditions in the policy, and whether or not it applied to that loss. The fact that they sent out the reservation of rights for a lack of cooperation for both the driver and the named insured, that complied with industry standards in terms of confirming coverage, because that was, you know, at the end of the day, while, you know, some states, some

courts don't look reasonable -- look at that as a reasonable denial of coverage, that is typically a coverage defense. And if you can't find anybody to verify anything, you have good grounds to deny coverage, so that they complied with that. I would expect them to look at -- interview police officers, look at the accident scene, et cetera, et cetera.

They did that, okay? And, you know, they eventually hired an accident reconstructionist because of how -- how misconstrued the facts were time and time again, and the fact that they couldn't get a hold of their operator, and the facts seemed to shift all the time, okay? And every time, you know, some new evidence came in, it was something else. So hiring an accident reconstructionist at the time they did it was appropriate. It wouldn't have been appropriate from day one. It was appropriate at the time they did it because they needed to verify, particularly in the -- in the instance, because it's a pure comparative state, additional facts that they didn't have at that time. That's an industry standard.

Trying to get medical information, looking at previous medical, because this plaintiff had a history of a couple of severe auto accidents in the past and some other issues that were not accident

related, but could have impacted his recovery time, that's an industry standard. So all of the things that NICO did in terms of coverage, liability, and damages were compliant with industry standards because they needed that information in order to evaluate the claim.

Q Okay.

A And the investigation is part of the evaluation process. I guess that's -- that's the other thing. It's like you -- you don't just sit there and make the claim at the end. You have to, like, start at the beginning and look at all of those factors. So all the investigation and -- and why you do the investigation is part of your evaluation process.

Q Okay. Makes sense.

A And I'm not -- sorry for the hands. I always use my hands.

Q No. No. I love it.

A I'm not even -- not Italian.

Q I sometimes talk with my hands, too. Yeah.

A I'm -- I'm Irish, so it's like, I don't know what that's about.

Q Right. That's right. I don't know what to do with my hands.

A You might think I was having a --
Q No, you're good.
A A little hard by Zoom, you know?
Q Yeah, sure. You mentioned that, you know, new facts came up and then it made it appropriate to hire the accident reconstructionist then.
A Right.
Q So what fact or facts that were new came up that made NICO think, okay, let's hire the accident reconstructionist now, versus before they denied liability?
A So, you know, at -- at the beginning, okay, based on the report and based on the information they had from the police department without actually talking to the police officer, et cetera, it -- it could have very well been that somebody was inattentive and hit a parked and unattended vehicle, okay?
Hitting a parked and unattended vehicle in -- in many instances, okay, is a fairly straight liability shot. The person that's driving that didn't see the parked and unattended vehicle is typically the -- the responsible party, okay? The fact that talking to the police officer and knowing that the rear wheel was X number of feet over the line and -- and, you

know, really trying to figure out the position of the vehicle, exactly how big the vehicle was, the whole issue with the triangles and that, all of those things kept coming piecemeal, if you would. They weren't all presented at the beginning. So those types of things, and the fact that they couldn't get a hold of the driver. I think NICO made an absolutely correct decision at the time they hired an accident construction -- reconstructionist to take a really deeper dive into the liability situation.

At that point, NICO, based on looking at the claim file and the documentation, at that point, and prior to that point, the reason they continued to do the investigation is significant information had come in, which caused them to really think about was the initial denial proper.

Was the initial denial quick at the beginning? Yes. Based on the initial facts they had, it wasn't an improper decision. You know, typically speaking, hitting a parked and unattended car and they didn't know the extent of the injuries, it was a lot unknown at the beginning. And after that decision, as more information came to light, it got assigned to a different adjuster, someone who was handling -- responsible for handling injury claims. They didn't

know about the extent of the injury at the beginning, et cetera, et cetera. More facts came to light. More investigation was done, and they rescinded their original denial. They operated under a reservation of rights without denying for a lack of cooperation, which was completely appropriate and very obvious that they didn't put their rights ahead against their -- ahead of their policy holder.

Q Okay. Did NICO have the collision report, the accident and collision report at the time it denied liability?

A I think they had the verbal report of how the accident occurred from whoever reported it. And I think it was your -- was your -- was it someone in your office that reported the loss?

Q Yes.

A Okay. So however that was reported, that initial adjuster, that their reaction to that was, well, this loss is, you know, hit a parked and unattended car. There's probably no liability.

Q So you believe that NICO did not have the collision report --

A I'd -- I'd have --

Q -- when it made the liability decision?

A Excuse me for interrupting. I'd have to go

back and actually look at all those claim notes again, just to make sure that specific date. I don't recall the police report right at the beginning. I think it came subsequent to that. I believe the first notice of loss -- I don't know if it was a phone call, I'm not sure. And I know the first notice of loss went through a couple of people first. Went -- didn't go directly to the claim office, right? It went to somebody else. So I'm not sure how that -- you know, I'd have to go back and look at that. It's been a while.

Q Okay. That's okay. I might ask you to take a look at that if we take a break here in a little bit to see if we can refresh your memory on that, but I'm not --

A Okay.

Q -- worried about that yet. I think I do want to talk a little bit about what the industry standards say about making a liability decision without even looking at the collision report. What -- is there any industry standards that say, "Hey, you actually do need to investigate. We got -- we know there's going to be a collision report"?

A You would -- you would want to get as many facts as you can if both vehicles are moving, okay,

typically speaking. So I want to separate this loss from when a car was parked and unattended, okay? When a car is parked and unattended and somebody hits the car while they're traveling, okay, typically the person that's driving is the one at fault, okay? And there was no indication at the beginning of the report, and my recollection was that this vehicle was partly in the roadway, or even if it was just over the road -- or the -- the line just a little bit, it was parked and unattended, okay? So, you know, that's kind of like if you're -- you know, think of cars parked along the street and someone goes down the street and smashes into a couple cars.

That's the typical scenario you would see for a parked and unattended vehicle. And in those instances, you don't need to review the cast of thousands or even get police reports. Your insured or a insured or someone hit a parked and unattended car. The -- the car that was parked and unattended is not negligent. It was just sitting there, okay? And that, I think, was the viewpoint that that adjuster had based on the information that they had.

I know my report has an inaccuracy with the date of the letter, okay? I just realized that the other day in terms of the -- the first denial letter.

But the first denial letter says, you know, based on the information I have, and if you have any other information, please contact me. So I think that was an absolutely appropriate letter to go out. They didn't say, I'm never paying. It's like, if you provide me additional information, I'll consider it, which your office ended up doing. And they got additional information, and they continued to investigate it.

Q Can you point to any kind of written industry standard that says, "Hey, if both vehicles aren't moving, you don't need to look at the collision report"?

A The -- you're never going to find a standard that actually says that. It's going to say, "Investigate the facts of the loss," okay?

Q Okay.

A And, you know -- and, you know, would you get an -- you know, you would -- you would get a police report or you would interview witnesses if there was a question of liability, okay? And how the accident information came in, it would appear that it was a individual that hit a parked and unattended vehicle.

Q So there's nothing written. You're --

nobody's going to be able to find an industry standard in writing that says adjusters don't have to look at the collision report before making a liability decision; is that right?
A I've never seen anything like that. So does it exist somewhere in the world in -- in a manual someplace? It might. I've never --
Q I mean, I'm not talking about hypotheticals. Every question I present to you, I want to be within your realm of knowledge.
A Okay.
Q So I want to be clear about that.
A To the best of my knowledge, no.
Q Okay. How many years in the insurance industry do you have?
A Fifty.
Q So in 50 years of experience, you've never seen any kind of written standard that says you don't have to look at the collision report before making a liability decision?
A No, because a lot of times you don't have a collision report. You know, you might have a self-report, but you don't have a police report.
Q In this case, we did have a collision report though, right?

A Right. But so it -- it would ask you to gather -- standards would say gather facts of the accident, and it could -- somebody might have, for example, you know, get a police report, but it doesn't say you have to have that to make a liability decision.
Q What doesn't say? I'm sorry. I must have missed something. What doesn't say you --
A I've never -- I've never seen a standard that says you have to have a police report to make a liability decision. I've never seen --
Q Have you ever seen a standard that is specifically said you don't need to see the collision report?
A No.
Q Okay.
A I've seen it --
Q In fact, every standard -- was it accurate to say every standard you've seen or come into contact with requires adjusters to make a reasonable investigation before a liability decision?
A A reasonable investigation, that's correct. Based on the facts of the accident as they have it --
Q If there is -- sorry, go ahead.
A No, as -- as they know it at that time.

Q Okay. So if there is a collision report available, an adjuster has an affirmative duty to acquire that collision report to review -- to make a reasonable investigation to determine what did the first person on the scene witness? Is that relevant? I mean, is that important?

A It -- it depends on the facts of the accident again, sir. If the car's parked and unattended, okay, as it happens, or somebody hits the rear end of a car at a red light, you don't need a police report to do that investigation, okay?

Q But you -- but -- okay, go ahead.

A What I'm saying is it depends on the facts of the loss, okay? And so in this instances -- in this particular instance, I think the information the original adjuster had, right or wrong at the time, but the information he or she had was the claimant hit a parked car, okay? They sent out an initial denial letter. They asked for more information, but based on what they had in their experience, they believed that -- that was an appropriate denial, okay?

Q Okay.

A If new information came to light and the decision was rescinded then the investigation continued.

Q If I stated NICO's claim records reflect they had the collision report as early as November 3rd of 2020, would you have any reason to disagree with me on that?
A That they did -- that they had the report?
Q They had the collision report on November 3, 2020.
A If they had the report, then I can't -- I can't disagree that they didn't have it, right?
Q Well, that's what I'm saying. Do you have any reason to think that's not true though, I guess is my question?
A No, I just said I couldn't remember, if you recall.
Q Okay.
A I couldn't remember.
Q Okay. Let's -- I'm going to share the screen again, pull this up. One minute. Are you good? Do we need a break? Are you okay?
A I could take a real quick, like, two-second break.
Q Okay. If we --
A If that's okay?
Q If we can go off the record for five minutes, we'll take a little break and come right

back.

A Okay, great. Thank you.

MR. MORRIN: All right. Thank you.

THE REPORTER: Okay. We're going off the record.

(Off the record.)

THE REPORTER: Okay. We're back on the record.

BY MR. MORRIN:

Q Okay, great. Okay. Let's see. I guess I need to share my screen to do that.

A Okay.

Q Let me know when it pops up on your end, please.

A Oh, yep. I got it.

Q Okay. What I have here is the collision report in this matter. I'll scroll through it so you can see each page. Have you seen this collision report before?

A Yes, I have. It's been a while, but I have seen it.

Q Okay. And as we said earlier, NICO did have this collision report at the time they denied liability. When adjuster's looking at a collision report, what are they looking for exactly?

A They're looking -- looking at the actions for the -- the operators of the vehicles involved.
Q Okay. And at least with Allstate, would they -- did they just have motor vehicle adjusters, or did they have separate adjusters who handled commercial motor vehicle accidents?
A We had a commercial division, okay, that handled at -- at some point in time. At the beginning, we didn't. It was all intermangled and then -- then we had a separate commercial division that handled commercial losses.
Q So if -- and is that pursuant to industry standards? Is that just an Allstate thing, or is that pretty much across the board?
A Every company sets up their claim practices differently in terms of who handles what.
Q Okay.
A So can I back up? Sets up --
Q Sure.
A How they -- how they disseminate the claims for handling, not necessarily claim practices.
Q Okay, sure. That makes sense.
A You would use the same -- you would use the same investigation practices on a commercial auto loss than you would -- than you would personal lines. The

-- the big difference on commercial would be the policy information many times is significantly different, depending on what type of insured you have.

Q And we -- I think you said earlier that we want to be -- we want to have appropriate evaluation. So we want to have a reasonable investigation and an appropriate evaluation; is that accurate?

A That's correct.

Q Okay. Would it be within industry standards for an insurance company to assign a matter to an adjuster who has no real experience or information in that specific category? I can provide an example if that helps.

A Please.

Q So for example, you know, there's a motor vehicle accident involving a commercial carrier. Would it be within industry standards to appoint that matter to an adjuster who has no knowledge of commercial motor carrier regulations?

A Not necessarily, because what you are looking at are the -- the actions of the driver. You're looking at how the accident occurred.

Q Okay.

A So as you read -- as I'm looking at this report, okay, aside from what regulations may or may

not have been in terms of the placement of the reflective triangles, because I know that was an issue according to the claim notes that was brought up by the plaintiff, as you're looking at this police report that they had -- or motor vehicle collision report that you had, you can see that they basically said this vehicle is parked. The -- the reflective triangles were behind -- could you go back to the Page I was reading, please?

Q Which one? Oh, I didn't know you were reading off of that.

A Yeah -- yeah.

Q Go ahead.

A Okay.

Q Yeah.

A "This vehicle -- this collision occurred about halfway down the ramp. Unit number 1 stated he was tired and didn't see Number 2 parked," okay? He hit the rear of the -- of the vehicle. There were reflective triangles out, et cetera, okay? So --

Q Yeah. Did not see Unit 2 parked on the edge of the ramp. Yeah --

A So from an -- from an adjuster getting that information that the driver of the vehicle didn't see the parked car and hit it, okay, it's a reasonable

assumption that -- that driver is -- could be and most likely could have been 100 percent responsible for that loss. I think that's a reasonable conclusion based on this particular report. Were there other factors outside of this report that came to light? Yes. The whole issue about the reflective triangles, whether or not the vehicle was over a certain light -- a certain line.

But this report doesn't say that. This report focuses initially on the fact that the vehicle was parked and unattended. The driver was inattentive and didn't see the vehicle. If you don't -- and there's lighting, it says there's lighting here. If you don't see a truck, that's kind of a problem, right? And I mean, it's not, like, a -- a little motor scooter. It's a truck. It's a tractor trailer truck, and you hit it.

Q Yeah. Very dangerous, right?

A I think it was -- well, it -- you know, the fact that you don't see a tractor trailer truck means that you're not attentive, okay?

Q Well --

A So there's nothing here that says all the other things that came to light. So I think it was --

Q That's not your opinion as an expert,

though. That's your lay opinion. If you don't see a truck, then you must not be paying attention. You're not an accident reconstructionist, right?

A No, I'm not. I'm talking --

Q You're a human factors expert.

A Correct. I'm talking about what this report says. And as a claim person, if that's all the information I had, I think it was reasonable for NICO to deny that loss based on this initial information.

Q Okay.

A They did leave it open. They did leave it open.

Q Is it your opinion that this report did not give NICO any basis to believe that their driver had any liability?

A This report's pretty straightforward. Yeah. It -- it doesn't appear -- it doesn't appear based on this report that NICO has liability based on this one fact of this one article.

Q Okay. If there was something in the report saying the driver did something unlawful, would that change your opinion?

A I would have to look at what the information is. If you want to scroll down, if there's more to give. I just remember looking at this as we were

talking.
Q Well, NICO denied liability after having this report.
A Correct.
Q I'll scroll down. I want you to see the whole thing.
A Okay. That'd be great.
Q Okay. Because you've mentioned a couple times the report says the truck was just parked, and I'm not so sure that's all it says about the truck being parked.
A Okay.
Q We got here -- I want to stop here on Unit 1. This is Charles Walden.
A Yep.
Q And so we do have human factors under Charles Walden. So I mean, there's fatigue and inattention. That exists. And I mean, we have this truck that's parked on the on-ramp. And so I mean, what kind of reasonable investigation would need to be conducted by an insurance adjuster following industry standards if there's a vehicle that's unlawfully parked?
A I'm not sure they knew it was unlawfully parked, at least the initial adjuster. I don't know.

Q And I'm not asking what they -- what they knew, right? I'm not asking you what the adjuster knew necessarily. I'm asking you what you think an adjuster should do in that situation, right? There's a -- there's a vehicle parked on a roadway. Is an adjuster allowed by industry standards, in your experience, is an adjuster allowed to say, I assume they're parked lawfully or there's probably nothing wrong there. That's not a parking lot. It's not a parking space, but they are parked. And I don't need to investigate that more. What's going on there? What's the industry standard say?

A So from an industry standard perspective, you would look to see if -- if the car was parked and unoccupied. According to this report, they did have reflective triangles out. It doesn't say the -- where it is. It just said the driver set out reflective triangles behind the truck. So the -- the assumption and a reasonable assumption would be the car broke down, or the vehicle broke down and it was left by the side of the road.

Okay. Is it parked illegally? Is it parked incorrectly? I don't know. Based on this information that they had and how the loss was reported with this, I think it was a reasonable conclusion to assume that

the other driver, Mr. Walden, was inattentive and tired and didn't see the vehicle, okay?

It's not like the vehicle was pulling out. I mean, there's a -- there's a lot of different factors, okay? I think it -- it was a reasonable conclusion at that time.

Q Okay.

A And I also think that, like most carriers, okay, NICO was -- the letter that they sent out was, and if you have any additional information that you want us to consider, please let us know. And -- and that is a reasonable way to deny a claim. You don't just say, denying the claim, see you later, okay? You always leave it open because there are -- there could be information that you don't have or comes to light later on. So I think the -- it was reasonable.

Q So down here -- let's see. We've got -- what page is this? Page 4 of 4 of the collision report. But can you read this section right here?

A It says, "Improperly parked vehicles." It doesn't show up in the body of the report, so I don't know what that means.

Q It just means that it's on page 4 of the collision report instead of page 2.

A Right. I mean, it's an environmental

factor. So I'm not sure what the officer was thinking.

Q Okay.

A And I don't know --

Q Well, yeah. I don't think we need the adjuster or anybody to know what the officer was thinking. I think we -- I need to know how does that not give the adjuster enough information to think, oh, my insured was improperly parked. There might be some liability on there, right? So I'm trying to understand the industry -- how the industry standard approaches that.

A So the -- so the industry standard -- and -- but they did have reflective lights out. So it's not like they just abandoned the car sitting in the middle of the road, okay?

Q We definitely have some comparative fault issues. I admit to that. I concede that.

A Okay.

Q But I'm looking at it. You know, we have the industry standard. We know that adjusters are supposed to look at facts favorable and unfavorable. And it seems like in this case, we have a fact that's unfavorable to the insured, to NICO's insured, and it's being disregarded to then deny liability. Is

that not what happened here?

A I don't -- I don't think the adjuster -- my recollection was that the adjuster looked at this report. The adjuster believed most of the negligence was on Mr. Walden. The focus was on Mr. Walden's inattentiveness and didn't even see the vehicle.

So even if you had the triangles, like, sitting right in front of you, if he doesn't even see the vehicle, it's a little hard to determine that there's any negligence on the driver at that point. We don't have information as to the exact position of the vehicle. It just says improperly parked. We know the police department said that the triangles were out, okay?

I think it was a reasonable -- was it -- was it the absolutely right decision? I don't know, but it was definitely reasonable based on the information that they had. And I would expect them to make a decision as quickly as they can based on the information that they have.

I think the thing they did really right was to leave it open. And then as you provided additional information and feedback to them, they reopened the investigation and continued to handle the claim. So I don't think -- so I guess, you know, people -- is it

perfect? Maybe not, but it's clearly not inappropriate and it's -- it's, you know, it's not in violation of claim handling standards.

Q If I've got an adjuster has a collision report that makes it pretty obvious their insured has some liability, how does the industry standard allow for the denial of the claim then?

A How do we know the insured has liability? The car was disabled. The vehicle was disabled. The rectangles were out. How is that clear? How is that liability without trying --

Q Parked in -- I mean, you know, I don't want to argue the case with you necessarily here. I think a jury's going to have to decide if improperly parked vehicle parked in a ramp is -- has any indication of liability there. That's probably a question for the jury eventually, but I don't understand the industry standard allowing -- like, what industry standard allows an -- that kind of indication in the collision report that is obvious indicia of comparative fault and there's nothing that has to be done otherwise about it? What should have been done here?

A I guess where I was coming from and what I'm trying to state is that could he or she have done some more? Perhaps, maybe. And they obviously did as a

carrier later on. The initial information the adjuster had was the vehicle was disabled. If a tractor trailer truck is -- is disabled, you don't pull it over and park it, okay?

And there were some indication later on that they had trouble moving the car because of -- of the issue. But be that as it may, we don't know that at this time. I get that. The vehicle's on the side of the road. I don't know exactly where it is positioned because the police report doesn't say it's sticking out two feet, three feet or on the side of the road.

It says improperly parked. Doesn't give me any indication exactly how it's parked. And by the way, there were rectangles out there. So it is reasonable for a driver getting off the ramp to see a vehicle with rectangles there and assume that the vehicle is disabled and to go around it, okay? Unless you're inattended and fatigued and you don't see it, okay?

So was -- was it a perfect decision? No. Was it unreasonable? No. And was it in violation of claim handling standards and practices? No, not necessarily. And they left the door open for additional information, and they were true to their work. The -- the file got reopened and additional

investigation was completed.

Q So it's your testimony right now that their investigation was reasonable and the denial of liability was reasonable despite the collision report?

A I think the denial at that time was reasonable based on the information that they had. And the fact that they left the door open for additional information, should it be forthcoming, which it was, additional -- additional investigation done was absolutely appropriate.

MR. MORRIN: Chloe, I'd like to mark this as Exhibit 2, please.

(Exhibit 2 was marked for identification.)

THE REPORTER: Okay. I got it.

BY MR. MORRIN:

Q I'll stop sharing briefly, if I know how to. Let's see. Hold on. There it is. Okay. We talked a little bit earlier about when the investigator was hired -- the private investigator. Can you talk to me about, you know, in your experience, what the industry standard says for -- when should you hire the private investigator in this situation, right?

We've got a missing driver. We -- the -- NICO hired the private adjuster to try to find them,

and then sometimes later hired the private investigator. What does the industry standard say that this timeline should look like?

A It -- it doesn't. There's no industry standard perspective. It's a reasonable attempt to find your insured operator and driver. Typically, on a commercial type of loss, okay, for, you know, a truck driver who has multiple gigs with different companies and all that jazz, they're hard to find, but, typically, you can find the named insured who's the business, okay?

Q Right.

A So the fact that they couldn't find that named insured for quite some time or they knew where the offices were and they were delivering information, which I don't see anything in the claim file that indicate the letters that they sent out were coming back to them, so they were being delivered. The fact that the insured was not responsive, the named insured was not responsive, was clearly a violation of the policy. You know, I think the -- the money they expended to get a private investigator was above and beyond personally, okay? I mean, I really think that based on the fact that the insured was just not responding, I would question why, you know, why that

was happening.

Q So you don't think they needed to hire a private investigator at any time?

A On this particular loss -- excuse me. On this particular loss, I think they went above and beyond trying to find the policy holder to talk to them. The driver I get, okay? I mean, I've seen circumstances before on, you know, trucking type of policies or this type of commercial auto policies where it's hard to get the driver sometimes because of how quick they move around and that they change jobs a lot, but not the named insured.

Q Right. Okay. So in your experience, there -- you -- let's say you were serving as a -- if you had been serving as a consultant when the claim was active and they said, Ms. Sullivan, we can't find our driver, what should we do? And they come to you that -- they've already hired the private adjuster. The private adjuster has not been successful for a couple months. What are you telling NICO in that situation? What are you advising them to do?

A You know, I mean, I think they had grounds to -- to deny coverage personally based on lack of cooperation, but they didn't, okay? What I'm saying is they didn't put their interests ahead of the policy

holder. They continued to try to find them, and they spent money trying to find a business who should have responded, who was getting the reservation rights letters and everything. So, you know, I think they went above and beyond.

Q Yeah. And so I can be -- I can clarify a little more. Maybe they're not coming to you to ask, hey, should we deny liability again, right? They've already denied liability. Now they're trying to find their driver. They got a missing driver situation. They hired the private adjuster. They couldn't find them. Ms. Sullivan, we can't find a driver. Can we just -- can we quit? What does a reasonable investigation say we need to do here? What do we need to do to find our insured?

A A reasonable investigation is you attempt to get a hold of your policy holder to find out the facts of the accident. That's exactly what they did.

Q Okay. In the hypothetical, they've not found their driver. They've not found their driver, been missing a couple months. They hired the private adjuster. They're asking Ms. Sullivan for -- we need your experience. We need the industry standard. We need to -- we want to make sure we don't get a bad faith claim here. We want to do what's right. What

would you advise them to do in that situation?
A I would -- to be honest with you, I was more concerned. It was not -- I didn't think it was unusual that they couldn't find the driver. I mean, that happens in these types of -- I was more concerned that the named insured wasn't responding. That bothered me, okay?
Q Okay.
A And so I think from a named insured -- and quite frankly, when they did find the driver, I'm not so sure, based on the accident reconstruction and everything else, that the driver provided some material fact that was above and beyond different than what they already had with the accident reconstruction and the information they had.
Q Well, he said he didn't know where the cones were, right?
A No, he didn't say he didn't know where the cones were. He said he didn't --
Q He didn't know where he put them?
A He -- he said he wasn't personally as familiar that he could say, I put it 10 feet or 100 feet. I think, you know --
Q He said he -- yeah, I agree.
A So he didn't say he didn't know that he put

the cones out. He knew he put the cones out. He couldn't remember --
Q Oh, not that he didn't. Yeah. You're correct.
A Could you remember if they were five, ten, 50 feet?
Q It was the spacing. Yeah. He remembered putting them out, definitely. I agree with you.
A And --
Q That's accurate.
A -- and he couldn't recall the exact regulation. Okay.
Q Yeah, he didn't know the regulation, and he didn't know the spacing of them.
A But I'm not sure that was all that material to the -- to the liability per se at that -- at that stage of the game.
Q That's fine. I respect your opinion on that. I don't -- I'm not sure you're qualified to make that opinion necessarily on liability for a federal motor carrier accident, but you're entitled to it for sure.
A Well, I think I --
Q Where are we now?
A I -- I think as an expert he handled

commercial claims before. I'm confident in -- in my ability to opine about that.

Q Well, okay. Well, let's go back to it and talk about it then a little bit because I don't want to -- I don't want to leave a huge gray area here. What's the purpose of those placards then?

A I didn't say that. I'm -- I'm talking about the fact that I don't think it was material that he -- I don't think finding him was that material to the liability decision. That's what I'm trying to say.

Q That wasn't part of the reasonable investigation?

A No. I'm just saying when they did find him, okay, that I don't think that his -- I don't think they would have denied based on the fact that they couldn't find that driver. I think the issue as it -- and I don't know. I didn't talk to anybody at -- so, maybe, -- maybe, I shouldn't have stated it that way.

I think the issue was the named insured not responding to a reservation of rights letter and not cooperating with the investigation and trying to find -- trying to help their carrier find the driver. That to me was a significant lack of cooperation. It wasn't about the driver. It was about the named insured from a claim perspective as I looked at it.

Q Okay.
A Because the named -- because the name -- the named insured was the insured, not the driver.
Q Right.
A So if the named insured is not -- I mean, I think that was grounds to technically deny coverage. Would it have held up long term in a court of law? I don't know. That's not my -- not my decision. I'm not a lawyer.
When they did find the driver, I don't think -- reading the deposition, I don't think the driver added significant material facts that impacted their liability decision. I think they had enough information at that time to know that the liability was still disputed. Who's to say if they're 25, 35, 55, 95? It was, like, there was negligence on both sides, okay? It was time to compromise and make an offer on the injury claim, which is what they did. That's what I was trying to say.
Q Okay. I understand. And again, I'm not trying -- I have a job to do, but I'm not trying to put words in your mouth necessarily, okay?
A I know. I know. I get that. And I'm -- I'm not trying to be argumentative. I just --
Q Yeah. No, you're good.

A I know sometimes -- I'm from the East Coast, so I know sometimes I can be a little long-winded. And I apologize for that. You know, that comes from --
Q No apology necessary. No, I appreciate it.
A -- living in -- living in Boston and New York, right? But I just -- I didn't feel like I was clear enough. I understood what you were saying, and I thought perhaps I misspoke. That was a --
Q Sure. No, that's fine. I want you to clarify anytime that happens. Not a problem.
A Thank you.
Q I do want to talk about -- I do need a little clarification though in terms of a reasonable investigation and finding the driver witness, right? This would've been the person that had some pretty relevant things to say in theory or could have --
A Right.
Q -- despite what we think about his deposition, right? But as a claims handling matter, are we saying that you don't really need to talk to the driver in every matter like this?
A No.
Q Like that's not a reasonable --
A No, no. I was just saying that for this

particular loss, in terms of whether or not NICO could have decided there was no coverage based on the lack of cooperation under that specific policy condition, I think the fact that the insured, named insured, was not responsive to anything, gave them more latitude -- gave them more reason to consider whether or not they should deny coverage based on lack of cooperation as opposed to the driver. That's --

Q That context changed something. Sure. That was a relevant material. Okay. Yes.

A Okay. But they didn't do -- they didn't do that. So I mean --

Q Right.

A -- you know, despite, you know, spending all that money and that angst trying to find somebody that commercial insured who should have picked up the phone and called -- or returned their call, I think the fact that they didn't do that was pretty good.

Q But do we at least agree that talking to the driver in these situations is part of a reasonable investigation?

A Absolutely. But if you can't never find the driver, then you can't find the driver, you know? But --

Q And that's kind of what I'm getting at,

right? We were at a situation where we can't find the driver. So what does the reasonable investigation do? Do we get to say -- I mean, because the -- because we're talking about an insurance company that gets to decide who they insure, right?

A Right.

Q I mean, they know who the -- at least the insured is. They probably didn't know the driver, but they knew who the insured was. And so if an insurance company goes and insures people that are going to disappear, are they then -- are we saying that, hey, that's okay within the industry standard? Is that -- I mean, what's the --

A That's not what I was saying. Okay. I was --

Q I didn't think that was what you were saying, but I'm trying to get more clarification there.

A So one of -- another reason why you might want to consider hiring an accident reconstructionist is because you can't talk to your driver.

Q Right.

A Okay? So, you know -- so I mean, there's a variety of -- of different issues. I was just saying that it is -- I have -- I have seen instances with

Allstate and other carriers where, you know, commercial drivers cannot be found. They just kind of disappear. But at least your named insured is assisting you in investigating the loss, and that didn't happen here at all.

Q Right. Okay. So if an adjuster can't find their driver, again, I want to get back to the industry standards, back to your experience, what you would advise somebody asking this. They can't find the driver. Would you then tell them, okay, maybe you need to hire an accident reconstructionist then? Or would you tell them, maybe you should take these extra steps to find the driver? Which component, if either, is part of a reasonable investigation in that situation?

A So based on the damages alleged and the -- the lack of clarity around how the accident -- who was actually negligent for what here, there was negligence on both sides and the -- the injury that was being alleged and the scenario that this individual had some prior issues as well. Based on the severity of the impact, I would've recommended at that time, I would've recommended if you can't find your driver, at least get an accident reconstructionist so you can clear up or have more clarity around liability, okay?

If, you know -- and again, it's -- and Mr. Morrin, it's really dependent on the facts of the loss and the damages alleged, okay? So accident reconstructionists are not routinely used. I mean, they're always available if you need them. Sure. But you don't always need them because you -- the accident may not be that severe. The facts are not that cloudy, okay? So you don't spend -- it's not about the -- it's not about the expense. It's about, you know, what is reasonable. And so an accident reconstructionist not -- an accident reconstructionist is not always reasonable in every circumstance. That's all.

Q Sure. Yeah. Not after -- you don't need to go get an accident reconstructionist after every accident just to determine that liability early on, right? Okay. And that makes sense.

A There had -- if there had been witnesses to the actual impact, it would've been reasonable to try to find the witnesses, okay?

Q Sure.

A But there were no witnesses, so ...

Q A lot more affordable than an accident reconstructionist too, usually, so …

Okay. So --

A And real time information.
Q Yeah. Right. Firsthand, that's helpful. So you would've -- you would -- in that situation, they can't find their driver. They hired the insurance adjuster. You would advise them, hey, you should probably consider an accident reconstructionist?
A I probably would have based on the -- the severity of -- of the accident.
Q Okay.
A Or severity of the crash, I should say.
Q And that would've happened -- that should have happened after the driver remained missing for a number of months? When should have -- when would that have reasonably been a decision to make, right? Because you -- I understand that we're -- you're trying to gauge, okay, cost with risk benefit, and is it necessary, right? Is it reasonable? But all those factors go into reasonable -- reasonableness, do they not?
A Yeah. But, you know, as a -- okay. And maybe it's just because I'm a purist and I've spent, you know, most of my life in the insurance industry. I never considered the cost of doing the investigation. You -- you spend what you need to

spend in order to ensure that you're protecting the assets of your policy holder and you're coming to a reasonable conclusion as to how the loss occurred, okay? Here I have a policy -- here they have a policy holder that's not even present. I'm not talking about the driver now. I'm talking about the named insured who doesn't seem to care, okay?

And, you know, they're going over and above trying to figure out what needs to be done here. It -- I don't think the timing was unreasonable. Would it have provided any information earlier on if they had done it early on? Maybe. Would it have changed their decision? I mean, they had already decided -- they -- they were already decided they were going to continue to investigate. So, you know, was the timing off? I can't -- I can't comment on that. I think that they did the right thing by hiring the accident reconstructionist.

Q Okay. From the point they can't find the driver and they hired the private insurance adjuster to help them find that, and let's stick with our hypothetical. We're a couple months out from that, right? I mean, it's -- they've had some time to find them, still can't find them. In Kentucky, we're supposed to have reasonable investigations for prompt

adjustment. Is that accurate as far as you know, the Unfair Claims Settlement Practices Act?

A I think that's the language. Yes. Correct.

Q Okay. So in line with that, what's the recommendation for hiring the reconstructionist? Do we say, let's hire him now because we have this duty to have an investigation that allows us to promptly adjust claims? How does that fit in with this fact scenario? When would you advise them to hire the reconstructionist?

A I don't have a specific timeline that I would've told them or advised them to hire the accident reconstructionist. You know, the -- the Unfair Claim -- Unfair Claims Settlement Practices Act, the model law of which Kentucky follows around prompt and fair settlement of claims is so that the claims aren't ignored, okay? I mean, that's the intention, right?

Q Yeah. Right.

A It's not about do things in -- in two seconds and -- and do everything you possibly could to resolve it. That's -- I don't -- that's not the intent, okay? So in terms of when they should have hired a accident reconstructionist, I mean, I thought they hired it when they -- they hired an accident

reconstructionist. I was less concerned about the timing of that. I don't think that played into the prompt handling of claims because that claim wasn't just sitting there. They were doing -- they were -- they had a lot of stuff going on in this claim all the time.

Q Sure.

A So the claim was not sitting there, nobody looking at it for, like, six to nine months, which, you know -- you know, those type -- types of time lags, I would worry about, okay?

Q Yeah.

A Like no activity for six to nine months, I would worry about that.

Q Right.

A I would worry about that for any carrier. That didn't happen here.

Q You didn't notice any gaps of adjusting activity in this matter?

A There were -- there were always check-ins with the independent adjuster. There were always check-ins with follow-up with your office for -- for medical. There were -- there were a lot of check-ins. You know, sometimes it was a month. Sometimes it was, you know -- I mean, I thought everything from a timely

standpoint was reasonable.
Q There were no year-long gaps of claim activity in this matter?
A I don't recall seeing a year-long gap.
Q Okay.
A If there's a dispute that people can't agree, you know, you can only go so far, right? You know, that -- that sort of thing. But I -- I didn't see --
Q Sure.
A -- that people didn't do anything in the claim.
Q Okay. In the scenario I'm -- we're talking about, you know, NICO's trying to find the driver. They've hired the private insurance adjuster. We're two to three months out from that. They haven't found anybody. The investigation still needs to be reasonable, right?
A Correct.
Q At that point, it's still got to be reasonable so that there can be prompt adjustment of claims. And we -- you already identified, hey, prompt doesn't mean right now tomorrow, right? That's not what we're saying, but yet the word prompt still is in the statute. So surely, it's got to mean some kind of

timeliness. How long would've been too long for NICO to wait to hire an accident reconstructionist in this situation? They're coming to you a couple months out, can't find the driver. If they wait ten years to hire an accident reconstructionist, is that still reasonable investigation for prompt adjustment?

A Ten years might be a little too long, but I have seen cases where an accident reconstructionist isn't hired for a year or two.

Q Okay.

A And it's because they -- you know, the people -- both sides can't agree on -- on liability or -- or -- and somebody feels additional facts might be helpful on either side, the plaintiff or the defense.

Q In this case, would you think -- I mean, considering we've got what we have in the police report, we've got some indicia of comparative fault, right? We have a missing driver, and we can't find them with the insurance adjuster. In this case, do you think it would've been appropriate for NICO to wait two years to hire an accident reconstructionist?

