UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION
CIVIL ACTION NO.: 5:22-cv-00238-KKC

CHARLES L. WALDEN PLAINTIFF,

VS.

NATIONAL INDEMNITY COMPANY DEFENDANTS

**********

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE AND/OR LIMIT EXPERT TESTIMONY OF FREDERICK J. FISHER**

**********

Plaintiff Charles L. Walden ("Plaintiff"), by and through counsel, respectfully submits this Response in Opposition to Defendant National Indemnity Company's ("NICO") Motion to Exclude and/or Limit the Expert Testimony of Frederick J. Fisher, J.D., CCP (DE 232).

## I. INTRODUCTION

NICO's Motion to Exclude Plaintiff's retained insurance claims-handling expert, Frederick J. Fisher, J.D., CCP, rests on a classic evidentiary Catch-22. On the one hand, NICO faults Mr. Fisher for refusing to take the witness stand and pronounce ultimate legal conclusions, such as declaring that NICO's conduct was legally "outrageous," that liability was legally "beyond dispute," or that NICO acted with an "evil motive"; ignoring that an insurance expert in this District is strictly barred from offering legal verdicts or corporate mind-reading under Federal Rules of Evidence 702 and 704. See *Adkins v. Shelter Mut. Ins. Co.*, No. 5:12-cv-00173-KKC, 2015 WL 1393588, at *3–4 (E.D. Ky. Mar. 26, 2015) (Caldwell, J.); *Berry v. City of Detroit*, 25 F.3d 1342, 1353–54 (6th Cir. 1994). On the other hand, NICO attacks Mr. Fisher for auditing its claim file against national insurance industry standards and the National Association

of Insurance Commissioners (“NAIC”) Model Unfair Claims Settlement Practices Act, while conveniently omitting that NICO refused to produce any internal claims-handling manuals in discovery on the ground that it maintains “no responsive documents for specific written claims handling materials in Kentucky.” (Ex. 1, NICO Resp. to Pl. RFP No. 18 at 19; see also Sullivan Dep., DE 231-4 at 36:4–22, 37:10–22).

Evaluated opinion-by-opinion under Federal Rule of Evidence 702, as amended effective December 1, 2023, and controlling Sixth Circuit precedent in *Davis v. SIG Sauer, Inc.*, 126 F.4th 1213, 1223–25 (6th Cir. 2025), and *In re Onglyza (Saxagliptin) & Kombiglyze Prods. Liab. Litig.*, 93 F.4th 339, 345 & n.4 (6th Cir. 2024), Plaintiff has demonstrated that it is more likely than not that each of Mr. Fisher’s five core qualitative claims-auditing opinions falls squarely within his 50-year specialized expertise (Rule 702(a)), rests on sufficient facts and data from NICO’s 6,365-page claim file (Rule 702(b)), applies reliable qualitative claims-auditing principles (Rule 702(c)), and reliably applies those principles chronologically to NICO’s documented handling of Plaintiff’s claim (Rule 702(d)). NICO’s Motion to Exclude should be denied in its entirety.

## II. GOVERNING LEGAL STANDARD UNDER AMENDED FRE 702

Because this diversity action is pending in the Eastern District of Kentucky, the admissibility of expert testimony is governed by Federal Rule of Evidence 702, while the substantive elements of Plaintiff’s statutory bad-faith claim are governed by Kentucky law. *Legg v. Chopra*, 286 F.3d 286, 290 (6th Cir. 2002). Under Rule 702, as amended effective December 1, 2023, a witness qualified by knowledge, skill, experience, training, or education may testify if the proponent demonstrates to the Court that it is more likely than not that: (a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702; *In re Onglyza*, 93 F.4th at 345 & n.4.

Where an expert offers non-scientific, experience-based industry testimony, the Court's gatekeeping inquiry under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), focuses on whether the witness explains how his industry experience and auditing standards reliably apply to the documented record. Furthermore, the Sixth Circuit requires district courts to evaluate expert admissibility on an opinion by opinion basis rather than ordering wholesale exclusion based on isolated criticisms. *Davis*, 126 F.4th at 1224–25.