A I don't know. I mean, there's --

Q Well, they're coming to you because you're the expert, right? You've got the industry standards, you've got the experience. So what would a -- what

would somebody with 50 years of insurance experience tell them?

A I think that they were still investigating the medical, so -- and it was going to be a compromise settlement based on the liability facts. I don't think a year or two was unreasonable.

Q Okay.

A And the accident -- you know, and whether -- whether or not we like this on either side, the accident reconstructionist confirmed there was negligence on both parties but didn't specify what the percentage was. That wasn't their role. So I'm assuming to this day, there may still be a disagreement as to who's on first and who's on second with respect to -- to negligence.

Q And the accident reconstructionist, to be fair, I mean, you reviewed his deposition, didn't you?

A Correct.

Q Yeah. I mean, he identified certain steps that the driver could have taken to avoid this entire thing from happening. So it's not like -- yeah, I think your depiction is accurate. He expressed negligence on both sides.

A He was pretty straightforward, but that doesn't mean it's a -- that doesn't mean that the

defense or the plaintiff are going to agree it's a 50/50 deal, okay? And that percentage has never been agreed upon.
Q That's true.
A Okay. So I -- so I think the liability -- you know, if there were no injury involved and the damages was just about the car, I don't think that claim would be settled today.
Q Yeah.
A Okay. Because I think -- you know, because there's -- you know, car is a car, right? So at the end of the day, there -- there's not been -- everybody knows there's negligence on both parties. And so in that instance, when there's an injury, you do the best you can in terms of evaluating the claim and you make a compromise offer based on the facts of the loss, from both the injury and the -- and the liability.
Q We got a missing driver, indicia of comparative fault, and then they're coming to you and say, we need the industry standard. You say, if you hire them within two years, you're probably fine?
A I think you hire them because you think you need them and that --
Q Okay. So do you hire them at that moment, or do you wait to hire them? Because they're coming

to you for a decision, right? They don't have as much experience as you do, Ms. Sullivan, so they're asking you.

A You know, I didn't handle the claim, so I don't know. I don't think it was inappropriate when they hired them -- when they hired him.

Q Is there any time that they could have waited that would've been inappropriate for them to hire -- for -- to have waited to hire him? I mean, when should they have acted or when would it have been inappropriate in terms of the industry standard for the reasonable investigation?

A Well, the reasonable investigation would've been having the facts of the -- having the facts of the loss. So they had facts of the loss. There was a difference of opinion as to both the medical damages, you know, what was -- that hadn't been decided yet. And there was a difference of opinion still in terms of, well, what actually is the liability here? So when you're going to make a compromise offer or making a compromise offer on, you know, your guy's 99 percent at fault versus there's -- there's, you know, a percentage on both sides, having additional information is helpful. Do you need it right away? No. I don't think there's an industry standard in

terms of when you hire an accident reconstructionist. And I've seen accident reconstructionist hired after the loss goes into suit because there's no decision or meeting of the minds in terms of either liability or damages.

Q Oh, it definitely happens. They get hired all the time all over the place.

A Exactly.

Q And so --

A So -- --

Q What I'm trying to figure out though is like, what does the industry say, hey, this is when you should hire somebody?

A Doesn't.

Q Just says reasonable, right?

A I mean, it's reasonable. It's based on the facts. It's -- it's what -- it's how you need to look at and evaluate the totality of the claim and what you're -- and what you're doing with it. So sometimes it's hired to defend yourself in a lawsuit and kind of verify or, you know, kind of support the position that was done before. Sometimes it's done as part of the investigation prior to the evaluation. It just depends.

Q Okay.

A And they're not used --
Q So you would tell --
A -- and they're not used all that frequently. So there -- there shouldn't be a specific standard. I don't know how you would come up with that.
Q You're not sure what would be a reasonable investigation decision in that situation. Is that what you're saying?
A No. You -- you asked me when -- when it would -- when it would have been appropriate. What's the reasonable standard in terms of when to hire, okay?
Q In that situation. It's not -- and not in every situation. I'm not -- right? Very specific.
A It's the when -- it's the when to hire, okay?
Q Okay.
A You hire it when you think you need it, okay, is -- is the best example I can give you. And that varies based on the facts of the law. So I can't say you should hire it 30 days, you should hire it 90 days or -- and we don't -- and the industry doesn't use accident reconstructionists all that frequently either, so …
Q So it could be reasonable in a specific

situation, if they waited ten years to hire them, it could be reasonable in that situation?
A It could very well be. You know, ten years might be reasonable in New York with how long it takes a case to get tried, but in most states, ten years would be a little off -- off the wall. But a year or two, I don't think that's unreasonable.
Q Okay. Longer than that? Like, I mean, what if --
A I, you know --
Q -- they waited three years? Is that reasonable?
A It would depend on -- it would depend on the facts and why you were hiring or why you felt you needed an accident --
Q This facts, this case.
A I can't --
Q Because you've reviewed the documents, you've reviewed all the papers, right?
A And I -- I think they hired it when they felt they needed it.
Q And you think that was an appropriate time for them to hire them?
A I do.
Q Okay. Is there any other information, apart

from the information in the claims file, that could be -- that you relied on to -- strike that. Let me think of this question again. What evidence outside of the claims file did you see that established NICO had adopted reasonable prompt investigation standards?

A How they handled the claim, okay? In terms of, you know, the -- the coverage, liability damages, and the steps that they took, I believed comported with -- or I knew comported with industry standards. I didn't go out and look at a specific reference other than their claim handling for this particular file.

Q Okay. And I don't think your report identifies any written NICO investigation standards.

A No, it doesn't.

Q Is that accurate?

A That's correct.

Q Did you request any from them?

A No, I did not.

Q Did you think that unusual that they didn't have those?

A No, they may have had something. They were not in the body of work that I got to look at, and that's not unusual. I don't sometimes get that when I'm looking at a file. I kind of rely on my knowledge of the industry and the work I've done over the years.

Q Sure.
A Okay? And I've been involved in a lot of market conduct exams where they look at the Unfair Claim Settlement Practices Act and their administrative codes and -- and that sort of thing. So I'm very familiar with -- with what happens in, you know, in the industry in terms of investigating claims.
Q I hate to do this, but my mic -- my AirPod just cut out for the, like, the last ten seconds of what you just said. Can I ask you to repeat that, please?
A Okay. So I think you asked -- you asked me about did I ask for the standards?
Q Yes. Yes.
A Okay. And I said no, I did not, but I don't always get -- you know, as I've been doing expert witness work over the years, I don't always get written standards unless they've been produced and -- and/or whoever I'm -- and I feel like I need them. I have a lot of experience in the industry, not just with Allstate, but in the industry, and also with the work I've done with the Insurance Institute and then the market conduct exam work I've done over the years, that I'm very familiar with what's required in all

states.

And so I can tell how a claim is handled, whether or not it's done in -- in a reasonable fashion and it -- it follows industry standards or whether or not it's, you know, better than industry standards or worse, you know? I mean, it's like it -- it is what it is. You know, it's, like, I can tell that this person handling this claim was well versed in what needed to get done.

Q Okay. I know you mentioned Allstate. Did you work for any other insurance companies?

A No, I did not.

Q Okay.

A But, you know, if -- if I could say, the work I did with the Insurance Institute and the Inserts -- insurance Research Council while I was still working with Allstate allowed me to see what was going on from an industry perspective. And I did a lot of work with the Insurance Institute in terms of, you know, the -- reviewing curriculum for them, not just the ones that show up on my CV. I've been involved in reviewing a lot of industry textbooks, writing exams for -- writing exam questions for national exams for certification. So I'm very familiar with what the industry does.

Q Okay. Are written investigation standards considered best practices? Like, just a company having those, is that considered best practices or does -- is there really no indication one way or the other you can --
A I don't think there's one -- there's an indication one way or the other. You know, some carriers have manuals, others have job aids. You know, some of -- now most everything is electronic, so it -- it comes in different forms, if you would.
Q You would agree though that they're required to have a prompt investigation standard?
A They're required to have a standard that results in a prompt investigation.
Q Doesn't necessarily need to be written, but it could be orally passed down in theory?
A Correct.
Q Okay. A responsible claim handler should identify the material liability questions; is that accurate?
A And so by material, you mean?
Q Anything that could have a real bearing on liability, right? Like, anything that could have a substantial bearing on it could impact it. Yeah, that's -- that would be pertinent material necessary

for them to make a -- an appropriate liability decision.

A Could you repeat the beginning? And I'm sorry, I --

Q Yes. You're okay.

A I have -- I have a dog at a vet right now having surgery.

Q I know. I understand.

A The phone rang and it was like, okay, but it wasn't that.

Q If you need to take a -- you get a call from them, you need to take break, you let me know. We'll go off the record.

A I would, but it came at right at the beginning of the question, so I missed the stem.

Q Okay. No problem. A responsible handler should identify the material liability questions in a claim they're handling?

A I think that's a fair statement, yes.

Q Okay. Would you agree with this other one, the responsible claims handler should assign a person to pursue an open material question?

A They don't necessarily need to assign it to somebody. I think a responsible -- let's back up for a second. What do you mean by a responsible claim

handler? I think we need to get rid of that word. I would say a claim --
Q I think someone's abiding by the industry standards by abiding by the Unfair Claims Settlement Practice. They know their stuff. That's a responsible -- you know, they're not going and asking people all the time. They know their stuff. It's one of the adjusters you referenced, right?
A Experienced. An experienced claim handler is responsible for identifying material facts.
Q Okay.
A And -- and in -- in trying to find ways to -- to learn about those facts.
Q And to pursue open material questions. You got a question that bears on liability, you ought to pursue it, right?
A Correct.
Q Okay.
A To the extent you can.
Q All under the umbrella of reasonableness, right?
A Correct.
Q Okay.
A So that's a big thing, you know? There's a lot of --

Q Sure. Yeah.
A -- there's a lot of --
Q There could be a fact in there that changes things. Yeah.
A -- a lot of unreasonable things that happen in the course of claim handling when you're dealing with human beings.
Q That's fair. If -- okay. Let's stick with the open material. We got an open material question that's bearing on liability. If the first effort fails to determine that the answer to that question, there needs to be a follow-up; is that accurate?
A I don't know. It would depend, right?
Q Well, it's a material question on liability.
A But if you can't find it, you can follow -- you can do a million different things. It's not going to change the outcome. So I --
Q But would it be reasonable to follow up once?
A I think it's reasonable to try to find the facts that you need to make a decision, but that doesn't mean one follow-up, two follow-up, three follow-ups. It depends.
Q Okay. If those ordinary follow-ups fail, a significant claim, a large risk to the insurance

company, right, wouldn't that call for an escalation of some sort, to run it up the chain to say, hey, what needs to happen next, versus, let me sit on these and see if anything changes?

A That's hard to say. I mean, I've seen -- I have had adjusters in the past working for me that had more experience than I did, and I didn't expect them to run to me with a question. I knew that they could handle it. Would I want to know about it from a leadership perspective? Sure. Okay.

Q Right.

A But was it necessary? No. If I had -- you know, there were some things that you would obviously want to escalate, but I don't -- I don't -- and we had a couple of things that needed to be escalated, but at the end of the day, not -- you can't come up -- you can't come up with a practice that accounts for every little variation you're going to see on a day-to-day basis because every --

Q Sure.

A -- single claim is so different. So, you know, if you have an experienced person and they have good -- and they have a good track record of handling claims, not just that they have the experience, right? Because you could have somebody who's been there 20

years and doesn't do a great job. But if you have an experienced person who has a good track record, you trust them to make the right decisions and let you know if you need to know about something and typically, there's no problem. As opposed to saying, you need to show me every single thing. If you have a brand new person, you want to hover -- hover a little bit, you know?

Q Sure. In reviewing the claim file, what caused -- what deadline diary or supervisor review, what actually caused NICO to say, let's go hire this accident reconstructionist just to be sure, because we just want to be sure. We're just trying to do the right thing. Now we have this fact that has caused us to go hire this accident reconstructionist. In your review, what caused them to do that?

A I can't recall any -- I can't recall a specific issue in the diary that said that. I'm sure there was, but I can't recall. You know, it's been several months since I looked at that diary.

Q Okay. Well, in trying to determine whether or not they were acting reasonable, right, that's what I'm trying to do, obviously. I'm trying to figure out, okay, was this really reasonable? How do we determine it's reasonable or not to wait as long as

they did for the accident reconstructionist if we don't know what caused them to go ahead and take that step?

A Well, I'm not saying that there wasn't some information in the diary. I don't know. It's -- it's been a while since I looked at the diary pages. That was -- that was the first thing I looked at. So that was, like, many months ago.

Q Okay.

A I can't recall a specific, you know, comment that they made as to why they hired an accident reconstructionist.

Q Do you have the claim files in front of you?

A No, I don't. And I did -- you know, the -- the claim file diary is pretty lengthy, so, you know, I left it online. I don't even know if I have access to it anymore. But if you can show me -- if you can show me a page that you'd like me to look at, that would be great.

Q Well, I can't really figure out what caused them to escalate it on my end. So, you know -- and especially after waiting so long after deciding they couldn't find it with an insurance adjuster. So I was hoping you could kind of tell me, as the experienced insurance industry expert, what actually caused them

to go and make that decision that you would've advised them to make, because they didn't make it two months or three months or even a year after they decided they couldn't find their driver. They made it multiple years later.

A So I can -- I can give you my opinion as to why accident reconstructionists are -- are generally used, okay? Which may --

Q No, I don't know if that helps me as much. I think I need to know in this case what caused NICO to go hire an accident reconstructionist so late versus when they couldn't find the driver?

MR. BUNNELL: I'm going to object to the form.

THE WITNESS: Okay. Well, I didn't talk to anybody at -- at NICO, so -- but I would say that I -- I believe they hired the accident reconstructionist because they were still not convinced they owed any money on the claim from a liability perspective.

BY MR. MORRIN:

Q So --

A So -- so aside from the fact that they couldn't find the driver, okay, they had a police report that showed that there was some parking issue,

okay? But you also had separate facts and confirmed facts by the plaintiff's driver to the officer that he didn't even see the vehicle and was inattentive, okay? There was no indication that the vehicle was completely straddling, like blocking an entire lane on the road on the police report.

I think there was significant questions of liability, and I believe that based on the injury and wanting to do the right thing in terms of the decision on this claim, that at the end of the day, when they got to the point where they had no additional recourse in terms of determining liability, that getting an accident reconstructionist would help them assess whether they actually owed anything on this claim. And I think at that point is why they hired the accident reconstructionist. And quite frankly, when they -- when the driver -- when they eventually did find the driver and he gave a deposition, I personally don't think his deposition informed the liability decision any more than they had before. So I --

Q I understand. I understand that's your opinion. That's not really what I asked you, but that is -- I understand. You've expressed that opinion multiple times and so -- but I want to make sure that I'm clear on what your answer to the question was in

terms of why did NICO hire the accident reconstructionist when it did. And your testimony is that they hired it multiple years after they couldn't find their driver because they were trying to do the right thing?

A They were -- they were trying to determine the -- the right liability, whether they owed money on the claim, yes.

Q Okay. So why didn't they do the right thing a year out? Why didn't they do the right thing six months out? Why didn't they do the right thing a year and a half out? What was happening during that time that stopped them from going and doing the right thing?

MR. BUNNELL: Object to form.

THE WITNESS: They were trying to -- they were still trying to find their driver. They did depositions of the police -- the police officer. They were doing a lot of different things, and they believed that they would've had enough information. The -- the fact of the matter is you had someone with a severe injury, okay, who had a, you know -- and -- and I really believe that they were trying to ensure that they made the appropriate compromise decision, and they thought an accident reconstructionist could

help them with that. And --
BY MR. MORRIN:
Q You said they were trying to find their driver. What did they do to try to find their driver in that time after the insurance adjuster couldn't find them in the two years after?
A Then they were trying to find the named insured to see if they could help.
Q Yeah. What were they trying to do to find the driver in the two years after they didn't find him with the insurance adjuster?
A So you're telling me there was two years between the insurance adjuster and the -- I don't believe it was that long.
Q It was more than that. It was longer.
A So they -- okay. Let's back up for a second. I'd have to look at the diary to -- to confirm the exact dates in terms of when the -- when the adjuster stopped looking for the driver, because there was a lot going -- you know, it's not when they assign it. They were looking for him for quite some time. And I -- and if you're telling me -- I'm not -- I'm not refuting that you're telling me a lie. It's just I would want to confirm that date --
Q Sure.

A -- for myself so I get it correctly, okay? If you're telling me it's two years, I'd like to -- I don't believe --
Q Well, my question was -- if I can back us up just a --
A Okay, sure.
Q -- little bit to the question.
A Sure.
Q I was asking you, after they had hired that independent adjuster and they couldn't find the driver, and during that time, there was a time period where they didn't hire an accident reconstructionist. And you just testified that during that time, one of the reasons they didn't hire the accident reconstructionist was because they were trying to find the driver. And I'm not saying you're wrong. I'm just saying, okay, but what activity did they engage in in addition, during that time, to find their driver? Because they already didn't have the driver, they hired the insurance adjuster, and they had not hired the private investigator, and they didn't for some years. So during that time -- I don't -- I don't know if I agree with you that they were looking for the driver necessarily. I think they did -- they knew they didn't find him, but I'm asking because I don't

know for sure. You're more familiar with the claim file than I am. So what were they doing?

A Well, my recollection is the driver, they did find out where he lived, and then he was on a job and he was out of town. So I think there was a couple of touchpoints in that time period where they kept following up in terms of his last known address. So I don't think it was like, well, we went there and no one was there and we stopped. I think they tried to work with that outside firm for a period of time. And they did -- I believe they talked to somebody in the -- in the neighborhood, so they knew the guy was out of town or something like that. That's my recollection. And if I got it mixed up -- mixed up with another file I was handling some time ago, I apologize for that. But as I'm sitting here today, that's my recollection. So I don't -- I don't think they did nothing.

Q What did they do though, right? Because you're testifying today that NICO did everything by the industry standard, is what you've explained, is that they did everything reasonable within industry standard; is that accurate?

A Yes, that is accurate.

Q Okay. So what did they do to find their

driver between hiring that insurance adjuster, that private insurance adjuster to find them, and then over three years later, hiring the private investigator? What were they doing to find their driver in that period?

A They followed up multiple times with the -- the adjuster to try to find that person, okay? And did --

Q Who did? Who followed up with the adjuster? I'm sorry. I couldn't hear you.

A The -- NICO followed up with the independent adjuster a couple times within that time frame. There is no absolute standard that they needed to hire an accident reconstructionist. So they could have made a decision without them, okay? They could have made a decision without them, evaluated the claim, and then moved on. And based on the facts that they had and the discussion that the adjuster had with their supervisory group, okay, I believe they determined maybe we should hire an accident reconstructionist. Yeah. Was it a couple years down the road? Yeah, that I do recall, okay? But there's no --

Q Was that -- yeah.

A There's no -- I guess what I'm trying to get at, Mr. Morrin, is there is no standard that says you

have to hire an accident reconstructionist.
Q Right. And it seems like there's a lot of absence of these written standards in the insurance industry, which is why we rely on experience and practice, right? We're relying on your experience and your knowledge of it and your education and your training. I agree. I think that it kind of creates this gray area for us.
A But it -- it does, but most -- most claims are pretty straightforward. The majority -- especially auto, okay, the majority of auto claims, you get a pretty straightforward, okay? And so you don't --
Q I agree with that.
A -- hire accident reconstructionists. You don't need to hire private investigators to run around looking for people. That's not the norm, okay? And it's not to say that you don't use them when appropriate, okay? And if carriers did all of that, you know, I don't think that would be reasonable. And I think it would harm the public in terms of potential delays in handling as well as more expensive insurance premiums, okay?
Q I think so. Yeah.
A But at the end of the day, it's not that

they won't spend the money to do that, but they do that when it's -- when they believe it's appropriate. And most injury -- most auto accidents are pretty standard. Are -- are there some -- you know, every accident is a little different. Every injury is a little different. But in terms of the investigation process, pretty standard.

Q So we know -- if I can kind of refocus on what your answer to the specific question was, because I think you said they -- NICO followed up with the private insurance adjuster maybe a couple times, a few times. Did they do this by letter, by calling; do you recall?

A I think it was a little bit of both. I know there were reports coming in.

Q Okay.

A There were written reports coming in, that I remember, okay? So I think they followed up. How many times, I couldn't tell you without actually looking at a diary entry.

Q Okay.

A Several --

Q How many times would you expect an adjuster -- let's say an adjuster is under you and you're supervising, it's one of your adjusters you're

supervising. What would you tell them to do in terms of following up? Or would you tell them to follow up? Maybe you wouldn't tell them to follow up.
A I would expect them to -- to follow up at least monthly, if not more, okay? For a liability thing, I would want them to follow up a couple of times a month, okay? The fact that the -- the driver, they had information. I recall seeing a note that the driver was out of town on a job. So, you know, the fact that nobody knew where he was, which the insured would've known if the insured -- that's the other problem, okay? So --
Q If he was only working for the insured, the insured would've known, right?
A Yeah. Yeah. But the -- the insured was not of any help at all.
Q Do we know that if he was only working for the insured?
A I'm not sure we actually know that, but we never talked to the insured because the -- you know, the insured --
Q Right.
A -- never responded to anything. I don't recall them ever -- I think they talked to the insured at the end around the same time they talked to the

driver, so.
Q Okay. When an outside investigator returns some information, a claims handler needs to decide what it means for liability. You get a return from any outside investigator that you're asking to go get information. They provide you some information. They've got to -- you've got to analyze that and take it into account, right?
A You should, yes.
Q Okay. Industry standards would require it, right?
A If -- if you hired someone to do some investigation and they're reporting back to you -- you should look at it. Yes.
Q Makes sense. Okay. What's the interplay between an attempt to contact the driver and determining comparative fault in a situation? Is there any -- does that have any bearing on how comparative fault is determined?
A Could you repeat that question?
Q Sure. You -- we're trying to find the driver, and we can't find the driver, but we're trying to contact them. We've made contact attempts, and that's in the claims file where they're trying to contact them, right? How does that impact a liability

determination specifically with comparative fault, because that's what we have here?

A You -- you want to get the -- their version of what the -- of the facts as they remembered it.

Q That's part of the reasonable investigation. That's why NICO was trying to find them the whole time, right?

A That's correct.

Q Okay.

A Excuse me.

Q You're fine. And just to clarify, it's your testimony today that there is no insurance industry standard that can help adjusters with guidance in terms of dealing with these situations, lost driver, when to hire, what's reasonable, right? There's no guidance out there for that?

A There's --

MR. BUNNELL: Object to the form.

THE WITNESS: I think what I was trying to say is you will -- like, if you were to pick up, like, the AIC manual that I was -- I wrote in, I believe you'd find a paragraph on accident reconstruction experts in terms of what they're for, okay? What it won't tell you is, hire them in 30 days, hire them in one year, or make sure you hire

them within this time frame, okay?
BY MR. MORRIN:
Q Right.
A It's not going to say that. It's going to tell you why you might want to consider hiring them, okay?
Q Okay.
A And I -- and I think that's what I was trying to get across. And I did a --
Q Sure.
A -- not a great job explaining.
Q No, no. You're doing a great job. I'm -- we're all here just doing the best we can. I'm going to give you grace and I'm going to ask for grace for myself, too, if that's all right.
A Okay. So I -- I think you will find standards around when you should consider, not when you should, but when you should consider hiring an accident reconstructionist. And companies will have that standard, too. I had this -- I had that conversation with adjusters when I was in charge of claim handling practices and procedures at Allstate. But what you won't find is, you must hire them within this time frame.
Q Sure.

A Like, if you wait a year, it's too bad. If you wait 30 years, it's too bad. You know, it's not -- you're not going to find a time frame because you can't put a time --
Q Not a bright line rule like that.
A And you won't --
Q But in that, there's got to be something -- no, go ahead. Go ahead. I don't want to cut you off.
A And you won't find anything in any regulation for any state that says you must hire an accident reconstructionist.
Q No. Legislators don't do that. Yeah, you're right. That's right. They don't provide that.
A Oh, yeah.
Q Okay. Okay. And I think that's fair. That makes sense to me. In that AIC manual, I would think there's some kind of content in there talking about -- that would relate to when to hire an accident reconstructionist, not necessarily a bright line rule that says, hey, you're five years out. No matter what, you hire an accident -- it probably -- it doesn't say that, but it's got to have -- surely it has something in there that has bearing on the reasonableness and when you might want to heavily consider hiring the accident reconstructionist.

A It's a textbook, okay? Not a manual. And it does -- so it's -- it's more of an academic thing.

Q Yeah. I see.

A It's not a -- not a best practice, per se.

Q Yeah. Okay.

A It will tell you when you might want to consider, not when. It would tell you why you might want to consider hiring accident special -- accident reconstructionist, not when.

Q Okay.

A Okay? And I think that's -- I think that's what you're asking me and -- and what perhaps we're struggling with here.

Q Yeah. Try to make some clarity, yeah.

A I don't think -- you know, and -- and for companies that do have best practices published in whatever form they publish, they probably have information on an accident -- why you might want to hire an accident reconstructionist, but they would never say when because there's -- there's no timing -- there's no time guideline for that. And it just depends. You know, it's -- it's like -- it's like an extra data point you may need to defend the interests of your policy holder. That's what it comes down to.

Q Right. Okay. If I go look at the textbook,

will it indicate, can't find the driver? Maybe that's when you consider accident reconstructionist. Is that in there?

A That's a great memory question for me because I have a --

Q Yeah. Yes. Okay.

A Yeah. I can pull -- I can -- I can pull it out if you'd like me to.

Q That's all right. I'm going to go get your textbook here, not right now, but after we're done. Okay. We got past that. Good. Will a claims entry file, will that show -- like, you hire the private insurance adjuster. Once they report back, a claims handler, industry standard, they go make an entry into the file with what the finding is? Is that typical? Is that what you would expect?

A In the old days, I would say yes. Now today where everything is electronic, sometimes forms or letters come in and they're automatically inserted into the file in one way, shape or another. So depending on what kind -- you know, how their system is set up. But you would find --

Q Okay.

A Typically, you would find some indication that a report was -- was sent in and is made part of

the claim file.
Q Okay. Did you make sure, like, in your evaluation that you were retained to conduct, did you make sure that NICO had entries to substantiate that they had done all these things a responsible claims handler would do?
A I made sure that as I was reading through the claim file, that I -- I looked for the timing of what they did and when they did it, okay?
Q Okay.
A So to make sure, you know, I'm not sure I understand your question fully. I will say that if I wasn't comfortable with their claim handling in terms of complying with industry standards, I wouldn't have written the report that I did.
Q Okay. So are there any NICO entries you used to verify that the claims handler in this matter acted as a responsible claims handler as we've discussed previously?
A I think -- I think I relied on the totality of -- of the claim file, not a specific entry.
Q Okay. As you sit here, you can't point to a specific NICO entry that confirms any of these though; is that accurate?
A I don't think that's what I said. So are

you talking about -- I can't -- I could take my report, and I can't align it with what they actually did in the claim file? I could do that. I didn't -- I never do a chronological thing. I think I did -- I think I did that maybe 20, 30 years ago. I don't do that anymore. But I do look at what they did. I look at the timing. I look at whether or not there were gaps, you know, and -- and if there were gaps, why were there gaps or what -- or what was reasonable or not. I reviewed all correspondence that was given me as part of the claim file, and I reviewed the entire electronic claim notes. So my report is based on what I read, okay? I didn't -- I didn't do, you know, this date, this date, that date. That's --

Q Line by line? Okay.

A That was -- I don't do a line-by-line thing. That's not my usual practice.

Q Okay. I am going to take us back to the collision report a little bit and hopefully just briefly. I feel like we talked about it a lot, but I saw another question here that I thought was pertinent. Because we talked about material -- issues that are material to the liability determination and what a responsible claims handler does with those.

So in this matter, the claims handler was

aware -- presumably would've been aware, if they conducted a reasonable investigation, reviewed the collision report, they would've been aware the vehicle was parked partially in the road. In your review of the claims file, what source, what additional fact, what caused them, the adjuster, to say, you know what? The truck being improperly parked is resolved. This is not an issue. I'm a responsible claims handler. I can get past this because of X.

What fact allowed the adjuster to just decide that that's not really a material issue or that doesn't bear on liability before their denial? That was a long question. If you need me to try to repeat it, I'll do my best.

A Well, no. Well, no. No, I get it. And I -- I understand exactly what you're saying. I don't have the claim file in front of me, okay? But based on the report itself, okay, there was nothing in the written report other than the one little note, that improperly parked, okay? When you read the -- the text version, test -- text version of what the officer wrote on the report, the focus was not on the improper -- improper parking. The focus was on the vehicle was disabled. Unit 1 said the vehicle was disabled. They put the placards out. Unit number 2, or -- or maybe I

get that vice versa, but the plaintiff operator never saw the vehicle, never saw the placards, hit the rear of the car, okay?

So at that point, okay, it doesn't say on the police report that I can recall -- we just looked at it. And I'll look at it -- if you want to bring it back up, I can look at it again. I don't believe there's any indication that the vehicle was over a certain line or a -- a certain footage over the line on that police report. That came out later.

Q Okay. But it did say improperly parked, right? So I mean, that's got a -- surely that sends a flag up for the adjuster, uh-oh, my guy was improperly parked. That doesn't indicate he was lawful, right? I mean, that doesn't indicate he was doing everything he was supposed to do, just by --

A No, but --

Q -- the plain language of the word improperly.

A But he also put the placards out. So you -- it -- would a reasonable -- if you -- if you think about theory of negligence and reasonableness, would a reasonable driver who was paying attention see placards in a fairly well-lit area and a truck that's just sitting there, would they reasonably assume that

they need to go around the truck? And I think that's the issue, okay? It doesn't say -- that police report says improperly parked. Does that mean it -- doesn't say it was straddling the -- I mean, there's -- there's no indication of exactly how it's parked, okay? There is no indication that it's obstructing the entire roadway. And there --

Q I'm going to challenge you a little bit there because the word improperly is used. That does indicate how it was parked, right?

A But it -- but I don't know how improper it is. Is it the front or the back?

Q Okay.

A I don't know.

Q Okay.

A Okay. If you're pulling it up and I get the back end, but -- but the front is out because the car -- the vehicle stalls and I can't restart it, it doesn't say that.

Q Yeah. Right.

A And it said -- and it does have the placards out.

Q Okay.

A So when you -- when you think about the -- you know, when you think about, you know, your theory

of negligence and reasonableness, okay, you know, there -- you know, for someone to be liable, you know, you look at were -- were their actions reasonable, right? Were the actions of the driver who parked the vehicle reasonable? There's nothing in that police report that says they were unreasonable. They had the placards out. It's a fairly well-lit area.

You have a lot on the -- on the plaintiff's side, inattentive, didn't even see the vehicle, hit the rear end. So I -- you know, I mean, I get -- you know, is it a perfect -- you know, sometimes claim handling is not perfect. Is it a perfect decision at that time? No. Was it unreasonable? No. I think it was a reasonable decision at the time.

Q You don't think there's enough in the police report to cause a reasonable claim handler to say, there's a comparative fault issue here?

A I think the decision was reasonable --

Q Okay.

A -- based on -- based on what they had at the time. I also think it was reasonable that they left the -- they asked for more information as well. The wording in the -- in the denial letter is pretty straightforward in terms of, if you have any additional information I need to consider, let me

know. So that's pretty straightforward. It wasn't like, I'm denying it. See you later, you know?

Q That's true. But if a denial is made prematurely, does -- is it then lawful if the denial says, but if you have more information, send it to me?

A I'm not sure it was the -- I think it was reasonable based on the information they had.

Q Okay. And I guess all I'm asking is, theoretically, is it a denial -- is an improper denial suddenly made proper because the adjuster says, you know, I'm denying this now, but if you have more information, I'm willing to take it into account?

A And I guess what I'm struggling with is I'm not sure it was an improper denial at that time.

Q This is a theoretical. If it -- if there's an improper denial, if there is an improper denial, does asking for more information make it proper?

A That's -- I don't know the answer to that question. I mean, it's, you know --

Q That's okay. Your report says NICO opened the file November 3, 2020, right?

A Could you tell me what page we're on? I have the report right in front of me, so if you just tell me what page you're on, I can --

Q Let me see.

A Did you say November 3, 2020?
Q Yes. Yeah, that's what I have.
A Okay. It's on page 3, correct.
Q Thank you. I believe it also says NICO retained a local independent adjuster on November 4th?
A Correct.
Q Okay. Do you know what that independent adjuster firm's -- what the written assignment was?
A I'd have to look at the --
Q Are you familiar with that?
A I would have to look at the claim notes again.
Q Okay.
A Typically, I contact the insured, find their version, that sort of thing. I mean, that's a typical --
Q Some of those basic kind of fundamental first steps?
A Basic things, correct.
Q Okay.
A And, you know, and -- and the other thing too, bear in mind, is if it's someone that -- if it's a company that they have a longstanding relationship with, they sometimes don't provide them significant amount of data.

Q The whole introductory --
A Right. And -- and they may have a contract with the firm that spells that out as well, so, you know.
Q Okay. What did that independent adjuster report back before -- I want to say before the January 19th assignment?
A The January 19th was that -- that's the incorrect date, right? I think --
Q That may -- yeah, I might be getting confused. I might be trying to put you on the February -- that February date.
A February, yeah.
Q Between that, yeah.
A February denial. You know, I'm sure there's something in the claim file. I don't have the claim file in front of me, and I don't do a chronological report on that.
Q Did you review the independent adjuster's complete report from December 9th?
A I'm sure I did when it was -- if it was in the file, yes.
Q Okay. Before NICO's initial denial, this puts us in February of 2021, the initial denial, what did they know -- what did NICO know about contact with

Enterprise in efforts up until that point?
A Well, it says here, "Correspondence produced indicates multiple follow-ups by the independent to contact the named insured and the named operator." That's in the first paragraph under Items 2, 3, and 4. So we know that there were multiple follow-ups. And then on December 16, 2020, the reservation of rights letter, then they hired a second claim file investigator to attempt contact with the named insured and the insured operator. That occurred on January 19th, and then the denial went out a month later in February. And I obviously transposed that January 19th down below.
Q Yeah. Okay. And it's --
A And I --
Q And from -- go ahead.
A Go ahead. And it was a preliminary denial based on the information I saw in the file.
Q Okay. And it seems like they had similar efforts made for the driver as well, for Howard?
A Correct.
Q Like -- likely parallel efforts still --
A Yeah.
Q I mean, you're trying to contact the same people? Okay.

A Well, you need to talk to both, right? You got to make sure that the driver was an authorized driver. I mean, you have to talk to both. You got to talk to the named insured.
Q Sure. When did NICO assign us the second investigation firm? Was that in January or was that in February?
A I believe that was -- I have January 19, 2021.
Q Okay. So that date might have been the assignment date then, the actual --
A Yeah. The denial date. The denial date --
Q Right. I think --
A Right.
Q I can see where that -- yeah.
A My typo got carried away.
Q Oh, I do it all the time, too. No problem.
A I'm going to blame it on my bifocals.
Q I can't ask -- I can ask -- you've been asked to be an expert, but we understand you're still human, so that's fine.
A Thank you.
Q And that second assignment was just to locate the insured and the driver, right?
A Correct.

Q That was a much more narrowly tailored --
A Yeah.
Q -- assignment for that second? Okay.
A Could you give me just two seconds? I want to just see if the -- I got a note --
Q Yes --
A -- besides that. It'll just take me two seconds.
Q Okay. I'm going to -- I'll wait two seconds then. I mean, I'll give you a little longer.
A No, we're good.
Q Okay.
A Just, you know, timing is everything, right? When I agreed on the date, I thought my dog was fine.
Q Yeah. Sure. No.
A Okay.
Q In trying to find the driver and trying to find the insured, what was NICO expecting to learn, right? Why is that part of the reasonable investigation? What could they learn from doing that?
A Well, first of all, you need to get the facts from your insured, okay? I mean, you're -- you -- that's your -- that is your customer, your policy holder. So you have a contractual obligation to them to protect their assets. If they're not even

reporting -- if somebody else reports the loss and you can't even confirm they had a loss with them -- now, granted, they confirmed they had a loss because of the police report, so they knew who it was.

Q Right.

A But suppose there was no police report and somebody is just calling in a loss, you can't just assume that, okay, your policy holder was involved, and this is how it happened. So that's what they were trying to do.

Q Okay. In terms of -- maybe narrow it down a little bit more. In terms of liability, what did NICO expect to learn from the driver?