## III. ARGUMENT

### A. Mr. Fisher Is Eminently Qualified Under FRE 702(a) to Audit NICO's Commercial Claims Handling Against NAIC and Industry Standards.

NICO first challenges Mr. Fisher's qualifications (DE 232 at 2–3, 8–11), arguing that his 50-year career includes specialty lines, surplus lines, professional liability, and California adjusting rather than exclusively adjusting Kentucky automobile claims, and noting that he recently retired his active adjuster license. (In Footnote 1 of its Motion, DE 232 at 3 n.1, NICO also insinuates an irregularity because Plaintiff's March 2026 motion to extend expert deadlines referenced an expert's cardiac health issues, DE 223, whereas Mr. Fisher was retained on May 14, 2026, DE 232-4. There was no irregularity: when Plaintiff's initially consulted expert suffered cardiac health complications prior to the original March 31, 2026 deadline, Plaintiff sought and obtained the Court's March 27, 2026 Order modifying the schedule, DE 224, and subsequently retained and timely disclosed Mr. Fisher on May 27, 2026 in strict compliance with

DE 224.)

Rule 702 explicitly permits qualification by "knowledge, skill, experience, training, or education." Over a 50-year career in the property and casualty insurance industry beginning in 1975, Mr. Fisher has worked directly as a property and casualty claims adjuster, Third-Party Administrator ("TPA") manager, qualitative claims auditor for major insurers, managing underwriter, insurance educator, and author of peer-reviewed insurance industry texts (including his May 2026 International Risk Management Institute ("IRMI") Expert Commentary on fair claims handling practices). (Fisher Rep., DE 232-1 at 1–3; Fisher CV, DE 232-2 at 1–21; Fisher Dep., DE 233-10 at 13:10–26:15, 238:15–241:11). Commercial trucking policies, like Enterprise's $1,000,000 NICO commercial auto policy (Policy No. 70 TRS 105576), and specialty casualty lines operate under the exact same NAIC Model Unfair Claims Settlement Practices Act standards, third-party comparative-fault reserving principles, and Claims Committee governance protocols that Mr. Fisher managed and audited throughout his career. Crucially, Mr. Fisher held a Non-Resident Insurance License in the Commonwealth of Kentucky and served as his firm's Designated Responsible Licensee for Kentucky regulatory compliance, requiring direct familiarity with Kentucky's insurance statutes and the NAIC Model Act; the exact model statute codified in Kentucky at KRS 304.12-230. (DE 232-1 at 1–2 & nn.1–3; DE 233-10 at 239:10–240:22). See *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 451 (Ky. 1997) (recognizing that Kentucky's KUCSPA is an almost verbatim adoption of the 1971 NAIC Model Act).

Both the Sixth Circuit and this Court routinely reject the argument that an insurance claims expert must hold an active state-specific auto-adjusting license to testify on P&C claims-handling standards. In *Phelps v. State Farm Mutual Automobile Insurance Co.*, 736 F.3d 697, 701, 705–07 (6th Cir. 2013), the Sixth Circuit expressly relied upon the testimony of a "national

claim handling expert" evaluating Kentucky third-party auto claims handling under KRS 304.12-230 based on multi-state adjusting and managerial experience. Likewise, in *Shepherd v. Unumprovident Corp.*, 381 F. Supp. 2d 608, 610–11 (E.D. Ky. 2005), this Court admitted an insurance-industry expert based on extensive claims-handling experience, holding that specific differences in line-of-business or localized credentials go to the weight of the testimony on cross-examination, not threshold admissibility. See also *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984). Indeed, NICO's own retained expert, Christine Sullivan, has never held a Kentucky adjuster license and admitted she performed no chronological audit of NICO's file. (Sullivan Dep., DE 231-4 at 119:4–17). Mr. Fisher's five decades of P&C claims adjusting, TPA management, Kentucky licensing compliance, and qualitative claims auditing readily satisfy Rule 702(a).