A I think they needed to see whether or not there was any negligence. If the -- if the vehicle had been, "properly parked," okay, and the placards were out, the exact thing, okay, there would probably be zero negligence, okay? And so regardless -- so we -- here we have a driver who tells you he was inattentive and fatigued, although he did change his story a few times, but granted, he was significantly hurt, so ...

Q Yeah. I don't think he ever admitted to being inattentive, but I think he did say that he was feeling tired.

A He was feeling tired.
Q So I'll concede that.
A But it -- but -- right. But there was one -- my recollection is there was one medical report that said, oh, I wasn't tired. Yet the day before, he had complained to his doctor he was always tired. So, you know, there -- there were some inconsistencies there.
Q Sure.
A So in any case, you have a -- you have a police report that says the driver was inattentive, fatigued, and didn't see the vehicle, okay? Okay. And so at that point, do you think there's any negligence on your insured at all? Probably not, okay? And I -- and that's what I was trying to get across. So you -- you need to, like, find out what actually happened, and that's why they were trying to get ahold of the driver.
Q Okay.
A And then the named insured. And they want to make sure that the driver was a -- was somebody who should have been driving and that sort of thing, because the -- the policy they had didn't indicate who the driver was, I don't -- I don't believe. It just indicated the vehicle.

Q Do you think the vehicle being listed as improperly parked was a material fact to liability?
A I don't know because I don't know what improper means. There wasn't -- there wasn't specific information on the police report as to what improper meant. So when -- when the accident --
Q Isn't that -- I mean, isn't that, kind of, looking at the facts a little bit too favorable to your side, though, to say, all of a sudden, I don't know what this word means because it's pointing at my insured? Like, that's --
A But if you -- but if you --
Q You are -- respectfully, Ms. Sullivan, you are incredibly -- you come off as incredibly intelligent, and I just do not believe that you do not know what the word improperly means.
A Well, I understand what you're saying, but I guess -- I guess if your -- if your vehicle breaks down and you can't move it, okay, what do you do? Okay. It's not like he just parked the car because he wanted -- he wanted to walk a mile and go to sleep, okay?
Q Sure.
A So -- I mean, you have to take that into consideration. And the fact that he had the

reflectors out, we knew there was some sort of problem, okay?

Q But isn't that actually a material fact that we just said a responsible claims handler would follow up with before denying liability?

A However, okay, they were -- they were trying to do that. They couldn't find the person right away, okay? The person didn't even report the loss. I think they had enough information to think there probably is -- isn't any negligence here. You have somebody that admitted allegedly to the police department that they didn't see the vehicle and they were tired. And it's like, okay, so -- so what else do you need?

Q Well, why didn't NICO continue their investigation and just not deny the claim? What pressure -- and maybe this is just something I don't know. What pressure were they experiencing, whether industry standards or otherwise, that required them to deny the claim before they answered that material question?

A I don't know if -- I don't believe they were under any pressure. That's my personal opinion, okay? I didn't see that in the claim file. I think the initial adjuster truly believed that the vehicle was

parked and unoccupied, and that because the -- the plaintiff driver said, I didn't see the vehicle and I'm tired, and the police indicated he was inattentive, that the -- that they were 100 percent responsible, that the proximate cause of the accident was their exhaustion and not seeing the vehicle, not the -- the way the vehicle was parked. And I believe that that's what the adjuster, at the outset, believed, and that's why he denied -- he or she denied the claim, okay?

Q And it's your testimony that that was a reasonable belief despite the indication of improperly parked. Without any further investigation into that, going ahead and making that liability denial, that was proper?

A But you're also admitting in your discussion right now that there were reflecting triangles there, which would indicate the vehicle was disabled. You're -- you're omitting that.

Q Well, no, that's not what reflector triangles indicate necessarily.

A No, but -- but that --

Q I do concede the triangles were out, yes.

A Okay.

Q But --

A So if -- so the thing is, if the -- so there was adequate warning, okay? I mean, you're admitting that in your discussion right now, and I'm not. That's -- that's our difference here, okay? So I think based --

Q Well, I don't think I ever said there was adequate warning. Let's --

MR. MORRIN: Chloe, can you read back that last question for me, my last question, please?

BY MR. MORRIN:

Q Let's try to get back on track if we can.

A Okay. Great.

THE REPORTER: Great. Yes. Give me one second.

MR. MORRIN: Okay. Thank you. Question hanging over.

(The reporter repeated the record as requested.)

BY MR. MORRIN:

Q Why -- what caused them to go ahead and issue that denial letter versus just continuing the investigation?

A And what was the material question again, please?

Q The material question, in my mind, would be

you -- we've got it in the collision report that our insured driver is propped -- is parked improperly. And from what I can tell from the -- unless you can correct me, from what I can tell from looking at the file, is that not a whole lot was done to answer that question before the deniable -- the denial letter was issued.

A Okay. So what's missing for me in that discussion is the vehicle is parked and unattended and there were reflective triangles out there, okay? If a car -- if a vehicle is properly parked, you typically don't have reflective triangles out there, okay? So if the vehicle -- if the reflective triangles are there, that would indicate that there's something amiss here and the vehicle could not be moved, okay?

There's no indication in the police report, at least I didn't see any, and I could have missed it because I'm not perfect, there's no indication that the vehicle was out, you know, ten feet, 100 feet, 50 feet. All we know is it's parked on the side of the road that's on the ramp, on the side of the ramp. That's what it says. It's a well-lit area. It says that, okay? And there's reflective triangles.

And we have an operator that -- and we can say he didn't say that, but it says in the police

report he was tired and attentive and didn't see the vehicle. Well, if you don't see a tractor trailer truck, okay, in my mind, most of the negligence, if not all of it, is probably on that driver.

Q Are you allowed to make that assumption though? Why --

A Because -- can I finish, please?

Q Yes.

A Because there's nothing on that police report that indicates to me that this car is -- that this truck is so improperly parked that it was obstructing anything. There's nothing on that police report, so I -- so based on the information that they had at the time, okay, that adjuster's decision was, this is a no liability case on the part of my policy holder. They did everything that they could reasonably. And -- and there's reflective triangles. This guy didn't even see the vehicle and smashed into it, okay?

So -- and said he was tired and -- you know, and agreed he was inattentive. At least that's the police -- what the police report says. So at the end of the day, okay, based on my -- based on what I have right now, even though we're going to try to get ahold of all these people, I think this claim should be

denied. So I deny the claim, and I leave it open. And so I don't -- I guess I don't think that is a -- a reasonable decision at that time based on what that adjuster had.

Should that adjuster done a million different things? I don't know, okay? I don't think they even knew how injured the person was at that point. It was still brand new, so ...

Q Okay. So there was enough in the police report to point to the plaintiff that allowed the adjuster to use that information to kind of answer what I was calling the material question of improperly parked. Is that a fair?

A I think that's a fair -- and I think that's the decision the adjuster made.

Q Okay.

THE WITNESS: Okay. Could I take a quick -- I can't stop drinking water.

MR. MORRIN: Yes. Yeah. I've got to go to the restroom, too. It was a quick three-to-five-minute break, please.

THE WITNESS: Okay, perfect.

MR. MORRIN: Okay. Thank you, all.

THE REPORTER: Okay. We're off the record.

(Off the record.)

THE REPORTER: Okay. We're back on the record.

BY MR. MORRIN:

Q Okay. Back to some fun questions, Ms. Sullivan. Let's go to the second insurance. Well, we have a second investigator or a second insurance adjuster assigned. This would've been the January 19th assignment, Ms. Sullivan.

A It's a claim investigation firm. It's -- it's not a private investigator, but it's a firm that does investigation.

Q Okay. Thank you. Do you know what date that firm first attempted contact?

A Again, I'd have to look specifically at the -- the claim file notes and the information they met -- they should have sent in, or most likely did send in, I should say.

Q Are you familiar with their contact methods?

A I believe that the -- there were combination -- I don't want to mix it up with the first one, but there were -- the second one was much more prolific in their reports. I remember that because they were with us for a while, okay?

Q Yeah.

A I know they did, you know, by foot, knocking on doors, as well as by mail.
Q Okay. They actually showed up and tried to serve him where they thought he might be?
A Yeah. And their -- and their reports were -- were very, very thorough, and they did them every single time they were out there. So there were several -- several reports and several attempts.
Q Okay. Like, not trying to box you in, but, like, three to five attempts. So can you give me any ballpark in terms of their efforts?
A There were -- I don't know the exact number.
Q Okay. None of their reports --
A But -- but I was impressed by how much they wrote. That's all. They were pretty good. And, you know, they -- they were having trouble finding them, but they -- they did make really good attempts.
Q And they -- but they didn't actually find the driver, right? I'm remembering that correctly.
A The private investigator, I believe, found the driver. I think the driver --
Q Not the firm, right?
A No, but they -- I don't know if it was the first or the second firm. They confirmed -- they confirmed. They confirmed where he lived, but he was

out of town on jobs. And one of thems actually spoke to a neighbor, that I remember.

Q Okay. None of the reports included Howard's version of the collision, though, did it?

A No, they did not.

Q They didn't get that far?

A No, it's -- I'm not -- I'm -- maybe the last one, but I'm not sure. I don't recall seeing that. I think that my recollection -- I hope I -- I hope this is a true recollection. I don't think I dreamt this. I usually don't dream about these types of things at night, but, you know --

Q Not the good ones. Not the good ones.

A We have the first time. Sorry. But in any case, I believe that Howard contacted defense counsel, not the -- not the named insured or the insurer.

Q Okay. So the firm did get some contact out of Howard?

A Yeah.

Q Okay.

A And then that he -- and he may have -- he may have gotten the -- another letter that he -- he finally called.

Q Okay.

A Yeah. So --

Q So did Howard actually talk to anyone from NICO, including their counsel, or did he -- do we just have a note that he reached out?
A I believe -- well, he got set up for a deposition, so he must have talked to the counsel, right?
Q I don't think he was found until the private investigator. This is the private firm we're talking about, right?
A Oh, okay. Okay. Yeah. Okay, so --
Q Yeah. So I don't think he was found until later.
A Back up. It was the -- it was the private investigator. Okay. You're right. Sorry.
Q Okay.
A My fault. See?
Q That's okay. Hey, this is what we're here to do. We can cooperate and get to it. Okay. So the second investigative firm didn't find Howard, and we don't have any kind of statement from him through their hiring, correct?
A Correct.
Q Okay. Okay. Did any of their reports establish the truck's position relative to the travel lane? Like, did any of their reports go into more

detail, like they went out and looked at this, or were they pretty much strictly, we're here to find Howard and the insured?

A They were -- I believe -- my recollection is they were pretty much strictly to find Howard, the insured, and hopefully get Howard's version, but yeah.

Q Right. Makes sense. But they didn't touch on the truck's position and where things were in any of the reports?

A No. Not that I'm aware of.

Q Okay.

A Or not that I can recall.

Q And I'll include the -- any mention of the triangles. They didn't go and try to measure where those could have been or done any accident reconstruction work?

A That's correct.

Q Okay. And for each of those reports, would those have just been coming into the claims adjuster, or would those have gone up to a supervisor? What kind of happened in that situation? The reports from the firm, when they report back, do those just go to the adjuster?

A I believe they went to the adjuster, but I would have to actually look at the report to see who

they addressed it to.
Q Okay. As far as you can recall, they went to the adjuster?
A Yeah. I don't -- there'd be no reason why it would go to the supervisor. I mean, the -- the adjuster was the one that hired them, so I believe it went to the adjuster, but to be very -- you know -- I mean, to specifically state that they went there, I'd have to look at how they were addressed.
Q Yeah. Not trying to trick you or nail you down on that. Just trying to get an idea.
A No, I'm trying to be precise.
Q I appreciate it. Are there any evaluations of those reports and conclusions within the claim file that appear in an entry before February 26th?
A Other than they can't find the person, that's -- no, that's --
Q Okay. Other than just the -- maybe a summary of what the report is --
A Yeah.
Q -- in the claim file? Okay.
A If -- if that was noted other than received report.
Q Okay.
A The -- the actual copy of the -- of the

report was part of the correspondence in the file, but I don't recall the exact language in the claim diary on that.

Q Sure. Yeah. That's okay. Which adjuster made the decision to deny the liability?

A Can't remember the person's name.

Q Let me see if I've got -- would it have been Vince Kline?

A I don't want to speculate. I can't remember the person's name.

Q That's all right. Let's see. Let's --

A Would -- would be a -- his name would be -- he would've signed the letter, right, that went out?

Q Yeah. I'm going to share my screen. I've got that up here. Let me know when you've got it.

A Got it.

Q Okay. I believe this is the denial letter that was sent out, the liability denial letter. It's dated February 26, 2021. It's signed by National Indemnity Company Claims Department, Vince Kline. Is this a -- as far as you can tell, an accurate --

A Yes.

Q -- copy of that letter, that claim denial letter?

A Yes.

Q Okay.
A But there's the accurate date, too, 2-26.
Q Yeah, there -- we can rely on that date for it, but I can see how you -- those could be mixed up easy. We're dealing with a lot of material dates here. Okay. So did Vince -- would that mean Vince Kline decided to deny the liability? He made that decision?
A It -- it would appear from the -- my recollection is he -- that he was the only one in the claim file at that point on the denial. I don't recall seeing a supervisor note. Again, it's been a while since I looked at the actual claim file, but he wrote the letter, so I believe it was his decision.
Q Okay. And you reviewed the claims file. What documents did he have? He had the -- I'm pretty sure he had the collision report, but what other documents did he have in making this determination?
A That was basically it, as you can see from the letter. Police report that your client was listed at fault for our -- rear-ending our insured's parked vehicle, despite the fact that insured had set up reflective triangles behind the vehicle due to fatigue. And in addition, no fault was placed on the insured. So he was basically relying on the first

notice of loss, which was from your office, plus the police report.
Q Okay.
A And then he just said, if you believe there's new evidence which has not been considered, please provide it to me for consideration.
Q So would you agree this is an affirmative statement from Vince Kline, the adjuster, that despite the improper parking note on the police report, that no fault was placed on the improperly parked -- or the driver who improperly parked?
A That's --
Q That's what he's saying here, right?
A That's what the letter says, yes.
Q Okay.
A At that time, it also says to date, right?
Q Sure. That's correct. And the only document he had -- he didn't have contact with the insured, didn't have contact with the driver, didn't have any other documents except the collision report, right?
A And the first notice of loss. And so he -- I did -- and then did he talk to --
Q Okay.
A Did he talk to the -- your -- I don't think

he talked to your client. You were representing your client from the get-go, correct?
Q From -- yes. Yes.
A Okay. So you would -- your client wouldn't have called the loss -- and your -- was -- the loss was reported --
Q Not if he's listening to me, he wouldn't have called.
A Okay. The loss -- the loss was reported by mail, if I recall, right? Letter?
Q Yes.
A Okay.
Q So he had that initial letter as well.
A Yeah.
Q Okay.
A Okay.
Q So would you agree that there were unknown facts that were material at the time the denial letter was issued?
A Well, the unknown facts was we haven't talked to the operator. We weren't even sure the operator was actually the operator, right? You know, because the -- the named insured never contacted us.
Q Sure.
A Police report was pretty specific, okay?

Were there other facts? And I think he left that open but based on -- and they couldn't get ahold of the insured. They've been trying for -- for a bit of time there. They had already hired the -- the second -- the first two adjusting firms to try to contact the insured. Based on the information that he had, I don't think that his decision was unreasonable, okay? It -- I think it was fairly reasonable. Was it 100 percent accurate? I don't know, but it was fairly reasonable.

Q Yeah.

A And -- and I also like the fact, from a good faith claim handling perspective and industry standards, that he leaves it open and asks you for any new evidence, okay? If he hadn't done that, I would worry, okay? But he did that, and that is completely appropriate, and that's what the industry does.

Q Okay. So are you testifying that there weren't unknowns? There weren't unknown -- material unknown facts at this point?

A As far as he -- as far as he knew, no.

Q Okay.

A He was looking at --

Q Well, he knew that he couldn't find the driver, right?

A Right, but he's looking at a police report that's pretty specific.
Q Well, why did they keep trying to find the driver if that's not a material fact?
A Because you always try to find your driver to -- to confirm the facts as reported to you from somebody else, but --
Q But isn't it -- go ahead. Sorry.
A But in this instance, the report that they got kind of put the -- most of the blame, if not all of it in his mind, but most of the blame on the -- on the claimant operator, your client, per the police report.
Q Yeah. Why were they trying to find the driver, though, if that didn't have a bearing on liability and wasn't a material fact? They had everything they needed to deny the liability, apparently, so why were they even messing with the effort?
A We also want to make sure the accident actually occurred and that person was -- seriously, there's a -- there's a variety of different reasons, but you have to talk to your insured. That's, like, number one.
Q Okay. If that's number one, then why was

liability denied before they talked to the insured?
A They were having trouble getting ahold of the insured, and they were taking all the reasonable steps they needed to do at the time to get ahold of them.
Q Then what was the purpose of this letter? No, there were -- you testified there was no pressure.
A Because --
Q There was -- that you were aware of, right? I mean --
A Because the file had been open over 30 days then at that point, right? Maybe 60 days? Two -- no, more than that, 90.
Q No. We were looking at -- we're looking -- yeah, we're looking at four or five months.
A Okay. And it's just sitting there. You had made a -- you made a claim, okay? Based on the information they had, they didn't think they were going to honor the claim from a liability perspective, but they'd already sent out the reservation of rights. So there was -- there was also policy implications that they were trying to manage as well.
Q Okay. Why did he say he was going to close the file in 30 days?
A If he didn't hear from you. If you didn't

disagree, he was going to leave it open for a while and -- you know --

Q Okay.

A And if you -- if you disagreed, he was going to continue to do something else, whatever that was, okay? Maybe a redenial, or at least do some additional investigation because maybe you brought new information in, which I believe you had at that point. And -- and you also confirmed the injuries a little more as time went on.

Q Sure.

A So the exposure to the named insured was bigger than initially thought, I think, because of the -- the nature of the injuries. I don't think they had that right at the beginning. I don't think all of that was included in your initial letter. So he is just waiting to hear from you. To be honest with you, I really -- I think this letter is a really good example of how they were trying to be reasonable in terms of handling this loss.

Q I think a jury might view it a little differently in terms of the improperly parked, but we can agree to disagree. We both have our functions here, so I'm not -- we're not here to argue about that. Okay. Let's move on. I can keep us moving.

A Okay.
Q And I think you already mentioned this. The letter says, "Based on its investigation to date."
A Yep.
Q Indicating that the investigation was ongoing?
A Correct.
Q Okay. Is that typical for a claim to be denied and then just the investigation to continue kind of automatically? Because I mean, it seems like he was still investigating. He wasn't. I know he says he's -- he wants to hear more from me, but it sounds like he's still investigating before that.
A So there was -- this was an unusual claim in the fact that the named insured wasn't responsive regardless of a reservation of rights, okay?
Q Right.
A So -- so the -- the issue is the claim had been open for 90 days. Do you wait until, you know, you deny the -- I mean, seriously, I think they were trying to handle the claim on parallel tracks in terms of policy investigation, liability, and damages to ensure that everything was -- was done within a reasonable time frame, whatever that turned out to be, based on the fact that they couldn't get ahold of the

insured and all of that.

So I don't think it's -- you know, I have seen other claims by other carriers where a portion of the claim was denied, or at least a denial -- and a preliminary -- or a preliminary denial was sent out based on the information they had to date. I've seen that before.

Q Okay. Now, Mr. Kline says something in the letter that I just don't think the police report says. He says, "No fault was placed on the insured." Does the police report, the collision report, does it actually say that? Does it say that anywhere? Like those words, "no fault was placed on the insured"?

A I --

Q Or no fault was placed? It wouldn't say -- it wouldn't call him an insured. It would say no fault was placed on unit two. I believe it was unit two.

A So I don't recall seeing that. I don't think I -- I don't recall seeing that specific language.

Q Okay.

A I believe that if -- if you -- you could read that two ways. You can read that specifically the police report or you could say -- or you can read

it, this is what the police report said, and so I assume no fault on the insured. I think you can read it both ways.

Q If we're trying to give Vince a break, I think we could. We -- if we wanted to give him a break, we could read it that way.

A I think you have to give everybody a break.

Q That's -- yeah. Grace is a good thing to give. It's a good thing to give. I think you called -- you mentioned preliminary denial earlier. Does it say preliminary denial anywhere on this letter? I might just be missing it. I really don't --

A No, it doesn't.

Q Okay.

A But he did leave it open. So to me, it is a preliminary denial, because at the end of the day, he would send out -- typically, after the 30 days had passed, he would send out a formal denial letter again. That's what usually happens.

Q Okay.

A Usually. Usually, so ...

Q Is that a system NICO has? Is that part of their policies and practices that you saw or just kind of what you've seen in general?

A It's what I've seen generally in the past.

Q Okay. Is that typical -- this letter says, you know, he -- hey, I'm going to proceed to -- otherwise, yes. Otherwise, you know, call me if you have questions regarding this claim. Otherwise, I'll proceed to close my file in this matter in 30 days from the date of this letter. If it's a preliminary denial, is that language that's typically included in preliminary denials?
A Not necessarily.
Q Okay. Okay. I'm going to stop share here. Ms. Sullivan, when did NICO learn exactly the reason why the truck remained on the ramp area?
A NICO learned. I'd have to look. I don't know the exact date on that.
Q Okay.
A Are you -- are you asking me when did they learn the -- the vehicle was --
Q Maybe I'm more interested in the source. How did they learn --
A Well, it was in the --
Q -- and why it was parked on the ramp like that?
A I think the police report talks about why it was left, does it not?
Q Because they talked -- they had talked to

the driver because he was in the hotel and came out?
A Yeah.
Q Okay. Is there any kind of note in the file or any kind of indication from the adjuster how the improper parking was weighed against Walden's alleged inattention?
A This first adjuster?
Q Yes. This would be Vince, Vince Kline.
A Not that I recall.
Q So there's no indication that --
A I didn't -- I don't recall. I don't recall. There may very well have been, but I don't recall.
Q Okay.
A I just want to look at the -- the notes that I produced to you. I may have something in there. Hold on one second.
Q Sure. Yeah. No. And I know I've got some quiet periods over here, but I am crossing off some questions that I've already talked to you about, so I am still making progress, I promise.
A I didn't bring a change of clothes for two hours.
Q Yeah. Yeah.
A Totally kidding.
Q I'm not trying to keep you longer than I

have.
A So I -- I have a note that, you know, the denial letter went out on 2-26-21. It's on page 17 of the document number 6, but I don't know what that is. So I'm just saying that.
Q Okay.
A I don't know. There may very well be a note there. I don't -- I'm not trying to prolong your questions.
Q That's -- yeah. I understand.
A But you asked -- you asked me a question that I can't answer.
Q Okay. So moving along, which completed investigative steps, other than reviewing the police report, causes you to believe that the denial was reasonable?
A I believe -- well, I -- I think they were making a good faith attempt to contact the insured driver and the named insured to verify the facts, okay? However, the police report was very specific in terms of what the facts are. And looking at it for -- at its face for what it said, it would appear that the bulk, if not all of the liability, was based on the inattention of the driver, that the vehicle may have been improperly parked, but it doesn't say exactly

how. There were placards out there. It -- it wasn't pitch black. It was a fairly well-lit area, and the driver didn't even see the vehicle and hit it right in the rear.

Q If talking to the insured or the driver, right, the operator, has got to be priority number one, where does the collision report fall in the priorities?

A It's just another data point.

Q Okay.

A It's not -- that's all you have. I mean, you know, there are circumstances in some files where everybody's deceased, so the police report is what you have, okay?

Q Sure.

A So, you know, get -- trying to get facts from both parties -- now, obviously, we couldn't talk to your client, okay? You represented, so that's, like, a done deal, okay? But trying --

Q I invited written questions, and I would provide written answers, actually. So I was very cooperative with the process.

A Okay. Okay. That's -- that's fine. No worries. No worries. And I'm sure you are. You strike me as a very cooperative.

Q Well, thank you. I think that's a compliment.
A A lot of experience here. But in any case, you know, that -- I think that they were making a good faith attempt to get ahold of their operator to just confirm the facts. Would it have -- would they have decided he was liable? Probably not based on what they had, okay?
Q Yeah.
A But at the end of the day, it's -- you know, you -- you always talk to -- you always try to confirm your facts with the insured. You want to make sure, you know, that the insured actually knew that they weren't in a loss, you know? There is -- you're right, there's a lot of fraud out there sometimes. So you want to confirm that they were involved in the loss. The police -- the police report was pretty -- the police report was not favorable to the plaintiff. Let me put it to you that way. Okay.
Q Yeah. I think it kind of cut both ways, but my -- I'm not --
A I think it was more --
Q The police report's relevant, but I'm more concerned of why this decision was made prior to finding the driver and talking to them. I don't see

any -- you mentioned there's no pressure on that. Maybe the claim had been open a long time. I'm -- I just don't see how that was part of the reasonable investigation, reasonable claim handling. I can't see it but may -- but if there's something that I'm missing, please.
A I think they were trying to make a good faith attempt to talk to the insured operator to confirm the facts and support the denial that they were planning to make based on the police report, okay? But at the end of the day, after it was open 90 plus days and they couldn't seem to get a hold of the insured, the police report is more favorable to the driver of the -- of the truck than it is to the driver of the vehicle that hit the truck, okay? And so the denial, they had a reasonable -- it -- it was reasonable for them to deny the claim based on what they had at that time. You responded fairly quickly. You obviously didn't agree, and the file stayed open, and they continued to investigate it, which is exactly what they should have done.
Q Would you agree that NICO's inability to locate Howard made fact gathering much more difficult?
A It made it difficult. And the fact that they couldn't even get a hold of the named insured was

-- was problematic as well.
Q Yeah. I mean, the police report was still available though, obviously. We didn't need Howard for that.
A Yeah.
Q The officer's name was on the police report, right? I mean, we had access. We knew who drafted the collision report.
A Right.
Q Do you know if Vince Kline talked to the officer before denying liability?
A That I don't know off the top of my head.
Q Would that be a -- would that be part of a reasonable investigation in this situation? Maybe not in every case, but maybe in this situation?
A It may have been. Don't know. I'm not sure that he -- he or she could have gotten more -- Vince could have gotten more information from the -- it's a pretty -- pretty well-written police report compared to some --
Q Hard to tell if you don't talk to somebody what you could get from them, isn't it?
A Yeah. But it doesn't -- didn't -- didn't just say accident happened, you know? So it was pretty specific.

Q That's true.
A Pretty specific, so …
Q NICO had the pictures of the collision as well. When they request -- when they got the collision report, they should have had the pictures. They had those, didn't they?
A I think they did. I don't -- I think they received them later, though. Before they made the denial, but later then they --
Q Before the denial? Okay.
A But -- but before the --
Q But not at the same time?
A Right. They didn't come with your letter, right? So --
Q Yeah. Couldn't Vince Kline -- couldn't he have reached out to the officer for clarification on anything?
A I'm not sure he thought they needed clarification. We don't know.
Q Well, if a reasonable adjuster has taken the negative facts and taken the positive facts equally and considering them fairly, and you've got some facts that point to your insured being somewhat liable, no, I'm not saying 100 percent, isn't that a material question that goes to liability?

A It may have been. It depends on how he was looking at the placards and whether the vehicle was actually improperly parked, other than it was parked -- it shouldn't have been parked there at all because it was a breakdown lane. I mean, it's, you know, like the no parking signs, it's off the road, but you're not supposed to park there. It was parked there because it was disabled. So does that make an improperly parked vehicle or is it improperly parked because it's out in the road? Police report doesn't say that. It just says improperly parked.

Q Yeah. It's like there's a material question there, and it would've been helpful if Vince Kline could have reached out to him to find -- to -- as part of a reasonable investigation, right?

MR. BUNNELL: Object to the form.

THE WITNESS: But I -- but I guess the other -- I'm sorry, Kyle, I didn't hear. Okay. I guess that the question in my mind is, and this is what I was trying to get earlier, okay?

BY MR. MORRIN:

Q Okay.

A Is it improperly parked because you're not supposed to park on a highway, period, or is it improperly parked because it's not in a breakdown

lane? We don't know, okay? But we do know for sure, okay, because the police report says that, that the placards are out there, so you assume it's because it broke down or at least it's -- you know, and we also know -- we also know that your driver didn't even see the damn thing. Excuse me. Didn't see the vehicle, okay? I apologize. I'm getting a little -- a little excited.

Q No, you're okay.

A But just --

Q I respect it. I respect it.

A I've repeated it -- I've repeated it several times, but at the end of the day, your driver was inattentive and tired, okay, and hit the back of a parked vehicle. The vehicle wasn't even moving. If the vehicle was moving --

Q I think we've got that. I think --

A Okay.

Q -- but my question wasn't about what -- I didn't ask, is my driver inattentive, right? I mean, I asked is -- did -- why didn't the adjuster reach out and get clarification from the officer when we've got a collision report that's pointing in two different directions?

A I don't think it's pointing in two different

directions, and I don't think he thought that either.
Q Okay.
A I think that's the issue.
Q Okay.
A I think the accident reconstructionist showed us a different point of view.
Q Do you know if Vince Kline went out and took any measurements or inspected the location at all prior to the denial letter?
A No. No, I don't. And I -- I believe he was an inside adjuster.
Q Okay. You mentioned something that I completely agree with, that the reconstructionist was a reasonable decision because it shed light on the liability issues that we needed.
A Yep.
Q But I guess my question is: Wouldn't a responsible claims handler identify those issues early on in the case and even prior to denying liability in this matter with all these -- I mean, if we've got an avenue that can provide clarity, which they eventually did see, what prevented him from seeing that avenue before the complaint was filed?
A You're talking about the first adjuster as opposed to the second adjuster?

Q Yes.
A Okay. So the first adjuster, different role, okay? Didn't have a lot of information in terms of the extent of the injury. Just got a first notice of loss with a police report that looked like this guy hit my insured's parked vehicle, okay? Typically, a parked vehicle doesn't have a heck of a lot of negligence, okay, typically. So would it be, you know, based on that, should they have run around and done a million things? Probably not, okay? I think what they did was reasonable. And was it perfect? Probably not, but I don't think they had as much information at the beginning as they did. And they certainly weren't aware at the beginning about -- of -- of the significance of the injuries either. I know you provided some information up front about the injuries, but there was a lot of additional medical information that was received way beyond the first notice of loss.
Q Okay. Correct me if I'm wrong, but you're not really able to point to a specific fact or specific change that caused NICO to hire the reconstructionist. I think you said that earlier. I'm not trying to --
A I believe that's correct. I don't recall

seeing -- I know they hired it. I know they had a -- somebody had a discussion.

Q Sure.

A I just think it was a different point of view. People -- adjusters look at things differently, and I think it was just a -- a different point of view. And the person that was now handling that injury claim had more experience from an injury perspective, and it was a way for them to determine not just liability, but ultimate exposure.

Q Ms. Sullivan, do you know when NICO first obtained Howard's account of the events?

A I think it was after he spoke to Defense Counsel, so whatever time frame that was.

Q Okay. That was some years after the denial letter, wasn't it?

A Yes. My -- my --

Q I don't recall. Off the top of my head, I really -- I don't recall the specific date either. I suppose we could pull it up. Do you know when Mr. Crum, the accident reconstructionist, first conducted a site visit?

A I know he didn't send the -- send the report in until April, and I'm trying to think of what year that was. '23 or no, '22, but I think he looked at

the site earlier than that.
Q I think the report was -- well, no. Okay.
A The report came in on the 24th.
Q I think it was April of '24, didn't it?
A Before. Yeah.
Q April 1st?
A Yep. And he did a -- but he did a -- a site visit before that. I don't know the exact date.
Q Yeah. Sure.
A And I know that he went out subsequent to that too, based on a request he had from Defense Counsel. Like a lot --
Q I think a second site visit maybe that was more on -- at the same time.
A Then they wanted him to go out at the exact same time so he could really --
Q Yes.
A -- really affirm the lighting.
Q Right. Did you review the video he took?
A I don't think I had access to the video.
Q Okay. Because in the video --
A I don't recall having access.
Q Okay. And I think he prepared -- did he prepare a supplemental report after he did that second visit?

A I think the report -- the supplemental report had to do with the lighting. It was very brief, I believe.
Q Yeah.
A Or at least a letter. It was a letter anyways to the defense counsel, perhaps. I don't think it was a full report.
Q Okay.
A My recollection.
Q Okay. Was there any written or oral reports made by Mr. Crum that was received by NICO prior to his April 1, 2024, report?
A I'm not sure I can answer that. My recollection is there was something, but I don't recall if it was oral or written. I think. I mean, that's how I would've known that he went out earlier, unless it was written in the report, but I'm not sure of that either. I don't have the report right in front of me.
Q When did NICO first document in its claims file some insured negligence, some exposure?
A I'd have to look at the claim file notes.
Q Do you know what year?
A Well, it would've been have -- it would've had to have been after the second adjuster got the

loss. I'm not sure.
Q Okay.
A I'm not sure.
Q It's all right. Do you know when NICO revised or qualified the February 2021 no liability position?
A I'd have to look at the claim file notes again for the exact date.
Q Okay.
A I know that they were -- there was a lot of back and forth between the adjuster and your firm.
Q Okay.
A So you -- you knew the claim file wasn't closed, okay, so. Okay. Can I -- I'm looking at my report. Can I clarify something on page 5?
Q Yes, please.
A It says --
Q Yeah, page 5. Okay.
A -- on top.
Q Where we at?
A Second paragraph.
Q Okay.
A It says about four lines down, "On 2-16-23, NICO's accident reconstructionist reports back." So he did report back, "That the insured should not have

left the vehicle on the off ramp, but the photo showed that the triangles were out. The vehicle was pulled over as far as possible and that there was room for the plaintiff to go around the vehicle." So he did confirm that the improper parking had to do with he shouldn't have left it on the ramp, so probably no parking on the ramp so that there is that and he pulled it over as far. So my -- my point is I didn't know. I knew he had reported back, but I couldn't remember, so he --

Q Sure. That's okay.

A Okay. Okay.

Q Thank you for clarifying that.

A Didn't want to have to write a note in an errata sheet, so you're fine.

Q That's right.

A It's easier to find it right away.

Q That's right. Correct it on the record while we're here. We got to do it. Okay. I'm not sure in your -- where in your report this says this necessarily, but I've got that in your report, it acknowledges the claim -- NICO acknowledged the claim to Counsel on a November 4, 2020 letter -- or 2020 letter.

A That was right at the beginning, right?

Q Yeah, it should have been.
A Okay. Oh, and that's when they requested a recorded statement as well, which you said you could send me the --
Q Yeah. I said, send me something in writing. I'll get you any info you need. You know, I've offered to -- I've offered insurance companies to let me take the recorded statement of their insured in those situations. I said, sure, let's just trade. They never want to take me up on that. It's -- they just prefer it in writing when I get in that mood. Okay. So we've got the acknowledgement to -- NICO acknowledging the claim on November 4th. Now I sent them a letter in May of 2021 about my liability theory. Can you tell me what action NICO took in response to that?
A That was when you requested -- you requested the -- the deck page again, correct?
Q I believe so.
A So shortly thereafter, they sent another reservation of rights letter. They sent multiple reservation of rights letter.
Q Okay. Was that their second one then? They sent a second reservation of rights?
A I think that was -- I think that was their

second one. Might have been their third. I'm trying to think.

Q Okay.

A So was the first one in November -- I mean, December of 2020, or did they send one earlier? Hold on one second. So the first one was sent on December 16, 2020. Second one was sent on October '21. October 21, '21.

Q Okay. So that would've been after my liability theory. Are there any other actions they took after --

A Still trying to find --

Q -- May 2021?

A -- still trying to find the insured.

Q Okay. You're fine. Take your time.

A No, no. They're still just trying to find the insured. That's all.

Q Oh, you're -- they're trying to find the insured. That's what -- that's the action they took. They kept trying to find them.

A Yeah.

Q Okay. And NICO received Plaintiff's initial demand, that would've been January 13, 2023, right?

A Yep.

Q That's in the report. That's dated. And I

believe you noted the demand, it didn't even set a response deadline, right?
A Correct. And Defense Counsel did respond like three times requesting some additional information --
Q Yeah.
A -- to respond to your demand. And then they had --
Q The absence of -- go ahead.
A -- in that interim, they hired the accident reconstructionist, too.
Q After the demand was sent?
A Well, they hired -- they got a report back on 2-16-23, so I'm not sure the -- I don't -- I don't recall the exact time they -- they hired the accident reconstructionist. I'd have to go look at the claim file notes again.
Q Okay.
A But they got a report back. They -- not -- not a formal report, just a -- they reported back.
Q The preliminary report, and then he went to go draft it?
A Yep.
Q An absence of a deadline in the demand, what does that mean to the insurance industry, right? The

best standards, best practices, 50 years of experience. There's no timeline in this demand. What are you advising the adjuster who says, hey, how -- can I -- what can I do because there's no timeline?