**B. Mr. Fisher's Qualitative Claims-Auditing Methodology Is Reliable (FRE 702(b)–(d)), and Each Surviving Opinion Satisfies Opinion-by-Opinion Gatekeeping Under *Davis v. SIG Sauer*.**

NICO next asserts (DE 232 at 1–2, 11–16) that Mr. Fisher's methodology is unreliable because his initial report's background section mentioned "unique" and "proprietary" auditing techniques, because he applies national NAIC industry standards rather than Kentucky-specific claims manuals, and because he refined certain initial formulations in his Rebuttal Report. Each contention lacks merit.

**1. Transparent Six-Step Qualitative Claims Auditing Protocol.**

Mr. Fisher's methodology in this case is neither a "black box" nor secret. As detailed in Section V of his Initial Report (DE 232-1 at 2–5), Section V of his Rebuttal Report (DE 233-11

at 2–3), and his deposition testimony (DE 233-10 at 240:1–243:18), Mr. Fisher applied Qualitative Claims Auditing, the standard auditing methodology used by internal insurance company auditors, TPAs, and state market-conduct examiners nationwide. In his Rebuttal Report, Mr. Fisher explicitly stated the six methodological controls governing his audit: (1) primary contemporaneous claim records control over post-hoc summaries; (2) claims decisions are evaluated chronologically by time period based on what was reasonably available when the decision was made (a rule NICO's expert Ms. Sullivan agreed with, DE 231-4 at 35:16–20); (3) distinguishing defense litigation steps from claims-department valuation; (4) auditing comparative-fault facts objectively from both sides; (5) recognizing that the $200,000 settlement informs the chronology without retroactively validating earlier delays; and (6) leaving legal rulings to the Court and verdict determinations to the jury. (DE 233-11 at 2–3).

**2. NICO Cannot Weaponize Its Own Refusal to Produce Claims Manuals.**

NICO's complaint that Mr. Fisher measured NICO's conduct against national NAIC and P&C industry standards rather than NICO's internal Kentucky guidelines is foreclosed by NICO's own discovery response. When Plaintiff requested NICO's claims manuals and policy statements in Request for Production No. 18, NICO produced zero pages, formally stating: "[T]here are no responsive documents for specific written claims handling materials in Kentucky." (Ex. 1, NICO Resp. to RFP No. 18 at 19; see also Sullivan Dep., DE 231-4 at 36:4–22, 37:10–22). NICO cannot withhold its internal claims manuals by claiming it maintains no Kentucky-specific written materials, and then move to exclude Plaintiff's expert for auditing NICO against the national NAIC Model Act baseline from which KRS 304.12-230 is directly derived.

**3. Methodological Integrity in Rebuttal Refinements and Opinion-by-Opinion Admissibility.**

NICO's attempt to portray Mr. Fisher's August 19, 2026 Rebuttal Report (DE 233-11) as "backtracking" turns a methodological strength into a criticism. In his Rebuttal Report, Mr. Fisher voluntarily clarified that the January 13, 2023 demand of $846,676.07 carried no express deadline and was below the $1,000,000 limit (§ VI(A)), distinguished defense counsel's litigation steps from NICO's 19-month internal valuation gap (§ VI(B)), withdrew the motive-laden word "weaponized" to preserve objective auditing neutrality (§ VI(D)), and removed first-party regulatory and statutory citations (806 KAR 12:095 § 6(1)(d) and KRS 304.12-230(7)) to focus strictly on third-party standards under KRS 304.12-230(3), (4), (6), and (14) (§§ VI(E), (G)). Under Rule 702(c)–(d) and *Davis v. SIG Sauer*, 126 F.4th at 1224–25, each of Mr. Fisher's five surviving core opinions independently satisfies every gate of Rule 702:

| Surviving Core Opinion | Record Facts & Data (FRE 702(b)) | Auditing Principle & Application (FRE 702(c)–(d)) |
|---|---|---|
| **Opinion 1:** Premature Feb. 26, 2021 Zero-Fault Denial & 30-Day Closure Threat | Police Report p. 4 ("Improperly Parked Vehicle[]", DE 231-2); 11/03/2020 log (DE 233-2, NICO 003757); 12/09/2020 lane-encroachment log (DE 233-2, NICO 003817); Feb. 26, 2021 denial (DE 231-3) before speaking to Howard, Enterprise, or Officer Curry. | NAIC / KRS 304.12-230(3)–(4) require a thorough, objective investigation of all available comparative-fault facts before denying liability (DE 233-11 at 6–9; DE 233-10 at 241:12–246:20). |
| **Opinion 2:** 19-Month Claims-Department Valuation Abandonment After $150,000 Reserve | May 25, 2021 acute ORIF hip-fracture records (DE 233-9); June 30, 2021 $150,000 BI reserve (DE 233-2, NICO 003669); zero status letters and zero comparative-fault valuation logged through Jan. 2023. | Pending requests for follow-up records are "not a substitute for evaluating what is already in the file" when serious surgical injury and lane encroachment are documented (DE 233-11 at 3–4, 10–13, 16). |

| Surviving Core Opinion | Record Facts & Data (FRE 702(b)) | Auditing Principle & Application (FRE 702(c)–(d)) |
|---|---|---|
| **Opinion 3:** Multi-Year Delay in Retaining Reconstructionist & Investigator, and 14-Month Post-Crum $0 Posture | 26-month wait to confer with Crum (Jan. 12, 2023, DE 233-2, NICO 004913–15); Crum's Feb. 16, 2023 report that Howard "shouldn't have left the vehicle on the off ramp" (DE 233-7 at 5); 41-month wait to hire PI or contact Curry (Mar. 2024, DE 233-2, NICO 003664–65). | Prompt investigation requires timely retention of technical and investigative specialists when an insured driver is unreachable, and prompt re-evaluation once the insurer's own expert confirms fault (DE 233-11 at 8–12). |
| **Opinion 4:** Failure to Separate Non-Cooperation Track & Uncommunicated Demand | Policy underwriting contacts (DE 231-5, NICO 003672–75); Oct. 2021 ROR letters; conceded failure to communicate Jan. 13, 2023 $846,676.07 demand to insureds (DE 233-7 at 10). | Industry standards require separating first-party coverage/cooperation issues from the duty to fairly evaluate third-party liability exposure and communicate major demands (DE 233-11 at 4, 13–14). |
| **Opinion 5:** Post-Committee Delay & Unexplained $100,000 Offer Against $234,249 / $250,000 Net Valuation | Feb. 22, 2024 Claims Committee net authority of $234,249 (DE 233-2, NICO 003664–65) and 250.0 EV sheet (DE 231-6, NICO 006516); April 20, 2024 first offer of $100,000 (<43% of net valuation). | NAIC / KRS 304.12-230(6) & (14) require prompt, good-faith settlement attempts aligned with documented net valuation and a reasonable explanation for offers far below net valuation (DE 233-11 at 13–15). |

### C. Mr. Fisher Properly Refused to Offer Ultimate Legal Conclusions or Speculate on Subjective Corporate Motive, and His Standard-of-Care Audit Directly Fits *Wittmer's* Second and Third Prongs.

NICO devotes the core of its Motion (DE 232 at 14–21) to arguing that Mr. Fisher's testimony must be excluded as "irrelevant" under *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993), and *United States Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. App. 2003), because he declined to testify at deposition that liability was legally "beyond dispute," refused to speculate

on NICO's subjective "evil motive," and described NICO's departures as falling "beneath the standard of care."