A You -- you should respond to the demand. It doesn't mean you have to accept it. You respond.

Q Right.

A And at this point, you had already filed suit, so there's Defense Counsel involved. So we had Defense Counsel respond the first time within just, like, three weeks. February 2nd, responded again on the 21st, and then 3-8-23, requesting some additional information to respond to the demand. And so regardless of the -- a time limit demand, you want the --

Q Yeah.

A -- adjuster or Defense Counsel, whoever's handling it at that point. The defense counsel doesn't take over the adjusting, but they can certainly talk to you, okay?

Q Sure. Kind of take over the boots on the ground.

A Right. The time limit demand, as you know, in some states, missing a time limit demand exposes the policy limit up over above, right?

Q Right.
A So -- so if it's a time --
Q Opens the policy.
A -- demand, there's an added sensitivity to that. And in some states, unfortunately, some plaintiff's attorneys give people, like, hours. So there's a very heightened -- and that's, like, not good, right?
Q Right. Yeah.
A I mean, that's not reasonable at all.
Q That makes sense.
A I'm just throwing that in there for the heck of it.
Q Sure.
A Anyways, at that point, so --
Q Hey, I'm on your side on this one issue. Yeah, that's --
A Okay. Good to know.
Q -- that's cool. Yeah.
A When you get a -- when you get a demand, you want a response within a timely fashion, which is --
Q Sure.
A -- if it's a time limit demand, obviously within the -- the time limit demand, but at least within a week or two. And that's what they did here.

They had Defense Counsel.
Q And by response, it's not necessarily a negotiation counteroffer.
A No. It just said --
Q You're just saying you can reach out and ask a couple questions and the feet are moving and things are happening.
A Right. But you want them to know that you've gotten the demand, you understand that it's important, you're not ignoring it, and you -- you might need additional information to -- to fully negotiate -- or to fully evaluate the claim.
Q Okay. What kind of evaluation of the demand was documented in the file when it was received?
A I believe they were -- they -- it was documented. I'd have to look at the exact wording, but the fact that the defense counsel reached out and asked for some additional information, they needed more information. So that's -- that was the reaction of the demand.
Q That's the evaluate, yeah. Okay. And I think you already said this, they reached out, responded, and asked for more information on February 2nd, February 21st, and then March 8th as well?
A Right.

Q Okay. Do you have -- do you know what specific information they requested in those correspondences?

A I'd have to look at the letters. I think that you got letters at -- at each time from Defense Counsel, and they were probably pretty specific. And it would be -- and my recollection is was mostly about the medical, not the accident issue. They were still -- the -- the carrier's still working with the accident reconstructionist at that point.

Q And correct me if I'm wrong, but they're requesting information more about the medicals, but we still have an active complete liability denial, right? They've not reversed course on their denial.

A They -- they haven't told you that it's -- they haven't sent you a letter saying it's been reversed, but they're still -- they've hired an accident reconstructionist, which I believe you knew about, okay? So there's stuff still happening. So the -- the claim file's still open and being worked.

Q Okay. So they didn't send a renewal denial and they didn't change their position necessarily. They kept working the file --

A Yeah. Yeah.

Q With the denial still in place, right?

A Well, okay. So can I back up for a second?
Q Sure. Go ahead.
A So typically, I'm -- I'm not sure -- you know, I understand they didn't send out another letter saying the denial's been lifted or rescinded. But at the end of the day, if you're going to stick with your denial while you would get additional information on the medical, you would not -- if you're denying on liability, you're not going to pay the medical, okay? You're not going to -- the evaluation is going to be zero, okay? So --
Q Right.
A The fact that they're asking you for more information to evaluate the claim and they've hired -- I mean, I'm sure that it was very obvious at that point to you that the claim file was still being worked and adequately handled.
Q It was -- yeah. It was obvious that they were still asking for information. That's true. I agree. Do you know which dated NICO entry first assigned a monetary range for this claim after the demand?
A Wondering if that's in my report. Hold on. So they had a claims committee review on 2-22-24, okay, to determine the expected value of the bodily

injury liability claim. They took into account the disputed liability and the fact that there was negligence attributed to the insured operator for the position of the vehicle. So that's in the claim file. The evaluation was completed on that day, and they evaluated the -- the value to be 234,269. So that would've been on -- the exact date, I believe it was on the end of February. And then on three -- and then they attempted --

Q 2024?

A Three -- in 2024. Yeah.

Q Yeah.

A And then on -- on 3-26-24, they attempted to contact you to discuss settlement. And then they were still dealing with the liability. So Defense Counsel after that contacted the investigating officer. Insured driver finally contacted Defense Counsel. So at that point, okay, they -- you know, they evaluated the -- the claim in terms of the ultimate value, and then they offered you -- after all of this has gone on, they offered you $100,000 based on liability and the disputed liability. They're accepting some negligence, but they haven't -- the liability is still in dispute in terms of who is actually, you know, the percentages assigned. That has not been determined

yet. And then also the -- I think there was something around future medical treatment, and there was a question whether or not -- my recollection is there was a question whether or not the future medical treatment was attributed to this accident or -- or a previous issue or a subsequent issue. And so that was disputed as well.

Q Okay.

A And then there was a mediation shortly thereafter, several months thereafter, and the underlying tort matter was settled at mediation.

Q The $100,000 offer was made shortly after the committee established the valuation, right? The 234,000?

A Yeah. And I'm not sure the exact date because I know after the committee, they decided what the value was and authorized the amount. And then they tried to contact you. But in -- after -- before they actually spoke to you, I believe they then spoke to the police officer and the -- the insured operator. So there's a lot of stuff that was occurring at that time. I'd have to go back and look at the claim file to see when they actually -- what the actual date was that they offered you $100,000. And they based -- their 100,000 was the first offer, right, based on the

total evaluation, but they were talking about the disputed liability and the medical -- and the disputed future medical treatment.

Q So they did talk to the police officer, at least -- well, we had the deposition.

A Yeah.

Q Okay. Is there any indication in the file that the officer was contacted prior to asking for the deposition or scheduling that?

A I'm not sure when he was deposed. I can't remember off the top of my head. I'm sure I've got it written down. Oh, here it is. Wait a minute. He -- his name is -- what is his name?

Q Curry.

A Curry?

Q Yeah. Officer Curry. That's right.

A He was deposed on July 9 -- July 29, 2024. And he was -- he talked to Defense Counsel on April 20, 2024. So it's still 2024. It's a couple years, obviously, years after the accident, but --

Q Yeah.

A -- it's several months before the -- the deposition.

Q Any reason that they waited that long to talk to the police officer?

A March. Wait a minute. It's March 30th, '24.
Q Okay. That was the deposition?
A Yeah. No, no. March 30th --
Q No.
A -- '24 was Defense Counsel talked to him.
Q First contact with him. Okay.
A Well, Defense Counsel. I don't -- I don't recall seeing in the file that the adjuster ever spoke to the police officer.
Q Okay. So I mean, from a claims handling perspective, was there any reason that the officer wasn't contacted prior to 2024?
A You know, I can't say why they didn't contact. I -- I do have to say, however, that typically that was a very -- that is a more robust police report than you see on most accidents. So there would not be an indication that you would have to contact the police officer. Typically, when you contact the police officer and you're an adjuster, they're going to just refer you to the report. So would they -- would he -- would it have been any different? I don't know, okay? If you know you're going to be deposed and you have a defense counsel trying to -- you know, an attorney trying to track you

down, you probably would probably be more open to talking to them.

Q Yeah. Okay.

A Just my experience.

Q It seems like they learned a lot of information, though, that was relevant to the adjustment of the claim by talking to the officer. Was there any indication in the file that he couldn't be reached earlier?

A I don't think they attempted to. I didn't see -- if they did it, it was not -- it -- I don't recall seeing it.

Q Okay. Comparative fault can permit a provisional percentage or range to be assigned by an adjuster, can't it?

A Could you repeat that? I'm sorry. You said comparative?

Q Sure. Comparative fault, yes, can permit a provisional percentage or range to be assigned by the adjuster.

A Okay. And what do you mean by provisional? How are you using that word?

Q Well, to say -- well, there's apparent comparative fault, right, in the beginning before an investigation necessary? So based on that, would an

adjuster provide that percentage? And I say provisional because it's not -- we still have the investigation to go, right? I mean, same thing -- same reason you called that first denial letter a preliminary denial.

A Reasonable. Yeah. Yeah.

Q We still got stuff moving forward. And so when there's comparative fault or indicia of comparative fault, it can allow an adjuster to affix a certain percentage?

A Yes, it can.

Q Is that accurate? Okay. And a medical causation dispute can affect value without necessarily answering the accident liability question, right?

A Medical, it's -- okay. I'm sorry. The --

Q I'll say it again. That's okay.

A I'm so sorry.

Q A medical causation. That's okay.

A Yeah.

Q A medical causation dispute can affect claim value without necessarily answering the accident liability fault question?

A Correct. So both -- both questions of causation and liability percentages, comparative fault, can affect the overall evaluation of a claim.

Q Okay.
A So typically what a -- what a carrier does is it'll -- most carriers, everybody is a little different, but most carriers from an industry perspective will do a gross tort value, okay, and then apply, you know, the issues around causation and then apply the issues around negligence. So assuming -- let's say you said the claim is worth $10,000 and there's 30 percent negligence, you're going to deduct 30 percent off of 10,000 and offer, you know, $7,000.
Q Sure.
A That would be the value, okay?
Q Okay.
A That's how that all works.
Q Okay. Thank you.
A And it's usually -- and it's -- you know, there's a -- there's a range for general damages. There's also a range for liability, particularly in a pure comparative state because it's -- it's so -- yeah, it's -- it's interesting. Yeah.
Q Yeah. Your report, I believe on page 5, I think we already covered this, but I'm going to say it again. It's a little redundant. Page 5 in your report says, "The committee on February 22, 2024, recognized some of their insured negligence,"

recognized some exposure.
A "To make sure the insured -- position of the vehicle." Yep.
Q Okay. What exact expected value -- no, we already covered that. Never mind. Okay. In that committee setting, I believe there were -- were there five or six committee members?
A I don't -- I don't recall the exact number.
Q Regardless of five or six, that's not really relevant. But is it -- in NICO's operating system, is it like a democratic vote? Who makes the ultimate decision when you have that committee?
A I don't know how NICO actually operates their committee. Typically, a claims committee is the group of people that are -- have enough authority to authorize a payment on a file, and the adjuster will be there to kind of guide them through the investigation that was done. And you know, it's usually not, you know, one -- it's -- you know, at -- at Allstate, we didn't have a claims committee, but depending on the value of the case, I would get together a group of people just to kick around a few things to make sure we had considered all the -- all of the facts.
And, you know, if somebody asked me was it a

claim committee, I don't know if I would've said yes or no, but in any way, it's -- it's a group of people that get together to ensure that every -- all the things that they need to think about, depending on the value of the case, okay, are -- are there and they come to an agreement.

Q It's more of a group think activity, kind of --

A Like a --

Q -- bouncing ideas off of each other?

A Kind of a -- kind of a consensus thing, typically.

Q Sure. Okay.

A Okay. And I don't know what NICO's is. So NICO could have a formal structure with, you know, bylaws and all that jazz. That I don't know.

Q Okay. So the claims committee, correct me if I'm wrong, they would've had, maybe not -- they would've had Crum's kind of informal communication? He had the -- your report describes a February 16, 2023 --

A Yep.

Q -- Crum communication talking about points favorable and unfavorable to NICO. But they wouldn't have had his actual report when they --

A No, because the report didn't come out --
Q -- fixed that --
A The -- the full report didn't come out until April, right?
Q Yeah. So they fixed that valuation, that reserve at 234,269 prior to getting that formal report, didn't they?
A It wasn't the reserve. That -- that's the value -- that's the value of the case, not the reserve.
Q Okay. That's -- can you explain the difference between those two for me?
A Yeah. Reserve is not an evaluation of the injury. Reserve is -- is a solvency issue.
Q Okay.
A So the minute you open a claim file, you got to put a reserve out there because the -- if the state were ever to come in and do a market conduct review, they want to make sure you've set aside -- allegedly set aside money to pay claims so that you're solvent.
Q Okay.
A So an adjuster's responsibility is to ensure that they understand what the potential worst-case scenario is, and they put money out there. And they adjust it from time to time.

Q Okay. Is the reserve set typically low or is it set high, on the high end? And why?
A Commercial is usually done higher because you have higher levels of exposure for commercial. But generally speaking, it's supposed to be what you think the ultimate value of the claim could be once you finish the investigation. And you're required to open it, like, immediately, but at the beginning, you have no idea. So, you know, people will open claims, you know, reserves of like $1,000 and then within, like, a few days, end up upping it, depending on what they've learned, so ...
Q Okay. So usually set by what's apparent and what is expected the proof to be; is that fair?
A Correct. Correct. And you adjust it all along and -- from a claim --
Q Sure.
A -- handling perspective. But it's not the evaluation of the claim because it could be higher than --
Q Right.
A -- the actual --
Q That's different than the reserve. The valuation takes in --
A Yeah. Yeah.

Q -- a lot more information detailed to the specific claim versus --
A Exactly. Exactly.
Q -- probabilities and likelihoods, right?
A Right.
Q Okay. So when the claim committee did that, they didn't have Crum's final report. They didn't have Howard's account of the accident because that wouldn't have been obtained, I think, until April 20th of 2024. And they didn't have Dr. Chris's May 10th IME report; is that accurate?
A I believe so, yes.
Q Okay. And then the -- NICO's first offer was 100,000 and it occurred on April 20, 2024, right?
A Yes.
Q Okay. Are there any contemporaneous entries in the NICO claims file explaining the amount and timing of the offer?
A I'd have to look at that. I'm sure there's some notation as to the -- how they arrived at that value. But I don't recall what it is off the top of my head.
Q Okay. And of course, an opening offer or even a second or third offer after a valuation comes down from a committee like that, it doesn't

necessarily need to be the actual valuation. That wouldn't even make any sense, right?

A Correct. It could be. I mean, it depends on the adjuster and the -- yeah.

Q Can be, but doesn't have to be?

A Doesn't have to be, correct.

Q Right? Okay. What kind of decisions or what kind of factors go into a play for a responsible claim handler in determining what kind of offer to make once the valuation is set?

A Lots of different factors. Okay. It depends on -- well, first of all, it depends on their negotiation style. A lot of adjusters like to negotiate in the higher range. Others use the whole range. Okay. Also depends on the relationship and/or perception they have of plaintiff's counsel in terms of whether the demand is going to be outrageous and the -- and they're expecting you to come in with a low offer, so you actually end up at a reasonable claim --

Q So it actually coming in with that really high offer scares you down to the low -- yeah, sure.

A Yeah. You don't have to -- the guy that decides that it's -- the offer is going to be $10 million when the case is worth, you know, like $100,000, that sort of thing.

Q Sure.
A I mean, you're not going to offer your full amount because you -- you expect that back and forth. So that goes into play as well.
Q Okay.
A Those -- all those factors. And -- and you also consider how many things are still up in the air, you know, how -- disputed liability, disputed injury, that sort of thing.
Q Any material questions still outlying?
A Yep. Yep.
Q Okay.
A Oh, excuse me. I'm sorry.
Q You're okay. I promise we are almost done. We're almost to my last page of questions and I'm at the bottom of the second to last, so we're close.
A How -- how much time per page we are?
Q It depends on the page. I'm not going to be able to average that for you.
A I need to take a bio break, and I need to get some more water. So could you just give me five minutes? Okay. Thank you.
Q Yep. I'm good with that. Five minutes, please. I'm almost done, Kyle.
THE REPORTER: Okay. We're going off

the record.

(Off the record.)

THE REPORTER: Okay. We're back on the record.

BY MR. MORRIN:

Q Okay. Ms. Sullivan, we just talked about the first offer submitted by NICO and also how the adjuster was well within their right to make an offer that wasn't the actual valuation. Do you know what explanation NICO actually conveyed with the $100,000 offer?

A I'd have to -- the exact thing they said, I don't know. Okay. But my notes indicate that when they contacted your office and -- and made the offer, that they discussed the liability issues that they -- you know, the comparative negligence issue, and also the disputed future medical treatment.

Q Was any expiration or deadline submitted along with their offer of 100,000 that you're aware of?

A Not that I'm aware of.

Q Okay. Did Counsel or the adjuster -- based on NICO's claim file, did their counsel or the adjuster suggest that if the offer wasn't accepted, no other offer would be made?

A Not that I'm aware of.
Q Okay.
A Or not to the best of my recollection.
MR. MORRIN: Chloe, I don't think I marked that last exhibit I had shared before I stopped sharing it.
THE REPORTER: The letter?
MR. MORRIN: Yeah, the denial letter. Did I get that as three?
THE REPORTER: You didn't, but I wrote it down and I was going to ask you at the end.
MR. MORRIN: Thank you. Let's go ahead and mark that as three.
(Exhibit 3 was marked for identification.)
THE REPORTER: Okay.
MR. MORRIN: Thank you.
BY MR. MORRIN:
Q At the time the denial letter was sent, which reasons in your report were conveyed to counsel? Like, which -- at the time of --
A The time of denial? I don't think counsel was involved in the denial.
Q We didn't have appointed counsel?
A In terms of -- in terms of the liability?

Q Uh-huh. Right.
A That initial denial? They -- they wouldn't have had -- I don't believe they had counsel involved because the file had not been -- the file was not in suit.
Q Okay. And frankly, I think we've already covered this, so I'm not sure I need to ask this question because you've already indicated that it was almost entirely the collision report and how it was written and the way that the liability was split up that way, right? Was that the basis of the denial letter?
A Well, there was negligence on both sides, but they would -- let me rephrase that. The denial letter was based on the fact that they didn't think there was any negligence on the insured because of the parked car and the inattentive of the driver.
Q Okay. Everything else that your report relies on was developed after the denial letter, wasn't it?
A Well, the denial letter happened really early, so everything else --
Q Correct.
A -- what I reviewed in the claim file in terms of both the -- the trying to get ahold of the

insured, the accident reconstructionist, et cetera, and the medical was after. That's correct.

Q Right. Okay. Why is it important for claim files to be handled and recorded in terms of material investigative results and liability decisions? Why is that important to record those milestones?

A Well, you need to know what happened in -- in terms of the handling of the claim, right? You also have -- you know, many times adjusters move positions and so somebody else picks up the file, so they need to have a record of what occurred as well. The insurance company needs a record of how claims are being handled just in terms of an oversight responsibility sort of thing.

Q Okay.

A And for --

Q Are there any NICO -- oh, go ahead.

A And for regulatory purposes too, you know, occasionally there's a market conduct exam, and so they don't go and interview adjusters. They just look at claim files.

Q Oh, okay.

A You know, so there is that --

Q What kind of audit is that called? Is that an audit? Is that called something else?

A When an insurance department comes in to do a review?
Q Yeah.
A No, it's just called a market conduct exam, and they're just done periodically and sporadically.
Q Okay. And those are internal? They're not hiring somebody else to come in and do it?
A They're not done internal. There's -- it's -- it's insurance regulators come in and do the review.
Q Oh, I misunderstood. Okay. I see --
A Talking about the market -- so it's -- when you have a regular -- when -- because, you know, some states have specific requirements for regulators to do market conduct exams within a certain time frame, some states.
Q Okay.
A When that happens, they come in and pull claim files. It's like you need to have -- it's not like they're going to go interview people that handled the claim. So they --
Q Right. They're not looking for an oral summary. They want to see exactly what was done?
A Exactly.
Q Okay. Are there any NICO entry documents --

entries that document transmitting the January 2023 demand to Enterprise?
A I think I wrote about that; did I not?
Q I'm not sure where you wrote it is the problem.
A Hang on one second.
Q I think you did. I think it's in your report.
A Okay. It's -- that was a -- that was part of -- that's on page 10 of the report. It was part of a --
Q Thank you.
A -- a rebuttal to Mr. Fisher's report.
Q Okay.
A Okay. And it -- and he does say there's no documentation that NICO ever communicated the January 2023 policy limits.
Q I see it. Yep.
A Okay. And so yes, they -- there was no documentation in the claim file that they advised the insured of the demand. The case was -- was settled at mediation for significantly less than the policy limits.
Q Okay. So nothing in the file showing that it was transmitted to the insured?

A Correct. That's correct.
Q Anything in the file documenting transmission to the driver, Howard?
A The -- no.
Q Okay.
A But the demand. They communicated reservation of rights letters plenty of times.
Q Yeah. They sent the reservation of rights letter --
A And nobody responded to, but not -- not for the demand.
Q Okay. Was there anything outside of the claim file that could have -- that implied that the insured or the driver received notice of the demand?
A I don't know. I don't know.
Q Any correspondence? Any -- I mean, anything that's not a claim entry, a claim file entry?
A I didn't see a letter there. Unless it -- there could very well have been. I think they got notice that the file was in suit from Counsel. I don't know if they ever picked that up, but the demand, I -- I didn't see anything in the claim file.
Q Okay. And of course, you don't have firsthand knowledge of any NICO employees' subjective motive in any of this, right?

A I'm sorry, what -- what motive?
Q You don't have firsthand knowledge of any NICO employee's subjective motive or how they're adjusting and why they did certain things that's outside of the claim file?
A No. No.
Q Are there any written or unwritten standards on which you relied for this report and for this piece of work that you were retained to do, are there any unidentified written or unwritten sources that you relied on?
A No.
Q Is there any additional record or document that would cause you to revise your opinion if you found it?
A Obviously, if it's something I don't have that, you know, is material to -- to what I wrote, it -- it may alter my opinion, but as of right now, no.
Q Okay. None that you know of, at least right now, correct?
A Everything -- yeah. Everything that I've read right now -- everything I've reviewed and read right now, I'm comfortable with based on the report I wrote.
Q Okay. Are you agreeable to supplement your

report if there is a material fact or basis that changes?

A Sure. Yes. And I think --

Q Have you worked with NICO --

A And I think I -- and I think I wrote that down in my report, right, my last paragraph?

Q Well, I'm just going to confirm and make sure, of course.

A Okay. Okay.

Q What other NICO or Dinsmore expert assignments have you had?

A Okay. I think we produced that. I think I've had -- in the time frame that you asked as far as the production --

Q Yes.

A I think was --

Q Right.

A I think I had one other NICO claim file.

Q Okay.

A And I had, I think, two Dinsmore.

Q Two others with Dinsmore. Okay.

A Yeah.

Q And that would've been Boyd, Coates, and Smith?

A Correct.

Q Okay. What total fees and hours --
A Oh, can you hold the -- my vet is calling. Can you just hold on a second?
Q Yes. Yes, I can. Not a problem. Yep.
THE REPORTER: Okay. We're going off the record.
(Off the record.)
THE REPORTER: Okay. We're back on the record.
BY MR. MORRIN:
Q All right, Ms. Sullivan, I've got literally one more question for you.
A Oh, geez. If I had known, I would've asked them to call me back.
Q Yeah, it's okay.
A Not like I did -- okay.
Q Just one more question. Yeah. I need you to estimate your total fees and hours you've billed in this matter.
A Okay.
Q And what were your rates? I think you already disclosed your rates in your --
A I did. And I, you know, and --
Q -- production.
A I haven't billed them because it's so busy

with a lot of crazy, mostly school stuff that I'm teaching. Excluding today, okay, I have 76 hours total, and that's about 26 -- I think it's like 26,000 and change or something like that. I didn't multiply it, but --

Q Okay.

A Okay. So that does not include today?

Q I think that's all I have. Yeah. I think that's all.

A I recorded -- I think Kyle and I talked yesterday real briefly, but that's about it. Okay.

Q Okay.

A And maybe it wasn't yesterday. I don't know. I can't remember. Okay. Okay.

MR. MORRIN: Kyle, have your witness.

MR. BUNNELL: Yeah. I don't have any questions. Yeah.

MR. MORRIN: All right. Well, thank you so much.

THE WITNESS: No questions, Kyle? Well, can I ask one question? Am I going to get a copy to review? Okay.

MR. MORRIN: Yes.

THE WITNESS: Just because I have to errata sheet. Okay.

THE REPORTER: So we want to read and sign?

MR. BUNNELL: That sounds like what Ms. Sullivan would like, so I'm fine with that, too. Read and sign is fine.

THE REPORTER: Okay. Sounds good. And did we end with -- I have three exhibits.

MR. MORRIN: That's all I used, yes.

THE REPORTER: Okay. And then would either one of y'all like a copy of the transcript?

MR. BUNNELL: Yes, please.

MR. MORRIN: Please.

MR. BUNNELL: Hey, Chloe, we were talking about this yesterday. We've got some dispositive and Daubert motions that are due on October 31. So I don't know if this -- we could get this in the next couple weeks to not cram up our deadline.

THE REPORTER: Yeah. The turnaround is about ten business days, so you should have --

MR. BUNNELL: Perfect.

MR. MORRIN: Should be good.

THE WITNESS: Perfect.

MR. BUNNELL: Okay. That sounds great.

THE REPORTER: We're going off the

record.

(Signature reserved.)

(Whereupon, at 3:18 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, CHLOE FRY, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CHLOE FRY
Notary Public in and for the
State of Kentucky

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 8, 2026

To: KYLE R. BUNNELL, ESQUIRE

Case Name: Charles L. Walden v. National Indemnity Group Of Insurance Companies Et Al

Veritext Reference Number: 8441847

Witness: Christine Sullivan Deposition Date: 9/29/2026

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8441847
CASE NAME: Charles L. Walden v. National Indemnity Group Of Insurance Companies Et Al
DATE OF DEPOSITION: 9/29/2026
WITNESS' NAME: Christine Sullivan

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ ________________________
Date Christine Sullivan

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 8441847
CASE NAME: Charles L. Walden v. National Indemnity Group Of Insurance Companies Et Al
DATE OF DEPOSITION: 9/29/2026
WITNESS' NAME: Christine Sullivan

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date Christine Sullivan

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 8441847

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

_______________ ________________________

Date Christine Sullivan

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**&**

**&** 2:13

**1**

**1** 3:7 25:3,4 57:17 60:14 120:24 170:12
**1,000** 7:22 191:10
**1,200** 7:22
**10** 6:6 71:22 193:23 200:10
**10,000** 187:8,10
**100** 2:14 58:2 71:22 134:4 136:19 149:8 163:24
**100,000** 181:21 182:12,24,25 192:14 193:25 195:10,19
**10:34** 1:14
**10th** 192:10
**11** 6:6
**1100** 209:1
**13** 174:23
**16** 127:7 174:7 189:20
**17** 158:3
**1820** 209:2
**19** 128:8
**196** 3:9
**19th** 126:7,8 127:11,13 139:9
**1st** 169:6

**2**

**2** 3:8 36:13 57:18,21 62:24 67:12,13 120:25 127:5
**2-16-23** 171:23 175:14
**2-22-24** 180:24
**2-26** 146:2
**2-26-21** 158:3
**20** 11:14,15 99:25 119:5 183:19 192:14 210:16 211:22 212:22
**20,000** 10:11,12
**2011** 5:23 15:22,23
**2020** 53:3,7 124:21 125:1 127:7 172:23 172:23 174:5,7
**2021** 126:24 128:9 145:19 171:5 173:14 174:13
**2023** 174:23 189:21 200:1 200:17
**2024** 170:12 181:10,11 183:17,19,19 184:13 187:24 192:10,14
**2026** 1:13 209:4
**20th** 192:9
**21** 174:7,8,8
**214** 2:5
**216-523-1313** 209:3
**21st** 176:12 178:24
**22** 168:25 187:24
**23** 168:25
**234,000** 182:14
**234,269** 181:6 190:6
**24** 169:4 184:2 184:6
**24th** 169:3
**25** 3:7 33:22 74:15
**26** 145:19 205:3
**26,000** 205:3
**26th** 144:15
**29** 1:13 183:17
**2nd** 176:11 178:24

**3**

**3** 3:9 53:6 124:21 125:1,3 127:5 196:14
**3-26-24** 181:13
**3-8-23** 176:12
**30** 11:14 29:12 90:21 113:24 115:2 119:5 151:11,24 155:17 156:5 187:9,10
**30th** 184:1,4
**31** 206:16
**35** 6:25 74:15
**358-0300** 2:8
**36** 6:24
**36183** 208:18
**3:18** 207:3
**3rd** 53:2

**4**

**4** 62:18,18,23 127:5 172:23
**40475** 1:17 2:6
**40507** 2:16
**425-1045** 2:18
**44114** 209:2
**4th** 125:5 173:13

**5**

**5** 3:3 171:15,18 187:21,23
**50** 8:17 26:8 50:17 72:6 86:1 136:19 176:1

**50/50** 87:2
**55** 74:16
**5:22cv00238...** 1:7

**6**

**6** 158:4
**60** 151:12
**67** 3:8

**7**

**7** 37:7
**7,000** 187:10
**70s** 16:3
**75** 33:23
**76** 205:2

**8**

**8** 209:4
**80s** 13:3
**8441847** 1:19 209:8 210:2 211:2 212:2
**859** 2:8,18
**88** 6:5
**8th** 178:24

**9**

**9** 183:17
**9/29/2026** 209:9 210:3 211:3
**90** 6:5 90:21 151:13 153:19 161:11
**900** 2:15
**95** 74:16
**99** 88:21
**9th** 126:20

**a**

**a.m.** 1:14
**abandoned** 63:15
**abide** 21:6
**abiding** 97:3,4
**ability** 73:2 208:10
**able** 39:3 50:1 167:21 194:19
**above** 38:17 68:22 69:5 70:5 71:13 81:8 176:25 209:17
**absence** 109:3 175:9,24
**absent** 4:5
**absolute** 108:13
**absolutely** 18:8 23:15 45:7 49:4 64:16 67:10 76:22
**academic** 116:2
**accept** 176:6
**accepted** 31:1 195:24
**accepting** 181:22
**access** 15:9 101:16 162:7 169:20,22
**accident** 33:25 38:23 41:19 42:7,9,15,25 44:6,9 45:8 46:10,13 49:22 51:3,23 52:8 56:16,22 59:3 70:18 71:11,14 72:21 77:20 78:11,17,24 79:3,6,10,11,15 79:16,23 80:6 80:9 81:17 82:13,24,25 85:2,5,8,21 86:8,10,16 89:1,2 90:23 91:15 100:12 100:15 101:1 101:11 102:7 102:11,17 103:13,16 104:1,25 106:12,14 108:14,20 109:1,15 110:5 113:22 114:19 115:11,18,21 115:25 116:8,8 116:18,19 117:2 132:6 134:5 143:15 150:20 162:24 166:5 168:21 171:24 175:10 175:15 179:8 179:10,18 182:5 183:20 186:14,21 192:8 198:1
**accidents** 42:24 55:6 110:3 184:17
**accordance** 11:5 210:5 211:5
**account** 17:24 112:8 124:12 168:12 181:1 192:8
**accounts** 99:17
**accurate** 24:15 24:23 25:11 27:25 28:4,5 30:7 51:18 56:7 72:10 82:1 86:22 92:15 95:20 98:12 107:23 107:24 118:24 145:21 146:2 149:9 186:12 192:11 208:9

**accurately** 22:10 27:19
**acknowledge** 210:11 211:16
**acknowledged** 172:22
**acknowledge...** 173:12
**acknowledges** 172:22
**acknowledging** 173:13
**acquire** 52:3
**act** 11:6 12:18 12:18 16:21 17:4 20:1 22:5 35:4 37:3 82:2 82:15 93:4 210:14 211:20
**acted** 88:10 118:18
**acting** 100:22
**action** 1:6 173:15 174:19 208:12,16
**actions** 55:1 56:21 123:3,4 174:10
**active** 69:16 179:13
**activity** 83:13 83:19 84:3 106:17 189:7
**actual** 17:3,4 20:21 79:19 128:11 144:25 146:13 182:23 189:25 191:22 193:1 195:9
**actually** 10:11 17:3 18:24 21:23 26:16 28:17 36:7 38:9 44:14 47:1,22 49:15 78:18 88:19 100:11 101:25 103:14 110:19 111:19 119:2 131:17 133:3 140:3,18 141:1 142:1 143:25 148:22 150:21 154:12 159:21 160:13 164:3 181:24 182:19 182:23 188:13 193:19,20 195:10
**added** 74:12 177:4
**addition** 106:18 146:24
**additional** 42:20 49:6,8 62:10 64:22 66:24,25 67:8 67:9,9 85:13 88:23 103:11 120:5 123:25 152:7 167:17 175:4 176:12 178:11,18 180:7 202:13
**additionally** 4:5
**address** 107:7 209:16
**addressed** 144:1,9
**adequate** 135:2 135:7
**adequately** 180:17
**adjunct** 26:7
**adjust** 82:8 190:25 191:15
**adjusted** 25:15
**adjuster** 7:11 7:12 9:6 10:5 14:12,16 22:22 23:12 26:25 28:16,20 29:1 29:13,17,23 33:8,9 34:5,6 35:12,16,19 39:7 40:9,12 40:13,14,15,25 41:4,7 45:24 46:18 48:21 52:2,16 56:11 56:18 57:23 60:21,25 61:2 61:4,6,7 63:6,8 64:2,3,4 65:4 66:2 67:25 69:18,19 70:11 70:22 78:6 80:5 81:20 83:21 84:15 85:19 101:23 105:5,11,13,19 106:10,20 108:1,2,7,9,12 108:18 110:11 110:23,24 117:13 120:6 120:10 121:13 124:10 125:5,8 126:5 133:25 134:8 138:4,5 138:11,15 139:8 143:19 143:23,24 144:3,6,7 145:4 147:8 157:4,7 163:20 165:21 166:11 166:24,25 167:2 170:25 171:11 176:3 176:17 184:9 184:20 185:15 185:20 186:1,9 188:16 193:4

195:8,22,24
**adjuster's** 28:24 54:24 126:19 137:14 190:22
**adjusters** 7:19 10:11,12 11:8 12:20 15:6,11 16:7 18:2,6 21:20,22 22:7 22:11 23:11 26:20 27:3,11 34:3 50:2 51:20 55:4,5 63:21 97:8 99:6 110:25 113:13 114:21 168:5 193:13 198:9,20
**adjusting** 9:24 17:13 26:22 36:1 38:6,8 39:4 83:18 149:5 176:19 202:4
**adjustment** 82:1 84:21 85:6 185:7
**administrative** 93:5
**admit** 63:18
**admitted** 130:23 133:11
**admitting** 134:16 135:2
**adopted** 41:11 92:5
**advice** 40:16
**advise** 71:1 78:9 80:5 82:9
**advised** 82:12 102:1 200:20
**advising** 69:21 176:3
**affect** 33:17 186:13,20,25
**affirm** 169:18
**affirmative** 52:2 147:7
**affix** 186:9
**affixed** 210:15 211:21
**affordable** 79:23
**ago** 101:8 107:15 119:5
**agree** 4:3,7 26:25 28:11 35:18 71:24 72:8 76:19 84:7 85:12 87:1 95:11 96:20 106:23 109:7,14 147:7 148:17 152:23 161:19,22 166:13 180:20
**agreeable** 202:25
**agreed** 87:3 129:14 137:21
**agreeing** 30:3
**agreement** 189:6
**ahead** 5:15 20:9 25:3 29:5 46:7,8 51:24 52:12 57:13 69:25 101:2 115:8,8 127:16 127:17 134:14 135:20 150:8 175:9 180:2 196:12 198:17
**ahold** 131:18 137:24 149:2 151:2,4 153:25 160:5 197:25
**aic** 26:13 113:21 115:16
**aids** 23:8 95:8
**aim** 26:2
**air** 194:7
**airpod** 93:9
**al** 209:7 210:3 211:3
**align** 119:2
**alleged** 9:15 10:14 78:16,20 79:3 157:5
**allegedly** 133:11 190:19
**allow** 65:6 186:9
**allowed** 61:6,7 94:17 120:10 137:5 138:10
**allowing** 65:18
**allows** 65:19 82:7
**allstate** 6:21,23 7:1,25 9:4 11:3 11:11,14 12:23 14:4 15:20,23 16:14 19:2 21:11 22:22 35:5,6 55:3,13 78:1 93:22 94:10,17 114:22 188:20
**allstate's** 15:9
**alter** 202:18
**amiss** 136:15
**amount** 26:11 125:25 182:17 192:17 194:3
**analyst** 10:16
**analysts** 10:9
**analyze** 112:7
**angst** 76:15
**answer** 17:3 98:11 103:25 110:9 124:18 136:5 138:11