NICO confuses the substantive threshold for a jury verdict with the admissibility standard for an industry expert under Rules 702 and 704. Under Rule 702(a), an expert witness is not required, and in this District is not permitted, to prove the plaintiff's entire legal case or pronounce the ultimate legal conclusion that an insurer's conduct was "outrageous" or motivated by "evil motive." As this Court held in *Adkins v. Shelter Mutual Insurance Co.*, No. 5:12-cv-00173-KKC, 2015 WL 1393588, at *3–4 (E.D. Ky. Mar. 26, 2015) (Caldwell, J.), an insurance expert may testify regarding insurance industry custom, claims-handling standards, and whether an insurer's documented actions departed from those standards, while leaving ultimate statutory compliance, outrageousness, and subjective state-of-mind determinations to the jury under the Court's instructions. See also *Berry*, 25 F.3d at 1353–54; *Carneal v. Travelers Cas. Ins. of Am.*, No. 5:12-cv-00174-TBR, 2013 WL 5939879, at *3 (W.D. Ky. Nov. 5, 2013).

Moreover, Mr. Fisher's industry standard-of-care testimony directly "fits" the issues the jury must decide under *Wittmer* and *Farmland Mutual Insurance Co. v. Johnson*, 36 S.W.3d 368, 375–76 (Ky. 2000). To determine whether NICO lacked a "reasonable basis in fact" for its multi-year 0% denial (*Wittmer* Prong 2) and whether NICO's repeated investigative and valuation failures were so extreme as to reflect "reckless disregard" rather than mere inadvertence (*Wittmer* Prong 3), the jury must first understand what accepted P&C claims investigation and evaluation standards require in a commercial comparative fault loss and how severely NICO deviated from those norms. Had Mr. Fisher gone further and proclaimed NICO "guilty" of "outrageous conduct" or "evil motive," NICO would have moved to strike those exact labels under Rule 704 (just as Plaintiff has moved to exclude Christine Sullivan for pronouncing NICO "not guilty" and mind-reading what NICO adjusters "truly believed," DE 231 at 1–3). Mr.

Fisher's disciplined adherence to Rules 702 and 704 is a reason to admit his testimony, not exclude it.

**D. Mr. Fisher's Testimony Will Directly Assist the Trier of Fact Under FRE 702(a).**

Finally, NICO's assertion (DE 232 at 2, 21–23) that a lay jury can interpret NICO's 6,365-page claim file without expert assistance is both legally incorrect and contradicted by NICO's own disclosure of claims-handling expert Christine Sullivan. The internal mechanics of a commercial lines insurance company, including how adjusters triage commercial lane-encroachment and FMCSR safety hazards, the operational distinction between claims-department comparative-fault valuation and litigation defense, the industry function of exposure reserves of $150,000 versus Claims Committee net settlement evaluations of $234,249 (or $250,000 on EV sheet NICO 006516), and standard investigative timelines for retaining reconstructionists and investigators when an insured driver goes missing, are specialized subjects well outside the everyday experience of an average juror. See *Phelps*, 736 F.3d at 701, 705–07; *Shepherd*, 381 F. Supp. 2d at 610–11. Mr. Fisher's testimony will directly assist the jury in understanding NICO's claim file and evaluating whether NICO's multi-year refusal to reasonably investigate and fairly evaluate Plaintiff's claim departed from accepted insurance industry standards.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court DENY Defendant NICO's Motion to Exclude and/or Limit the Expert Testimony of Frederick J. Fisher (DE 232) in its entirety.

Respectfully submitted,

MORRIN LAW OFFICE

_/s/ *Robert A. Morrin*__________
Hon. Robert A. Morrin (KBA # 94368)
214 West Main Street
Richmond, KY 40475
Telephone: (859) 358-0300
rob@morrinlawoffice.com
*Counsel for Plaintiff, Charles L. Walden*

* * * * * * * *

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including Hon. Mindy G. Barfield and Hon Kyle R. Bunnell, Dinsmore & Shohl LLP, Counsel for Defendant National Indemnity Company.

_/s/ *Robert A. Morrin*__________
Hon. Robert A. Morrin (KBA # 94368)
MORRIN LAW OFFICE
*Counsel for Plaintiff, Charles L. Walden*