158:12 170:13
**answered** 133:20
**answering** 186:14,21
**answers** 159:21
**anybody** 42:3 63:6 73:17 84:17 102:16
**anymore** 101:17 119:6
**anytime** 10:14 75:11
**anyway** 29:6
**anyways** 170:6 177:15
**apart** 91:25
**apologize** 75:3 107:16 165:7
**apology** 75:5
**apparent** 185:23 191:13
**apparently** 150:18
**appear** 24:25 49:22 59:17,17 144:15 146:9 158:22 210:11 211:15
**appended** 211:11,18
**applicable** 4:11 22:13
**applied** 12:15 41:20
**apply** 21:14 187:6,7
**appoint** 56:17
**appointed** 196:24
**appointing** 14:22
**appreciate** 75:5 144:13
**approaches** 63:12
**appropriate** 19:16 22:2 27:17 28:4,9 29:18 32:20 42:16,16,17 44:5 46:6 49:4 52:21 56:5,7 67:10 85:20 90:10 91:22 96:1 104:24 109:19 110:2 149:17
**appropriately** 20:20
**approved** 11:25
**approximately** 7:22
**april** 168:24 169:4,6 170:12 183:18 190:4
192:9,14
**area** 7:23 73:5 109:8 121:24 123:7 136:22 156:12 159:2
**areas** 9:9
**argue** 65:13 152:24
**argumentative** 74:24
**arrived** 192:20
**article** 59:19
**aside** 56:25 102:23 190:19 190:20
**asked** 6:11 10:19,24 20:21 52:19 90:9 93:13,13 103:22 123:22 128:20 158:11 158:11 165:21 178:18,23 188:25 203:13 204:13
**asking** 34:25 61:1,2,3 70:22 78:9 88:2 97:6 106:9,25 112:5 116:12 124:8 124:17 156:16 180:13,19 183:8
**asks** 149:14
**aspects** 27:16
**assess** 103:13
**assets** 27:12,14 28:2 81:2 129:25
**assign** 56:10 96:21,23 105:21 128:5
**assigned** 14:24 15:1 23:23 28:13 45:23 139:8 180:21 181:25 185:14 185:19
**assignment** 125:8 126:7 128:11,23 129:3 139:9 210:2 211:2 212:2
**assignments** 203:11
**assist** 41:2
**assistance** 23:2
**assisting** 78:4
**associate** 32:8
**association** 32:3
**assume** 61:7,25 66:16 121:25 130:8 155:2 165:3

**assuming** 86:13 187:7
**assumption** 58:1 61:18,19 137:5
**attached** 211:7
**attempt** 30:17 38:1 68:5 70:16 112:16 127:9 158:18 160:5 161:8
**attempted** 139:14 181:9 181:13 185:10
**attempts** 112:23 140:8 140:10,17
**attendance** 4:18
**attention** 59:2 121:23
**attentive** 58:21 137:1
**attorney** 184:25 208:14
**attorneys** 177:6
**attributed** 181:3 182:5
**audio** 208:8
**audit** 198:24,25
**authority** 12:23 40:14,15 188:15
**authorize** 188:16 211:11
**authorized** 128:2 182:17
**authors** 32:16
**auto** 7:14 8:8 13:5,16 42:24 55:24 69:9 109:11,11 110:3
**automatically** 16:4 117:19 153:10
**available** 18:5 18:6 20:22,24 35:5,14,19 39:1 52:2 79:5 162:3
**ave** 209:1
**avenue** 166:21 166:22
**average** 194:19
**avoid** 86:20
**aware** 10:17 16:9 21:7 29:13 30:16 32:3,22 34:14 40:21 120:1,1 120:3 143:10 151:9 167:14 195:19,21 196:1

**b**

**b** 3:5
**back** 6:18 8:4 35:9 39:14,15 47:1,10 54:1,7 55:18 57:8 68:18 73:3 78:7,8 96:24 105:16 106:4 112:13 117:13 119:18 121:7 122:12,17 126:6 135:8,11 139:2,5 142:13 143:22 165:14 171:11,24,25 172:9 175:13 175:19,20 180:1 182:22 194:3 195:3 204:8,14 209:16 45:18 48:22 49:1 51:23 52:19 58:4 59:9,17,18 61:23 64:17,19 67:6 68:24 69:23 71:11 73:15 76:2,7 78:16,21 80:8 86:5 87:16 89:16 90:20 103:8 108:17 119:12 120:17 123:20,20 124:7 127:18 135:5 137:13 137:23,23 138:3 149:2,6 151:17 153:3 153:25 154:6 158:23 160:7 161:10,17 167:9 169:11 181:21 182:24 182:25 185:25 195:22 197:15 202:23
**bad** 9:9,13,15 9:18 10:13,14 12:9,17 14:12 70:24 115:1,2
**ballpark** 140:11
**based** 27:8 28:9 31:5 32:23 33:15 37:15,21 38:13,14 41:6 44:13,13 45:11
**basic** 13:6 125:17,19
**basically** 26:8 57:6 146:19,25
**basis** 59:14 99:19 197:11 203:1

**bear** 120:12 125:22
**bearing** 95:22 95:24 98:10 112:18 115:23 150:15
**bears** 97:15
**beginning** 43:12 44:12 45:5,18,22 46:1 47:3 48:6 55:9 96:3,15 152:15 167:13 167:14 172:25 185:24 191:8
**behalf** 2:2,10 19:12
**beholder** 28:6
**beings** 98:7
**belief** 134:12
**believe** 26:21 35:21,25 36:22 40:24,25 46:21 47:4 59:14 102:17 103:8 104:23 105:14 106:3 107:11 108:19 110:2 113:22 121:7 125:4 128:8 131:24 132:15 133:22 134:7 139:20 140:20 141:15 142:4 143:4,24 144:6 145:17 146:14 147:4 152:8 154:17,23 158:15,17 166:10 167:25 170:3 173:19 175:1 178:15 179:18 181:7 182:19 187:21 188:6 192:12 197:3
**believed** 52:20 64:4 92:8 104:20 133:25 134:9
**believes** 28:21
**bell** 25:24
**benefit** 80:17
**best** 14:20 20:5 20:7,13,13,14 23:7,7,7 32:4,6 33:16 40:10 50:13 87:14 90:19 95:2,3 114:13 116:4 116:16 120:14 176:1,1 196:3 208:9
**bet** 39:24
**better** 94:5
**beyond** 68:23 69:6 70:5 71:13 167:18
**bifocals** 128:18
**big** 24:3 45:2 56:1 97:24
**bigger** 152:13
**billed** 204:18 204:25
**bio** 194:20
**bit** 6:1,2,18 7:13 8:20 34:11 47:13,18 48:9 67:19 73:4 100:8 106:7 110:14 119:19 122:8 130:12 132:8 149:3
**black** 159:2
**blame** 128:18 150:10,11
**blocking** 103:5
**blue** 33:18
**blur** 39:25
**board** 55:14
**bodily** 13:4 180:25
**body** 62:21 92:22
**book** 12:24 13:21
**books** 18:11
**boots** 176:21
**boston** 75:6
**bothered** 71:7
**bottom** 194:16
**bouncing** 189:10
**box** 140:9
**boyd** 203:23
**brand** 100:7 138:8
**break** 47:13 53:19,21,25 96:12 138:21 155:4,6,7 194:20
**breakdown** 164:5,25
**breaks** 132:18
**brief** 7:5,8 170:3
**briefly** 67:17 119:20 205:11
**bright** 115:5,19
**bring** 121:6 157:21
**broke** 61:19,20 165:4
**brought** 57:3 152:7
**bulk** 158:23
**bunnell** 2:12 4:21,21 102:13 104:15 113:18 164:16 205:16 206:3,11,13,21 206:24 209:5

**business** 8:18 68:11 70:2 206:20
**busy** 21:1 204:25
**bylaws** 189:16

**c**

**c** 2:1 4:1
**ca** 209:25
**call** 18:9 47:5 76:17 96:11 99:1 154:16 156:3 204:14
**called** 5:3 12:24 12:25 76:17 141:23 148:5,8 155:9 186:4 198:24,25 199:4
**calling** 110:12 130:7 138:12 204:2
**calls** 28:12
**canada** 8:8,11 8:18
**car** 33:18,22 45:20 46:20 48:2,3,4,18,19 52:10,18 57:25 61:14,19 63:15 65:9 66:6 87:7 87:11,11 121:3 122:17 132:20 136:11 137:10 197:17
**car's** 52:8
**care** 81:7
**carried** 128:16
**carrier** 29:23 31:3 33:7 56:16,19 66:1 72:21 73:22 83:16 187:2
**carrier's** 179:9
**carriers** 31:14 31:16 41:6 62:8 78:1 95:8 109:19 154:3 187:3,4
**cars** 48:11,13
**case** 24:4 50:24 63:23 65:13 85:15,19 91:5 91:16 102:10 131:10 137:15 141:15 160:3 162:15 166:19 188:21 189:5 190:9,23 193:24 200:21 209:6 210:3 211:3
**cases** 28:6 36:23 85:8
**cast** 48:16
**casualty** 26:3
**category** 56:12
**causation** 186:13,18,20 186:24 187:6
**cause** 39:25 123:16 134:5 202:14
**caused** 45:15 100:10,11,14 100:16 101:2 101:20,25 102:10 120:6 135:20 167:22
**causes** 158:15
**certain** 9:25 11:19 58:7,8 86:19 121:9,9 186:10 199:15 202:4
**certainly** 35:24 167:14 176:20
**certificate** 208:1 211:11
**certification** 8:25 94:24 210:1 211:1
**certified** 4:8
**certify** 208:3
**cetera** 32:12,12 32:13 42:7,7 44:15 46:2,2 57:20 198:1
**chain** 99:2
**challenge** 122:8
**change** 28:25 29:25 31:5 59:22 69:11 98:17 130:20 157:21 167:22 179:22 205:4 209:14,15 211:8 212:3
**changed** 14:17 76:9 81:12
**changes** 33:12 98:3 99:4 203:2 209:13 210:7 211:7,9
**changing** 33:11
**charge** 9:12 14:22 114:21
**charles** 1:4 2:2 5:11 60:14,17 209:6 210:3 211:3
**chartered** 26:3 26:3
**check** 83:20,22 83:23
**chicago** 26:5
**chief** 8:14
**chloe** 1:18 25:2 67:11 135:8 196:4 206:13 208:2,19
**chose** 16:16

**chris's** 192:10
**christine** 1:12 4:23 5:2,17 209:9 210:4,9 211:4,13 212:20
**chronological** 119:4 126:17
**circumstance** 79:12
**circumstances** 69:8 159:12
**civil** 1:6 210:5 211:5
**claim** 7:15,17 7:20,21 8:5,6 8:10,15 10:11 10:15 11:1,6 11:11,16,20,24 12:15,17 13:5 13:9,11,15 14:3,12,12 15:7,8,24 16:12,21 17:15 18:2,3,22 19:5 19:7,13,15,18 19:20,21,22,25 20:1,5,10,12,16 20:19 21:15,19 21:21 22:4 23:20 25:14 26:23 27:18 28:12 31:13,21 32:9,20 33:2 34:18,19,23 35:3 36:1,8,9 36:10 37:3,12 40:14,15,16,22 41:15 43:6,11 45:12 47:1,8 53:1 55:15,21 57:3 59:7 62:12,13 64:24 65:3,7 66:22 68:16 69:15 70:25 73:25 74:18 82:14 83:3,5,8 84:2 84:12 87:8,15 88:4 89:18 92:6,11 93:4 94:2,8 95:18 96:18,25 97:2 97:9 98:6,25 99:21 100:9 101:13,15 102:19 103:10 103:14 104:8 107:1 108:16 114:22 118:1,8 118:13,21 119:3,11,12 120:17 123:11 123:16 125:11 126:16,16 127:8 133:16 133:20,24 134:10 137:25 138:1 139:10 139:16 144:14 144:21 145:2 145:23 146:11 146:13 149:13 151:17,19 153:8,14,18,21 154:4 156:4 161:2,4,17 168:8 170:22 171:7,13 172:22,22 173:13 175:16 178:12 179:20 180:14,16,21 181:1,4,19 182:22 185:7 186:20,25 187:8 189:1 190:16 191:6 191:16,19 192:2,6 193:9 193:19 195:23 197:24 198:3,8 198:21 199:19 199:21 200:20 201:13,17,17 201:22 202:5 203:18
**claimant** 52:17 150:12
**claims** 8:3,14 9:3,10,12,14,18 10:4,8,9,13 13:22 14:24 15:10,12,12,13 17:13 23:4,22 23:23 25:10 26:13,21 29:3 29:6,20 30:4 30:23 32:9 33:16 36:4,7 36:19 37:10,19 45:25 55:20 73:1 75:20 82:2,8,14,16,17 83:3 84:22 92:1,4 93:8 96:21 97:4 99:24 109:9,11 112:3,24 117:11,13 118:5,17,18 119:24,25 120:5,8 133:4 143:19 145:20 146:15 154:3 166:18 170:20 180:24 184:11 188:14,20 189:17 190:20 191:9 192:17 198:12
**clarification** 75:14 77:17 163:16,19 165:22

**clarified** 23:18
**clarify** 27:21 70:6 75:11 113:11 171:15
**clarifying** 172:13
**clarity** 78:17,25 116:14 166:21
**clear** 50:12 65:10 75:8 78:25 103:25
**clearly** 65:1 68:20
**cleveland** 209:2
**client** 146:20 148:1,2,4 150:12 159:18
**close** 151:23 156:5 194:16
**closed** 171:14
**clothes** 157:21
**cloudy** 79:8
**coast** 75:1
**coates** 203:23
**codes** 93:5
**collision** 3:8 46:9,10,22 47:20,23 49:12 50:3,19,22,24 51:13 52:1,3 53:2,6 54:16 54:18,23,24 57:5,16 62:18 62:24 65:4,19 67:4 119:19 120:3 136:1 141:4 146:17 147:20 154:11 159:7 162:8 163:3,5 165:23 197:9
**combination** 139:20
**come** 9:10 18:16 28:24 30:24 34:6,7 45:14 51:19 53:25 69:17 90:5 99:16,17 117:19 132:14 163:13 189:6 190:1,3,18 193:18 199:7,9 199:18
**comes** 10:5 62:15 75:3 95:10 116:24 192:24 199:1
**comfortable** 118:13 202:23
**coming** 24:9 45:4 65:23 68:17 70:7 81:2 85:3,23 87:19,25 110:15,17 143:19 193:20
**comment** 81:16 101:10
**commercial** 8:12 38:24 55:6,7,10,11,24 56:1,16,19 68:7 69:9 73:1 76:16 78:2 191:3,4
**commission** 210:19 211:25 212:25
**committee** 180:24 182:13 182:16 187:24 188:6,7,12,14 188:14,20 189:1,17 192:6 192:25
**communicated** 200:16 201:6
**communication** 189:19,23
**comp** 7:12
**companies** 1:8 2:11 16:18,23 18:20 21:13 30:21,21 31:8 40:18 68:9 94:11 114:19 116:16 173:7 209:7 210:3 211:3
**company** 1:9 2:11 6:21 11:3 16:2,15 17:23 18:13,17 19:4 23:8 31:23 34:22 55:15 56:10 77:4,10 95:2 99:1 125:23 145:20 198:12
**comparative** 11:22 42:19 63:17 65:20 85:17 87:19 112:17,19 113:1 123:17 185:13,17,18 185:24 186:8,9 186:24 187:19 195:16
**compared** 21:9 36:1 162:19
**compartment** 14:7
**compilation** 31:20
**complained** 131:6
**complaint** 166:23
**complete** 30:13 31:8 126:20 179:13

**completed** 67:1 158:13 181:5 209:16
**completely** 46:6 103:5 149:16 166:13
**compliance** 8:14 18:14
**compliant** 43:4
**complied** 11:1 11:17 12:1 19:15,25 22:3 41:23 42:5
**compliment** 160:2
**comply** 6:12
**complying** 41:13 118:14
**component** 14:13 78:13
**comported** 92:8,9
**compromise** 74:17 86:4 87:16 88:20,21 104:24
**concede** 63:18 131:2 134:23
**concentration** 26:5
**concerned** 71:3 71:5 83:1 160:24
**concluded** 207:4
**conclusion** 28:7 58:3 61:25 62:6 81:3
**conclusions** 144:14
**condition** 76:3
**conditions** 41:19
**conduct** 8:19 10:22 36:1 93:3,24 118:3 190:18 198:19 199:4,15
**conducted** 60:21 120:2 168:21
**cones** 71:16,19 72:1,1
**confident** 73:1
**confines** 8:17
**confirm** 41:16 105:18,24 130:2 150:6 160:6,11,16 161:9 172:5 203:7
**confirmed** 86:10 103:1 130:3 140:24 140:25,25 152:9
**confirming** 41:24
**confirms** 118:23
**conformed** 11:4
**confused** 126:11
**consensus** 189:11
**consider** 49:6 62:11 76:6 77:20 80:6 114:5,17,18 115:25 116:7,8 117:2 123:25 194:7
**consideration** 29:24 132:25 147:6
**considered** 80:24 95:2,3 147:5 188:23
**considering** 85:16 163:22
**consistent** 20:2
**constitute** 4:15
**construction** 45:9
**consultant** 5:18 5:19 6:18 69:15
**contact** 49:3 51:19 112:16 112:23,23,25 125:14 126:25 127:4,9,24 139:14,19 141:17 147:18 147:19 149:5 158:18 181:14 182:18 184:7 184:15,19,20
**contacted** 141:15 148:23 181:16,17 183:8 184:13 195:14
**contains** 25:9
**contemporan...** 192:16
**content** 115:17
**context** 76:9
**continue** 81:14 133:15 152:5 153:9
**continued** 45:13 49:8 52:25 64:24 70:1 161:20
**continuing** 135:21
**contract** 126:2
**contractual** 129:24
**contributed** 26:14,16

**conversation** 114:21
**conveyed** 195:10 196:20
**convinced** 102:19
**cool** 177:19
**cooperate** 142:18
**cooperating** 73:21
**cooperation** 41:22 46:5 69:24 73:23 76:3,7
**cooperative** 159:22,25
**copy** 24:15,23 37:3 144:25 145:23 205:22 206:10
**correct** 6:16 9:7 13:12 19:8 19:9 24:22 25:12,16,19,22 26:15 33:5,21 34:22 35:21 36:3,11 37:22 45:7 51:22 56:8 59:6 60:4 72:4 82:3 84:19 86:18 92:16 95:17 97:17,22 113:8 125:3,6,19 127:21 128:25 136:4 142:21 142:22 143:17 147:17 148:2 153:7 167:20 167:25 172:18 173:18 175:3 179:11 186:23 189:17 191:15 191:15 193:3,6 197:23 198:2 201:1,1 202:20 203:25
**corrections** 209:13 211:17
**correctly** 11:10 23:22 25:13 32:2 106:1 140:19
**corresponden...** 119:10 127:2 145:1 201:16
**corresponden...** 179:3
**cost** 27:20 80:17,24
**council** 94:16
**counsel** 6:15 141:15 142:2,5 168:14 169:12 170:6 172:23 175:3 176:9,10 176:17,18 178:1,17 179:6 181:15,17 183:18 184:6,8 184:24 193:16 195:22,23 196:20,22,24 197:3 201:20 208:10,13
**counteroffer** 178:3
**county** 210:10 211:15
**couple** 36:23 42:24 47:7 48:13 60:8 69:19 70:21 81:22 85:3 99:15 107:5 108:12,21 110:11 111:6 178:6 183:19 206:17
**course** 19:1 20:3 98:6 179:14 192:23 201:23 203:8
**court** 1:1 74:7 210:7
**courts** 42:1
**cover** 32:9
**coverage** 41:17 41:24 42:2,3,5 43:3 69:23 74:6 76:2,7 92:7
**covered** 187:22 188:5 197:7
**cpcu** 26:2
**cram** 206:17
**crash** 80:11
**crazy** 205:1
**creates** 109:7
**crossing** 157:18
**crum** 168:21 170:11 189:23
**crum's** 189:19 192:7
**curious** 12:5
**currently** 27:15
**curriculum** 94:20
**curry** 183:14 183:15,16
**customer** 129:23
**cut** 93:10 115:8 160:20
**cv** 94:21

**d**

**d** 3:1 4:1
**damage** 7:14 13:5,16
**damages** 32:12 43:4 78:16 79:3 87:7 88:16 89:5 92:7 153:22

187:17
**damn** 165:6
**dangerous** 58:18
**data** 116:23 125:25 159:9
**database** 15:10
**date** 1:13 47:2 48:24 105:24 119:14,14,14 126:9,12 128:10,11,12 128:12 129:14 139:13 146:2,3 147:16 153:3 154:6 156:6,14 168:19 169:8 171:8 181:7 182:15,23 209:9 210:3,9 210:19 211:3 211:13,25 212:20,25
**dated** 145:19 174:25 180:20
**dates** 105:18 146:5
**daubert** 206:15
**day** 23:2,3,13 23:13 41:25 42:17 48:25 86:13 87:12 99:16,18,18 103:10 109:25 131:5 137:23 155:16 160:10 161:11 165:13 180:6 181:5 210:16 211:22 212:22
**days** 90:21,22 113:25 117:17 151:11,12,24 153:19 155:17 156:5 161:12 191:11 206:20 209:19
**deadline** 100:10 175:2 175:24 195:18 206:18
**deal** 87:2 159:19
**dealing** 98:6 113:14 146:5 181:15
**dear** 209:10
**deceased** 159:13
**december** 126:20 127:7 174:5,6
**decide** 40:6 65:14 77:5 112:3 120:11
**decided** 39:8 76:2 81:13,14 88:17 102:3 146:7 160:7 182:16
**decides** 193:23
**deciding** 101:22
**decision** 27:2,8 27:18 28:8,9 28:10,22,23,24 29:6,9,10,18,19 29:21,25 30:24 30:25 31:4 33:4,11,12 35:17,18 45:8 45:19,22 46:24 47:19 50:4,20 51:6,11,21 52:24 64:16,19 66:20 73:10 74:8,13 80:15 81:13 88:1 89:3 90:7 96:2 98:21 102:1 103:9,20 104:24 108:15 108:16 123:12 123:14,18 137:14 138:3 138:15 145:5 146:8,14 149:7 160:24 166:14 188:12
**decisions** 11:9 25:18 29:20 100:3 193:7 198:5
**deck** 173:18
**dedicated** 15:18
**deduct** 187:9
**deed** 210:14 211:20
**deemed** 209:20
**deeper** 45:10
**defend** 89:20 116:23
**defendant** 1:10 2:10
**defense** 5:25 6:6 42:3 85:14 87:1 141:15 168:13 169:11 170:6 175:3 176:9,10,17,18 178:1,17 179:5 181:15,17 183:18 184:6,8 184:24
**definitely** 63:17 64:17 72:8 89:6
**delays** 109:22
**delivered** 68:18
**delivering** 68:15
**demand** 174:23 175:1,7,12,24 176:2,5,13,14 176:23,24

177:4,20,23,24 178:9,13,20 180:22 193:17 200:2,21 201:6 201:11,14,22
**democratic** 188:11
**deniable** 136:6
**denial** 3:9 42:2 45:16,17 46:4 48:25 49:1 52:18,21 65:7 67:3,5 120:12 123:23 124:3,4 124:9,9,14,16 124:16 126:15 126:23,24 127:11,17 128:12,12 134:14 135:21 136:6 145:17 145:18,23 146:11 148:18 154:4,5 155:10 155:11,16,18 156:7 158:3,15 161:9,16 163:9 163:10 166:9 168:15 179:13 179:14,21,25 180:7 186:4,5 196:8,19,22,23 197:2,11,14,19 197:21
**denial's** 180:5
**denials** 156:8
**denied** 44:10 46:11 54:23 60:2 70:9 73:15 134:9,9 138:1 151:1 153:9 154:4
**deny** 42:4 59:9 62:12 63:25 69:23 70:8 74:6 76:7 133:16,20 138:1 145:5 146:7 150:17 153:20 161:17
**denying** 46:5 62:13 124:2,11 133:5 162:11 166:19 180:8
**department** 8:2 8:5 10:2,17 44:14 64:13 133:12 145:20 199:1 209:22
**depend** 91:13 91:13 98:13
**dependent** 79:2
**depending** 33:25 40:12,13 56:3 117:21 188:21 189:4 191:11
**depends** 35:18 52:7,13 89:24 98:23 116:22 164:1 193:3,12 193:12,15 194:18
**depiction** 86:22
**deposed** 183:10 183:17 184:24
**deposition** 1:12 4:13 5:14 6:7 74:11 75:20 86:17 103:18 103:19 142:5 183:5,9,23 184:3 208:1 209:9,12 210:1 210:3 211:1,3
**depositions** 104:18
**describes** 189:20
**description** 3:6
**designation** 26:2,4
**designations** 26:2
**desk** 23:13
**despite** 67:4 75:19 76:14 134:12 146:22 147:8
**detail** 143:1
**detailed** 192:1
**determination** 113:1 119:23 146:18
**determine** 19:14 20:19 28:7 31:4 41:11 52:4 64:9 79:16 98:11 100:21 100:25 104:6 168:9 180:25
**determined** 108:19 112:19 181:25
**determining** 103:12 112:17 193:9
**developed** 197:19
**development** 7:17 33:4
**diary** 40:2 100:10,18,20 101:5,6,15 105:17 110:20 145:2
**difference** 56:1 88:16,18 135:4 190:12
**different** 9:9 11:19 14:18 18:20 21:20 23:3,15 29:12

30:9 32:16,16 37:2 38:3,5 45:24 56:3 62:4 68:8 71:13 77:24 95:10 98:16 99:21 104:19 110:5,6 138:6 150:22 165:23 165:25 166:6 167:2 168:4,6 184:23 187:4 191:23 193:11
**differently** 55:16 152:22 168:5
**difficult** 161:23 161:24
**digital** 208:8
**dinsmore** 2:13 203:10,20,21
**dinsmore.com** 2:17
**directed** 9:25
**direction** 9:24 10:19
**directions** 165:24 166:1
**directly** 23:11 47:8
**director** 8:5 9:11
**disabled** 65:9,9 66:2,3,17
120:24,24 134:18 164:8
**disagree** 53:3,9 152:1,23
**disagreed** 152:4
**disagreement** 86:14
**disappear** 77:11 78:3
**disclosed** 204:22
**disclosure** 26:14
**discovery** 5:13
**discuss** 181:14
**discussed** 118:19 195:15
**discussion** 108:18 134:16 135:3 136:9 168:2
**discussions** 10:18
**disfavoring** 27:2
**dispositive** 206:15
**dispute** 84:6 181:24 186:13 186:20
**disputed** 40:21 74:15 181:2,22 182:7 183:2,2
194:8,8 195:17
**disregarded** 63:25
**disseminate** 55:20
**district** 1:1,1 7:15
**dive** 45:10
**division** 1:2 55:7,10
**doctor** 131:6
**document** 14:6 18:4 29:5,8,20 37:18 147:18 158:4 170:20 200:1 202:13
**documentation** 29:10,16 35:5 36:8 45:12 200:16,20
**documented** 28:13 31:22,23 31:24 178:14 178:16
**documenting** 18:21 201:2
**documents** 6:11 16:16 20:11 35:1,11 36:14,15,18,20 91:18 146:16 146:18 147:20 199:25
**dog** 96:6 129:14
**doing** 5:22 49:7 80:24 83:4 89:19 93:17 104:13,19 107:2 108:4 114:12,13 121:15 129:20
**dollar** 11:24
**door** 66:23 67:7
**doors** 140:2
**dr** 192:10
**draft** 175:22
**drafted** 24:14 25:21 162:7
**dream** 141:11
**dreamt** 141:10
**drinking** 138:18
**driver** 37:24 38:2,24 39:7 40:8 41:22 45:7 56:21 57:24 58:1,11 59:14,21 61:17 62:1 64:10 66:15 67:24 68:6,8 69:7,10 69:17 70:10,10 70:12,20,20 71:4,10,12 73:16,22,24

74:3,10,11 75:15,22 76:8 76:20,23,23 77:2,8,21 78:7 78:10,13,23 80:4,13 81:6 81:20 84:14 85:4,18 86:20 87:18 102:4,12 102:24 103:2 103:17,18 104:4,17 105:4 105:4,10,19 106:11,16,19 106:19,24 107:3 108:1,4 111:7,9 112:1 112:16,22,22 113:14 117:1 121:23 123:4 127:20 128:2,3 128:24 129:17 130:13,19 131:11,18,21 131:24 134:2 136:2 137:4 140:19,21,21 147:11,19 149:25 150:4,5 150:15 157:1 158:19,24 159:3,5 160:25 161:14,14 165:5,13,20
181:17 197:17 201:3,14
**drivers** 78:2
**driving** 44:21 48:5 131:22
**due** 146:23 206:15
**duly** 5:3 208:5
**duty** 52:2 82:6

**e**

**e** 2:1,1 3:1,5 4:1 4:1
**earlier** 5:10 54:22 56:4 67:19 81:11 155:10 164:20 167:23 169:1 170:16 174:5 185:9
**early** 53:2 79:16 81:12 166:18 197:22
**easier** 172:17
**east** 75:1
**eastern** 1:1
**easy** 146:5
**edge** 57:21
**edited** 26:15
**education** 5:21 8:1,2 20:18 25:23,25 26:8 109:6
**effort** 98:10 150:19
**efforts** 127:1,20 127:22 140:11
**either** 11:24 40:10 78:13 85:14 86:9 89:4 90:24 166:1 167:15 168:19 170:18 206:10
**electronic** 18:9 95:9 117:18 119:12
**elevator** 34:9
**email** 209:17
**employed** 208:11,14
**employee** 208:13
**employee's** 202:3
**employees** 38:4 201:24
**enclosed** 209:12
**ended** 49:7
**engage** 106:17
**england** 7:18
**ensure** 27:12 30:13 81:1 104:23 153:23 189:3 190:22
**ensuring** 8:15
**entered** 211:9
**enterprise** 127:1 200:2
**entire** 10:24 27:7 86:20 103:5 119:11 122:7 210:5 211:5
**entirely** 197:9
**entitled** 72:21
**entity** 31:7 32:3
**entries** 118:4 118:16 192:16 200:1
**entry** 110:20 117:11,14 118:21,23 144:15 180:20 199:25 201:17 201:17
**environmental** 62:25
**eons** 31:22
**equally** 163:21
**errata** 172:15 205:25 209:14 209:19 211:7 211:10,18 212:1
**es** 208:4
**escalate** 40:6,8 99:14 101:21

**escalated** 99:15
**escalation** 40:3 40:4 99:1
**especially** 101:22 109:11
**esquire** 2:3,12 209:5
**establish** 142:24
**established** 92:4 182:13
**estimate** 6:3 204:18
**et** 32:12,12,13 42:7,7 44:15 46:2,2 57:20 198:1 209:7 210:3 211:3
**evaluate** 19:18 43:5 89:18 178:12,21 180:14
**evaluated** 108:16 181:6 181:18
**evaluating** 87:15
**evaluation** 28:4 33:5,24 35:25 43:9,14 56:5,7 89:23 118:3 178:13 180:10 181:5 183:1 186:25 190:13 191:19
**evaluations** 144:13
**events** 168:12
**eventually** 42:9 65:17 103:17 166:21
**everybody** 27:4 87:12 155:7 187:3
**everybody's** 159:13
**evidence** 42:14 92:3 147:5 149:15
**evidentiary** 4:12
**exact** 39:10 64:11 72:11 105:18 130:17 140:12 145:2 156:14 169:8 169:15 171:8 175:15 178:16 181:7 182:15 188:4,8 195:12
**exactly** 12:12 28:18 45:2 54:25 66:9,13 70:18 89:8 120:16 122:5 156:11 158:25 161:20 192:3,3 199:23,24
**exam** 93:24 94:23 198:19 199:4
**examination** 3:2 5:8
**examined** 5:5
**example** 11:21 12:9 13:4 14:11 32:7 35:8 40:7 51:4 56:12,15 90:19 152:19
**exams** 8:19 93:3 94:23,24 199:15
**except** 147:20
**excited** 165:8
**excluding** 205:2
**excuse** 46:25 69:4 113:10 165:6 194:13
**executed** 211:10
**execution** 210:14 211:19
**exhaustion** 134:6
**exhibit** 3:7,8,9 25:3,4 67:12 67:13 196:5,14
**exhibits** 206:7
**exist** 50:6
**existence** 31:22
**existent** 30:22
**exists** 60:18
**expect** 27:7,9 28:22 29:7,8,9 29:14,18,22,23 30:1,2,12 31:3 33:8,11 40:16 42:6 64:18 99:7 110:23 111:4 117:16 130:13 194:3
**expected** 180:25 188:4 191:14
**expecting** 129:18 193:18
**expended** 68:22
**expense** 79:9
**expensive** 109:22
**experience** 8:24 14:20 20:18 21:11,13,22 22:8,12,20,23 23:1,3,16 25:20 26:9 33:13 37:16 38:13,14 40:13 41:1,6,9 50:17 52:20 56:11 61:7 67:21 69:13 70:23

Case: 5:22-cv-00238-KKC-EBA Doc #: 234-2 Filed: 11/19/26 Page: 230 of 275 - Page ID#: 3609



78:8 85:25 86:1 88:2 93:21 99:7,24 109:4,5 160:3 168:8 176:2 185:4
**experienced** 18:6 22:19 97:9,9 99:22 100:2 101:24
**experiencing** 133:18
**expert** 5:21 21:12 58:25 59:5 72:25 85:24 93:17 101:25 128:20 203:10
**experts** 113:23
**expiration** 195:18 210:19 211:25 212:25
**explain** 190:11
**explained** 107:21
**explaining** 114:11 192:17
**explanation** 195:10
**exposes** 176:24
**exposure** 152:12 168:10 170:21 188:1 191:4
**expressed** 86:22 103:23
**extent** 11:16 12:17 27:5 28:20 45:21 46:1 97:19 167:4
**extra** 78:12 116:23
**eye** 28:5

**f**

**face** 158:22
**fact** 28:11 30:18,24 31:1 31:2,4,5 41:20 42:11 44:8,23 45:6 51:18 58:10,20 59:19 63:23 67:7 68:13,18,24 71:13 73:8,15 76:4,17 82:8 98:3 100:14 102:23 104:21 111:7,10 120:5 120:10 132:2 132:25 133:3 146:22 149:12 150:4,16 153:15,25 161:23,24 167:21 178:17 180:13 181:2
197:15 203:1
**factor** 63:1
**factors** 43:13 58:5 59:5 60:16 62:5 80:19 193:8,11 194:6
**facts** 27:1,3,5,8 27:25 28:4,9 28:24 29:2 30:15,18,24 41:18 42:10,12 42:20 44:5,8 45:18 46:2 47:25 49:16 51:2,23 52:7 52:13 63:22 70:17 74:12 79:2,7 85:13 86:5 87:16 88:14,14,15 89:17 90:20 91:14,16 97:10 97:13 98:21 103:1,2 108:17 113:4 129:22 132:8 148:18 148:20 149:1 149:20 150:6 158:19,21 159:16 160:6 160:12 161:9 163:21,21,22 188:24
**fail** 98:24
**fails** 98:11
**fair** 19:17 20:9 21:5 82:16 86:17 96:19 98:8 115:15 138:13,14 191:14
**fairly** 11:15 44:20 121:24 123:7 149:8,9 159:2 161:18 163:22
**faith** 9:10,13,15 9:18 10:14,15 12:9,17 14:12 26:23 70:25 149:13 158:18 160:5 161:8
**fall** 159:7
**familiar** 16:17 16:20 19:22 20:4 71:22 93:6,25 94:25 107:1 125:10 139:19
**far** 17:10,17,20 37:21 82:1 84:7 141:6 144:2 145:21 149:21,21 172:3,8 203:13
**fashion** 94:3 177:21

**fatigue** 60:17 146:24
**fatigued** 66:18 130:20 131:12
**fault** 11:23 48:5 63:17 65:20 85:17 87:19 88:22 112:17,19 113:1 123:17 142:16 146:21 146:24 147:10 154:10,13,15 154:17 155:2 185:13,18,24 186:8,9,22,25
**favorable** 27:6 27:24 63:22 132:8 160:18 161:13 189:24
**favoring** 27:1
**february** 126:12,12,13 126:15,24 127:12 128:7 144:15 145:19 171:5 176:11 178:23,24 181:8 187:24 189:20
**federal** 72:21
**feedback** 64:23
**feel** 30:16 75:7 93:20 119:20
**feeling** 130:25 131:1
**feels** 29:17,17 85:13
**fees** 204:1,18
**feet** 44:25 66:11,11 71:22 71:23 72:6 136:19,19,20 178:6
**felt** 91:14,21
**field** 9:16
**fifty** 50:16
**figure** 45:1 81:9 89:11 100:23 101:20
**file** 9:25 19:13 36:10 45:12 66:25 68:16 92:1,4,11,24 100:9 101:15 107:2,15 112:24 117:12 117:15,20 118:1,8,21 119:3,11 120:5 120:17 124:21 126:16,17,22 127:8,18 133:24 136:5 139:16 144:14 144:21 145:1 146:11,13,15 151:11,24 156:5 157:3 161:19 170:21 170:22 171:7 171:13 175:17 178:14 179:23 180:16 181:4 182:22 183:7 184:9 185:8 188:16 190:16 192:17 195:23 197:4,4,24 198:10 200:20 200:24 201:2 201:13,17,20 201:22 202:5 203:18
**file's** 179:20
**filed** 166:23 176:8
**files** 101:13 159:12 198:4 198:21 199:19
**final** 192:7
**finally** 141:23 181:17
**finance** 26:6
**financially** 208:15
**find** 5:13 14:19 30:17,19 35:14 35:23 37:5 38:2,10,16,17 38:24 39:3,7 40:7 41:4 42:3 49:14 50:1 67:25 68:6,9 68:10,13 69:6 69:16 70:1,2,9 70:11,12,15,17 71:4,10 73:13 73:16,21,22 74:10 76:15,22 76:23 77:1 78:6,9,13,23 79:20 80:4 81:19,21,23,24 84:14 85:4,18 97:12 98:15,20 101:23 102:4 102:12,24 103:18 104:4 104:17 105:3,4 105:6,7,9,10 106:10,15,18 106:25 107:4 107:25 108:2,4 108:7 112:21 112:22 113:6 113:22 114:16 114:23 115:3,9 117:1,22,24 125:14 129:17 129:18 131:16 133:7 140:18 142:19 143:2,5 144:16 149:24 150:3,5,14 164:14 172:17

174:12,14,16 174:18,20 209:12
**finding** 73:9 75:15 117:15 140:16 160:25
**fine** 72:18 75:10 87:21 113:11 128:21 129:14 159:23 172:15 174:15 206:4,5
**finish** 137:7 191:7
**firm** 19:12 38:6 38:8 39:4 41:2 107:10 126:3 128:6 139:10 139:11,14 140:22,24 141:17 142:8 142:19 143:22 171:11
**firm's** 125:8
**firms** 149:5
**first** 5:3 15:7 47:4,6,7 48:25 49:1 52:5 86:14 98:10 101:7 125:18 127:5 129:21 139:14,21 140:24 141:14 146:25 147:22 149:5 157:7 166:24 167:2,4 167:18 168:11 168:21 170:20 174:4,6 176:10 180:20 182:25 184:7 186:4 192:13 193:12 195:7
**firsthand** 80:2 201:24 202:2
**fisher's** 200:13
**fit** 82:8
**five** 53:24 72:5 115:20 138:21 140:10 151:15 188:7,9 194:21 194:23
**fixed** 190:2,5
**flag** 121:13
**flip** 12:8,10
**focus** 64:5 120:22,23
**focuses** 58:10
**follow** 22:7 28:13 29:4,8 37:24 83:22 98:12,15,18,22 98:22,23,24 111:2,3,4,6 127:3,6 133:4
**followed** 8:17 21:18 108:6,9 108:11 110:10 110:18
**following** 36:14 60:21 107:7 111:2
**follows** 5:5 82:15 94:4
**foot** 140:1
**footage** 121:9
**foregoing** 208:3,4 210:13 211:18
**forget** 26:10
**form** 19:14 102:14 104:15 113:18 116:17 164:16
**formal** 155:18 175:20 189:15 190:6
**forms** 95:10 117:18
**forth** 171:11 194:3
**forthcoming** 67:8
**forward** 30:7,9 186:7 209:16
**found** 38:20 70:20,20 78:2 84:16 140:20 142:7,11 202:15
**four** 151:15 171:23
**frame** 108:12 114:1,24 115:3 153:24 168:14 199:15 203:13
**frankly** 38:15 71:10 103:16 197:6
**fraud** 160:15
**free** 210:14 211:20
**frequently** 90:3 90:23
**front** 12:8 64:8 101:13 120:17 122:12,17 124:23 126:17 167:16 170:19
**fry** 1:18 208:2 208:19
**fulfill** 30:22
**full** 5:16 8:9 170:7 190:3 194:2
**fully** 6:11 17:3 118:12 178:11 178:12
**fun** 139:5
**functions** 152:23
**fundamental** 125:17
**further** 6:18 36:25 134:13 208:12

**future** 27:15 182:2,4 183:3 195:17

**g**

**g** 4:1
**game** 72:17
**gap** 29:1,2 30:6 84:4
**gaps** 83:18 84:2 119:8,8,9
**gather** 51:2,2
**gathering** 161:23
**gauge** 80:17
**geared** 11:12 11:20
**geez** 204:13
**general** 6:5 26:22 155:24 187:17
**generally** 15:4 15:6 102:7 155:25 191:5
**getting** 28:19 57:23 66:15 70:3 76:25 103:12 126:10 151:2 165:7 190:6
**gigs** 68:8
**give** 5:15 6:2 7:4,6 34:10 35:8 59:14,25 63:8 66:12 90:19 102:6 114:14 129:4 129:10 135:13 140:10 155:4,5 155:7,9,9 177:6 194:21
**given** 12:20 119:10
**giving** 18:24
**glasses** 24:2
**go** 5:15 6:17 14:14,15 15:4 20:9 24:8,16 24:18 25:2 29:5 35:14 36:24 46:25 47:7,10 49:4 51:24 52:12 53:24 57:8,13 66:17 73:3 79:15 80:19 84:7 92:10 96:13 100:11 100:15 101:2 102:1,11 112:5 115:8,8 116:25 117:9,14 122:1 127:16,17 132:21 135:20 138:20 139:6 142:25 143:14 143:22 144:5 148:2 150:8 169:15 172:4 175:9,16,22 180:2 182:22 186:3 193:8 196:12 198:17 198:20 199:20
**goal** 34:18
**goes** 17:10 48:12 77:10 89:3 163:25 194:4
**going** 5:12 33:19,22 47:23 49:14,15 50:1 53:17 54:4 61:11 65:14 77:10 81:8,14 83:5 86:4 87:1 88:20 94:18 97:6 98:16 99:18 102:13 104:13 105:20 114:4,4,13,14 115:3 117:9 119:18 122:8 128:18 129:9 134:14 137:24 145:14 151:19 151:23 152:1,4 156:2,10 180:6 180:9,10,10 184:21,24 187:9,22 193:17,23 194:2,18,25 196:11 199:20 203:7 204:5 205:21 206:25
**good** 8:23 26:23 42:4 44:2 53:19 74:25 76:18 99:23,23 100:2 117:11 129:11 140:15,17 141:13,13 149:12 152:18 155:8,9 158:18 160:4 161:7 177:8,18 194:23 206:6 206:22
**gotten** 141:22 162:17,18 178:9
**governing** 37:24
**governs** 40:21
**grace** 114:14 114:14 155:8
**granted** 130:3 130:21
**gray** 73:5 109:8
**great** 7:10 14:10 24:20 31:10 54:2,10 60:7 100:1 101:19 114:11

114:12 117:4 135:12,13 206:24
**green** 33:19
**gross** 187:5
**ground** 176:22
**grounds** 42:4 69:22 74:6
**group** 1:7 2:10 108:19 188:15 188:22 189:2,7 209:6 210:3 211:3
**guess** 10:22 12:5,23 13:22 14:4 22:14 28:15,15 34:25 43:9 53:11 54:10 64:25 65:23 108:24 124:8,13 132:18,18 138:2 164:17 164:19 166:17
**guidance** 113:13,16
**guide** 12:23 188:17
**guideline** 116:21
**guidelines** 12:16 21:14
**guides** 14:5
**guy** 107:12 121:13 137:18 167:5 193:22
**guy's** 88:21

**h**

**h** 3:5
**half** 104:12
**halfway** 57:17
**hand** 34:15
**handbook** 12:25
**handle** 9:22,23 9:24 12:1 14:20 15:13 21:21 23:2 25:14 40:9,14 40:16 64:24 88:4 99:9 153:21
**handled** 9:3,3,9 10:13 11:9 15:12,12 20:20 33:8 40:25 55:5,8,11 72:25 92:6 94:2 180:17 198:4,13 199:20
**handler** 95:18 96:16,21 97:1 97:9 112:3 117:14 118:6 118:17,18 119:24,25 120:8 123:16 133:4 166:18 193:9
**handles** 55:16
**handling** 8:6 8:10,16,25 10:5,12 11:2 11:11,16 12:16 13:5,15,23 14:3 16:12,14 16:19 17:15 18:3,22 19:5 19:12,15,20,21 19:23,25 20:7 20:11,12,16 21:10,19 22:2 23:22 25:10 26:13,21,24 28:12 29:4 30:4 31:13,21 32:9,21 33:2 33:16 34:18,24 36:2,8,23 37:12,19 41:15 45:24,25 55:21 65:3 66:22 75:20 83:3 92:11 94:8 96:18 98:6 99:23 107:15 109:22 114:22 118:13 123:11 149:13 152:20 161:4 168:7 176:18 184:11 191:18 198:8
**hands** 43:17,18 43:21,25
**hang** 200:6
**hanging** 135:16
**happen** 33:12 78:5 83:17 98:5 99:3
**happened** 29:13 64:1 80:12,13 130:9 131:17 143:21 162:24 197:21 198:7
**happening** 69:1 86:21 104:12 178:7 179:19
**happens** 52:9 71:5 75:11 89:6 93:6 155:19 199:18
**hard** 44:3 64:9 68:9 69:10 99:5 162:21
**harm** 109:21
**hate** 93:9
**head** 21:2 39:9 39:16 162:12 168:18 183:11 192:22
**hear** 108:10 151:25 152:17

153:12 164:18
**heavily** 115:24
**heck** 167:7 177:12
**heightened** 177:7
**held** 74:7
**help** 26:19 38:6 73:22 81:21 103:13 105:1,8 111:16 113:13
**helpful** 80:2 85:14 88:24 164:13
**helps** 31:7 56:13 102:9
**hereto** 208:14
**hey** 47:21 49:11 70:8 77:11 80:5 84:22 89:12 99:2 115:20 142:17 156:2 176:3 177:16 206:13
**hi** 5:10
**high** 191:2,2 193:21
**higher** 191:3,4 191:19 193:14
**highway** 164:24
**hire** 18:24 38:5 38:21 39:8 44:6,9 67:22 69:2 78:11 82:6,9,12 85:2 85:4,21 87:21 87:22,24,25 88:9,9 89:1,13 90:11,15,18,21 90:21 91:1,23 100:11,15 102:11 104:1 106:12,14 108:13,20 109:1,15,16 113:15,24,25 113:25 114:23 115:10,18,21 116:19 117:12 167:22
**hired** 38:7,9,19 42:9 45:8 67:20,25 68:1 69:18 70:11,21 80:4 81:20 82:24,25,25 84:15 85:9 88:6,6 89:2,6 89:20 91:20 101:11 102:17 103:15 104:3 106:9,20,21 112:12 127:8 144:6 149:4 168:1 175:10 175:13,15 179:17 180:14
**hiring** 39:6 42:14 77:20 81:17 82:5 91:14 108:1,3 114:5,18 115:25 116:8 142:21 199:7
**history** 42:24
**hit** 44:17 46:19 48:18 49:23 52:17 57:19,25 58:17 121:2 123:9 159:3 161:15 165:14 167:6
**hits** 48:3 52:9
**hitting** 44:19 45:20
**hold** 42:11 45:6 67:18 70:17 157:16 161:12 161:25 174:5 180:23 204:2,3
**holder** 27:6,12 27:14 30:23 46:8 69:6 70:1 70:17 81:2,5 116:24 129:24 130:8 137:16
**home** 7:25 9:11 9:16 10:10,16
**homeowner** 7:13
**honest** 71:2 152:17
**honor** 151:19
**hope** 12:4 23:18 141:9,9
**hopefully** 119:19 143:6
**hoping** 101:24
**hotel** 157:1
**hour** 33:23,23
**hours** 157:22 177:6 204:1,18 205:2
**hover** 100:7,7
**howard** 127:20 141:15,18 142:1,19 143:2 143:5 161:23 162:3 201:3
**howard's** 141:3 143:6 168:12 192:8
**huge** 21:17 73:5
**huh** 13:14 197:1
**human** 59:5 60:16 98:7 128:21
**hurt** 130:22
**hypothetical** 70:19 81:22
**hypotheticals** 50:8

**i**

**idea** 15:16 144:11 191:9
**ideas** 189:10
**identification** 25:5 67:14 196:15
**identified** 26:13 84:22 86:19
**identifies** 92:13
**identify** 4:18 27:1 95:19 96:17 166:18
**identifying** 97:10
**ignored** 82:17
**ignoring** 178:10
**illegally** 61:22
**illinois** 8:1 26:5
**ime** 192:11
**immediately** 191:8
**impact** 78:22 79:19 95:24 112:25
**impacted** 43:1 74:12
**implications** 151:21
**implied** 201:13
**import** 33:10
**important** 17:23 18:1 33:15 52:6 178:10 198:3,6
**impressed** 140:14
**improper** 45:19 120:22,23 122:11 124:9 124:14,16,16 132:4,5 147:9 157:5 172:5
**improperly** 62:20 63:9 64:12 65:14 66:12 120:7,20 121:11,13,19 122:3,9 132:2 132:16 134:12 136:2 137:11 138:12 147:10 147:11 152:22 158:25 164:3,9 164:9,11,23,25
**improved** 13:20
**inability** 161:22
**inaccuracy** 48:23
**inappropriate** 65:2 88:5,8,11
**inattended** 66:18
**inattention** 60:18 157:6 158:24
**inattentive** 44:17 58:11 62:1 103:3 123:9 130:20 130:24 131:11 134:4 137:21 165:14,20 197:17
**inattentiveness** 64:6
**include** 143:13 205:7
**included** 32:23 36:14 141:3 152:16 156:7 209:14
**including** 23:1 142:2
**inconsistencies** 131:7
**incorporated** 211:12
**incorrect** 126:9
**incorrectly** 61:23
**incredibly** 132:14,14
**indemnity** 1:7 1:9 2:10,11 4:22 145:20 209:6 210:3 211:3
**independent** 38:5,7 39:4,7 83:21 106:10 108:11 125:5,7 126:5,19 127:3
**index** 12:7
**indicate** 68:17 117:1 121:14 121:15 122:10 131:23 134:18 134:21 136:14 195:13
**indicated** 131:25 134:3 197:8
**indicates** 41:14 127:3 137:10
**indicating** 153:5 209:14
**indication** 48:6 65:15,19 66:5 66:13 95:4,7 103:4 117:24 121:8 122:5,6 134:12 136:16 136:18 157:4 157:10 183:7 184:18 185:8
**indicia** 65:20 85:17 87:18 186:8

**individual** 39:3 49:23 78:20
**individuals** 18:21 38:10
**industry** 10:21 18:15 19:2,15 20:2,19 21:12 22:2 25:21 26:9 30:4,13 31:6,11,19,20 32:13,18 36:2 37:14 38:1,11 40:10 41:8,9 41:12,23 42:21 43:2,4 47:18 47:21 49:11 50:1,15 55:12 56:9,17 60:21 61:6,12,13 63:11,11,13,21 65:6,17,18 67:21 68:2,4 70:23 77:12 78:8 80:23 85:24 87:20 88:11,25 89:12 90:22 92:9,25 93:7,21,22 94:4,5,18,22,25 97:3 101:25 107:21,22 109:4 112:10 113:12 117:14 118:14 133:19 149:13,17 175:25 187:4
**info** 173:6
**informal** 189:19
**information** 13:6,24 15:10 28:20 29:23 30:1 32:15 33:9,12,14,15 35:18 38:23 40:24 42:22 43:5 44:13 45:14,23 48:22 49:2,3,6,8,22 52:15,17,19,23 56:2,11 57:24 59:8,9,23 61:23 62:10,15 63:8 64:11,17 64:20,23 66:1 66:24 67:6,8 68:15 71:15 74:14 80:1 81:11 88:24 91:25 92:1 101:5 104:20 111:8 112:3,6 112:6 116:18 123:22,25 124:5,7,12,17 127:18 132:5 133:9 137:13 138:11 139:16 149:6 151:18 152:8 154:6 162:18 167:3 167:13,16,18 175:5 176:13 178:11,18,19 178:23 179:2 179:12 180:7 180:14,19 185:6 192:1
**informed** 27:8 27:17 28:3,8 28:21 103:19
**informs** 25:20
**initial** 45:16,17 45:18 46:18 52:18 59:9 60:25 66:1 126:23,24 133:25 148:13 152:16 174:22 197:2
**initially** 38:7 58:10 152:13
**injured** 138:7
**injuries** 45:21 152:9,14 167:15,17
**injury** 8:8,10 13:4 40:22 45:25 46:1 74:18 78:19 87:6,14,17 103:8 104:22 110:3,5 167:4 168:8,8 181:1 190:14 194:8
**ins** 83:20,22,23
**inserted** 117:19
**inserts** 94:16
**inside** 166:11
**inspected** 166:8
**instance** 38:6 42:19 52:15 87:14 150:9
**instances** 10:20 44:20 48:16 52:14 77:25
**institute** 19:3 31:12,24 32:8 37:15 93:23 94:15,19
**insurance** 1:8 2:11 6:20,21 11:3 16:18,23 17:13,23 18:13 18:17,20 19:3 26:1,9 31:8,12 31:24 32:8 37:15 50:14 56:10 60:21 77:4,9 80:5,23 81:20 84:15 85:19 86:1 93:23 94:11,15 94:16,19 98:25 101:23,25 105:5,11,13

106:20 108:1,2 109:3,22 110:11 113:12 117:13 139:6,7 173:7 175:25 198:12 199:1,9 209:6 210:3 211:3
**insure** 77:5
**insured** 27:2 37:24 38:22,25 41:22 48:17,18 56:3 63:9,24 63:24 65:5,8 68:6,10,14,19 68:19,24 69:12 70:15 71:6,9 73:19,25 74:3 74:3,5 76:4,4 76:16 77:8,9 78:3 81:6 105:8 111:10 111:11,13,14 111:15,18,20 111:21,24 125:14 127:4,9 127:10 128:4 128:24 129:18 129:22 131:14 131:20 132:11 136:2 141:16 143:3,6 146:22 146:25 147:19 148:23 149:3,6 150:23 151:1,3 152:12 153:15 154:1,10,13,16 155:2 158:18 158:19 159:5 160:12,13 161:8,13,25 163:23 170:21 171:25 173:8 174:14,17,19 181:3,17 182:20 187:25 188:2 197:16 198:1 200:21 200:25 201:14
**insured's** 146:21 167:6
**insurer** 16:11 141:16
**insurers** 18:1
**insures** 77:10
**intelligent** 132:15
**intend** 25:11
**intended** 4:10
**intending** 22:16
**intent** 82:23
**intention** 82:18
**interested** 156:18 208:15
**interesting** 187:20
**interests** 69:25 116:23
**interim** 175:10
**intermangled** 55:9
**internal** 35:1 199:6,8
**internalized** 23:24
**interplay** 12:11 112:15
**interrupting** 46:25
**interview** 42:6 49:20 198:20 199:20
**introductory** 126:1
**investigate** 32:11,12 34:19 47:22 49:9,16 61:11 81:15 161:20
**investigating** 78:4 86:3 93:7 153:11,13 181:16
**investigation** 27:13 30:14,15 31:9 34:8 37:8 43:8,13,14 45:14 46:3 51:21,22 52:4 52:11,24 55:24 56:6 60:20 64:24 67:1,3,9 70:14,16 73:12 73:21 75:15 76:21 77:2 78:14 80:25 82:7 84:17 85:6 88:12,13 89:23 90:7 92:5,13 95:1 95:12,14 110:6 112:13 113:5 120:2 128:6 129:20 133:16 134:13 135:22 139:10,12 152:7 153:3,5 153:9,22 161:4 162:14 164:15 185:25 186:3 188:18 191:7
**investigations** 32:5,24 81:25
**investigative** 32:25 142:19 158:14 198:5
**investigator** 38:9,20 39:8 67:19,20,23 68:2,22 69:3 106:21 108:3 112:2,5 127:9 139:7,11 140:20 142:8

142:14
**investigators** 109:16
**invited** 159:20
**involved** 27:4 32:7,23 55:2 87:6 93:2 94:22 130:8 160:16 176:9 196:23 197:3
**involves** 27:16
**involving** 56:16
**irish** 43:22
**irmi** 31:12
**island** 7:16
**issue** 10:6 12:9 14:21 35:4 40:6 45:3 57:2 58:6 66:7 73:16,19 100:18 102:25 120:8,11 122:2 123:17 135:21 153:18 166:3 177:16 179:8 182:6,6 190:14 195:16
**issued** 136:7 148:19
**issues** 8:25 9:10 42:25 63:18 77:24 78:21 119:22 166:15 166:18 187:6,7 195:15
**it'll** 129:7 187:3
**italian** 43:20
**items** 127:5

**j**

**january** 126:6 126:8 127:10 127:12 128:6,8 139:8 174:23 200:1,16
**jazz** 68:9 189:16
**job** 1:19 20:4 74:21 95:8 100:1 107:4 111:9 114:11 114:12
**jobs** 69:11 141:1
**july** 183:17,17
**jury** 28:7 65:17 152:21
**jury's** 65:14

**k**

**keep** 150:3 152:25 157:25
**kentucky** 1:2 9:1,2,4,6,18,19 12:10 15:7,8,9 15:10,12,12,14 16:22 17:11 81:24 82:15 208:21
**kentucky's** 16:17,20
**kept** 45:4 107:6 174:20 179:23
**kick** 188:22
**kidding** 157:24
**kind** 5:19 7:19 8:24 9:8 12:5 15:25 17:12 19:17 24:15 35:7 36:19,19 48:11 49:10 50:18 58:14 60:20 65:19 76:25 78:2 84:25 89:20,21 92:24 101:24 109:7 110:8 115:17 117:21 125:17 132:7 138:11 142:20 143:21 150:10 153:10 155:23 157:3,4 160:20 176:21 178:13 188:17 189:7 189:11,11,19 193:7,8,9 198:24
**kline** 145:8,20 146:7 147:8 154:8 157:8 162:10 163:15 164:13 166:7
**knew** 60:24 61:2,3 68:14 72:1 77:9 92:9 99:8 106:24 107:12 111:10 130:4 133:1 138:7 149:21 149:24 160:13 162:7 171:13 172:9 179:18
**knocking** 140:1
**know** 10:10 12:8 13:19 16:4,5,13 18:9 18:10,11,25 21:1 22:24 23:24 28:16,17 28:18 29:12 30:19,21 31:17 32:10,11 33:18 34:6 35:9,24 36:22 38:3,21 39:3,22,24 40:17 41:9,24 41:25 42:8,13 43:22,24 44:3 44:4,12 45:1 45:19,21 46:1 46:19 47:5,6,9 47:22 48:10,11 48:23 49:1,18 49:18,19 50:22 51:4,25 54:13 56:15 57:2,10

58:19 60:25 61:23 62:11,22 63:4,6,7,20,21 64:12,16,25 65:2,8,12 66:7 66:9 67:17,21 68:7,21,25 69:8,22 70:4 71:16,18,20,23 71:25 72:13,14 73:17 74:8,14 74:23,23 75:1 75:2,3 76:14 76:14,23 77:7 77:8,23 78:1 79:1,10 80:21 80:23 81:8,15 82:1,13 83:10 83:10,24,25 84:7,8,14 85:11,22 86:8 87:6,10,11 88:4,5,17,21,22 89:21 90:5 91:3,10 92:7 93:7,17 94:5,6 94:7,10,14,20 95:7,9 96:8,12 97:5,6,7,24 98:13 99:9,13 99:22 100:4,4 100:8,19 101:2 101:5,10,14,15 101:16,21 102:9,10 104:22 105:20 106:23 107:1 109:20 110:4,8 110:14 111:9 111:17,19,20 115:2 116:15 116:22 117:21 118:11 119:8 119:13 120:6 122:11,14,25 122:25 123:1,2 123:2,10,10,11 124:1,2,11,18 124:19 125:7 125:21 126:4 126:15,25,25 127:6 129:13 131:7 132:3,3 132:10,16 133:18,22 136:19,20 137:20 138:6 139:13 140:1,1 140:12,16,23 141:12 144:7 145:15 148:22 149:9 152:2 153:11,19 154:2 156:2,3 156:14 157:17 158:2,4,7 159:12,16 160:4,10,13,14 162:10,12,16 162:24 163:19 164:5 165:1,1 165:4,5,5 166:7 167:9,15 168:1,1,11,20 168:23 169:8 169:10 170:23 171:4,10 172:9 173:6 176:23 177:18 178:8 179:1 180:4,20 181:18,24 182:16 184:14 184:23,23,25 187:6,10,16 188:13,18,19 188:19,25 189:1,14,15,16 191:9,10 193:24 194:8 195:9,13,16 198:7,9,18,23 199:13 201:15 201:15,21 202:17,19 204:23 205:14 206:16

**knowing** 44:24

**knowledge** 37:14 50:10,13 56:18 92:24 109:6 201:24 202:2 208:9

**known** 107:7 111:11,14 170:16 204:13

**knows** 38:23 87:13

**ky** 1:17 2:6,16

**kyle** 2:12 4:21 164:18 194:24 205:10,15,20 209:5

**kyle.bunnell** 2:17

**l**

**l** 1:4 2:2 209:6 210:3 211:3

**lack** 41:21 46:5 69:23 73:23 76:2,7 78:17

**lags** 83:11

**lane** 103:5 142:25 164:5 165:1

**language** 82:3 121:18 145:2 154:21 156:7

**large** 98:25

**late** 13:3 102:11

**lately** 21:1

**latest** 25:25

**latitude** 76:5

**law** 1:16 2:4 19:12 74:7

82:15 90:20
**lawful** 18:14 121:14 124:4
**lawfully** 61:8
**laws** 4:12 11:18
**lawsuit** 10:15 89:20
**lawyer** 74:9
**lay** 59:1
**leadership** 99:10
**learn** 33:18 97:13 129:18 129:20 130:13 156:11,17,19
**learned** 33:22 156:13 185:5 191:12
**learning** 5:14
**leave** 59:11,11 62:14 64:22 73:5 138:1 152:1 155:15
**leaves** 149:14
**left** 13:14 61:20 66:23 67:7 101:16 123:21 149:1 156:24 172:1,6
**legal** 10:2,16 209:1 212:1
**legislation** 31:25
**legislators** 115:12
**lengthy** 101:15
**letter** 3:9 48:24 48:25 49:1,4 52:19 62:9 73:20 110:12 123:23 127:8 135:21 136:6 141:22 145:13 145:17,18,23 145:24 146:14 146:20 147:14 148:10,13,18 151:6 152:16 152:18 153:3 154:9 155:11 155:18 156:1,6 158:3 163:13 166:9 168:16 170:5,5 172:23 172:24 173:14 173:21,22 179:16 180:4 186:4 196:7,8 196:19 197:12 197:15,19,21 201:9,18 209:20
**letters** 68:17 70:4 117:19 179:4,5 201:7
**levels** 191:4
**lexington** 1:2 2:16
**liability** 7:12 8:8 13:17 25:18 27:2 32:12 33:3 35:16,17 43:3 44:11,21 45:10 46:11,20,24 47:19 49:21 50:3,20 51:5 51:11,21 54:24 59:15,18 60:2 63:10,25 65:6 65:8,11,16 67:4 70:8,9 72:16,20 73:10 74:13,14 78:25 79:16 85:12 86:5 87:5,17 88:19 89:4 92:7 95:19,23 96:1,17 97:15 98:10,14 102:20 103:8 103:12,19 104:7 111:5 112:4,25 119:23 120:12 130:12 132:2 133:5 134:14 137:15 145:5 145:18 146:7 150:16,17 151:1,19 153:22 158:23 162:11 163:25 166:15,19 168:10 171:5 173:14 174:10 179:13 180:9 181:1,2,15,21 181:22,23 183:2 186:14 186:22,24 187:18 194:8 195:15 196:25 197:10 198:5
**liable** 123:2 160:7 163:23
**library** 35:11
**license** 8:24 9:2
**lie** 105:23
**life** 80:23
**lifted** 180:5
**light** 28:24 29:24 45:23 46:2 52:10,23 58:5,7,24 62:15 166:14
**lighting** 58:13 58:13 169:18 170:2
**lights** 63:14
**likelihoods** 192:4
**likely** 58:2 127:22 139:17

**limit** 176:14,23 176:24,25 177:23,24
**limits** 200:17 200:23
**line** 24:19 38:11 44:25 48:9 58:8 82:4 115:5,19 119:15,15,16 119:16 121:9,9 209:14 211:7 212:3
**lines** 8:12,16 55:25 171:23
**list** 36:13
**listed** 132:1 146:20 211:7 211:17
**listen** 17:11
**listening** 148:7
**listing** 211:7
**lit** 121:24 123:7 136:22 159:2
**literally** 204:11
**litigation** 27:15
**little** 6:1,2,17 7:13 8:20 34:11 36:24 39:1 44:3 47:13,18 48:9 53:25 58:15 64:9 67:19 70:7 73:4 75:2 75:14 85:7 91:6 99:18 100:7 106:7 110:5,6,14 119:19 120:19 122:8 129:10 130:12 132:8 152:9,21 165:7 165:7 187:3,23
**lived** 107:4 140:25
**living** 75:6,6
**llp** 2:13
**local** 12:14 16:5 39:5 125:5
**locate** 38:8 128:24 161:23
**located** 37:25
**location** 1:15 166:8
**logical** 29:2
**long** 5:22 18:4 21:18 39:6 74:7 75:2 84:2 84:4 85:1,1,7 91:4 100:25 101:22 105:14 120:13 161:2 183:24
**longer** 91:8 105:15 129:10 157:25
**longstanding** 125:23
**look** 10:4,7,23 11:1,7,8 17:2 20:19,23 21:23 21:25 22:24 23:6,12,16 27:3,7,24 30:5 30:6,15 31:3 33:9 35:12,12 36:6 39:14 41:18 42:1,1,6 42:7 43:12 47:1,10,13 49:12 50:2,19 59:23 61:14 63:22 68:3 89:17 92:10,22 93:3 101:18 105:17 112:14 116:25 119:6,6 119:7 121:6,7 123:3 125:9,11 139:15 143:25 144:9 156:13 157:14 168:5 170:22 171:7 175:16 178:16 179:4 182:22 192:19 198:20
**looked** 21:9 36:7 37:2 41:15 64:3 73:25 100:20 101:6,7 118:8 121:5 143:1 146:13 167:5 168:25
**looking** 15:6 19:24 20:7,11 22:1 27:16 36:12,15,18 39:10 41:16 42:22 45:11 47:20 54:24,25 55:1,1 56:21 56:22,24 57:4 59:25 63:20 83:9 92:24 105:19,21 106:23 109:17 110:20 132:8 136:4 149:23 150:1 151:14 151:14,15 158:21 164:2 171:14 199:22
**loss** 7:23,24 27:5,17 41:20 46:15,19 47:5 47:6 48:1 49:16 52:14 55:24 58:3 59:9 61:24 68:7 69:4,5 76:1 78:4 79:2 81:3 87:16 88:15,15 89:3

130:1,2,3,7 133:8 147:1,22 148:5,5,9,9 152:20 160:14 160:17 167:5 167:19 171:1
**losses** 55:11
**lost** 113:14
**lot** 18:8 35:10 39:22 45:21 50:21 61:9 62:4 69:12 79:23 83:5,23 93:2,21 94:19 94:22 97:25 98:2,5 104:19 105:20 109:2 119:20 123:8 136:5 146:5 160:3,15 167:3 167:7,17 169:12 171:10 182:21 185:5 192:1 193:13 205:1
**lots** 193:11
**love** 43:19
**low** 191:1 193:18,21

**m**

**madam** 209:10
**made** 10:17 11:9 20:24 30:25 44:5,9 45:7 46:24 101:11 102:4 104:24 108:14 108:15 112:23 117:25 118:7 124:3,10 127:20 138:15 145:5 146:7 151:17,17 160:24 161:23 161:24 163:8 170:11 182:12 195:14,25 210:7
**mail** 140:2 148:10
**main** 2:5,14 12:22,22
**majority** 109:10,11
**make** 22:9 24:3 27:8,17 28:3,8 28:21,23 29:9 29:18,19,20 30:17,24,25 34:7,17 43:11 47:2 51:5,10 51:20 52:3 64:18 70:24 72:20 74:17 80:15 87:15 88:20 96:1 98:21 100:3 102:1,2,2 103:24 113:25 116:14 117:14 118:2,4,11 124:17 128:2 131:21 137:5 140:17 150:20 160:12 161:7 161:10 164:8 188:2,23 190:19 193:2 193:10 195:8 203:7
**makes** 12:4 33:17 43:16 55:22 65:5 79:17 112:15 115:16 143:7 177:11 188:11
**making** 16:11 28:10 35:16 47:19 50:3,19 88:20 134:14 146:18 157:20 158:18 160:4
**manage** 151:22
**managed** 7:16
**management** 18:23
**manager** 7:15 7:15,17,20 22:22 23:1 40:9,17
**managers** 11:9 12:14 14:24 15:1
**mandate** 16:12
**manner** 4:13
**manual** 13:5,15 14:1 15:5 16:3 16:13 18:8 21:17,21 23:14 31:6,11,19 32:14,17 36:5 36:7,19 37:11 37:14 50:6 113:21 115:16 116:1
**manuals** 18:10 23:7 31:24 33:1 95:8
**march** 178:24 184:1,1,4
**mark** 25:3 67:11 196:13
**marked** 25:4 67:13 196:5,14
**market** 8:19 93:3,24 190:18 198:19 199:4 199:12,15
**marketing** 26:6
**massachusetts** 7:16
**material** 16:7 18:5 22:25 23:6 27:1

28:11,17 31:3 33:4,10 34:15 34:16 35:13 71:13 72:15 73:8,9 74:12 76:10 95:19,21 95:25 96:17,22 97:10,14 98:9 98:9,14 119:22 119:23 120:11 132:2 133:3,20 135:23,25 138:12 146:5 148:18 149:19 150:4,16 163:24 164:12 194:10 198:4 202:17 203:1
**materials** 12:19 19:13 26:13 31:12 32:19 34:21 41:10
**matter** 5:12 10:18,24 19:6 19:19,20 24:14 25:11,15,18 33:4 36:2,14 54:17 56:10,18 75:20,22 83:19 84:3 104:21 115:20 118:17 119:25 156:5 166:20 182:11 204:19
**matters** 11:9
**mba** 26:4
**mean** 10:7,21 14:8 15:25 18:14,15 20:17 23:20 27:21 29:2,25 32:15 33:18 37:13,18 50:8 52:6 58:15 60:17,18 60:19 62:4,25 65:12 68:23 69:7,22 71:4 74:5 76:12 77:3,7,13,23 79:4 81:13,23 82:17,24 83:25 84:23,25 85:15 85:22 86:17,19 86:25,25 88:9 89:16 91:8 94:6 95:21 96:25 98:22 99:5 121:12,15 122:3,4 123:10 124:19 125:15 127:24 128:3 129:10,22 132:7,24 135:2 144:5,8 146:6 151:10 153:10 153:20 159:11 162:2,7 164:5 165:20 166:20 170:15 174:4 175:25 176:6 177:10 180:15 184:11 185:21 186:3 193:3 194:2 201:16
**means** 4:14 30:15 58:20 62:22,23 112:4 132:4,10,16
**meant** 132:6
**measure** 27:19 143:14
**measurements** 166:8
**mediation** 182:9,11 200:22
**medical** 42:22 42:23 83:23 86:4 88:16 131:4 167:17 179:8 180:8,9 182:2,4 183:2 183:3 186:12 186:15,18,20 195:17 198:2
**medicals** 179:12
**meeting** 89:4
**members** 188:7
**memory** 47:14 117:4
**mention** 143:13
**mentioned** 22:7 44:4 60:8 94:10 153:2 155:10 161:1 166:12
**messing** 150:18
**met** 18:16 139:16
**methods** 139:19
**mic** 93:9
**middle** 63:15
**midwest** 209:17 212:1
**mile** 132:21
**miles** 33:23,23
**milestones** 198:6
**million** 98:16 138:5 167:10 193:24
**mind** 125:22 135:25 137:3 150:11 164:19 188:5
**minds** 89:4
**minute** 53:18 138:21 183:12 184:1 190:16
**minutes** 53:25 194:22,23
**misconstrued** 42:10

**missed** 51:8 96:15 136:17
**missing** 29:3 30:17 36:21 67:24 70:10,21 80:13 85:18 87:18 136:8 155:12 161:6 176:24
**misspoke** 75:9
**misstating** 35:24
**misunderstood** 199:11
**mix** 139:21
**mixed** 107:14 107:14 146:4
**model** 12:18 82:15
**moment** 17:5 87:24
**monetary** 180:21
**money** 68:21 70:2 76:15 102:19 104:7 110:1 190:20 190:24
**month** 83:24 111:7 127:11
**monthly** 111:5
**months** 39:19 39:20 69:20 70:21 80:14 81:22 83:9,13 84:16 85:3 100:20 101:8 102:2,3 104:11 151:15 182:10 183:22
**mood** 173:11
**morning** 6:8
**morrin** 1:16 2:3,4 3:3 4:19 4:19 5:9,11 25:2,7,8 54:3,9 67:11,16 79:2 102:21 105:2 108:25 114:2 135:8,10,15,19 138:19,23 139:4 164:21 195:5 196:4,8 196:12,17,18 204:10 205:15 205:18,23 206:8,12,22
**morrinlawoff...** 2:7
**motions** 206:15
**motive** 201:25 202:1,3
**motor** 14:14,14 14:15 55:4,6 56:15,19 57:5 58:16 72:21
**mouth** 22:9 74:22
**move** 69:11 132:19 152:25 198:9
**moved** 108:17 136:15
**moving** 30:7,8 47:25 49:12 66:6 152:25 158:13 165:15 165:16 178:6 186:7
**multiple** 68:8 102:4 103:24 104:3 108:6 127:3,6 173:21
**multiply** 205:4

**n**

**n** 2:1 3:1 4:1
**nail** 144:10
**name** 5:11,16 74:2 145:6,10 145:12 162:6 183:13,13 209:6 210:3,4 210:15 211:3,4 211:21
**named** 38:25 41:22 68:10,14 68:19 69:12 71:6,9 73:19 73:24 74:2,3,5 76:4 78:3 81:6 105:7 127:4,4 127:9 128:4 131:20 141:16 148:23 152:12 153:15 158:19 161:25
**narrow** 130:11
**narrowly** 129:1
**national** 1:7,8 2:10,11 4:21 11:13 16:4,6 36:24 94:24 145:19 209:6 210:3 211:3
**nature** 152:14
**necessarily** 15:13 19:24 20:22 21:6 29:25 38:21 55:21 56:20 61:3 65:13 66:23 72:20 74:22 95:15 96:23 106:24 115:19 134:21 156:9 172:21 178:2 179:22 186:13,21 193:1
**necessary** 29:17 41:1 75:5 80:18 95:25 99:12 185:25

**need** 19:22 20:23 21:23 23:2 24:17 27:24,25 28:3 28:8,21 30:5 35:23 37:13 39:14 47:22 48:16 49:12 51:13 52:10 53:19 54:11 60:20 61:10 63:5,7 70:14 70:14,22,23,24 75:13,21 78:11 79:5,6,14 80:25 87:20,23 88:24 89:17 90:18 93:20 95:15 96:11,12 96:23 97:1 98:21 100:4,6 102:10 109:16 116:23 120:13 122:1 123:25 128:1 129:21 131:16 133:14 162:3 173:6 178:11 189:4 193:1 194:20 194:20 197:7 198:7,11 199:19 204:17
**needed** 14:5,9 31:5 35:12 42:18 43:5 69:2 91:15,21 94:9 99:15 108:13 130:14 150:17 151:4 163:18 166:15 178:18
**needs** 28:20 37:13 81:9 84:17 98:12 99:3 112:3 198:12
**negative** 163:21
**negligence** 11:23 64:4,10 74:16 78:18 86:11,15,23 87:13 121:22 123:1 130:15 130:18 131:14 133:10 137:3 167:8 170:21 181:3,23 187:7 187:9,25 195:16 197:13 197:16
**negligent** 48:20 78:18
**negotiate** 178:12 193:14
**negotiation** 178:3 193:13
**neighbor** 141:2
**neighborhood** 107:12
**neither** 208:10
**never** 9:5 23:12 30:18 49:5,14 50:5,7,17 51:9 51:9,11 76:22 80:24 87:2 111:20,23 116:20 119:4 121:1,2 148:23 173:10 188:5
**new** 7:18,20,23 22:24 23:14 28:23 29:23 30:1,24 31:1,5 33:9,12,14,15 42:13 44:5,8 52:23 75:6 91:4 100:7 138:8 147:5 149:15 152:7
**nico** 19:8,12 21:5 22:11 36:4 37:11,23 39:6,8 40:2,6 40:20 41:10,11 43:3 44:9 45:7 45:11 46:9,21 54:22 59:8,14 59:18 60:2 62:9 67:25 69:20 76:1 85:1,20 92:4 92:13 100:11 102:10,16 104:1 107:20 108:11 110:10 113:6 118:4,16 118:23 124:20 125:4 126:25 128:5 129:18 130:12 133:15 142:2 155:22 156:11,13 163:3 167:22 168:11 170:11 170:20 171:4 172:22 173:12 173:15 174:22 180:20 188:13 189:15,24 192:17 195:7 195:10 198:17 199:25 200:16 201:24 202:3 203:4,10,18
**nico's** 19:15,18 19:22 20:4,24 25:14,17 36:1 40:10 53:1 63:24 84:14 126:23 161:22 171:24 188:10 189:14 192:13 195:23

**night** 141:12
**nine** 83:9,13
**nobody's** 50:1
**norm** 109:17
**notarized** 209:15
**notary** 208:20 209:25 210:10 210:18 211:15 211:23 212:23
**notation** 192:20
**note** 111:8 120:19 129:5 142:3 146:12 147:9 157:3 158:2,7 172:14 209:13
**noted** 144:22 175:1
**notes** 36:9 47:1 57:3 119:12 125:11 139:16 157:14 170:22 171:7 175:17 195:13
**notice** 6:7,10 30:6 47:4,6 83:18 147:1,22 167:4,19 201:14,20
**notices** 29:1
**november** 53:2 53:6 124:21 125:1,5 172:23 173:13 174:4
**nowadays** 18:9
**number** 44:25 57:17,18 80:14 120:25 140:12 150:24,25 158:4 159:6 188:8 209:8,14
**numbers** 211:7

**o**

**o** 4:1
**object** 102:13 104:15 113:18 164:16
**objection** 4:5
**obligation** 27:10,11 129:24
**obstructing** 122:6 137:12
**obtained** 168:12 192:9
**obvious** 46:6 65:5,20 180:15 180:18
**obviously** 10:13 18:23 29:3 65:25 99:13 100:23 127:12 159:17 161:19 162:3 177:23 183:20 202:16
**occasionally** 198:19
**occurred** 33:25 46:13 56:22 57:16 81:3 127:10 150:21 192:14 198:11
**occurring** 182:21
**october** 5:23 174:7,8 206:16 209:4
**offer** 25:11 30:25 31:1 74:18 87:16 88:20,21 182:12,25 187:10 192:13 192:18,23,24 193:9,19,21,23 194:2 195:7,8 195:11,14,19 195:24,25
**offered** 173:7,7 181:20,21 182:24
**office** 1:16 2:4 7:25 9:11,16 10:10,16 35:11 38:25 46:15 47:8 49:7 83:22 147:1 195:14
**officer** 8:6,15 44:15,24 63:1 63:6 103:2 104:18 120:21 162:11 163:16 165:22 181:16 182:20 183:4,8 183:16,25 184:10,12,19 184:20 185:7 208:1,2
**officer's** 162:6
**officers** 42:6
**offices** 7:16,21 9:16 68:15
**official** 210:15 211:21
**oh** 26:1 54:15 57:10 63:8 72:3 89:6 115:14 121:13 128:17 131:5 142:10 173:2 174:18 183:12 194:13 198:17 198:22 199:11 204:2,13
**ohio** 209:2
**okay** 5:6,19,22 5:24 6:10,14 6:17,22 7:1,3 7:11,11 8:20 9:5,8,17,21 10:1 11:10,14

12:3,13,22
13:2,3,5,6,7,13
13:18 14:2,4
14:22 15:1,4
15:11,15,17
16:3,8,17,22
17:1,6,17,22
18:12,19 19:6
19:10,17,21
20:3,9,24 21:3
21:18,19 22:6
22:17 23:17,25
24:3,5,7,8,11
24:20,21,23
25:1,6,13,20,24
26:12,18 27:4
28:7,17,18
29:1 30:11,19
30:23 31:6
32:10 33:3
34:2,5,13,14,21
34:25 35:7,21
36:4,12,18
37:5,7,9,11,18
37:23 38:23
39:6,16,18
40:13,13,20
41:8 42:8,13
43:7,16 44:9
44:12,18,20,23
46:9,17 47:12
47:12,16,25
48:2,4,5,10,20
48:24 49:16,17
49:21 50:11,14
51:16 52:1,9
52:11,12,14,18
52:21,22 53:15
53:17,19,22,23
54:2,4,7,10,10
54:12,16,22
55:3,7,17,22
56:9,23,25
57:14,18,20,25
58:21 59:10,20
60:7,8,12
61:22 62:2,5,7
62:9,13 63:3
63:16,19 64:14
66:4,17,19
67:15,18 68:7
68:11,23 69:7
69:13,24 70:19
71:7,8 72:12
73:3,14 74:1
74:17,20,22
76:10,11 77:12
77:14,23 78:6
78:10,25 79:3
79:8,17,20,25
80:10,17,21
81:4,7,19 82:4
82:17,23 83:11
84:5,13 85:10
86:7 87:2,5,10
87:24 89:25
90:12,16,17,19
91:8,25 92:6
92:12 93:2,13
93:16 94:10,13
95:1,18 96:5,9
96:16,20 97:11
97:18,23 98:8
98:24 99:10
100:21,24
101:9 102:8,15
102:24 103:1,3
104:9,22
105:16 106:1,6
106:17 107:25
108:7,15,19,22
109:11,12,17
109:19,23
110:16,18,21
111:5,7,12
112:2,10,15
113:9,24 114:1
114:6,7,16
115:15,15
116:1,5,10,11
116:25 117:6
117:11,23
118:2,9,10,16
118:22 119:13
119:15,18
120:17,18,20
121:3,4,11
122:2,6,13,15
122:16,23
123:1,19 124:8
124:20 125:3,7
125:13,20
126:5,23
127:14,19,25
128:10 129:3,9
129:12,16,22
130:8,11,16,17
130:18 131:12
131:12,15,19
132:19,20,22
133:2,6,8,13,23
134:10,24
135:2,4,12,15
136:8,10,12,15
136:23 137:3
137:14,19,23
138:6,9,16,17
138:22,23,24
139:2,5,13,24
140:3,9,13
141:3,17,20,24
142:10,10,10
142:14,15,17
142:18,23,23
143:11,18
144:2,18,21,24
145:4,17 146:1
146:6,15 147:3
147:15,24
148:4,9,12,15
148:16,25
149:7,15,16,18
149:22 150:25
151:16,17,23
152:3,6,25
153:1,8,16

154:8,22 155:14,20 156:1,10,10,15 157:3,13 158:6 158:13,20 159:10,14,18 159:19,23,23 160:8,19 161:11,15 163:10 164:18 164:20,22 165:1,2,7,9,14 165:18 166:2,4 166:12 167:2,3 167:6,8,10,20 168:15 169:2 169:21,23 170:8,10 171:2 171:9,12,14,14 171:18,22 172:11,12,12 172:19 173:2 173:12,23 174:3,9,15,22 175:18 176:20 177:18 178:13 178:21 179:1 179:19,21 180:1,9,11,25 181:18 182:8 183:7 184:3,7 184:11,23 185:3,13,21 186:12,15,16 186:18 187:1,5 187:12,13,15 188:4,5 189:5 189:13,14,17 190:11,15,21 191:1,13 192:6 192:13,16,23 193:7,11,15 194:5,12,14,22 194:25 195:3,6 195:13,22 196:2,16 197:6 197:18 198:3 198:15,22 199:6,11,17,25 200:9,14,15,19 200:24 201:5 201:12,23 202:19,25 203:9,9,12,19 203:21 204:1,5 204:8,15,16,20 205:2,6,7,11,12 205:14,14,22 205:25 206:6,9 206:24

**old** 117:17

**omitting** 134:19

**once** 38:19 98:19 117:13 191:6 193:10

**ones** 94:21 141:13,13

**ongoing** 153:6

**online** 13:20 35:14 101:16

**open** 59:11,12 62:14 64:22 66:23 67:7 96:22 97:14 98:9,9 138:1 149:1,14 151:11 152:1 153:19 155:15 161:2,11,19 179:20 185:1 190:16 191:8,9

**opened** 124:20

**opening** 192:23

**opens** 177:3

**operated** 46:4

**operates** 188:13

**operating** 23:5 188:10

**operator** 42:12 68:6 121:1 127:4,10 136:24 148:21 148:22,22 150:12 159:6 160:5 161:8 181:3 182:20

**operators** 55:2

**opine** 73:2

**opinion** 17:22 18:12 19:14 38:15 39:2,2 58:25 59:1,13 59:22 72:18,20 88:16,18 102:6 103:22,23 133:23 202:14 202:18

**opinions** 25:10 25:21

**opportunity** 21:25

**opposed** 10:24 18:24 76:8 100:5 166:25

**oral** 170:10,15 199:22

**orally** 95:16

**order** 19:21 27:17 28:21 34:19 43:5 81:1

**ordinary** 98:24

**original** 46:4 52:16

**originated** 9:19

**ought** 97:15

**outcome** 98:17 208:15

**outline** 32:19

**outlying** 194:10

**outrageous** 193:17

**outset** 134:8

**outside** 15:13 35:1,4 41:2 58:5 92:3 107:10 112:2,5 201:12 202:5
**outsource** 18:22 38:3
**overall** 12:15 13:14 14:1 186:25
**overseeing** 12:10
**oversight** 198:13
**owed** 102:19 103:14 104:7
**own** 21:6 22:19 22:23 38:4

**p**

**p** 2:1,1 4:1
**p.m.** 207:3
**page** 3:2,6 36:13 37:7 54:18 57:8 62:18,18,23,24 101:18 124:22 124:24 125:3 158:3 171:15 171:18 173:18 187:21,23 194:15,17,18 200:10 209:14 209:16 211:7 212:3
**pages** 101:6
**paper** 35:10
**papers** 91:19
**paragraph** 113:22 127:5 171:21 203:6
**parallel** 127:22 153:21
**park** 66:4 164:7,24
**parked** 44:17 44:19,22 45:20 46:19 48:2,3 48:10,12,15,18 48:19 49:23 52:8,18 57:7 57:18,21,25 58:11 60:9,11 60:19,23,25 61:5,8,10,14,22 61:22 62:20 63:9 64:12 65:12,14,15 66:12,13 120:4 120:7,20 121:11,14 122:3,5,10 123:4 130:16 132:2,20 134:1 134:7,13 136:2 136:9,11,20 137:11 138:13 146:21 147:10 147:11 152:22 156:21 158:25 164:3,3,4,7,9,9 164:11,23,25 165:15 167:6,7 197:17
**parking** 61:9 61:10 102:25 120:23 147:9 157:5 164:6 172:5,7
**part** 26:17 32:8 43:8,14 73:11 76:20 78:14 89:22 113:5 117:25 119:11 129:19 137:15 145:1 155:22 161:3 162:13 164:14 200:9 200:10 211:9
**partially** 120:4
**participant** 25:17
**participated** 26:23
**particular** 20:3 27:5,16 35:13 41:4 52:15 58:4 69:4,5 76:1 92:11
**particularly** 42:18 187:18
**parties** 4:3,6 86:11 87:13 159:17 208:11 208:14
**partly** 48:8
**party** 44:23
**passed** 95:16 155:18
**past** 42:25 99:6 117:11 120:9 155:25
**pay** 30:23 180:9 190:20
**paying** 49:5 59:2 121:23
**payment** 188:16
**pcs** 35:10
**people** 7:22 9:25 10:25 15:18 18:5,6 38:18 47:7 64:25 77:10 84:6,11 85:12 97:7 109:17 127:25 137:25 168:5 177:6 188:15,22 189:2 191:9 199:20
**percent** 6:5,6 58:2 88:21 134:4 149:9 163:24 187:9

187:10
**percentage** 86:12 87:2 88:23 185:14 185:19 186:1 186:10
**percentages** 181:25 186:24
**perception** 193:16
**perfect** 65:1 66:20 123:11 123:12,12 136:18 138:22 167:11 206:21 206:23
**period** 11:13 22:24 28:22 106:11 107:6 107:10 108:5 164:24
**periodically** 199:5
**periods** 157:18
**permit** 185:13 185:18
**permitted** 4:10
**person** 14:19 44:21 48:5 52:5 59:7 75:16 94:8 96:21 99:22 100:2,7 108:7 133:7,8 138:7 144:16 150:21 168:7
**person's** 145:6 145:10
**personal** 8:11 22:19,23 55:25 133:23
**personally** 9:23 34:11 68:23 69:23 71:21 103:18 210:11 211:15
**perspective** 11:23 22:2 61:13 68:5 73:25 94:18 99:10 102:20 149:13 151:19 168:9 184:12 187:5 191:18
**pertinent** 95:25 119:22
**phone** 47:5 76:16 96:9 209:3
**photo** 172:1
**phrase** 22:15
**physical** 7:14 13:5,16
**pick** 113:20
**picked** 76:16 201:21
**picks** 198:10
**pictures** 163:3 163:5
**piece** 30:9 202:8
**piecemeal** 45:4
**pitch** 159:2
**placards** 73:6 120:25 121:2 121:20,24 122:21 123:7 130:16 159:1 164:2 165:3
**place** 89:7 179:25
**placed** 146:24 147:10 154:10 154:13,15,17
**placement** 57:1
**plain** 121:18
**plaintiff** 1:5 2:2 5:25 6:6 42:23 57:4 85:14 87:1 121:1 134:2 138:10 160:18 172:4
**plaintiff's** 103:2 123:8 174:22 177:6 193:16
**plaintiffs** 4:20
**planning** 161:10
**play** 193:8 194:4
**played** 83:2
**please** 4:18 5:16 25:25 49:3 54:14 56:14 57:9 62:11 67:12 93:12 135:9,24 137:7 138:21 147:6 161:6 171:16 194:24 206:11,12 209:12,12
**plenty** 201:7
**plus** 147:1 161:12
**point** 8:9 30:23 34:9,16 35:7 45:11,12,13 49:10 55:8 64:10 81:19 84:20 103:11 103:15 116:23 118:22 121:4 127:1 131:13 138:8,10 146:11 149:20 151:12 152:8 159:9 163:23 166:6 167:21 168:4,6 172:8 176:8,18 177:15 179:10 180:16 181:18

**pointing** 132:10 165:23 165:25
**points** 189:23
**police** 42:6 44:14,15,24 47:3 48:17 49:20 50:23 51:4,10 52:11 57:4 64:13 66:10 85:16 102:24 103:6 104:18,18 121:5,10 122:2 123:5,15 130:4 130:6 131:11 132:5 133:11 134:3 136:16 136:25 137:9 137:12,22,22 138:9 146:20 147:2,9 148:25 150:1,12 154:9 154:11,25 155:1 156:23 158:14,20 159:13 160:17 160:17,18,23 161:10,13 162:2,6,19 164:10 165:2 167:5 182:20 183:4,25 184:10,17,19 184:20
**policies** 12:15 36:4 69:9,9 155:23
**policy** 12:7 27:6,12,14 30:22 41:19 46:8 56:2 68:21 69:6,25 70:17 76:3 81:2,4,4 116:24 129:23 130:8 131:23 137:15 151:21 153:22 176:25 177:3 200:17 200:22
**pops** 54:13
**portion** 154:3
**portions** 11:19
**position** 45:1 64:11 89:21 142:24 143:8 171:6 179:22 181:4 188:2
**positioned** 66:9
**positions** 198:10
**positive** 163:21
**possible** 172:3
**possibly** 82:21
**potential** 27:20 109:21 190:23
**pouring** 23:19
**practice** 25:21 32:21 33:16 97:5 99:17 109:5 116:4 119:17
**practices** 8:7 8:10,16 11:2,6 11:11,16,25 12:18 13:15 14:3 16:21 17:16 20:1,5,7 20:12 22:4 23:8 31:13,21 32:4,6,9 33:2 35:3 37:3 40:10 55:15,21 55:24 66:22 82:2,14 93:4 95:2,3 114:22 116:16 155:23 176:1
**practitioners** 18:2
**precise** 144:12
**prefer** 173:11
**preliminary** 127:17 154:5,5 155:10,11,16 156:6,8 175:21 186:5
**prematurely** 124:4
**premiums** 109:23
**prepare** 169:24
**prepared** 169:23
**present** 50:9 81:5
**presented** 31:2 45:5
**presently** 25:10
**president** 9:12
**pressure** 133:17,18,23 151:7 161:1
**presumably** 120:1
**pretty** 32:17 38:20 55:14 59:16 65:5 75:16 76:18 86:24 101:15 109:10,12 110:3,7 123:23 124:1 140:15 143:2,5 146:16 148:25 150:2 160:17 162:19 162:19,25 163:2 179:6
**prevented** 166:22
**previous** 42:23 182:6

**previously** 118:19
**printed** 35:10
**prior** 45:13 78:21 89:23 160:24 166:9 166:19 170:11 183:8 184:13 190:6 208:5
**priorities** 159:8
**prioritize** 22:12
**priority** 159:6
**private** 38:9,19 39:8 67:20,22 67:25 68:1,22 69:3,18,19 70:11,21 81:20 84:15 106:21 108:2,3 109:16 110:11 117:12 139:11 140:20 142:7,8,13
**probabilities** 192:4
**probably** 14:10 14:24 46:20 61:8 65:16 77:8 80:6,8 87:21 115:21 116:17 130:17 131:14 133:10 137:4 160:7 167:10,12 172:6 179:6 185:1,1
**problem** 40:7 58:14 75:11 96:16 100:5 111:12 128:17 133:2 200:5 204:4
**problematic** 39:5 162:1
**procedural** 4:11 15:5
**procedure** 12:11,22 13:1 32:21 33:16 36:20 210:5 211:5
**procedures** 8:7 8:11,16 11:2,4 11:4,11,16,17 11:20,25 12:15 12:24 13:15,23 14:3 15:24 16:9 17:13,16 19:18,23 20:5 21:6,9,10,13,24 31:14,21,23 32:10,11 33:2 114:22
**proceed** 28:14 29:6 156:2,5
**proceeding** 1:15 4:9 207:4
**proceedings** 208:3,4,6,8
**process** 10:5 32:25 43:9,15 110:7 159:22
**processes** 40:18
**produced** 4:8 21:24 93:19 127:2 157:15 203:12
**production** 203:14 204:24 209:16,17,22
**profession** 6:19
**progress** 157:20
**prolific** 139:22
**prolong** 158:8
**promise** 30:22 157:20 194:14
**prompt** 81:25 82:16 83:3 84:21,22,24 85:6 92:5 95:12,14
**promptly** 82:7
**proof** 191:14
**proper** 18:3 45:16 124:10 124:17 134:15
**properly** 26:3 34:20 130:16 136:11
**property** 26:3
**propped** 136:2
**protect** 27:11 28:2 129:25
**protected** 27:14
**protecting** 81:1
**provide** 6:11 10:18 14:4 38:22 49:6 56:12 112:6 115:13 125:24 147:6 159:21 166:21 186:1
**provided** 6:14 37:19 64:22 71:12 81:11 167:16
**provinces** 8:18
**provisional** 185:14,19,21 186:2
**proximate** 134:5
**public** 109:21 208:20 210:10 210:18 211:15 211:23 212:23
**publish** 32:4 116:17
**published** 116:16
**publishes** 31:7 31:13
**pull** 32:15 37:6 53:18 66:4

117:7,7 168:20 199:18
**pulled** 39:11,13 172:2,8
**pulling** 62:3 122:16
**pure** 11:22 42:19 187:19
**purist** 80:22
**purpose** 73:6 151:6
**purposes** 198:18
**pursuant** 55:12
**pursue** 96:22 97:14,16
**put** 9:13 22:9 23:8 29:11 39:13,14 46:7 69:25 71:20,22 71:25 72:1 74:22 115:4 120:25 121:20 126:11 150:10 160:19 190:17 190:24
**puts** 126:24
**putting** 72:8

**q**

**qualified** 72:19 171:5 208:7
**question** 10:6 14:11 31:10 49:21 50:9 53:12 65:16 68:25 92:3 96:15,22 97:15 98:9,11,14 99:8 103:25 106:4,7 110:9 112:20 117:4 118:12 119:21 120:13 124:19 133:21 135:9,9 135:16,23,25 136:6 138:12 158:11 163:25 164:12,19 165:19 166:17 182:3,4 186:14 186:22 197:8 204:12,17 205:21
**questions** 5:12 23:6 94:23 95:19 96:17 97:14 103:7 139:5 156:4 157:19 158:9 159:20 178:6 186:23 194:10 194:15 205:17 205:20
**quick** 45:17 53:20 69:11 138:18,20
**quickly** 38:20 64:19 161:18
**quiet** 157:18
**quit** 70:13
**quite** 38:14 68:14 71:10 103:16 105:21

**r**

**r** 2:1,12 4:1 209:5
**ramp** 57:17,22 60:19 65:15 66:15 136:21 136:21 156:12 156:21 172:1,6 172:7
**rang** 96:9
**range** 180:21 185:14,19 187:17,18 193:14,15
**rates** 204:21,22
**reach** 165:21 178:5
**reached** 142:3 163:16 164:14 178:17,22 185:9
**reaction** 46:18 178:19
**read** 56:24 62:19 119:13 120:20 135:8 154:24,24,25 155:2,6 202:22 202:22 206:1,4 210:5,6,12 211:5,6,17
**reading** 39:23 39:24 57:9,11 74:11 118:7 209:20
**real** 7:4,8 53:20 56:11 80:1 95:22 205:11
**realized** 48:24
**really** 21:18 30:6 45:1,9,15 64:21 68:23 75:21 79:2 95:4 100:24 101:20 103:22 104:23 120:11 140:17 152:18 152:18 155:12 167:21 168:19 169:16,18 188:9 193:20 197:21
**realm** 50:10
**rear** 44:24 52:10 57:19 121:2 123:9 146:21 159:4
**reason** 19:6 28:13 29:5 45:13 53:3,11

76:6 77:19 144:4 156:11 183:24 184:12 186:4 209:15 211:8 212:3
**reasonable** 28:12 29:3,11 30:3 37:8,12 42:1,2 51:20 51:22 52:4 56:6 57:25 58:3 59:8 60:20 61:19,25 62:5,12,16 64:15,17 66:15 67:3,4,6 68:5 70:13,16 73:11 75:14,24 76:20 77:2 78:14 79:10,12,19 80:18,19 81:3 81:25 84:1,18 84:21 85:6 88:12,13 89:15 89:16 90:6,11 90:25 91:2,4 91:12 92:5 94:3 98:18,20 100:22,24,25 107:22 109:20 113:5,15 119:9 120:2 121:21 121:23 123:3,5 123:14,16,18 123:21 124:7 129:19 134:12 138:3 149:8,10 151:3 152:19 153:24 158:16 161:3,4,16,17 162:14 163:20 164:15 166:14 167:11 177:10 186:6 193:19
**reasonableness** 35:17 80:19 97:20 115:24 121:22 123:1
**reasonably** 80:15 121:25 137:17
**reasons** 106:14 150:22 196:20
**rebuttal** 200:13
**recall** 9:21 17:17 21:2 39:18 40:23 47:2 53:14 72:11 84:4 100:17,17,19 101:10 108:22 110:13 111:8 111:24 121:5 141:8 143:12 144:2 145:2 146:12 148:10 154:19,20 157:9,11,11,12 167:25 168:18 168:19 169:22 170:15 175:15 184:9 185:12 188:8 192:21
**receipt** 209:19
**received** 144:22 163:8 167:18 170:11 174:22 178:14 201:14
**reciting** 22:10
**recognized** 187:25 188:1
**recollection** 17:7,10,20 48:7 64:3 107:3,14,17 131:4 141:9,10 143:4 146:10 170:9,14 179:7 182:3 196:3
**recommendat...** 82:5
**recommended** 78:22,23
**reconstruction** 71:11,14 113:23 143:16
**reconstructio...** 42:9,15 44:6 44:10 45:9 59:3 77:20 78:11,24 79:11 79:11,15,24 80:7 81:18 82:5,10,13,24 83:1 85:2,5,8 85:21 86:10,16 89:1,2 100:12 100:15 101:1 101:12 102:11 102:18 103:13 103:16 104:2 104:25 106:12 106:15 108:14 108:20 109:1 114:19 115:11 115:19,25 116:9,19 117:2 166:5,13 167:23 168:21 171:24 175:11 175:16 179:10 179:18 198:1
**reconstructio...** 79:4 90:23 102:7 109:15
**record** 4:3,6,18 53:24 54:5,6,8 96:13 99:23 100:2 135:17 138:25 139:1,3 172:18 195:1,2 195:4 198:6,11 198:12 202:13 204:6,7,9 207:1 208:9

211:9
**recorded** 4:13 173:3,8 198:4 205:10 208:6
**recording** 4:8 208:8
**records** 53:1
**recourse** 103:11
**recovery** 43:1
**rectangles** 65:10 66:14,16
**red** 52:10
**redenial** 152:6
**reduced** 208:6
**redundant** 187:23
**reevaluation** 33:6,20
**refer** 23:14 184:21
**reference** 16:6 18:5 23:6,9,14 34:15,21 37:11 92:10 209:8 210:2 211:2
**referenced** 97:8 210:11 211:15
**referred** 9:15 10:9,15
**referring** 40:5
**reflect** 53:1
**reflecting** 134:17
**reflective** 57:2 57:7,20 58:6 61:16,17 63:14 136:10,12,13 136:23 137:17 146:23
**reflector** 134:20
**reflectors** 133:1
**refocus** 110:8
**refresh** 47:14
**refuting** 105:23
**regarding** 12:14 156:4
**regardless** 130:18 153:16 176:14 188:9
**region** 7:18
**regular** 199:13
**regulation** 35:13 72:12,13 115:10
**regulations** 11:5,17,18 12:1 22:3 31:16 32:1 56:19,25
**regulators** 199:9,14
**regulatory** 8:17 198:18
**relate** 115:18
**related** 8:25 43:1 208:11
**relationship** 125:23 193:15
**relative** 142:24 208:13
**relevant** 52:5 75:17 76:10 160:23 185:6 188:10
**relied** 92:2 118:20 202:8 202:11
**relies** 197:19
**rely** 22:11,19 31:16 92:24 109:4 146:3
**relying** 109:5 146:25
**remained** 80:13 156:12
**remains** 28:12
**remember** 37:21 53:13,16 59:25 72:2,5 110:18 139:23 141:2 145:6,9 172:10 183:11 205:14
**remembered** 72:7 113:4
**remembering** 140:19
**remote** 1:15
**remotely** 4:4
**renewal** 179:21
**reopened** 64:23 66:25
**repeat** 93:11 96:3 112:20 120:13 185:16
**repeated** 135:17 165:12 165:12
**rephrase** 197:14
**report** 3:7,8 24:13,24 25:9 35:21 36:6 37:4,22 44:13 46:9,10,12,22 47:3,20,23 48:7,23 49:13 49:20 50:3,19 50:22,23,23,24 51:4,10,14 52:1,3,11 53:2 53:5,6,8 54:17 54:19,23,25 56:25 57:4,5 58:4,5,9,10 59:6,13,18,20 60:3,9 61:15 62:19,21,24 64:4 65:5,20 66:10 67:4 85:17 92:12

102:25 103:6 117:13,25 118:15 119:2 119:12,19 120:3,18,19,22 121:5,10 122:2 123:6,16 124:20,23 126:6,18,20 130:4,6 131:4 131:11 132:5 133:8 136:1,16 137:1,10,13,22 138:10 143:22 143:25 144:19 144:23 145:1 146:17,20 147:2,9,20 148:25 150:1,9 150:13 154:9 154:11,11,25 155:1 156:23 158:15,20 159:7,13 160:17,18 161:10,13 162:2,6,8,19 163:5 164:10 165:2,23 167:5 168:23 169:2,3 169:24 170:1,2 170:7,12,17,18 171:15,25 172:20,21 174:25 175:13 175:19,20,21 180:23 184:17 184:21 187:21 187:24 189:20 189:25 190:1,3 190:7 192:7,11 196:20 197:9 197:18 200:8 200:10,13 202:8,23 203:1 203:6

**report's** 59:16 160:23

**reported** 1:18 46:13,15,17 61:24 148:6,9 150:6 172:9 175:20

**reporter** 4:2 5:6 25:6 54:4,7 67:15 135:13 135:17 138:24 139:2 194:25 195:3 196:7,10 196:16 204:5,8 206:1,6,9,19,25 210:7

**reporting** 112:13 130:1

**reports** 48:17 110:15,17 130:1 139:23 140:5,8,13 141:3 142:23 142:25 143:9 143:18,21 144:14 170:10 171:24

**represent** 5:11

**represented** 159:18

**representing** 148:1

**request** 92:17 163:4 169:11 211:9,11

**requested** 135:18 173:2 173:17,17 179:2

**requesting** 175:4 176:12 179:12

**require** 16:22 29:4 33:5,19 33:24 41:17 112:10

**required** 10:19 18:3 20:4 29:19 93:25 95:11,13 133:19 191:7 209:25

**requirement** 16:1,8,18,24 17:8 40:3,4,24 41:3

**requirements** 16:10 17:25 199:14

**requires** 41:18 51:20

**rescinded** 46:3 52:24 180:5

**research** 94:16

**reservation** 41:21 46:4 70:3 73:20 127:7 151:20 153:16 173:21 173:22,24 201:7,8

**reserve** 190:6,8 190:10,13,14 190:17 191:1 191:23

**reserved** 207:2

**reserves** 191:10

**resolve** 82:22

**resolved** 120:7

**resource** 34:8

**respect** 20:12 31:25 72:18 86:15 165:11 165:11

**respectfully** 132:13

**respond** 175:3 175:7 176:5,6 176:10,13

**responded** 70:3 111:23 161:18 176:11 178:23 201:10
**responding** 68:25 71:6 73:20
**response** 173:16 175:2 177:21 178:2
**responsibility** 190:22 198:14
**responsible** 7:17,21 8:2,6 8:15 9:13,14 18:22 44:23 45:25 58:2 95:18 96:16,21 96:24,25 97:6 97:10 118:5,18 119:24 120:8 133:4 134:5 166:18 193:8
**responsive** 68:19,20 76:5 153:15
**restart** 122:18
**restate** 14:11
**restroom** 138:20
**results** 95:14 198:5
**retain** 23:5
**retained** 19:7 19:10,11,13,18 118:3 125:5 202:9
**retired** 19:1
**return** 112:4
**returned** 76:17 209:19
**returns** 112:2
**reversed** 179:14,17
**review** 10:18 10:24 17:4 19:13 20:6,10 20:21,25 21:20 21:25 30:1 36:5,13,13 37:13 40:3,21 41:3,5 48:16 52:3 100:10,16 120:4 126:19 169:19 180:24 190:18 199:2 199:10 205:22 209:13 210:1 211:1
**reviewed** 21:8 36:7,8,10,21 41:14 86:17 91:18,19 119:10,11 120:2 146:15 197:24 202:22
**reviewing** 10:20 94:20,22 100:9 158:14
**reviews** 10:22
**revise** 202:14
**revised** 171:5
**revisions** 26:16
**rhode** 7:16
**richmond** 1:17 2:6
**rid** 97:1
**right** 14:13,15 15:1,5 17:18 20:17 23:20,23 24:12 26:7,12 29:2 33:20,24 37:20 43:24,24 44:7 47:3,8 50:4,25 51:1 52:16 53:9,25 54:3 58:15,18 59:3 61:2,4 62:19,25 63:10 64:8,16,21 67:2,23 68:12 69:13 70:8,25 71:17 74:4 75:7,15,18,20 76:13 77:1,5,6 77:22 78:6 79:17 80:2,15 80:18 81:17,23 82:18,19 83:15 84:7,18,23,23 85:18,24 87:11 88:1,24 89:15 90:14 91:19 95:23 96:6,14 97:8,16,21 98:13 99:1,11 99:24 100:3,14 100:22 103:9 104:5,7,9,10,11 104:13 107:19 109:2,5 111:14 111:22 112:8 112:11,25 113:7,15 114:3 114:15 115:13 115:13 116:25 117:9,10 121:12,14 122:10,20 123:4 124:21 124:23 126:2,9 128:1,13,14,24 129:13,19 130:5 131:3 133:7 134:17 135:3 137:24 140:19,22 142:6,9,14 143:7 145:11 145:13 147:13 147:16,21 148:10,22 149:25 150:1 151:9,12

152:15 153:17 159:3,6 160:15 162:7,9 163:13 163:14 164:15 165:20 169:19 170:18 171:4 172:16,17,18 172:25,25 174:23 175:2 175:25 176:7 176:23,25 177:1,8,9 178:8,25 179:13,25 180:12 182:13 182:25 183:16 185:24 186:3 186:14 190:4 191:21 192:4,5 192:14 193:2,7 195:8 197:1,11 198:3,8 199:22 201:25 202:18 202:19,22,23 203:6,17 204:11 205:18
**rights** 41:21 46:5,7 70:3 73:20 127:7 151:20 153:16 173:21,22,24 201:7,8
**risk** 27:20 80:17 98:25
**road** 34:1 48:9 61:21 63:16 66:9,11 103:6 108:21 120:4 136:21 164:6 164:10
**roadway** 48:8 61:5 122:7
**rob** 2:7 4:19 5:11
**robert** 2:3
**robust** 184:16
**role** 7:1 86:12 167:3
**roles** 7:2
**room** 172:3
**routine** 41:5
**routinely** 79:4
**rule** 37:24 40:20 115:5,19
**rules** 4:12 210:5 211:5
**run** 99:2,8 109:16 167:9

**s**

**s** 2:1 3:5 4:1 209:16 211:8,8 212:3
**sales** 8:3
**salvage** 7:24
**save** 28:1
**saw** 41:11 119:21 121:2,2 127:18 155:23
**saying** 14:9 22:11 39:2 52:13 53:10 59:21 69:24 73:13 75:8,21 75:25 77:11,14 77:17,24 84:24 90:8 100:5 101:4 106:16 106:17 120:16 132:17 147:13 158:5 163:24 178:5 179:16 180:5
**says** 17:11,18 24:9 31:19 32:18 49:1,11 49:15 50:2,18 51:10 58:13,23 59:7 60:9,10 62:20 64:12 66:12 67:22 89:15 108:25 115:10,20 122:3 123:6 124:5,10,20 125:4 127:2 131:11 136:22 136:22,25 137:22 147:14 147:16 153:3 153:12 154:8,9 154:10 156:1 164:11 165:2 171:17,23 172:20 176:3 187:24
**scares** 193:21
**scenario** 27:7 48:14 78:20 82:9 84:13 190:24
**scene** 42:7 52:5
**scheduling** 183:9
**school** 205:1
**schools** 26:7
**scooter** 58:16
**screen** 24:1,5 36:16 53:18 54:11 145:14
**scroll** 24:16,18 54:17 59:24 60:5
**se** 72:16 116:4
**seal** 210:15 211:21
**second** 20:10 53:20 86:14 96:25 105:17 127:8 128:5,23 129:3 135:14 139:6,7,7,22 140:24 142:19 149:4 157:16 166:25 169:13 169:24 170:25

171:21 173:23 173:24 174:1,6 174:7 180:1 192:24 194:16 200:6 204:3
**seconds** 82:21 93:10 129:4,8 129:9
**section** 12:10 13:9 14:15 26:18,23 35:22 62:19
**sections** 32:23 32:24 33:1
**see** 5:13 6:7,17 15:15 23:25,25 24:5 26:12 29:14 36:6,15 36:19 44:22 47:14 48:14 51:13 54:10,18 57:6,18,21,24 58:12,14,20 59:1 60:5 61:14 62:2,13 62:17 64:6,8 66:15,18 67:18 68:16 84:9 92:4 94:17 99:4,18 103:3 105:8 116:3 121:23 123:9 124:2,25 128:15 129:5 130:14 131:12 133:12,24 134:2 136:17 137:1,2,18 142:16 143:25 145:7,11 146:4 146:19 159:3 160:25 161:3,4 165:5,6 166:22 182:23 184:17 185:11 199:11 199:23 200:18 201:18,22
**seeing** 40:23 84:4 111:8 134:6 141:8 146:12 154:19 154:20 166:22 168:1 184:9 185:12
**seek** 40:16
**seem** 81:7 161:12
**seemed** 42:12
**seems** 63:23 109:2 127:19 153:10 185:5
**seen** 23:10,12 50:5,18 51:9 51:11,12,17,19 54:18,21 69:7 77:25 85:8 89:2 99:5 154:3,6 155:24 155:25
**segregated** 13:11
**self** 50:22
**send** 124:5 139:17 155:17 155:18 168:23 168:23 173:4,5 174:5 179:21 180:4
**sends** 38:22 121:12
**sense** 12:4 33:17 43:16 55:22 79:17 112:15 115:16 143:7 177:11 193:2
**sensitivity** 177:4
**sent** 41:20 52:18 62:9 68:17 117:25 139:17 145:18 151:20 154:5 173:13,20,21 173:24 174:6,7 175:12 179:16 196:19 201:8
**separate** 12:6 14:6,6,6 16:16 48:1 55:5,10 103:1
**separated** 14:19
**september** 1:13
**serious** 40:22
**seriously** 150:21 153:20
**serve** 140:4
**serving** 69:14 69:15
**set** 61:17 117:22 142:4 146:22 175:1 190:19,20 191:1,2,13 193:10
**sets** 55:15,18
**setting** 188:6
**settled** 87:8 182:11 200:21
**settlement** 12:18 16:21 20:1 25:18 82:2,14,16 86:5 93:4 97:4 181:14
**seven** 7:21
**several** 100:20 110:22 140:8,8 140:8 165:12 182:10 183:22
**severe** 42:24 79:7 104:22
**severity** 78:21 80:9,11

**shape** 117:20
**share** 23:25 24:7 39:11,13 53:17 54:11 145:14 156:10
**shared** 196:5
**sharing** 67:17 196:6
**shed** 166:14
**sheet** 172:15 205:25 209:14 211:7,10,18 212:1
**shift** 42:12
**shohl** 2:13
**shortly** 173:20 182:9,12
**shot** 44:21
**show** 62:21 94:21 100:6 101:17,18 117:12
**showed** 102:25 140:3 166:6 172:1
**showing** 200:24
**shown** 209:16
**shy** 6:24,24
**side** 5:25,25 61:21 66:8,11 85:14 86:9 123:8 132:9 136:20,21 177:16
**sides** 74:17 78:19 85:12 86:23 88:23 197:13
**sign** 206:2,5
**signature** 24:19 24:21 207:2 208:18 209:15
**signed** 145:13 145:19 210:13 211:18
**significance** 167:15
**significant** 45:14 73:23 74:12 98:25 103:7 125:24
**significantly** 56:2 130:21 200:22
**signing** 209:20
**signs** 164:6
**similar** 32:5 127:19
**simply** 21:14
**sincerely** 209:21
**single** 21:15,21 23:20 99:21 100:6 140:7
**sir** 6:9 52:8 209:10
**sit** 21:20 23:12 43:10 99:3 118:22
**site** 168:22 169:1,7,13
**sitting** 10:25 17:4 48:20 63:15 64:8 83:4,8 107:16 121:25 151:16
**situation** 45:10 61:4 67:23 69:20 70:10 71:1 77:1 78:15 80:3 85:3 90:7,13 90:14 91:1,2 112:17 143:21 162:14,15
**situations** 76:20 113:14 173:9
**six** 7:19 83:9,13 104:10 188:7,9
**skills** 208:10
**sleep** 132:21
**small** 26:11
**smashed** 137:18
**smashes** 48:13
**smith** 203:24
**software** 14:23 15:2
**solutions** 209:1 212:1
**solvency** 190:14
**solvent** 190:20
**somebody** 22:25 44:16 47:9 48:3 51:3 52:9 76:15 78:9 85:13 86:1 89:13 96:24 99:25 107:11 130:1,7 131:21 133:11 150:7 162:21 168:2 188:25 198:10 199:7
**someone's** 97:3
**someplace** 50:7
**somewhat** 163:23
**sorry** 43:17 51:7,24 96:4 108:10 141:14 142:14 150:8 164:18 185:16 186:15,17 194:13 202:1
**sort** 13:17,17 26:21 29:7 35:15 84:8 93:5 99:2 125:15 131:22 133:1 193:25 194:9 198:14

**sounds** 8:21 9:8 153:13 206:3,6 206:24
**source** 35:2,4,7 120:5 156:18
**sources** 202:10
**space** 61:10
**spacing** 72:7,14
**speaking** 45:20 48:1 191:5
**special** 116:8
**specialty** 32:3
**specific** 10:21 11:3 12:16,19 13:16,24 15:18 16:24 17:8,18 17:24 29:5 31:17,18 33:4 34:22,23 35:22 40:18,23 41:3 47:2 56:12 76:3 82:11 90:4,14,25 92:10 100:18 101:10 110:9 118:21,23 132:4 148:25 150:2 154:20 158:20 162:25 163:2 167:21 167:22 168:19 179:2,6 192:2 199:14
**specifically** 8:25 9:21 22:4 37:10 51:13 113:1 139:15 144:8 154:24
**specify** 86:11
**speculate** 145:9
**speech** 34:9
**spells** 126:3
**spend** 79:8 80:25 81:1 110:1
**spending** 76:14
**spent** 70:2 80:22
**split** 197:10
**spoke** 141:1 168:13 182:19 182:19 184:9
**sporadically** 199:5
**staff** 39:5
**stage** 72:17
**stalls** 122:18
**standard** 17:12 18:13,18 30:4 30:13 31:6 38:1,12 42:21 43:2 49:11,14 50:1,18 51:9 51:12,18,19 61:12,13 63:11 63:13,21 65:6 65:18,18 67:22 68:2,5 70:23 77:12 87:20 88:11,25 90:4 90:11 95:12,13 107:21,23 108:13,25 110:4,7 113:13 114:20 117:14
**standardized** 11:15
**standards** 10:21 16:11,14 16:18,25 17:9 17:15,19,24 18:15 19:4,15 20:2,16,21,24 22:13,13 23:7 23:20 26:22 31:19,20 32:13 32:18,20 36:2 37:8,12,17,19 40:11 41:8,12 41:23 43:4 47:19,21 51:2 55:13 56:9,17 60:22 61:6 65:3 66:22 78:8 85:24 92:5,9,13 93:14,19 94:4 94:5 95:1 97:4 109:3 112:10 114:17 118:14 133:19 149:14 176:1 202:7
**standpoint** 84:1
**start** 43:12
**started** 7:11,12 16:2,15
**starting** 24:10
**state** 7:24 10:21 11:5,12 11:18,18,19,20 11:21,22,23 12:6,13,16 13:23 14:5,5 16:5 17:24 18:3 22:4 31:17,18 38:4 38:5 42:20 65:24 115:10 144:8 187:19 190:17 208:21 210:10 211:15
**stated** 35:25 41:3 53:1 57:17 73:18
**statement** 96:19 142:20 147:8 173:3,8 210:13,14 211:19,19
**states** 1:1 7:20 8:7,11,17 11:7 12:2 15:18,19 16:10 17:14 31:25 41:25

91:5 94:1 176:24 177:5 199:14,16
**statute** 35:13 84:25
**statutes** 31:18
**stayed** 161:19
**stem** 96:15
**stenographic** 4:14
**step** 101:3
**steps** 78:13 86:19 92:8 125:18 151:4 158:14
**stick** 81:21 98:8 180:6
**sticking** 66:10
**stipulation** 4:15
**stop** 24:17 39:10 60:13 67:17 138:18 156:10
**stopped** 104:13 105:19 107:9 196:5
**story** 130:21
**straddling** 103:5 122:4
**straight** 44:20
**straightforward** 28:5 59:16 86:24 109:10 109:12 123:24 124:1
**street** 2:5,14 48:12,13
**strictly** 143:2,5
**strike** 92:2 159:25
**structure** 189:15
**struggling** 116:13 124:13
**students** 34:5 39:22
**stuff** 83:5 97:5 97:7 179:19 182:21 186:7 205:1
**style** 193:13
**subjective** 201:24 202:3
**submitted** 195:7,18
**subpoena** 6:8 6:10
**subscribed** 210:10 211:14 212:21
**subsection** 12:6
**subsequent** 47:4 169:10 182:6
**substantial** 95:24
**substantiate** 118:4
**successful** 69:19
**sudden** 132:9
**suddenly** 124:10
**suffices** 18:7
**sufficient** 37:14
**suggest** 195:24
**suit** 89:3 176:9 197:5 201:20
**suite** 2:15 209:2
**sullivan** 1:12 4:23,23 5:2,10 5:17,20 25:9 69:16 70:12,22 88:2 132:13 139:6,9 156:11 168:11 195:6 204:11 206:4 209:9 210:4,9 211:4,13 212:20
**sullivans** 3:7
**summary** 7:6 144:19 199:23
**super** 24:2
**superior** 209:1
**supervise** 9:17 10:8,12 25:14
**supervised** 9:3 9:24
**supervising** 7:19 8:19 9:13 9:14 23:11 110:25 111:1
**supervisor** 7:14 23:1,11 40:21 100:10 143:20 144:5 146:12
**supervisors** 11:8
**supervisory** 108:19
**supplement** 202:25
**supplemental** 169:24 170:1
**support** 89:21 161:9
**suppose** 130:6 168:20
**supposed** 40:9 63:22 81:25 121:16 164:7 164:24 191:5
**sure** 5:17 6:4 7:7 10:6 13:22 13:22 14:8,8 14:10,17 15:4 16:11 17:14 20:15 21:4,16 22:9,21 26:1 26:10 28:18 30:20 34:7,17 37:1 39:24

44:4 47:2,6,9 55:19,22 60:10 60:24 63:1 70:24 71:11 72:15,19,22 75:10 76:9 79:5,14,21 83:7 84:10 90:6 93:1 98:1 99:10,20 100:9 100:12,13,18 103:24 105:25 106:6,8 107:1 111:19 112:21 113:25 114:10 114:25 118:2,4 118:7,11,11 124:6,14 126:15,21 128:2,5 129:15 131:9,21 132:23 141:8 145:4 146:17 147:17 148:21 148:24 150:20 152:11 157:17 159:15,24 160:12 162:16 163:18 165:1 168:3 169:9 170:13,17 171:1,3 172:11 172:20 173:9 175:14 176:21 177:14,22 180:2,3,15 182:15 183:10 183:11 185:18 187:11 188:2 188:23 189:13 190:19 191:17 192:19 193:21 194:1 197:7 200:4 203:3,8

**surely** 84:25 115:22 121:12

**surgery** 96:7

**suspect** 39:1

**swear** 4:3

**sworn** 4:6 5:3 208:5 210:10 210:13 211:14 211:18 212:21

**synopsis** 7:9

**system** 117:21 155:22 188:10

**t**

**t** 3:5

**tabs** 13:16

**tailored** 129:1

**take** 17:24 29:24 45:9 47:12,13 53:20 53:25 78:12 96:11,12 101:2 112:7 119:1,18 124:12 129:7 132:24 138:17 173:8,10 174:15 176:19 176:21 194:20

**taken** 86:20 163:20,21 208:3,12

**takes** 91:4 191:24

**talk** 18:6 36:25 37:7 43:21 47:18 67:20 69:6 73:4,17 75:13,21 77:21 102:16 128:1,3 128:4 142:1 147:23,25 150:23 159:17 160:11 161:8 162:21 176:20 183:4,25

**talked** 67:18 107:11 111:20 111:24,25 119:20,22 142:5 148:1,21 151:1 156:25 156:25 157:19 162:10 183:18 184:6 195:6 205:10

**talking** 10:25 29:15 44:15,23 50:8 59:4,6 60:1 73:7 76:19 77:4 81:5,6 84:13 115:17 119:1 142:8 159:5 160:25 166:24 183:1 185:2,7 189:23 199:12 206:14

**talks** 17:15 156:23

**teach** 26:6 39:22

**teaching** 205:2

**technically** 74:6

**technology** 13:20

**tell** 5:4 24:14 25:25 39:9,17 78:10,12 86:2 90:2 94:2,7 101:24 110:19 111:1,2,3 113:24 114:5 116:6,7 124:22 124:24 136:3,4 145:21 162:21 173:15

**telling** 13:25 69:20 105:12 105:22,23 106:2

**tells** 130:19
**ten** 8:14 72:5 85:4,7 91:1,3,5 93:10 136:19 206:20
**tender** 31:1
**tenure** 11:14 15:3 19:1
**term** 74:7
**terms** 18:23 32:11 34:18 40:19 41:23 43:3 48:25 55:16 57:1 75:14 76:1 82:23 87:15 88:11,18 89:1 89:4 90:11 92:6 93:7 94:19 103:9,12 104:1 105:18 107:7 109:21 110:6 111:1 113:14,23 118:13 123:24 130:11,12 140:11 152:20 152:22 153:21 158:21 167:3 181:19,24 193:16 196:25 196:25 197:25 198:4,8,13
**territorial** 7:20
**test** 120:21
**testified** 5:5 22:10 106:13 151:7
**testifying** 107:20 149:18 208:5
**testimony** 67:2 104:2 113:12 134:11 210:6,7 211:6,9,12
**text** 120:21,21
**textbook** 26:15 26:17,18,21 116:1,25 117:10
**textbooks** 32:7 32:16,19,22 94:22
**thank** 15:23 25:7 54:2,3 75:12 125:4 128:22 135:15 138:23 139:13 160:1 172:13 187:15 194:22 196:12,17 200:12 205:18
**that'd** 24:20 60:7
**thems** 141:1
**theoretical** 124:15
**theoretically** 124:9
**theory** 5:14 75:17 95:16 121:22 122:25 173:15 174:10
**thing** 35:15 38:25 43:10 55:13 60:6 64:21 81:17 84:8 86:21 93:5 97:24 100:6,14 101:7 103:9 104:5,9 104:10,11,14 111:6 116:2 119:4,16 125:15,21 130:17 131:22 135:1 155:8,9 165:6 186:3 189:11 193:25 194:9 195:12 198:14
**things** 9:25 13:17 18:8 23:2,12 29:12 30:3,5,10 34:19 37:2 39:25 43:2 45:3,5 58:24 75:17 82:20 98:4,5,16 99:13,15 104:19 118:5 125:19 138:6 141:11 143:8 167:10 168:5 178:6 188:23 189:4 194:7 202:4
**think** 6:25 7:21 8:13 16:10,24 17:14 18:1,4,7 18:10,16,20 19:3 22:8,15 23:10,19 27:3 29:11 33:15 38:15,17 39:20 40:17 41:2 44:1,9 45:7,15 46:12,14 47:3 47:17 48:11,21 49:3 52:15 53:11 56:4 58:3,19,24 59:8 61:3,25 62:5,8,16 63:5 63:7,8 64:2,15 64:21,25 65:13 67:5 68:21,23 69:2,5,22 70:4 71:3,9,23 72:23,25 73:8 73:9,14,14,16 73:19 74:6,10 74:11,13 75:19 76:4,17 77:16

81:10,16 82:3 83:2 85:15,20 86:3,6,22 87:5 87:7,10,22,22 88:5,25 90:18 91:7,20,22 92:2,12,19 93:13 95:6 96:19,24 97:1 97:3 98:20 102:10 103:7 103:15,19 106:24 107:5,8 107:9,17 109:7 109:20,21,24 110:10,14,18 111:24 113:19 114:8,16 115:15,16 116:11,11,15 118:20,20,25 119:4,5 121:21 122:1,24,25 123:13,15,18 123:21 124:6 126:9 128:13 130:14,23,24 131:13 132:1 133:9,9,24 135:5,6 137:25 138:2,6,14,14 140:21 141:9 141:10 142:7 142:11 147:25 149:1,7,8 151:18 152:13 152:14,15,18 152:21 153:2 153:20 154:2,9 154:20 155:2,5 155:7,9 156:23 158:17 160:1,4 160:20,22 161:7 163:7,7 165:17,17,25 166:1,3,5 167:10,12,23 168:4,6,13,24 168:25 169:2,4 169:13,20,23 170:1,7,15 173:25,25 174:2 178:22 179:4 182:1 185:10 187:22 189:4,7 191:6 192:9 196:4,22 197:6,15 200:3 200:7,7 201:19 203:3,5,5,12,12 203:16,18,20 204:21 205:3,8 205:8,10

**thinking** 63:2,7

**third** 174:1 192:24

**thirty** 209:19

**thorough** 27:13 30:14,14 31:9 32:4,24 34:8 140:6

**thought** 39:12 75:9 82:24 83:25 104:25 119:21 129:14 140:4 152:13 163:18 166:1

**thousands** 48:17

**three** 26:6 66:11 84:16 91:11 98:22 102:3 108:3 138:20 140:10 175:4 176:11 181:8,11 196:9 196:13 206:7

**threshold** 11:24

**throwing** 177:12

**time** 1:14 4:17 5:24 6:4,4 7:22 9:17 13:2 14:17 15:11 16:15,15 21:21 22:25 28:10,22 29:9,19 35:19 39:10 42:10,11 42:13,13,15,17 42:21 43:1 45:8 46:10 51:25 52:16 54:23 55:8 62:6 66:8 67:5 68:14 69:3 74:14,17 78:22 80:1 81:23 83:6,10 88:7 89:7 91:22 97:7 104:12 105:5,22 106:11,11,13 106:18,22 107:6,10,15 108:12 111:25 113:7 114:1,24 115:3,4 116:21 123:12,14,21 124:14 128:17 137:14 138:3 140:7 141:14 147:16 148:18 149:3 151:4 152:10 153:24 161:2,18 163:12 168:14 169:14,16 174:15 175:15 176:10,14,23 176:24 177:2 177:23,24 179:5 182:22 190:25,25 194:17 196:19

196:21,22 199:15 203:13
**timeline** 68:3 82:11 176:2,4
**timeliness** 85:1
**timely** 83:25 177:21
**times** 50:21 56:2 60:9 103:24 108:6 108:12 110:11 110:12,19,23 111:7 130:21 165:13 175:4 198:9 201:7
**timing** 81:10,15 83:2 116:20 118:8 119:7 129:13 192:18
**tired** 57:18 62:2 130:25 131:1,5,6 133:13 134:3 137:1,20 165:14
**title** 5:16 12:25
**today** 5:13 14:18 17:21 19:7 24:2 87:8 107:16,20 113:12 117:17 205:2,7
**together** 23:9 188:22 189:3
**told** 15:21 82:12 179:15
**tomorrow** 84:23
**took** 92:8 166:7 169:19 173:15 174:11,19 181:1
**top** 21:2 39:9 39:16 162:12 168:18 171:19 183:11 192:21
**tort** 182:11 187:5
**total** 6:25 7:23 7:24 183:1 204:1,18 205:3
**totality** 89:18 118:20
**totally** 157:24
**touch** 143:7
**touchpoints** 107:6
**towards** 11:12 11:14,20
**town** 107:5,13 111:9 141:1
**track** 99:23 100:2 135:11 184:25
**tracks** 153:21
**tractor** 58:16 58:20 66:3 137:2
**trade** 173:9
**trailer** 58:16,20 66:3 137:2
**train** 18:1 23:22
**trained** 14:20 15:19 21:22 22:7 34:2
**training** 7:18 7:19 8:3 12:14 12:14,19 16:5 16:5,6 18:5,21 23:8 31:11 34:6 109:7
**trains** 22:11
**transcribed** 210:7
**transcript** 4:8 206:10 209:12 209:13 210:5 210:12 211:5 211:11,17
**transcriptionist** 208:7
**transmission** 201:3
**transmitted** 200:25
**transmitting** 200:1
**transposed** 127:12
**travel** 142:24
**traveling** 48:4
**treatment** 182:2,5 183:3 195:17
**triangles** 45:3 57:2,8,20 58:6 61:16,18 64:7 64:13 134:17 134:21,23 136:10,12,13 136:23 137:17 143:14 146:23 172:2
**trick** 144:10
**tried** 28:6 91:5 107:9 140:3 182:18
**trouble** 66:6 140:16 151:2
**truck** 38:24 58:14,16,17,20 59:2 60:9,10 60:19 61:18 66:3 68:8 120:7 121:24 122:1 137:3,11 156:12 161:14 161:15
**truck's** 142:24 143:8
**trucking** 69:8
**true** 24:15,23 53:11 66:24 87:4 124:3

141:10 163:1 180:19 208:9
**truly** 133:25
**trust** 100:3
**truth** 5:4,4,5
**try** 14:11 24:3 67:25 70:1 79:19 98:20 105:4 108:7 116:14 120:13 135:11 137:24 143:14 149:5 150:5 160:11
**trying** 24:7 38:17 42:22 45:1 63:10 65:11,24 69:6 70:2,9 73:10 73:21,22 74:19 74:21,21,24 76:15 77:17 80:17 81:9 84:14 89:11 97:12 100:13 100:21,23,23 104:4,6,16,17 104:23 105:3,7 105:9 106:15 108:24 112:21 112:22,24 113:6,19 114:9 126:11 127:24 129:17,17 130:10 131:15 131:17 133:6 140:9 144:10 144:11,12 149:3 150:3,14 151:22 152:19 153:21 155:4 157:25 158:8 159:16,19 161:7 164:20 167:24 168:24 174:1,12,14,16 174:18,20 184:25,25 197:25
**tuesday** 1:13
**turnaround** 206:19
**turned** 153:24
**two** 26:1 32:7 33:1 53:20 66:11 82:20 84:16 85:9,21 86:6 87:21 91:7 98:22 102:2 105:6,10 105:12 106:2 129:4,7,9 149:5 151:12 154:17,18,24 157:21 165:23 165:25 177:25 190:12 203:20 203:21
**type** 13:9,10,11 16:12 29:14,15 34:1,23 56:3 68:7 69:8,9 83:10
**types** 23:4 34:18 45:5 71:5 83:10 141:11
**typewriting** 208:7
**typical** 48:14 117:15 125:16 153:8 156:1
**typically** 40:12 41:5,18 42:2 44:22 45:19 48:1,4 68:6,10 100:5 117:24 125:14 136:11 155:17 156:7 167:6,8 180:3 184:16,19 187:2 188:14 189:12 191:1
**typo** 128:16

**u**

**uh** 13:14 121:13 197:1
**ultimate** 168:10 181:19 188:11 191:6
**umbrella** 97:20
**unattended** 44:17,19,22 45:20 46:20 48:2,3,10,15,18 48:19 49:23 52:9 58:11 136:9
**uncomfortable** 30:8
**under** 4:11 37:2,7 46:4 60:16 76:3 97:20 110:24 127:5 133:23
**underlying** 182:11
**understand** 4:7 11:10 12:20 14:9 20:18 25:13 31:8 32:2 37:16 63:11 65:17 74:20 80:16 96:8 103:21,21 103:23 118:12 120:16 128:20 132:17 158:10 178:9 180:4 190:23
**understanding** 17:11
**understood** 34:17 75:8

**underwriting** 8:4 26:4
**unfair** 11:6 12:17 16:21 19:25 22:4 35:3 37:3 82:2 82:14,14 93:3 97:4
**unfavorable** 27:6,25 63:22 63:24 189:24
**unfortunately** 177:5
**unidentified** 202:10
**union** 36:24
**unit** 7:15 57:17 57:21 60:13 120:24,25 154:17,17
**united** 1:1 8:7 8:11 11:7
**university** 26:5
**unknown** 28:12 45:22 148:17 148:20 149:19 149:20
**unknowns** 149:19
**unlawful** 59:21
**unlawfully** 60:22,24
**unoccupied** 61:15 134:1
**unreasonable** 66:21 81:10 86:6 91:7 98:5 123:6,13 149:7
**unusual** 71:4 92:19,23 153:14
**unwritten** 202:7,10
**upping** 191:11
**ups** 98:23,24 127:3,6
**use** 20:13 22:8 38:4 43:18 55:23,23 90:23 109:18 138:11 193:14
**used** 79:4 90:1 90:3 102:8 118:17 122:9 206:8
**uses** 4:10
**using** 12:23 39:4 41:1 185:22
**usual** 119:17
**usually** 79:24 141:11 155:19 155:21,21 187:16 188:19 191:3,13

**v**

**v** 1:6 209:6 210:3 211:3
**valuation** 28:1 182:13 190:5 191:24 192:24 193:1,10 195:9
**value** 180:25 181:6,19 182:17 186:13 186:21 187:5 187:12 188:4 188:21 189:5 190:9,9 191:6 192:21
**variation** 99:18
**variations** 12:21
**varied** 12:18
**varies** 6:4 90:20
**variety** 30:9 77:24 150:22
**various** 11:4 31:25
**vehicle** 14:14 14:14,15 44:17 44:19,22 45:2 45:2 48:7,15 49:24 55:4,6 56:16 57:5,7 57:16,19,24 58:7,10,12 60:22 61:5,20 62:2,3 64:6,9 64:12 65:9,15 66:2,16,17 103:3,4 120:3 120:23,24 121:2,8 122:18 123:5,9 130:15 131:12,25 132:1,18 133:12,25 134:2,6,7,18 136:9,11,13,15 136:19 137:2 137:18 146:22 146:23 156:17 158:24 159:3 161:15 164:2,9 165:6,15,15,16 167:6,7 172:1 172:2,4 181:4 188:3
**vehicle's** 66:8
**vehicles** 47:25 49:11 55:2 62:20
**vendor** 18:23
**venue** 23:4
**verbal** 11:24 46:12
**verify** 42:4,18 89:21 118:17 158:19

**veritext** 209:1,8 212:1
**veritext.com.** 209:17
**versa** 121:1
**versed** 94:8
**version** 113:3 120:21,21 125:15 141:4 143:6
**versions** 11:6 31:14
**versus** 27:20 33:23 44:10 88:22 99:3 102:12 135:21 192:2
**vet** 96:6 204:2
**vice** 9:12 121:1
**video** 169:19 169:20,21
**videoconfere...** 2:3,12
**view** 152:21 166:6 168:5,7
**viewpoint** 48:21
**vince** 145:8,20 146:6,6 147:8 155:4 157:8,8 162:10,17 163:15 164:13 166:7
**violation** 65:3 66:21 68:20
**visit** 168:22 169:8,13,25
**voluntarily** 15:25
**vote** 188:11
**vp** 8:9

**w**

**wait** 24:7 85:2 85:4,21 87:25 100:25 115:1,2 129:9 153:19 183:12 184:1
**waited** 88:8,9 91:1,11 183:24
**waiting** 101:22 152:17
**waived** 209:20
**walden** 1:4 2:2 5:11 60:14,17 62:1 64:5 209:6 210:3 211:3
**walden's** 19:7 64:5 157:5
**walk** 132:21
**wall** 91:6
**want** 20:13 22:6,8,9 24:14 26:10 27:12 34:16 35:24 47:18,24 48:1 50:9,12 56:5,5 56:6 59:24 60:5,13 62:11 65:12 70:24,25 73:4,5 75:10 75:13 77:20 78:7 99:9,14 100:7,13 103:24 105:24 111:6 113:3 114:5 115:8,24 116:6,8,18 121:6 126:6 129:4 131:20 139:21 145:9 150:20 157:14 160:12,16 172:14 173:10 176:14 177:21 178:8 190:19 199:23 206:1
**wanted** 34:14 34:17 132:21 132:21 155:5 169:15
**wanting** 103:9
**wants** 153:12
**warning** 135:2 135:7
**water** 138:18 194:21
**way** 8:21 9:14 22:15 27:19 29:12 35:9 62:12 66:14 73:18 95:4,7 117:20 134:7 155:6 160:19 167:18 168:9 189:2 197:10 197:11
**ways** 18:21 97:12 154:24 155:3 160:20
**we've** 37:5 62:17 67:24 85:16,17 112:23 118:18 136:1 165:17 165:22 166:20 173:12 197:6 206:14
**week** 177:25
**weeks** 176:11 206:17
**weighed** 157:5
**went** 7:25 8:1,4 13:20 25:24 38:17 47:6,7,8 69:5 70:5 107:8 127:11 143:1,24 144:2 144:7,8 145:13 152:10 158:3 166:7 169:10 170:16 175:21
**west** 2:5,14

**whatnot** 16:13
**wheel** 44:24
**whoever's** 176:17
**willing** 124:12
**winded** 75:2
**witness** 4:4,6,7 4:24 5:3,21 21:12 52:5 75:15 93:18 102:15 104:16 113:19 138:17 138:22 164:17 205:15,20,24 206:23 208:4 209:9,12 210:1 210:4,11 211:1 211:4,15
**witnesses** 49:20 79:18,20,22
**witness'** 209:15
**wonderful** 7:7
**wondering** 180:23
**word** 20:14 84:24 97:1 121:18 122:9 132:10,16 185:22
**wording** 123:23 178:16
**words** 22:9 74:22 154:13
**work** 5:21 6:3 6:22 12:11 18:25 19:3 37:15 38:4 40:2 66:25 92:22,25 93:18 93:23,24 94:11 94:15,19 107:10 143:16 202:9
**worked** 6:20,20 8:20 9:8 10:2 179:20 180:17 203:4
**workers** 7:12
**working** 5:24 41:9 94:17 99:6 111:13,17 179:9,23
**works** 187:14
**world** 50:6
**worried** 47:17
**worries** 159:24 159:24
**worry** 83:11,14 83:16 149:16
**worse** 94:6
**worst** 190:23
**worth** 187:8 193:24
**would've** 34:22 75:16 78:22,23 79:19 80:3,12 82:12 85:1,20 88:8,13 102:1 104:20 111:11 111:14 120:1,3 139:8 145:13 164:13 170:16 170:24,24 174:9,23 181:7 189:1,18,19 203:23 204:13
**write** 26:19 172:14
**writing** 50:2 94:23,23 173:5 173:11
**written** 4:15 22:12 34:16 35:9,11 36:4 41:13 49:10,25 50:18 92:13 93:19 95:1,15 109:3 110:17 118:15 120:19 125:8 159:20 159:21 162:19 170:10,15,17 183:12 197:10 202:7,10
**wrong** 35:22 39:21 52:16 61:9 106:16 167:20 179:11 189:18
**wrote** 26:17,22 35:6 113:21 120:22 140:15 146:14 196:10 200:3,4 202:17 202:24 203:5

**x**

**x** 3:1,5 44:25 120:9

**y**

**y'all** 206:10
**yeah** 26:12 33:14,17 37:5 39:11,12,13 40:1 43:21 44:4 57:12,12 57:15,21,22 58:18 59:16 63:5 70:6 71:24 72:3,7 72:13 74:25 79:14 80:2,21 82:19 83:12 86:19,21 87:9 95:24 98:1,4 105:9 108:21 108:21,23 109:24 111:15 111:15 115:12 115:14 116:3,5 116:14,14 117:6,7 122:20 125:2 126:10 126:13,14 127:14,23

128:12,15 129:2,15 130:23 138:19 139:25 140:5 141:19,25 142:10,11 143:6 144:4,10 144:20 145:4 145:14 146:3 148:14 149:11 150:14 151:15 155:8 157:2,17 157:23,23 158:10 160:9 160:20 162:2,5 162:23 163:15 164:12 169:5,9 170:4 171:18 173:1,5 174:21 175:6 176:16 177:9,17,19 178:21 179:24 179:24 180:18 181:11,12 182:15 183:6 183:16,21 184:4 185:3 186:6,6,19 187:20,20,21 190:5,13 191:25,25 193:4,21,22 196:8 199:3 201:8 202:21 203:22 204:15 204:17 205:8 205:16,17 206:19

**year** 11:15 15:20 84:2,4 85:9 86:6 91:6 102:3 104:10 104:11 113:25 115:1 168:24 170:23

**years** 6:22,24 6:25 7:2 8:14 11:15 26:8 33:13 35:14 39:18,21 50:14 50:17 85:4,7 85:21 86:1 87:21 91:1,3,5 91:11 92:25 93:18,24 100:1 102:5 104:3 105:6,10,12 106:2,22 108:3 108:21 115:2 115:20 119:5 168:15 176:1 183:19,20

**yep** 37:1 54:15 60:15 153:4 166:16 169:7 174:24 175:23 188:3 189:22 194:11,11,23 200:18 204:4

**yesterday** 205:11,13 206:14

**york** 7:21,23 75:7 91:4

**z**

**zero** 130:18 180:11

**zoom** 44:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.